# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
|  | ) | Case No. 08-13031 (MFW) |
| Eclipse Aviation Corporation, *et al.*, [1] | ) |  |
|  | ) | (Joint Administration Requested) |
| Debtors. | ) |  |
|  | ) | **Objection Deadline for Sale Procedures: TBD** |
|  | ) | **Sale Procedures Hearing Date: TBD** |
|  | ) | **Sale Objection Deadline: TBD** |
|  | ) | **Sale Hearing: TBD** |

**MOTION OF THE DEBTORS FOR ORDERS: (A)(I) APPROVING
SALE PROCEDURES FOR SALE OF SUBSTANTIALLY ALL OF THE DEBTORS'
ASSETS; (II) SCHEDULING A HEARING TO CONSIDER THE SALE AND
APPROVING FORM AND MANNER OF NOTICE THEREOF; (III) ESTABLISHING
PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CERTAIN
CONTRACTS, INCLUDING NOTICE OF PROPOSED CURE AMOUNTS; (IV)
AUTHORIZING PAYMENT OF A BREAK-UP FEE AND AN EXPENSE
REIMBURSEMENT; AND (V) GRANTING RELATED RELIEF; AND (B)(I)
AUTHORIZING THE SALE OF SUCH ASSETS FREE AND CLEAR OF LIENS,
CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS; (II) AUTHORIZING AND
APPROVING PURCHASE AGREEMENT THERETO; (III) APPROVING THE
ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND
UNEXPIRED LEASES RELATED THERETO; (IV) PROVIDING FOR PAYMENT OF
SALE PROCEEDS TO SECURED LENDER; AND (V) GRANTING RELATED RELIEF**

Eclipse Aviation Corporation ("Eclipse Aviation") and Eclipse IRB Sunport, LLC

("Eclipse Sunport" together with Eclipse Aviation, "Eclipse" or the "Debtors"), by and through

their undersigned counsel, hereby submit this motion (the "Motion"), pursuant to sections 105(a),

363, 365, 503 and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the

"Bankruptcy Code"), and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules") for entry of (A) an order, substantially in the form annexed

---

[1] The Debtors in these proceedings are: Eclipse Aviation Corporation (Tax ID No. XX-XXX9000) and Eclipse IRB Sunport LLC., a wholly owned subsidiary of Eclipse Aviation Corporation (Tax ID No. XX-XXX4013), each with a mailing address of 2503 Clark Carr Loop SE, Albuquerque, NM 87106.

hereto as Exhibit A (the "Sale Procedures Order"), (i) approving sale procedures (the "Sale Procedures"), substantially in the form annexed as Exhibit 1 to the Sale Procedures Order, with respect to the sale (the "Sale") of substantially all of the Debtors' assets associated with the operation of the Debtors' businesses (the "Assets"), as set forth in that certain asset purchase agreement (the "APA") by and between the Debtors and EclipseJet Aviation International, Inc. or its assignee(s) or designee(s) (the "Stalking Horse Bidder"); (ii) scheduling a hearing (the "Sale Hearing") on the Sale and setting objection and bidding deadlines with respect to the Sale; (iii) directing that notice of the Sale Procedures and the Sale be given, substantially in the form annexed as Exhibit 2 to the Sale Procedures Order (the "Auction and Sale Notice"); (iv) establishing procedures for the assumption and assignment of certain Designated Contracts[1], including notice of proposed cure amounts; (v) authorizing Debtors to pay to Stalking Horse Bidder a break-up fee and an expense reimbursement under certain terms and conditions set forth more particularly below; and (vi) granting related relief; and (B) an order or orders, substantially in the form annexed hereto as Exhibit B (the "Sale Order"),[2] (i) authorizing the Sale of the Assets of the Debtors free and clear of liens, claims encumbrances, and other interests pursuant to the APA, substantially in the form annexed to the Sale Order as Exhibit 1; (ii) authorizing and approving the APA; (iii) approving the assumption and assignment of executory contracts and unexpired leases, as necessary in connection with the Sale; (iv) providing for the payment of net proceeds from the sale of the Assets to the Noteholders (defined below) in their capacity as the secured lender; and (v) granting related relief. The facts and circumstances supporting this Motion are set forth in the concurrently filed Affidavit of J. Mark Borseth in Support of Chapter 11 Petitions and First Day

---

[1] All capitalized terms shall have the meaning ascribed to them in the APA unless otherwise defined herein.

[2] If the terms of any agreement respecting the Sale require modification of the proposed Sale Order, the Debtors will provide notice of the modified proposed Sale Order to the Court and interested parties in advance of the Sale Hearing.

Motions (the "Borseth Affidavit"). In further support of this Motion, the Debtors respectfully state as follows:

## JURISDICTION

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of these cases and this Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory and legal predicates for the relief requested herein are sections 105(a), 363, and 365 of title 11 of the United States Code (the "Bankruptcy Code"), and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## GENERAL BACKGROUND

2. On the date hereof (the "Petition Date"), the Debtors each commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code. The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of Title 11 of the United States Code (the "Bankruptcy Code").

3. This Court has jurisdiction over these chapter 11 cases pursuant to 28 U.S.C. §§ 157 and 1334 and venue is proper in the United States Bankruptcy Court for the District of Delaware pursuant to 28 U.S.C. §§ 1408 and 1409.

4. No request for appointment of a chapter 11 trustee or examiner has been made and, as of the date hereof, no official committee has been appointed.

### History and Operations

**A.    Background and Corporate Structure**

5. Founded in 1998, Eclipse Aviation, which currently employs approximately 945 people, has developed and manufactures twin turbofan jet aircraft, specifically known as the

Eclipse 500®. As set forth in greater detail below, the Eclipse 500 seats up to six people (including the pilot) and is designed to cruise at 425 mph, fly as high as 41,000 feet and with a range of approximately 1,495 nautical miles. The Eclipse 500 has the ability to take off and land on runways of less than 2,400 feet, which enables the Eclipse 500 to serve approximately 10,000 airports in the U.S. alone.

6.     Eclipse Aviation engineers, manufactures and sells the Eclipse 500 through its manufacturing and headquarters facilities in Albuquerque, New Mexico and provides full service maintenance and repair services through its three service centers located in Albuquerque, New Mexico, Albany, New York and Gainesville, Florida. Eclipse Aviation also operates a pilot training facility located in Albuquerque at which it trains pilots to operate the Eclipse 500.

7.     ETIRC Aviation, S.a.r.l. ("ETIRC") is the largest shareholder of Eclipse Aviation, and its chairman, Roel Pieper, is the Chairman of the Board and acting Chief Executive Officer of Eclipse Aviation. Representatives of ETIRC, including Mr. Pieper, constitute two of the five persons on the Board of Directors of Eclipse Aviation. In addition, ETIRC is the exclusive distributor of the Eclipse 500 aircraft in Europe, Russia and countries comprising the Commonwealth of Independent States, a regional organization whose participating countries are former Soviet Republics, and has the right to receive kitted components from Eclipse Aviation and assemble Eclipse 500s in a facility to service its distribution territory.

8.     Eclipse Aviation is the sole member of Eclipse Sunport, a Delaware limited liability company. Eclipse Sunport is a holding company whose sole asset is the ownership of City of Albuquerque, New Mexico Industrial Revenue Bonds (Eclipse Aviation Corporation Project), Series 2004, in the original amount not to exceed $45,000,000 and a single corporate bank account.

DB02:7587602.3                                                067809.1001

Eclipse Sunport has guaranteed the bulk of the senior secured notes of Eclipse Aviation with a balance in excess of $550 million, and has pledged its asset as security.

**B.**     **The Very Light Jet Market and the Eclipse 500**

9.     The Eclipse 500 received a Type Certificate on September 30, 2006 after meeting all Federal Aviation Administration (the "FAA") requirements for the approval of its design (*FAR Part 23, FAA Certified Aircraft*). Manufactured aircraft conforming to the FAA-approved type design and that are in a condition for safe operation are eligible to receive a Certificate of Airworthiness.

10.     On April 26, 2007, Eclipse Aviation received a production certificate from the FAA. A production certificate is an approval to manufacture aircraft with an FAA-approved type design and to obtain airworthiness certificates for the aircraft produced without a further showing. Eclipse Aviation's production certificate authorizes it to issue standard airworthiness certificates for its production aircraft, which is currently performed with FAA approval of each aircraft. Eclipse Aviation delivered the first Eclipse 500 production aircraft to its customer in January 2007.

11.     In the aircraft design and production industry, Eclipse Aviation is considered by many to have created the very light jet, or "VLJ", market, and Eclipse Aviation continues to be the leader in the segment as measured by aircraft deliveries and orders. The ability of the Eclipse 500 to access such a large number of airports, combined with the Eclipse 500's low acquisition price and lowest operating costs of any jet aircraft, can bring point-to-point affordable jet travel to secondary and tertiary markets that currently have declining or no commercial airline service and will also significantly expand the existing markets for personal jets.

DB02:7587602.3                                                                                         067809.1001

12. Specifically, the Eclipse 500 was designed to address the needs of, as well as expand, several existing and emerging domestic and international market segments, including, but not limited to, individual pilots, small companies new to aircraft ownership, existing corporate flight departments, traditional "for hire" charter operations, shared-owned and managed aircraft, air taxi for travel outside major commercial hubs and logistics for "same day" delivery of time-sensitive parcels. The Eclipse 500 was also designed to provide commercial airline-like reliability to support the high duty cycles expected in the air taxi and other "for hire" market segments.

13. As a testament to the innovation of the Eclipse 500, Eclipse Aviation received the 2005 Robert J. Collier trophy, one of the most prestigious awards in aerospace/aviation. This annual award given by the National Aeronautics Association is "for the greatest achievement in aeronautics or astronautics in America." The 95 year-old trophy was presented to Eclipse Aviation in May 2006 "for leadership, innovation and the advancement of general aviation" in the production of VLJs, and specifically, the Eclipse 500.

