# EXHIBIT B

## Sale Order

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ECLIPSE AVIATION CORPORATION, *et al.,* | ) | Case No. 08-13031 (MFW) |
| | ) | |
| | ) | |
| Debtors. | ) | |

## ORDER (A) AUTHORIZING THE DEBTORS TO SELL SUBSTANTIALLY ALL OF THEIR ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES, (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (C) GRANTING RELATED RELIEF

Upon the motion, dated November 25, 2008 (the "Sale Motion"), of the above-captioned debtors and debtors in possession (the "Debtors" or "Sellers") for the entry of an order pursuant to sections 105, 363 and 365 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (as amended, the "Bankruptcy Code") and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules") authorizing the Debtors to, *inter alia,* (i) enter into that certain Asset Purchase Agreement, dated as of November 25, 2008, between Eclipsejet Aviation International, Inc. ("Buyer"), and the Debtors (the "Agreement," attached hereto as Exhibit 1),[1] (ii) sell substantially all of their assets free and clear of all Encumbrances (as defined below), with such sale to be in accordance with the terms and conditions of the Agreement; (iii) assume and sell and assign certain executory contracts and unexpired leases to the Buyer; and (iv) granting related relief; and this Court having entered an order dated _____, 2008 (the "Procedures Order" and attached as Exhibit 1, the "Bid Procedures") authorizing the Debtors to conduct, and approving the terms and conditions of, the Auction and Bid Procedures to consider higher and better offers for the Assets, establishing a date for the Auction, and approving, *inter alia,* (i) the Bid Procedures in connection with the

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Agreement.

Auction; (ii) the form and manner of notice of the Auction and Bid Procedures; (iii) procedures relating to certain Designated Contracts, including notice of proposed cure amounts; and (iv) the Breakup Fee and the Expense Reimbursement; and the Court having established the date of the Sale Hearing; and the Court having jurisdiction to consider the Sale Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157(b)(2) and 1334; and after consideration of the Sale Motion, the relief requested therein, and the responses thereto, if any; this being a core proceeding in accordance with 28 U.S.C. § 157(b); and the appearance of all interested parties and all responses and objections, if any, to the Sale Motion having been duly noted in the record of the Sale Hearing; and upon the record of the Sale Hearing, and all other pleadings and proceedings in this case, including the Sale Motion; and it appearing that the relief requested in the Sale Motion is in the best interests of the Debtors, their estates, their creditors and all other parties in interest; and after due deliberation and sufficient cause appearing therefore;

I.    FINDINGS OF FACT:

IT IS HEREBY FOUND, DETERMINED AND CONCLUDED THAT:[2]

## Jurisdiction, Final Order, Statutory Predicates

A.    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

B.    The Court has jurisdiction over this matter and over the property of the Debtors, including the Assets to be sold, transferred or conveyed pursuant to the Agreement, and their estates pursuant to 28 U.S.C. § § 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of this chapter 11 case and the Sale Motion in this district is proper

---

[2]    To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. *See* Fed. R. Bankr. P. 7052.

067809.1001

pursuant to 28 U.S.C. §§ 1408 and 1409.

C.     The statutory predicates for the relief sought in the Sale Motion and the basis for the approvals and authorizations herein are (i) Bankruptcy Code §§ 102, 105, 363, 365, 1123, 1141 and 1146, and (ii) Bankruptcy Rules 2002, 6004, 6006 and 9014.

D.     This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(g) and 6006(d), the parties may consummate the transactions provided for under the terms and conditions of the Agreement immediately upon entry of this Order. To any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Order.

## Retention of Jurisdiction

E.     It is necessary and appropriate for the Court to retain jurisdiction to, among other things, interpret and enforce the terms and provisions of this Order and the Agreement, and to adjudicate, if necessary, any and all disputes relating in any way to the transactions provided for under the terms and conditions of the Agreement.

## Time Is of the Essence

F.     On February 25, 2008 (the "Petition Date"), the Debtors filed voluntary petitions for reorganization under chapter 11 of the Bankruptcy Code. Since the Petition Date, the Debtors have continued in possession and management of their businesses and properties as debtors in possession pursuant to Bankruptcy Code §§ 1107(a) and 1108.

G.     Time is of the essence in consummating the sale. In order to maximize the value of the Assets, it is essential that the sale of the Assets occur within the time constraints set forth in the Agreement. Accordingly, there is cause to lift the stays contemplated by Bankruptcy

DB02:7587616.2          067809.1001

Rules 6004 and 6006.

## Notice of the Sale Motion

H.        As evidenced by the affidavits of service and publication filed with the Court, (i) proper, timely, adequate, and sufficient notice of the Sale Motion, the Auction, and the Sale Hearing (including due and proper notice of the assumption, sale, and assignment of each Designated Contract to each non-debtor party under each such Designated Contract) have been provided in accordance with Bankruptcy Code §§ 102(1) and 363(b), Bankruptcy Rules 2002, 6004, 6006, 9006, 9007, 9008 and 9014, the local rules of this Court, the procedural due process requirements of the United States Constitution, and in compliance with the Procedures Order; (ii) such notice was good and sufficient and appropriate under the particular circumstances; and (iii) no other or further notice of the Sale Motion, the Auction, the Sale Hearing, the assumption and assignment of the Designated Contracts, or of the entry of this Order is necessary or shall be required.

I.        Actual written notice of the Sale Motion, the Auction, and the Sale Hearing (including due and proper notice of the assumption, sale, and assignment of each Designated Contract to each non-debtor party under each such Designated Contract) and a reasonable opportunity to object or be heard regarding the requested relief has been afforded to all interested persons and entities, including, without limitation, (i) all entities that claim any interest in or lien upon the Assets; (ii) all parties to Designated Contracts assumed and sold and assigned pursuant to this Order; (iii) all governmental taxing authorities that have or as a result of the sale of the Assets may have claims, contingent or otherwise, against the Debtors; (iv) all parties that filed requests for notices under Bankruptcy Rule 9010(b) or were entitled to notice under Bankruptcy Rule 2002; (v) all creditors (whether liquidated, contingent or unmatured) of the Debtors; (vi) all

interested governmental, pension, environmental and other regulatory entities; (vii) the attorneys general of all states in which the Purchased Assets are located; (viii) the Office of the United States Trustee; and (ix) all entities that heretofore expressed to the Debtors an interest in purchasing the Assets within the past 12 months. Other parties interested in bidding on the Assets were provided, upon request, sufficient information to make an informed judgment on whether to bid on the Assets.

J.     The Auction and Sale Publication Notice was published in (i)_____ on _____, 2008, and (ii) _____ on _____, 2008. Such publication notice was sufficient and proper notice to any other interested parties, including those whose identities are unknown to the Debtors.

## Compelling Circumstances for Immediate Sale

K.     The Debtors have demonstrated a sufficient basis and the existence of exigent circumstances requiring it to enter into the Agreement, sell the Assets and assume and assign the Designated Contracts under Bankruptcy Code §§ 363, 365, 1123 and 1141, and such actions are appropriate exercises of the Debtors' business judgment and in the best interests of the Debtors, their estates and their creditors, in that:

1.     The Debtors violated the terms of the minimum cash covenant in their Senior Secured Notes, and the holders of such notes would not consent to the use of additional cash collateral absent a sale of substantially all of their assets.

2.     Due to the Debtors' need for additional liquidity, they cannot continue to operate in the ordinary course of business for a sufficient period of time to reorganize their business other than through a sale.

5

3.      The Debtors' postpetition financing does not allow the Debtors to operate their business in the ordinary course for a period beyond that required for a sale of substantially all of their assets.

4.      Even with the use of cash collateral permitted by the Senior Secured Noteholders and the postpetition financing obtained by the Debtors, they can continue to operate their business and preserve the value of their assets only for a short period of time.  If the sale and related transactions under the Agreement were not approved and consummated promptly, the Debtors would exhaust the financing available to them under their postpetition financing, and the Debtors' business could deteriorate to the point where Buyer could terminate the Agreement, thereby potentially consigning the Debtors to a liquidation that would achieve far less value for creditors than the transactions contemplated by the Agreement or a sale involving a significantly reduced purchase price.

5.      A sale pursuant to section 363(b) of the Bankruptcy Code is the only viable alternative for preserving and capturing the value of the Assets and ensuring the continuation of the Debtors' business.  Without the sale, the Debtors cannot continue to operate their business for the time required to confirm and consummate a plan of reorganization without risking an immediate and material decline in the value of their business and the Assets.  Thus, the only way to preserve and maximize value is to consummate the sale and sell the Assets pursuant to section 363(b) of the Bankruptcy Code, thereby ensuring an orderly and equitable sales process and distribution of proceeds.

DB02:7587616.2

067809.1001

6.    A sale of the Assets at this time to Buyer would result in the highest possible purchase price therefore.

## Consent of Senior Secured Noteholders

L.    [Pursuant to that certain written consent dated _____, 2008, holders of at least 90% of the Debtors' Senior Secured Note have consented to the entry of this Order, to the terms and conditions of the Agreement, and to the consummation of the transactions under the Agreement. Pursuant to the terms of the Debtors' Senior Secured Notes, the liens securing the Senior Secured Notes may be released with the consent of the holders of more than 50% of the Debtors' Senior Secured Notes.]

## Good Faith

M.    It has been fully disclosed to the Court and other parties in interest that the Buyer is an entity formed by an "insider" or "affiliate" of the Debtors as those terms are defined in the Bankruptcy Code. Notwithstanding its status as an insider or affiliate, the Buyer is a purchaser in good faith, as that term is used in the Bankruptcy Code and court decisions thereunder, and is entitled to the protections of Bankruptcy Code § 363(m). The Agreement was negotiated and entered into in good faith, based upon arm's length bargaining, and without collusion or fraud of any kind. The sales process [and Auction] were conducted in accordance with the Procedures Order and in good faith within the meaning of Bankruptcy Code § 363(m). Neither the Debtors nor the Buyer have engaged in any conduct that would prevent the application of Bankruptcy Code § 363(m) or cause the application of or implicate Bankruptcy Code § 363(n) to the Agreement or to the consummation of the sale transaction and transfer of the Assets and Designated Contracts to Buyer. The Buyer is entitled to all the protections and immunities of Bankruptcy Code § 363(m). The Buyer will be acting in good faith within the meaning of

067809.1001

section 363(m) of the Bankruptcy Code in closing the transactions pursuant to the terms and conditions of the Agreement any time after the entry of this Order, including immediately after its entry. The Court has found that the Buyer has acted in good faith in all respects in connection with these chapter 11 cases and the transactions under the Agreement in that, among other things:

1. the Debtors established a special committee of the Board of Directors (which did not include any representative of Buyer or its affiliates) to conduct the sale process and to negotiate with the Buyer;

2. the Buyer recognized that the Debtors were free to negotiate with any other party that expressed qualified interest in purchasing their assets;

3. the Buyer agreed to subject its bid to the competitive bidding procedures set forth in the Bidding Procedures Order;

4. the Buyer did not induce, cause, or require the commencement of the Debtors' chapter 11 cases;

5. all payments to be made by Buyer and other agreements or arrangements entered into by Buyer with the Debtors in connection with the Agreement have been disclosed;

6. the Buyer has disclosed at the Sale Hearing all material written post-Closing employment arrangements with the Debtors' senior management; and

7. the negotiation and execution of the Agreement and all other aspects of the transactions contemplated thereby were conducted in good faith and at arms' length.

N. In the absence of a stay pending appeal, the Buyer will be acting in good faith,

DB02:7587616.2

067809.1001

pursuant to Bankruptcy Code § 363(m), in closing the transactions contemplated by the Agreement at any time on or after the entry of this Order and cause has been shown as to why this Order should not be subject to the stay provided by Bankruptcy Rules 6004(g) and 6006(d).

### No Collusion

O.     The Buyer has not violated section 363(n) of the Bankruptcy Code by any action or inaction. The sale price to be paid by Buyer was not controlled by an agreement among potential bidders at such sale. The transactions under the Agreement may not be avoided, and no damages may be assessed against the Buyer or any other party under section 363(n) of the Bankruptcy Code or any other applicable bankruptcy or non-bankruptcy law.

### Bid Procedures Fair

P.     The Bid Procedures set forth in the Procedures Order were non-collusive, substantively and procedurally fair to all parties and were the result of arms length negotiations between the Debtors and the Buyer.

Q.     The Debtors and their professionals have complied, in good faith, in all respects with the Procedures Order. As demonstrated by (i) the testimony and other evidence proffered or adduced at the Sale Hearing and (ii) the representations of counsel made on the record at the Sale Hearing. Through marketing efforts and a competitive sale process conducted in accordance with the Procedures Order, the Debtors (i) afforded interested potential purchasers a full, fair and reasonable opportunity to qualify as bidders and submit their highest or otherwise best offer to purchase substantially all of the Debtors' assets, (ii) provided potential purchasers, upon request, sufficient information to enable them to make an informed judgment on whether to bid on the Assets, (iii) considered any bids submitted on or before the Bid Deadline, **[and (iv) commenced the Auction on_____, 2008]**.

## Marketing Efforts Leading to Sale

R.     [describe]

## Auction

S.     [TBD]

## Highest and Best Offer

T.     At the conclusion of the Auction, the Debtors announced that, after consultation with the Ad Hoc Committee, they had determined that the offer submitted by the Buyer in the Agreement was the highest and best offer and the Buyer is the Successful Bidder for the Assets in accordance with the Procedures Order. The Bidding Procedures obtained the highest value for the Assets for the Debtors and their estates.

U.     The offer of the Buyer, upon the terms and conditions set forth in the Agreement, including the form and total consideration to be realized by the Debtors pursuant to the Agreement, (i) is the highest and best offer received by the Debtors; (ii) is fair and reasonable; (iii) is in the best interests of the Debtors' creditors and estates; (iv) constitutes full and adequate consideration and reasonably equivalent value for the Assets; and (v) will provide a greater recovery for the Debtors' creditors and other interested parties than would be provided by any other practical and available alternative. The Debtors' determination that the Agreement constitutes the highest and best offer for the Assets constitutes a valid and sound exercise of the Debtors' business judgment.

V.     The Agreement and the transactions thereunder are not being entered into to escape liability for the estates' debts. The Debtors' estates are unable to satisfy all of the Debtors' debts.

## No Fraudulent Transfer

W.     The total consideration provided by the Buyer for the Assets is the highest and

DB02:7587616.2 067809.1001

best offer received by the Debtors, and the Purchase Price constitutes (a) reasonably equivalent value under the Bankruptcy Code and the Uniform Fraudulent Transfer Act, (b) fair consideration under the Uniform Fraudulent Conveyance Act, and (c) under any other applicable laws of the United States, any state, territory or possession, or the District of Columbia, reasonably equivalent value, fair consideration and fair value for the Assets.

### Validity of Transfer

X.     Prior to the transactions contemplated under the Agreement, the Assets are property of the Debtors' estates and title thereto is vested in the Debtors' estates.

Y.     The Debtors have full corporate power and authority to execute the Agreement and all other documents contemplated thereby, and the sale of the Assets has been duly and validly authorized by all necessary corporate authority by the Debtors to consummate the transactions contemplated by the Agreement. No consents or approvals, other than as may be expressly provided for in the Agreement, are required by the Debtors to consummate such transactions.

Z.     The Debtors have advanced sound business reasons for seeking to enter into the Agreement and to sell and/or assume and sell and assign the Assets and the Designated Contracts, as more fully set forth in the Sale Motion and as demonstrated at the Sale Hearing, and it is a reasonable exercise of the Debtors' business judgment to sell and assign the Assets and the Designated Contracts and to consummate the transactions contemplated by the Agreement. Notwithstanding any requirement for approval or consent by any person, the transfer of the Assets to the Buyer and the assumption and assignment of the Designated Contracts is a legal, valid and effective transfer of the Assets and any Designated Contracts.

AA.     The terms and conditions of the Agreement, including the consideration to be

realized by the Debtors pursuant to the Agreement, are fair and reasonable, and the transactions contemplated by the Agreement are in the best interests of the Debtors' estates.

## Section 363(f) Is Satisfied

BB.     Except as otherwise provided in the Agreement, the Assets shall be sold free and clear of all of the following (collectively, the "Encumbrances"): mortgages, security interests, conditional sale or other retention agreements, pledges, liens (as that term is defined in section 101(37) of the Bankruptcy Code), claims (as that term is defined in section 101(5) of the Bankruptcy Code), obligations, guaranties, debts, obligations, rights, contractual commitments, interests, judgments, demands, easements, charges, encumbrances, defects, options, rights of first refusal, other Encumbrances (as defined in the Agreement), Liens (as defined in the Agreement), and restrictions of any kind or nature whether imposed by agreement, understanding, law, equity, or otherwise, including, without limitation (i) encumbrances that purport to give any party a right or option to effect any forfeiture, modification or termination of any Debtor or of the Buyer in the Assets or (ii) in respect of taxes, in each case accruing, arising, or relating to a period prior to the Closing. All such Encumbrances shall attach to the consideration to be received by the Debtors in the same priority and subject to the same defenses and avoidability, if any, as before the Closing, and Buyer would not enter into the Agreement to purchase the Assets otherwise.

CC.     The transfer of the Assets to Buyer will be a legal, valid and effective transfer of the Assets, and, except as may otherwise be provided in the Agreement, shall vest Buyer with all right, title and interest of the Debtors to the Assets free and clear of any and all Encumbrances. Except as specifically provided in the Agreement or this Order, the Buyer shall not assume or become liable for any Encumbrances relating to the Assets being sold by the Debtor.

DD.     The transfer of the Assets to the Buyer free and clear of all Encumbrances will not

12

result in any undue burden or prejudice to any holders of any Encumbrances as all such Encumbrances of any kind or nature whatsoever shall attach to the net proceeds of the sale of the Assets received by the Debtors in the order of their priority, with the same validity, force and effect which they now have as against the Assets and subject to any claims and defenses the Debtors or other parties may possess with respect thereto. All persons having Encumbrances of any kind or nature whatsoever against or in any of the Debtors or the Assets shall be forever barred, estopped and permanently enjoined from pursuing or asserting such Encumbrances against the Buyer, any of its assets, property, successors or assigns, or the Assets.

EE.     The Debtors may sell the Assets free and clear of all Encumbrances of any kind or nature whatsoever because, in each case, one or more of the standards set forth in Bankruptcy Code § 363(f) has been satisfied.  Those (i) holders of Encumbrances and (ii) non-debtor parties, who did not object, or who withdrew their objections, to the sale of the Assets and the Sale Motion are deemed to have consented pursuant to Bankruptcy Code § 363(f)(2).  Those holders of Encumbrances who did object fall within one or more of the other subsections of Bankruptcy Code § 363(f) and are adequately protected by having their Encumbrances, if any, attach to the proceeds of the sale of the Assets ultimately attributable to the property against or in which they claim or may claim any Encumbrances, with such Encumbrances being subject to treatment as prescribed in the Debtors' Plan or by separate order of this Court.

FF.     Not selling the Assets free and clear of all Encumbrances would adversely impact the Debtors' estates, and the sale of Assets other than free and clear of all Encumbrances would be of substantially less value to the Debtors' estates.

GG.     The Buyer shall have no obligations with respect to any liabilities of the Debtors other than the Assumed Liabilities and its obligations under the Agreement.

13

## Cure under Designated Contracts; Adequate Assurance of Future Performance

HH.    The Debtors and the Buyer have, to the extent necessary, satisfied the requirements of section 365 of the Bankruptcy Code. Pursuant to the terms and subject to the conditions of this Order and the Agreement, the Buyer shall, within the time period set forth in the Agreement, (i) cure or provide adequate assurance of cure of any undisputed default existing prior to the Closing under any of the assigned Designated Contracts, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code and (ii) provide compensation or adequate assurance of compensation to any party other than the Debtors for any undisputed actual pecuniary loss to such party resulting from an undisputed default prior to the Closing under any of the assigned Designated Contracts, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code. The Buyer has demonstrated adequate assurance of future performance with respect to the Designated Contracts, within the meaning of section 365(b)(1)(C) of the Bankruptcy Code. The Designated Contracts are assignable notwithstanding any provisions contained therein to the contrary pursuant to section 365(f) of the Bankruptcy Code. The assumption and assignment of the Designated Contracts pursuant to the terms of this Order is integral to the Agreement and is in the best interests of the Debtors, their estate, creditors and other parties in interest, and represents the exercise of sound and prudent business judgment by the Debtors.

## No Successor Liability

II.    The transactions contemplated under the Agreement do not amount to a consolidation, merger or *de facto* merger of the Buyer and the Debtors and/or the Debtors' estates, there is not substantial continuity between the Buyer and the Debtors, there is no continuity of enterprise between the Debtors and the Buyer, the Buyer is not a mere continuation

14

of the Debtors or their estates, and the Buyer does not constitute a successor to the Debtors or their estates.

JJ.     Except as expressly set forth in the Agreement, the transfer of the Assets to the Buyer and assumption and assignment to Buyer of the Designated Contracts and the Assumed Liabilities by Buyer do not and will not subject the Buyer or any of its affiliates or subsidiaries to any liability by reason of such transfer under (i) the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based in whole or part on, directly or indirectly, including without limitation, any theory of antitrust, environmental, products liability, successor or transferee liability, labor law, *de facto* merger, or substantial continuity or (ii) any employment contract, understanding or agreement, including without limitation collective bargaining agreements, employee pension plans, or employee welfare or benefit plans.

### Miscellaneous

KK.     The sale of the Assets outside of a plan of reorganization pursuant to the Agreement neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates the terms of a plan of liquidation or reorganization for the Debtors. The sale does not constitute a *sub rosa* chapter 11 plan.

LL.     Pursuant to Section ___ of the Agreement, the Debtors are providing the Buyer with a general release of claims and the Buyer is providing fair value for the release.

II.     CONCLUSIONS OF LAW:

NOW, THEREFORE, BASED UPON ALL OF THE FOREGOING, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:[3]

1.      The relief requested in the Sale Motion is granted in its entirety, subject to the

---

[3]     To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such. *See* Fed. R. Bankr. P. 7052.

067809.1001

terms and conditions contained herein.

2.     All objections, responses, and requests for continuance concerning the Sale Motion are resolved in accordance with the terms of this Order and as set forth in the record of the Sale Hearing. To the extent any such objection, response or request for continuance was not otherwise withdrawn, waived, or settled, it, and all reservations of rights contained therein, is overruled and denied on the merits.

3.     Notice of the Sale Hearing was fair and adequate under the circumstances and complied in all respects with 11 U.S.C. § 102(1) and Bankruptcy Rules 2002, 6004 and 6006.

