# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 7 |
| Eclipse Aviation Corporation, *et al.*, [1] | ) | |
| | ) | Case No. 08-13031 (MFW) |
| Debtors. | ) | |
| | ) | (Jointly Administered) |

**Objection Deadline:  August____, 2009, ____ _.m.**
**(To be determined)**
**Hearing Date:  August__, 2009, ____ p.m.**
**(To be determined) (Bidding Procedures)**
**Hearing Date:  August__, 2009, ____ p.m.**
**(To be determined) (Approval of Sale)**

## MOTION OF THE CHAPTER 7
## TRUSTEE TO APPROVE SALE PROCEDURES,
## AND TO APPROVE SALE, AND FOR RELATED RELIEF

Jeoffrey L. Burtch, Chapter 7 Trustee (the "Trustee") in the above-captioned cases moves for the entry of (A) an order, substantially in the form annexed hereto as Exhibit A (the "Sale Procedures Order"), (i) approving sale procedures (the "Sale Procedures" or "Bidding Procedures"), substantially in the form annexed as Exhibit 1 to the Sale Procedures Order, with respect to the sale (the "Sale") of substantially all of the assets of these Chapter 7 estates (the "Eclipse Assets"), as set forth in that certain asset purchase agreement by and between the Trustee and the Buyer (sometimes, the "Stalking Horse Bidder"); (ii) scheduling a hearing (the "Sale Hearing") on the Sale and setting objection and bidding deadlines with respect to the Sale; (iii) directing that notice of the Sale Procedures and the Sale be given, substantially in the form annexed as Exhibit 2 to the Sale Procedures Order (the "Auction and Sale Notice"); (iv) establishing procedures for the assumption and assignment of certain Designated Contracts, including notice of proposed cure amounts; (v) authorizing the Trustee to pay to the Stalking

---

[1]The Debtors in these proceedings are: Eclipse Aviation Corporation  and Eclipse IRB Sunport, LLC, a wholly owned subsidiary of Eclipse Aviation Corporation.

Horse Bidder a break-up fee under certain terms and conditions set forth more particularly below; and (vi) granting related relief; and (B) an order, substantially in the form annexed hereto as Exhibit B (the "Sale Order"), (i) authorizing the Sale of the Eclipse Assets free and clear of liens, claims encumbrances, and other interests pursuant to the Agreement, substantially in the form annexed to the Sale Order as Exhibit 1; (ii) authorizing and approving the Agreement; (iii) approving the assumption and assignment of executory contracts and unexpired leases, as necessary in connection with the Sale. In support of this motion (the "Motion"), the Trustee respectfully represents as follows:

## JURISDICTION

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.      The statutory and legal predicates for the relief requested herein are sections 105(a), 363, and 365 of title 11 of the United States Code (the "Bankruptcy Code"), and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## BACKGROUND

3.      On November 25, 2008 (the "Petition Date"), each of the above caption debtors (the "Debtors") filed with this Court a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The cases are jointly administered pursuant to Bankruptcy Rule 1015(b).

4.      Prior to the Petition Date, the Debtors issued 8% Senior Secured Notes due 2012 (the "Notes", holders of the Notes being collectively, the "Senior Secured Noteholders"). Prior to the Petition Date, certain of the Senior Secured Noteholders formed an ad hoc committee comprised of Kings Road Investments, Ltd., Citadel Investment Group, L.L.C. and HBK

Services, LLC (the "Ad Hoc Committee") to represent the interests of the Senior Secured Noteholders in negotiations with the Debtors.

5.      A detailed description of the events leading up to these Chapter 11 filings is set forth more fully in the Affidavit of J. Mark Borseth in Support of Chapter 11 Petitions and First Day Motions [Docket No. 2], filed in these cases on November 25, 2008.

6.      In the Chapter 11 cases, this Court approved sale procedures.  No qualified bid was submitted, and the Court (after a contested hearing) approved the sale of substantially all of the assets of the Debtors to ETIRC Aviation, S.a.r.l. ("ETIRC").  That sale to ETIRC did not close.  On March 5, 2009, the cases converted to cases under Chapter 7.  Jeoffrey L. Burtch was appointed as interim trustee on March 5, 2009, and serves as the trustee in these cases pursuant to Section 702(d) of the Bankruptcy Code.

7.      Since the date of his appointment, the Trustee has been pursuing the sale of substantially all the assets of the Chapter 7 estates (the "Eclipse Assets").  A for sale listing concerning Eclipse Assets was placed on the BankruptcySales.com website.  A related for sale listing was placed upon the website for Cooch and Taylor.  The Trustee received over 30 inquiries from prospective purchasers.    Approximately 12 of those entities executed nondisclosure agreements, and approximately six groups visited the Eclipse facilities in Albuquerque, New Mexico in connection with their due diligence.[2]  All interested entities (and their respective representatives) that executed nondisclosure agreements further were provided electronic access to a virtual data room containing voluminous documents equivalent in size to gigabytes of electronic information.  Over the past few months, the Trustee has received several term sheets or letters of intent that reflected purchase offers.  However, prospective purchasers

---

[2] To be clear, all these visits occurred post conversion.  Upon information and belief, approximately two additional groups visited the Eclipse facilities during the Chapter 11 period of these cases.

were either hesitant to make the first public bid, were unable to obtain financing, required unacceptable conditions to closing, or otherwise backed out.

8. In consultation with the Ad Hoc Committee, the Trustee has determined that the offer of the Buyer (as defined and further detailed below) had the most promise, and the parties negotiated and drafted the terms of an asset purchase agreement. A copy of the agreement is attached as Exhibit 1 to Exhibit B to this motion (hereinafter, the "Agreement").

9. The Ad Hoc Committee has been involved with the negotiations concerning the Agreement, and the language of the Agreement, and has approved the form and substance of the Agreement.

## RELIEF REQUESTED

10. By this Motion, the Trustee seeks <u>first</u>, the entry of the Sale Procedures Order (i) approving the Sale Procedures; (ii) scheduling the Sale Hearing and establishing related deadlines; (iii) approving the form and manner of notice of the Sale Procedures, the notice of the Auction and Sale Hearing; (iv) approving and establishing procedures related to the assumption and assignment of various executory contracts and unexpired leases related thereto; (v) authorizing the Trustee to pay to the Stalking Horse Bidder a break-up fee under certain terms and conditions; and (vi) granting such other and further related relief; and second, the entry of a Sale Order (i) authorizing the sale of the Eclipse Assets free and clear of liens, claims, encumbrances, and interests, pursuant to the Agreement; (ii) authorizing and approving the Agreement; and (iii) approving the assumption and assignment of various executory contracts and unexpired leases related thereto.

## **THE AGREEMENT**

11.     The material terms of the Agreement are as follows: [3]

(a)     Purchase and Sale of Assets.  Subject to the terms and conditions set forth in the Agreement, at the Closing (and on the applicable Assumption Date with respect to Purchased Assets consisting of rights under any Designated Contract assumed by the Seller and assigned to Buyer after the Closing Date as provided herein) Buyer shall purchase from Sellers, and Sellers shall sell, transfer, assign, convey and deliver or cause to be sold, transferred, assigned, conveyed and delivered to Buyer, all of the Purchased Assets, free and clear of all Liens and free and clear of all Liabilities (other than Assumed Liabilities).