C. **Eclipse Aviation's Production Philosophy and Pricing Advantage**

14. To achieve its value proposition, Eclipse Aviation designed the Eclipse 500 aircraft for high-volume and low-cost production. Unlike traditional, low volume general aviation manufacturers, Eclipse Aviation has the vast majority of the aircraft structure machined from solid billets of aluminum with tight manufacturing tolerances. The result is an aircraft structure that can be easily assembled. Eclipse Aviation believes that this manufacturing strategy distinguishes it from other aircraft manufacturers and enables achievement of the Eclipse Aviation's low price and high-volume production goals. This strategy is based on lean manufacturing practices that enable optimization of the assembly line for volume production.

6

## A.    The Debtors' Pre-Petition Financing

15.    The Debtors' pre-petition debt structure consists of senior secured notes, certain unsecured loans, as well as certain miscellaneous secured loans and trade debt.[3]

## B.    Pre-Existing Indebtedness Paid By Old Notes Issuance

16.    In 2004, Eclipse Aviation issued secured notes payable, due June 30, 2006, in an aggregate principal amount of $42 million, bearing interest at 10% per annum. In accordance with the terms of the notes, Eclipse Aviation issued the note holders warrants to purchase 629,325 shares of Series A common stock at $75 per share. Approximately $10.8 million of the proceeds was received from two members of the board of directors who are also shareholders, and approximately $17.4 million was received from other Eclipse Aviation shareholders. The notes were paid in full on May 31, 2006, as set forth below.

17.    In August 2005, Eclipse Aviation issued secured notes payable, due June 30, 2006, in an aggregate principal amount of $17.3 million, bearing interest at 10% per annum. In accordance with the terms of the notes, Eclipse Aviation issued the note holders warrants to purchase 138,000 shares of Series A common stock at $95 per share. Approximately $6.5 million of the proceeds was received from a member of the board of directors who is also a shareholder, and approximately $3.3 million was received from other Eclipse Aviation shareholders. The notes were paid in full on May 31, 2006, as set forth below.

---

[3] In addition to the indebtedness set forth below, Eclipse Aviation, as borrower, is a party to that certain loan agreement with First Source Bank, dated as of July 2005 in the original principal amount of $226,000, bearing interest at a rate of 7.4% per annum (the "Aircraft Loan"). The Aircraft Loan requires monthly principal and interest payments of approximately $3,000 through June 2010 with a balloon payment of $104,000 due at maturity in July 2010. The Aircraft Loan is secured by an airplane that was purchased with the loan proceeds. Eclipse Aviation leases this aircraft for $1,500 per month to a non-profit organization dedicated to supporting and promoting general aviation for Eclipse Aviation employees and the community.

18.     In February 2006, Eclipse Aviation issued a secured note payable, due June 30, 2007, in an aggregate principal amount of approximately $5.8 million, bearing interest at 13% per annum.  In accordance with the terms of the note, Eclipse Aviation issued the note holder a warrant to purchase 34,000 shares of Series A common stock at $100 per share.  The note was paid in full on May 31, 2006, as set forth below.

19.     In March 2006, a $15 million secured promissory note was issued to a member of the board of directors who is also a shareholder, bearing interest at 15% per annum.  In conjunction with the note, Eclipse Aviation issued the note holder a warrant to purchase 17,500 shares of Series A common stock at $135 per share.  The note was paid in full on May 31, 2006, as set forth below.

C.     **Old Notes**

20.     On May 31, 2006, Eclipse Aviation issued $225 million in aggregate principal amount of senior secured convertible notes due 2010 (the "May 2006 Notes"), payable to several institutional investors, bearing interest payable quarterly at a base rate of 6% per annum if paid in cash, or 7% if added to the principal.  The May 2006 Notes were secured by substantially all of the assets of Eclipse Aviation and were guaranteed by Eclipse Sunport.  Outstanding amounts due under the May 2006 Notes could be converted into series A common stock at the holder's option at any time at a conversion price (subject to adjustment) of $154.90 (the "May 2006 Warrants").

21.     Approximately $110 million of the proceeds from the May 2006 Notes was used to repay existing note holders, as set forth above, approximately $29.3 million was used to redeem shares of Series G preferred stock outstanding and approximately $15 million was disbursed for fees and costs relating to the transaction.  Effective March 14, 2007, the May 2006

8

Notes were amended and restated to, among other things, increase the base rate of interest from 6% to 8%, and reduce the price to convert into the Eclipse Aviation's series A common stock from $154.90 to $134.25.

22. On March 15, 2007, Eclipse Aviation issued $50 million in aggregate principal amount of secured promissory notes, of which $25 million was received from a member of the board of directors who is also a shareholder, and the remaining $25 million was from other existing investors and shareholders. The notes bore interest at 8.5% per annum and the principal and interest were due in full on the earlier of September 15, 2007 or the date Eclipse Aviation received new financing of at least $50 million. In connection with the notes, Eclipse Aviation issued warrants to purchase 744,875 shares of Series I Preferred Stock for $134.25 per share to the note holders. The security interest associated with the notes is considered *pari-passu* with the March 2007 Notes.

23. In June and July of 2007, Eclipse Aviation issued approximately $272 million in aggregate principal amount of senior secured convertible notes due 2010 (the "June 2007 Notes", and together with the May 2006 Notes, the "Old Notes"), payable to new and current investors and shareholders, bearing interest payable quarterly at a base rate of 8% per annum if paid in cash, or 9% if added to principal. Of the $272 million of notes issued, approximately $46.6 million were exchanged by holders of the May 2006 Notes, and approximately $12.9 million were issued as payment related to debt issuance costs.

24. In addition, the holders of the May 2006 Notes modified their notes to have terms consistent with the June 2007 Notes. The June 2007 Notes were secured by substantially all of the assets of Eclipse Aviation. Eclipse Aviation also issued common stock warrants to the note

DB02:7587602.3 067809.1001

holders who provided new financing to Eclipse in June 2007 with an exercise price of $35.50 per share (the "June 2007 Warrants", and together with the May 2006 Warrants, the "Old Warrants").

On December 19, 2007, Eclipse Aviation entered into a restructuring agreement with holders of more than 90% in principal amount of the Old Notes (the "Consenting Old Noteholders") and Alfred E. Mann ("Mann"), a member of Eclipse Aviation's board of directors, in his capacity as a holder of Eclipse Aviation's preferred stock. Pursuant to the restructuring agreement, the Consenting Old Noteholders agreed to the amendment of the Old Notes to, among other things, authorize Eclipse Aviation to enter into a bridge loan facility with ETIRC, and to agree to tender their Old Notes and Old Warrants in connection with an exchange offer.

25.    On December 28, 2007, Eclipse Aviation entered into a bridge loan agreement and related documents with ETIRC (the "ETIRC Bridge Loan") pursuant to which Eclipse Aviation issued a secured promissory note for an aggregate principal amount of $70 million to ETIRC on a senior secured basis, ranking *pari passu* with the Old Notes. The ETIRC Bridge Loan bore interest at 9.0% per annum repayable, at Eclipse Aviation's option, in cash or shares of preferred stock representing 17.5% of Eclipse Aviation's common stock on a fully diluted basis.

26.    In connection with the notes, Eclipse issued warrants to purchase 197,183 shares of Series A Common Stock for $35.50 per share to ETIRC. In connection with the ETIRC Bridge Loan, Eclipse Aviation received, among other things, an option to acquire 5% of the shares of ETIRC. In accordance with the terms of the ETIRC Bridge Loan, the principal amount was repaid through the issuance of shares of preferred stock representing approximately 17.5% of Eclipse's common stock on a fully diluted basis. In addition, pursuant to the terms of the ETIRC Bridge Loan agreement, on February 15, 2008, ETIRC exercised its right to purchase for $70

10

million an additional amount of preferred stock representing 17.5% of Eclipse Aviation's common stock on a fully diluted basis.

**D.  New Notes**

27.     On January 16, 2008, Eclipse Aviation initiated an exchange offer (the "Exchange Offer") of the Old Notes for a new issuance of $551,449,643 of 8.00% Senior Secured Notes due 2012 (the "New Notes") and warrants exercisable to purchase common stock of Eclipse at an initial exercise price of $35.50 per share (the "New Warrants"). The New Notes bear interest at the rate of 8% per annum, or 9% if added to the principal, and are payable quarterly in arrears commencing June 30, 2008. The New Notes are guaranteed by Eclipse Sunport, and are secured by substantially all of the assets of the Debtors.

28.     In connection with the Exchange Offer, the Old Notes were modified such that (i) the security for the Old Notes were secured by only a small portion of the collateral formerly securing the Old Notes, including certain letter of credit rights and commercial tort claims, (ii) were not guaranteed by Eclipse Sunport, (iii) contain very few covenants or restrictions, and (iv) contain very limited default provisions. The Old Warrants were modified such that (i) the exercise price was increased to $10,000 per share, and (ii) certain anti-dilution provisions were removed, and (iii) the term expired one day after the closing of the exchange offer.

29.     Approximately 98% of the holders of Old Notes and Old Warrants exchanged such notes and warrants for New Notes and New Warrants. As of the Petition Date, approximately $568 million is owed under the New Notes, and $9 million is owed under the Old Notes. In addition to the foregoing, Eclipse Aviation has approximately $135 million in trade debt.

DB02:7587602.3                                                                                                                           067809.1001

## E.    Second Bridge Loans

30.    On July 18, 2008, the Debtors breached a covenant of the New Notes requiring a minimum cash and cash equivalent balance of $35 million (the "Cash Balance Covenant"), triggering an Event of Default thereunder.  Pursuant to the terms of the New Notes, the holders of more than 25% of the outstanding Notes (i) declared the entire principal amount of the New Notes to be immediately due and payable and (ii) froze Eclipse Aviation's bank account deposits pursuant to certain account control agreements dated June 21, 2007 and June 22, 2007.

31.    Eclipse Aviation entered into negotiations with certain Noteholders (the "Consenting Noteholders"), ETIRC and Mann, to remedy the default.  In connection therewith, on July 28, 2008, the Debtors along with the Consenting Noteholders, ETIRC and Mann entered into an agreement (the "July 2008 Restructuring Agreement"), pursuant to which Mann and ETIRC agreed to make unsecured loans to Eclipse Aviation in the principal amount of $25,000,000 (the "Bridge Loans").  At the same time, the previous Chief Executive Officer of Eclipse Aviation was replaced by Roel Pieper.