## Approval of Sale

4.     The sale of the Assets, the terms and conditions of the Agreement (including all schedules and exhibits affixed thereto), the bid by the Buyer and the transactions contemplated thereby be, and hereby are, authorized and approved in all respects.

5.     The sale of the Assets and the consideration provided by the Buyer under the Agreement is fair and reasonable and shall be deemed for all purposes to constitute a transfer for reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable law.

6.     The Buyer is hereby granted and is entitled to all of the protections provided to a good faith buyer under Bankruptcy Code § 363(m), including with respect to the transfer of the Designated Contracts as part of the sale of the Assets pursuant to Bankruptcy Code § 365 and this Order.

7.     The Debtors be, and hereby are, authorized and directed to fully assume, perform under, consummate and implement the terms of the Agreement together with any and all additional instruments and documents that may be reasonably necessary or desirable to

16

implement and effectuate the terms of the Agreement, this Order and sale of the Assets contemplated thereby including, without limitation, deeds, assignments, stock powers and other instruments of transfer, and to take all further actions as may reasonably be requested by the Buyer for the purpose of assigning, transferring, granting, conveying and conferring to the Buyer, or reducing to possession any or all of the Assets or Assumed Liabilities and the assumption and assignment of the Designated Contracts, as may be necessary or appropriate to the performance of the Debtors' obligations as contemplated by the Agreement, without any further corporate action or orders of this Court. The Buyer shall have no obligation to proceed with the Closing of the Agreement until all conditions precedent to its obligations to do so have been met, satisfied or waived. The Buyer may consummate the transactions under the Agreement at any time after the entry of this Order (including immediately thereafter) by waiving all closing conditions set forth in the Agreement that have not been satisfied and by proceeding to close such transactions, without any notice to the Court, any pre-petition or post-petition creditor of the Debtors or any other party in interest.

8.     The Debtors are hereby authorized and directed to distribute, to the extent and in the manner set forth in the Senior Secured Notes, the consideration received by the Debtors pursuant to the Agreement to the Bank of New York, in its capacity as Collateral Agent under that certain Amended and Restated Security Agreement dated as of February 15, 2008 as payments for amounts due and owing the holders of the Debtors' Senior Secured Notes pursuant to the terms of the Senior Secured Notes.

9.     The Debtors and each other person or entity having duties or responsibilities under the Agreement, any agreements related thereto or this Order, and their respective directors, officers, employees, members, agents, representatives, and attorneys, are authorized and

067809.1001

empowered, subject to the terms and conditions contained in the Agreement, to carry out all of the provisions of the Agreement and any related agreements; to issue, execute, deliver, file, and record, as appropriate, the documents evidencing and consummating the Agreement, and any related agreements; to take any and all actions contemplated by the Agreement, any related agreements or this Order; and to issue, execute, deliver, file, and record, as appropriate, such other contracts, instruments, releases, indentures, mortgages, deeds, bills of sale, assignments, leases, or other agreements or documents and to perform such other acts and execute and deliver such other documents, as are consistent with, and necessary or appropriate to implement, effectuate, and consummate, the Agreement, any related agreements and this Order and the transactions contemplated thereby and hereby, all without further application to, or order of, the Court or further action by their respective directors, officers, employees, members, agents, representatives, and attorneys, and with like effect as if such actions had been taken by unanimous action of the respective directors, officers, employees, members, agents, representatives, and attorneys of such entities. The secretary or any assistant secretary of the Debtors shall be, and hereby is, authorized to certify or attest to any of the foregoing actions (but no such certification or attestation shall be required to make any such action valid, binding, and enforceable). The Debtors are further authorized and empowered to cause to be filed with the secretary of state of any state or other applicable officials of any applicable governmental units any and all certificates, agreements, or amendments necessary or appropriate to effectuate the transactions contemplated by the Agreement, any related agreements and this Order, including amended and restated certificates or articles of incorporation and by-laws or certificates or articles of amendment, and all such other actions, filings, or recordings as may be required under appropriate provisions of the applicable laws of all applicable governmental units or as any of

18

the officers of the Debtors may determine are necessary or appropriate. The execution of any such document or the taking of any such action shall be, and hereby is, deemed conclusive evidence of the authority of such person to so act. Without limiting the generality of the foregoing, this Order shall constitute all approvals and consents, if any, required by the corporation laws of the State of Delaware and all other applicable business corporation, trust, and other laws of the applicable governmental units with respect to the implementation and consummation of the Agreement, any related agreements and this Order, and the transactions contemplated thereby and hereby.

10.     Effective as of the Closing, (a) the sale of the Assets by the Debtors to the Buyer shall constitute a legal, valid and effective transfer of the Assets notwithstanding any requirement for approval or consent by any person and shall vest Buyer with all right, title and interest of the Debtors in and to the Assets, free and clear of all Claims, Liens, Interests and Encumbrances of any kind, pursuant to Bankruptcy Code § 363(f), and (b) the assumption of any Assumed Liabilities by the Buyer shall constitute a legal, valid and effective delegation of any Assumed Liabilities to the Buyer and shall divest the Debtors of all liability with respect to any Assumed Liabilities.

11.     The sale of the Assets is not subject to avoidance, and no damages may be assessed against the Buyer or any other party, pursuant to Bankruptcy Code § 363(n).

## Transfer of Assets

12.     Except to the extent specifically provided in the Agreement, upon the closing, pursuant to Bankruptcy Code § 1141(c), the Debtors shall be, and hereby are, authorized, empowered, and directed, pursuant to Bankruptcy Code §§ 105, 363(b), 1123 and 1141, to sell the Assets to the Buyer. The sale of the Assets shall vest Buyer with all right, title and interest of

067809.1001

the Debtors to the Assets free and clear of any and all Encumbrances and other liabilities and claims, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or noncontingent, liquidated or unliquidated, matured or unmatured, disputed or undisputed, or known or unknown, whether arising prior to or subsequent to the Petition Date, whether imposed by agreement, understanding, law, equity or otherwise, with all such Encumbrances and other liabilities and claims to attach only to the proceeds of the sale (if any) with the same priority, validity, force, and effect, if any, as they now have in or against the Assets, subject to all claims and defenses the Debtors may possess with respect thereto. Following the Closing Date, no holder of any Encumbrance in the Assets shall interfere with the Buyer's use and enjoyment of the Assets based on or related to such Encumbrance, or any actions that the Debtors may take in their chapter 11 cases and no person shall take any action to prevent, interfere with or otherwise enjoin consummation of the transactions contemplated in or by the Agreement or this Order. To the extent provided for in the Agreement, any and all of the Debtors' security deposits, or other security held by landlords, lessors and other counterparties to the contracts, leases, and licenses that are to be assumed and assigned under the Agreement are being transferred and assigned to, and shall be the property of, the Buyer from and after the Closing, which transfer and assignment of security deposits, other deposits, or security shall satisfy in full the requirements of Bankruptcy Code section 365(l) for all contracts, leases, and licenses assumed and assigned pursuant to this Order or the Agreement.

13. The provisions of this Order authorizing the sale of the Assets free and clear of Encumbrances, other than Assumed Liabilities, shall be self-executing, and neither the Debtors nor the Buyer shall be required to execute or file releases, termination statements, assignments,

067809.1001

consents, or other instruments in order to effectuate, consummate and implement the provisions of this Order. However, the Debtors and the Buyer, and each of their respective officers, employees and agents are hereby authorized and empowered to take all actions and execute and deliver any and all documents and instruments that either the Debtors or the Buyer deem necessary or appropriate to implement and effectuate the terms of the Agreement and this Sale Order. Moreover, effective as of the Closing, the Buyer, its successors and assigns, shall be designated and appointed the Debtors' true and lawful attorney and attorneys, with full power of substitution, in the Debtors' name and stead, on behalf and for the benefit of the Buyer, its successors and assigns, to demand and receive any and all of the Assets and to give receipts and releases for and in respect of the Assets, or any part thereof, and from time to time to institute and prosecute in the Debtors' name, for the benefit of the Buyer, its successors and assigns, any and all proceedings at law, in equity or otherwise, which the Buyer, its successors and assigns, may deem proper for the collection or reduction to possession of any of the Assets, and to do all acts and things with respect to the Assets which the Buyer, its successors and assigns, shall deem desirable. The foregoing powers are coupled with an interest and are and shall be irrevocable by the Debtors.

14.     On or before the Closing Date, all parties holding Encumbrances of any kind are authorized and directed to execute such documents and take all other actions as may be necessary to release any Encumbrances of any kind against the Assets, as such Encumbrances may have been recorded or may otherwise exist. If any person or entity that has filed financing statements or other documents or agreements evidencing any Encumbrances in or against the Assets shall not have delivered to the Debtors prior to the Closing after request therefor, in proper form for filing and executed by the appropriate parties, termination statements,

067809.1001

instruments of satisfaction, or releases of all such Encumbrances that the person or entity has with respect to the Assets, the Debtors are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to such Assets prior to the Closing, and the Buyer is authorized to file such documents after Closing.

15.    To the greatest extent available under applicable law, the Buyer shall be authorized, as of the Closing Date, to operate under any license, permit, registration and governmental authorization or approval of the Debtors with respect to the Assets, and all such licenses, permits, registrations and governmental authorizations and approvals are deemed to have been, and hereby are, directed to be transferred to the Buyer as of the Closing Date.

16.    All of the Debtors' interests in the Assets to be acquired by the Buyer under the Agreement shall be, as of the Closing Date and upon the occurrence of the Closing, transferred to and vested in the Buyer.  Upon the occurrence of the Closing, this Order shall be considered and constitute for any and all purposes a full and complete general assignment, conveyance and transfer of the Assets acquired by the Buyer under the Agreement and/or a bill of sale or assignment transferring good and marketable, indefeasible title and interest in the Assets to the Buyer.

17.    Except as expressly provided in the Agreement, the Buyer is not assuming nor shall it or any affiliate or subsidiary of Buyer be in any way liable or responsible, as a successor or otherwise, for any liabilities, debts, or obligations of the Debtors in any way whatsoever relating to or arising from the Debtors' ownership or use of the Assets prior to the consummation of the transactions contemplated by the Agreement, or any liabilities calculable by reference to the Debtors or their operations or the Assets, or relating to continuing or other conditions existing on or prior to consummation of the transactions contemplated by the Agreement, which

067809.1001

liabilities, debts, and obligations are hereby extinguished insofar as they may give rise to liability, successor or otherwise, against Buyer or any affiliate or subsidiary of the Buyer.

18.    Except as otherwise provided in the Agreement, on the Closing Date, each of the Debtors' creditors is authorized and directed to execute such documents and take all other actions as may be necessary to release their respective Interests or Claims against the Assets, if any, as may have been recorded or may otherwise exist.

19.    Except as otherwise expressly provided in the Agreement, all persons or entities, presently or on or after the Closing Date, in possession of some or all of the Assets are directed to surrender possession of the Assets to the Buyer on the Closing Date or at such time thereafter as the Buyer may request.

**Designated Contracts**

20.    Subject to the terms of the Agreement and the occurrence of the Closing Date, the assumption by the Debtors of the Designated Contracts and the sale and assignment of such agreements to the Buyer, as provided for or contemplated by the Agreement, be, and hereby is, authorized and approved pursuant to sections 363, 365, 1123(a)(5)(D) and 1141(c) of the Bankruptcy Code.

21.    The Designated Contracts shall be deemed valid and binding and in full force and effect and assumed by the Debtors and sold and assigned to the Buyer at the Closing, pursuant to Bankruptcy Code §§ 363 and 365, subject only to (a) the payment by Buyer of all cures required to assume and assign the Designated Contracts to the Buyer as provided in this Order and the Agreement; and (b) the Buyer's right to exclude Designated Contracts from the definition of Designated Contracts in accordance with the terms of the Agreement.  To the extent the Buyer excludes any Designated Contracts from the definition of Designated Contracts, the Debtors

23

shall file a revised Schedule _ to the Agreement with the Court and provide proper and adequate notice thereof.

22. Upon the Closing, in accordance with Bankruptcy Code §§ 363 and 365, the Buyer shall be fully and irrevocably vested in all right, title and interest of each Designated Contract. The Debtors shall cooperate with, and take all actions reasonably requested by, the Buyer to effectuate the foregoing.

23. Pursuant to Bankruptcy Code §§ 365(b)(1)(A) and (B), pursuant to the terms and subject to the conditions of this Order and the Agreement, within the time period provided in the Agreement the Buyer shall pay or cause to be paid to the parties to any Designated Contracts the requisite Cure Amounts, if any, set forth in the notice served by the Debtors on each of the parties to the Designated Contracts, except to the extent that a cure amount was amended on the record of the Sale Hearing (the "Cure Amounts"), following the assumption and assignment thereof. The Cure Amounts are hereby fixed at the amounts set forth in the notice served by the Debtors, or the amounts set forth on the record of the Sale Hearing, as the case may be, and the non-debtor parties to the Designated Contracts are forever bound by such Cure Amounts.

24. All defaults or other obligations under the Designated Contracts arising prior to the Closing (without giving effect to any acceleration clauses or any default provisions of the kind specified in Bankruptcy Code § 365(b)(2)) shall be deemed cured by payment of the Cure Amounts.

25. Any provision in any Designated Contract that purports to declare a breach, default or payment right as a result of an assignment or a change of control in respect of the Debtors is unenforceable, and all Designated Contracts shall remain in full force and effect, subject only to payment of the appropriate Cure Amount, if any. No sections or provisions of any

24

Designated Contract that purport to provide for additional payments, penalties, charges, or other financial accommodations in favor of the non-debtor third party to the Designated Contracts shall have any force and effect with respect to the sale transaction and assignments authorized by this Order, and such provisions constitute unenforceable anti-assignment provisions under Bankruptcy Code § 365(f) and/or are otherwise unenforceable under Bankruptcy Code § 365(e) and no assignment of any Designated Contract pursuant to the terms of the Agreement shall in any respect constitute a default under any Designated Contract. The non-Debtor party to each Designated Contract shall be deemed to have consented to such assignment under Bankruptcy Code § 365(c)(1)(B), and the Buyer shall enjoy all of the rights and benefits under each such Designated Contract as of the applicable date of assumption without the necessity of obtaining each such non-Debtor party's written consent to the assumption or assignment thereof.

26.     The Buyer has satisfied all requirements under Bankruptcy Code §§ 365(b)(1) and 365(f)(2) to provide adequate assurance of future performance under the Designated Contracts.

27.     The Debtors and their estates shall be relieved of any liability for any breach of any of the Designated Contracts occurring from and after Closing, pursuant to and in accordance with Bankruptcy Code § 365(k).

### Additional Provisions

28.     Each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Agreement and this Order.

29.     The Buyer has not assumed and is otherwise not obligated for any of the Debtors' liabilities other than the Assumed Liabilities as set forth in the Agreement, and the Buyer has not purchased any of the Excluded Assets.  Consequently, all persons, Governmental Units (as

067809.1001

defined in Bankruptcy Code §§ 101(27) and 101(41)) and all holders of Encumbrances based upon or arising out of liabilities retained by the Debtors are hereby enjoined from taking any action against any of the Buyer, its affiliates, and subsidiaries or the Assets to recover any Encumbrance or on account of any liabilities of the Debtors other than Assumed Liabilities pursuant to the Agreement. All persons holding or asserting any Encumbrance in the Excluded Assets are hereby enjoined from asserting or prosecuting such Encumbrance or cause of action against any of the Buyer, its affiliates, and subsidiaries or the Assets for any liability associated with the Excluded Assets.

30.     The Buyer is not a "successor" to the Debtors or their estates by reason of any theory of law or equity, and the Buyer, its affiliates, and subsidiaries shall not assume, nor be deemed to assume, or in any way be responsible for any liability or obligation of any of the Debtors and/or their estates including, but not limited to, any bulk sales law, successor liability or similar liability except as otherwise expressly provided in the Agreement. Neither the purchase of the Assets by the Buyer or its affiliates or subsidiaries, nor the fact that the Buyer or its affiliates or subsidiaries are using any of the Assets previously operated by the Debtors, will cause the Buyer or any of its affiliates or subsidiaries to be deemed a successor in any respect to the Debtors' businesses within the meaning of any foreign, federal, state or local revenue, pension, ERISA, tax, labor, employment, environmental, or other law, rule or regulation (including without limitation filing requirements under any such laws, rules or regulations), or under any products liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine, or under any product warranty liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine, and the Buyer, its affiliates and subsidiaries shall have no liability or obligation on account of any of the foregoing.

Buyer and its affiliates shall have no liability or obligation under the WARN Act (29 U.S.C. §§ 210 *et seq.*) or the Comprehensive Environmental Response Compensation and Liability Act, or any foreign, federal, state or local labor, employment, or environmental law by virtue of the Buyer's purchase of the Assets or assumption of the Assumed Liabilities.

31.    Except to the extent expressly included in the Assumed Liabilities, pursuant to Bankruptcy Code §§ 105, 363, 1123(a)(5)(D) and 1141(c), all persons and entities, including, but not limited to, the Debtors, all debt security holders, equity security holders, the Debtors' employees or former employees, governmental, tax and regulatory authorities, lenders, parties to or beneficiaries under any benefit plan, any claimant asserting a products liability claim, trade and other creditors asserting or holding an Encumbrance of any kind or nature whatsoever against, in or with respect to any of the Debtors or the Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated), arising under or out of, in connection with, or in any way relating to the Debtors, the Assets, the operation of the Debtors' businesses prior to the Closing Date or the transfer of the Assets to the Buyer, shall be forever barred, estopped, and permanently enjoined from asserting, prosecuting or otherwise pursuing such Encumbrance or other liability against the Buyer or any affiliate, subsidiary, successor or assign thereof and each of their respective current and former members, officers, directors, managed funds, investment advisors, attorneys, employees, partners, affiliates and representatives (each of the foregoing in its individual capacity), or the Assets.  For the avoidance of doubt, the foregoing shall not prevent the Debtors, their estates, successors or permitted assigns from pursuing claims, if any, against the Buyer and/or its successors and assigns in and only in accordance with the terms of the Agreement.

32.    The general release set forth in paragraph ___ of the Agreement is approved in its

entirety.

33.     Subject to the terms of the Agreement, the Agreement and any related agreements may be waived, modified, amended, or supplemented by agreement of the Debtors, the Ad Hoc Committee, and the Buyer, without further action or order of the Court; provided, however, that any such waiver, modification, amendment, or supplement is not material and substantially conforms to, and effectuates, the Agreement and any related agreements.

34.     No bulk sale law or any similar law of any state or other jurisdiction shall apply in any way to the sale and the transactions contemplated by the Agreement.

35.     The failure specifically to include any particular provisions of the Agreement or any related agreements in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court, the Debtors and the Buyer that the Agreement and any related agreements are authorized and approved in their entirety with such amendments thereto as may be made by the parties in accordance with this Order prior to Closing. To the extent any provisions of this Order conflict with the terms and conditions of the Agreement, the terms and conditions of the Agreement shall govern and control. Nothing in this Order shall alter or amend the Agreement and the obligations of the Debtors and Buyer thereunder.

36.     This Order and the Agreement shall be binding upon and govern the acts of all Persons and entities, including without limitation, the Debtors and the Buyer, their respective successors and permitted assigns, including, without limitation, any chapter 11 trustee hereinafter appointed for the Debtors' estates or any trustee appointed in a chapter 7 case if this case is converted from chapter 11, all creditors of any Debtor (whether known or unknown), filing agents, filing officers, title agents, recording agencies, secretaries of state, and all other persons and entities who may be required by operation of law, the duties of their office or contract to

067809.1001

accept, file, register, or otherwise record or release any documents or instruments or who may be required to report or insure any title in or to the Assets. All Encumbrances against the Debtors estates of record as of the Closing shall forthwith be removed and stricken as against the Assets, without further order of the Court or act of any party. Upon Closing, the entities listed above in this paragraph are authorized and directed to strike all such recorded Encumbrances against the Assets as provided for herein from their records, official and otherwise. Each and every federal, state, and local governmental agency, unit, or department are hereby directed to accept this Order as sole and sufficient evidence of the transfer of title of the Assets to the Buyer, and such agency, unit, or department may rely upon this Order in consummating the transactions contemplated by the Agreement.

37.     Any amounts that become payable by the Debtors to Buyer pursuant to the Agreement shall (a) constitute administrative expenses of the Debtors' estate under sections 503(b) and 507(a)(1) of the Bankruptcy Code, and (b) be paid by the Debtors in the time and manner provided by the Agreement, all without further Court order and notwithstanding any Encumbrances against the Debtors' estate.

38.     The provisions of this Order are non-severable and mutually dependent.

39.     Nothing in any order of this Court or contained in any plan of reorganization or liquidation confirmed in the Chapter 11 Cases, or in any subsequent or converted cases of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code, shall conflict with or derogate from the provisions of the Agreement or the terms of this Order.

40.     Notwithstanding Bankruptcy Rules 6004, 6006 and 7062, this Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing. In the absence of any person or entity obtaining a stay pending appeal, the Debtors and the Buyer

067809.1001

are free to close under the Agreement at any time, subject to the terms of the Agreement. If, in the absence of any person or entity obtaining a stay pending appeal, the Debtors and the Buyer close under the Agreement, the Buyer shall be deemed to be acting in "good faith" and shall be entitled to the protections of Bankruptcy Code § 363(m) as to all aspects of the transactions under and pursuant to the Agreement if this Order or any authorization contained herein is reversed or modified on appeal.

41. This Court shall retain jurisdiction even after the closing of these chapter 11 cases to:

a. interpret, implement, and enforce the terms and provisions of this Order, the Procedures Order, and the Agreement, all amendments thereto and any waivers or consents thereunder and each of the agreements executed in connection therewith in all respects;

b. decide any disputes concerning this Order, the Agreement, or the rights and duties of the parties hereunder or thereunder or any issues relating to the Agreement and this Order including, but not limited to, the interpretation of the terms, conditions and provisions hereof and thereof, the status, nature and extent of the Assets and any Designated Contracts and all issues and disputes arising in connection with the relief authorized herein, inclusive of those concerning the transfer of the assets free and clear of all Encumbrances;

c. protect the Buyer or any of the Designated Contracts or Assets against any of the Encumbrances as provided herein including, without limitation, to enjoin the commencement or continuation of any action seeking to impose

successor liability or bulk sale liability;

d.　　enter orders in aid or furtherance of the transactions contemplated by the Agreement or to ensure the peaceful use and enjoyment of the Designated Contracts or the Assets by the Buyer;

e.　　compel delivery of all Assets to the Buyer;

f.　　adjudicate any and all remaining issues concerning the Debtors' right and authority to assume and assign the Designated Contracts and the rights and obligations of the Debtors and the Buyer with respect to such assignment and the existence of any default under any such Designated Contract;

g.　　adjudicate any and all disputes concerning alleged pre-Closing Encumbrances in and to the Assets including without limitation the extent, validity, enforceability, priority, and nature of any and all such alleged Encumbrances;

h.　　adjudicate any and all disputes relating to the Debtors right, title, or interest in the Assets and the proceeds thereof; and

i.　　re-open the Debtors' chapter 11 case to determine any of the foregoing.