(b)     Purchased Assets. The Purchased Assets consist of all of the properties and assets of Sellers (other than the Excluded Assets) of every kind and description, wherever located, real, personal or mixed, tangible or intangible, owned, leased, licensed, used or held for use in or relating to the Business, and as further defined on page A-12 of the Agreement.

(c)     Excluded Assets.  The Excluded Assets consist of: (i) all cash, (ii) shares of capital stock or other equity interest of any Seller or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest of any Seller; (iii) any and all Avoidance Actions; and as further defined on page A-6 and A-7 of the Agreement.

(d)     Purchase Price.  The Purchase Price is $40,000,000.00.  Subject to the terms and conditions set forth in the Agreement and in reliance upon the representations and warranties of the Parties set forth therein, at the Closing, the aggregate purchase price to be paid by Buyer to the Seller in exchange for the Purchased Assets shall be an amount equal to (i) the

---

[3] The summary of the Agreement is provided for the convenience of the Court and the parties receiving this Motion; and to comply with applicable Local Rules.  To the extent that the summary differs in any way from the terms of the Agreement, the terms of Agreement shall control.  Capitalized terms used but not defined in this summary shall have the meanings given in the Agreement.

Cash Consideration, consisting of $20,000,000, plus (ii) the Note Consideration, consisting of $20,000,000.00. See Agreement, pages 5-6, A-3 and A-10.

(e) <u>Closing Date</u>. Subject to the terms and conditions set forth in the Agreement, the Closing shall occur, as promptly as practicable, and at no time later than the fifth Business Day, following the date on which the closing conditions set forth in Article VIII of the Agreement have been satisfied or waived, where applicable, or at such other date as Buyer and Sellers may mutually agree. See Agreement, page 6.

(f) <u>Break-Up Fee</u>. Upon the closing of an Alternative Transaction, (ii) Sellers shall pay Buyer in immediately available funds the amount of $1,600,000.00 (the "Break-Up Fee"). Agreement, page 24.

(g) <u>The Buyer</u>. The Buyer is Eclipse Aerospace, Inc. Eclipse Aerospace, Inc is a corporation incorporated under the laws of Delaware. Mason Holland is the President of Eclipse Aerospace, Inc. Neither Mr. Holland, nor any officer or director of Eclipse Aerospace, Inc has any relationship with the Debtors, or the Trustee.

(h) <u>Good Faith Deposit</u>. Immediately upon the Bankruptcy Court's entry of the Bidding Procedures Order (as defined below) and its approval of this Agreement as the stalking horse bid, Buyer will deposit $5,000,000 with a third party escrow agent pursuant to a deposit escrow agreement. See Agreement, page 20.

(i) <u>Use of Proceeds</u>. The Sale Order provides for the release of sale proceeds on and after closing without further Court order. Paragraph eight of the (proposed) Sale Order states in full as follows:

> "8. The Trustee is authorized and directed to deposit and hold in escrow the Cash Consideration (as defined in the Agreement), and furthermore to make distributions from the Cash Consideration and of the Notes on the Closing Date as follows:

a.     The Trustee shall deposit $3,324,944.73 (the "Chapter 11 Professional Fee Amount") in a separate account for payment of the chapter 11 professional fees pursuant to the Omnibus Order Awarding Allowance of Compensation for Services Rendered and Reimbursement Or Expenses of Chapter 11 Professionals Employed in This Case [Docket No. 733].

b.     The Trustee shall deposit $20,325.00 (the "U.S. Trustee Fee Amount") in a separate account for payment of outstanding U.S. Trustee fees.

c.     The Trustee shall deposit $636,250.00 (the "Trustee Compensation Reserve") in a separate account for payment of compensation to which the Chapter 7 Trustee may be entitled pursuant to section 326 of the Bankruptcy Code subject to further order of the Court.

d.     The Trustee shall deposit $5,000.00 (the "Trustee Expense Reserve") in a separate account to reimburse him for his reasonable expenses subject to further order of the Court.

e.     The Trustee shall deposit an amount sufficient to pay unpaid fees and expenses of professionals employed by the Chapter 7 Trustee in excess of the Chapter 7 Carve-Out (as defined in the Stipulation And Agreed Order Authorizing Limited Use Of Cash Collateral (the "Cash Collateral Order") [Docket no. 714] (the "Chapter 7 Professional Fee Amount") in a separate account to pay unpaid fees and expenses of professionals employed by the Chapter 7 Trustee after further order of this Court.

f.     The Trustee shall deposit $100,000.00 (the "Closing Expense Reserve") in a separate account to be available without further order of the Court to pay any necessary post-closing obligations of the Trustee as Seller that are contemplated by the Agreement.

g.     The Trustee shall deposit an amount sufficient to pay any unpaid expense approved by the Stipulation And Agreed Order Authorizing

Limited Use Of Cash Collateral [Docket no. 714] (and any agreed-upon extensions thereof) and any fees and expenses of counsel to the Ad Hoc Committee of Secured Noteholders in excess of any amounts payable pursuant to the Cash Collateral Order (and any extensions thereof) that are incurred by the Ad Hoc Committee of Secured Noteholders through and including the Closing Date; and

h.      The Trustee shall distribute to each of (i) the Bank of New York, in its capacity as Collateral Agent under that certain Amended and Restated Security Agreement dated as of February 15, 2008, as payment for amounts due and owing the holders of the Debtors' Senior Secured Notes pursuant to the terms of the Senior Secured Notes and (ii) to the Alfred Mann Living Trust for his share pursuant to the Final Order Pursuant to 11 U.S.C. Sections 105, 362, 363 and 364 and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (1) Authorizing Incurrence by the Debtors of Post-Petition Secured Indebtedness with Priority Over All Other Secured Indebtedness and with Administrative Superpriority, (2) Granting Liens and (3) Modifying the Automatic Stay [Docket No. 230], their prorated share of the remaining Cash Consideration and the Note Consideration.    Any funds held by the Trustee in escrow as stated above in subparagraphs 8(a) through 8(g), inclusive, that are not actually expended by the Trustee shall be distributed in accordance with subparagraph 8(h)."

Pending distribution of the Cash Consideration the Trustee shall not commingle the Cash Consideration with any other of the Debtors' assets.

(j)      Record Retention.  The Agreement contains a records retention provision, which states in part:

"Buyer shall permit Trustee's counsel, accountants and any other professional representative of the Trustee, during regular business hours, with reasonable notice, and subject to reasonable rules and regulations, reasonable access to any information acquired by the Buyer pursuant to this Agreement, including financial information of the Companies, and other books and records which comprised part of the Purchased Assets, that are required for the Trustee to

complete the Post-Close Filings, or to facilitate the administration of these Bankruptcy Cases. Buyer shall retain all any information acquired by the Buyer pursuant to this Agreement for a period of at least six (6) years following the Closing Date. On or after the end of such period, the Buyer shall provide the Trustee with at least forty-five (45) days prior written notice before destroying any such information, during which period the Trustee can elect to take possession, at its own expense, of such books and records. The obligations created by this Section 7.10 shall terminate 30 days after the entry of a final non-appealable order by the Bankruptcy Court approving the Trustee's Final Report."