32.    The July 2008 Restructuring Agreement required Eclipse Aviation to commence an exchange offer (the "Second Exchange Offer") no later than September 23, 2008 for the outstanding shares of Eclipse Aviation's existing preferred stock.  At the completion of the Second Exchange Offer, the Bridge Loans were to be repaid through the issuance of additional preferred stock.  The Second Exchange Offer was commenced but, as of the Petition Date, not completed.  The Bridge Loans will become due and payable in full on January 31, 2009 and bear interest at eight percent (8%) per annum.

33.    Also, in connection with the July 2008 Restructuring Agreement, the New Notes were amended to, among other things, authorize the Bridge Loans and reduce the Cash

DB02:7587602.3                                                                                        067809.1001

Balance Covenant for the period between July 28, 2008 and November 18, 2008 from $35 million to $17.5 million.

34.     On November 1, 2008, the Debtors breached the reduced Cash Balance Covenant, and the holders of more than 25% of the outstanding New Notes (i) declared the entire principal amount of the Notes to be immediately due and payable and (ii) froze Eclipse Aviation's bank account deposits pursuant to certain account control agreements dated June 21, 2007 and June 22, 2007.

## Events Leading to Commencement of Chapter 11 Cases

35.     Eclipse broke new ground in the civil aviation industry in a number of areas, including offering the first very light jet (VLJ) and pioneering the use of new technologies such as friction stir welding and the PhostrEx® fire suppressant system. These achievements required a substantial outlay of capital, and various production delays were caused, in part, by the new technologies that Eclipse deployed. In addition, Eclipse from the beginning offered a unique low-price, high-volume business model patterned more on industries such as the computer industry than on traditional aviation businesses. Eclipse negotiated supplier contracts which provided for volume-based discounts. This business model required production of aircraft in unprecedented volumes to achieve the unit cost savings necessary to make the low pricing strategy successful.

36.     Although Eclipse achieved manufacturing volumes in excess of most other aircraft manufacturers, Eclipse was unable to meet its targeted throughput needed to support its business plan, and was unable to control its costs to contemplated levels. Inventory holdings increased based on unachieved production goals, while per aircraft costs increased based in part on lower production volumes. As a result, Eclipse continued to lose larger than expected sums of money on each aircraft manufactured, and has not reached a cash flow positive in its operations.

37. Eclipse went through several rounds of financing and price increases on the Eclipse 500 aircraft, all aimed at giving Eclipse additional opportunities to meet the necessary production, revenue and cost targets and achieve its financial plan. Despite these efforts, Eclipse was unable to meet its business plan and continued to lose money. At the beginning of August 2008, Eclipse received $50 million in bridge loan financing, but needed to raise significant additional financing within the following several months. Eclipse hired a major investment banking firm to identify and approach prospective investors about a substantial investment in Eclipse. To conserve its cash while creating as long a window of time as possible to procure financing, Eclipse in late August 2008 reduced its workforce substantially and severely curtailed planned aircraft production in the months of September 2008 through the end of the year. Due to a variety of factors, including the current global economic uncertainties, those efforts to raise capital outside of a bankruptcy proceeding proved unsuccessful, and Eclipse's cash balance has declined to levels that jeopardize the continued operation of the company.

38. Eclipse, in consultation with its financial advisors, other professionals, and other interested parties, considered a number of potential sales and restructuring alternatives in order to develop a plan that would maximize value for its creditors and to ensure the long-term survival of its business. After considering its options and, in light of the aforementioned financial difficulties, Eclipse determined that the only viable course of action to preserve the going concern value of the company would be through an orderly sale of substantially all of their assets under section 363 of the Bankruptcy Code, subject to higher and better bids pursuant to a Bankruptcy Court approved open auction process. In order to maximize the value that could be obtained from such a sale, Eclipse sought a "stalking horse" bidder, and began negotiations with its secured creditors and ETIRC to that end. After lengthy arms-length negotiations, Eclipse entered into an

14

agreement to sell substantially all of its assets to Stalking Horse Bidder, an acquisition vehicle formed by ETIRC, pursuant to an asset purchase agreement that would serve as the "stalking horse" bid in a sale under section 363.[4]

39.    Had the Debtors not commenced these cases, their ability to finance, sell or restructure their business, maximize value and preserve and enhance the Debtors' financial health would likely have been severely compromised. The commencement of these cases and implementation of an orderly sale process under the supervision of this Court, with Stalking Horse Bidder providing a floor against which interested parties may bid, will permit the Debtors to consummate a going-concern sale of all or substantially all of their assets and maximize value of their estates for all interested parties.

## RELIEF REQUESTED

40.    By this Motion, the Debtors seek first, the entry of the Sale Procedures Order (i) approving the Sale Procedures; (ii) scheduling the Sale Hearing and establishing related deadlines; (iii) approving the form and manner of notice of the Sale Procedures, the Auction and Sale Hearing; (iv) approving and establishing procedures related to the assumption and assignment of various executory contracts and unexpired leases related thereto; (v) authorizing the Debtors to pay to the Stalking Horse Bidder a break-up fee and an expense reimbursement under certain terms and conditions; and (vi) granting such other and further relief as is just and proper; and second, the entry of one or more Sale Orders (i) authorizing the sale of the Assets free and clear of liens, claims, encumbrances, and interests, pursuant to the APA; (ii) authorizing and approving the APA;

---

[4] As noted above, ETIRC is an affiliate of the Debtors as that term is defined in section 101(2) of the Bankruptcy Code. ETIRC is the largest shareholder of Eclipse Aviation, and its chairman, Roel Pieper, is the Chairman of the Board and acting Chief Executive Officer of Eclipse Aviation. Representatives of ETIRC, including Mr. Pieper, constitute two of the five persons on the Board of Directors of Eclipse Aviation. In connection with this Sale Motion, the Debtors have also sought Debtor-in-Possession financing from Mann, another member of the Board of Directors of Eclipse Aviation, and a significant shareholder of the Debtors.

(iii) approving the assumption and assignment of various executory contracts and unexpired leases related thereto; (iv) providing for the payment of net proceeds from the sale of the Assets to the holders of the New Notes (the "Noteholders") in their capacity as the secured lender; and (v) granting related relief.

## A.    The Proposed Sale

41.    The Debtors have been actively attempting to address their financial and operating issues for the past several months, and in connection therewith, retained the services of a major investment banking firm to identify and approach prospective investors about a substantial investment in Eclipse.  These efforts were unsuccessful.  In order to maximize the Debtors' assets for the benefit of their estates and creditors, the Debtors, in consultation with their professionals, have determined that it is in the best interests of the estates at this time to commence the formal solicitation of bids for the sale of the Assets as a going concern.  ETIRC, an affiliate of the Debtors, has stepped forward with an offer to purchase substantially all of the Debtors assets on the terms set forth below.  In their business judgment, Debtors believe that the offer represents the best offer available, preserves the going concern value of the Debtors' business, and is preferable to a liquidation of the Debtors' assets in a Chapter 7 proceeding.

42.    Nevertheless, the Debtors intend to aggressively solicit potential purchasers in accordance with the Sale Procedures set forth herein.  Although the Debtors will consider all Bids submitted in accordance with the Sale Procedures, they will favor bids that maximize the value of their estates.  Subject to the entry and terms and conditions of an order approving the Sale, the Debtors propose to sell, assign and transfer title to the Assets free and clear of Encumbrances, with such Encumbrances to attach to the net proceeds of the Sale, if any.

**B.** **The Asset Purchase Agreement**

43. The material terms of the APA are as follows:[5]

A. <u>Purchase and Sale of Assets</u>. Subject to the terms and conditions set forth in the APA, at the Closing (and on the applicable Assumption Date with respect to Purchased Assets consisting of rights under any Designated Contract assumed by a Seller and assigned to Buyer after the Closing Date as provided herein) Buyer shall purchase from Sellers, and Sellers shall sell, transfer, assign, convey and deliver or cause to be sold, transferred, assigned, conveyed and delivered to Buyer, all of the Purchased Assets, free and clear of all Liens and free and clear of all Liabilities (other than Assumed Liabilities).

B. <u>Purchased Assets</u>. The Purchased Assets consist of all of the properties and assets of Sellers (other than the Excluded Assets) of every kind and description, wherever located, real, personal or mixed, tangible or intangible, owned, leased, licensed, used or held for use in or relating to the Business, including, but not limited to, all right, title and interest of each Seller in, to or under: (i) all Accounts Receivable; (ii) the right to receive and retain payments in respect of any Accounts Receivable and the right to receive and retain Sellers' mail and other communications relating to the Business; (iii) all Equipment; (iv) all Assumed Contracts; (v) all the Assumed Leases; (vi) all Permits and pending applications therefor; (vii) all Seller Intellectual Property; (viii) all Products, including all products in development by Sellers; (ix) to the extent permitted by applicable law, all Documents except those (1) relating solely to any Excluded Asset or Excluded Liability; or (2) relating to employees of Sellers who are not Transferred Employees; (x) all telephone, telex and telephone facsimile numbers and other directory listings used in connection with the Business; (xi) all Purchased Deposits; (xii) inventories of raw materials, work-in-process, finished goods, spare parts, supplies, products under research and development, and other accessories related thereto which are held at, or are in transit from or to, the locations at which the Business is conducted, or located at customers' or suppliers' premises on consignment, in each case, which are used by any Seller in the conduct of the Business; (xiii) all rights to proceeds under insurance policies relating to claims for losses related to any Purchased Asset or Assumed Liability; (xiv) all Assumed Capitalized Leases; (xv) any rights, claims, refunds, causes of action, choses in action, rights of recovery and rights of setoff of Sellers against third parties arising out of events occurring prior to the Closing Date, including and, for the avoidance of doubt, arising out of events occurring prior to the Petition Date, and including any rights under or pursuant to any and all warranties, representations and guarantees made by suppliers, manufacturers and contractors relating to products sold, or services provided, to Sellers, excluding only the rights, claims, refunds, causes of action, choses in action, rights of recovery and rights of setoff that are identified as Excluded Assets as defined in Annex 1 to the APA; (xvi) all goodwill and other intangible assets associated with the Business or the Purchased Assets; (xvii) any proprietary or licensed