Dated:　Wilmington, Delaware
　　　　　_____, 2008

　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　Mary F. Walrath
　　　　　　　　　　　　　　　　United States Bankruptcy Judge

# EXHIBIT 1

## APA

ASSET PURCHASE AGREEMENT

Dated as of November 25, 2008

Among

ECLIPSE AVIATION CORPORATION,

Certain of Its Affiliates Named Herein, as Sellers,

And

ECLIPSEJET AVIATION INTERNATIONAL, INC., as Buyer

# TABLE OF CONTENTS

Page

**ARTICLE I**

**DEFINITIONS** ................................................................**1**
Section 1.1  Definitional and Interpretive Matters.............................1
Section 1.2  Accounting Terms and Determinations ........................2

**ARTICLE II**

**PURCHASE AND SALE** .........................................**3**
Section 2.1  Purchase and Sale of Purchased Assets .....................3
Section 2.2  Assumption of Liabilities........................................3
Section 2.3  Assignments.........................................................3
Section 2.4  Further Assurances................................................5

**ARTICLE III**

**PURCHASE PRICE** ..................................................**5**
Section 3.1  Purchase Price......................................................5
Section 3.2  Closing Date Payment; Issuance of Buyer Stock and Notes ....6
Section 3.3  Allocation of Purchase Price....................................6
Section 3.4  Closing Date.........................................................6
Section 3.5  Buyer's Deliveries..................................................6
Section 3.6  Sellers' Deliveries..................................................7
Section 3.7  Post-Closing Transaction Expenses ...........................8

**ARTICLE IV**

**REPRESENTATIONS AND WARRANTIES OF SELLERS** ..............**9**
Section 4.1  Organization of Sellers .........................................9
Section 4.2  Subsidiaries and Investments..................................9
Section 4.3  Authority of Sellers...............................................9
Section 4.4  Title to Purchased Assets .......................................9

**ARTICLE V**

**REPRESENTATIONS AND WARRANTIES OF BUYER** ...............**10**
Section 5.1  Organization and Authority of Buyer .......................10
Section 5.2  No Finder ...........................................................11
Section 5.3  Financing............................................................11

DB02:7587587.1                                                          067809.1001

**ARTICLE VI**

**ACTIONS PRIOR TO THE CLOSING DATE**..................................**11**
Section 6.1    Information Regarding the Business..................................11
Section 6.2    Contact with Customers, Vendors and Employees....................12
Section 6.3    Third Party Consents.................................................12
Section 6.4    Purchased Deposits .................................................12
Section 6.5    Governmental Approvals ............................................12
Section 6.6    Certain Provisions relating to Consents, Cooperation and Adequate Assurance..................................................14
Section 6.7    Conduct of Business Prior to the Closing Date ........................14
Section 6.8    Notification of Breach; Disclosure .................................14
Section 6.9    Insurance ..........................................................14
Section 6.10   Bankruptcy Matters; Bidding Process ...............................15
Section 6.11   Best Efforts .......................................................16
Section 6.12   Buyer Protections..................................................16
Section 6.13   Financial Statements ...............................................16
Section 6.14   Takeover Proposal; Confidential Information .........................16

**ARTICLE VII**

**ADDITIONAL AGREEMENTS** ..........................................**17**
Section 7.1    Taxes..............................................................17
Section 7.2    No Successor Liability to Sellers' Employees..........................18
Section 7.3    Employment........................................................18
Section 7.4    Collection of Receivables............................................20
Section 7.5    Adequate Assurances Regarding Assumed Contracts and Assumed Leases.............................................................20
Section 7.6    Certifications.......................................................20
Section 7.7    Certain Actions ....................................................20
Section 7.8    Cure Amounts .....................................................21
Section 7.9    Reasonable Access to Records and Certain Personnel ................21

**ARTICLE VIII**

**CONDITIONS TO CLOSING**............................................**21**
Section 8.1    Conditions to Obligations of Each Party ..............................21
Section 8.2    Conditions to Obligations of Buyer ..................................21
Section 8.3    Conditions to Obligations of Sellers .................................22

**ARTICLE IX**

**TERMINATION** .......................................................**23**
Section 9.1    Termination........................................................23
Section 9.2    Effect of Termination; Expense Reimbursement; Break-Up Fee..........24

DB02:7587587.1

067809.1001

## ARTICLE X

**INDEMNIFICATION** ...................................................................**25**

Section 10.1 No Survival of Representations, Warranties, Covenants and
Agreements .....................................................................25

## ARTICLE XI

**GENERAL PROVISIONS** ...........................................................**26**

Section 11.1 Confidential Nature of Information ......................................26
Section 11.2 No Public Announcement ..................................................26
Section 11.3 Notices ...................................................................26
Section 11.4 Successors and Assigns ....................................................28
Section 11.5 Entire Agreement; Amendments; Disclosure Schedules .............28
Section 11.6 Waivers ...................................................................28
Section 11.7 Expenses ..................................................................29
Section 11.8 Partial Invalidity..........................................................29
Section 11.9 Execution in Counterparts..................................................29
Section 11.10 Governing Law ...........................................................29
Section 11.11 No Third Party Beneficiaries .............................................30
Section 11.12 Eclipse Acting on Behalf of Sellers .......................................30

DB02:7587587.1

067809.1001

## EXHIBIT LIST

EXHIBIT A – FORM OF BUYER PROTECTIONS ORDER
EXHIBIT B – FORM OF SALE ORDER
EXHIBIT C – FORM OF NOTE
EXHIBIT D – FORM OF CONSENT

## ASSET PURCHASE AGREEMENT

This **ASSET PURCHASE AGREEMENT** (this "Agreement") is made as of November 25, 2008, by and among Eclipse Aviation Corporation, a Delaware corporation ("Eclipse") and certain of its Affiliates listed on Schedule I hereto (collectively, "Sellers") and EclipseJet Aviation International, Inc., a Delaware corporation ("Buyer"). Capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in Annex 1.

**WHEREAS**, Sellers are primarily engaged in (i) the design, production and sale of very light jet aircraft ("VLJs") and (ii) the support of the VLJs including training, maintenance, flight and data services and other product support (the "Business");

**WHEREAS**, each Seller will, not later than one (1) Business Day after the date of this Agreement, file voluntary petitions commencing Chapter 11 Bankruptcy Cases (which Sellers shall request to have jointly administered) (hereinafter, the "Bankruptcy Cases") pursuant to Title 11 of United States Code, 11 U.S.C. Sections 101 et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), the date such petitions are filed the "Petition Date";

**WHEREAS**, Sellers desire to sell to Buyer, the Purchased Assets and Buyer desires to purchase from Sellers the Purchased Assets and assume the Assumed Liabilities, upon the terms and conditions hereinafter set forth;

**WHEREAS**, the Parties intend to effectuate the transactions contemplated by this Agreement through a sale of the Purchased Assets pursuant to section 363 of the Bankruptcy Code; and

**WHEREAS**, the execution and delivery of this Agreement and Sellers' ability to consummate the transactions set forth in this Agreement are subject, among other things, to the entry of the Sale Order.

**NOW, THEREFORE**, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, the Parties agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.1    Definitional and Interpretive Matters.  Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(a)    Calculation of Time Period.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If

the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(b)    <u>Dollars</u>.  Any reference in this Agreement to $ shall mean U.S. dollars.

(c)    <u>Exhibits/Schedules</u>.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in Annex 1.

(d)    <u>Gender and Number</u>.  Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(e)    <u>Headings</u>.  The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement.  All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

(f)    <u>Herein</u>.  The words such as "herein," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(g)    <u>Including</u>.  The word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(h)    <u>No Strict Construction</u>.  The Parties participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

Section 1.2    <u>Accounting Terms and Determinations</u>.  Unless otherwise specified herein, all accounting terms used herein shall be interpreted, all determinations with respect to accounting matters hereunder shall be made, and all financial statements and certificates and reports as to financial matters required to be furnished hereunder shall be prepared, in accordance with GAAP.

DB02:7587587.1    067809.1001

# ARTICLE II

## PURCHASE AND SALE

Section 2.1    <u>Purchase and Sale of Purchased Assets</u>.

(a)    On the terms and subject to the conditions set forth in this Agreement, at the Closing (and on the applicable Assumption Date with respect to Purchased Assets consisting of rights under any Designated Contract assumed by a Seller and assigned to Buyer after the Closing Date as provided herein) Buyer shall purchase from Sellers, and Sellers shall sell, transfer, assign, convey and deliver or cause to be sold, transferred, assigned, conveyed and delivered to Buyer, all of the Purchased Assets, free and clear of all Liens and free and clear of all Liabilities (other than Assumed Liabilities).

(b)    <u>Indivisible Transaction</u>. The sale of all of the Purchased Assets to Buyer constitutes a single, indivisible transaction and the Purchased Assets are intended to be sold to Buyer as a single, indivisible group of assets.

Section 2.2    <u>Assumption of Liabilities</u>.

(a)    On the terms and subject to the conditions set forth in this Agreement, at the Closing (and on the applicable Assumption Date with respect to Assumed Liabilities under any Designated Contract assumed by a Seller and assigned to Buyer after the Closing Date as provided herein), Buyer shall assume and become responsible for the Assumed Liabilities.

(b)    ANYTHING CONTAINED HEREIN TO THE CONTRARY NOTWITHSTANDING, EXCEPT FOR THE ASSUMED LIABILITIES DESCRIBED IN THIS <u>SECTION 2.2</u>, BUYER SHALL NOT AND BUYER DOES NOT ASSUME ANY LIABILITIES, TAXES (OTHER THAN AS SET FORTH IN ARTICLE VII HEREOF), OR OBLIGATIONS (FIXED OR CONTINGENT, KNOWN OR UNKNOWN, MATURED OR UNMATURED) OF THE SELLERS WHETHER OR NOT ARISING OUT OF OR RELATING TO THE ASSETS OR THE BUSINESS OR ANY OTHER BUSINESS OF THE SELLERS, ALL OF WHICH LIABILITIES, TAXES, AND OBLIGATIONS SHALL, AT AND AFTER THE CLOSING, REMAIN THE EXCLUSIVE RESPONSIBILITY OF THE SELLERS (AS APPLICABLE).

Section 2.3    <u>Assignments</u>.

(a)    <u>Schedule 2.3</u> lists all Assumed Contracts and Assumed Leases that Buyer may elect to assume and have Sellers assume and assign to Buyer at Closing (the "<u>Designated Contracts</u>"). Buyer shall have until entry of the Approval Order to designate which of such Contracts it wishes to assume and have the Sellers assume and assign to Buyer at Closing (such date being referred to herein as the "<u>Contract Designation Date</u>"). In all cases, appropriate additions and deletions to <u>Schedule 2.3</u> (and corresponding additions and deletions to <u>Schedule A-1</u>, <u>Schedule A-2</u> and <u>Schedule A-3</u>) shall be made to reflect such elections made by Buyer.

3

(b)     If, at any time after the date hereof through the 90th Business Day after the Closing Date, any party to this Agreement becomes aware that any Seller is a party to any Contract related to the Business that is not an Excluded Asset and is not disclosed on <u>Schedule 2.3</u> (each, an "<u>Undisclosed Contract</u>"), the discovering party shall immediately notify the other parties of this Agreement in writing (the "<u>Notification</u>") of such Undisclosed Contract. For a period of thirty (30) Business Days after the date of Buyer's receipt or delivery, as the case may be of the Notification, Buyer shall have the right, in it sole discretion, to require the Seller that is the party to such Undisclosed Contract to file one or more motions with the Bankruptcy Court (which motion(s) shall be in form and substance reasonably satisfactory to Buyer) seeking the entry of an order (the "<u>Undisclosed Contract Assignment Order</u>"), pursuant to Sections 363 and 365 of the Bankruptcy Code, to assign, transfer, convey and deliver to Buyer or one of its designated Affiliates such Undisclosed Contract as if it had been disclosed on <u>Schedule 2.3</u>, or to otherwise transfer to the benefits of such Undisclosed Contract to the Buyer or one of its designated Affiliates without any additional consideration (except for any obligation Buyer may have to pay applicable Cure Costs pursuant to <u>Section 7.8</u>), by written notice to such Seller or Affiliate. Any Cure Costs in relation to any such Undisclosed Contract shall be dealt with in accordance with <u>Section 7.8</u>. In the event that Buyer notifies a Seller of Buyer's desire to assume any Undisclosed Contract, such Seller shall, as soon as practicable after receiving such notification, file with Bankruptcy Court the motion(s) seeking the entry of the Undisclosed Contract Assignment Order. In addition, such Seller shall (i) use its reasonable best efforts to cause the Undisclosed Contract Assignment Order to become a Final Order and (ii) not take any action that would reasonably be expected to delay, prevent or impede the entry of, or result in the revocation, modification or amendment of, the Undisclosed Contract Assignment Order. Any Undisclosed Contract that Buyer elects to acquire pursuant to <u>Schedule 2.3</u> and for which an Undisclosed Contract Assignment Order is entered and becomes a Final Order shall constitute a Purchased Asset.

(c)     Sellers shall promptly notify Buyer in writing of any new Contract entered into after the commencement of the Bankruptcy Cases (each, a "<u>Post-Petition Contract</u>"). No later than the date that is the later of (i) Contract Designation Date, and (ii) ten (10) Business Days subsequent to the date that a copy of such Post-Petition Contract is delivered or made available to Buyer, Buyer shall notify Sellers in writing whether it will assume such Post-Petition Contract.

(d)     With respect to each Designated Contract, on the Closing Date, Sellers shall (i) assume such Designated Contract in the Bankruptcy Cases and (iii) subject to Buyer curing all defaults under such Designated Contract and providing adequate assurance of performance to the counterparty thereto to the extent required by the Bankruptcy Court, assign such Designated Contract to Buyer pursuant to an Order of the Bankruptcy Court (which may be the Sale Order). Effective on the Closing Date, Buyer shall assume each such Designated Contract.

(e)     The Sale Order shall provide that as of the Closing, Sellers (as applicable) shall assign to Buyer the Designated Contracts and the Designated Contracts shall be identified by (i) the name and date of the Designated Contracts (if available), (ii) the other party to the Designated Contract, and (iii) the address of such party for notice purposes, all included on an exhibit attached to either the motion filed in connection with the Sale Order or

4

a motion for authority to assume and assign such Designated Contracts or a notice filed pursuant to the Bidding Procedures Order. Such exhibit shall also (i) set forth the amounts necessary to cure any defaults under each of the Designated Contracts as determined by Sellers based on Sellers' books and records or as otherwise determined by the Bankruptcy Court, and (ii) delineate a procedure for transferring to Buyer the rights to any security deposits in the form of cash or letters of credit on deposit with the other party to any Designated Contract.

(f)     In the case of licenses, certificates, approvals, authorizations, leases, Contracts and other commitments included in the Purchased Assets that cannot be transferred or assigned effectively without the consent of any third party, which consent has not been obtained prior to the Closing (after giving effect to the Sale Order and the Bankruptcy Code), Sellers shall, subject to any approval of the Bankruptcy Court that may be required and the terms set forth in Section 6.3, cooperate with Buyer in endeavoring to obtain such consent.

Section 2.4     Further Assurances.

(a)     At the Closing, and at all times thereafter as may be necessary, upon the request of the Buyer, Sellers shall execute and deliver (or use its best efforts to have any applicable third party execute and deliver) such instruments of transfer and instruments of release as shall be reasonably necessary to vest in Buyer title to the Purchased Assets free and clear of all Encumbrances, and such other instruments, agreements and documents as shall be reasonably necessary to evidence the assignment by Sellers and the assumption by Buyer or its designee of the Assumed Liabilities, including the Assumed Contracts and the Assumed Leases. Sellers and Buyer shall cooperate with one another to execute and deliver such other documents and instruments as may be reasonably required to carryout the transactions contemplated hereby.

(b)     At the Closing, and at all times thereafter as may be necessary, Sellers shall, at the reasonable request of Buyer, execute, deliver, and file, or cause to be executed, delivered, and filed by any applicable third party, such other instruments of conveyance, transfer and release and take such other actions as Buyer may reasonably request, in order to more effectively consummate the transactions contemplated by this Agreement and to vest in Buyer title to the Seller Intellectual Property free and clear of all Encumbrances, including, without limitation, executing, filing, and recording, with all appropriate intellectual property registration authorities and other relevant entities, all assignment instruments and other filings that are necessary to correctly record the prior chain of title with respect to ownership of the Seller Intellectual Property.

# ARTICLE III

# PURCHASE PRICE

Section 3.1     Purchase Price. Subject to the terms and conditions set forth in this Agreement and in reliance upon the representations and warranties of the Parties set forth herein, at the Closing, the aggregate purchase price to be paid by Buyer to the Sellers in

exchange for the Purchased Assets shall be an amount equal to (i) the Cash Consideration which amount shall be payable as set forth in <u>Section 3.2</u> below, plus (ii) the Note Consideration, plus (iii) the Stock Consideration, plus (iv) the Buyer Funded Transaction Expenses (items (i)-(iv), collectively, the "<u>Purchase Price</u>").

Section 3.2 <u>Closing Date Payment; Issuance of Buyer Stock and Notes</u>. At the Closing, Buyer shall (i) pay to Sellers by wire transfer of immediately available funds to the account(s) designated by Sellers, the Cash Purchase Price, (ii) issue stock certificates to Sellers, or to such other Persons as designated by Sellers, which represent the Closing Buyer Shares and (iii) issue to the Sellers, or such other Persons as designated by Sellers, the Notes in an aggregate principal amount equal to the Note Consideration.

Section 3.3 <u>Allocation of Purchase Price</u>. Buyer shall determine the allocation of the consideration paid by Buyer for the Purchased Assets. Each party hereto agrees (i) that any such allocation shall be consistent with the requirements of Section 1060 of the Code and the regulations thereunder, (ii) to complete jointly and to file separately Form 8594 with its Federal income Tax Return consistent with such allocation for the tax year in which the Closing Date occurs and (iii) that no party will take a position on any income, transfer or gains Tax Return, before any Governmental Authority charged with the collection of any such Tax or in any judicial proceeding, that is in any manner inconsistent with the terms of any such allocation without the consent of the other party.

Section 3.4 <u>Closing Date</u>. Upon the terms and conditions set forth in this Agreement the closing of the sale of the Purchased Assets and the assumption of the Assumed Liabilities contemplated hereby (the "<u>Closing</u>") shall take place at the offices of Goodwin Procter LLP, The New York Times Building, 620 Eighth Avenue, New York, NY 10018-1405, as promptly as practicable, and at no time later than the third Business Day, following the date on which the conditions set forth in <u>Article VIII</u> have been satisfied or waived (other than the conditions which by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), or at such other place or time as Buyer and Sellers may mutually agree. The date and time at which the Closing actually occurs is hereinafter referred to as the "<u>Closing Date</u>."

Section 3.5 <u>Buyer's Deliveries</u>. At or prior to the Closing, Buyer shall deliver to Sellers, in addition to the Cash Purchase Price:

(a) an assumption and assignment agreement having terms and conditions consistent with this Agreement and otherwise in form and substance reasonably satisfactory to Buyer (the "<u>Assumption and Assignment Agreement</u>") and each other Ancillary Document to which Buyer is a party, duly executed by Buyer;

(b) stock certificates representing, in the aggregate, the Closing Buyer Shares issued in the name of the Sellers or such other Persons as designated by the Sellers;

(c) the Notes, having an aggregate principal amount of $160,000,000, issued in the name of the Sellers or such other Persons as designated by the Sellers;

(d)     the certificates required to be delivered pursuant to Sections 8.3(a) and 8.3(b);

(e)     a certificate of an authorized Person of Buyer, dated the Closing Date, in form and substance reasonably satisfactory to Sellers, as to (i) Buyer's authorization to execute and perform its obligations under this Agreement and the Ancillary Documents to which Buyer is a party and (ii) incumbency and signatures of the authorized Persons of Buyer executing this Agreement and such Ancillary documents; and

(f)     such other assignments and other good and sufficient instruments of assumption and transfer, in form reasonably satisfactory to Sellers, as Sellers may reasonably request to transfer and assign the Assumed Liabilities to Buyer.

Section 3.6     Sellers' Deliveries. At or prior to the Closing, Sellers shall deliver to Buyer:

(a)     a bill of sale, in form and substance reasonably satisfactory to Buyer (the "Bill of Sale"), the Assumption and Assignment Agreement and each other Ancillary Document to which any Seller is a party, duly executed by such Sellers;

(b)     instruments of assignment of the Patents, Trademarks, Copyrights and Domain Names that are owned by Sellers and included in the Purchased Assets, if any, duly executed by Sellers, in form and substance reasonably satisfactory to Buyer and any other assignments or instruments with respect to any Seller Intellectual Property for which an assignment or instrument is required to assign, transfer and convey such assets to Buyer;

(c)     a certified copy of the Sale Order;

(d)     the officer's certificates required to be delivered pursuant to Sections 8.2(a) 8.2(b) and 8.2(c);

(e)     a General Release of Buyer and its officers, directors, shareholders, agents, employees, representatives and Affiliates, in form and substance reasonably satisfactory to Buyer (the "Release"), executed by each Seller and by the holders of at least 90% of the aggregate principal amount of the Senior Notes (excluding any Senior Notes held by Al Mann or any Affiliate of Al Mann);

(f)     certificates executed by each Seller, in the form prescribed under Treasury Regulation Section 1.1445-2(b), that such Seller is not a foreign person within the meaning of Section 1445(f)(3) of the Code;

(g)     to the extent approved by the Sale Order, instruments of assumption and assignment of the Assumed Leases in form and substance reasonably satisfactory to Buyer (the "Assumption and Assignment of Leases"), duly executed by Sellers, in form for recordation with the appropriate public land records, if necessary, and any other related documentation or instruments with respect to any Assumed Lease reasonably requested by Buyer;

DB02:7587587.1

067809.1001

(h)     to the extent in Sellers' possession: (i) all lease files for the Assumed Leases (including copies of any plans of the Leased Real Property), and (ii) keys for the Leased Real Property, the combination of any safes located in the Leased Real Property, and the access codes for any electronic security system located at the Leased Real Property, in each case, in respect of the Assumed Leases;

(i)     a certificate of an authorized Person of Sellers, dated the Closing Date, in form and substance reasonably satisfactory to Buyer, as to (i) Sellers authorization to execute and perform its obligations under this Agreement and the Ancillary Documents to which Sellers are a party and (ii) incumbency and signatures of the authorized Persons of Sellers executing this Agreement such Ancillary Documents;

(j)     all instruments and documents necessary to release (or evidence the release of) any and all Encumbrances, including, without limitation, appropriate UCC financing statement amendments (termination statements), mortgage release instruments and certificates of title;

(k)     such other bills of sale, deeds, endorsements, assignments and other good and sufficient instruments of conveyance and transfer, in form reasonably satisfactory to Buyer, as Buyer may reasonably request to vest in Buyer all the right, title and interest of Sellers in, to or under any or all the Purchased Assets; and

(l)     all other documents required to be entered into by the Sellers pursuant to this Agreement or reasonably requested by the Buyer to convey the Purchased Assets to Buyer or to otherwise consummate the transactions contemplated by this Agreement.