Agreement, Section 7.10.

(k)     <u>Relief from Bankruptcy Rule 6004(h)</u>. The Sale order seeks relief from the ten-day stay imposed by Rule 6004(h) and other Bankruptcy Rules. Sale Order, page 32, ¶ 39.

## PROPOSED SALE PROCEDURES

12.     The Trustee desires to maximize the value for the Eclipse Assets, which should factor in the need to minimize the substantial expenses and costs necessary to preserve those assets prior to the consummation of such a sale in these Chapter 7 cases. The available cash to preserve the Eclipse Assets is rapidly diminishing, and the Trustee believes it is absolutely imperative that he promptly move forward with approval and, thereafter, implementation of the Sale Procedures. Accordingly, the Sale Procedures (as summarized below) were developed consistent with the Trustee's need to expedite the sale process, and with the objective of promoting competitive bidding that will result in the highest and best offer the current marketplace can provide for the Assets. Moreover, the Sale Procedures reflect the Trustee's objective of conducting the Auction in a controlled, but fair and open, fashion that promotes interest in the Assets by financially capable, motivated bidders who are able to close the transaction. These Sale Procedures are substantially similar to those approved by this Court in these cases during the Chapter 11 phase. See Docket No. 229.

13.     To the extent the Sale Procedures proposed herein are different than those approved by this Court in these cases during the Chapter 11 phase, the Trustee submits there are valid justifications.  This Motion is not a filing at the beginning of the bankruptcy cases.  It comes over eight months after the petition date (November 25, 2008).  Numerous parties have filed notices of appearance and have retained legal counsel and are monitoring these (now) Chapter 7 cases.  Schedules and statements of financial affairs have been filed by the Debtors.  Monthly operating reports have been filed by the Debtors.  Upon information and belief, extensive litigation transpired in the Chapter 11 phase that included depositions of principals of the Debtor.  Much information is known now by the parties in interest that was not available at the commencement of these cases, and more than an adequate period of time has transpired for parties in interest to evaluate and investigate the circumstances of these Debtors and their assets and their prior business.

14.     The following paragraphs in this section summarize only the key provisions of the Sale Procedures (and as required by this Court's Local Rules), but are qualified in their entirety by reference to the actual Sale Procedures attached hereto as Exhibit 1 to the Sale Procedures Order:

(a)     <u>Assets for Sale</u>.   The Trustee is offering for sale in one or more transactions all or substantially all of the assets of Eclipse Aviation Corporation and its affiliated debtor.  The assets proposed to be sold to the Buyer consist of the Purchased Assets as set forth in the Agreement.  The assets for sale to the Buyer do not include the Excluded Assets, which shall mean (i) the excluded assets specified in the Agreement.

(b)     <u>Participation Requirements</u>.  In order to participate in the bidding process and to or otherwise be considered for any purpose hereunder, a person interested in all or

portions of the Assets (a "Potential Bidder") must first deliver (unless previously delivered) to the Trustee and his counsel no later than 12:00 noon (prevailing Eastern Time) on August ___, 2009: [4]

(i)     Confidentiality Agreement. An executed confidentiality agreement in form and substance acceptable to the Trustee and his counsel; such form attached as Exhibit 1 to the Sale Procedures (if not already provided); and

(ii)     Identification of Potential Bidder.  Identification of the Potential Bidder and any Principals (defined below), and the representatives thereof who are authorized to appear and act on their behalf for all purposes regarding the contemplated transaction.

(c)     Designation as Qualified Bidder.  A "Qualified Bidder" is a Potential Bidder (or combination of Potential Bidders whose bids for the Debtors' assets do not overlap and who agree to have their bids combined for purposes of the determination of whether such Potential Bidders together constitute a Qualified Bidder, and who shall also be referred to herein as a single Qualified Bidder) that delivers the documents described in subparagraphs (a)-(b) above, and that the Trustee in his discretion and with assistance from his advisors, and in consultation with the Ad Hoc Committee, determines is reasonably likely to submit a bona fide offer that would result in greater total consideration being received for the benefit of the Chapter 7 estates than under the Agreement and to be able to consummate a sale if selected as a Successful Bidder (defined below).

---

[4] Due to the severe time exigencies of filing this Motion and at the instructions of Court chambers, this Motion is being filed without known dates for the hearing for the Court to consider the Sale Procedures and the hearing for the Court to consider the Sale.  Those unknown dates will affect the precise deadlines for the various dates contemplated by the Sale Procedures, and will be determined at a subsequent time. Therefore, as indicated in various points in this Motion, certain deadlines and/or hearing dates are left blank.  Similarly, there are blanks in the Agreement for the same reason.

(d)    <u>Access to Due Diligence Materials</u>.  Only Potential Bidders that comply with the Participation Requirements are eligible to receive due diligence access or additional non-public information.  If the Trustee, in consultation with the Ad Hoc Committee of Senior Secured Noteholders, determines that a Potential Bidder who has satisfied the Participation Requirements does not constitute a Qualified Bidder, then such Potential Bidder's right to receive due diligence access or additional non-public information shall terminate.  The Trustee will designate a representative to coordinate all reasonable requests for additional information and due diligence access from such Qualified Bidders.  The Trustee shall not be obligated to furnish any due diligence information after the Bid Deadline.  The Trustee is not responsible for, and will bear no liability with respect to, any information obtained by Qualified Bidders in connection with the sale of the Assets.

(e)    <u>Due Diligence from Bidders</u>. Each Potential Bidder and Qualified Bidder shall comply with all reasonable requests for additional information and due diligence access by the Trustee, the Ad Hoc Committee of Senior Secured Noteholders or their advisors regarding such Bidder and its contemplated transaction.  Failure by a Potential Bidder to comply with requests for additional information and due diligence access will be a basis for the Trustee to determine that the Potential Bidder is not a Qualified Bidder.  Failure by a Qualified Bidder to comply with requests for additional information and due diligence access will be a basis for the Trustee to determine that a bid made by a Qualified Bidder is not a Qualified Bid.

(f)    <u>Bid Process</u>. The Trustee and his advisors, in consultation with the Ad Hoc Committee of Senior Secured Noteholders, shall:  (i) determine whether a Potential Bidder is a Qualified Bidder; (ii) coordinate the efforts of Bidders in conducting their due diligence investigations, as permitted by the provisions, above; (iii) receive offers from Qualified Bidders;

and (iv) negotiate any offers made to purchase the Assets (collectively, the "Bidding Process"). The Trustee shall have the right to adopt such other rules for the Bidding Process (including rules that may depart from those set forth herein) that will better promote the goals of the Bidding Process and that are not inconsistent with any of the other provisions hereof or of any Bankruptcy Court order.