---

[5] The summary of the APA is provided for the Court's convenience only. To the extent that the summary differs in any way from the terms of the APA, the terms of the APA shall control. Capitalized terms used but not defined in this summary shall have the meanings given in the Agreement.

rights in Internet protocol addresses, ideas, concepts, methods, processes, formulae, models, methodologies, algorithms, reports, data, customer lists, mailing lists, business plans, market surveys, market research studies, websites, information contained on drawings and other documents, information relating to research, development or testing, and documentation and media constituting, describing or relating to the Seller Intellectual Property, including memoranda, manuals, technical specifications and other records wherever created throughout the world, but excluding reports of accountants, investment bankers, crisis managers, turnaround consultants and financial advisors or consultants; (xviii) Avoidance Actions; (xix) all advertising, marketing and promotional materials, studies, reports and all other printed or written materials relating to the Business; (xx) all rights of Sellers under non-disclosure or confidentiality, non-disparagement, non-compete, or non-solicitation agreements with former employees of Sellers, agents of Sellers or with third parties; (xxi) all cash (including checks received prior to the close of business on the Closing Date, whether or not deposited or cleared prior to the close of business on the Closing Date), commercial paper, certificates of deposit and other bank deposits, treasury bills and other cash equivalents; (xxii) all other or additional assets, properties, privileges, rights (including prepaid expenses) and interests of Sellers related to the Business of every kind and description and wherever located, whether known or unknown, fixed or unfixed, tangible or intangible, accrued, absolute, contingent or otherwise, and whether or no specifically referred to in the APA; (xxiii) the Insurance Policies; and (xxiv) all tax credits and similar Tax attributes relating to the Business or the Purchased Assets.

C.     Excluded Assets.  The Excluded Assets consist of: (i) all shares of capital stock or other equity interest of any Seller or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest of any Seller; (ii) all minute books, stock ledgers, corporate seals and stock certificates of Sellers; (iii) any Customer Contracts; (iv) any Contracts pertaining to the Jet Complete Program; (v) any Contracts with Employees or otherwise pertaining to employee matters; (vi) all Excluded Contracts; (vii) all Excluded Leases; (viii) any rights, claims or causes of action of Sellers against the Buyer under the APA or the Ancillary Documents, including all right, title and interest to the Cash Purchase Price; (ix) all receivables, claims or causes of action related solely to any Excluded Asset; (x) rights under director and officer liability policies, ERISA and trustee liability policies and employment practices liability policies, and all rights under insurance policies relating to claims for losses related solely to any Excluded Asset or Excluded Liability; (xi) all Benefit Plans; (xii) all Documents relating solely to an Excluded Asset or an Excluded Liability; and (xiii) all refunds, if any, of Taxes due to any Seller for any taxable period ending on or before the Closing Date.

D.     Purchase Price.  Subject to the terms and conditions set forth in the APA and in reliance upon the representations and warranties of the Parties set forth therein, at the Closing, the aggregate purchase price to be paid by Buyer to the Sellers in exchange for the Purchased Assets shall be an amount equal to (i) the Cash Consideration, consisting of $28,000,000, which amount shall be payable as set forth in Section 3.2 of the APA, plus (ii) the Note Consideration, consisting of $160,000,000 of senior secured notes in the Buyer, plus (iii) the Stock Consideration, consisting of !5% of the shares of Buyer Stock (subject to various conditions) plus (iv) the Buyer Funded Transaction Expenses, consisting

of $5,000,000 to be funded by buyer, and an additional $5,000,000 to funded 50% from Buyer, 50% from proceeds of the sale.

E. <u>Closing Date</u>. Subject to the terms and conditions set forth in the APA, the Closing shall occur, as promptly as practicable, and at no time later than the third Business Day, following the date on which the closing conditions set forth in Article VIII of the APA have been satisfied or waived, where applicable, or at such other date as Buyer and Sellers may mutually agree.

F. <u>Condition of Acquired Assets</u>. The Sellers shall maintain the Purchased Assets and operate and carry on the Business only in the Ordinary Course of Business, except as otherwise contemplated by the APA or with the consent of Buyer. Consistent with the foregoing and to the extent permitted or required by the Bankruptcy Cases, Sellers shall use commercially reasonable efforts to (i) continue operating the Business as a going concern in the Ordinary Course of Business, (ii) maintain the Purchased Assets and the assets and properties of, or used by, the Sellers relating to the Business in their current condition (ordinary wear and tear excepted), (iii) maintain the business organization of the Business intact, including its agents, employees, consultants and independent contractors, (iv) maintain the Documents of the Business, (v) comply with all Legal Requirements, and (vi) preserve the goodwill of the manufacturers, suppliers, contractors, licensors, employees, customers, distributors and others having business relations with the Business. In connection therewith, no Seller shall (1) offer employment for any period on or after the Closing Date to any employee or agent of the Business unless Buyer has determined not to make an offer of employment in accordance with the terms set forth herein to such employee or agent; or (2) otherwise attempt to persuade any such employee or agent to terminate his or her relationship with the Business.

G. <u>Expense Provisions</u>. Except as otherwise provided in the APA or in any Ancillary Document, including as provided in Section 9.2 of the APA, Buyer shall be entitled to an Expense Reimbursement of actual out-of-pocket costs and reasonable expenses, subject to a cap of $1,000,000.

H. <u>Break-Up Fee</u>. Upon the closing of an Alternative Transaction, (ii) Sellers shall pay Buyer an amount in cash equal to Four Million Dollars ($4,000,000) by wire transfer of immediately available funds to an account designated in writing by Buyer (the "Break-Up Fee").

I. <u>Conditions to Obligations</u>. The respective obligations of each Party to affect the sale and purchase of the Purchased Assets shall be subject to the fulfillment (or, if permitted by applicable law, waiver) on or prior to the Closing Date, of the conditions as set forth in Section 8.2 of the APA (Conditions to Obligations of Buyer) in the case of the Buyer and Section 8.3 of the APA (Conditions to Obligations of Sellers) in the case of the Sellers.

J. <u>Termination Procedures</u>. Any other provisions of the APA notwithstanding, the APA and the transactions contemplated thereby may be terminated in any of the following ways at any time prior to the Closing Date and in no other manner: (i)

by mutual written consent of Buyer and Eclipse; provided, that such written consent is approved in writing by the holders of a majority of the Senior Notes; (ii) by Buyer upon five (5) Business Days notice if, at or prior to the Closing Date, satisfaction of any condition set forth in Section 8.2 of the APA is or becomes impossible (other than through the breach by Buyer of any of its representations or warranties or the failure of Buyer to perform any of its obligations pursuant to the APA) and Buyer shall not have waived such condition in writing at or prior to the Closing Date; (iii) by Sellers upon five (5) Business Days notice if, at or prior to the Closing Date, satisfaction of any condition set forth in Section 8.3 of the APA is or becomes impossible (other than through the breach by Sellers of any of their representations or warranties or the failure of Sellers to perform any of their obligations pursuant to the APA) and Sellers shall not have waived such condition in writing at or prior to the Closing Date; (iv) by Buyer or Sellers, immediately upon the occurrence of any of the following events: (A) the Bankruptcy Court approves an Alternative Transaction, or an Alternative Transaction is consummated; (B) the dismissal or conversion of the Bankruptcy Cases to a cases under Chapter 7 of the Bankruptcy Code; or (C) the Sale Order is not entered on or before January 12, 2009; (v) By Buyer, if the Sellers have not obtained the written consent, in the form attached hereto as Exhibit D to the APA, of Ninety Percent (90%) in principal amount of the Senior Notes (excluding any Senior Notes held by Al Mann or any Affiliates of Al Mann) to the terms and conditions of the APA and the transactions contemplated hereby on or prior to the earlier of the hearing to consider the Bidding Procedures Order or the tenth (10th) Business Day following the commencement of the Bankruptcy Cases, provided Buyer is not in default of its obligations under the APA; (vi) By either party, provided the terminating party is not in default of its obligations under the APA, if the Closing shall not have occurred for any reason by February 28, 2009; (vii) By either party if a Governmental Authority issues a final and non-appealable Order prohibiting the transactions contemplated by the APA.

## C.    Proposed Sale Procedures[6]

44.    The Debtors desire to receive the greatest value for the Assets. Although the Debtors have undertaken certain efforts to market the assets, in order to reach a broader pool of potential purchasers and to seize on possible sale opportunities before any declination in value, the Debtors believe it is imperative that they promptly move forward with approval and implementation of the Sale Procedures. Accordingly, the Sale Procedures (as summarized below) were developed consistent with the Debtors' need to expedite the sale process, but with the objective of promoting active bidding that will result in the highest and best offer the marketplace

---

[6] As noted below, to facility the Sale Procedures, the Debtors respectfully request the Bid Deadline (as defined below) be no later than January 6, 2009 the Auction (as defined below) be scheduled for no later than January 7, 2009; and the Sale Hearing be scheduled, at the convenience of the Court, no later than January 8, 2009.

can sustain for the Assets. Moreover, the Sale Procedures reflect the Debtors' objective of conducting the Auction in a controlled, but fair and open, fashion that promotes interest in the Assets by financially capable, motivated bidders who are likely to close a transaction.

45.     The following paragraphs in this section summarize only the key provisions of the Sale Procedures, but are qualified in their entirety by reference to the actual Sale Procedures attached hereto as <u>Exhibit 1</u> to the Sale Procedures Order:

46.     Specifically, the Sale Procedures provide, in relevant part, as follows: [7]

A.     <u>Assets for Sale</u>. The Debtors are offering for sale in one or more transactions all or substantially all of the assets of Eclipse Aviation Corporation and its affiliated debtors and debtors in possession. The assets for sale do not include the Excluded Assets.