Section 3.7   <u>Post-Closing Transaction Expenses</u>.  At such time as the Transaction Expenses shall exceed the amount of the Closing Transaction Expenses, Buyer shall pay to Sellers as additional Purchase Price by wire transfer of immediately available funds to the account(s) designated by Sellers, no more frequently than once per month, upon reasonable certification and invoice, an amount equal to Fifty Percent (50%) the Transaction Expenses incurred in excess of Five Million Dollars ($5,000,000) and up to a maximum amount of Ten Million Dollars ($10,000,000) of Transaction Expenses.  The amount by which the Buyer is obligated to fund the Transaction Expenses in excess of the Closing Transaction Expenses pursuant to this provision is referred to herein as the "<u>Post-Closing Transaction Expenses</u>" and, together with the Closing Transaction Expenses, the "<u>Buyer Funded Transaction Expenses</u>"). For purposes of clarification, the Buyer's obligation hereunder to pay Purchase Price with respect to Buyer Funded Transaction Expenses shall not exceed Seven Million Five Hundred Thousand Dollars ($7,500,000).  Any provision for the payment of the Transaction Expenses in excess of the Buyer Funded Transaction Expenses shall be set forth in the Sale Order and shall provide that such Transaction Expenses shall be payable from the other assets of the estate.

DB02:7587587.1 067809.1001

# ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF SELLERS

As an inducement to Buyer to enter into this Agreement and to consummate the transactions contemplated hereby, each Seller jointly and severally represents and warrants to Buyer as of the date hereof and as of the Closing Date as follows:

Section 4.1    Organization of Sellers.  Each Seller is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization set forth opposite each such entities' name on Schedule 4.1.  Each Seller is in good standing in each of the jurisdictions in which the ownership or leasing of its properties or the conduct of its businesses requires such qualification, except where failure to so qualify or be in good standing would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  Each Seller has full corporate or similar power and authority to own or lease and to operate and use the Purchased Assets and to carry on the Business as, in all material respects, now conducted.

Section 4.2    Subsidiaries and Investments.  Except as set forth on Schedule 4.2, each of the Sellers do not, directly or indirectly, own, of record or beneficially, any outstanding voting securities, membership interests or other equity interests in any Person.

Section 4.3    Authority of Sellers.  Each Seller has full power and authority to execute, deliver and, subject to the entry of the Sale Order, perform its obligations under, and consummate the transactions contemplated by, this Agreement and each of the Ancillary Documents to which such Seller is a party.  The execution, delivery and performance of this Agreement and such Ancillary Documents by each Seller, and consummation of the transactions contemplated hereby and thereby, have been duly authorized and approved by all required action on the part of each Seller, including by each Seller's board of directors (or similar governing body) and, subject to the entry of the Sale Order, does not require any authorization or consent of any Seller's shareholders or members that has not been obtained.  This Agreement has been duly authorized, executed and delivered by each Seller and, subject to the entry of the Sale Order, is the legal, valid and binding obligation of each Seller enforceable in accordance with its terms, and each of the Ancillary Documents to which each Seller is a party has been duly authorized by Seller and upon execution and delivery by each Seller and subject to the entry of the Sale Order, will be a legal, valid and binding obligation of each Seller enforceable in accordance with its terms in each case, subject as to enforceability, to bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and other laws of general applicability relating to or affecting creditors' rights and to general principals of equity.

Section 4.4    Title to Purchased Assets.  Sellers have, and, upon delivery to Buyer on the Closing Date of the instruments of transfer contemplated by Section 3.6, and subject to the terms of the Sale Order, Sellers will thereby transfer to Buyer, good and valid title to, or, in the case of property leased or licensed by Sellers, a valid and subsisting leasehold interest in or a legal, valid and enforceable licensed interest in or right to use, all of the material Purchased Assets (other than any Non-Transferable Agreement), free and clear of all Encumbrances, except for the Assumed Liabilities and Permitted Liens.  Except for the Excluded

9

Assets and any Non-Transferable Assets there are no material assets, material properties, material rights or material interests of any kind or nature that Sellers have been using, holding or operating in the Business that will not be used, held or owned by Buyer immediately following the Closing.

# ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF BUYER

As an inducement to Sellers to enter into this Agreement and to consummate the transactions contemplated hereby, Buyer hereby represents and warrants to Sellers as of the date hereof and as of the Closing Date as follows:

Section 5.1    <u>Organization and Authority of Buyer</u>.

(a)    Buyer is a Delaware corporation, duly organized, validly existing and in good standing under the laws of the State of Delaware. Buyer has full corporate power and authority to execute, deliver and perform its obligations under this Agreement and all of the Ancillary Documents to which it is a party. The execution, delivery and performance of this Agreement and such Ancillary Documents by Buyer have been duly authorized and approved by Buyer's board of directors and do not require any further authorization or consent of Buyer or its board of directors or stockholders. This Agreement has been duly authorized, executed and delivered by Buyer and is the legal, valid and binding agreement of Buyer enforceable against Buyer in accordance with its terms, and each Ancillary Document to which Buyer is a party has been duly authorized by Buyer and upon execution and delivery by Buyer will be a legal, valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms, except as (i) enforceability may be limited by bankruptcy, insolvency, reorganization or other similar laws affecting creditors rights generally and (ii) the remedy of specific performance and injunctive and other forms of equitable relief may be subject to equitable defenses.

(b)    Subject to the receipt of the Required Consents, neither the execution and delivery of this Agreement or any of such Ancillary Documents or the consummation of any of the transactions contemplated hereby or thereby nor compliance with or fulfillment of the terms, conditions and provisions hereof or thereof will:

(i)    conflict with, result in a breach of the terms, conditions or provisions of, or constitute a default, or an event of default under (1) Buyer's certificate of incorporation or bylaws, (2) any Order to which Buyer is a party or by which it is bound or (3) any Legal Requirement affecting Buyer; or

(ii)    require the approval, consent, authorization or act of, or the making by Buyer of any declaration, filing or registration with, any Person, other than filings with the Bankruptcy Court or under the HSR Act or other anti-trust or competition laws.

10

Section 5.2    No Finder.  Except as set forth on Schedule 5.2, neither Buyer nor any Person acting on its behalf has paid or become obligated to pay any fee or commission to any broker, finder or intermediary for or on account of the transactions contemplated by this Agreement for which any Seller is or will become liable, and Buyer shall hold harmless and indemnify Seller from any claims with respect to any such fees or commissions.

Section 5.3    Financing.  Buyer and Buyer Parent have previously delivered to the Sellers true, correct and complete copies of the following: (a) a fully executed commitment letter (the "AIP Commitment Letter") from AirLyper Investment Partners, a Spanish entity (the "AIP"), providing the terms and conditions upon which AIP has committed to provide Buyer Parent with financing (the "AIP Financing") in an aggregate amount equal to Seventy-Five Million Dollars ($75,000,000); (b) fully executed letters (the "VEB Letters"), describing certain commercial relationships between Buyer Parent and its Affiliates and the Russian Federation Bank for Development and Foreign Economic Affairs ("Vnesheconombank" or "VEB") which provide for a loan facility by VEB to a subsidiary of Buyer Parent in an aggregate amount of Two Hundred Five Million Dollars ($205,000,000); and (c) a fully executed letter (the "Equity Commitment Letter, and together with the AIP Commitment Letter and the VEB Letters, the "Financing Letters") from Buyer Parent pursuant to which Buyer Parent has committed to provide or cause to be provided to Buyer equity financing in an aggregate amount of up to One Hundred Fifty Million Dollars ($150,000,000).  The financing contemplated by the Financing Letters (the "Financing") are sufficient for Buyer to (1) pay the Cash Purchase Price, (2) after payment of the Cash Purchase Price, provide Buyer with at least Twenty-One Million Eight Hundred Thousand Dollars ($21,800,000) in cash for the operations of Buyer post-Closing and (3) to fulfill the financing obligations of Buyer and Buyer Parent contemplated by Section 8.3(d).


**ARTICLE VI**

**ACTIONS PRIOR TO THE CLOSING DATE**

The Parties, as applicable to the extent set forth below, covenant and agree to take the following actions between the date hereof and the earlier of the termination of this Agreement and the Closing Date:

Section 6.1    Information Regarding the Business.  Sellers will (a) provide Buyer and its officers, employees, counsel, accountants, partners, affiliates, financial advisors, consultants and other representatives (collectively, "Representatives") with reasonable access, upon reasonable prior notice and during normal business hours, to the Employees, officers and agents of Sellers who have any responsibility for the conduct of the Business, and to the Purchased Assets, but only to the extent that such access does not unreasonably interfere with the Business and (b) furnish Buyer and such other Persons with such information and data (including without limitation copies of Business Contracts, Business Licenses, personal property Leases and other Business books and records) concerning the Business, the Purchased Assets and the Assumed Liabilities as Buyer or any of such other Persons reasonably may request in connection with such investigation, except to the extent that furnishing any such information or data would violate any Law, Order, Contract or License applicable to any Seller or by which any of its assets

11

and properties is bound. Sellers shall notify Buyer of (i) any material Contract entered into by Sellers, (ii) any material Contract that is terminated and (iii) any material amendment to a material Business Contract, in each case promptly and, in any event, not later than the third Business Day prior to the Auction.

Section 6.2 <u>Contact with Customers, Vendors and Employees</u>. Subject to applicable Law, Eclipse shall use its commercially reasonable efforts to facilitate Buyer's contact and communication with the key employees of the Sellers, and to the extent agreed by any Seller, customers, suppliers, vendors and distributors of the Business of such Seller as requested by Buyer to Eclipse at any time from and after the execution of this Agreement. All such contact and communication will be requested through, and arranged by, one or more members of senior management of Eclipse to be designated in writing to Buyer.

Section 6.3 <u>Third Party Consents</u>. Sellers shall use their commercially reasonable efforts to obtain all Third Party Consents; <u>provided</u>, that Sellers shall not be required to pay or commit to pay any amount to (or incur any obligation in favor of) any person from whom any such consent may be required (other than nominal filing or application fees).

Section 6.4 <u>Purchased Deposits</u>. Sellers will take all commercially reasonable steps necessary to transfer to Buyer on the Closing Date all of Sellers' right, title and interest in and to the Purchased Deposits.

Section 6.5 <u>Governmental Approvals</u>.

(a) Subject to <u>Section 6.5(c)</u>, as soon as reasonably practicable following the Auction if Buyer is the Successful Bidder (or earlier if Buyer so determines in its sole discretion), Sellers, and Buyer shall each prepare and file, or cause to be prepared and filed, an appropriate filing of a Notification and Report Form (the "<u>HSR Filing</u>") pursuant to the HSR Act with the United States Federal Trade Commission ("<u>FTC</u>") and the United States Department of Justice ("<u>DOJ</u>"), and request early termination of the waiting period under the HSR Act. Subject to the limitations set forth in this <u>Section 6.5</u>, each party shall promptly respond to any requests for additional information in connection with such filings and shall take all other reasonable actions to cause the waiting periods under the HSR Act to terminate or expire at the earliest possible date after the date of filing.

(b) In addition to the actions to be taken under <u>Section 6.5(a)</u>, during the period prior to the Closing Date, Sellers and Buyer shall act diligently and reasonably, and shall cooperate with each other, to do or cause to be done, all things necessary, proper or advisable consistent with applicable confidentiality and Legal Requirements to cause the conditions precedent to the Closing to be satisfied and to cause the Closing to occur, including to secure any consents and approvals of any governmental authority required to be obtained by them under non-United States antitrust or competition laws, in order to assign or transfer any Permits to Buyer, to permit the consummation of the transactions contemplated by this Agreement, or to otherwise satisfy the conditions set forth in <u>Article VIII</u>, in each case as necessary to the extent such consents are not provided for or satisfied by the Sale Order; <u>provided</u>, <u>however</u>, that Sellers shall not make any agreement or understanding affecting the Purchased Assets or the Business (excluding the Excluded Assets or Excluded Liabilities) as a

condition for obtaining any such consents or approvals except with the prior written consent of Buyer. Subject to the limitations set forth in this Section 6.5, Buyer shall act diligently and reasonably to cooperate with Sellers, to the extent commercially reasonable, to obtain the consents and approvals contemplated by this Section 6.5(b); provided, however, Buyer shall not be required to waive any of the conditions to Closing set forth in Article VIII.

(c) Subject to all applicable confidentiality and Legal Requirements, each Seller and Buyer (i) shall promptly inform each other of any communication from any Governmental Authority concerning this Agreement, the transactions contemplated hereby, and any filing, notification or request for approval and (ii) shall permit the other Party to review in advance any proposed written communication or information submitted to any such Governmental Authority in response thereto; provided, however, that no Party shall be required to provide any other Party with copies of confidential documents or information included in its filings and submissions under the HSR Act, and provided, further, that a Party may request entry into a joint defense agreement as a condition to providing any such materials and that, upon receipt of that request, the Parties shall work in good faith to enter into a joint defense agreement to create and preserve attorney-client privilege in a form and substance mutually acceptable to the Parties. In addition, none of Parties shall agree to participate in any meeting with any Governmental Authority in respect of any filings, investigation or other inquiry with respect to this Agreement or the transactions contemplated hereby, unless such Party consults with the other Parties in advance and, to the extent permitted by any such Governmental Authority, gives the other Parties the opportunity to attend and participate thereat, in each case to the maximum extent practicable. Subject to any restrictions under applicable laws, rules or regulations, each Party shall furnish the other with copies of all correspondence, filings and communications (and memoranda setting forth the substance thereof) between it and its Affiliates and their respective Representatives on the one hand, and the Governmental Authority or members of its staff on the other hand, with respect to this Agreement, the transactions contemplated hereby (excluding documents and communications which are subject to preexisting confidentiality agreements or to the attorney-client privilege or work product doctrine) or any such filing, notification or request for approval. Each Party shall also furnish the other Party with such necessary information and assistance as such other party and its Affiliates may reasonably request in connection with their preparation of necessary filings, registration or submissions of information to the Governmental Authority in connection with this Agreement, the transactions contemplated hereby and any such filing, notification or request for approval. Sellers and Buyer shall prosecute all required requests for approval with all necessary diligence and otherwise use their respective commercially reasonable efforts to obtain the grant thereof by an Order as soon as possible.

(d) Notwithstanding anything else to the contrary in this Agreement, in the event that any administrative or judicial action or proceeding is instituted (or threatened to be instituted) by a Governmental Authority or private party challenging the transactions hereunder or any other agreement contemplated hereby, (i) each Party shall cooperate in all respects with each other and use its respective best efforts to contest and resist any such action or proceeding and to have vacated, lifted, reversed or overturned any decree, judgment, injunction or other order, whether temporary, preliminary or permanent, that is in effect and that prohibits, prevents or restricts consummation of the transactions contemplated by this

13

Agreement, and (ii) Buyer must defend, at its sole cost and expense, any action or actions, whether judicial or administrative, in connection with the transactions contemplated by this Agreement. Notwithstanding the foregoing, in no event shall Buyer be required to divest any of the Purchased Assets in order to comply with this Section 6.5(d).

Section 6.6    Certain Provisions relating to Consents, Cooperation and Adequate Assurance. Sellers shall use commercially reasonable efforts prior to and after the Closing Date to obtain all consents of Governmental Agencies and counterparties to Contracts and Leases that Buyer has designated as Assumed Contracts or Assumed Leases that are required in connection with the transactions contemplated by this Agreement; provided, however, that Sellers shall not be obligated to offer or to pay any consideration or grant any financial accommodation in connection therewith.

Section 6.7    Conduct of Business Prior to the Closing Date. From and after the date hereof until the earlier of the Closing Date and the termination of this Agreement in accordance with the terms of Article IX hereof, Sellers shall maintain the Purchased Assets and operate and carry on the Business only in the Ordinary Course of Business, except as otherwise contemplated by this Agreement or with the consent of Buyer. Consistent with the foregoing and to the extent permitted or required by the Bankruptcy Cases, Sellers shall use commercially reasonable efforts to (i) continue operating the Business as a going concern in the Ordinary Course of Business, (ii) maintain the Purchased Assets and the assets and properties of, or used by, the Sellers relating to the Business in their current condition (ordinary wear and tear excepted), (iii) maintain the business organization of the Business intact, including its agents, employees, consultants and independent contractors, (iv) maintain the Documents of the Business, (v) comply with all Legal Requirements, and (vi) preserve the goodwill of the manufacturers, suppliers, contractors, licensors, employees, customers, distributors and others having business relations with the Business. In connection therewith, no Seller shall (1) offer employment for any period on or after the Closing Date to any employee or agent of the Business unless Buyer has determined not to make an offer of employment in accordance with the terms set forth herein to such employee or agent; or (2) otherwise attempt to persuade any such employee or agent to terminate his or her relationship with the Business.

Section 6.8    Notification of Breach; Disclosure. Each Party shall promptly notify the other of any event, condition or circumstance of which such Party becomes aware prior to the Closing Date that would cause, or would reasonably be expected to cause, a violation or breach of this Agreement (or a breach of any representation or warranty contained in this Agreement). During the period prior to the Closing Date, each Party will promptly advise the other in writing of any written notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement. It is acknowledged and understood that no notice given pursuant to this Section 6.8 shall have any effect on the representations, warranties, covenants or agreements contained in this Agreement for purposes of determining satisfaction of the conditions contained herein.

Section 6.9    Insurance. Until the Closing, Sellers shall maintain (including necessary renewals thereof) Insurance Policies against risk and liabilities to the extent and in the manner and at the levels maintained by Sellers as of the date hereof with respect to the Business

and the Purchased Assets. If requested by Buyer, the Sellers shall in good faith cooperate with Buyer and take all actions reasonably requested by Buyer that are necessary or desirable to permit Buyer to have available to it following the Closing the benefits (whether direct or indirect) of the insurance policies maintained by or on behalf of the Sellers with respect to the Business, the Purchased Assets or the Assumed Liabilities that are currently in force and in the manner and at the levels maintained by Sellers as of the date hereof.

Section 6.10 <u>Bankruptcy Matters; Bidding Process</u>.

(a)     Sellers and Buyer acknowledge that this Agreement and the sale of the Purchased Assets are subject to Bankruptcy Court approval. Sellers and Buyer acknowledge that (i) to obtain such approval, Sellers must demonstrate that they have taken reasonable steps to obtain the highest or otherwise best offer possible for the Purchased Assets, including, but not limited to, giving notice of the transactions contemplated by this Agreement to creditors and certain other interested parties as ordered by the Bankruptcy Court, and conducting an auction in respect of the Purchased Assets (the "<u>Auction</u>"), and (ii) Buyer must cure all defaults and provide adequate assurance of future performance under the Designated Contracts.

(b)     Promptly, but in no event later than one (1) Business Day after the commencement of the Bankruptcy Cases, Eclipse shall file with the Bankruptcy Court a motion (the "<u>Sale Motion</u>"), notices and proposed orders, each in form and substance reasonably satisfactory to Buyer seeking the Bankruptcy Court's issuance of:

(i)     an Order in the form of <u>Exhibit A</u> hereto (the "<u>Buyer Protections Order</u>" or "<u>Bidding Procedures Order</u>"); and

(ii)     an Order in the form of <u>Exhibit B</u> hereto, with all incomplete items contained therein completed in Buyer's reasonable discretion (the "<u>Sale Order</u>").

(c)     Sellers shall serve a copy of the Sale Motion on: (i) all entities that claim any interest in or lien upon the Purchased Assets; (ii) all parties to Designated Contracts; (iii) all governmental taxing authorities that have or as a result of the sale of the Purchased Assets may have claims, contingent or otherwise, against the Sellers; (iv) all parties that filed requests for notices under Bankruptcy Rule 9010(b) or were entitled to notice under Bankruptcy Rule 2002; (v) all creditors (whether liquidated, contingent or unmatured) of the Sellers; (vi) all interested governmental, pension, environmental and other regulatory entities; (vii) the attorneys general of all states in which the Purchased Assets are located; (viii) the Office of the United States Trustee; and (ix) all entities that expressed to the Sellers an interest in purchasing the Purchased Assets in the twelve (12) months prior to the date of this Agreement. Sellers shall serve a notice of the Sale Motion on all parties to Contracts and Leases (other than Excluded Assets).

(d)     Sellers shall use their reasonable best efforts to provide Buyer with copies of all motions, applications and supporting papers prepared by or on behalf of the Sellers (including forms of orders and notices to interested parties) directly relating to the Purchased Assets or this Agreement at least two (2) Business Days, unless the exigencies of

time prevent the period from being that long, prior to the filing thereof in the Bankruptcy Cases so as to allow Buyer to provide reasonable comments for incorporation into same; except that the Sale Motion (including forms of orders and notices to interested parties) shall be provided to Buyer at least three (3) Business Days prior to its filing.

Section 6.11   Best Efforts.   Upon the terms and subject to the conditions of this Agreement, each of the parties hereto shall use its best efforts to take, or cause to be taken, all action, and to do, or cause to be done, all things necessary, proper or advisable consistent with applicable Legal Requirements to consummate and make effective in the most expeditious manner practicable the transactions contemplated hereby.   Without limiting the foregoing, Sellers shall not voluntarily dismiss the Bankruptcy Cases once filed and shall use their reasonable best efforts to:

  (a) commence the Bankruptcy Cases within one (1) Business Day of the date of this Agreement;

  (b) file the Sale Motion within one (1) Business Day Business Days of commencing the Bankruptcy Cases;

  (c) obtain the Bidding Procedures Order within twenty (20) days following the commencement of the Bankruptcy Cases;

  (d) obtain the Sale Order on or prior to January 12, 2009 and cause it to be a Final Order on or prior to January 22, 2009;

  (e) subject to the fiduciary duties of the members of the board directors of each of the Sellers, prevent the dismissal of the Bankruptcy Cases or the conversion of the Bankruptcy Cases to a case under Chapter 7 of the Bankruptcy Code.