(g)     Bid Deadline. The deadline for submitting bids by a Qualified Bidder shall be August ___, 2009, at 12:00 noon (Eastern Time) (the "Bid Deadline"). Prior to the Bid Deadline, a Qualified Bidder that desires to make an offer, solicitation or proposal (a "Bid") shall deliver written copies of its bid to the Notice Parties, so that the bid is actually received by the Bid Deadline.  A Bid received after the Bid Deadline shall not constitute a Qualified Bid unless otherwise agreed by the Trustee in consultation with the Ad Hoc Committee of Senior Secured Noteholders.

(h)     Bid Requirements.  Such a Bid must be determined by the Trustee, in consultation with the Ad Hoc Committee of Senior Secured Noteholders, to satisfy each of the following conditions:  (a) Each Bid must be accompanied by a Good Faith Deposit in the form of cash or a certified check payable to the order of the Trustee in an amount of not less than $5.0 million; (b) The aggregate consideration must exceed the sum of the Purchase Price by at least $2,000,000; (c) A bid must be irrevocable until two (2) business days after the Assets have been sold pursuant to the Closing of the sale or sales approved by the Bankruptcy Court; and (d) A Bid may be for the Purchased Assets under the Agreement, as applicable for the Purchased Assets subject to the Bid (provided, however, that any variations from one or more material terms must, in the aggregate constitute an improvement, as determined by the Trustee in consultation with the Ad Hoc Committee of Senior Secured Noteholders, upon such term or

terms as set forth in the Agreement). The Bid must be on terms that, in the Trustee's business judgment, in consultation with the Ad Hoc Committee of Senior Secured Noteholders, are substantially the same or better than the terms of the Agreement. A Bid must include executed transaction documents pursuant to which the Qualified Bidder proposes to effectuate the contemplated transaction. A Bid shall include a copy of the Agreement marked to show all changes requested by the Bidder (including those related to Purchase Price). The Contemplated Transaction Documents must include a written commitment satisfactory to the Trustee and the Ad Hoc Committee of Senior Secured Noteholders of its financial ability and intention to complete the transaction and contain a representation that the Qualified Bidder shall make all necessary regulatory filings, if any, and pay all costs and expenses of such filings (including the Trustee's costs and expenses). A Bid may not be conditioned on obtaining financing or any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy in all material respects at the closing of specified representations and warranties or the satisfaction in material respects at the closing of specified conditions, none of which shall be more burdensome than those set forth in the Agreement, as applicable. A Bid must include written evidence of the Qualified Bidder's chief executive officer or other appropriate senior executive's approval of the contemplated transaction; provided, however, that if the Qualified Bidder is an entity specially formed for the purpose of effectuating the contemplated transaction, then the Qualified Bidder must furnish written evidence reasonably acceptable to the Trustee of the approval of the contemplated transaction by the equity holder(s) of such Potential Bidder. A Bid must contain written evidence satisfactory to the Trustee, in consultation with the Ad Hoc Committee of Senior Secured Noteholders, that demonstrates the Qualified Bidder has the necessary financial ability to close the contemplated transaction and provide adequate assurance

of future performance under all contracts to be assumed in such contemplated transaction. Such information should include, *inter alia*, the following: (i) the Qualified Bidder's current financial statements (audited if they exist); (ii) contact names and numbers for verification of financing sources, (iii) evidence of the Qualified Bidder's internal resources and proof of any debt or equity funding commitments that are needed to close the contemplated transaction; and (iv) any such other form of financial disclosure or credit quality support information or enhancement reasonably acceptable to the Trustee in consultation with the Ad Hoc Committee of Senior Secured Noteholders demonstrating that such Qualified Bidder has the ability to close the contemplated transaction provided, however, that the Trustee shall determine, in his reasonable discretion, in consultation with his advisors and the Ad Hoc Committee of Senior Secured Noteholders, whether the written evidence of such financial wherewithal is reasonably acceptable, and shall not unreasonably withhold acceptance of a Qualified Bidder's financial qualifications. A Bid may not request or entitle the Qualified Bidder to any breakup fee, termination fee, expense reimbursement or similar type of payment. Moreover, by submitting a Bid a Bidder shall be deemed to waive the right to pursue a substantial contribution claim under section 503 of the Bankruptcy Code related in any way to the submission of its Bid or the Bid Procedures. A Bid received from a Qualified Bidder before the Bid Deadline that meets the above requirements, and that satisfies the Bid Deadline requirement above, shall constitute a "Qualified Bid," if the Trustee believes, in his reasonable discretion and after consultation with the Ad Hoc Committee of Senior Secured Noteholders, that such bid would be consummated if selected as the Successful Bid. For purposes hereof, the Agreement shall constitute a Qualified Bid. Promptly upon such determination, the Trustee shall provide any other Qualified Bids to the Buyer and to any Qualified Bidders. In the event that any Bid is determined by the Trustee,

in consultation with the Ad Hoc Committee of Senior Secured Noteholders, not to be a Qualified Bid, the Qualified Bidder shall be refunded its deposit and all accumulated interest thereon within three (3) business days after that determination.

(i)     Auction.  Only if a Qualified Bid (other than Buyer's) is received by the Bid Deadline, shall the Trustee conduct an auction to determine the highest and best bid with respect to the Purchased Assets under the Agreement.  The Trustee shall provide Buyer and all Qualified Bidders with copies of all Qualified Bids at least eighteen (18) hours prior to the Auction.  The Auction shall commence on August ___, 2009 at 10:00 a.m. (prevailing Eastern time), at the law offices of Cooch and Taylor, Wilmington, Delaware.

No later than 4:00 p.m. (prevailing Eastern time) on August ___, 2009, the Trustee will notify all Qualified Bidders of (i) the highest and best Qualified Bid(s), as determined in the Trustee's discretion after consultation with the Ad Hoc Committee of Senior Secured Noteholders (the "Baseline Bid") and (ii) the time and place of the Auction, and provide copies of all submitted bids to all Qualified Bidders.  If, however, no other such Qualified Bid is received by the Bid Deadline, then the Auction will not be held, Buyer will be the Successful Bidder, the Agreement will be the Successful Bid, and, at the August ___, 2009 Sale Hearing, the Trustee will seek approval of and authority to consummate the Proposed Sale contemplated by the Agreement.