B.     <u>Participation Requirements</u>. In order to participate in the bidding process and to or otherwise be considered for any purpose hereunder, a person interested in all or portions of the Assets (a "Potential Bidder") must first deliver (unless previously delivered) to the Debtors and their counsel, not later than ten days following entry of the Sales Procedure Order: (i) An executed confidentiality agreement in form and substance acceptable to the Debtors and their counsel; and (2) Identify the Potential Bidder and any Principals, and the representatives thereof who are authorized to appear and act on their behalf for all purposes regarding the contemplated transaction.

C.     <u>Designation as Qualified Bidder</u>. A Qualified Bidder is a Potential Bidder (or combination of Potential Bidders whose bids for the assets of the Debtors do not overlap and who agree to have their bids combined for purposes of the determination of whether such Potential Bidders together constitute a Qualified Bidder, and who shall also be referred to herein as a single Qualified Bidder) that meets the Participation Requirements, and that the Debtors in their discretion and with assistance from their advisors determine is reasonably likely to submit a *bona fide* offer that would result in greater total consideration being received for the benefit of the Debtors' creditors than under the Agreement and to be able to consummate a sale if selected as a Successful Bidder (defined below). Upon the receipt from a Potential Bidder of the information required by the Participation Requirements, the Debtors, as soon as is practicable, shall determine and notify the Potential Bidder with respect to whether such Potential Bidder is a Qualified Bidder.

D.     <u>Access to Due Diligence Materials</u>. Only Potential Bidders that comply with the Participation Requirements are eligible to receive due diligence access or

---

[7]     Capitalized terms used but not defined in this paragraph have the meanings ascribed to them in Sale Procedures annexed hereto as <u>Exhibit 1</u> to the Sale Procedures Order.

additional non-public information. If the Debtors determine that a Potential Bidder that has satisfied the Participation Requirements does not constitute a Qualified Bidder, then such Potential Bidder's right to receive due diligence access or additional non-public information shall terminate. The Debtors will designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from such Qualified Bidders. The Debtors shall not be obligated to furnish any due diligence information after the Bid Deadline. The Debtors are not responsible for, and will bear no liability with respect to, any information obtained by Qualified Bidders in connection with the sale of the Assets. If the Debtors furnish any information related to the Debtors not theretofore given to Buyer, then the Debtors shall make such information available to Buyer and each Qualified Bidder.

E.     Due Diligence from Bidders.  Each Bidder shall comply with all reasonable requests for additional information and due diligence access by the Debtors or their advisors regarding such Bidder and its contemplated transaction. Failure by a Potential Bidder to comply with requests for additional information and due diligence access will be a basis for the Debtors to determine that the Potential Bidder is not a Qualified Bidder. Failure by a Qualified Bidder to comply with requests for additional information and due diligence access will be a basis for the Debtors to determine that a bid made by a Qualified Bidder is not a Qualified Bid.

F.     Bid Process.  The Debtors and their advisors, in consultation with the Ad Hoc Committee of Senior Secured Noteholders, shall: (i) determine whether a Potential Bidder is a Qualified Bidder; (ii) coordinate the efforts of Bidders in conducting their due diligence investigations, as permitted by the provisions, above; (iii) receive offers from Qualified Bidders; and (iv) negotiate any offers made to purchase the Assets. Subject to the prior consent of Buyer, the Debtors shall have the right to adopt such other rules for the Bidding Process (including rules that may depart from those set forth herein) that will better promote the goals of the Bidding Process and that are not inconsistent with any of the other provisions hereof or of any Bankruptcy Court order. Prior to the Bid Deadline, a Qualified Bidder that desires to make a Bid shall deliver written copies of its bid to the Notice Parties, by the Bid Deadline.

G.     Bid Deadline. The deadline for submitting bids by a Qualified Bidder shall be January 6, 2009, at 12:00 p.m. (Eastern Time). A Qualified Bidder that desires to make a Bid shall deliver written copies of its bid to the Notice Parties not later than 12:00 p.m. (prevailing eastern time) on January 6, 2009 and shall comply with the requirements set forth in the Bid Procedures for making such bid. A Bid received after the Bid Deadline shall not constitute a Qualified Bid.

H.     Bid Requirements.  To be eligible to participate in the Auction, each Bid and each Qualified Bidder submitting such a Bid must be determined by the Debtors to satisfy each of the following conditions: (i) Each Bid must be accompanied by a Good Faith Deposit in the form of cash or a certified check payable to the order of the Debtors in an amount of not less than $5.0 million; (ii) The aggregate consideration must equal or exceed the value of the Purchase Price plus (A) $5.0 million and (B) an amount necessary to repay the Debtors' postpetition debtor-in-possession financing in full; (iii) A bid must be

irrevocable until two (2) business days after the Assets have been sold pursuant to the Closing of the sale or sales approved by the Bankruptcy Court; (iv) A Bid must include executed transaction documents pursuant to which the Qualified Bidder proposes to effectuate the contemplated transaction. A Bid shall include a copy of the Agreement marked to show all changes requested by the Bidder (including those related to Purchase Price). The Bid must include a written commitment satisfactory to the Debtors and the Ad Hoc Committee of Senior Secured Noteholders of its financial ability and intention to complete the transaction and contain a representation that the Qualified Bidder shall make all necessary regulatory filings, if any, and pay all costs and expenses of such filings (including the Debtors' costs and expenses). Any variations from one or more material terms must, in the aggregate constitute an improvement, as determined by the Debtors in consultation with the Ad Hoc Committee of Senior Secured Noteholders, upon such term or terms as set forth in the Agreement); (v) A Bid may not be conditioned on obtaining financing or any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy in all material respects at the closing of specified representations and warranties or the satisfaction in all material respects at the closing of specified conditions, none of which shall be more burdensome than those set forth in the Agreement; (vi) A Bid must include written evidence of the Qualified Bidder's chief executive officer or other appropriate senior executive's approval of the contemplated transaction; provided, however, that if the Qualified Bidder is an entity specially formed for the purpose of effectuating the contemplated transaction, then the Qualified Bidder must furnish written evidence reasonably acceptable to the Debtors of the approval of the contemplated transaction by the equity holder(s) of such Potential Bidder; (vii) A Bid must contain written evidence satisfactory to the Debtors, in consultation with the Ad Hoc Committee of Senior Secured Noteholders, that demonstrates the Qualified Bidder has the necessary financial ability to close the contemplated transaction and provide adequate assurance of future performance under all contracts to be assumed in such contemplated transaction. Such information should include, *inter alia*, the following: (1) the Qualified Bidder's current financial statements (audited if they exist); (2) contact names and numbers for verification of financing sources, (3) evidence of the Qualified Bidder's internal resources and proof of any debt or equity funding commitments that are needed to close the contemplated transaction; and (4) any such other form of financial disclosure or credit quality support information or enhancement reasonably acceptable to the Debtors in consultation with the Ad Hoc Committee of Senior Secured Noteholders demonstrating that such Qualified Bidder has the ability to close the contemplated transaction; provided, however, that the Debtors shall determine, in their reasonable discretion, in consultation with the Ad Hoc Committee of Senior Secured Noteholders and the Debtors' advisors, whether the written evidence of such financial wherewithal is reasonably acceptable, and shall not unreasonably withhold acceptance of a Qualified Bidder's financial qualifications; (viii) A Bid may not request or entitle the Qualified Bidder to any breakup fee, termination fee, expense reimbursement or similar type of payment. Moreover, by submitting a Bid a Bidder shall be deemed to waive the right to pursue a substantial contribution claim under Bankruptcy Code § 503 related in any way to the submission of its Bid or the Bid Procedures. A Bid received from a Qualified Bidder before the Bid Deadline that meets the above requirements, and that satisfies the Bid Deadline requirement above, shall constitute a "Qualified Bid," if the Debtors believe, in their reasonable discretion and after

consultation with the Ad Hoc Committee of Senior Secured Noteholders, that such bid would be consummated if selected as the Successful Bid. For purposes hereof, the Agreement shall constitute a Qualified Bid. In the event that any Bid is determined by the Debtors not to be a Qualified Bid, the Qualified Bidder shall be refunded its deposit and all accumulated interest thereon within three (3) business days after that determination.

I.  Auction. Only if a Qualified Bid (other than Buyer's) is received by the Bid Deadline, shall the Debtors conduct an auction to determine the highest and best bid with respect to the Assets. The Debtors shall provide Buyer and all Qualified Bidders with copies of all Qualified Bids at least twenty-four (24) hours prior to the Auction. The Auction shall commence on January 7, 2009 at 10:00 a.m.

No later than 4:00 p.m. on January 6, 2009, the Debtors will notify all Qualified Bidders of (i) the highest and best Qualified Bid, as determined in the Debtors' discretion after consultation with the Ad Hoc Committee of Senior Secured Noteholders and (ii) the time and place of the Auction, and provide copies of all submitted bids to all Qualified Bidders (if Buyer's Qualified Bid constitutes the Baseline Bid then the Breakup Fee and Expense Reimbursement, calculated for this purpose in accordance with the Agreement, shall be added to such Qualified Bid for purposes of the Auction). If, however, no other such Qualified Bid is received by the Bid Deadline, then the Auction will not be held, Buyer will be the Successful Bidder, the Agreement will be the Successful Bid, and, at the January 8, 2009 Sale Hearing (subject to Court approval at such date), the Debtors will seek approval of and authority to consummate the Proposed Sale contemplated by the Agreement.