Section 6.12   Buyer Protections.   Sellers agree to comply (and cause their Representatives to comply) with each of the procedures, terms, conditions and provisions set forth in Exhibit A hereto.

Section 6.13   Financial Statements.   Eclipse shall provide Buyer (A) on the Friday of each week during the period from the date hereof to the Closing, with a statement of the Sellers cash flows and (B) on a bi-weekly basis during the period from the date hereof to the Closing, with (i) unaudited monthly financial statements (including a balance sheet and related statements of operations and cash flows) of Eclipse, on a consolidated basis and (ii) operating or management reports, in each case, for such preceding month. Sellers covenant that such weekly and monthly statements will be prepared on a basis consistent with prior monthly periods.

Section 6.14   Takeover Proposal; Confidential Information.

  (a) Sellers shall not furnish information concerning their business, properties or assets to any Third Party, except pursuant to a confidentiality agreement with terms and conditions no less restrictive than those contained in the Confidentiality Agreement between the parties. Sellers shall not release any Third Party from, or waive any provision of, any such confidentiality agreement or any similar confidentiality or standstill agreement to

DB02:7587587.1

067809.1001

which any Seller is a party. To the extent that this Section 6.14 conflicts with the Bidding Procedures Order, the Bidding Procedures Order shall govern.

(b)     Sellers shall promptly (and in any event within one (1) Business Day) notify Buyer in writing at such time as any Takeover Proposal has been determined to be a Qualified Bid.

## ARTICLE VII

## ADDITIONAL AGREEMENTS

Section 7.1     Taxes.

(a)     Sellers shall be liable for and shall pay, and pursuant to Section 7.1(c) shall reimburse Buyer for, all Taxes (whether assessed or unassessed) applicable to the Business and the Purchased Assets, in each case attributable to periods (or portions of Straddle Periods) ending on or prior to the Closing Date ("Pre-Closing Taxes"). Without limiting the obligations of Buyer contained elsewhere in this Agreement, including in respect of the Assumed Liabilities, Buyer shall be liable for and shall pay, and pursuant to Section 7.1(c) shall reimburse the applicable Seller for, all Taxes (whether assessed or unassessed) applicable to the Business, the Purchased Assets and the Assumed Liabilities, in each case attributable to periods (or portions of Straddle Periods) beginning after the Closing Date ("Post-Closing Taxes"). For purposes of this paragraph (a), any period beginning before and ending after the Closing Date (a "Straddle Period") shall be treated as two partial periods, one ending on the Closing Date and the other beginning on the day after the Closing Date and items of income, gain, deduction, loss or credit, and state and local apportionment factors for the Straddle Period shall be allocated between such two partial periods on a "closing of the books basis" by assuming that the books of the Person subject to such Tax were closed at the close of the day on the Closing Date, provided, however, that exemptions, allowances or deductions that are calculated on an annual basis (such as the deduction for depreciation), and Taxes (such as property Taxes) imposed on a periodic basis shall be allocated on a daily basis.

(b)     Without limiting the other terms set forth in this Agreement, any sales Tax, use Tax, real property transfer or gains Tax, real property records recordation fees, documentary stamp Tax or similar Tax attributable to the sale or transfer of the Purchased Assets and not exempted under the Sale Order or by section 1146(a) of the Bankruptcy Code ("Transfer Taxes") shall be borne (i) with respect to the first One Hundred Thousand Dollars ($100,000) of such Transfer Taxes (the "Buyer Transfer Taxes Cap"), by Buyer and (ii) any amounts in excess of the Buyer Transfer Taxes Cap, by Sellers. Sellers and Buyer shall use reasonable efforts and cooperate in good faith to exempt the sale and transfer of the Purchased Assets from any such Transfer Taxes. Notwithstanding the foregoing, Sellers shall seek inclusion in the Final Order of a conclusion that the transactions contemplated by this Agreement are exempt from stamp or similar taxes on transfers pursuant to Section 1146 of the Bankruptcy Code, and if such a conclusion is included in the Final Order, the instruments transferring the Purchased Assets to Buyer shall contain the following endorsement:

> "This instrument has been authorized pursuant to order of the United States Bankruptcy Court for the District of Delaware, which order provides that it is exempt from transfer taxes, stamp taxes or similar taxes pursuant to 11 U.S.C. § 1146(a)."

(c)     Sellers or Buyer, as the case may be, shall provide reimbursement for any Tax paid by one Party all or a portion of which is the responsibility of the other Party in accordance with the terms of this Section 7.1. Within a reasonable time prior to the payment of any such Tax, the Party paying such Tax shall give notice to the other of the Tax payable and each Party's respective liability therefor, although failure to do so will not relieve the other Party from its liability hereunder.

(d)     Buyer and Sellers agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Business and the Purchased Assets (including access to books and records) as is reasonably necessary for the filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any taxing authority, and the prosecution or defense of any claim, suit or proceeding relating to any Tax. Buyer and Sellers shall retain all books and records with respect to Taxes pertaining to the Purchased Assets for a period of at least six years following the Closing Date. On or after the end of such period, each party shall provide the other with at least 10 days prior written notice before destroying any such books and records, during which period the party receiving such notice can elect to take possession, at its own expense, of such books and records. Sellers and Buyer shall cooperate with each other in the conduct of any audit or other proceeding relating to Taxes involving the Purchased Assets or the Business.

(e)     Sellers shall (i) provide appropriate notice of the Bankruptcy Cases, the Sale Motion and related matters to all Governmental Agencies that may seek to collect Property Taxes or impose on Sellers, Buyer or any Purchased Asset penalties for any Property Taxes, and (ii) use all commercially reasonable efforts to obtain certificates, releases or other appropriate documentation from such Governmental Agencies to the extent such Governmental Agencies provide such certificates, releases or documentation in the ordinary course, providing that such Property Taxes have been paid or are not owed.

Section 7.2     No Successor Liability to Sellers' Employees. Under no circumstances shall Buyer assume or be obligated to pay, and the Purchased Assets shall not be or become liable for or subject to, any claims of or liabilities of Sellers' Employees, including but not limited to, any claims or liabilities related to employment practices, COBRA, equal employment opportunity, nondiscrimination, harassment, wrongful termination, breach of contract, immigration, wage and hour laws, any other state, federal or local labor and employment laws, liability under the WARN Act, salaries, vacations, sick pay, incentives, severance pay, bonus, overtime, meal period, pension profit sharing retirement and/or deferred compensation and any other compensation or benefits (the "Employee Claims"), which Employee Claims shall be and remain the liability, responsibility and obligation of Sellers.

Section 7.3     Employment.

(a)     Buyer may (but shall not be required to), in its sole and absolute discretion, offer employment to any and all individuals employed by Sellers in connection with the Business as of the Closing Date to commence immediately following the Closing, each such offer contingent upon the issuance of the Sale Order of the Bankruptcy Court and the Closing. Buyer's employment of any individuals previously employed by Sellers shall be on an "at will" basis and on such other terms and conditions of employment as Buyer shall offer in its sole discretion. Except as otherwise agreed to in writing, Buyer shall be under no obligation to employ or continue to employ any individual for any period. The employees who accept Buyer's offer of employment and who commence employment with Buyer from and after the Closing Date shall be referred to herein as the "Hired Employees". Under no circumstance shall any individual employed or formerly employed by Sellers become an employee of Buyer unless such individual becomes a Hired Employee.

(b)     With respect to each Hired Employee, Sellers hereby waive and release each such individual from any and all contractual, common law or other restrictions enforceable by Sellers on the employment, activities or other conduct of such individuals after their termination of employment with Sellers; provided, however, that Sellers shall assign to Buyer Sellers' rights to all obligations of each Hired Employee not to disclose confidential information relating to the Business and all obligations not to compete with the Business owed to Sellers by such Hired Employee.

(c)     Except as expressly provided herein, nothing herein shall be construed as transferring to Buyer (i) any Contract or agreement with any current of former employee of Sellers or for the employment of any Person or engagement of any independent contractor by Sellers or (ii) any rights or obligation Sellers may owe to or be owed by any current or former employee, officer, director, consultant, independent contractor or agent of Sellers.

(d)     Nothing herein, express or implied, shall confer upon any employee or former employee of Sellers any rights or remedies (including any right to employment or continued employment for any specific period) of any nature or kind whatsoever, under or by reason of this Agreement. Buyer and Seller agree that the provisions contained herein are not intended to be for the benefit of or otherwise be enforceable by, any third party, including any employee or former employee of Sellers.

(e)     Buyer shall have no obligation to pay severance to any individual previously employed by Sellers, irrespective of whether such individual becomes a Hired Employee, and any such obligations remain obligations of the Seller.

(f)     Nothing contained in this Agreement shall be construed to require, or prevent the termination of, employment of any individual, require minimum benefit or compensation levels or prevent any change in the employee benefits provided to any individual Employee. No provision of this Agreement shall create any third party beneficiary rights in any employee or former employee of Sellers or any other Persons or entities (including any beneficiary or dependent thereof), in respect of continued employment (or resumed employment) for any specified period of any nature or kind whatsoever.

DB02:7587587.1                                                                 067809.1001

(g)     At least ten (10) Business Days prior to the Auction, Sellers shall deliver to Buyer a list of all of Sellers' Employees, together with particulars of the date of commencement of employment or service, periods of continuous employment or service, job description or grade, age, holiday entitlements, annual salary or hourly rate of pay and commissions.

Section 7.4     Collection of Receivables.  If, after the Closing Date, Sellers shall receive payment from any account debtor with respect to any Accounts Receivable included in the Purchased Assets, Sellers shall promptly thereafter deliver such funds and assets to Buyer. Effective as of the Closing Date, each Seller hereby designates Buyer and its respective officers as such Seller's true and lawful attorney-in-fact, with full power of substitution, to execute and endorse for the benefit of Buyer all checks, notes or other documents received by such Seller in payment of or in substitution or exchange for any of the Purchased Assets.  Each Seller hereby acknowledges and agrees that the power of attorney set forth in the preceding sentence in favor of Buyer is coupled with an interest, and further agrees to execute and deliver to Buyer from time to time any documents or other instruments reasonably requested by Buyer to evidence such power of attorney.

Section 7.5     Adequate Assurances Regarding Assumed Contracts and Assumed Leases.  With respect to each Assumed Contract and each Assumed Lease, Buyer will use commercially reasonable efforts to cure all defaults and provide adequate assurance as required under the Bankruptcy Code of the future performance by Buyer of each such Assumed Contract and Assumed Lease.  Buyer and Sellers agree that they will promptly take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that all defaults have been cured and there has been an adequate demonstration of adequate assurance of future performance under the Assumed Contracts and the Assumed Leases, such as furnishing affidavits, non-confidential financial information or other documents or information for filing with the Bankruptcy Court and making Buyer's and Sellers' employees and representatives available to testify before the Bankruptcy Court.

Section 7.6     Certifications.  Prior to the Closing Date, Sellers shall cooperate with and provide reasonable assistance to the Buyer in connection with the Buyer's negotiation with (i) all EASA authorities, employees, officials and personnel to obtain the issuance to Buyer of a new EASA certificate, of the same quality and type as the Eclipse EASA Certificate and (ii) all FAA authorities, employees, officials and personnel to obtain the issuance to Buyer of a new (x) FAA production certificate and (y) FAA type certificate (the "New FAA Type Certificate"), of the same quality and type as the Eclipse Production Certificate and Eclipse Type Certificate. Notwithstanding the foregoing or any other provision of this Agreement to the contrary, it is expressly understood and agreed by Sellers and Buyer that Buyer shall bear all risk that the New EASA Certificate or a New FAA Certificate is not obtained by Buyer.

Section 7.7     Certain Actions.  Prior to the Closing Date, each Seller shall take such corporate and other actions necessary to change its corporate or company name, as the case may be, to a name that is not similar to, or confusing with, the current name of any Seller.  In connection with enabling Buyer, at or as soon as practicable after the Closing Date, to use the current corporate names of each of the Sellers, the Sellers, at or prior to the Closing Date, shall execute and deliver to Buyer all consents related to such change of name as may be requested by

20

Buyer, and will otherwise cooperate with Buyer in effecting such name change. Within ten (10) days after Closing, Sellers shall file in all jurisdictions in which they are qualified to do business any documents necessary to reflect such change of name or to terminate their qualification therein.

Section 7.8    Cure Amounts. Set forth on Schedule 2.3 is a list of the costs that pursuant to Bankruptcy Code Section 365(b) will be required to cure any default on the part of any Seller under the Designated Contracts, which costs must be delivered to the nondebtor under the Designated Contracts, or with respect to which adequate assurance of prompt delivery by such Seller must be provided as a prerequisite to the assumption of such Designated Contracts under Bankruptcy Code Section 365(a) (the "Cure Costs"). Appropriate additions and deletions shall be made to Schedule 2.3, and the Cure Costs shall be correspondingly amended, to reflect additions and deletions to Schedule 2.3 made from time to time in accordance with Section 2.3. Prior to the Closing, Sellers shall cooperate with Buyer to resolve any disputes with the nondebtor party to any of the Designated Contracts regarding the amount of the Cure Costs. Subject to entry of the Approval Order and it becoming a Final Order, Buyer shall within fourteen (14) days (or such shorter period as may be required by the Bankruptcy Court) after the Closing pay the Cure Costs.

Section 7.9    Reasonable Access to Records and Certain Personnel. In order to facilitate Sellers' efforts to (i) administer and close the Bankruptcy Cases, and (ii) prepare tax returns (together, the "Post-Close Filings"), for a period of two (2) years following the Closing, the Buyer shall permit Sellers' counsel and accountants (collectively, "Permitted Access Parties") during regular business hours, with reasonable notice, and subject to reasonable rules and regulations, reasonable access to the financial and other books and records which comprised part of the Purchased Assets that are required to complete the Post-Close Filings.

## ARTICLE VIII

## CONDITIONS TO CLOSING

Section 8.1    Conditions to Obligations of Each Party. The respective obligations of each Party to affect the sale and purchase of the Purchased Assets shall be subject to the fulfillment (or, if permitted by applicable law, waiver) on or prior to the Closing Date, of the conditions as set forth in Section 8.2 in the case of the Buyer and Section 8.3 in the case of the Sellers.

Section 8.2    Conditions to Obligations of Buyer. The obligation of Buyer to effect the purchase of the Purchased Assets contemplated by this Agreement shall be subject to the fulfillment (unless waived in writing by Buyer) on or prior to the Closing Date of the following additional conditions:

(a)      the representations and warranties of Sellers contained in Article IV of this Agreement shall be true and correct on and as of the Closing Date with the same effect as if such representations and warranties had been made on and as of such date (other than any such representations and warranties that address matters only as of a particular date,

which shall be true and correct as of such date), in each case except for breaches as to matters that, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect. For purposes of determining the satisfaction of this condition, the representations and warranties of Sellers contained in Article IV of this Agreement shall be deemed not qualified by any references therein to materiality generally or to whether or not any breach results in a Material Adverse Effect. Buyer shall have received a certificate of each Seller to such effect signed by a duly authorized officer of such Seller.

(b)     each covenant and obligation that Sellers are required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been duly performed and complied with in all material respects. Buyer shall have received a certificate of each Seller to such effect signed by a duly authorized officer of such Seller.

(c)     the Sellers shall be operating the Business as a going concern on a basis consistent with the Budget and otherwise consistent with past practice or acting as a debtor-in-possession in a Chapter 11 bankruptcy case, except as may be attributable to the loss of any Non-Transferable Agreement. Buyer shall have received a certificate of each Seller to such effect signed by a duly authorized officer of such Seller.

(d)     the Sale Order shall have been entered and shall not have been (i) vacated, stayed or reversed or (ii) (except with the express written consent of the Buyer, or as would not be adverse to Buyer in any material respect): amended, supplemented or otherwise modified;

(e)     each of the deliveries required to be made to Buyer pursuant to Section 3.5 shall have been so delivered;

(f)     each of the Governmental Authority authorizations, consents or waiting periods set forth on Schedule 8.2(f) shall have been obtained or expired, as applicable; and

(g)     no Governmental Authority shall have enacted, issued, promulgated, entered any Order that is in effect and has the effect of making illegal or otherwise prohibiting the consummation of the transactions contemplated by this Agreement that has not been withdrawn or terminated.

Any condition specified in this Section 8.2 may be waived by Buyer; provided that no such waiver shall be effective against Buyer unless it is set forth in a writing executed by Buyer.

Section 8.3     Conditions to Obligations of Sellers. The obligation of Sellers to affect the sale of the Purchased Assets contemplated by this Agreement shall be subject to the fulfillment (unless waived in writing by Eclipse) on or prior to the Closing Date of the following additional conditions:

(a)     the representations and warranties of Buyer contained in this Agreement shall be true and correct in all material respects when made and on and as of the Closing Date with the same effect as if such representations and warranties had been made on and

as of such date (other than representations and warranties that address matters only as of a particular date, which shall be true and correct in all material respects as of such date), except that any representations and warranties made by Buyer that by their terms are subject to any materiality or material adverse effect qualifier or exception, shall be true and correct in all respects when made on and as of the Closing Date with the same effect as if such representations and warranties had been made on and as of such date (other than representations and warranties that address matters only as of a particular date, which shall be true and correct in all respects as of such date) and Sellers shall have received a certificate of Buyer to such effect signed by a duly authorized officer thereof;

(b)     each covenant and obligation that Buyer is required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been duly performed and complied with in all material respects, and Sellers shall have received a certificate of Buyer to such effect signed by a duly authorized officer thereof;

(c)     each of the deliveries required to be made to Sellers pursuant to Section 3.6 shall have been so delivered;

(d)     prior to or simultaneously with the Closing, Buyer shall have received common equity financing in an amount equal to the sum of (x) the amount of Cash Purchase Price and (y) Twenty-One Million Eight Hundred Thousand Dollars ($21,800,000), and as of the Closing, (1) the equity commitments to provide financing to Buyer in an amount up to One Hundred Fifty Million Dollars ($150,000,000), *less*, the amounts referred to in the preceding sentence, copies of which have been provided to the Sellers and the holders of Senior Notes prior to the date hereof, shall continue to be in full force and effect and (2) Buyer shall have no Indebtedness (as defined in the Notes) other than the Notes; and

(e)     the Sale Order shall have been entered.

Any condition specified in this Section 8.3 may be waived by Sellers; provided that no such waiver shall be effective against Sellers unless it is set forth in writing executed by Eclipse.


## ARTICLE IX

## TERMINATION

Section 9.1     Termination.     Anything in this Agreement to the contrary notwithstanding, this Agreement and the transactions contemplated hereby may be terminated in any of the following ways at any time prior to the Closing Date and in no other manner:

(a)     By mutual written consent of Buyer and Eclipse; *provided*, that such written consent is approved in writing by the holders of a majority of the Senior Notes.

(b)     By Buyer upon five (5) Business Days notice if, at or prior to the Closing Date, satisfaction of any condition set forth in Section 8.2 is or becomes impossible

DB02:7587587.1                                                                                                   067809.1001

(other than through the breach by Buyer of any of its representations or warranties or the failure of Buyer to perform any of its obligations pursuant to this Agreement) and Buyer shall not have waived such condition in writing at or prior to the Closing Date.

(c)     By Sellers upon five (5) Business Days notice if, at or prior to the Closing Date, satisfaction of any condition set forth in Section 8.3 is or becomes impossible (other than through the breach by Sellers of any of their representations or warranties or the failure of Sellers to perform any of their obligations pursuant to this Agreement) and Sellers shall not have waived such condition in writing at or prior to the Closing Date.

(d)     By Buyer or Sellers, immediately upon the occurrence of any of the following events:

(i)     The Bankruptcy Court approves an Alternative Transaction, or an Alternative Transaction is consummated;

(ii)     The dismissal or conversion of the Bankruptcy Cases to a cases under Chapter 7 of the Bankruptcy Code; or

(iii)     The Sale Order is not entered on or before January 12, 2009.

(e)     By Buyer, if the Sellers have not obtained the written consent, in the form attached hereto as Exhibit D, of Ninety Percent (90%) in principal amount of the Senior Notes (excluding any Senior Notes held by Al Mann or any Affiliates of Al Mann) to the terms and conditions of this Agreement and the transactions contemplated hereby on or prior to the earlier of the hearing to consider the Bidding Procedures Order or the tenth (10th) Business Day following the commencement of the Bankruptcy Cases, provided Buyer is not in default of its obligations under this Agreement.

(f)     By either party, provided the terminating party is not in default of its obligations under this Agreement, if the Closing shall not have occurred for any reason by February 28, 2009.

(g)     By either party if a Governmental Authority issues a final and non-appealable Order prohibiting the transactions contemplated by this Agreement.

Section 9.2     Effect of Termination; Expense Reimbursement; Break-Up Fee.

(a)     In the event this Agreement is terminated pursuant to Section 9.1, all further obligations of the parties hereunder shall terminate, except for this Section 9.2 and Article XI (to the extent applicable to the aforesaid surviving provisions), and except that nothing in this Section 9.2 shall relieve any party hereto of any liability for the willful breach of any of the covenants or of any of the representations or warranties contained in this Agreement prior to such termination.

(b)     In the event this Agreement is terminated by Buyer pursuant to Section 9.1(d)(i) and the relevant Alternative Transaction is acceptable to the Sellers and approved by the Bankruptcy Court:

(i)     Buyer may provide to Seller a reasonably detailed calculation of the actual out-of-pocket costs and expenses (including, without limitation, reasonable expenses of counsel and other outside consultants and reasonable legal expenses related to the transactions contemplated hereby, preparing and negotiating this Agreement and documents related hereto, investigating Sellers or the Purchased Assets, and to fund the reasonable expenses to be paid with respect to obtaining the Financing) incurred by Buyer in connection with its due diligence investigation of Sellers and the negotiation and execution of this Agreement and the transactions contemplated hereby and thereupon Sellers shall pay Buyer in cash an amount equal to such costs and expenses, subject to a cap of One Million Dollars ($1,000,000) in the aggregate (the "Expense Reimbursement"); and

(ii)     Sellers shall pay Buyer an amount in cash equal to Four Million Dollars ($4,000,000) by wire transfer of immediately available funds to an account designated in writing by Buyer (the "Break-Up Fee").