The Auction shall be conducted according to the following procedures: (i) Only a Qualified Bidder that has submitted a Qualified Bid is eligible to participate at the Auction.  The auction shall be conducted openly and all creditors shall be entitled to attend.  Each Qualified Bidder shall have at least one representative physically present at the location of the Auction.  During the Auction, bidding shall begin initially with the highest Baseline Bid as to the

Purchased Assets under the Agreement and subsequently continue in minimum increments of at least $100,000. Bidding at the auction shall be transcribed or videotaped. Other than otherwise set forth herein, the Trustee may conduct the Auction in the manner he determines, in consultation with the Ad Hoc Committee of Senior Secured Noteholders, will result in the highest and best offer for the Purchased Assets under the Agreement; (ii) The Trustee and his professionals shall direct and preside over the Auction. At the start of the Auction the Trustee shall describe the terms of the Baseline Bid. The determination of which Qualified Bid constitutes the Baseline Bid shall take into account any factors the Trustee, in consultation with the Ad Hoc Committee of Senior Secured Noteholders, reasonably deems relevant to the value of the Qualified Bid to the estate, including, *inter alia*, the Bid Assessment Criteria. All Bids made thereafter shall be Overbids, and shall be made and received on an open basis, and all material terms of each Bid shall be fully disclosed to all other Qualified Bidders. The Trustee shall maintain a transcript of all Bids made and announced at the Auction, including the Baseline Bid, all Overbids and the Successful Bid. To submit an Overbid for purposes of the Auction, a Qualified Bidder must comply with the following conditions: (1) Any Overbid after the Baseline Bid shall be made in increments of at least $100,000; (2) Except as modified herein, an Overbid must comply with the conditions for a Qualified Bid set forth above, provided, however, that the Bid Deadline shall not apply. Any Overbid made by a Qualified Bidder must remain open and binding on the Qualified Bidder until and unless (a) the Trustee, in consultation with the Ad Hoc Committee of Senior Secured Noteholders, accepts a higher Qualified Bid as an Overbid and (b) such Overbid is not selected as the Back-up Bid. To the extent not previously provided (which shall be determined by the Trustee), a Qualified Bidder submitting an Overbid must submit, as part of its Overbid, written evidence (in the form of financial disclosure or credit-quality support

information or enhancement reasonably acceptable to the Trustee and the Ad Hoc Committee of Senior Secured Noteholders) demonstrating such Qualified Bidder's ability to close the transaction proposed by such Overbid; (3) The Trustee shall announce at the Auction the material terms of each Overbid, the basis for calculating the total consideration offered in each such Overbid and the resulting benefit to the Debtors' estates based on, *inter alia*, the Bid Assessment Criteria; (4) The Trustee, in consultation with the Ad Hoc Committee of Senior Secured Noteholders, may adopt rules for the Auction at or prior to the Auction that, in his reasonable discretion, will better promote the goals of the Auction and that are not inconsistent with any of the provisions of the Bidding Procedures Order. All such rules will provide that all bids shall be made and received in one room, on an open basis, and all other Qualified Bidders shall be entitled to be present for all bidding with the understanding that the true identity of each Qualified Bidder (i.e., the principals submitting the Bid) shall be fully disclosed to all other Qualified Bidders and that all material terms of each Qualified Bid will be fully disclosed to all other Qualified Bidders throughout the entire Auction. Subject to the prior consent of the Buyer, the Trustee, in consultation with the Ad Hoc Committee of Senior Secured Noteholders, in his reasonable discretion, may adjourn without further notice the Auction (and Sale Hearing) if in his reasonable discretion an adjournment will better promote the goals of the Auction and allow parties to make progress towards modifications of any Qualified Bid that could result in a higher and better Qualified Bid; (5) All Qualified Bidders at the Auction shall be deemed to have consented to the core jurisdiction of the Bankruptcy Court and waived any right to a jury trial in connection with any disputes relating to the Auction, and the construction and enforcement of the Bidder's Contemplated Transaction Documents, as applicable; (6) Upon conclusion of the bidding, the Auction shall be closed, and the Trustee, in consultation with the Ad Hoc

Committee of Senior Secured Noteholders, shall (i) immediately review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the Proposed Sale, and (ii) immediately identify the highest and best offer for the Purchased Assets under the Agreement and the entity submitting such Successful Bid, which highest and best offer will provide the greatest amount of net value to the Debtors' estates, and the next highest or otherwise best offer after the Successful Bid, and advise the Qualified Bidder of such determination. If Buyer's final bid is deemed to be highest and best at the conclusion of the Auction, Buyer will be the Successful Bidder, and such bid, the Successful Bid.

(j)      <u>Acceptance of Successful Bid</u>. The Trustee shall sell the assets subject to the Successful Bid(s) to the Successful Bidder(s) upon the approval of the Successful Bid by the Bankruptcy Court after the Sale Hearing. The Trustee's presentation of a particular Qualified Bid to the Bankruptcy Court for approval does not constitute the Trustee's acceptance of the bid. The Trustee will be deemed to have accepted a Bid only when the Bid has been approved by the Bankruptcy Court at the Sale Hearing. All interested parties reserve their right to object to the Trustee's selection of the Successful Bidder (including the assignment of any of such objector's Designated Contract thereto, provided, however, that any objection to such assignment on the basis of the Cure Amount must be made and/or reserved as set forth in the order approving these Bid Procedures).

(k)      <u>"As Is, Where Is"</u>. The sale of the Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Trustee, his agents or the Chapter 7 estates except to the extent set forth in the Agreement or the purchase agreement of another Successful Bidder. Buyer and each Qualified Bidder shall be deemed to

acknowledge and represent that it has had an opportunity to conduct any and all due diligence regarding the Assets prior to making its offer, that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its bid, and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in these Bid Procedures or, (i) as to Buyer, the terms of the sale of the Purchased Assets under the Agreement shall be set forth in the Agreement, or (ii) as another Successful Bidder, the terms of the sale of the Assets shall be set forth in the applicable purchase agreement.

(l)     <u>Free of Any And All Interests</u>.   Except as otherwise provided in the Agreement or another Successful Bidder's purchase agreement, all of Chapter 7 estates' right, title and interest in and to the Assets subject thereto shall be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options and interests thereon and there against (collectively, the "Interests'') in accordance with section 363 of the Bankruptcy Code, with such Interests to attach to the net proceeds of the sale of the Assets.

(m)     <u>Sale Hearing</u>.   The Sale Hearing shall be conducted by the Bankruptcy Court on August ___, 2009 or on such date as may be established by the Bankruptcy Court. Following the approval of the sale of the Assets to the Successful Bidder(s) at the Sale Hearing, if any Successful Bidder fails to consummate an approved sale within ten (10) days after entry of an Order approving the Sale, the Trustee, unless such Order approving the Sale is otherwise stayed by order of a court with competent jurisdiction, shall be authorized, but not required, to deem the Back-Up Bid, as disclosed at the Sale Hearing, the Successful Bid, and the Trustee

shall be authorized, but not required, to consummate the sale with the Qualified Bidder submitting such Bid without further order of the Bankruptcy Court.

(n) <u>Return of Good Faith Deposit</u>. Good Faith Deposits of the Successful Bidder(s) shall be applied to the purchase price of such transaction at Closing. The Good Faith Deposit of the Back-up Bidder shall be held in an interest-bearing account until five (5) days after the Closing of the transactions contemplated by the Successful Bid, and thereafter returned to the Back-up Bidder. Good Faith Deposits of all other Qualified Bidders shall be held in an interest-bearing escrow account until no later than two (2) business days after the Sale Hearing, and thereafter returned to the respective bidders. If a Successful Bidder or the Back-up Bidder, as appropriate, fails to consummate an approved sale because of a breach or failure to perform on the part of such Bidder, the Trustee shall be entitled to retain the Good Faith Deposit as part of the Debtors' damages resulting from the breach or failure to perform by such Bidder.