The Auction shall be conducted according to the following procedures: (i) Only a Qualified Bidder that has submitted a Qualified Bid is eligible to participate at the Auction. Only the authorized representative of each of the Qualified Bidders, the Debtors and the Ad Hoc Committee of Senior Secured Noteholders shall be permitted to attend. During the Auction, bidding shall begin initially with the highest Baseline Bid and subsequently continue in minimum increments of at least $1,000,000. Other than otherwise set forth herein, the Debtors may conduct the Auction in the manner they determine will result in the highest and best offer for the Assets; (ii) The Debtors and their professionals shall direct and preside over the Auction. At the start of the Auction the Debtors shall describe the terms of the Baseline Bid. The determination of which Qualified Bid constitutes the Baseline Bid shall take into account any factors the Debtors, in consultation with the Ad Hoc Committee of Senior Secured Noteholders, reasonably deem relevant to the value of the Qualified Bid to the estate, including, *inter alia,* the Bid Assessment Criteria. All Bids made thereafter shall be Overbids, and shall be made and received on an open basis, and all material terms of each Bid shall be fully disclosed to all other Qualified Bidders. The Debtors shall maintain a transcript of all Bids made and announced at the Auction, including the Baseline Bid, all Overbids and the Successful Bid; (iii) An "Overbid" is any bid made at the Auction subsequent to the Debtors' announcement of the Baseline Bid. To submit an Overbid for purposes of the Auction, a Qualified Bidder must comply with the following conditions: (1) Any Overbid after the Baseline Bid shall be made in increments of at least $1,000,000, (2) Except as modified herein, an Overbid must

24

comply with the conditions for a Qualified Bid set forth above, provided, however, that the Bid Deadline shall not apply. Any Overbid made by a Qualified Bidder must remain open and binding on the Qualified Bidder until and unless (x) the Debtors accept a higher Qualified Bid as an Overbid and (y) such Overbid is not selected as the Back-up Bid. To the extent not previously provided (which shall be determined by the Debtors), a Qualified Bidder submitting an Overbid must submit, as part of its Overbid, written evidence (in the form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors and the Ad Hoc Committee of Senior Secured Noteholders) demonstrating such Qualified Bidder's ability to close the transaction proposed by such Overbid; (3) The Debtors shall announce at the Auction the material terms of each Overbid, the basis for calculating the total consideration offered in each such Overbid, and the resulting benefit to the Debtor's estate based on, *inter alia,* the Bid Assessment Criteria; (iv) The Debtors, in their reasonable discretion, may adopt rules for the Auction at or prior to the Auction that, in their reasonable discretion, will better promote the goals of the Auction and that are not inconsistent with any of the provisions of the Bidding Procedures Order. All such rules will provide that all bids shall be made and received in one room, on an open basis, and all other Qualified Bidders shall be entitled to be present for all bidding with the understanding that the true identity of each Qualified Bidder (i.e., the principals submitting the Bid) shall be fully disclosed to all other Qualified Bidders and that all material terms of each Qualified Bid will be fully disclosed to all other Qualified Bidders throughout the entire Auction; (v) All Qualified Bidders at the Auction shall be deemed to have consented to the core jurisdiction of the Bankruptcy Court and waived any right to a jury trial in connection with any disputes relating to the Auction, and the construction and enforcement of the Bidder's Contemplated Transaction Documents, as applicable; (vi) Upon conclusion of the bidding, the Auction shall be closed, and the Debtors, in consultation with the Ad Hoc Committee of Senior Secured Noteholders, shall (i) immediately review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the Proposed Sale, and (ii) immediately identify the highest and best offer for the Assets and Successful Bidder, which highest and best offer will provide the greatest amount of net value to the Debtors, and the next highest or otherwise best offer after the Successful Bid, and advise the Qualified Bidder of such determination. If Buyer's final bid is deemed to be highest and best at the conclusion of the Auction, Buyer will be the Successful Bidder, and such bid, the Successful Bid.

J. <u>Acceptance of Successful Bid</u>. The Debtors shall sell the Assets to the Successful Bidder upon the approval of the Successful Bid by the Bankruptcy Court after the Sale Hearing. The Debtors' presentation of a particular Qualified Bid to the Bankruptcy Court for approval does not constitute the Debtors' acceptance of the bid. The Debtors will be deemed to have accepted a Bid only when the Bid has been approved by the Bankruptcy Court at the Sale Hearing. All interested parties reserve their right to object to the Debtors' selection of the Successful Bidder (including the assignment of any of such objector's Assumed Executory Contract thereto, provided, however, that any objection to such assignment on the basis of the Cure Amount must be made and/or reserved as set forth in the order approving these Bid Procedures).

DB02:7587602.3                                        067809.1001

K.    "As Is, Where Is".  The sale of the Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtors, their agents or their estates except to the extent set forth in the Agreement or the purchase agreement of another Successful Bidder. Buyer and each Qualified Bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all due diligence regarding the Assets prior to making its offer, that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its bid, and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in these Bid Procedures or, (A) as to Buyer, the terms of the sale of the Acquired Assets shall be set forth in the Agreement, or (B) as to another Successful Bidder, the terms of the sale of the Assets shall be set forth in the applicable purchase agreement.

L.    Free Of Any And All Interests.  Except as otherwise provided in the Agreement or another Successful Bidder's purchase agreement, all of Debtors' right, title and interest in and to the Assets subject thereto shall be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options and interests thereon and there against (collectively, the "Interests") in accordance with Bankruptcy Code § 363, with such Interests to attach to the net proceeds of the sale of the Assets.

M.    Sale Hearing.  The Sale Hearing shall be conducted by the Bankruptcy Court on a day that is one (1) business day following the Auction Date or on such date as may be established by the Bankruptcy Court. Following the approval of the sale of the Assets to the Successful Bidder at the Sale Hearing, if such Successful Bidder fails to consummate an approved sale within twenty (20) days after entry of an Order approving the Sale, the Debtors, unless such Order approving the Sale is otherwise stayed by order of a court with competent jurisdiction, shall be authorized, but not required, to deem the Back-up Bid, as disclosed at the Sale Hearing, the Successful Bid, and the Debtors shall be authorized, but not required, to consummate the sale with the Qualified Bidder submitting such Bid without further order of the Bankruptcy Court.

N.    Return of Good Faith Deposit.  Good Faith Deposits of the Successful Bidder shall be applied to the purchase price of such transaction at Closing. Good Faith Deposits of all other Qualified Bidders shall be held in an interest-bearing escrow account until five (5) days after Closing of the transactions contemplated by the Successful Bid, and thereafter returned to the respective bidders. If a Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Debtors shall be entitled to retain the Good Faith Deposit as part of its damages resulting from the breach or failure to perform by the Successful Bidder. Buyer shall not be required to provide a deposit.

O.    Modifications.  The Bid Procedures may not be modified except with the express written consent of the Debtors, Buyer and the Ad Hoc Committee of Senior Secured Noteholders. The Debtors, after consultation with the Ad Hoc Committee of Senior Secured Noteholders, may (a) determine, which Qualified Bid, if any, is the highest and

best offer; and (b) reject at any time before entry of an order of the Bankruptcy Court approving a Qualified Bid, any Bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bid Procedures, or the terms and conditions of sale, or (iii) contrary to the best interests of the Debtors, their estates and creditors.

In all cases where the Bid Procedures require the Debtors to consult with the Ad Hoc Committee of Senior Secured Noteholders, the Debtors' fiduciary duties shall not be limited by such consultation requirement.

47. The Debtors submit that implementation of the Sale Procedures will facilitate the bidding for the Assets. The Debtors do not believe that at this juncture, given their available liquidity and the need to sell the Assets on an expedited basis, approval of the Sale Procedures will chill any bidding. Quite to the contrary, approval of the Sale Procedures is in the best interests of the Debtors, their estates and their creditors in that it provides a structure and format for all potentially interested parties to equally formulate a bid for the Assets and participate in the process.

## D.  Expense Reimbursement and Break-Up Fee

48. As stated above, the Debtors also seek this court's approval of the Expense Reimbursement and Break-Up Fee as set forth in Section 9.2 of the APA. The Debtors seek authorization to reimburse the Stalking Horse Bidder (i) its actual out-of-pocket costs and expenses reasonably incurred by the Stalking Horse Bidder, up to a cap of $1,000,000, in connection with the Sale if the Sale does not close for reasons outside the control of the Stalking Horse Bidder, including the consummation of a bid with an alternative bidder, and (ii) a Break-Up Fee in the amount of $4,000,000 upon the closing of an Alternative Transaction. in connection with the Sale if the Sale does not close for reasons outside the control of the Stalking Horse Bidder, including the consummation of a bid with an alternative bidder. The Sellers' obligation to pay the Break-Up Fee shall constitute and be treated as a superpriority administrative expense of Sellers under Sections 503(b) and 507(a)(1) of the Bankruptcy Code and shall be payable in cash when

27

due. Payment of the Expense Reimbursement or the Break-Up Fee shall be made concurrently with the consummation of the applicable Alternative Transaction.

**E.    Notice of Auction and Sale Hearing**

49.    Subject to the Court's availability, the Debtors seek to have the Sale Hearing scheduled for a date on or prior to January 8, 2009, with an objection deadline seven (7) business days prior to the Sale Hearing. Additional objections related solely to the identity of a Successful Bidder will be permitted following identification of such party.

50.    On or before three (3) business days after the entry of the Sale Procedures Order, the Debtors will serve copies of the Auction and Sale Notice, the APA, and the Sale Procedures Order by mail, postage prepaid to: (i) the Office of the United States Trustee; (ii) counsel for the Noteholders; (iii) counsel for the Committee, if and when appointed; (iv) all entities known to have expressed a bona fide interest, within the last six months, in acquiring the Assets; (vi) all entities (or counsel therefor) known to have asserted any lien, claim, encumbrance, right of refusal, or other interest in or upon the Assets; (vii) federal, state, and local regulatory or taxing authorities or recording offices or any other governmental authorities that, as a result of the Sale of the Assets, may have claims, contingent or otherwise, in connection with the Debtors' ownership of the Assets or have any reasonably known interest in the relief requested by the Motion; (viii) all counterparties to and parties, if any, who are known to claim interests in any Executory Contracts and Leases (defined below); (ix) the United States Attorney's office; (x) the Internal Revenue Service; (xi) counsel to Mann; and (xi) all parties who have requested notice pursuant to Bankruptcy Rule 2002 as of the date of the entry of the Sale Procedures Order. In addition to the foregoing, on or before three (3) business days after entry of the Sale Procedures Order, the

Debtors will serve the Notice of Auction and Sale Hearing, by mail, postage prepaid to all known creditors of the Debtors.

## AUTHORITY FOR REQUESTED RELIEF

### A.    The Proposed Sale Procedures are Appropriate

51.    Section 105(a) of the Bankruptcy Code provides that the Court "may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). As described above, approval of the Sale Procedures will greatly assist the Debtors in maximizing the value that they may obtain for the Assets. Consequently, the Debtors respectfully submit that granting the requested relief is "appropriate" under the circumstance.