(c)     In the event this Agreement (i) is terminated by Buyer or Seller (as applicable) (A) pursuant to Section 9.1(b), (B) pursuant to Section 9.1(e) or (C) pursuant to Section 9.1(f) or (D) pursuant to Section 9.1(g) and (ii) the Sellers subsequently consummate an Alternate Transaction that constitutes a higher and better offer for the Purchased Assets, then Buyer will be entitled to the Expense Reimbursement and the Break-Up Fee.

(d)     Any payments of Expense Reimbursement or Break-Up Fee pursuant to Section 9.1(b) or (c) shall be made concurrently with the consummation of the applicable Alternate Transaction,

(e)     Buyer and Sellers hereby agree that the Expense Reimbursement and the Break-Up Fee: (i) are not a penalty, but rather, are a reasonable estimate of the damages to be suffered by Buyer in the event the transactions contemplated by this Agreement are not consummated under the circumstances set forth herein, (ii) are a necessary inducement for Buyer to enter into the transactions contemplated by this Agreement and (iii) shall be the sole remedy of Buyer for breach of this Agreement by Sellers (other than for non-payment of the Expense Reimbursement) if this Agreement is terminated under circumstances where the Break-Up Fee is payable.

## ARTICLE X

## INDEMNIFICATION

Section 10.1     No Survival of Representations, Warranties, Covenants and Agreements.     The representations, warranties, covenants and agreements contained in this Agreement shall not survive beyond the Closing Date, and there shall be no liability in respect thereof, whether such liability has accrued prior to the Closing Date or after the Closing Date, on the part of either party or its officers, directors, employees, agents and Affiliates; provided, however, that all covenants and agreements, which, by their terms, contemplate performance after the Closing Date, shall survive in accordance with their terms.  Nothing in the foregoing

25

sentence shall preclude any party from bringing an action for fraud involving intentional and wanton conduct involving the entire transaction provided for in this Agreement.

## ARTICLE XI

## GENERAL PROVISIONS

Section 11.1    Confidential Nature of Information.  Each Party agrees that it will treat in confidence all documents, materials and other information that it shall have obtained regarding the other Party during the course of the negotiations leading to the consummation of the transactions contemplated hereby (whether obtained before or after the date of this Agreement), the investigation provided for herein and the preparation of this Agreement and other related documents.  Such documents, materials and information shall not be disclosed or communicated to any third Person (other than, in the case of Buyer, to its counsel, accountants, financial advisors and potential lenders, and in the case of Sellers, to the holders of the Senior Notes and to the respective counsel, accountants and financial advisors of Sellers and the holders of the Senior Notes).  No Party shall use any confidential information referred to in the second immediately preceding sentence in any manner whatsoever except solely for the purpose of evaluating the proposed purchase and sale of the Purchased Assets and the enforcement of its rights hereunder and under the Ancillary Documents; provided, however, that after the Closing, Buyer may use or disclose any confidential information included in the Purchased Assets and may use or disclose other confidential information that is otherwise reasonably related to the Business or the Purchased Assets.  The obligation of each Party to treat such documents, materials and other information in confidence shall not apply to any information that (i) is or becomes available to such Party from a source other than the disclosing Party, provided such other source was not, and such Party would have no reason to believe such source was, subject to a confidentiality obligation in respect of such information, (ii) is or becomes available to the public other than as a result of disclosure by such Party or its agents, (iii) is required to be disclosed under applicable law or judicial process, including the Bankruptcy Cases, but only to the extent it must be disclosed, or (iv) such Party reasonably deems necessary to disclose to obtain any of the consents or approvals contemplated hereby.

Section 11.2    No Public Announcement.    Neither Sellers nor Buyer shall, without the approval of Sellers (in the case of a disclosure by Buyer) or Buyer (in the case of a disclosure by Sellers), make any press release or other public announcement concerning the transactions contemplated by this Agreement, except as and to the extent that any such party shall be so obligated by law, including as may be required by the Bankruptcy Cases, securities laws, or the rules of any stock exchange, in which case the other party or parties shall be advised prior to such disclosure and the parties shall use their reasonable best efforts to cause a mutually agreeable release or announcement to be issued.

Section 11.3    Notices.    All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given (a) when delivered personally to the recipient, (b) one (1) Business Day after the date when sent to the recipient by reputable express courier service

(charges prepaid), or (c) seven (7) Business Days after the date when mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, if delivered personally (with written confirmation of receipt), on the date of such delivery or, if sent via facsimile, on the date of the transmission of the facsimile, provided that the sender thereof receives written confirmation that the facsimile was successfully delivered to the intended recipient. Notice by Buyer to Eclipse shall be deemed to be notice to all Sellers. Such notices, demands and other communications shall be sent to Sellers and to Buyer at the addresses indicated below:

If to Buyer, to:

>ETIRC Aviation S.a.r.l.
>16 Rue Jean-Brasseur
>Luxembourg 1258
>Luxembourg
>Attn: Roland Pieper
>Facsimile: 352 2626 14 444

with a copy to (which shall not constitute notice):

>Goodwin Procter LLP
>New York Times Building
>620 Eighth Avenue
>New York, New York 10018
>Attn:  Allan S. Brilliant, Esq.
>         Edward A. Reilly
>Facsimile: (212) 355-3333

If to Sellers, to:

>Eclipse Aviation Corporation
>2503 Clark Carr Loop SE
>Albuquerque, New Mexico 87106
>Attn: J. Mark Borseth
>Facsimile: (505) 245-7888

with a copy to (which shall not constitute notice):

>Allen & Overy LLP
>1221 Avenue of the Americas
>New York, New York 10022
>Attn: Daniel Guyder
>Facsimile: (212) 610-6399

or to such other address or facsimile number as such party may indicate by a notice delivered to the other party hereto.

DB02:7587587.1                                                                                                          067809.1001

Section 11.4   <u>Successors and Assigns</u>.

    (a)     Except as expressly permitted in this Agreement, the rights and obligations of the Parties under this Agreement shall not be assignable by such parties without the written consent of the other parties hereto. Notwithstanding the foregoing, from and after the Closing Buyer shall have the unrestricted right to assign this Agreement as collateral and in connection therewith to delegate all or any part of its obligations hereunder to any lender in connection with any financing or to any Affiliate of Buyer, but in such event Buyer shall remain fully liable for the performance of all of such obligations in the manner prescribed in this Agreement.

    (b)     This Agreement shall be binding upon and inure to the benefit of the Parties and their successors and permitted assigns. The successors and permitted assigns hereunder shall include any permitted assignee as well as the successors in interest to such permitted assignee (whether by merger, consolidation, liquidation (including successive mergers, consolidations or liquidations) or otherwise). Nothing in this Agreement, expressed or implied, is intended or shall be construed to confer upon any Person other than the parties and successors and assigns permitted by this <u>Section 11.4</u> any right, remedy or claim under or by reason of this Agreement.

    Section 11.5   <u>Entire Agreement; Amendments; Disclosure Schedules</u>. This Agreement, the Ancillary Documents and Disclosure Schedules referred to herein contain the entire understanding of the parties hereto with regard to the subject matter contained herein or therein, and supersede all prior agreements, understandings or letters of intent between or among any of the parties hereto with respect to such subject matter. This Agreement shall not be amended, modified or supplemented except by a written instrument signed by the Buyer and Eclipse (on behalf of each of the Sellers) and approved in writing by a the holders of a majority of the Senior Notes.

    Section 11.6   <u>Waivers</u>. Any term or provision of this Agreement may be waived, or the time for its performance may be extended, by an instrument in writing executed by the party or parties entitled to the benefit thereof (with Eclipse having the ability to waive on behalf of all Sellers); <u>provided</u>, that any such waiver is approved in writing by the holders of a majority of the Senior Notes. Any such waiver shall be validly and sufficiently authorized for the purposes of this Agreement if, as to any party, it is authorized in writing by an authorized representative of such party. Except as otherwise provided herein, the failure of any party hereto to enforce at any time any provision of this Agreement shall not be construed to be a waiver of such provision, nor in any way to affect the validity of this Agreement or any part hereof or the right of any party thereafter to enforce each and every such provision. No waiver of any breach of this Agreement shall be held to constitute a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any right, power or remedy. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

    

Section 11.7　Expenses. Except as otherwise provided herein or in any Ancillary Document, including as provided in Section 9.2 hereof, each party hereto will pay all costs and expenses incident to its negotiation and preparation of this Agreement and to its performance and compliance with all agreements and conditions contained herein on its part to be performed or complied with, including the fees, expenses and disbursements of its counsel and accountants. Notwithstanding the foregoing, the Sellers shall pay upon the earlier of ten (10) Business Days from the date of demand by the Buyer and the Closing Date (i) all fees, expenses and disbursements of counsel to the Buyer, in connection with the negotiation of this Agreement (whether or not the transactions contemplated hereby or thereby are consummated) and any amendments, modifications or waivers of the provisions hereof and thereof.

Section 11.8　Partial Invalidity. Wherever possible, each provision hereof shall be interpreted in such manner as to be effective and valid under applicable law, but in case any one or more of the provisions contained herein shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such provision shall be ineffective to the extent, but only to the extent, of such invalidity, illegality or unenforceability without invalidating the remainder of such invalid, illegal or unenforceable provision or provisions or any other provisions hereof, unless such a construction would be unreasonable.

Section 11.9　Execution in Counterparts. This Agreement may be executed in counterparts, each of which shall be considered an original instrument, but all of which shall be considered one and the same agreement, and shall become binding when one or more counterparts have been signed by and delivered to each of the Parties hereto. Delivery of an executed counterpart of a signature page to this Agreement by facsimile shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 11.10　Governing Law.

(a)　This Agreement and the legal relations between the parties hereto shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and performed therein and the Bankruptcy Code, to the extent applicable.

(b)　During the pendency of the Bankruptcy Cases any Proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement may only be brought against any of the parties in the Bankruptcy Court, and each of the parties consents to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts) in any such action or proceeding and waives any objection to venue laid therein.

(c)　At any time following the pendency of the Bankruptcy Cases, any proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement may only be brought against any of the parties in the courts of the State of New York, County of New York, or, if it has or can acquire jurisdiction, in the United States District Court for the Southern District of New York, and each of the parties consents to the jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding and waives any objection to venue laid therein.

(d) Process in any Proceeding referred to in the preceding sentence may be served on any party anywhere in the world.

Section 11.11 <u>No Third Party Beneficiaries</u>. This Agreement is for the sole benefit of the Parties and the holders of the Senior Notes and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable benefit, claim, cause of action, remedy or right of any kind.

Section 11.12 <u>Eclipse Acting on Behalf of Sellers</u>. For all purposes hereunder (including performance of obligations), except where the context expressly requires otherwise, Eclipse may act on behalf of, and Buyer may accept performance by, and may tender performance to, Eclipse on behalf of, any and all Sellers. Unless otherwise directed by Sellers in writing to Buyer, the payment of money by Buyer to Eclipse shall be deemed a payment of money by Buyer to Sellers as their interests may appear.

[SIGNATURE PAGES FOLLOW]

DB02:7587587.1

067809.1001

IN WITNESS WHEREOF, the parties hereto have caused this Asset Purchase Agreement to be executed the day and year first above written.

**BUYER:**

**EclipseJet Aviation International, Inc.**


By:_____
    Name:
    Title:


**SELLERS:**

**Eclipse Aviation Corporation**


By:_____
    Name:
    Title:


**Eclipse IRB Sunport, LLC**


By:_____
    Name:
    Title:

# ANNEX 1

## DEFINITIONS

"Accounts Receivable" means, with respect to a Seller, all accounts receivable and other rights to payment of such Seller and the full benefit of all security for such accounts receivable or rights to payment, including, but not limited to, all accounts receivable in respect of goods shipped or products sold or services rendered to customers by such Seller, any other miscellaneous accounts receivable of such Seller, and any claim, remedy or other right of such Seller related to any of the foregoing.

"Action" means any legal action, suit or arbitration, or any inquiry, proceeding or investigation, by or before any Governmental Authority.

"Adjustment Date" means the earlier of (i) the second anniversary of the Closing Date and (ii) 180 days prior to the date on which a Change of Control (as defined in the Note) occurs.

"Administrative Claim" means a Claim for payment of an administrative expense solely in the Chapter 11 Bankruptcy Cases of a kind specified in section 503(b) of the Bankruptcy Code and entitled to priority pursuant to section 507(a)(1) of the Bankruptcy Code.

"Affiliate" means, as to any Person, any other Person which directly or indirectly controls, or is under common control with, or is controlled by, such Person. As used in this definition, "control" (including, with its correlative meanings, "controlled by" and "under common control with") shall mean possession, directly or indirectly, of the power to direct or cause the direction of management or policies (whether through ownership of securities or partnership or other ownership interests, by contract or otherwise) of such Person.

"Aggregate Equity Financing Amount" means the aggregate amount of equity financing proceeds received from the initial investment group and their related parties by Buyer as of the Adjustment Date.

"Agreement" has the meaning specified in the preamble.

"AIP" has the meaning specified in Section 5.3.

"AIP Commitment Letter" has the meaning specified in Section 5.3.

"AIP Financing" has the meaning specified in Section 5.3.

"Allowed Administrative Claim" means an Administrative Claim or any portion thereof, (a) that has been allowed by a Final Order of the Bankruptcy Court, or (b) for which a proof of claim in a liquidated amount has been timely filed with the Bankruptcy Court pursuant to the Bankruptcy Code, any Final Order of the Bankruptcy Court or other applicable bankruptcy law, and as to which either (i) no objection to its allowance has been filed within the periods of limitation fixed by a plan, the Bankruptcy Code or by any order of the Bankruptcy Court or (ii) any objection to its allowance has been settled or withdrawn, or has been denied by a Final Order.

"Allowed Professionals Compensation Claim" means a Professional Compensation Claim or any portion thereof, (a) that has been allowed by a Final Order of the Bankruptcy Court, or (b) for which a proof of claim in a liquidated amount has been timely filed with the Bankruptcy Court pursuant to the Bankruptcy Code, any Final Order of the Bankruptcy Court or other applicable bankruptcy law, and as to which either (i) no objection to its allowance has been filed within the periods of limitation fixed by a plan, the Bankruptcy Code or by any order of the Bankruptcy Court or (ii) any objection to its allowance has been settled or withdrawn, or has been denied by a Final Order.

"Alternative Transaction" means any one of the following transactions with or by a Third Party resulting in the sale of the Business: (a) a merger, consolidation or similar transaction involving the Sellers, or (b) a sale, lease or other disposition directly or indirectly by merger, consolidation, tender offer, share exchange or otherwise of assets of Sellers constituting a majority of the consolidated assets of Sellers, excluding the Excluded Assets.

"Ancillary Documents" means a Bill of Sale, the Assumption and Assignment Agreement, an Assignment of Patents, an Assignment of Trademarks, an Assignment of Copyrights, an Assignment of Domain Names, an Assumption and Assignment of Leases, each in form and substance satisfactory to Buyer in its sole discretion, and each other agreement, document or instrument (other than this Agreement) executed and delivered by the parties hereto in connection with the consummation of the transactions contemplated by this Agreement.

"Approval Order" means the Sale Order or any other order entered by the Bankruptcy Court approving the assumption and assignment of the Designated Contracts.

"Assumed Capitalized Leases" has the meaning specified below in the definition of "Purchased Assets."

"Assumed Contracts" has the meaning specified below in the definition of "Purchased Assets".

"Assumed Leases" has the meaning specified below in the definition of "Purchased Assets."

"Assumed Liabilities" shall only mean only the following liabilities and obligations (without duplication):

> (i)     All obligations of any Seller arising at and after the Closing under the Assumed Contracts and the Assumed Leases, in each case solely to the extent such obligations are not required to be performed from and after the Closing Date; and

> (ii)    The Cure Costs.

"Assumption and Assignment Agreement" has the meaning specified in Section 3.5.

"Assumption and Assignment of Leases" has the meaning specified in Section 3.6(g).

"Assumption Date" means the date as of which a Designated Contract is assumed by a Seller in the Bankruptcy Cases and assigned to the Buyer pursuant to an Order of the Bankruptcy Court (which may be the Sale Order), in accordance with the terms of this Agreement.

"Auction" has the meaning specified in Section 6.10(a).

"Avoidance Actions" means any and all claims of Sellers under Chapter 5 of the Bankruptcy Code.

"Bankruptcy Cases" has the meaning specified in the recitals.

"Bankruptcy Code" means Title 11 of the United States Code 11 U.S.C. Sections 101 et. seq.

"Bankruptcy Court" has the meaning specified in the recitals.

"Benefit Plan" means any benefits plans provide by the Sellers to any Employee.

"Bidding Procedures" means the bidding procedures set forth in the Bidding Procedures Order.

"Bidding Procedures Order" shall have the meaning set forth in Section 6.10(b)(i).

"Bill of Sale" shall have the meaning set forth in Section 3.6(a).

"Break-Up Fee" shall have the meaning set forth in Section 9.2(b).

"Budget" means the cash budget for the Sellers developed by Buyer and the Sellers, and approved by the holders of a majority of the Senior Notes or as amended by mutual agreement of Buyer, the Sellers and the holders of a majority of the Senior Notes.

"Business" has the meaning specified in the recitals.

"Business Day" has the meaning specified in Section 1.1(a).

"Buyer" has the meaning specified in the preamble.

"Buyer Funded Transaction Expenses" shall have the meaning set forth in Section 3.7.

"Buyer Parent" means ETIRC Aviation S.a.r.l., a Luxembourg entity.

"Buyer Protections" means the procedures, provisions and conditions set forth in the Buyer Protections Order.

"Buyer Protections Order" or "Bidding Procedures Order" has the meaning set forth in Section 6.10(b).

"Buyer Stock" means the common stock of Buyer, par value $0.01.

"Buyer Transfer Taxes Cap" shall have the meaning set forth in Section 7.1(b).

"Cash Consideration" means Twenty-Eight Million Dollars ($28,000,000).

"Cash Purchase Price" means an amount equal to (x) the Cash Consideration, plus (y) the Closing Transaction Expenses.

"Claim" means a claim against the Sellers (or all or any of them) as defined in section 101(5) of the Bankruptcy Code.

"Closing" has the meaning specified in Section 3.4.

"Closing Buyer Shares" means those shares of Buyer Stock issued as Stock Consideration.

"Closing Date" has the meaning specified in Section 3.4.

"Closing Transaction Expense" shall mean Five Million Dollars ($5,000,000).

"COBRA" means the United States Consolidated Omnibus Budget Reconciliation Act of 1985.

"Code" means the United States Internal Revenue Code of 1986, as amended.

"Computers" means all computer equipment and hardware, including, without limitation, all central processing units, terminals, disk drives, tape drives, electronic memory units, printers, keyboards, screens, peripherals (and other input/output devices), modems and other communication controllers, and any and all parts and appurtenances thereto, together with all Intellectual Property used in connection with the operation of such computer equipment, including all Software and rights under any licenses related to such use.

"Contract" means any agreement, contract, obligation, promise, instrument, undertaking or other arrangements (whether written or oral), and any amendment thereto, that is legally binding, other than a Lease, to which any Seller is party.

"Contract Designation Date" has the meaning specified in Section 2.3(a).

"Copyrights" means all U.S. and common law works of authorship and copyrightable subject matter, and copyrights, whether registered or unregistered, copyright registrations and applications therefor, all rights to register and obtain renewals and extensions of copyright registrations, and all other rights corresponding to any of the foregoing throughout the world, including "moral" rights.

"Cure Costs" has the meaning specified in Section 7.8.

"Customer Contracts" has the meaning specified below in this Annex 1.

"Designated Contract" has the meaning specified in Section 2.3(a).

"Disclosure Schedules" means the disclosure schedules attached hereto that Sellers have prepared and delivered to Buyer pursuant to the terms of this Agreement, setting forth information regarding the Business, the Purchased Assets, the Assumed Liabilities and other matters with respect to Sellers as set forth therein.

"Documents" means all books, records, files, invoices, inventory records, product specifications, advertising materials, customer lists, cost and pricing information, supplier lists, business plans, catalogs, customer literature, quality control records and manuals, research and development files, records and laboratory books and credit records of customers, and all records, notes, and documents relating to any Software (including all data and other information stored on discs, tapes or other media) to the extent used in or to the extent relating to the assets, properties, including the Seller Intellectual Property, business or operations of the Business.

"DOJ" has the meaning specified in Section 6.5(a).

"Domain Names" means any alphanumeric designation registered with or assigned by a domain name registrar, registry or domain name registration authority as part of an electronic address on the Internet.

"EASA" means the European Aviation Safety Agency.

"Eclipse" has the meaning specified in the preamble.

"Eclipse EASA Certificate" means the Type Certificate for Eclipse 500 (EA500), identified as NBR: EASA.IMA.A.171 and issued to Eclipse on November 21, 2008.

"Eclipse Production Certificate" means Production Certificate Number 500 issued to Eclipse on April 26, 2007 by the U.S. Department of Transportation Federal Aviation Administration.

"Eclipse Type Certificate" means Type Certificate Number A00002AC reissued to Eclipse on September 30, 2006 by the U.S. Department of Transportation Federal Aviation Administration.

"Employee" means any full- or part-time employee or independent contractor of any Seller as of the date of this Agreement.

"Employee Claims" has the meaning specified in Section 7.2.

"Encumbrance" means any interest, charge, lien, claim (as defined in section 101(5) of the Bankruptcy Code), mortgage, sublease, hypothecation, deed of trust, pledge, security interest, option, right of use, first offer or first refusal, easement, servitude, restrictive covenant, encroachment, encumbrance, or other similar restriction of any kind.

"Environmental Laws" means any Legal Requirement relating to protection of human health, safety, the environment, and natural resources, including without limitation Hazardous Materials, drinking water, groundwater, wetlands, landfills, open dumps, storage tanks, underground storage tanks, solid waste, waste water, storm water runoff, waste emissions or

wells. Without limiting the generality of the foregoing, the term will encompass each of the following statutes, and the regulations promulgated thereunder, in each case as in effect as of Closing: (a) the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (codified in scattered sections of 26 U.S.C., 33 U.S.C., 42 U.S.C. and 42 U.S.C. § 9601 et seq., "CERCLA"); (b) the Resource Conservation and Recovery Act of 1976 (42 U.S.C. § 6901 et seq., "RCRA"); (c) the Hazardous Materials Transportation Act (49 U.S.C § 1801 et seq., "HMTA"); (d) the Toxic Substances Control Act (15 U.S.C. § 2061 et seq., "TSCA"); (e) the Clean Water Act (33 U.S.C. § 1251 et seq.); (f) the Clean Air Act and Amendments (42 U.S.C. § 7401 et seq.); (g) the Safe Drinking Water Act (21 U.S.C. § 349); 42 U.S.C. § 201 and § 300 et seq.); (h) the National Environmental Policy Act of 1969 (42 U.S.C. § 4321); (i) the Superfund Amendment and Reauthorization Act of 1986 (codified in scattered sections of 10 U.S.C., 29 U.S.C., 33 U.S.C. and 42 U.S.C., "SARA"); and (j) Title III of the Superfund Amendment and Reauthorization Act (42 U.S.C. § 11,001 et seq.).