(o) <u>Modifications</u>. The Trustee, after consultation with the Ad Hoc Committee of Senior Secured Noteholders, may (a) determine, which Qualified Bid, if any, is the highest and best offer; and (b) reject at any time before entry of an order of the Bankruptcy Court approving a Qualified Bid, any Bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bid Procedures or the terms and conditions of sale, or (iii) contrary to the best interests of the Debtors' estates and creditors. The Trustee shall not make material modifications to these Bidding Procedures without Bankruptcy Court approval, <u>provided</u>, <u>however</u>, that, to the extent not contrary to the Bidding Procedures Order, the Trustee in consultation with the Ad Hoc Committee of Senior Secured Noteholders and the Buyer, may make other non-material modifications to such procedures if their reasonable

judgment such modifications would be in the best interests of the Debtors' estates and promote an open and fair sale process.

In all cases where the Bid Procedures require the Trustee to obtain consent or consult with the Buyer or the Ad Hoc Committee of Senior Secured Noteholders, the Trustee's fiduciary duties shall not be limited by such requirement.

## NOTICE OF AUCTION AND SALE HEARING

15. Not later than three (3) days after entry of the Sales Procedures Order, the Trustee will cause the Auction and Sale Notice to be sent by first-class mail postage prepaid to the Notice Parties (as defined in the Sale Procedures).

16. The Trustee requests this Court to have this Motion heard in an expeditious manner. The available cash to preserve the Eclipse Assets is rapidly diminishing, and the Trustee believes it is absolutely imperative that he promptly moves forward with approval and implementation of the Sale Procedures and a sale to a Successful Bidder. Therefore, the Trustee seeks to have the Sale Hearing scheduled in August 2009 at the earliest possible time after the conclusion of the Auction, and with an objection deadline prior to the Sale hearing that balances the needs of third parties for an opportunity to evaluate the proposed Sale with the needs of the Trustee and the Successful Bidder to prepare for such Sale hearing.

## AUTHORITY FOR REQUESTED RELIEF

**The Proposed Sale Procedures are Appropriate**

17. Section 105(a) of the Bankruptcy Code provides that the Court "may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). As described above, approval of the Sale Procedures will allow the Trustee in maximizing the value that he may obtain for the Eclipse Assets. Consequently, the

Trustee respectfully submits that granting the requested relief is "appropriate" under the circumstances.

18. Once the Debtors articulate a valid business justification, "[t]he business judgment rule is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." *In re S.N.A. Nut Company*, 186 B.R. 98 (Bankr. N.D. Ill. 1995) (internal quotation, citation omitted); *In re Integrated Resources, Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992); *In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions.").

19. Indeed, when applying the "business judgment" rule, courts show great deference to the debtor's decision-making. *See Summit Land Co. v. Allen*, 13 B.R. 310, 315 (Bankr. D. Utah 1981). Thus, this Court should grant the relief requested in this motion if the Trustee demonstrates a sound business justification therefore. *See Schipper*, 933 F.2d at 515; *In re Lionel Com.*, 722 F.2d at 1071; *In re Delaware Hudson Ry. Co.*, 124 B.R. 169 at 179.

20. As stated above, the business justification includes the need to close upon a sale of the Eclipse Assets as soon as possible and before the cash available to maintain the status quo of those assets is gone.

21. The Sale Procedures are designed to encourage competitive bidding in an orderly manner to maximize value for the Debtors' estates for their creditors, customers and employees. The proposed procedures contain terms typical for a process through which a Sale of this nature is consummated, and the adoption of the Sale Procedures represents a sound exercise of the Trustee's business judgment.

22. The Sale Procedures are designed to encourage competitive bidding in an orderly manner to maximize value for the Chapter 7 estates for their creditors. The proposed procedures contain terms typical for a process through which a Sale of this nature is consummated, and the adoption of the Sale Procedures represents a sound exercise of the Trustee's business judgment.

23. The Trustee has sound business justifications for seeking approval of the Sale Procedures at this juncture. The cash available to preserve the Eclipse Assets is diminishing rapidly. It is imperative to the Trustee that the sale of the Eclipse Assets move forward as soon as possible. The Trustee believes it is in the best interests of the estates, creditors, customers and employees to commence an auction process as soon as possible after the process has been approved by this Court. While the Trustee has undertaken certain efforts to reduce expenses, it is questionable whether the Trustee will be able to continue the status quo with respect to the Eclipse Assets beyond the period of this proposed bidding process, and a Sale Hearing in later August. In addition, the proposed sale will protect the value of the Eclipse planes that have already been sold, allow for the employment of persons in connection with the contemplated business of the Buyer, and otherwise be in the public interest of economic development. Absent a Sale, the Trustee will most likely be forced to abandon or liquidate the Eclipse Assets on a piece meal basis.

24. In addition, the Trustee is requesting approval of the Break-Up Fee as set forth in Section 9.2 of the Agreement (page 24). Specifically, the Trustee seeks authorization to pay the Stalking Horse Bidder a Break-Up Fee in the amount of $1,600,000.00 upon the closing of an Alternative Transaction in connection with the Sale.

25. In *Calpine Corp. v. O'Brien Environmental Energy, Inc.* (*In re O'Brien Environmental Energy, Inc.*), 181 F.3d 527 (3d Cir. 1999), the Third Circuit held that even

though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions, the administrative expense provisions of section 503(b) of the Bankruptcy Code govern in the bankruptcy context. Accordingly, to be approved, bidding incentives must provide some benefit to the estate. *Id*. at 533.

26.     The Third Circuit identified at least two instances in which bidding incentives may benefit the estate. First, benefit may be found if the bidding procedures "promote[] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Id*. at 537. Second, where the availability of bidding incentives induce a bidder to research the value of the debtor and submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id.*

27.     Whether evaluated under Section 105(a) of the Bankruptcy code, the business judgment rule, or the Third Circuit "administrative expense" standard, approval of the Sale Procedures, including the Break Up Fee are appropriate to maximizing the value the Trustee may obtain for the Eclipse Assets. First, Unlike the Chapter 11 sale, the proposed Stalking Horse here is not an insider. The principals of Eclipse Aerospace have expended considerable time and energy in conducting due diligence over the past few months. Many parties are anxious for Eclipse Aviation to survive and have contacted the Trustee since March 5, 2009 over the past few months to perform due diligence. Yet very few of those parties, if any, however, have been able to come up with the financial ability to purchase the Eclipse Assets with acceptable non-economic terms and with acceptable conditions to close, and to do so in a timely fashion. The Chapter 11 debtors, through the previously approved bidding process prior to conversion,

marketed the ETIRC proposed deal. No alternative bidders appeared. Moreover, the absence of a prompt credible purchase offer after the conversion of these cases (March 5, 2009) speaks volumes about the hesitancy of prospective purchasers to make the first offer for these Eclipse Assets. Eclipse Aerospace has done so, and if this brings one or more Qualified Bids out of the woodwork and that results in the closing of an Alternative Transaction, a break-up fee is appropriate. Therefore, the Trustee respectfully submits that the filing of the current Agreement is necessary to encourage others to bid in the economic range acceptable to the Trustee.