52.    Once the Debtors articulate a valid business justification, "[t]he business judgment rule is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." In re S.N.A. Nut Company, 186 B.R. 98 (Bankr. N.D. Ill. 1995) (internal quotation, citation omitted); In re Integrated Resources, Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992); In re Johns-Manville Corp., 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions.").

53.    Indeed, when applying the "business judgment" rule, courts show great deference to the debtor's decision-making. See Summit Land Co. v. Allen, 13 B.R. 310, 315 (Bankr. D. Utah 1981). Thus, this Court should grant the relief requested in this motion if the Debtors demonstrate a sound business justification therefore. See Schipper, 933 F.2d at 515; In re Lionel Com., 722 F.2d at 1071; In re Delaware Hudson Ry. Co., 124 B.R. 169 at 179.

54.    The Sale Procedures are designed to encourage competitive bidding in an orderly manner to maximize value for the Debtors' estates for their creditors, customers and

29

employees.  The proposed procedures contain terms typical for a process through which a Sale of this nature is consummated, and the adoption of the Sale Procedures represents a sound exercise of the Debtors' business judgment.

55.     The Debtors have sound business justification for seeking approval of the Sale Procedures at this juncture.  The Debtors belief it is in the best interests of their estates, creditors, customers and employees to commence an auction process immediately, as the Debtors have limited funding and resources, to try to maximize the value of their assets and maintain a core workforce.  While the Debtors have undertaken certain efforts to reduce expenses and are in the process of stabilizing their business, it is questionable whether they will be able to continue operating beyond the period of this proposed bidding process without additional funding, which may not be forthcoming.  In addition, the Sale of the Assets provides a realistic means for the continuation of services for the Debtors' customers with minimal interruption and inconvenience. Absent a Sale, the Debtors may be forced to cease operations and wind down their affairs.  For these reasons, the Debtors have determined, based on their business judgment, that the best option for maximizing the value of their estates for the benefit of their creditors, customers, employees and other parties in interest is through a sale of the Assets pursuant to the Sale Procedures.

56.     In addition, the Debtors' request for approval of the Expense Reimbursement Fee and bidding incentives should be approved as an appropriate exercise of the Debtors' business judgment, and because they provide a benefit to the bankruptcy estates by encouraging competitive bidding and incentivizing the Stalking Horse Bidder to serve as a stalking horse bidder in these cases.  For example, in Calpine Corp. v. O'Brien Environmental Energy, Inc. (In re O'Brien Environmental Energy, Inc.), 181 F.3d 527 (3d Cir. 1999), the Third Circuit held that even though bidding incentives are measured against a business judgment standard in non-bankruptcy

transactions, the administrative expense provisions of section 503(b) of the Bankruptcy Code govern in the bankruptcy context. Accordingly, to be approved, bidding incentives must provide some benefit to the debtor's estate. Id. at 533.

57. The Third Circuit identified at least two instances in which bidding incentives may benefit the estate. First, benefit may be found if the bidding procedures "promote[] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." Id. at 537. Second, where the availability of bidding incentives induce a bidder to research the value of the debtor and submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." Id.

58. Whether evaluated under Section 105(a) of the Bankruptcy code, the business judgment rule, or the Third Circuit "administrative expense" standard, approval of the Sale Procedures, including the Expense Reimbursement and other bidder protections described above are appropriate and necessary to maximizing the value Debtors may obtain for all or portions of their Assets.

59. The Sale Procedures are designed to encourage competitive bidding. The Debtors and the Stalking Horse Bidder are only seeking reimbursement for actual expenses incurred by the Stalking Horse Bidder in connection with the Sale, and only if the Stalking Horse Bidder is not the Successful Bidder. The Expense Reimbursement is intended to cover the Stalking Horse Bidder's costs in conducting due diligence of the Debtors and the costs of negotiating and documenting the Stalking Horse Bids, including the negotiation and documentation of the APA. The bid will serve as a floor for other bids and will induce other bids that otherwise would not have

31

been made or otherwise would have been limited. Thus, the Expense Reimbursement (to some extent if not in total) will be covered by the proceeds that will be realized from the alternative transaction with the higher and better bidder. This is obviously a benefit to the estate.

60. The minimum overbid requirements described in the Sale Procedures are appropriate under the circumstances as well. They are rather modest minimum overbid requirements given the size of this transaction, and the Debtors believe that it is unlikely that they will deter a serious competing bidder. Consequently, the Debtors believe that the overbid requirement adequately protects this added value.

61. Moreover, absent authorization of the Expense Reimbursement and the minimum overbid requirements, the Debtors may lose the opportunity to obtain the highest and best offer for the Assets. If the protections are not approved, the Stalking Horse Bidder may not go forward with the Sale.

62. Finally, the Expense Reimbursement and minimum overbid requirements were negotiated in good faith and were the product of arm's-length negotiations.

63. Accordingly, the Debtors request that the Court authorize the Sale Procedures, the payment of Expense Reimbursement and the other bidder protections.

**B.     The Sale is Within the Sound Business
        Judgment of the Debtors and Should be Approved**

64. Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets prior to confirmation of a plan. However, courts in this Circuit and others have required that the decision to sell assets outside the ordinary course of

business be based upon the sound business judgment of the debtors. See In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986); see also Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983); Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp., (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del. 1999); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D.D.C. 1991).

65.     The "sound business judgment" test requires a debtor to establish four elements in order to justify the sale or lease of property outside the ordinary course of business, namely, (a) that a "sound business purpose" justifies the sale of assets outside the ordinary course of business, (b) that adequate and reasonable notice has been provided to interested persons, (c) that the debtors have obtained a fair and reasonable price, and (d) good faith.  Abbotts Dairies, 788 F.2d 143; Titusville Country Club v. Pennbank (In re Titusville Country Club), 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); In re Sovereign Estates, Ltd., 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989). In this case, the Debtors submit that the decision to proceed with the Sale of the Assets and the Sale Procedures related thereto are based upon their sound business judgment and should be approved.  A debtor's showing of a sound business purpose need not be unduly exhaustive but, rather, a debtor is "simply required to justify the proposed disposition with sound business reasons."  In re Baldwin United Corp., 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984).  Whether or not there are sufficient business reasons to justify a transaction depends upon the facts and circumstances of each case.  Lionel, 722 F.2d at 1071; Montgomery Ward, 242 B.R. at 155 (approving funding of employee incentive and severance program; business purpose requirement fulfilled because stabilizing turnover rate and increasing morale were necessary to successful reorganization).

33

66.     Additionally, section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under the Bankruptcy Code. Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is proper. In re Fesco Plastics Corp., 996 F.2d 152, 154 (7th Cir. 1993); Pincus v. Graduate Loan Ctr. (In re Pincus), 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002). Pursuant to section 105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtor's assets. See, e.g., Chinichian v. Campolongo (In re Chinichian), 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); In re Cooper Props. Liquidating Trust, Inc., 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws.").

67.     The Debtors submit that more than ample business justification exists to sell the Assets to the Successful Bidder (or Next Highest Bidder) pursuant to the Sale Procedures and on substantially the terms set forth in the APA. The Debtors believe that it is essential to sell the Assets promptly. Simply put, given the circumstances facing the Debtors as a result of their liquidity position, it is necessary to promptly sell the Assets to avoid a deterioration in the value of the Assets. The Debtors believe that the Sale Procedures and the Auction will generate interest and bidding, and that the bidding process will yield the highest and best bids for the Assets.

34

Accordingly, the Debtors believe that the relief sought by this Motion is not only reasonable, but necessary, to maximize the value of the Debtors' estates for the benefit of their stakeholders.

68.     The notice described herein and the Sale Procedures are designed to provide adequate notice to all potentially interested parties, including those who have previously expressed an interest in purchasing the Assets. Accordingly, the proposed Sale satisfies the second prong of the Abbotts Dairies standard.

69.     Moreover, the Sale Procedures are designed to maximize the value received for the Assets. The process proposed by the Debtors allows for a timely auction process, given the circumstances currently facing the Debtors, while providing bidders and consultants with ample time and information to submit a timely bid. The Sale Procedures are designed to ensure that the Assets will be sold for the highest or otherwise best possible purchase price under the circumstances. The Debtors are subjecting the value of the Assets to market testing and permitting prospective purchasers to bid on the Assets. The proposed Sale will be further subject to a market check through the solicitation of competing bids in a court-supervised Auction process as set forth in the Sale Procedures. Additionally, the Debtors have retained Greenhill to assist in the marketing and sale of the Assets. Accordingly, the Debtors and all parties in interest can be assured that the consideration received for the Assets will be fair and reasonable, and the third prong of the Abbotts Dairies standard is satisfied. As discussed below, the "good faith" prong of the Abbotts Dairies standard is also satisfied here.

**C.      The Sale is Proposed in "Good Faith"**
**Under Section 363(m) of the Bankruptcy Code**

70.     The Debtors request that the Court find that the Successful Bidder (or Next Highest Bidder) is entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the Sale.

71.    Section 363(m) of the Bankruptcy Code provides, in pertinent part:

The reversal or modification on appeal of an authorization under
subsection (b) . . . of this section of a sale . . . of property does not
affect the validity of a sale . . . under such authorization to an entity
that purchased . . . such property in good faith, whether or not such
entity knew of the pendency of the appeal, unless such authorization
and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).

72.    Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets

sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the

purchased assets if the order allowing the sale is reversed on appeal.  By its terms, section 363(m)

of the Bankruptcy Code applies to sales of interests in tangible assets, such as the Assets.