"Equipment" means all furniture, fixtures, equipment, Computers, machinery, apparatus, appliances, spare parts, signage, supplies, vehicles, forklifts and all other tangible personal property of every kind and description in which Sellers have an interest.

"Equity Commitment Letter" has the meaning specified in Section 5.3.

"ERISA" means the United States Employee Retirement Income Security Act of 1974, as amended.

"Excluded Assets" means:

(a)     all shares of capital stock or other equity interest of any Seller or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest of any Seller;

(b)     all minute books, stock ledgers, corporate seals and stock certificates of Sellers;

(c)     any Contracts, whether written or oral, with any customer regarding the purchase, sale or lease of any Products (the "Customer Contracts");

(d)     any Contracts pertaining to the Jet Complete Program;

(e)     any Contracts with Employees or otherwise pertaining to employee matters;

(f)     any Contracts (which list shall include the Customer Contracts) listed or described in Schedule A-1 (the "Excluded Contracts");

(g)     any Leases, and rights thereunder, listed or described in Schedule A-2 (the "Excluded Leases");

(h)     any rights, claims or causes of action of Sellers against the Buyer under this Agreement or the Ancillary Documents, including all right, title and interest to the Cash Purchase Price;

(i)     all receivables, claims or causes of action related solely to any Excluded Asset;

(j)     rights under director and officer liability policies, ERISA and trustee liability policies and employment practices liability policies, and all rights under insurance policies relating to claims for losses related solely to any Excluded Asset or Excluded Liability;

(k)     all Benefit Plans;

(l)     all Documents relating solely to an Excluded Asset or an Excluded Liability; and

(m)     all refunds, if any, of Taxes due to any Seller for any taxable period ending on or before the Closing Date.

"Excluded Contracts" has the meaning specified above in this Annex 1.

"Excluded Leases" has the meaning specified above in this Annex 1.

"Excluded Liabilities" shall mean all Liabilities of Sellers, other than the Assumed Liabilities.  For the avoidance of doubt, the Excluded Liabilities include, but are not limited to, the following:

(a)     any Liability of Sellers, arising out of, or relating to, this Agreement or the transactions contemplated by this Agreement, whether incurred prior to, at or subsequent to the Closing Date, including, without limitation, all finder's or broker's fees and expenses, any and all fees and expenses of any Representatives of Sellers, and any severance, change in control, termination or similar payments to any employees of Sellers;

(b)     any Liability relating to (x) events or conditions occurring or existing in connection with, or arising out of, the Business as operated prior to the Closing Date, or (y) the ownership, possession, use, operation or sale or other disposition prior to the Closing Date of any Purchased Assets (or any other assets, properties, rights or interests associated, at any time prior to the Closing Date, with the Business);

(c)     any (i) Liability for Taxes; (ii) Liability or obligation of Sellers, or any member of any consolidated, affiliated, combined or unitary group of which one or more Sellers is or has been a member, for Taxes and (iii) Taxes of any other Person pursuant to an agreement or otherwise;

(d)    any Liability incurred by Sellers or their respective directors, officers, stockholders, agents or employees (acting in such capacities) whether arising prior to or after the Closing;

(e)    any Liability of Sellers to any Person on account of any Action or Proceeding;

(f)    Employee Claims;

(g)    any Liability relating to or arising out of an Excluded Asset;

(h)    any liability or obligation, whether known or unknown, (i) arising under Environmental Laws attributable to or incurred as a result of any acts, omissions, or conditions first occurring or in existence as of or prior to the Closing Date, including, but not limited to, any liability or obligation with respect to the release, handling, discharge, treatment, storage, generation, disposal, or presence of Hazardous Substances at any location, (ii) claims relating to employee health and safety, including claims for injury, sickness, disease or death of any Person or (iii) compliance with any Legal Requirement relating to any of the foregoing;

(i)    any Liability or obligation relating to or arising out of any Benefit Plan;

(j)    fees or expenses of Sellers incurred with respect to the transactions contemplated herein; and

(k)    any severance, termination, change of control or other similar payment obligations of the Sellers (whether arising prior to or after the Closing).

"Expense Reimbursement" shall have the meaning set forth in Section 9.2(b).

"FAA" means the Federal Aviation Administration of the United States of America and any successor Governmental Agency.

"Final Order" means an action taken or Order issued by the applicable Governmental Authority as to which: (i) no request for stay of the action or Order is pending, no such stay is in effect, and, if any deadline for filing any such request is designated by statute or regulation, it is passed, including any extensions thereof; (ii) no petition for rehearing or reconsideration of the action or Order, or protest of any kind, is pending before the Governmental Authority and the time for filing any such petition or protest is passed; (iii) the Governmental Authority does not have the action or Order under reconsideration or review on its own motion and the time for such reconsideration or review has passed; and (iv) the action or Order is not then under judicial review, there is no notice of appeal or other application for judicial review pending, and the deadline for filing such notice of appeal or other application for judicial review has passed, including any extensions thereof.

"Financing" has the meaning specified in Section 5.3.

"Financing Letters" has the meaning specified in Section 5.3.

"FTC" has the meaning specified in Section 6.5(a).

"GAAP" means generally accepted accounting principles employed in the United States, as strictly applied.

"Governmental Agency" or "Governmental Authority" means (a) any international, foreign, federal, state, county, local or municipal government or administrative agency or political subdivision thereof, (b) any governmental agency, authority, board, bureau, commission, department or instrumentality, (c) any court or administrative tribunal, (d) any non-governmental agency, tribunal or entity that is vested by a governmental agency with applicable jurisdiction, or (e) any arbitration tribunal or other non-governmental authority with applicable jurisdiction.

"Hazardous Materials" means each and every element, compound, chemical mixture, contaminant, pollutant, material, waste or other substance which is defined, determined or identified as hazardous or toxic under any Environmental Law or the Release of which is prohibited or regulated under any Environmental Law. Without limiting the generality of the foregoing, the term will include: (a) *"hazardous substances"* as defined in CERCLA, SARA, or Title III of the Superfund Amendments and Reauthorization Act, each as amended to date, and regulations promulgated thereunder; (b) *"hazardous waste"* as defined in RCRA and regulations promulgated thereunder; (c) *"hazardous materials"* as defined in the HMTA, as amended to date, and regulations promulgated thereunder; (d) *"chemical substance or mixture"* as defined in the TSCA as amended to date, and regulations promulgated thereunder; (e) *"petroleum,"* including crude oil or any fraction; and (f) *"natural gas,"* including liquids and synthetic gas usable for fuel.

"Hired Employees" has the meaning specified in Section 7.3(a).

"HSR Act" means the United States Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the relevant rules and regulations thereunder.

"HSR Filing" has the meaning specified in Section 6.5(a).

"Insurance Policies" means insurance policies of the Sellers as of the date hereof.

"Intellectual Property" means all of the following:

      (a)     all Trademarks;

      (b)     all Patents;

      (c)     all Copyrights;

      (d)     all inventions (whether patentable or not), invention disclosures, discoveries, and improvements;

      (e)     all Trade Secrets;

(f)     all industrial designs and any registrations and applications therefor throughout the world;

(g)     all databases and data collections and all rights therein throughout the world;

(h)     all Software;

(i)     licenses, immunities, covenants not to sue and the like relating to the foregoing;

(j)     books and records describing or used in connection with the foregoing, including all contracts, licenses, and other agreements to which any Seller is a party or by which it is bound either as licensee or licensor relating to any intellectual property described above;

(k)     any and all other intellectual property rights and proprietary rights relating to any of the foregoing; and

(l)     all goodwill, franchises, licenses, permits, consents, approvals and claims or causes of action arising out of or related to infringement or misappropriation of any of the foregoing.

"Law" means each provision of any currently implemental federal, state, local or foreign law, statute, ordinance, decree, injunction, judgment, order, code, rule or regulation, promulgated or issued by any Governmental Authority.

"Leased Real Property" has the meaning specified below in the definition of "Purchased Assets."

"Leases" means any Contract pertaining to leased real property.

"Legal Requirement" means any federal, state, provincial, local, municipal, foreign, international, multinational, or other administrative Order, constitution, law, ordinance, principle of common law, regulation, statute or treaty.

"Liability" means any debt, loss, claim (as defined in section 101(5) of the Bankruptcy Code), damage, demand, fine, judgment, penalty, liability or obligation (whether direct or indirect, known or unknown, absolute or contingent, asserted or unasserted, accrued or unaccrued, matured or unmatured, determined or determinable, liquidated or unliquidated, or due or to become due, and whether in contract, tort, strict liability, successor liability or otherwise), and including all costs and expenses relating thereto (including fees, discounts and expenses of legal counsel, experts, engineers and consultants and costs of investigations).

"License" means the license of Sellers' names licensed to Buyer in a perpetual exclusive non-royalty bearing agreement.

"Lien" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge, equitable interest, conditional sale or other title retention device or arrangement, occupancy agreement, license or lease, or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Material Adverse Effect" means any change, development or event that has a material adverse effect on the property, business, operations, assets (tangible and intangible) or financial condition of the Seller, taken as a whole, or the Purchased Assets or the ability of Sellers to perform any of their respective material obligations under this Agreement or the Ancillary Documents to which it is a party; provided, that any change, development or event which (A) adversely affects the VLJ industry generally, (B) arises out of general political, economic or industry conditions, (C) results from or is caused by acts of terrorism or war; (D) arises out of or relates to the failure of the Sellers or the Buyer to have the benefit of any Non-Transferable Agreement; or (E) reasonably expected to arise out of, result from or relate to the commencement or proceedings of the Bankruptcy Case or the other transactions contemplated by this Agreement or the announcement thereof, shall not be considered in determining whether a Material Adverse Effect has occurred.

"Minimum Equity Commitment" has the meaning specified below in this Annex 1.

"New FAA Type Certificate" has the meaning specified in Section 7.6.

"Non-Transferable Agreement" means any Assumed Contract or Assumed Lease that (i) Buyer does not timely elect to assume pursuant to Section 2.3(a), or (ii) that may not be assigned to Buyer due to Buyer's failure to cure all defaults of Sellers thereunder and/or provide adequate assurance of performance to the counterparty thereto to the extent required by the Bankruptcy Court.

"Note Consideration" means One Hundred Sixty Million Dollars ($160,000,000), the aggregate principal amount of Notes issued at Closing.

"Notes" means the senior secured notes, substantially in the form attached hereto as Exhibit C.

"Notification" has the meaning specified in Section 2.3(b).

"Order" means any decree, writ, assessment, award, decision, injunction, judgment, order, ruling, subpoena, verdict or arbitration award entered, issued, made, or rendered by any Governmental Agency or Governmental Authority.

"Ordinary Course of Business" means the ordinary and usual course of day-to-day operations of the Business (including acts and omissions of Sellers in the ordinary and usual course) through the date hereof, consistent with the Budget and otherwise consistent with past practice or acting as a debtor-in-possesion in a Chapter 11 bankruptcy case.

"Party" or "Parties" means, individually or collectively, Buyer and each Seller.

"Patents" means (a) patent rights, inventions, discoveries and invention disclosures (whether or not patentable) and (b) U.S. and foreign patents (including certificates of invention and other patent equivalents), utility models, and applications for any of the foregoing, including provisional applications, and all continuations, and continuations-in-part, divisionals, reissues, re-examinations, renewals, and extensions thereof or related thereto, and all applications or counterparts in any jurisdiction pertaining to the any of the foregoing.

"Permits" means all franchises, grants, authorizations, licenses, permits, easements, variances, exceptions, consents, certificates, approvals, clearances and orders of any Governmental Authority which are necessary or required for Sellers to own, lease and operate their properties and assets or to carry on the Business as it is now being conducted or as is presently intended to be conducted.

"Permitted Access Parties" has the meaning specified in Section 7.9.

"Permitted Liens" means (i) easements, covenants, conditions, restrictions and other similar matters of record on real property, leasehold estates or personalty that do not in any material respect detract from the value thereof and do not individually or in the aggregate in any material respect interfere with the use of the property subject thereto, (ii) Encumbrances that constitute Assumed Liabilities and (iii) foreign, local, county, state and federal laws, ordinances or governmental regulations now or hereafter in effect relating to the real property, which do not, individually or in the aggregate, materially detract from the value thereof and do not individually or in the aggregate in any material respect interfere with the use of the property subject thereto, (iv) statutory liens for current property Taxes and assessments not yet due and payable, including, without limitation, liens for *ad valorem* Taxes and statutory liens not yet due and payable arising other than by reason of any default by Sellers that, in each case, are not material to the Business or the value of the Purchased Assets, and (v) landlords', carriers', warehousemen's, mechanics', suppliers', materialmen's, repairmen's liens or other like Encumbrances arising in the Ordinary Course of Business that, in each case, are not material to the Business, and are with respect to amounts not yet overdue.

"Person" means any individual, corporation, partnership, joint venture, limited liability company, association, joint-stock company, trust, unincorporated organization, Governmental Authority or other entity.

"Petition Date" has the meaning specified in the recitals.

"Post-Close Filings" has the meaning specified in Section7.9.

"Post-Closing Taxes" has the meaning specified in Section 7.1(a).

"Post-Closing Transaction Expense" has the meaning set forth in Section 3.7.

"Post-Petition Contract" has the meaning specified in Section 2.3(c).

"Pre-Closing Taxes" has the meaning specified in Section 7.1(a).

"Proceeding" means any action, arbitration, audit, claim, cause of action, hearing, investigation, litigation, or suit (whether civil, criminal, administrative or investigative) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Authority or arbitrator.

"Products" means any and all products and services, and related documentation, currently or previously researched, designed, developed, manufactured, sold, leased, licensed, delivered, distributed, installed, or otherwise made commercially available by or on behalf of a Seller, including, without limitation, any VLJs.

"Professional Compensation Claim" means a Claim solely in the Chapter 11 Bankruptcy Cases pursuant to sections 327, 328 or 330 of the Bankruptcy Code for final allowance of compensation or reimbursement of expenses incurred by Professionals retained by the Sellers and the Creditors' Committee in connection with the Bankruptcy Cases.

"Professionals" means those Persons employed pursuant to an order of the Bankruptcy Court in accordance with sections 327, 328, or 1103 of the Bankruptcy Code and to be compensated for services pursuant to sections 327, 328, 329 or 330 of the Bankruptcy Code, for which compensation and reimbursement has been allowed solely on a final basis by the Bankruptcy Court pursuant to such section(s), as applicable, of the Bankruptcy Code.

"Purchase Price" has the meaning specified in Section 3.1.

"Purchased Assets" shall mean all of the properties and assets of Sellers (other than the Excluded Assets) of every kind and description, wherever located, real, personal or mixed, tangible or intangible, owned, leased, licensed, used or held for use in or relating to the Business, including, but not limited to, all right, title and interest of each Seller in, to or under:

      (a)     all Accounts Receivable;

      (b)     the right to receive and retain payments in respect of any Accounts Receivable and the right to receive and retain Sellers' mail and other communications relating to the Business;

      (c)     all Equipment;

      (d)     all Contracts listed or described on Schedule 2.3, as updated from time to time by Buyer prior to the Contract Designation Date (the "Assumed Contracts");

      (e)     all Contracts pertaining to the lease of any real property ("Leased Real Property") listed or described on Schedule 2.3, as updated from time to time by Buyer prior to the Contract Designation Date (such Leases, the "Assumed Leases");

      (f)     all Permits and pending applications therefor;

      (g)     all Seller Intellectual Property;

      (h)     all Products, including all products in development by Sellers;

(i)     to the extent permitted by applicable law, all Documents except those (i) relating solely to any Excluded Asset or Excluded Liability; or (ii) relating to employees of Sellers who are not Transferred Employees;

(j)     all telephone, telex and telephone facsimile numbers and other directory listings used in connection with the Business;

(k)     all Purchased Deposits;

(l)     inventories of raw materials, work-in-process, finished goods, spare parts, supplies, products under research and development, and other accessories related thereto which are held at, or are in transit from or to, the locations at which the Business is conducted, or located at customers' or suppliers' premises on consignment, in each case, which are used by any Seller in the conduct of the Business;

(m)     all rights to proceeds under insurance policies relating to claims for losses related to any Purchased Asset or Assumed Liability;

(n)     the capitalized leases listed or described on Schedule 2.3 (the "Assumed Capitalized Leases");

(o)     any rights, claims, refunds, causes of action, choses in action, rights of recovery and rights of setoff of Sellers against third parties arising out of events occurring prior to the Closing Date, including and, for the avoidance of doubt, arising out of events occurring prior to the Petition Date, and including any rights under or pursuant to any and all warranties, representations and guarantees made by suppliers, manufacturers and contractors relating to products sold, or services provided, to Sellers, excluding only the rights, claims, refunds, causes of action, chooses in action, rights of recovery and rights of setoff that are identified as Excluded Assets as defined in Annex 1;

(p)     all goodwill and other intangible assets associated with the Business or the Purchased Assets;

(q)     any proprietary or licensed rights in Internet protocol addresses, ideas, concepts, methods, processes, formulae, models, methodologies, algorithms, reports, data, customer lists, mailing lists, business plans, market surveys, market research studies, websites, information contained on drawings and other documents, information relating to research, development or testing, and documentation and media constituting, describing or relating to the Seller Intellectual Property, including memoranda, manuals, technical specifications and other records wherever created throughout the world, but excluding reports of accountants, investment bankers, crisis managers, turnaround consultants and financial advisors or consultants;

(r)     Avoidance Actions;

(s)     all advertising, marketing and promotional materials, studies, reports and all other printed or written materials relating to the Business;

(t)     all rights of Sellers under non-disclosure or confidentiality, non-disparagement, non-compete, or non-solicitation agreements with former employees of Sellers, agents of Sellers or with third parties;

(u)     all cash (including checks received prior to the close of business on the Closing Date, whether or not deposited or cleared prior to the close of business on the Closing Date), commercial paper, certificates of deposit and other bank deposits, treasury bills and other cash equivalents;

(v)     all other or additional assets, properties, privileges, rights (including prepaid expenses) and interests of Sellers related to the Business of every kind and description and wherever located, whether known or unknown, fixed or unfixed, tangible or intangible, accrued, absolute, contingent or otherwise, and whether or no specifically referred to in this Agreement;

(w)     the Insurance Policies; and

(x)     all tax credits and similar Tax attributes relating to the Business or the Purchased Assets.

"Purchased Deposits" means all deposits (including customer deposits and security deposits for rent and electricity (including such deposits made by Seller in connection with the Assumed Leases)) and prepaid charges and expenses of Sellers, other than any deposits or prepaid charges and expenses paid in connection with or relating solely to any Excluded Assets or any Excluded Liability.

"Qualified Bid" shall have the meaning set forth in the Bidding Procedures.

"Release" has the meaning specified in Section 3.6(e).

"Representative" has the meaning specified in Section 6.1.

"Required Consents" means the filings by Sellers and Buyer required by the HSR Act and the expiration or earlier termination of all waiting periods under the HSR Act.

"Sale Motion" has the meaning set forth in Section 6.10(b).

"Sale Order" has the meaning set forth in Section 6.10(b).

"Sellers" has the meaning specified in the preamble.

"Seller Copyrights" means all Copyrights owned by each Seller or used or held for use by a Seller in the Business.

"Seller Equity Value" means Twenty-Two Million Dollars ($22,000,000).

"Seller Intellectual Property" means all of the following, owned, used or held for use in connection with the Business:

(a)     all Seller Trademarks;

(b)     all Seller Patents;

(c)     all Seller Copyrights;

(d)     all inventions (whether patentable or not), invention disclosures, discoveries, and improvements;

(e)     all Seller Trade Secrets;

(f)     all industrial designs and any registrations and applications therefor throughout the world;

(g)     all databases and data collections and all rights therein throughout the world;

(h)     all Software;

(i)     licenses, immunities, covenants not to sue and the like relating to the foregoing;

(j)     books and records describing or used in connection with the foregoing, including all contracts, licenses, and other agreements to which any Seller is a party or by which it is bound either as licensee or licensor relating to any intellectual property described above;

(k)     any and all other intellectual property rights and proprietary rights relating to any of the foregoing; and

(l)     all goodwill, franchises, licenses, permits, consents, approvals and claims or causes of action arising out of or related to infringement or misappropriation of any of the foregoing.

"Seller Patents" means all Patents owned by each Seller or used or held for use by a Seller in the Business.

"Seller Percentage" has the meaning specified below in this Annex 1.

"Senior Notes" means the 8% senior secured notes due May 31, 2012.

"Software" means all computer software (whether in source code, object code, or other form), including firmware, development tools, files, records, specifications, and data, all media on which any of the foregoing is recorded; and all systems, databases and platforms owned, licensed or used by a Seller, including all compilations, tool sets, compilers, higher level or "proprietary" languages, related documentation, technical manuals and materials, and any licenses to use or other rights relating to the foregoing, including all documentation and tools

reasonably necessary for a skilled programmer to maintain, modify, and create derivative works of the applicable Software.

"Stock Consideration" means that number of shares of Buyer Stock which equals Fifteen Percent (15%) (the "Seller Percentage") of the issued and outstanding Buyer Stock on the Closing Date after taking into consideration the issuance of the Closing Buyer Shares and the conversion or exercise of all issued and outstanding securities which are convertible into, or exercisable for, Buyer Stock on the Closing Date; provided, however, if on the Adjustment Date the Aggregate Equity Financing Amount is less than Ninety-Six Million Eight Hundred Thousand Dollars ($96,800,000) (the "Minimum Equity Commitment"), then, on the Adjustment Date, Buyer shall issue to the Sellers that number of shares of Buyer Stock equal to the difference between (A) the number of shares of Buyer Stock that the Sellers would have received pursuant to this Agreement if the Seller Percentage had been equal to the quotient obtained by dividing (x) the Seller Equity Value by (y) the sum of (1) the Aggregate Equity Financing Amount, plus (2) the Seller Equity Value minus (B) the Closing Buyer Shares. Buyer shall grant the holders of the Stock Consideration "preemptive rights" with respect to future issuances of the Buyer's Common Stock (subject to typical exclusions for incentive plans, mergers and acquisitions and equity kickers) with the understanding that if the holders of the Stock Consideration do not exercise their "preemptive rights" they will be subject to normal dilution. Buyer will provide the holders of the Stock Consideration with no less than seven (7) days advance notice of a Change of Control (as defined in the Note) and the adjustment contemplated hereby shall be effective immediately prior to such Change of Control. The Closing Buyer Shares shall bear a legend providing that such Closing Buyer Shares may only be transferred after receipt by the Buyer of a legal opinion, satisfactory to the Buyer in its reasonable discretion, confirming that the proposed transfer of the Closing Buyer Shares will not constitute a public offering and will be exempt from the registration provisions of the Securities Act of 1933, as amended, and all other applicable domestic or foreign securities laws.