28. With respect to the amount, the percentage is 4% of $40,000,000.00. While half of that consideration is new Note Consideration, the Senior Secured Noteholders are the entities at risk with respect to that Note Consideration, and the Trustee understands the Ad Hoc Committee for Senior Secured Noteholders to support both the existence and amount of the Break Up Fee. [5]

29. The other aspects of the Sale Procedures are designed to encourage competitive bidding. As previously stated, these procedures are modeled after those utilized in these Chapter 11 cases. Thus, the Break Up Fee, if payable will be $400,000 less than the Minimum Overbid of $2 Million.

30. The minimum overbid requirements described in the Sale Procedures are appropriate under the circumstances as well. They are rather modest minimum overbid requirements given the size of this transaction, and the Trustee believes that it is unlikely that they will deter a serious competing bidder. Finally, the Break Up Fee and minimum overbid requirements were negotiated in good faith and were the product of arm's-length negotiations. Accordingly, the Trustee requests that the Court authorize the Sale Procedures in their entirety.

---

[5] The Trustee has been informed by the Buyer that the Buyer will very shortly be filing a pleading in support of the existence and amount of the Break Up Fee.

**The Sale is Within the Sound Business Judgment of the Debtors and Should be Approved**

31.     Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."   11 U.S.C. § 363(b)(1).   Section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets prior to confirmation of a plan.   However, courts in this Circuit and others have required that the decision to sell assets outside the ordinary course of business be based upon the sound business judgment of the debtors. *See In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986); see also *Myers v. Martin* (*In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *Comm. of Equity Sec. Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063, 1071 (2d Cir. 1983); *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp.*, (*In re Montgomery Ward Holding Corp.*), 242 B.R. 147, 153 (D. Del. 1999); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D.D.C. 1991).

32.     The "sound business judgment" test requires a debtor to establish four elements in order to justify the sale or lease of property outside the ordinary course of business, namely, (a) that a "sound business purpose" justifies the sale of assets outside the ordinary course of business, (b) that adequate and reasonable notice has been provided to interested persons, (c) that the debtors have obtained a fair and reasonable price, and (d) good faith.  *Abbotts Dairies*, 788 F.2d 143; *Titusville Country Club v. Pennbank (In re Titusville Country Club)*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); *In re Sovereign Estates, Ltd.*, 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989).   In this case, the Trustee submits that the decision to proceed with the Sale of the Assets and the Sale Procedures related thereto are based upon his sound business judgment and should be approved.   A debtor's showing of a sound business purpose need not be unduly exhaustive but, rather, a debtor is "simply required to justify the proposed disposition with sound business

reasons." *In re Baldwin United Corp.*, 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984). Whether or not there are sufficient business reasons to justify a transaction depends upon the facts and circumstances of each case. *Lionel*, 722 F.2d at 1071; *Montgomery Ward*, 242 B.R. at 155 (approving funding of employee incentive and severance program; business purpose requirement fulfilled because stabilizing turnover rate and increasing morale were necessary to successful reorganization).

33.     Additionally, section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under the Bankruptcy Code. Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is proper. *In re Fesco Plastics Corp.*, 996 F.2d 152, 154 (7th Cir. 1993); *Pincus v. Graduate Loan Ctr. (In re Pincus)*, 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002). Pursuant to section 105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtor's assets. *See*, *e.g.*, *Chinichian v. Campolongo (In re Chinichian)*, 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); *In re Cooper Props. Liquidating Trust, Inc.*, 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws.")

**The Sale is Proposed in "Good Faith" Under Section 363(m) of the Bankruptcy Code**

34.     The Trustee requests that the Court find that the Successful Bidder (or Next Highest Bidder) is entitled to the benefits and protections provided by section 363(m) of the

Bankruptcy Code in connection with the Sale. Section 363(m) of the Bankruptcy Code provides, in pertinent part:

> (i)  The reversal or modification on appeal of an authorization under subsection (b) . . . of this section of a sale . . . of property does not affect the validity of a sale . . . under such authorization to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).

35.  Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal.  By its terms, section 363(m) of the Bankruptcy Code applies to sales of interests in tangible assets, such as the Eclipse Assets.  Additionally, the United States Court of Appeals for the Third Circuit (the "Third Circuit") has indicated that section 363(m) of the Bankruptcy Code also protects the assignee of a debtor's interest in executory contracts under Bankruptcy Code section 365.  *Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc., 141 F.3d 490, 497-98 (3d. Cir. 1998)*.  In *Krebs*, the Court considered "whether assignments of [certain automobile dealership] franchises under section 365 are also sales of estate property subject to section 363(m)."  *Id.* at 497.  Despite the absence of an explicit reference to assignments of executory contracts under section 365 of the Bankruptcy Code, the Court in *Krebs* concluded that section 363(m) of the Bankruptcy Code protected an assignment of a debtor's interest in certain automobile franchise agreements pursuant to an auction sale.  Like the franchise agreements protected in *Krebs*, the Designated Contracts are executory contracts  or leases that may be assumed and assigned pursuant to section 365 of the Bankruptcy Code.  In light of *Krebs*, the Trustee respectfully submits that section 363(m) applies to protect the Successful Bidder (or Next Highest Bidder) with respect to both the Designated

Contracts designated for assumption and assignment, and the Assets that are included in such bids.

36. As required by section 363(m) of the Bankruptcy Code, the Sale Procedures have been proposed in good faith and provide for both the Trustee and the potential purchaser to act in good faith in negotiating the Sale and the assignment of the Designated Contracts. Although the Bankruptcy Code does not define "good faith purchaser," the Third Circuit, construing section 363(m) of the Bankruptcy Code, has stated that "the phrase encompasses one who purchases in 'good faith' and for 'value'." *Abbotts Dairies*, 788 F.2d at 147. To constitute lack of good faith, a party's conduct in connection with the sale must usually amount to "fraud, collusion between the purchaser and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders." *Id.* (citing *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)). See also *In re Bedford Springs Hotel, Inc.*, 99 B.R. 302, 305 (Bankr. W.D. Pa. 1989*); In re Perona Bros., Inc.*, 186 B.R. 833, 839 (D.N.J. 1995). Due to the absence of a bright line test for good faith, the determination is based on the facts of each case, concentrating on the "integrity of [an actor's] conduct during the sale proceedings." *In re Pisces Leasing Corp.*, 66 B.R. 671, 673 (E.D.N.Y. 1986) (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1998 (7th Cir. 1978)).

37. Here, the sale of the Eclipse Assets and the assignment of the Designated Contracts which are designated by the purchaser is in good faith. There is no evidence of fraud or collusion in the terms of the Sale and the assignment of the Designated Contracts.

38. All parties in interest will receive notice of the Sale and will be provided with an opportunity to be heard. Additionally, all counterparties to Designated Contracts will be provided notice of the potential assumption and assignment of their agreements and an opportunity to be heard. The Trustee submits that such notice is adequate for entry of the Sale

Order and satisfies the requisite notice provisions required under sections 363(b) and 365 of the Bankruptcy Code.