Additionally, the United States Court of Appeals for the Third Circuit (the "Third Circuit") has

indicated that section 363(m) of the Bankruptcy Code also protects the assignee of a debtor's

interest in executory contracts under Bankruptcy Code section 365.  Krebs Chrysler-Plymouth, Inc.

v. Valley Motors, Inc., 141 F.3d 490, 497-98 (3d. Cir. 1998).  In Krebs, the Court considered

"whether assignments of [certain automobile dealership] franchises under section 365 are also sales

of estate property subject to section 363(m)."  Id. at 497.  Despite the absence of an explicit

reference to assignments of executory contracts under section 365 of the Bankruptcy Code, the

Court in Krebs concluded that section 363(m) of the Bankruptcy Code protected an assignment of

a debtor's interest in certain automobile franchise agreements pursuant to an auction sale.  Like the

franchise agreements protected in Krebs, the Executory Contracts and Leases (as defined below)

are executory contracts that may be assumed and assigned pursuant to section 365 of the

Bankruptcy Code.  In light of Krebs, the Debtors respectfully submit that section 363(m) applies to

protect the Successful Bidder (or Next Highest Bidder) with respect to both the Executory

DB02:7587602.3                                                                                                067809.1001

Contracts and Leases (as defined and described more fully below) designated for assumption and assignment and the Assets that are included in such bids.

73. As required by section 363(m) of the Bankruptcy Code, the Sale Procedures have been proposed in good faith and provide for both the Debtors and the potential purchaser to act in good faith in negotiating the Sale and the assignment of the designated Executory Contracts and Leases (as defined below). Although the Bankruptcy Code does not define "good faith purchaser," the Third Circuit, construing section 363(m) of the Bankruptcy Code, has stated that "the phrase encompasses one who purchases in 'good faith' and for 'value'." Abbotts Dairies, 788 F.2d at 147. To constitute lack of good faith, a party's conduct in connection with the sale must usually amount to "fraud, collusion between the purchaser and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders." Id. (citing In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978)). See also In re Bedford Springs Hotel, Inc., 99 B.R. 302, 305 (Bankr. W.D. Pa. 1989); In re Perona Bros., Inc., 186 B.R. 833, 839 (D.N.J. 1995). Due to the absence of a bright line test for good faith, the determination is based on the facts of each case, concentrating on the "integrity of [an actor's] conduct during the sale proceedings." In re Pisces Leasing Corp., 66 B.R. 671, 673 (E.D.N.Y. 1986) (quoting In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1998 (7th Cir. 1978)).

74. Here, the sale of the Assets and the assignment of the Executory Contracts and Leases (as defined below) which are designated by the purchaser is in good faith. There is no evidence of fraud or collusion in the terms of the Sale and the assignment of the Executory Contracts and Leases. To the contrary, as discussed throughout this Motion, and as will be further demonstrated at the Sale Hearing, the APA will be the culmination of a solicitation and negotiation process in which all parties will be represented by counsel. All negotiations have been and will

37

continue to be conducted on an arms length, good faith basis. With respect to the potential bidders, the Sale Procedures are designed to ensure that no party is able to exert undue influence over the process. Under the circumstances, the Successful Bidder (or Next Highest Bidder) should be afforded the protections that section 363(m) of the Bankruptcy Code provides to a good faith purchaser. Furthermore, the Sale Procedures are designed to prevent the Debtors or the Successful Bidder (or Next Highest Bidder) from engaging in any conduct that would cause or permit the APA, or the Sale of the Assets to the Successful Bidder (or Next Highest Bidder) pursuant thereto and hereto, to be avoided under section 363(n) of the Bankruptcy Code.

75.     All parties in interest will receive notice of the Sale and will be provided with an opportunity to be heard. Additionally, all counterparties to Executory Contracts and Leases (as defined below) will be provided notice of the potential assumption and assignment of their agreements and an opportunity to be heard. The Debtors submit that such notice is adequate for entry of the Sale Order and satisfies the requisite notice provisions required under sections 363(b) and 365 of the Bankruptcy Code.

## D.     The Sale Satisfies the Requirements of Section 363(f) of the Bankruptcy Code

76.     Under section 363(f) of the Bankruptcy Code, a debtor-in-possession may sell all or any part of its property free and clear of any and all liens, claims or interests in such property if: (i) such a sale is permitted under applicable non-bankruptcy law; (ii) the party asserting such a lien, claim or interest consents to such sale; (iii) the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property; (iv) the interest is the subject of a *bona fide* dispute; or (v) the party asserting the lien, claim or interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest. 11 U.S.C. § 363(f); Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot), 94 B.R.

38

343, 345 (E.D. Pa. 1988) (noting that section 363(f) of the Bankruptcy Code is written in the disjunctive; therefore, a court may approve a sale "free and clear" provided at least one of the subsections is met). Because the Debtors expect that they will satisfy the second and fifth of these requirements, if not others as well, approving the sale of the Assets free and clear of all adverse interests is warranted. Furthermore, courts have held that they have the equitable power to authorize sales free and clear of interests that are not specifically covered by section 363(f). See, e.g., In re Trans World Airlines, Inc., 2001 WL 1820325 at *3, 6 (Bankr. D. Del. March 27, 2001); Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.), 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987).

**E. Assumption and Assignment
of Executory Contracts and Unexpired Leases Should be Approved**

77. To facilitate and effectuate the sale of the Assets, the Debtors seek authority to assume and assign various executory contracts and unexpired leases related to the Assets (as may be identified by separate notice prior to the Sale Hearing, the "Executory Contracts and Leases") to the Successful Bidder (or the Next Highest Bidder) to the extent required by such Successful Bidder (or Next Highest Bidder). Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign its executory contracts and unexpired leases, subject to the approval of the Bankruptcy Court, provided that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided. A debtor's decision to assume or reject an executory contract or unexpired lease must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment. Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co., 318 U.S. 523 (1943) (applying Bankr. Act section 77 subsection (b), the predecessor to Bankruptcy Code section 365) (rejecting the test of whether the executory contract was burdensome in favor of whether

39

rejection is within the debtor's business judgment); Lubrizol Enter., Inc. v. Richmond Metal Finishers, Inc., 756 F.2d 1043, 1046-47 (4th Cir. 1985).

78.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." See Carlisle Homes. Inc. v. Azzari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1989).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  In re Bygaph, Inc., 56 B.R. 596, 605-6 (Bankr. S.D.N.Y. 1986) (finding adequate assurance of future performance present when the prospective assignee of a lease from the debtors has the financial resources and has expressed a willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding; "chief determinant of adequate assurance of future performance is whether rent will be paid").

79.     The Successful Bidder (or the Next Highest Bidder) may desire to take assignment of certain executory contracts and unexpired leases related to the Assets.  To the extent Executory Contracts and Leases are identified for assumption and assignment by the Successful Bidder (or the Next Highest Bidder), the Debtors believe that they can and will demonstrate that all requirements for assumption and/or assignment of the such Executory Contracts and Leases will be satisfied at the Sale Hearing.  The Debtors, as required by the Sale Procedures, will evaluate the financial wherewithal of all potential bidders before qualifying such bidders to bid for the Assets. Further, for the reasons stated throughout this Motion, the Debtors, in exercising their sound business judgment, believe that selling the Assets and assuming and assigning to the Successful Bidder (or the Next Highest Bidder) the selected Executory Contracts and Leases would be in the best interests of their estates.  Moreover, the Debtors will provide all parties to the Executory

40

Contracts and Leases an opportunity to be heard. A schedule of Executory Contracts and Leases to be assumed and assigned in connection with the sale of the Assets will be served on all counterparties to such contracts and leases, including proposed cure amounts, within three (3) days of entry of this entry. The Debtors have proposed that any party objecting to the potential assumption and assignment of its contract or leases on any grounds must file such objection no later than twenty days from the date entry of the Sale Procedures Order. If an Auction is conducted, a notice identifying the Successful Bidders will be sent by overnight courier or facsimile to all parties to the Executory Contracts and Leases identified for assumption and assignment within twenty four hours of the conclusion of the Auction. At that point, such parties may object solely on the issue of whether such Successful Bidder can provide adequate assurance of future performance as required by Section 365 of the Bankruptcy Code. If any party has timely asserted an objection to the sufficiency of assurance of future performance by the proposed assignee and such objection has not been withdrawn or resolved by the date of the Sale Hearing, the Debtors request that this Court conduct a further hearing on such adequate assurance objections.

80. Thus, the Debtors request that assumption and assignment of the Executory Contracts and Leases which are designated for assumption and assignment by the Successful Bidders should be approved.

**F. Relief from the Ten Day Waiting Periods Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate**

81. Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise." Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 10

days after the entry of the order, unless the court orders otherwise." The Debtors request that the Sale Order be effective immediately by providing that the ten (10) day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

82.     The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d). Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the ten (10) day stay period, Collier on Bankruptcy suggests that the ten (10) day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 Collier on Bankruptcy 15th Ed. Rev., ¶6064.09 (L. King, 15th rev. ed. 1988). Furthermore, Collier's provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. Id.

83.     The Debtors hereby request that the Court waive the ten-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

## NOTICE

84.     No trustee, examiner or creditors' committee has been appointed in these chapter 11 cases. Notice of this Motion has been provided to: (i) the Office of the United States Trustee for the District of Delaware; (ii) the list of the largest unsecured creditors for the Debtors on a consolidated basis as identified in the Debtors' chapter 11 petitions; (iii) counsel to the Noteholders; (iv) the Internal Revenue Service; and (v) all parties entitled to notice under Local Rule 2002-1(b). In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

42

## CONCLUSION

WHEREFORE, the Debtors respectfully request (A) entry of the Sale Procedures Order, substantially in the form attached hereto as <u>Exhibit A</u>, (B) entry of Sale Order substantially in the form attached hereto as <u>Exhibit B</u>, and (C) such other and further relief as the Court deems just and proper.

Dated: Wilmington, Delaware
      November 25, 2008

<div style="margin-left:2em">

ALLEN & OVERY LLP
David C. L. Frauman (*pro hac vice* pending)
Daniel Guyder (*pro hac vice* pending)
John Kibler (*pro hac vice* pending)
ALLEN & OVERY LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 610-6300 (Telephone)
(212) 610-6399 (Facsimile)

-and-

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Joseph M. Barry (No. 4221)
Donald J. Bowman, Jr. (No. 4383)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6758
Facsimile: (302) 571-1253

*Proposed Attorneys for the Debtors
and Debtors in Possession*

</div>

44