"Straddle Period" has the meaning specified in Section 7.1(a).

"Successful Bidder" has the meaning specified in the Buyer Protections.

"Takeover Proposal" means any inquiry, proposal or offer from any Third Party, whether in writing or otherwise, relating to any Alternative Transaction.

"Tax" or "Taxes" (and with correlative meaning, "Taxable" and "Taxing") means (i) any federal, state, provincial, local, foreign or other income, alternative, minimum, add-on minimum, accumulated earnings, personal holding company, franchise, capital stock, net worth, capital, profits, intangibles, windfall profits, gross receipts, value added, sales, use, goods and services, excise, customs duties, transfer, conveyance, mortgage, registration, stamp, documentary, recording, premium, severance, environmental, natural resources, real property, personal property, ad valorem, intangibles, rent, occupancy, license, occupational, employment, unemployment insurance, social security, disability, workers' compensation, payroll, health care, withholding, estimated or other similar taxes, duty, levy or other governmental charge or assessment or deficiencies thereof (whether payable directly or by withholding and whether or not requiring the filing of a Tax Return), whether disputed or not and including any obligations to indemnify or otherwise assume or succeed to Taxes of any other Person, and including all

interest and penalties thereon and additions thereto , (ii) any liability in respect of any items described in clause (i) above arising as a result of being a member of a combined, consolidated, unitary or affiliated group of which the Sellers (or any predecessor) is or was a member on or prior to the Closing Date, including pursuant to Treasury Regulations Section 1.1502-6 or any analogous or similar provision of state, local or foreign laws and (iii) any and all Taxes referenced in clauses (i) and (ii) hereof of any Person (other than the Sellers) imposed on the Sellers (x) as a transferee or successor, (y) by Contract or Law or (z) otherwise, which Taxes relate to an event occurring prior to or on the Closing Date.

"Tax Return" means any return, report or similar statement required to be filed with respect to any Taxes (including any attached schedules), including any information return, claim for refund, amended return or declaration of estimated Tax.

"Third Party" means any Person or group other than Buyer and its Affiliates.

"Third Party Consents" means each material consent, waiver, authorization or approval of any governmental or regulatory authority, domestic or foreign, or of any other Person, and each material declaration to or filing or registration with any such governmental or regulatory authority, that is required in connection with the execution and delivery of this Agreement and the Ancillary Documents by the Sellers or the performance by the Sellers of their obligations thereunder.

"Trademarks" means all trademarks, service marks, trade and business names (including all assumed or fictitious names under which the Business is conducted), brand names, trade dress, designs, logos, packaging design, slogans, Internet domain names and other commercial symbols in any and all forms, whether registered or unregistered, all registrations and pending applications to register any of the foregoing (including intent to use applications), throughout the world.

"Trade Secrets" means rights in all confidential, non-public, or proprietary information, including, ideas, research and development, know-how, trade secrets, processes, formulae, compositions, processes, technology, methodologies, blueprints, drawings, schematics, flow charts, models, prototypes, testing procedures and results, specifications, designs, plans, concepts, ideas, inventor's notes, invention disclosures, algorithms, techniques, technical data, customer and supplier lists, pricing and cost information, and business and marketing plans and proposals formulae, and customer lists, all documentation relating to any of the foregoing, and the right in any jurisdiction to limit the use or disclosure thereof.

"Transfer Taxes" has the meaning specified in Section 7.1(b).

"Transaction Expenses" means Allowed Administrative Claims and the Allowed Professionals Compensation Claims.

"Undisclosed Contract" has the meaning specified in Section 2.3(b).

"Undisclosed Contract Assignment Order" has the meaning specified in Section 2.3(b).

"VEB Letters" has the meaning specified in Section 5.3.

"VLJ" has the meaning specified in the recitals.

"Vnesheconombank" or "VEB" has the meaning specified in Section 5.3.

"WARN Act" means The Worker Adjustment and Retraining Notification Act of 1988, as amended, and the relevant rules and regulations promulgated thereunder.

NY: 608708-5
DB02:7587587.1

067809.1001

**Schedule 2.3**

**Designated Contracts**

*Buyer is in the process of evaluating the Sellers' existing Contracts and will be making additions and deletions to this schedule as provided in Section 2.3 of the Agreement.*

Assumed Contracts

1.      License Agreement between Avidyne Corporation and Eclipse Aviation Corporation, dated as of February 21, 2007.

2.      Asset Purchase Agreement by and among Eclipse Aviation Corporation, PhyRx, Ltd. Liability Co. and Peter Haaland, dated as of March 23, 2007.

3.      Licence [sic] Agreement between The Welding Institute and Eclipse Aviation, dated as of November 7, 2001.

4.      Master Services Agreement between Eclipse Aviation Corporation and Computer Sciences Corporation, dated as of October 9, 2008.

5.      MOU between Eclipse Aviation Corporation and Buyer Parent dated December 15, 2007, and all undertakings and agreements in furtherance thereof

6.      Capital Lease with Citicorp Leasing.

7.      Capital Lease with Lyon Financial.

8.      Capital Lease with De Lage Landen Financial Services.

9.      Loan Agreement by and among DayJet Leasing, LLC, DayJet Corporation, UT Finance Corporation, Eclipse Aviation Corporation and Bank of Utah, dated as of July 16, 2007.

Assumed Leases

1.      Sunport III Hangar Lease between the City of Albuquerque and Eclipse Aviation Corporation, dated as of June 5, 2007 pertaining to the Sunport III Hangar at Albuquerque International Sunport, New Mexico.

2.      Standard Industrial/Commercial Single-Tenant Lease between East Road Corporation and Eclipse Aviation Corporation, dated as of November 1, 2005 pertaining to Lot 2C, Broadway Industrial Subdivision, Unit 2, Albuquerque, New Mexico, as amended by East Road Corporation and Eclipse Aviation Corporation by First Amendment to Lease, dated as of March 10, 2006 and Second Amendment to Lease, dated as of August 1, 2006.

3.      Lease between Applegates Landing I and Eclipse Aviation Corporation, dated as of November 11, 2005 pertaining to Lot 1-B, Airport Technical Center, Albuquerque, New Mexico.

4.      Sub-Lease between Bode Aero Services, Inc. and Eclipse Aviation Corporation, dated as of September 1, 2007 pertaining to 7401 Paseo Del Volcan NW, Albuquerque, New Mexico.

5.      Sunport IV Hangar Lease between the City of Albuquerque and Eclipse Aviation Corporation, dated as of December 1, 2006 pertaining to the Sunport IV Hangar at Albuquerque International Sunport, New Mexico.

6.      Commercial Lease between J.N.J. Property Management, LLC and Eclipse Aviation Corporation, dated as of July 7, 2008 pertaining to 2601 Karsten Court S.E., Suite B, Albuquerque, New Mexico.

7.      Lease Agreement between CG & D, L.L.C. and Eclipse Aviation Corporation, dated as of July 1, 2008 pertaining to 5541 Midway Park Place NE, Albuquerque, New Mexico.

8.      Sublease Agreement between Express Logistics, Inc. and Eclipse Aviation, dated as of July 30, 2008 pertaining to 2400 Alamo SE, Albuquerque, New Mexico.

9.      Use and Occupancy Agreement between Atlantic Aviation Albuquerque and Eclipse Aviation, dated as of September 1, 2008 pertaining to four (4) hangar spaces in various hangars at Albuquerque International Sunport, New Mexico.

10.     Sublease Agreement between Brown, Alcantar & Brown, Inc. and Eclipse Aviation Corporation, dated as of September 1, 2008 pertaining to 3211 University Blvd, SE, Albuquerque, New Mexico.

11.     Aircraft Hangar and Office Lease and Agreement between the City of Albuquerque and Eclipse Aviation Corporation, dated as of May 16, 2000 pertaining to hangar and office space at the Albuquerque International Sunport, New Mexico, as amended by the City of Albuquerque and Eclipse Aviation Corporation by the First Amendment to Aircraft Hangar and Office Lease and Agreement, dated as of October 9, 2001, the Second Amendment to Aircraft Hangar and Office Lease and Agreement, dated as of January 7, 2002, the Third Amendment to Aircraft Hangar and Office Lease and Agreement, dated as of June 24, 2002, the Fourth Amendment to Aircraft Hangar and Office Lease and Agreement, dated as of January 2, 2004, the Fifth Amendment to Aircraft Hangar and Office Lease and Agreement, dated as of August 25, 2005, and as extended by the Letter, dated as of May 19, 2008.

12.     Apron Area Lease and Agreement between the City of Albuquerque and Eclipse Aviation Corporation, dated as of August 14, 2001 pertaining to the apron area adjacent to hangar and office space at the Albuquerque International Sunport, New Mexico, as extended by the Letter, dated as of May 21, 2008.

     

13. Standard Industrial/Commercial Single-Tenant Lease between Broadway Development Company, L.L.C. and Eclipse Aviation Corporation, dated as of May 10, 2002 pertaining to Lot 2D, Broadway Industrial Subdivision, Unit 2, Albuquerque, New Mexico, as amended and assigned by and among Broadway Development Company, L.L.C., E.A. L.L.C. and Eclipse Aviation Corporation by the First Amendment to Lease, dated as of October 29, 2002, and as amended by E.A. L.L.C. and Eclipse Aviation Corporation by the Second Amendment to Lease, dated as of March 10, 2003 and by the Third Amendment to Lease, dated as of November 1, 2005.

14. Land and Facility Lease Agreement between Albany County Airport Authority and Eclipse Aviation Corporation, dated as of September 21, 2006 pertaining to a certain plot of land and improvements thereto at the Albany International Airport, New York.

15. Lease Agreement between Gainesville–Alachua County Regional Airport Authority and Eclipse Aviation, Corp., dated as of March 31, 2006 pertaining to an aircraft service center at Gainesville Regional Airport, Florida.

DB02:7587585.1

067809.1001

## Schedule 5.2

## Fees

None.

## Schedule 8.2(h)

## Governmental Authority Consents

The HSR Filing shall have been made and the waiting periods under the HSR Act shall have terminated or expired without any adverse action or ruling.

DB02:7587585.1

067809.1001

**Schedule A-1**

**Excluded Contracts**

1.  Amended and Restated Shareholders Agreement, among Eclipse Aviation Corporation and certain Shareholders, dated as of June 8, 1999, as amended and restated on February 15, 2008.

2.  Any Purchase Agreements related to any equity or security in Eclipse Aviation Corporation.

3.  Note, Conversion Share and Redemption Equity Warrants Subscription Agreement, by and between Eclipse Aviation Corporation and certain Investors, dated as of May 26, 2006.

4.  Third Amended and Restated Intercreditor Agreement, among Bank of New York and Eclipse Aviation Corporation, dated as of May 31, 2006.

5.  Security Agreement, by Bank of New York and Eclipse Aviation Corporation, dated as of March 15, 2007.

6.  Collateral Agent Agreement, by Bank of New York, Eclipse Aviation Corporation and certain Lenders, dated as of March 13, 2007.

7.  Accession Agreement, among Bank of New York and Eclipse Aviation Corporation, dated as of March 31, 2006.

8.  Convertible Loan Agreement, among Eclipse Aviation Corporation and Alfred E. Mann Living Trust, dated as of July 29, 2008.

9.  Promissory Note, by Eclipse Aviation Corporation, dated as of August [＿], 2008.

10. Convertible Loan Agreement, among Eclipse Aviation Corporation and ETIRC Aviation S.a.r.l., dated as of August [＿], 2008.

11. Warrant to Purchase Series A Common Stock of Eclipse Aviation Corporation, by Eclipse Aviation Corporation and Roel Pieper, dated as of August [＿], 2008.

12. Limited Waiver of Change of Control Redemption Provision by Parker [＿＿＿] LP, dated as of August 1, 2008.

13. Limited Waiver of Change of Control Redemption Provision by Daniel J. McElroy, dated as of August 4, 2008.

14. Limited Waiver of Change of Control Redemption Provision by JBJK Investments, LLC, dated as of August 4, 2008.

15. Limited Waiver of Change of Control Redemption Provision by Richard Novel, dated as of August 1, 2008.

6

16. Limited Waiver of Change of Control Redemption Provision by Lars Thuesen, dated as of August 1, 2008.

17. Limited Waiver of Change of Control Redemption Provision by Texas Eclipse Group, dated as of August 7, 2008.

18. Limited Waiver of Change of Control Redemption Provision by Melinda Mason, dated as of August 4, 2008.

19. Limited Waiver of Change of Control Redemption Provision by Monte Ahuja Family Trust and Usha Ahuja Family Trust, dated as of August 6, 2008.

20. Limited Waiver of Change of Control Redemption Provision by Robert A. Mittledorf, Peggy A. Mittledorf TTE FBO The Mittledorf Family Trust, dated as of August 5, 2008.

21. Limited Waiver of Change of Control Redemption Provision by Brian L. Mittledorf, dated as of August 5, 2008.

22. Limited Waiver of Change of Control Redemption Provision by Iroll & Manolla LLP, dated as of August 5, 2008.

23. Limited Waiver of Change of Control Redemption Provision by William Luterman, dated as of August 5, 2008.

24. Limited Waiver of Change of Control Redemption Provision by Jeffrey M. Rubenstein, dated as of July 30, 2008.

25. Limited Waiver of Change of Control Redemption Provision by Rapid Prototypes, Inc., dated as of August 5, 2008.

26. Limited Waiver of Change of Control Redemption Provision by Klaburde Revocable Trust, dated as of July 31, 2008.

27. Limited Waiver of Change of Control Redemption Provision by Lloyd Marcum DDS Inc. Profit Sharing Plan, dated as of July 30, 2008.

28. Limited Waiver of Change of Control Redemption Provision by Brook J. Lenfest, dated as of August 1, 2008.

29. Limited Waiver of Change of Control Redemption Provision by Global Light Industrial, Inc., dated as of July 31, 2008.

30. Limited Waiver of Change of Control Redemption Provision by Sand Hill Sakura Fund, LP, dated as of August 1, 2008.

31. Limited Waiver of Change of Control Redemption Provision by Eric M. Kobren, dated as of July 31, 2008.

32. Limited Waiver of Change of Control Redemption Provision by James Teng, dated as of [_____].

33. Amended and Restated Security Agreement made by Eclipse IRB Sunport LLC in favor of the Bank of New York, dated as of February 15, 2008.

34. Second Amendment to Mortgage with Assignment of Rents and Fixture Filing, by and between Eclipse Aviation Corporation and the Bank of New York, dated as of February 15, 2008.

35. Fourth Accession Agreement, by the Bank of New York and Eclipse Aviation Corporation, dated as of February 15, 2008.

36. Amended and Restated Shareholders Agreement, by Eclipse Aviation Corporation and certain Investors named therein, dated as of February 15, 2008.

37. J-1 and J-2 Preferred Stock Subscription Agreement, by and between ETIRC Aviation S.a.r.l. and Eclipse Aviation Corporation, dated as of January 17, 2008.

38. Joinder Agreement to Amended and Restated Shareholders Agreement by ETIRC Aviation S.a.r.l., dated as of June 8, 1999.

39. Exchange Agent Agreement, by Eclipse Aviation Corporation and accepted by The Bank of New York Trust Company, N.A., dated as of January 17, 2008.

40. Exchange Offer Agreement by and among Eclipse Aviation Corporation, Kings Road Investments Ltd., Citadel Horizon S.a.r.l. and HBK Master Fund L.P., dated as of February 12, 2008.

41. July 2008 Restructuring Agreement by and among Eclipse Aviation Corporation, ETIRC Aviation S.a.r.L., Alfred E. Mann as defined therein, and the Consenting Holders as defined therein, dated as of July 28, 2008.

42. Air Taxi Fleet Financing Agreement between Eclipse Aviation Corporation and UT Finance Corporation, dated as of April 5, 2005.

43. Air Taxi Fleet Financing Agreement by and among Eclipse Aviation Corporation, UT Finance Corporation and Pratt & Whitney Canada Corp., dated as of June 30, 2007.

44. Commitment Letter by and among UT Finance Corporation, Eclipse Aviation Corporation, DayJet Leasing LLC and DayJet Corporation, dated as of June __, 2007.

45. Amended and Restated Aircraft Purchase Agreement between Eclipse Aviation Corporation and DayJet Corporation, dated as of June 23, 2006.

46. Professional Services Agreement – Aircraft Data Center between Eclipse Aviation Corporation and DayJet Corporation, dated as of December 17, 2007, as amended by

DB02:7587585.1                                                                                 067809.1001

Eclipse Aviation Corporation and DayJet Corporation by the Amendment to Professional Services Agreement – Aircraft Data Center, dated as of August 15, 2008.

47. Proprietary Rights and Non Disclosure Agreement between Eclipse Aviation Corporation and DayJet Corporation, dated as of May 14, 2008.

48. Letter Agreement between Eclipse Aviation Corporation and DayJet Services, LLC, dated as of May 14, 2008.

49. Agreement by and among DayJet Corporation, DayJet Services, LLC, DayJet Leasing, LLC, and Eclipse Aviation Corporation, dated as of May 10, 2008.

50. Letter Agreements between Eclipse Aviation Corporation and DayJet Corporation, dated as of May 10, 2008.

51. Maintenance Services Agreement between DayJet Services, LLC and Eclipse Aviation Corporation, dated as of May 1, 2008.

52. Pilot Services Agreement between DayJet Services, LLC and Eclipse Aviation Corporation, dated as of May 1, 2008.

53. Option Agreement to Subscribe Shares of Capital of ETIRC Aviation S.a r.l. between Eclipse Aviation Corporation and ETIRC Aviation S.a r.l., dated as of May 9, 2008.

54. Option and Factory Extension Agreement between ETIRC Aviation S.a r.l. and Eclipse Aviation Corporation, dated as of June 30, 2008, to extend the Memorandum of Understanding between ETIRC Aviation S.a r.l. and Eclipse Aviation Corporation, dated as of December 15, 2007.

55. Distributor Agreement between Eclipse Aviation Corporation and ETIRC Aviation Cyprus Ltd., dated as of September 17, 2007.

56. Confidentiality and Non-Disclosure Agreement by and among Eclipse Aviation Corporation, ETIRC Aviation Cyprus Ltd., and ETIRC Aviation S.a.r.l., dated as of September 17, 2007.

57. Eclipse 500 Fleet Aircraft Purchase Agreement between ETIRC Aviation Europe and Eclipse Aviation Corporation, dated as of January 12, 2006.

58. Pilot Training Services Agreement between Eclipse Aviation Corporation and United Air Lines, Inc., dated as of November 11, 2004, as terminated by Eclipse Aviation Corporation and United Air Lines, Inc. by the Amendment to Agreement – Pilot Training Services, dated as of February 15, 2007.

59. Aircraft Lease Agreement between Eclipse Aviation Corporation and Vern Raburn, dated as of August 27, 2008.

DB02:7587585.1                                                                 067809.1001

60. Severance Agreement and General Release between Vern Raburn, Eclipse Aviation Corporation and ETIRC Aviation S.a.r.l., dated as of July 25, 2008, as amended by Vern Raburn and Eclipse Aviation Corporation by the Amendment to Severance Agreement and General Release, dated as of August 27, 2008.

61. Letter Agreement between Vern Raburn, King Road Investments, Ltd., Citadel Horizons S.a.r.L., and HBK Master Fund, L.P., dated as of July 28, 2008.

62. Severance Agreement and General Release between Chris Herzog and Eclipse Aviation, Inc., dated as of October 31, 2004.

63. Severance Agreement and General Release between Eugene Garnes and Eclipse Aviation, Inc., dated as of December 30, 2006.

64. Severance Agreement and General Release between Don Taylor and Eclipse Aviation, Inc. dated as of November 5, 2007.

65. Severance Agreement and General Release between William Bonder and Eclipse Aviation, Inc. dated as of June 7, 2008.

66. Employment Agreement between Eclipse Aircraft Corporation and Oliver Masefield, dated as of July 1, 2001.

67. Employment Agreement between Eclipse Aviation Corporation and J. Mark Borseth, dated as of June 11, 2008.

68. Bonus Letter from Eclipse Aviation Corporation to J. Mark Borseth, dated as of August 25, 2008.

69. Bonus Letter from Eclipse Aviation Corporation to Michael McConnell, dated as of August 25, 2008.

70. Bonus Letter from Eclipse Aviation Corporation to Peg Billson, dated as of August 25, 2008.

71. All Contracts relating to the Jet Complete Program.

72. All Contracts with Irell & Manella LLP.

73. All Contracts with International Business Machines.

74. All Contracts with BAE Systems.

75. All Contracts with Mach 2 Management, Inc.

76. All Contracts with DayJet Services LLC.

77. All Contracts with Unifirst Corporation.

78. All Contracts with Albuquerque Isotopes.

79. All Contracts with Productivity Team LLC.

80. All Contracts with Wexler & Walker Public Policy Association.

81. All Contracts with Castle & Cooke Aviation Services, I.

82. All Contracts with Gallagher & Kennedy.

83. All Contracts with The Santa Fe Opera.

84. All Contracts with Pool Aviation

85. All Contracts with Kennard E. Goldsmith, Jr.

86. All Contracts with Jack Harrington.

DB02:7587585.1

067809.1001

## Schedule A-2

## Excluded Leases

1.  Sublease between Castle & Cooke Aviation Services Inc. and Eclipse Aviation Corporation, dated as of December 1, 2006 pertaining to 7415, 7501, 7530 and 7405 Hayvenhurst Place, Van Nuys, California.

2.  Memorandum of Agreement between Lan Tien Ventures, LLC and Eclipse Aviation Corporation, dated as of June 14, 2007.

3.  Lease between SKAR, LLC and Eclipse Aviation Corporation, dated as of February 28, 2008 pertaining to 2811 Karsten Court SE, Albuquerque, New Mexico.

4.  Sublease between Mediaworks and Eclipse Aviation Corporation, dated as of July 9, 2007 pertaining to 6203 Pan American Building, Suite A.

DB02:7587585.1

067809.1001