**The Sale Satisfies the Requirements of Section 363(f) of the Bankruptcy Code**

39.     Under section 363(f) of the Bankruptcy Code, a debtor-in-possession may sell all or any part of its property free and clear of any and all liens, claims or interests in such property if:  (i) such a sale is permitted under applicable non-bankruptcy law; (ii) the party asserting such a lien, claim or interest consents to such sale; (iii) the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property; (iv) the interest is the subject of a bona fide dispute; or (v) the party asserting the lien, claim or interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest. 11 U.S.C. § 363(f); *Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that section 363(f) of the Bankruptcy Code is written in the disjunctive; therefore, a court may approve a sale "free and clear" provided at least one of the subsections is met).  Because the Trustee expects that he will satisfy one of these requirements, if not others as well, approving the sale of the Eclipse Assets free and clear of all adverse interests is warranted. Furthermore, courts have held that they have the equitable power to authorize sales free and clear of interests that are not specifically covered by section 363(f).  *See, e.g., In re Trans World Airlines, Inc.*, 2001 WL 1820325 at *3, 6 (Bankr. D. Del. March 27, 2001); *Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987).

**Assumption and Assignment of Executory Contracts and Unexpired Leases Should be Approved**

40.     To facilitate and effectuate the sale of the Eclipse Assets, the Trustee seeks authority to assume and assign various executory contracts and unexpired leases related to the

Eclipse Assets (as may be identified by separate notice prior to the Sale Hearing, the "Designated Contracts") to the Successful Bidder (or the Next Highest Bidder) to the extent required by such Successful Bidder (or Next Highest Bidder). Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign its executory contracts and unexpired leases, subject to the approval of the Bankruptcy Court, provided that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided. A debtor's decision to assume or reject an executory contract or unexpired lease must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment. *Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co.,* 318 U.S. 523 (1943) (applying Bankr. Act section 77 subsection (b), the predecessor to Bankruptcy Code section 365) (rejecting the test of whether the executory contract was burdensome in favor of whether rejection is within the debtor's business judgment); *Lubrizol Enter., Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1046-47 (4th Cir. 1985).

41.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes. Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *In re Bygaph, Inc.*, 56 B.R. 596, 605-6 (Bankr. S.D.N.Y. 1986) (finding adequate assurance of future performance present when the prospective assignee of a lease from the debtors has the financial resources and has expressed a willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding; "chief determinant of adequate assurance of future performance is whether rent will be paid").

42.     The Successful Bidder (or the Next Highest Bidder) may desire to take assignment of certain executory contracts and unexpired leases related to the Assets. To the extent Designated Contracts and Leases are identified for assumption and assignment by the Successful Bidder (or the Next Highest Bidder), the Trustee believes that he can and will demonstrate that all requirements for assumption and/or assignment of the such Designated Contracts will be satisfied at the Sale Hearing. The Trustee, as required by the Sale Procedures, will evaluate the financial wherewithal of all potential bidders before qualifying such bidders to bid for the Assets. Further, for the reasons stated throughout this Motion, the Trustee, in exercising his sound business judgment, believes that selling the Assets and assuming and assigning to the Successful Bidder (or the Next Highest Bidder) the selected Designated Contracts would be in the best interests of the Chapter 7 estates. Moreover, the Trustee will provide all parties to the Designated Contracts an opportunity to be heard. A schedule of Designated Contracts to be assumed and assigned in connection with the sale of the Assets will be served on all counterparties to such contracts and leases, including proposed cure amounts, within three (3) days of entry of this entry.

43.     Indeed, attached to the Agreement as Schedule 2.3 is a preliminary list of such Designated Contracts and the believed cure amounts. All counter parties to those contracts are being served with a complete copy of this Motion (including Schedule 2.3).

44.     To facilitate the sale, assumption and assignment of any Designated Contracts, the Trustee will serve a notice (the "Cure Amount Notice"), not later than three (3) days after the entry of the Sale Procedures Order upon each counterparty to a Designated Contract under the Agreement.

45.     As further stated in Section 2.3 of the Agreement (page 3), the Trustee proposes that the Buyer shall have, (except as otherwise provided with respect to contracts with the City of Albuquerque), until that date which is five (5) business days prior to the date scheduled for hearing on the entry of the Sale Order to designate which of such Contracts it wishes to assume and have the Seller assume and assign to Buyer at Closing (such date being referred to herein as the "Contract Designation Date"); provided that Buyer shall have until thirty (30) days after the Closing to designate any contract identified on Schedule 2.3 with the City of Albuquerque.

46.     Unless the non-debtor party to a Designated Contract timely files and serves an objection (the "Cure Amount Objection") to its scheduled Cure Cost or any other objection to the proposed assumption and assignment of its Designated Contract (or in the event Buyer is not the Successful Bidder, at or prior to the Sale Hearing), such non debtor party shall (i) be forever barred from objecting to the Cure Amount and from asserting any additional cure or other amounts with respect to such Designated Contract or any other objection to the proposed assumption and assignment of its Designated Contract and the Trustee shall be entitled to rely solely upon the Cure Amount; and (ii) be forever barred and estopped from asserting or claiming against the Trustee, the Chapter 7 estates, the Buyer, or such other Successful Bidder or any other assignee of the relevant Designated Contract that any additional amounts are due or defaults exist under such Designated Contract.

47.     Thus, the Trustee requests that assumption and assignment of the Executory Contracts and Leases which are designated for assumption and assignment by the Successful Bidders should be approved.

**Relief from the Ten Day Waiting Periods Under Bankruptcy Rules 6004, 6006 is Appropriate**

48.     The Trustee requests that the Court waive the ten-day stay period under Bankruptcy Rules 6004 and 6006.  Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise."  Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 10 days after the entry of the order, unless the court orders otherwise."

49.     The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  *See Advisory Committee Notes to Fed. R. Bankr.* P. 6004(h) and 6006(d).  Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the ten (10) day stay period, Collier on Bankruptcy suggests that the ten (10) day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure."  *10 Collier on Bankruptcy 15th Ed. Rev.*, ¶6064.09 (L. King, 15th rev. ed. 1988).  Furthermore, *Collier's* provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal.  *Id.*

50.     Given the limited cash available to the Trustee, it is critical that an approved sale be allowed to close at the earliest possible time and without the impediment of the automatic stay provided by the above Bankruptcy Rules.

WHEREFORE, the Trustee respectfully requests (A) entry of the Sale Procedures Order, substantially in the form attached hereto as Exhibit A, (B) entry of the Sale Order substantially in the form attached hereto as Exhibit B, and (C) such other and further relief as the Court deems just and proper.

Dated: July 31, 2009

COOCH AND TAYLOR, P.A.

  /s/ Adam Singer
Adam Singer (No. 2472)
M. Claire McCudden (No. 5036)
The Brandywine Building
1000 West Street, 10th Floor
Wilmington, DE 19801
Telephone: (302) 984-3800
Facsimile: (302) 984-3939

Attorneys for Jeoffrey L. Burtch,
Chapter 7 Trustee