# ATTACHMENT A

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| ECLIPSE AVIATION CORPORATION, *et al.*,[1] | ) | Case No. 08-13031 (MFW) |
| | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | Docket No. 763 and 787 |

## ORDER (A) AUTHORIZING THE TRUSTEE TO SELL SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES, (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND (C) <u>GRANTING RELATED RELIEF</u>

Upon the motion, dated July 31, 2009 (the "<u>Sale Motion</u>"), of Jeoffrey L. Burtch, the appointed chapter 7 trustee (the "<u>Trustee</u>") for the debtors in the above-captioned cases (the "<u>Debtors</u>") for the entry of an order pursuant to sections 105, 363 and 365 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "<u>Bankruptcy Code</u>") and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") authorizing the Trustee to, *inter alia,* (i) enter into that certain Asset Purchase Agreement, dated as of July 30, 2009, between Eclipse Aerospace, Inc. (the "<u>Buyer</u>") and the Trustee (the "<u>Agreement</u>," attached hereto as <u>Exhibit 1</u>),[2] (ii) sell substantially all of the Debtors' assets free and clear of all Encumbrances (as defined below), with such sale to be in accordance with the terms and conditions of the Agreement; (iii) assume and sell and assign certain executory contracts and unexpired leases to the Buyer; and (iv) granting related relief; and this Court

---

[1] The Debtors in these proceedings are: Eclipse Aviation Corporation (Tax I.D. No. XX-XXX9000) and Eclipse IRB Sunport, LLC, a wholly-owned subsidiary of Eclipse Aviation Corporation (Tax I.D. No. XX-XX4013), each with a mailing address of 2503 Clark Carr Loop SE, Albuquerque, NM 87106.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Agreement.

having entered an order dated August 11, 2009 (the "Procedures Order," and attached hereto as Exhibit 2, the "Bid Procedures") authorizing the Trustee to conduct, and approving the terms and conditions of, the Auction and Bid Procedures to consider higher and better offers for the Assets, establishing a date for the Auction and approving, inter alia, (i) the Bid Procedures in connection with the Auction; (ii) the form and manner of notice of the Auction and Bid Procedures; (iii) procedures relating to certain Designated Contracts, including notice of proposed cure amounts; and (iv) the Break-Up Fee; and the Court having established the date of the Sale Hearing; and the Court having jurisdiction to consider the Sale Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157(b)(2) and 1334; and after consideration of the Sale Motion, the relief requested therein, and the responses thereto, if any; and this being a core proceeding in accordance with 28 U.S.C. § 157(b); and the appearance of all interested parties and all responses and objections, if any, to the Sale Motion having been duly noted in the record of the Sale Hearing; and upon the record of the Sale Hearing, and all other pleadings and proceedings in this case, including the Sale Motion; and it appearing that the relief requested in the Sale Motion is in the best interests of the Debtors, the Chapter 7 estates, their creditors and all other parties in interest; and after due deliberation and sufficient cause appearing therefore;

I.    FINDINGS OF FACT:

IT IS HEREBY FOUND, DETERMINED AND CONCLUDED THAT:[3]

## Jurisdiction, Final Order, Statutory Predicates

A.    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

---

[3]    To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. See FED. R. BANKR. P. 7052.

B.     The Court has jurisdiction over this matter and over the property of the Debtors, including the Purchased Assets to be sold, transferred or conveyed pursuant to the Agreement, and the Chapter 7 estates pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of this chapter 7 case and the Sale Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C.     The statutory predicates for the relief sought in the Sale Motion and the basis for the approvals and authorizations herein are (i) sections 363 and 365 of the Bankruptcy Code and (ii) Bankruptcy Rules 2002, 6004, 6006 and 9014.

D.     This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(g) and 6006(d), the parties may consummate the transactions provided for under the terms and conditions of the Agreement immediately upon entry of this Order.  To any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Order.

## Retention of Jurisdiction

E.     It is necessary and appropriate for the Court to retain jurisdiction to, among other things, interpret and enforce the terms and provisions of this Order and the Agreement, and to adjudicate, if necessary, any and all disputes relating in any way to the transactions provided for under the terms and conditions of the Agreement.

## Time Is of the Essence

F.     On November 25, 2008 (the "Petition Date"), the Debtors filed voluntary petitions for reorganization under chapter 11 of the Bankruptcy Code.  On March 5, 2009 (the "Conversion Date"), the Court entered an order converting the Debtors' chapter 11 cases to cases

under chapter 7 of the Bankruptcy Code. On the Conversion Date, Jeoffrey L. Burtch was appointed as interim chapter 7 trustee and currently serves as the Trustee in these cases pursuant to section 702(d) of the Bankruptcy Code.

G. Time is of the essence in consummating the sale. In order to maximize the value of the Purchased Assets, it is essential that the sale of the Purchased Assets occur within the time constraints set forth in the Agreement. Accordingly, there is cause to lift the stays contemplated by Bankruptcy Rules 6004 and 6006.

## Notice of the Sale Motion

H. As evidenced by the affidavits of service filed with the Court, (i) proper, timely, adequate and sufficient notice of the Sale Motion, the Auction and the Sale Hearing (including due and proper notice of the assumption, sale and assignment of each Designated Contract to each non-Debtor party under each such Designated Contract) have been provided in accordance with sections 102(1) and 363(b) of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9006, 9007, 9008 and 9014, the local rules of this Court, the procedural due process requirements of the United States Constitution and in compliance with the Procedures Order; (ii) such notice was good and sufficient and appropriate under the particular circumstances; and (iii) no other or further notice of the Sale Motion, the Auction, the Sale Hearing, the assumption and assignment of the Designated Contracts or of the entry of this Order is necessary or shall be required.

I. Actual written notice of the Sale Motion, the Auction and the Sale Hearing (including due and proper notice of the assumption, sale and assignment of each Designated Contract to each non-Debtor party under each such Designated Contract) and a reasonable opportunity to object or be heard regarding the requested relief has been afforded to all interested

persons and entities, including, without limitation, (i) all entities known to assert any interest in or lien upon the Purchased Assets; (ii) all parties to Designated Contracts; (iii) all parties that are entitled to notice under Bankruptcy Rule 2002; (iv) the attorneys general of all states in which the Purchased Assets are located; (v) the Office of the United States Trustee; (vi) the Securities and Exchange Commission; (vii) the Internal Revenue Service and any governmental taxing authority that has filed a claim against the Chapter 7 Estates; (viii) all entities that expressed to the Seller an interest in purchasing the Purchased Assets; (ix) any party appearing in the Bankruptcy Cases and claiming a secured interest in the Purchased Assets; or any party known to the Seller and claiming a secured interest in the Purchased Assets. Other parties interested in bidding on the Purchased Assets were provided, upon request, sufficient information to make an informed judgment on whether to bid on the Purchased Assets.

## Compelling Circumstances for Immediate Sale

J.      The Trustee has demonstrated a sufficient basis and the existence of exigent circumstances requiring it to enter into the Agreement, sell the Purchased Assets and assume and assign the Designated Contracts under sections 363 and 365 of the Bankruptcy Code, and such actions are appropriate exercises of the Trustee's business judgment and in the best interests of the Debtors, the Chapter 7 estates and their creditors, in that:

1.      The holders of Senior Secured Notes (as defined below) (the "Noteholders") would not consent to the continued use of additional cash collateral absent a sale of substantially all of the assets.

2.      If the sale and related transactions under the Agreement is not approved and consummated promptly, the Trustee will exhaust any cash collateral available, thereby potentially consigning the Debtors to a piecemeal liquidation that would

achieve far less value for creditors than the transactions contemplated by the Agreement.

3.      A sale pursuant to section 363(b) of the Bankruptcy Code is the only viable alternative for preserving and capturing the maximum value of the Purchased Assets and allow for the Debtors to begin operations again for the benefit of current owners of Eclipse aircraft and other customers. Thus, the only way to preserve and maximize value is to consummate the sale and sell the Purchased Assets pursuant to section 363(b) of the Bankruptcy Code, thereby ensuring an orderly and equitable sales process and distribution of proceeds.

4.      A sale of the Purchased Assets at this time to Buyer would result in the highest possible purchase price therefore.

### Consent of Senior Secured Noteholders

K.      Pursuant to the terms of the Debtors' 8% Senior Secured Notes due 2012 (the "2012 Senior Secured Notes"), the Debtors' Senior Secured Convertible Notes due 2010 (the "2010 Senior Secured Notes" and, collectively with the 2012 Senior Secured Notes, the "Senior Secured Notes"), and the Amended and Restated Security Agreement dated February 15, 2008, the liens securing the Senior Secured Notes may be released with the consent of the holders of more than 50% of the 2012 Senior Secured Notes, which constitute requisite holders of the Senior Secured Notes. Holders of more than 50% of the 2012 Senior Secured Notes have consented to the sale of the Purchased Assets and the release of the liens on the Purchased Assets securing the Senior Secured Notes in accordance with the terms of the Agreement and this Order.

## **Good Faith**

L.     The Buyer is a purchaser in good faith, as that term is used in the Bankruptcy Code and court decisions thereunder, and is entitled to the protections of section 363(m) of the Bankruptcy Code.  The Agreement was negotiated and entered into in good faith, based upon arm's length bargaining, and without collusion or fraud of any kind.  The sales process was conducted in accordance with the Procedures Order and in good faith within the meaning of section 363(m) of the Bankruptcy Code.  Neither the Trustee nor the Buyer have engaged in any conduct that would prevent the application of section 363(m) of the Bankruptcy Code or cause the application of or implicate section 363(n) of the Bankruptcy Code to the Agreement or to the consummation of the sale transaction and transfer of the Purchased Assets and Designated Contracts to Buyer.  The Buyer is entitled to all the protections and immunities of section 363(m) of the Bankruptcy Code.  The Buyer will be acting in good faith within the meaning of section 363(m) of the Bankruptcy Code in closing the transactions pursuant to the terms and conditions of the Agreement any time after the entry of this Order, including immediately after its entry. The Court has found that the Buyer has acted in good faith in all respects in connection with these chapter 7 cases and the transactions under the Agreement in that, among other things:

1.     The Trustee, as a fiduciary of this Court pursuant to section 702 of the Bankruptcy Court,  conducted the sale process and negotiated with the Buyer;

2.     The Buyer recognized that the Trustee was free to negotiate with any other party that expressed qualified interest in purchasing the Purchased Assets;

3.     The Buyer agreed to subject its bid to the competitive bidding procedures set forth in the Bidding Procedures Order;

4.     All payments to be made by the Buyer and other Agreement or arrangements

entered into by Buyer with the Trustee in connection with the Agreement have been disclosed; and

5.      The negotiation and execution of the Agreement and all other aspects of the transactions contemplated therein were conducted in good faith and at arms' length.

M.      In the absence of a stay pending appeal, the Buyer will be acting in good faith, pursuant to section 363(m) of the Bankruptcy Code, in closing the transactions contemplated by the Agreement at any time on or after the entry of this Order and cause has been shown as to why this Order should not be subject to the stay provided by Bankruptcy Rules 6004(g) and 6006(d).

<u>No Collusion</u>

N.      The Buyer has not violated section 363(n) of the Bankruptcy Code by any action or inaction. The sale price to be paid by Buyer was not controlled by an agreement among potential bidders at such sale. The transactions under the Agreement may not be avoided, and no damages may be assessed against the Buyer or any other party under section 363(n) of the Bankruptcy Code or any other applicable bankruptcy or non-bankruptcy law.

<u>Bid Procedures Fair</u>

O.      The Bid Procedures set forth in the Procedures Order were non-collusive, substantively and procedurally fair to all parties and were the result of arms length negotiations between the Trustee and the Buyer.

P.      The Trustee and his professionals have complied, in good faith, in all respects with the Procedures Order. As demonstrated by (i) the testimony and other evidence proffered or adduced at the Sale Hearing and (ii) the representations of counsel made on the record at the Sale Hearing. Through marketing, and an open and competitive sale process conducted in accordance

with the Procedures Order, the Trustee (i) afforded interested potential purchasers a full, fair and reasonable opportunity to qualify as bidders and submit their highest or otherwise best offer to purchase substantially all of the Debtors' assets;  and (ii) provided potential purchasers, upon request, sufficient information to enable them to make an informed judgment on whether to bid on the Purchased Assets.

### Marketing Efforts Leading to Sale

Q.      Since the date of his appointment, the Trustee has identified interested parties who have previously expressed an interest in the Purchased Assets and continued to identify other parties who may have a strategic or financial interest in acquiring the Purchased Assets.  The Trustee negotiated with several parties in an attempt to reach an asset purchase agreement and selected the Buyer as the most qualified and beneficial bid after several months of negotiations.

### Auction

R.      No Potential Bidder submitted a bid, and no auction was conducted.

### Highest and Best Offer

S.      Therefore, the Trustee has determined that, after consultation with the Ad Hoc Committee, the offer submitted by Eclipse Aerospace, Inc. (hereinafter, the "Buyer") in the Agreement was the highest and best offer, and the Buyer is the Successful Bidder for the Purchased Assets in accordance with the Procedures Order.  The Bidding Procedures obtained the highest value for the Purchased Assets.

T.      The offer of the Buyer, upon the terms and conditions set forth in the Agreement, including the form and total consideration to be realized by the Trustee pursuant to the Agreement, (i) is the highest and best offer received by the Trustee; (ii) is fair and reasonable; (iii) is in the best interests of the Debtors' creditors and estates; (iv) constitutes full and adequate

consideration and reasonably equivalent value for the Purchased Assets; and (v) will provide a greater recovery for the Debtors' creditors and other interested parties than would be provided by any other practical and available alternative. The Trustee's determination that the Agreement constitutes the highest and best offer for the Purchased Assets constitutes a valid and sound exercise of the Trustee's business judgment.

U. The Agreement and the transactions thereunder is not being entered into to escape liability for the estates' debts. The Chapter 7 estates are unable to satisfy all of the Debtors' debts.

## No Fraudulent Transfer

V. The total consideration provided by the Buyer for the Purchased Assets is the highest and best offer received by the Trustee, and the Purchase Price constitutes (i) reasonably equivalent value under the Bankruptcy Code and the Uniform Fraudulent Transfer Act; (ii) fair consideration under the Uniform Fraudulent Conveyance Act; and (iii) under any other applicable laws of the United States, any state, territory or possession or the District of Columbia, reasonably equivalent value, fair consideration and fair value for the Purchased Assets.

## Validity of Transfer

W. Prior to the transactions contemplated under the Agreement, the Purchased Assets are property of the Chapter 7 estates and title thereto is vested in the Chapter 7 estates.[4]

X. The Trustee has full power and authority to execute the Agreement and all other documents contemplated thereby, and the sale of the Purchased Assets has been duly and validly

---

[4] Notwithstanding the foregoing and as more specifically set forth in this Order, and subject to Paragraph 7 hereof, the Trustee, the Alfred Mann Living Trust, the Ad Hoc Committee of Secured Noteholders and Buyer acknowledge that title to and liens upon certain of the Purchased Assets are the subject of the pending WIP Adversary Proceedings and Opinicus Adversary Proceeding.

authorized by all necessary corporate authority by the Trustee to consummate the transactions contemplated by the Agreement. No consents or approvals, other than as may be expressly provided for in the Agreement, are required by the Trustee to consummate such transactions.

Y.     The Trustee has advanced sound business reasons for seeking to enter into the Agreement and to sell and/or assume and sell and assign the Purchased Assets and the Designated Contracts, as more fully set forth in the Sale Motion and as demonstrated at the Sale Hearing, and it is a reasonable exercise of the Trustee's business judgment to sell and assign the Purchased Assets and the Designated Contracts and to consummate the transactions contemplated by the Agreement. Notwithstanding any requirement for approval or consent by any person, the transfer of the Purchased Assets to the Buyer and the assumption and assignment of the Designated Contracts is a legal, valid and effective transfer of the Purchased Assets and any Designated Contracts.

Z.     The terms and conditions of the Agreement, including the consideration to be realized by the Debtors pursuant to the Agreement, are fair and reasonable, and the transactions contemplated by the Agreement are in the best interests of the Chapter 7 estates.

## Section 363(f) of the Bankruptcy Code is Satisfied

AA.     Except as otherwise provided in the Agreement or otherwise specifically set forth in this Order, the Purchased Assets shall be sold free and clear of all of the following (collectively, the "Encumbrances"): mortgages, security interests, conditional sale or other retention agreement, pledges, liens (as that term is defined in section 101(37) of the Bankruptcy Code), claims (as that term is defined in section 101(5) of the Bankruptcy Code), obligations, guaranties, debts, obligations, rights, contractual commitments, interests, judgments, demands, easements, charges, encumbrances, defects, options, rights of first refusal, other Encumbrances

(as defined in the Agreement), Liens (as defined in the Agreement) and restrictions of any kind or nature whether imposed by agreement, understanding, law, equity, or otherwise, including, without limitation (i) encumbrances that purport to give any party a right or option to effect any forfeiture, modification or termination of any Debtor or of the Buyer in the Purchased Assets or (ii) in respect of taxes, in each case accruing, arising or relating to a period prior to the Closing.

BB.     The transfer of the Purchased Assets to the Buyer will be a legal, valid and effective transfer of the Purchased Assets, and, except as may otherwise be provided in the Agreement or this Order, shall vest Buyer with all right, title and interest of the Trustee to the Purchased Assets free and clear of any and all Encumbrances.  Except as specifically provided in the Agreement or this Order, the Buyer shall not assume or become liable for any Encumbrances relating to the Purchased Assets being sold by the Debtor.

CC.     Except as may otherwise be provided in the Agreement or this Order, the transfer of the Purchased Assets to the Buyer free and clear of all Encumbrances will not result in any undue burden or prejudice to any holders of any Encumbrances as all such Encumbrances of any kind or nature whatsoever shall attach to the net proceeds of the sale of the Purchased Assets received by the Trustee in the order of their priority, with the same validity, force and effect which they now have as against the Purchased Assets and subject to any claims and defenses the Debtors or other parties may possess with respect thereto. Except as may otherwise be provided in the Agreement or this Order, all persons having Encumbrances of any kind or nature whatsoever against or in any of the Debtors or the Purchased Assets shall be forever barred, estopped and permanently enjoined from pursuing or asserting such Encumbrances against the Buyer, any of its assets, property, successors or assigns, or the Purchased Assets.

DD.    Except as may otherwise be provided in the Agreement or this Order, the Trustee may sell the Purchased Assets free and clear of all Encumbrances of any kind or nature whatsoever because, in each case, one or more of the standards set forth in section 363(f) of the Bankruptcy Code has been satisfied.  Those (i) holders of Encumbrances and (ii) non-Debtor parties, who did not object, or who withdrew their objections, to the sale of the Purchased Assets and the Sale Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.  Those holders of Encumbrances who did object fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are adequately protected by having their Encumbrances, if any, attach to the proceeds of the sale of the Purchased Assets ultimately attributable to the property against or in which they claim or may claim any Encumbrances, with such Encumbrances being subject to treatment as prescribed by separate order of this Court.

**Cure under Designated Contracts; Adequate Assurance of Future Performance**

EE.    The Trustee and the Buyer have, to the extent necessary, satisfied the requirements of section 365 of the Bankruptcy Code.  Pursuant to the terms and subject to the conditions of this Order and the Agreement, the Buyer shall, within the time period set forth in the Agreement, (i) cure or provide adequate assurance of cure of any undisputed default existing prior to the Closing under any of the assigned Designated Contracts, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code and (ii) provide compensation or adequate assurance of compensation to any party other than the Trustee for any undisputed actual pecuniary loss to such party resulting from an undisputed default prior to the Closing under any of the assigned Designated Contracts, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code.  The Buyer has demonstrated adequate assurance of future performance with

respect to the Designated Contracts, within the meaning of section 365(b)(1)(C) of the Bankruptcy Code. The Designated Contracts are assignable notwithstanding any provisions contained therein to the contrary pursuant to section 365(f) of the Bankruptcy Code. The assumption and assignment of the Designated Contracts pursuant to the terms of this Order is integral to the Agreement and is in the best interests of the Chapter 7 estates, creditors and other parties in interest, and represents the exercise of sound and prudent business judgment by the Trustee.

## No Successor Liability

FF.     The transactions contemplated under the Agreement do not amount to a consolidation, merger or *de facto* merger of the Buyer and the Chapter 7 estates, there is not substantial continuity between the Buyer and the Debtors, there is no continuity of enterprise between the Debtors and the Buyer, the Buyer is not a mere continuation of the Debtors or the Chapter 7 estates, and the Buyer does not constitute a successor to the Debtors or the Chapter 7 estates.

GG.     Except as expressly set forth in the Agreement or this Order, the transfer of the Purchased Assets to the Buyer and assumption and assignment to Buyer of the Designated Contracts and the Assumed Liabilities by Buyer do not and will not subject the Buyer or any of its affiliates or subsidiaries to any liability by reason of such transfer under (i) the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based in whole or part on, directly or indirectly, including without limitation, any theory of antitrust, environmental, products liability, successor or transferee liability, labor law, *de facto* merger or substantial continuity or (ii) any employment contract, understanding or agreement, including

without limitation collective bargaining agreements, employee pension plans or employee welfare or benefit plans.

HH.    Pursuant to the terms of the Agreement, the Buyer has agreed to assume certain liabilities of the Debtor Eclipse Aviation Corporation and the related Chapter 7 estate which are the subject of pending adversary proceedings described in Section 7.8 of the Asset Purchase Agreement, namely the adversary proceedings set forth on Schedule 7.8 (the "WIP Adversary Proceedings") and the adversary proceeding with Opinicus Corporation (the "Opinicus Adversary Proceeding"), those liabilities assumed by the Buyer are expressly limited to the obligations of the Chapter 7 estate to return to the Plaintiffs in those actions any property that is the subject of such actions, to the extent such rights, if any, are established by Final Order of the Court.  Any claims against Buyer pursuant to those actions, shall be, and hereby are, limited to the obligation to return to the Plaintiffs, if such rights are established, any property which is part of the Purchased Assets and which the Court may later determine the Plaintiffs are entitled to possession of under applicable law.  The Buyer shall not be liable for:  (1) specific performance;  or (2) any monetary claims against the Seller, including but not limited to, any claims to deposits or segregated funds.  The Buyer shall be substituted for the chapter 7 Trustee as a party in the adversary proceedings set forth on Schedule 7.8, or, as procedurally appropriate, and at the election of Buyer, shall be allowed to intervene, and shall have all rights, claims and defenses to which the Debtors, chapter 7 estates and/ or the Trustee could assert against the parties to those actions or the property which is the subject of those actions; however, that to the extent the Trustee or the Debtors shall remain a party to any of the adversary proceedings described above, the Trustee and the Debtors shall retain those rights, claims and defenses to the extent of any claims against Trustee or as otherwise agreed to between Buyer and Trustee.

II.     The sale contemplated by this Order is a sale of all or substantially all of the Estates' assets in a single sale pursuant to section 363 of the Bankruptcy Code, to which a majority of the Senior Secured Notes consent.

CONCLUSIONS OF LAW:

NOW, THEREFORE, BASED UPON ALL OF THE FOREGOING, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:[5]

1.      The relief requested in the Sale Motion is granted in its entirety, subject to the terms and conditions contained herein.

2.      Notice of the Sale Hearing was fair and adequate under the circumstances and complied in all respects with section 102(1) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006.

**Approval of Sale**

3.      The sale of the Purchased Assets, the terms and conditions of the Agreement (including all schedules and exhibits affixed thereto), the bid by the Buyer and the transactions contemplated thereby be, and hereby are, authorized and approved in all respects.

4.      The sale of the Purchased Assets and the consideration provided by the Buyer under the Agreement is fair and reasonable and shall be deemed for all purposes to constitute a transfer for reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable law.

5.      The Buyer is hereby granted and is entitled to all of the protections provided to a good faith buyer under section 363(m) of the Bankruptcy Code, including with respect to the

---

[5]   To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such. See FED. R. BANKR. P. 7052.

transfer of the Designated Contracts as part of the sale of the Purchased Assets pursuant to section 365 of the Bankruptcy Code and this Order.

6.     The Trustee be, and hereby is, authorized and directed to fully assume, perform under, consummate and implement the terms of the Agreement together with any and all additional instruments and documents that may be reasonably necessary or desirable to implement and effectuate the terms of the Agreement, this Order and sale of the Purchased Assets contemplated thereby including, without limitation, deeds, assignments, stock powers and other instruments of transfer, and to take all further actions as may reasonably be requested by the Buyer for the purpose of assigning, transferring, granting, conveying and conferring to the Buyer, or reducing to possession any or all of the Purchased Assets or Assumed Liabilities and the assumption and assignment of the Designated Contracts, as may be necessary or appropriate to the performance of the Trustee's obligations as contemplated by the Agreement, without any further corporate action or orders of this Court.  The Buyer shall have no obligation to proceed with the Closing of the Agreement until all conditions precedent to its obligations to do so have been met, satisfied or waived.   The Buyer may consummate the transactions under the Agreement at any time after the entry of this Order (including immediately thereafter) by waiving all closing conditions set forth in the Agreement that have not been satisfied and by proceeding to close such transactions, without any notice to the Court, any pre-petition or post-petition creditor of the Debtors or any other party in interest.

7.     The Trustee is authorized and directed to deposit and hold in escrow the Cash Consideration (as defined in the Agreement), and furthermore to make distributions (i) first, from the Cash Consideration and (ii) second, from the Note Consideration (as defined in the Agreement) on the Closing Date as follows:

a.    The Trustee shall deposit $3.2 million in cash (the "Over and Out Escrow Amount") in a separate account. The replacement claims and liens pursuant to the Chapter 11 Final Cash Collateral Order (as defined below) and the Senior Secured Notes, the liens of the Alfred Mann Living Trust pursuant to the Chapter 11 Final DIP Order, as defined below, and the interests (if any) alleged by the Over and Out Plaintiffs (as defined below) in the Over and Out Action (as defined below), shall attach to the Over and Out Escrow Amount in the order of their priority. The Over and Out Escrow Amount shall be not be distributed, except in accordance with a final order of the Court resolving by settlement, dismissal or adjudication, the Adversary Proceeding No. 09-50029, commenced by Over and Out, Inc., Ocala Bedrock, Inc., The Kenneth and Shari Meyer Trust, Michael T. Flynn, Richard A. Smith, James Frisbie, Team Aircraft, Inc., Max J. Cohen, Joseph J. Rusin/Northwest Ohio International LLC, Shaun Hughes, Henry Orlosky, Peter Riechers, Peter Schultz, Management Tech LLC, Robert H. Yarbrough, Linde International, Inc., Davis Air, LLC, Julian MacQueen, Jeff Reynolds, K2 Jet, LLC, James Teng, Black Falcon Aviation & Consulting, LLC, Gulfstream Nautical, Dan Mudge, Gray & Co., Inc., The Gray Oil & Gas Company, Louisiana, N400EA, Richard Ryan, Michael Osbourne (the "Over and Out Plaintiffs") against Eclipse Aviation Corporation (the "Over and Out Action").

b.    The Trustee shall deposit $650,000.00 in cash (the "Tapia Escrow Amount") in a separate account. The replacement claims and liens pursuant to the Chapter 11 Final Cash Collateral Order (as defined below) and the Senior

Secured Notes, the liens of the Alfred Mann Living Trust pursuant to the Chapter 11 Final DIP Order, as defined below, and the interests (if any) alleged by the Tapia Plaintiffs (as defined below) in the Tapia Action (as defined below), shall attach to the Tapia Escrow Amount in the order of their priority. The Tapia Escrow Amount shall be not be distributed, except in accordance with a final order of the Court resolving by settlement, dismissal or adjudication, the Adversary Proceeding 09-50109, commenced by Javier Tapia And Alejandro Camou (the "Tapia Plaintiffs") against Eclipse Aviation Corp., Kings Road Investments Ltd., Citadel Investment Group, L.L.C., HBK Services, LLC, a/k/a HBK Master Fund L.P. (the "Tapia Action").

c.      The Trustee shall deposit $2,604,435.00 (the "Chapter 11 Professional Fee Amount") in a separate account (the "Professional Fee Escrow") for payment of fees and expenses of the chapter 11 professionals employed by the Debtors, including those fees and expenses approved by the *Omnibus Order Awarding Allowance of Compensation for Services Rendered and Reimbursement Of Expenses of Chapter 11 Professionals Employed in This Case* (the "Final Fee Order") [Docket No. 733]. The Trustee is directed to make distributions to those chapter 11 professionals whose fees and expenses were approved by the Final Fee Order from the Chapter 11 Professional Fee Escrow within five (5) business days of the Closing Date in the amounts allowed in accordance with the Final Fee Order, less any amounts previously paid to such chapter 11 professionals.

d.      The Trustee shall deposit $20,325.00 (the "U.S. Trustee Fee Amount") in a

separate account for payment of outstanding U.S. Trustee fees.

e.     The Trustee shall deposit $636,250.00 (the "Trustee Compensation Reserve") in a separate account for payment of compensation to which the Chapter 7 Trustee may be entitled pursuant to section 326 of the Bankruptcy Code subject to further order of the Court.

f.     The Trustee shall deposit $5,000.00 (the "Trustee Expense Reserve") in a separate account to reimburse him for his reasonable expenses subject to further order of the Court.

g.     The Trustee shall deposit an amount sufficient to pay unpaid fees and expenses of professionals employed by the Chapter 7 Trustee in excess of the Chapter 7 Carve-Out (as defined in the Stipulation And Agreed Order Authorizing Limited Use Of Cash Collateral (with any extensions thereof, the "Chapter 7 Cash Collateral Order") [Docket no. 714] (the "Chapter 7 Professional Fee Amount") in a separate account to pay unpaid fees and expenses of professionals employed by the Chapter 7 Trustee after further order of this Court.

h.     The Trustee shall deposit $100,000.00 (the "Closing Expense Reserve") in a separate account to be available without further order of the Court to pay any necessary post-closing obligations of the Trustee as Seller that are contemplated by the Agreement.

i.     The Trustee shall deposit an amount sufficient to pay (i) any unpaid expense approved by the Cash Collateral Order, (ii) any fees and expenses of counsel to the Ad Hoc Committee of Secured Noteholders in excess of any amounts

payable pursuant to the Chapter 7 Cash Collateral Order that are incurred by the Ad Hoc Committee of Secured Noteholders through and including the Closing Date and (iii) any unpaid fees and expenses of counsel to the Collateral Agent under that certain Amended and Restated Security Agreement dated as of February 15, 2008. The Trustee is directed to pay the amounts set forth in subsections (ii) and (iii) of the previous sentence to such professionals as soon as practicably possible, and no later than, within 3 business days of the Closing Date; and

j.    The Trustee shall distribute as soon as practicably possible, and no later than within 3 business days of the Closing Date, the remainder of the Cash Consideration as follows: (i) first, to pay the amount due and owing to the Noteholders (as such term is defined in the Chapter 7 Cash Collateral Order) in connection with the Chapter 7 Cash Collateral Order, and (ii) second, to pay on a prorated basis the amount due and owing to (a) the Alfred Mann Living Trust pursuant to the Final Order Pursuant to 11 U.S.C. Sections 105, 362, 363 and 364 and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (1) Authorizing Incurrence by the Debtors of Post-Petition Secured Indebtedness with Priority Over All Other Secured Indebtedness and with Administrative Superpriority, (2) Granting Liens and (3) Modifying the Automatic Stay [Docket No. 230] (the "Chapter 11 Final DIP Order"), and (b) the Noteholders pursuant to the Final Order Authorizing Limited Use of Cash Collateral and Granting Adequate Protection [Docket No. 228] (the "Chapter 11 Final Cash Collateral Order"). Upon exhaustion

of the Cash Consideration, the Trustee shall next distribute the Note Consideration as follows: (i) first, to pay on a prorated basis the remainder of the amount due and owing to (a) the Alfred Mann Living Trust pursuant to the Chapter 11 Final DIP Order, and (b) the Noteholders pursuant to the Chapter 11 Final Cash Collateral Order on a prorated basis, until such amounts are paid in full, and (ii) second, with respect to any remaining Note Consideration, to pay to the Noteholders, the amount due and owing to the Noteholders pursuant to the terms of the Senior Secured Notes. Notwithstanding anything to the contrary in the preceding sentence, no later than within 3 business days after the Closing Date, $2,002,000.00 of the Note Consideration to be paid to the Alfred Mann Living Trust pursuant to the preceding sentence shall be held by the Trustee in escrow pending the resolution and/or settlement of the Over and Out Action and the Tapia Action as follows: (i) Note Consideration in the amount of $1,661,660.00 in connection with the Over and Out Action (the "Over and Out Action Note Consideration Reserve") and (ii) Note Consideration in the amount of $340,340 in connection with the Tapia Action (the "Tapia Action Note Consideration Reserve"). All interest due to the Alfred Mann Living Trust in connection with the $2,002,000.00 of the Note Consideration referred to in the preceding sentence will also be held in trust by the Trustee. Any amounts returned to the Trustee and/or the estate from the Over and Out Escrow Amount (as reduced by the amount of the legal fees and expenses incurred by the Noteholders and the Alfred Mann Living Trust in connection with the

litigation of the Over and Out Action) will be distributed by the Trustee as set forth for the distribution of Cash Consideration in section 7(j)(ii) within two (2) business days of the entry of a final order of the Court resolving by settlement, dismissal or adjudication the Over and Out Action; provided however that the amount that would have been distributed to the Noteholders pursuant to the Chapter 11 Final Cash Collateral Order under section 7(j)(ii)(b) shall be paid directly to the Noteholders as provided in the terms of the Senior Secured Notes.  After such distributions, the Trustee shall distribute to the Alfred Mann Living Trust the Note Consideration from the Over and Out Action Note Consideration Reserve in an amount equal to the Over and Out Action Note Consideration Reserve minus the cash actually received by the Alfred Mann Living Trust in connection with the Over and Out Action.  Any remainder of the Over and Out Action Note Consideration Reserve after giving effect to the preceding sentence shall be retained by the Trustee for distribution to the Noteholders pursuant to the terms of the Senior Secured Notes and this Order.  Any amounts returned to the Trustee and/or the estate from the Tapia Escrow Amount (as reduced by the amount of the legal fees and expenses incurred by the Noteholders and the Alfred Mann Living Trust in connection with the litigation of the Tapia Action) will be distributed by the Trustee as set forth for the distribution of Cash Consideration in section 7(j)(ii) within two (2) business days of the entry of a final order of the Court resolving by settlement, dismissal or adjudication the Tapia Action; provided however that the amount that would have been

distributed to the Noteholders pursuant to the Chapter 11 Final Cash Collateral Order under section 7(j)(ii)(b) shall be paid directly to the Noteholders as provided in the terms of the Senior Secured Notes. After such distributions, the Trustee shall distribute to the Alfred Mann Living Trust the Note Consideration from the Tapia Action Note Consideration Reserve in an amount equal to the Tapia Action Note Consideration Reserve minus the cash actually received by the Alfred Mann Living Trust in connection with the Tapia Action. Any remainder of the Tapia Action Note Consideration Reserve shall be retained by the Trustee for distribution to the Noteholders pursuant to the terms of the Senior Secured Notes and this Order. Any funds held by the Trustee in escrow as stated above in subparagraphs 7(c) through 7(i), inclusive, that are not actually expended by the Trustee shall be distributed in accordance with subparagraph 7(j). All the Cash Consideration and the Note Consideration held by the Trustee pending distribution pursuant to this subsection shall continue to be subject to the liens and claims granted under the Chapter 7 Cash Collateral Order, the Chapter 11 Final Cash Collateral Order, the Chapter 11 Final DIP Order and the Senior Secured Notes, in order of their priority.

Pending distribution of the Cash Consideration the Trustee shall not commingle the Cash Consideration with any other of the Debtors' assets.

8.     The Trustee and each other person or entity having duties or responsibilities under the Agreement, any agreements related thereto or this Order, and their respective directors, officers, employees, members, agents, representatives and attorneys, are authorized and

empowered, subject to the terms and conditions contained in the Agreement, to carry out all of the provisions of the Agreement and any related agreements; to issue, execute, deliver, file and record, as appropriate, the documents evidencing and consummating the Agreement, and any related agreements; to take any and all actions contemplated by the Agreement, any related agreements or this Order; and to issue, execute, deliver, file and record, as appropriate, such other contracts, instruments, releases, indentures, mortgages, deeds, bills of sale, assignments, leases or other agreements or documents and to perform such other acts and execute and deliver such other documents, as are consistent with, and necessary or appropriate to implement, effectuate, and consummate, the Agreement, any related agreements and this Order and the transactions contemplated thereby and hereby, all without further application to, or order of, the Court. The Trustee shall be, and hereby is, authorized to certify or attest to any of the foregoing actions (but no such certification or attestation shall be required to make any such action valid, binding, and enforceable). The Trustee is further authorized and empowered to cause to be filed with the secretary of state of any state or other applicable officials of any applicable governmental units any and all certificates, agreements or amendments necessary or appropriate to effectuate the transactions contemplated by the Agreement, any related agreements and this Order, including amended and restated certificates or articles of incorporation and by-laws or certificates or articles of amendment, and all such other actions, filings, or recordings as may be required under appropriate provisions of the applicable laws of all applicable governmental units or as the Trustee may determine are necessary or appropriate. The execution of any such document or the taking of any such action shall be, and hereby is, deemed conclusive evidence of the authority of such person to so act. Without limiting the generality of the foregoing, this Order shall constitute all approvals and consents, if any, required by the corporation laws of the

State of Delaware and all other applicable business corporation, trust and other laws of the applicable governmental units with respect to the implementation and consummation of the Agreement, any related agreements and this Order, and the transactions contemplated thereby and hereby.

9.      Effective as of the Closing, (a) the sale of the Purchased Assets by the Trustee to the Buyer shall constitute a legal, valid and effective transfer of the Purchased Assets notwithstanding any requirement for approval or consent by any person and shall vest Buyer with all right, title and interest of the Debtors in and to the Purchased Assets, free and clear of all Claims, Liens, Interests and Encumbrances of any kind, pursuant to section 363(f) of the Bankruptcy Code, except as otherwise provided in the Agreement or this Order, and (b) the assumption of any Assumed Liabilities by the Buyer shall constitute a legal, valid and effective delegation of any Assumed Liabilities to the Buyer and shall divest the Debtors of all liability with respect to any Assumed Liabilities.

10.     The sale of the Purchased Assets is not subject to avoidance, and no damages may be assessed against the Buyer or any other party, pursuant to section 363(n) of the Bankruptcy Code.

11.     The Eclipse Production Certificate is an Excluded Asset and is not transferred to the Buyer via this sale. The Eclipse Production Certificate is not transferable. See 14 C.F.R. § 21.155. Further, per FAA regulations, a new production certificate will be issued only upon the Buyer's  independent compliance with the requirements of 14 C.F.R. Part 21, Subpart G (14 C.F.R. §§ 21.131-21.165).

12.     The Trustee is not selling, transferring, assuming, assigning, or otherwise conveying, and shall not sell, transfer, assume, deliver, assign or otherwise convey any of the

Curtiss-Wright IP (as defined in the limited objection of Curtiss-Wright Integrated Sensing, Inc. and Novatronics, Inc. to the Trustee's motion to sell assets [D.I. 805] (the "C-W Objection")) or the Contracts (as defined in the C-W Objection) by or through this Order, the Sale Motion or the Agreement (as defined in this Order) and related documents. Any and all rights, remedies and claims of (i) the Curtiss-Wright Companies (as defined in the C-W Objection) against the Debtors and the Chapter 7 Estates and (ii) the Debtors and the Chapter 7 Estates (including the right to seek attorneys' fees under the Contracts), are not affected by this Order and are expressly reserved and preserved with respect to the Curtiss-Wright IP and the Contracts.

13. Notwithstanding anything in this Order or the Agreement to the contrary, the Purchased Assets purchased by the Buyer shall not include the P&WC Intellectual Property, as defined in the Limited Objection and Reservation of Rights With Respect To Sale Motion filed by Pratt & Whitney Canada Corp. ("P&WC") (Docket No. 799, filed 8/17/09). Certain P&WC Intellectual Property is contained on computers or other media which are part of the Purchased Assets, or may otherwise be accessible to the Buyer as a result of its purchase of the Purchased Assets. Pending negotiation of confidentiality and limited use license agreement with P&WC, Buyer shall preserve and protect the P&WC Intellectual Property in its current state and shall not use or disclose P&WC Intellectual Property for any purpose. Buyer's rights and obligations with respect to the P&WC Intellectual Property shall be as set forth in a letter agreement between P&WC and the Buyer dated August 19, 2009, or any agreement subsequently negotiated between P&WC and the Buyer.

14. Notwithstanding any other provisions in the Agreement or this Order to the contrary, the objections of UT Finance Corporation (" UT Finance ") [D.I. 821] will not be deemed overruled on the merits and are hereby preserved in accordance with terms of the

reported settlement between the Trustee, UT Finance and the Buyer. The Trustee and the Chapter 7 Estates have assigned to the Buyer any all rights, claims and interests they have under those certain Air Taxi Financing Agreement between Eclipse Aviation Corporation and UT Finance Corporation, dated as of April 5, 2005; Air Taxi Financing Agreement by and among Eclipse Aviation Corporation, UT Finance Corporation and Pratt & Whitney Canada Corp., dated as of June 30, 2007 and all related agreements (the "UT Financing Agreements"); the Buyer, in accordance with the Asset Purchase Agreement, shall hold all rights, claims and interests of the Chapter 7 Estates and the Debtors in the UT Financing Agreements or related to the twenty-eight Eclipse 500 aircraft previously sold to DayJet Leasing LLC and currently in the custody of the Trustee (the "DayJet Aircraft"). Buyer shall otherwise have no affirmative obligation to expend funds or otherwise affirmatively to take any action pursuant to the UT Financing Agreements. Upon the Closing of the sale to the Buyer, UT Finance and the Trustee and the Chapter 7 Estates shall be deemed to have released each other from any and all claims under the UT Financing Agreements or otherwise related to the DayJet Aircraft; except that UT Finance may file a general, nonpriority, unsecured claim in the Chapter 7 proceedings and the Trustee's rights to object to any such claim shall be preserved.

15.    Notwithstanding any other provisions in the Agreement or this Order to the contrary, the objections of SAP America, Inc. ("SAP") [D.I. 813] will not be deemed overruled on the merits, but will be deemed withdrawn based on the settlement reached by the parties as described herein. In connection with the assumption and assignment of the Designated Contract identified on Schedule 2.3 of the Agreement and described as the "Certified Business Solutions Provider End-User License Agreement" (the "SAP License Agreement"), the Trustee is authorized to assume and assign the SAP License Agreement to Buyer and the Trustee and

Buyer are authorized to execute any documents necessary to consummate the assumption and assignment of the SAP License Agreement. The assumption and assignment of the SAP License Agreement shall be conditioned on the following: (i) the Buyer shall pay or cause to be paid to SAP ten (10) days after the Closing an amount equal $63,308.37, which amount shall constitute the Cure Amount for the SAP License Agreement and (ii) the Trustee and Buyer shall execute and deliver a License Assignment Acknowledgment Agreement in a form that is acceptable to SAP. Other than the transfer of the License Agreement from the Trustee to Buyer upon satisfaction of the foregoing requirements, nothing contained in the Agreement or this Order shall modify the terms of the License Agreement or the respective rights of the parties thereto.

### Transfer of Purchased Assets

16.     Except to the extent specifically provided in the Agreement or this Order, upon the closing the Trustee shall be, and hereby is, authorized, empowered and directed, pursuant to sections 105 and 363(b) of the Bankruptcy Code, to sell the Purchased Assets to the Buyer. Except with respect to the Assumed Liabilities and except as otherwise provided in this Order, the sale of the Purchased Assets shall vest Buyer with all right, title and interest of the Debtors to the Purchased Assets free and clear of any and all Encumbrances and other liabilities and claims, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or noncontingent, liquidated or unliquidated, matured or unmatured, disputed or undisputed, or known or unknown, whether arising prior to or subsequent to the Petition Date, whether imposed by agreement, understanding, law, equity or otherwise, with all such Encumbrances and other liabilities and claims to attach only to the proceeds of the sale (if any) with the same priority, validity, force and effect, if any, as they now have in or against the Purchased Assets, subject to all claims and

defenses the Debtors may possess with respect thereto. Following the Closing Date, no holder of any Encumbrance in the Purchased Assets shall interfere with the Buyer's use and enjoyment of the Purchased Assets based on or related to such Encumbrance, or any actions that the Trustee may take in the chapter 7 cases and no person shall take any action to prevent, interfere with or otherwise enjoin consummation of the transactions contemplated in or by the Agreement or this Order. To the extent provided for in the Agreement, any and all of the Debtors' security deposits, or other security held by landlords, lessors and other counterparties to the contracts, leases and licenses that are to be assumed and assigned under the Agreement are being transferred and assigned to, and shall be the property of, the Buyer from and after the Closing, which transfer and assignment of security deposits, other deposits or security shall satisfy in full the requirements of section 365(l) of the Bankruptcy Code for all contracts, leases, and licenses assumed and assigned pursuant to this Order or the Agreement.

17. The provisions of this Order authorizing the sale of the Purchased Assets free and clear of Encumbrances, other than Assumed Liabilities, shall be self-executing, and neither the Trustee nor the Buyer shall be required to execute or file releases, termination statements, assignments, consents or other instruments in order to effectuate, consummate and implement the provisions of this Order. However, the Trustee and the Buyer, and each of their respective officers, employees and agents are hereby authorized and empowered to take all actions and execute and deliver any and all documents and instruments that either the Trustee or the Buyer deem necessary or appropriate to implement and effectuate the terms of the Agreement and this Sale Order. Moreover, effective as of the Closing, the Buyer, its successors and assigns, shall be designated and appointed the Debtors' true and lawful attorney and attorneys, with full power of substitution, in the Debtors' name and stead, on behalf and for the benefit of the Buyer, its

successors and assigns, to demand and receive any and all of the Purchased Assets and to give receipts and releases for and in respect of the Purchased Assets, or any part thereof, and from time to time to institute and prosecute in the Debtors' name, for the benefit of the Buyer, its successors and assigns, any and all proceedings at law, in equity or otherwise, which the Buyer, its successors and assigns, may deem proper for the collection or reduction to possession of any of the Purchased Assets, and to do all acts and things with respect to the Purchased Assets which the Buyer, its successors and assigns, shall deem desirable. The foregoing powers are coupled with an interest and are and shall be irrevocable by the Debtors.

18.     On or before the Closing Date, all parties holding Encumbrances of any kind are authorized and directed to execute such documents and take all other actions as may be necessary to release any Encumbrances of any kind against the Purchased Assets, as such Encumbrances may have been recorded or may otherwise exist. If any person or entity that has filed financing statements or other documents or agreements evidencing any Encumbrances in or against the Purchased Assets shall not have delivered to the Trustee prior to the Closing after request therefor, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, or releases of all such Encumbrances that the person or entity has with respect to the Purchased Assets, the Trustee is hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to such Purchased Assets prior to the Closing, and the Buyer is authorized to execute and file such documents after Closing.

19.     To the greatest extent available under applicable law, the Buyer shall be authorized, as of the Closing Date, to operate under any license, permit, registration and governmental authorization or approval of the Trustee with respect to the Purchased Assets, and

all such licenses, permits, registrations and governmental authorizations and approvals are deemed to have been, and hereby are, directed to be transferred to the Buyer as of the Closing Date.

20. All of the Debtors' interests in the Purchased Assets to be acquired by the Buyer under the Agreement shall be, as of the Closing Date and upon the occurrence of the Closing, transferred to and vested in the Buyer. Upon the occurrence of the Closing, this Order shall be considered and constitute for any and all purposes a full and complete general assignment, conveyance and transfer of the Purchased Assets acquired by the Buyer under the Agreement and/or a bill of sale or assignment transferring good and marketable, indefeasible title and interest in the Purchased Assets to the Buyer, subject to the Assumed Liabilities.

21. Except as expressly provided in the Agreement or this Order, the Buyer is not assuming nor shall it or any affiliate or subsidiary of Buyer be in any way liable or responsible, as a successor or otherwise, for any liabilities, debts or obligations of the Debtors in any way whatsoever relating to or arising from the Debtors' ownership or use of the Purchased Assets prior to the consummation of the transactions contemplated by the Agreement, or any liabilities calculable by reference to the Debtors or their operations or the Purchased Assets, or relating to continuing or other conditions existing on or prior to consummation of the transactions contemplated by the Agreement, which liabilities, debts, and obligations are hereby extinguished insofar as they may give rise to liability, successor or otherwise, against Buyer or any affiliate or subsidiary of the Buyer.

22. With respect to the WIP Adversary Proceedings and the Opinicus Adversary Proceeding, those liabilities assumed by the Buyer are expressly limited to the obligations of the chapter 7 estate to return to the Plaintiffs in those actions any property that is the subject of such

action, to the extent such rights, if any, are established by Final Order of the Court. Any claims against Buyer pursuant to those actions, shall be, and hereby are, limited to the obligation to return to the Plaintiffs, if such rights are established, any property which is part of the Purchased Assets and which the Court may later determine the Plaintiffs are entitled to possession of under applicable law. The Buyer shall not be liable for: (1) specific performance; or (2) any monetary claims against the Seller, including but not limited to, any claims to deposits or segregated funds. The Buyer shall be substituted for the chapter 7 Trustee as a party in the adversary proceedings set forth on Schedule 7.8 and the Opinicus Adversary Proceeding or, as appropriate, and at the election of Buyer, shall be allowed to intervene, and shall have all rights, claims and defenses to which the Debtor, chapter 7 estates and/ or the Trustee could assert against the parties to those actions or the property which is the subject of those actions; however, that to the extent the Trustee or the Debtors shall remain a party to any of the adversary proceedings described above, the Trustee and the Debtors shall retain those rights, claims and defenses to the extent of any claims against Trustee or as otherwise agreed to between Buyer and Trustee. Notwithstanding anything in this Order, the Agreement or any other order in these Bankruptcy Cases to the contrary, no aspect of the transactions authorized herein shall impair, substantively or procedurally, the prosecution of the claims in the WIP Adversary Proceedings or the Opinicus Adversary Proceeding in the context of the pending adversary proceeding, other than the specific limitation of the Buyer's obligations set forth above. Buyer acknowledges that Maverik may be entitled to possession of the aircraft under its first claim for relief if the Court finds in its favor in the pending adversary proceeding, although it would not be entitled to a complete judgment of specific performance for any assembly or production work to be performed on the aircraft. Before and after the consummation of the transactions authorized herein, the Plaintiffs in the WIP Adversary Proceedings shall have the right to inspect the

property that is the subject of such proceedings, under reasonable conditions and upon reasonable notice to both the Trustee and the Buyer, and after execution of a nondisclosure agreement. The Buyer shall include the Equipment (as defined in the Opinicus Adversary Proceeding) which are, in part, the subject of the Opinicus Adversary Proceeding, in its insurance coverage. The Buyer shall not operate, transfer or share the Equipment (or the intellectual property contained therein, if any) absent further order of the Court. Opinicus, the Plaintiff in the Opinicus Adversary Proceeding, shall have no obligation to turn over any intellectual property relating to the Equipment absent further order of the Court.

23. Except as otherwise provided in the Agreement, on the Closing Date, each of the Debtors' creditors is authorized and directed to execute such documents and take all other actions as may be necessary to release their respective Interests or Claims against the Purchased Assets, if any, as may have been recorded or may otherwise exist.

24. Except as otherwise expressly provided in the Agreement or this Order, all persons or entities, presently or on or after the Closing Date, in possession of some or all of the Purchased Assets are directed to surrender possession of the Purchased Assets to the Buyer on the Closing Date or at such time thereafter as the Buyer may request.

25. Notwithstanding anything in this Order or the Agreement to the contrary: (a) the Purchased Assets purchased by the Buyer shall include approximately 712,690 pounds of inventory owned by one or more of the Debtors (the "Eclipse Owned TW Inventory") and warehoused by TW Metals, Inc. ("TW"); (b) promptly following the closing of the Agreement, Buyer shall retrieve from TW (upon at least two weeks prior written notice, during regular business hours and at a date and time acceptable to TW) all of the Eclipse Owned TW Inventory and Buyer shall be responsible for all attendant costs, expenses and transportation associated

with Buyer's retrieval of such inventory from TW's warehouse; and (c) if Buyer fails to retrieve the Eclipse Owned TW Inventory at Buyer's expense within ninety (90) days following the closing of the Agreement (or such later date to which TW and Buyer may hereafter agree), TW shall be relieved of any further obligation to store, hold, warehouse, protect, account for, or otherwise safeguard such inventory and may abandon or otherwise dispose of such inventory.

### Designated Contracts

26.     Subject to the terms of the Agreement and the occurrence of the Closing Date, the assumption by the Trustee of the Designated Contracts and the sale and assignment of such agreements to the Buyer, as provided for or contemplated by the Agreement, be, and hereby is, authorized and approved pursuant to sections 363 and 365 of the Bankruptcy Code.

27.     The Designated Contracts shall be deemed valid and binding and in full force and effect and assumed by the Trustee and sold and assigned to the Buyer at the Closing, pursuant to sections 363 and 365 of the Bankruptcy Code, subject only to (a) the payment by Buyer of all cures required to assume and assign the Designated Contracts to the Buyer as provided in this Order and the Agreement; and (b) the Buyer's right to exclude Designated Contracts from the definition of Designated Contracts in accordance with the terms of the Agreement. To the extent the Buyer excludes any Designated Contracts from the definition of Designated Contracts, the Trustee shall file a revised Schedule 2.3 to the Agreement with the Court and provide proper and adequate notice thereof.

28.     Upon the Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, the Buyer shall be fully and irrevocably vested in all right, title and interest of each Designated Contract. The Trustee shall cooperate with, and take all actions reasonably requested by, the Buyer to effectuate the foregoing.

29.    Pursuant to sections 365(b)(1)(A) and (B) of the Bankruptcy Code, pursuant to the terms and subject to the conditions of this Order and the Agreement, within the time period provided in the Agreement, or  as otherwise provided in this Order or agreed to between Buyer and any party to a Designated Contract, the Buyer shall pay or cause to be paid to the parties to any Designated Contracts the requisite Cure Amounts, if any, set forth in the notice served by the Trustee on each of the parties to the Designated Contracts, except to the extent that a cure amount was amended on the record of the Sale Hearing (the "Cure Amounts"), following the assumption and assignment thereof.  The Cure Amounts are hereby fixed at the amounts set forth in the notice served by the Trustee, or the amounts set forth on the record of the Sale Hearing, as the case may be, and the non-Debtor parties to the Designated Contracts are forever bound by such Cure Amounts.

30.    Notwithstanding anything to the contrary herein, the Cure Amount for the June 21, 2004 Agreement between Eclipse Aviation Corporation and Southwest Research Institute ("SwRI"), as amended by subsequent purchase agreements (collectively the"Contract"), (i) is set at $360,697.08, (ii) must be paid by the Buyer before SwRI shall be required to resume any performance under the Contract, and (iii) pursuant to the Contract SwRI shall retain possession of the $300,000 it holds (and in which it has possessory liens and security interests) under the Contract and apply the $300,000 to the last invoice applicable to the Contract.

31.    All defaults or other obligations under the Designated Contracts arising prior to the Closing (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be deemed cured by payment of the Cure Amounts.

32.    Any provision in any Designated Contract that purports to declare a breach,

default or payment right as a result of an assignment or a change of control in respect of the Debtors is unenforceable, and all Designated Contracts shall remain in full force and effect, subject only to payment of the appropriate Cure Amount, if any. No sections or provisions of any Designated Contract that purport to provide for additional payments, penalties, charges or other financial accommodations in favor of the non-Debtor third party to the Designated Contracts shall have any force and effect with respect to the sale transaction and assignments authorized by this Order, and such provisions constitute unenforceable anti-assignment provisions under section 365(f) of the Bankruptcy Code and/or are otherwise unenforceable under section 365(e) of the Bankruptcy Code and no assignment of any Designated Contract pursuant to the terms of the Agreement shall in any respect constitute a default under any Designated Contract. The non-Debtor party to each Designated Contract shall be deemed to have consented to such assignment under section 365(c)(1)(B) of the Bankruptcy Code, and the Buyer shall enjoy all of the rights and benefits under each such Designated Contract as of the applicable date of assumption without the necessity of obtaining each such non-Debtor party's written consent to the assumption or assignment thereof.

33.     The Buyer has satisfied all requirements under sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code to provide adequate assurance of future performance under the Designated Contracts.

34.     The Debtors and the Chapter 7 estates shall be relieved of any liability for any breach of any of the Designated Contracts occurring from and after Closing, pursuant to and in accordance with section 365(k) of the Bankruptcy Code.

35.     Notwithstanding anything else in this Order, that certain real property described and identified as the "Eclipse Tract" in the Special Warranty Deed (the "Deed") recorded

January 20, 2005 as document no. 2005009859, in Bk-A90, Pg-9831, in the Office of the County Clerk of Bernalillo County, New Mexico (Recording and Filing Department), a copy of which Deed is attached hereto as "Exhibit 3", shall only be sold or transferred subject to the right of reversion (the "Right of Reversion") retained by Ranch Joint Venture, LLP ("Ranch") as described in the Deed. The date after which the Right of Reversion may be exercised under the circumstances set forth in the Deed has been extended to January 15, 2013 by notice to Ranch properly provided in accordance with the Deed. Notwithstanding the foregoing two sentences, Eclipse and Ranch further agree five acres of the Eclipse Tract on which there is currently situated a flight training/simulator center (the "Flight Training Parcel"), identified as Tract D-1-A-2 on Plat of Tracts D-1-A-1, D-1-A-2, and S-1-A of Amended Bulk Land Plat For Aerospace Technology Park Within Section 36, Township 11 North, Range 1 East and Section 3, Township 10 North, Range 1 East City of Albuquerque Bernalillo County, New Mexico, June 2007, is not subject to Ranch's Right of Reversion and is owned free and clear of the Right of Reversion. The option of Ranch to purchase the Eclipse Tract set forth in the Deed shall not be deemed to be triggered by reason of the bankruptcy filing of Eclipse Aviation Corporation or the transfer of the Eclipse Tract to Buyer.

36.    Notwithstanding any other provisions in the Agreement or this Order to the contrary, the objections of Qwest Corporation and Qwest Communications Corporation (collectively, "Qwest ") [D.I. 810] will not be deemed overruled on the merits and shall be preserved in all respects pending further Order of the Court. In connection with the assumption and assignment of the Designated Contracts, Buyer shall be afforded an additional period expiring on August 31, 2009 to designate any contracts or accounts with Qwest for assumption and assignment and serve Qwest with notice of such designation. Qwest shall thereafter have ten

(10) days within which to file any objections to the proposed assumption and assignment of the Qwest contracts. The Court shall schedule a further hearing on any proposed assumption and assignment of the Qwest contracts, or, alternatively, the rights of the Chapter 7 estates, if any, in and to the telephone, telex and telephone facsimile numbers related to the Qwest contracts as referred to in the Qwest objection.

37.     Notwithstanding any other provisions in the Agreement or this Order to the contrary, in connection with the assumption and assignment of the Designated Contracts, Parametric Technology Corporation shall be afforded an additional period expiring on September 9, 2009 to object to any contracts designated by Buyer for assumption and assignment. The Court shall schedule a further hearing on any objection.

## Additional Provisions

38.     Each and every federal, state and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Agreement and this Order.

39.     The Buyer has not assumed and is otherwise not obligated for any of the Debtors' liabilities other than the Assumed Liabilities as set forth in the Agreement, or as otherwise provided in this Order, and the Buyer has not purchased any of the Excluded Assets. Consequently, all persons, Governmental Units (as defined in sections 101(27) and 101(41) of the Bankruptcy Code) and all holders of Encumbrances based upon or arising out of liabilities retained by the Debtors are hereby enjoined from taking any action against any of the Buyer, its affiliates and subsidiaries or the Purchased Assets to recover any Encumbrance or on account of any liabilities of the Debtors other than Assumed Liabilities pursuant to the Agreement or as otherwise provided in this Order. All persons holding or asserting any Encumbrance in the

Excluded Assets are hereby enjoined from asserting or prosecuting such Encumbrance or cause of action against any of the Buyer, its affiliates, and subsidiaries or the Purchased Assets for any liability associated with the Excluded Assets.

40. The Buyer is not a "successor" to the Debtors or the Chapter 7 estates by reason of any theory of law or equity, and the Buyer, its affiliates and subsidiaries shall not assume, nor be deemed to assume, nor in any way be responsible for any liability or obligation of any of the Debtors and/or the Chapter 7 estates including, but not limited to, any bulk sales law, successor liability or similar liability except as otherwise expressly provided in the Agreement. Neither the purchase of the Purchased Assets by the Buyer or its affiliates or subsidiaries, nor the fact that the Buyer or its affiliates or subsidiaries are using any of the Purchased Assets previously operated by the Debtors, will cause the Buyer or any of its affiliates or subsidiaries to be deemed a successor in any respect to the Debtors' businesses within the meaning of any foreign, federal, state or local revenue, pension, ERISA, tax, labor, employment, environmental or other law, rule or regulation (including without limitation filing requirements under any such laws, rules or regulations), or under any products liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine, or under any product warranty liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine, and the Buyer, its affiliates and subsidiaries shall have no liability or obligation on account of any of the foregoing. Buyer and its affiliates shall have no liability or obligation under the WARN Act (29 U.S.C. § 210 *et seq.*) or the Comprehensive Environmental Response Compensation and Liability Act, or any foreign, federal, state or local labor, employment, or environmental law by virtue of the Buyer's purchase of the Purchased Assets or assumption of the Assumed Liabilities.

41. Except to the extent expressly provided in this Order or included in the Assumed

Liabilities, pursuant to sections 105 and 363 of the Bankruptcy Code, all persons and entities, including, but not limited to, the Debtors, all debt security holders, equity security holders, the Debtors' employees or former employees, governmental, tax and regulatory authorities, lenders, parties to or beneficiaries under any benefit plan, any claimant asserting a products liability claim, trade and other creditors asserting or holding an Encumbrance of any kind or nature whatsoever against, in or with respect to any of the Debtors or the Purchased Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated), arising under or out of, in connection with, or in any way relating to the Debtors, the Purchased Assets, the operation of the Debtors' businesses prior to the Closing Date or the transfer of the Purchased Assets to the Buyer, shall be forever barred, estopped and permanently enjoined from asserting, prosecuting or otherwise pursuing such Encumbrance or other liability against the Buyer or any affiliate, subsidiary, successor or assign thereof and each of their respective current and former members, officers, directors, managed funds, investment advisors, attorneys, employees, partners, affiliates and representatives (each of the foregoing in its individual capacity) or the Purchased Assets. For the avoidance of doubt, the foregoing shall not prevent the Debtors, the Chapter 7 estates, successors or permitted assigns from pursuing claims, if any, against the Buyer and/or its successors and assigns in and only in accordance with the terms of the Agreement.

42. Subject to the terms of the Agreement, the Agreement and any related agreements may be waived, modified, amended, or supplemented by agreement of the Trustee, the Ad Hoc Committee and the Buyer without further action or order of the Court; provided, however, that any such waiver, modification, amendment or supplement is not material and substantially conforms to and effectuates the Agreement and any related Agreement.

43. No bulk sale law or any similar law of any state or other jurisdiction shall apply in any way to the sale and the transactions contemplated by the Agreement.

44. The failure specifically to include any particular provisions of the Agreement or any related Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court, the Trustee and the Buyer that the Agreement and any related agreements are authorized and approved in their entirety with such amendments thereto as may be made by the parties in accordance with this Order prior to Closing. To the extent any provisions of this Order conflict with the terms and conditions of the Agreement, the terms and conditions of the Agreement shall govern and control. Nothing in this Order shall alter or amend the Agreement and the obligations of the Trustee and Buyer thereunder.

45. This Order and the Agreement shall be binding upon and govern the acts of all Persons and entities, including without limitation, the Debtors and the Buyer, their respective successors and permitted assigns, including, without limitation, any successor chapter 7 trustee hereinafter appointed for the Chapter 7 estates, all creditors of any Debtor (whether known or unknown), filing agents, filing officers, title agents, recording agencies, secretaries of state and all other persons and entities who may be required by operation of law, the duties of their office or contract to accept, file, register or otherwise record or release any documents or instruments or who may be required to report or insure any title in or to the Purchased Assets. All Encumbrances against the Chapter 7 estates of record as of the Closing shall forthwith be removed and stricken as against the Purchased Assets, without further order of the Court or act of any party. Upon Closing, the entities listed above in this paragraph are authorized and directed to strike all such recorded Encumbrances against the Purchased Assets as provided for herein from their records, official and otherwise. Each and every federal, state and local

governmental agency, unit or department are hereby directed to accept this Order as sole and sufficient evidence of the transfer of title of the Purchased Assets to the Buyer, and such agency, unit or department may rely upon this Order in consummating the transactions contemplated by the Agreement.

46. The provisions of this Order are non-severable and mutually dependent.

47. Nothing in any order of this Court shall conflict with or derogate from the provisions of the Agreement or the terms of this Order.

48. Notwithstanding Bankruptcy Rules 6004, 6006 and 7062, this Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing. In the absence of any person or entity obtaining a stay pending appeal, the Trustee and the Buyer are free to close under the Agreement at any time, subject to the terms of the Agreement. If, in the absence of any person or entity obtaining a stay pending appeal, the Trustee and the Buyer close under the Agreement, the Buyer shall be deemed to be acting in "good faith" and shall be entitled to the protections of section 363(m) of the Bankruptcy Code as to all aspects of the transactions under and pursuant to the Agreement if this Order or any authorization contained herein is reversed or modified on appeal.

49. This Order may be recorded by the Buyer in any registry or government office.

50. This Court shall retain jurisdiction even after the closing of these chapter 7 cases to:

  a. Interpret, implement and enforce the terms and provisions of this Order, the Procedures Order, and the Agreement, all amendments thereto and any waivers or consents thereunder and each of the Agreement executed in connection therewith in all respects;

b.  Decide any disputes concerning this Order, the Agreement or the rights and duties of the parties hereunder or thereunder or any issues relating to the Agreement and this Order including, but not limited to, the interpretation of the terms, conditions and provisions hereof and thereof, the status, nature and extent of the Purchased Assets and any Designated Contracts and all issues and disputes arising in connection with the relief authorized herein, inclusive of those concerning the transfer of the assets free and clear of all Encumbrances;

c.  Protect the Buyer or any of the Designated Contracts or Purchased Assets against any of the Encumbrances as provided herein including, without limitation, to enjoin the commencement or continuation of any action seeking to impose successor liability or bulk sale liability;

d.  Enter orders in aid or furtherance of the transactions contemplated by the Agreement or to ensure the peaceful use and enjoyment of the Designated Contracts or the Purchased Assets by the Buyer;

e.  Compel delivery of all Purchased Assets to the Buyer;

f.  Adjudicate any and all remaining issues concerning the Trustee's right and authority to assume and assign the Designated Contracts and the rights and obligations of the Debtors and the Buyer with respect to such assignment and the existence of any default under any such Designated Contract;

g.  Adjudicate any and all disputes concerning alleged pre-Closing Encumbrances in and to the Purchased Assets including without limitation the extent, validity, enforceability, priority, and nature of any and all such

alleged Encumbrances; and

h.     Adjudicate any and all disputes relating to the Trustee's right, title or interest

in the Purchased Assets and the proceeds thereof.


Dated:  August_____, 2009
Wilmington, Delaware


                                              _____
                                              The Honorable Mary F. Walrath
                                              United States Bankruptcy Judge

# EXHIBIT 1

**ASSET PURCHASE AGREEMENT**


**Dated July 30, 2009**


**Among**


**JEOFFREY L. BURTCH, as the trustee of**

**ECLIPSE AVIATION CORPORATION and**

**ECLIPSE IRB SUNPORT, LLC (and not in his personal capacity),**


**And**


**ECLIPSE AEROSPACE, INC., as Buyer**

# TABLE OF CONTENTS

Page

**ARTICLE I**

**DEFINITIONS** ...................................................................................1
Section 1.1  Definitional and Interpretive Matters..........................................1
Section 1.2  Accounting Terms and Determinations .....................................2

**ARTICLE II**

**PURCHASE AND SALE** ...............................................................3
Section 2.1  Purchase and Sale of Purchased Assets .....................................3
Section 2.2  Assumption of Liabilities.............................................................3
Section 2.3  Assignments.................................................................................3
Section 2.4  Further Assurances.......................................................................4

**ARTICLE III**

**PURCHASE PRICE** ......................................................................5
Section 3.1  Purchase Price..............................................................................5
Section 3.2  Closing Date Payment; Issuance of Buyer Notes .....................5
Section 3.3  Allocation of Purchase Price........................................................5
Section 3.4  Closing Date.................................................................................6
Section 3.5  Buyer's Deliveries .......................................................................6
Section 3.6  Seller's Deliveries ........................................................................6

**ARTICLE IV**

**REPRESENTATIONS AND WARRANTIES OF SELLER**.................8
Section 4.1  Organization of the Companies ...................................................8
Section 4.2  Subsidiaries and Investments.......................................................8
Section 4.3  Authority of Seller .......................................................................8
Section 4.4  Title to Purchased Assets .............................................................8
Section 4.5  Intellectual Property Assets .........................................................8

**ARTICLE V**

**REPRESENTATIONS AND WARRANTIES OF BUYER** .................8
Section 5.1  Organization and Authority of Buyer ..........................................9
Section 5.2  No Finder .....................................................................................9

**ARTICLE VI**

**ACTIONS PRIOR TO THE CLOSING DATE**...................................10
Section 6.1  Information Regarding the Business............................................10

| | | |
|---|---|---|
| Section 6.2 | Contact with Customers, Vendors and Employees | 10 |
| Section 6.3 | Third Party Consents | 10 |
| Section 6.4 | Purchased Deposits | 11 |
| Section 6.5 | Governmental Approvals | 11 |
| Section 6.6 | Certain Intellectual Property Matters | 12 |
| Section 6.7 | Certain Provisions relating to Consents, Cooperation and Adequate Assurance | 13 |
| Section 6.8 | Conduct of Business Prior to the Closing Date | 13 |
| Section 6.9 | Notification of Breach; Disclosure | 13 |
| Section 6.10 | Insurance | 13 |
| Section 6.11 | Bankruptcy Matters; Bidding Process | 13 |
| Section 6.12 | Best Efforts | 14 |
| Section 6.13 | Bidding Procedures Order | 15 |
| Section 6.14 | Takeover Proposal; Confidential Information | 15 |
| Section 6.15 | DayJet Transaction | 15 |
| Section 6.16 | Access to Premises | 15 |

## ARTICLE VII

| | **ADDITIONAL AGREEMENTS** | **15** |
|---|---|---|
| Section 7.1 | Taxes | 15 |
| Section 7.2 | No Successor Liability to Employees | 17 |
| Section 7.3 | Employment | 17 |
| Section 7.4 | Collection of Receivables | 18 |
| Section 7.5 | Adequate Assurances Regarding Assumed Contracts and Assumed Leases | 18 |
| Section 7.6 | Certifications | 18 |
| Section 7.7 | Certain Actions | 19 |
| Section 7.8 | Substitution of Parties | 19 |
| Section 7.9 | Cure Amounts | 19 |
| Section 7.10 | Reasonable Access to Records and Certain Personnel | 19 |
| Section 7.11 | Deposit | 20 |
| Section 7.12 | Seller Post-Closing Obligations | 20 |

## ARTICLE VIII

| | **CONDITIONS TO CLOSING** | **20** |
|---|---|---|
| Section 8.1 | Conditions to Obligations of Each Party | 20 |
| Section 8.2 | Conditions to Obligations of Buyer | 20 |
| Section 8.3 | Conditions to Obligations of Seller | 21 |

## ARTICLE IX

| | **TERMINATION** | **22** |
|---|---|---|
| Section 9.1 | Termination | 22 |
| Section 9.2 | Effect of Termination | 23 |

**ARTICLE X**

**INDEMNIFICATION** ...................................................................**24**

Section 10.1    No Survival of Representations, Warranties, Covenants and
Agreements ...........................................................................24

**ARTICLE XI**

**GENERAL PROVISIONS** .......................................................**24**

Section 11.1    Confidential Nature of Information ....................................24

Section 11.2    No Public Announcement ....................................................25

Section 11.3    Notices ................................................................................25

Section 11.4    Successors and Assigns .....................................................26

Section 11.5    Entire Agreement; Amendments; Disclosure Schedules ..........27

Section 11.6    Waivers .............................................................................27

Section 11.7    Expenses ...........................................................................27

Section 11.8    Partial Invalidity ...............................................................27

Section 11.9    Execution in Counterparts ..................................................27

Section 11.10   Governing Law and Dispute Resolution ...............................28

Section 11.11   No Third Party Beneficiaries ..............................................28

# ASSET PURCHASE AGREEMENT

This **ASSET PURCHASE AGREEMENT** (this "Agreement") dated July 30, 2009 (the "Effective Date"), by and among Jeoffrey L. Burtch as the duly appointed Chapter 7 trustee of the Chapter 7 estates of each of Eclipse Aviation Corporation ("Eclipse") and Eclipse IRB Sunport, LLC ("Eclipse LLC"), and not in his personal capacity ("Seller" or "Trustee") and Eclipse Aerospace, Inc., a Delaware corporation ("Buyer"). Capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in Annex 1.

**WHEREAS,** Eclipse and Eclipse LLC were formerly engaged primarily in (i) the design, production and sale of very light jet aircraft ("VLJs") and (ii) the support of the VLJs including training, maintenance, flight and data services and other product support (the "Business");

**WHEREAS,** each of Eclipse and Eclipse LLC (collectively, the "Companies") have filed voluntary petitions commencing Chapter 11 Bankruptcy Cases (hereinafter, the "Bankruptcy Cases") pursuant to Title 11 of United States Code, 11 U.S.C. Sections 101 et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), the date such petitions are filed the "Petition Date," which cases have been converted to Chapter 7 Bankruptcy Cases;

**WHEREAS,** Jeoffrey L. Burtch has been appointed as the trustee for each of Eclipse and Eclipse LLC in the Chapter 7 Bankruptcy Cases;

**WHEREAS,** Seller desires to sell the Purchased Assets to Buyer and Buyer desires to purchase from Seller the Purchased Assets and assume the Assumed Liabilities, upon the terms and conditions hereinafter set forth;

**WHEREAS,** the Parties intend to effectuate the transactions contemplated by this Agreement through a sale of the Purchased Assets pursuant to section 363 of the Bankruptcy Code; and

**WHEREAS,** the execution and delivery of this Agreement and Seller's ability to consummate the transactions set forth in this Agreement are subject, among other things, to the entry of the Sale Order.

**NOW, THEREFORE,** in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, the Parties agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.1     Definitional and Interpretive Matters.  Unless otherwise expressly

provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(a) <u>Calculation of Time Period</u>. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day. A "<u>Business Day</u>" means any day other than a Saturday, a Sunday or a day on which banks in New York City are required or authorized to close.

(b) <u>Dollars</u>. Any reference in this Agreement to $ shall mean U.S. dollars.

(c) <u>Exhibits/Schedules</u>. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in <u>Annex 1</u>.

(d) <u>Gender and Number</u>. Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(e) <u>Headings</u>. The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

(f) <u>Herein</u>. The words such as "herein," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires. References to the "date hereof" are to the Effective Date.

(g) <u>Including</u>. The word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(h) <u>No Strict Construction</u>. The Parties participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

Section 1.2 <u>Accounting Terms and Determinations</u>. Unless otherwise specified herein, all accounting terms used herein shall be interpreted, all determinations with respect to accounting matters hereunder shall be made, and all financial statements and certificates and reports as to financial matters required to be furnished hereunder shall be prepared, in accordance with GAAP.

**ARTICLE II**

**PURCHASE AND SALE**

Section 2.1     Purchase and Sale of Purchased Assets.

(a)     On the terms and subject to the conditions set forth in this Agreement, at the Closing (and on the applicable Assumption Date with respect to Purchased Assets consisting of rights under any Designated Contract assumed by Seller and assigned to Buyer after the Closing Date as provided herein), Buyer shall purchase from Seller, and Seller shall sell, transfer, assign, convey and deliver or cause to be sold, transferred, assigned, conveyed and delivered to Buyer, all of the Purchased Assets, free and clear of all Liens and free and clear of all Liabilities (other than the Assumed Liabilities).

(b)     Indivisible Transaction.  The sale of all of the Purchased Assets to Buyer constitutes a single, indivisible transaction and the Purchased Assets are intended to be sold to Buyer as a single, indivisible group of assets.

Section 2.2     Assumption of Liabilities.

(a)     On the terms and subject to the conditions set forth in this Agreement, at the Closing (and on the applicable Assumption Date with respect to Assumed Liabilities under any Designated Contract assumed by a Seller and assigned to Buyer after the Closing Date as provided herein), Buyer shall assume and become responsible for the Assumed Liabilities.

(b)     ANYTHING CONTAINED HEREIN TO THE CONTRARY NOTWITHSTANDING, EXCEPT FOR THE ASSUMED LIABILITIES DESCRIBED IN THIS SECTION 2.2, BUYER SHALL NOT AND BUYER DOES NOT ASSUME ANY LIABILITIES, TAXES, OR OBLIGATIONS (FIXED OR CONTINGENT, KNOWN OR UNKNOWN, MATURED OR UNMATURED) OF THE SELLER OR THE COMPANIES WHETHER OR NOT ARISING OUT OF OR RELATING TO THE ASSETS OR THE BUSINESS OR ANY OTHER BUSINESS OF THE SELLER OR THE COMPANIES, ALL OF WHICH LIABILITIES, TAXES, AND OBLIGATIONS SHALL, AT AND AFTER THE CLOSING, REMAIN THE EXCLUSIVE RESPONSIBILITY OF THE SELLER (AS APPLICABLE).

Section 2.3     Assignments.

(a)     Schedule 2.3 lists all Assumed Contracts and Assumed Leases that Buyer may elect to assume and have Seller assume and assign to Buyer (the "Designated Contracts").  Buyer shall have, except as otherwise provided below with respect to contracts with the City of Albuquerque, until that date which is five (5) business days prior to the date scheduled for hearing on the entry of the Sale Order to designate which of such Contracts it wishes to assume and have the Seller assume and assign to Buyer at Closing (such date being referred to herein as the "Contract Designation Date"); provided that Buyer shall have until thirty (30) days after the Closing to designate any contract identified on Schedule 2.3 with the City of Albuquerque.  In all cases, appropriate additions and deletions to Schedule 2.3 (and

corresponding additions and deletions to <u>Schedule A-1</u> and <u>Schedule A-2</u>) shall be made to reflect such elections made by Buyer. Any amendment to Schedule 2.3 as provided for above, shall be served by Buyer on the parties to the Designated Contracts who have been added to <u>Schedule 2.3</u>.

(b)     With respect to each Designated Contract, on the Closing Date, Seller shall (i) assume such Designated Contract in the Bankruptcy Cases and (ii) subject to Buyer paying any amounts necessary to cure any default under such Designated Contract (the "Cure Costs") and providing adequate assurance of performance to the counterparty thereto to the extent required by the Bankruptcy Court, assign such Designated Contract to Buyer pursuant to an Order of the Bankruptcy Court (which may be the Sale Order). Seller shall provide Buyer with a credit against the Purchase Price by reducing the Cash Consideration in an amount equal to the lesser of (x) $175,000 and (y) the actual amount of Cure Costs attributable to breaches occuring after the Petition Date of the Designated Contracts actually assumed by Buyer. Effective on the Closing Date, or as otherwise provided in Section 2.3(a) with respect to contracts with the City of Albuquerque, Buyer shall assume each such Designated Contract.

(c)     The Sale Order shall provide that, as of the Closing, Seller (as applicable) shall assign to Buyer the Designated Contracts and the Designated Contracts shall be identified by (i) the name and date of the Designated Contracts (if available), (ii) the other party to the Designated Contract, and (iii) the address of such party for notice purposes, all included on an exhibit attached to either the motion filed in connection with the Sale Order or a motion for authority to assume and assign such Designated Contracts or a notice filed pursuant to the Bidding Procedures Order. Such exhibit shall also (A) set forth the amounts necessary to cure any defaults under each of the Designated Contracts as determined by Seller based on the Companies' books and records or as otherwise determined by the Bankruptcy Court, and (B) delineate a procedure for transferring to Buyer the rights to any security deposits in the form of cash or letters of credit on deposit with the other party to any Designated Contract.

(d)     In the case of licenses, certificates, approvals, permits, authorizations, leases, Contracts and other commitments included in the Purchased Assets that cannot be transferred or assigned effectively without the consent of any third party, which consent has not been obtained prior to the Closing (after giving effect to the Sale Order and the Bankruptcy Code), Seller shall, subject to any approval of the Bankruptcy Court that may be required and the terms set forth in <u>Section 6.3</u>, cooperate with Buyer in endeavoring to obtain such consent.

Section 2.4     <u>Further Assurances</u>.

(a)     At the Closing, and at all times thereafter as may be necessary, upon the request of the Buyer, Seller shall execute and deliver (or use his best efforts to have any applicable third party execute and deliver) such instruments of transfer and instruments of release as shall be reasonably necessary to vest in Buyer title to the Purchased Assets free and clear of all Encumbrances, and such other instruments, agreements and documents as shall be reasonably necessary to evidence the assignment by Seller and the assumption by Buyer or its designee of the Assumed Liabilities, including the Assumed Contracts and the Assumed

4

Leases.  Seller and Buyer shall cooperate with one another to execute and deliver such other documents and instruments as may be reasonably required to carry out the transactions contemplated hereby.

(b)     At the Closing, and at all times thereafter as may be necessary, Seller shall, at the reasonable request of Buyer, execute, deliver, and file, or cause to be executed, delivered, and filed by any applicable third party, such other instruments of conveyance, transfer and release and take such other actions as Buyer may reasonably request, in order to more effectively consummate the transactions contemplated by this Agreement and to vest in Buyer title to the Seller Intellectual Property free and clear of all Encumbrances, including, without limitation, executing, filing, and recording, with all appropriate intellectual property registration authorities and other relevant entities, all assignment instruments and other filings that are necessary to correctly record the prior chain of title with respect to ownership of the Seller Intellectual Property.  Any out-of-pocket expenses incurred by Seller pursuant to this Section 2.4 shall be subject to the provisions of Section 7.12.

## ARTICLE III

## PURCHASE PRICE

Section 3.1     Purchase Price.  Subject to the terms and conditions set forth in this Agreement and in reliance upon the representations and warranties of the Parties set forth herein, at the Closing, the aggregate purchase price to be paid by Buyer to the Seller in exchange for the Purchased Assets shall be an amount equal to (i) the Cash Consideration which amount shall be payable as set forth in Section 3.2 below, plus (ii) the Note Consideration (collectively, the "Purchase Price").  The Buyer and Seller agree that the aggregate value of the Purchase Price is $40,000,000.   Upon the entry by the Bankruptcy Court of the Bidding Procedures Order, Buyer shall deposit the amount of $5,000,000 of the Cash Consideration pursuant to the Deposit Escrow Agreement.

Section 3.2     Closing Date Payment; Issuance of Buyer Notes.  At the Closing, Buyer shall (i) pay to Seller or as otherwise provided in the Sale Order wire transfer of immediately available funds to the account(s) designated by Seller, the Cash Purchase Price, plus any amount Buyer is required to credit Seller pursuant to Section 6.4, less  any amount Buyer is entitled to offset pursuant to Section 2.3(b), any amounts pursuant to the last sentence of Section 7.1(b), and the last sentence of Section 7.6, and (ii) issue to the Seller or such other Person or Agent as otherwise provided in the Sale Order, the Notes in an aggregate principal amount equal to the Note Consideration.

Section 3.3     Allocation of Purchase Price.  Buyer shall determine the allocation of the consideration paid by Buyer for the Purchased Assets.  Each party hereto agrees (i) that any such allocation shall be consistent with the requirements of Section 1060 of the Code and the regulations thereunder, (ii) to complete jointly and to file separately Form 8594 with its Federal income Tax Return consistent with such allocation for the tax year in which the Closing Date occurs and (iii) that no party will take a position on any income, transfer or gains Tax Return,

before any Governmental Authority charged with the collection of any such Tax or in any judicial proceeding, that is in any manner inconsistent with the terms of any such allocation without the consent of the other party.

Section 3.4    Closing Date.  Upon the terms and conditions set forth in this Agreement, the closing of the sale of the Purchased Assets and the assumption of the Assumed Liabilities contemplated hereby (the "Closing") shall take place at the offices of Cooch & Taylor P.A., 1000 West Street, Wilmington, Delaware 19801, as promptly as practicable, and at no time later than the fifth Business Day, following the date on which the conditions set forth in Article VIII have been satisfied or waived (other than the conditions which by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), or at such other place or time as Buyer and Seller may mutually agree.  The date and time at which the Closing actually occurs is hereinafter referred to as the "Closing Date."

Section 3.5    Buyer's Deliveries.  At or prior to the Closing, Buyer shall deliver to Seller, in addition to the Cash Purchase Price:

(a)    an assumption and assignment agreement having terms and conditions consistent with this Agreement and otherwise in form and substance reasonably satisfactory to Buyer (the "Assumption and Assignment Agreement") and each other Ancillary Document to which Buyer is a party, duly executed by Buyer;

(b)    the Notes, having an aggregate principal amount of $20,000,000 issued in the name of the Seller or such other Persons as designated by the Seller;

(c)    the certificates required to be delivered pursuant to Sections 8.3(a) and 8.3(b);

(d)    a certificate of an authorized Person of Buyer, dated the Closing Date, in form and substance reasonably satisfactory to Seller, as to (i) Buyer's authorization to execute and perform its obligations under this Agreement and the Ancillary Documents to which Buyer is a party and (ii) incumbency and signatures of the authorized Persons of Buyer executing this Agreement and such Ancillary documents; and

(e)    such other assignments and other good and sufficient instruments of assumption and transfer, in form reasonably satisfactory to Seller, as Seller may reasonably request to transfer and assign the Assumed Liabilities to Buyer.

Section 3.6    Seller's Deliveries.  At or prior to the Closing, Seller shall deliver to Buyer:

(a)    a bill of sale, in form and substance reasonably satisfactory to Buyer (the "Bill of Sale"), the Assumption and Assignment Agreement and each other Ancillary Document to which any of the Companies or Seller is a party, duly executed by Seller;

(b)    instruments of assignment of the Patents, Trademarks, Copyrights and Domain Names that are owned by Seller and included in the Purchased Assets, if any, duly executed by Seller, in form and substance reasonably satisfactory to Buyer and any other assignments or instruments with respect to any Seller Intellectual Property for

which an assignment or instrument is required to assign, transfer and convey such assets to Buyer;

(c)     a certified copy of the Sale Order;

(d)     Seller's certificates required to be delivered pursuant to Sections 8.2(a) and 8.2(b);

(e)     a certificate executed by Seller, in the form prescribed under Treasury Regulation Section 1.1445-2(b), that Seller is not a foreign person within the meaning of Section 1445(f)(3) of the Code;

(f)     to the extent approved by the Sale Order, instruments of assumption and assignment of the Assumed Leases in form and substance reasonably satisfactory to Buyer (the "Assumption and Assignment of Leases"), duly executed by Seller, in form for recordation with the appropriate public land records, if necessary, and any other related documentation or instruments with respect to any Assumed Lease reasonably requested by Buyer;

(g)     to the extent in Seller's possession: (i) all lease files for the Assumed Leases (including copies of any plans of the Leased Real Property), and (ii) keys for the Leased Real Property, the combination of any safes located in the Leased Real Property, and the access codes for any electronic security system located at the Leased Real Property, in each case, in respect of the Assumed Leases;

(h)     an executed security agreement and intercreditor agreement with respect to the Notes in a form to be agreed to among the Buyer and the holders of a majority in principal amount of the Prior Notes on or before a date which is at least two (2) days prior to the entry of the Bidding Procedures Order.

(i)     a certificate of Seller, dated the Closing Date, in form and substance reasonably satisfactory to Buyer, as to Seller's authorization to execute and perform his obligations under this Agreement and the Ancillary Documents to which Seller or the Companies is a party;

(j)     all instruments and documents necessary to release (or evidence the release of) any and all Encumbrances, including, without limitation, appropriate UCC financing statement amendments (termination statements), mortgage release instruments and certificates of title;

(k)     such other bills of sale, deeds, endorsements, assignments and other good and sufficient instruments of conveyance and transfer, in form reasonably satisfactory to Buyer, as Buyer may reasonably request to vest in Buyer all the right, title and interest of Seller in, to or under any or all the Purchased Assets; and

(l)     all other documents required to be entered into by the Seller pursuant to this Agreement or reasonably requested by the Buyer to convey the Purchased Assets to Buyer or to otherwise consummate the transactions contemplated by this Agreement.

# ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF SELLER

As an inducement to Buyer to enter into this Agreement and to consummate the transactions contemplated hereby, Seller represents and warrants to Buyer as of the date hereof and as of the Closing Date as follows:

Section 4.1    Intentionally Omitted.

Section 4.2    Subsidiaries and Investments.  Except as set forth on Schedule 4.2, each of the Companies do not, directly or indirectly, own, of record or beneficially, any outstanding voting securities, membership interests or other equity interests in any Person.

Section 4.3    Authority of Seller.  Seller has full power and authority to execute, deliver and, subject to the entry of the Sale Order, perform his obligations under, and consummate the transactions contemplated by, this Agreement and each of the Ancillary Documents to which Seller is a party.  This Agreement, subject to the entry of the Sale Order, is the legal, valid and binding obligation of Seller enforceable in accordance with its terms, and each of the Ancillary Documents to which Seller is a party has been duly authorized by Seller and upon execution and delivery by Seller and subject to the entry of the Sale Order, will be a legal, valid and binding obligation of Seller enforceable in accordance with its terms in each case.

Section 4.4    Title to Purchased Assets.  Seller has, and, upon delivery to Buyer on the Closing Date of the instruments of transfer contemplated by Section 3.6, and subject to the terms of the Sale Order, Seller will thereby transfer to Buyer, good and valid title to, or, in the case of property leased or licensed by Seller, a valid and subsisting leasehold interest in or a legal, valid and enforceable licensed interest in or right to use, all of the material Purchased Assets (other than any Non-Transferable Agreement), free and clear of all Encumbrances, except for the Assumed Liabilities and Permitted Liens.

Section 4.5    Intellectual Property Assets.  Seller has listed on Schedule 4.5, all of Seller's Intellectual Property that is subject to registration with the United States Patent and Trademark Office or any foreign patent or trademark agency.

# ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF BUYER

As an inducement to Seller to enter into this Agreement and to consummate the transactions contemplated hereby, Buyer hereby represents and warrants to Seller as of the date hereof and as of the Closing Date as follows:

Section 5.1    Organization and Authority of Buyer.

(a)    Buyer is a Delaware corporation, duly organized, validly existing and in good standing under the laws of the State of Delaware.  Buyer has full corporate power and authority to execute, deliver and perform its obligations under this Agreement and all of the Ancillary Documents to which it is a party.  The execution, delivery and performance of this Agreement and such Ancillary Documents by Buyer have been duly authorized and approved by Buyer's board of directors and do not require any further authorization or consent of Buyer or any stockholder.  This Agreement has been duly authorized, executed and delivered by Buyer and is the legal, valid and binding agreement of Buyer enforceable against Buyer in accordance with its terms, and each Ancillary Document to which Buyer is a party has been duly authorized by Buyer and upon execution and delivery by Buyer will be a legal, valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms, except as (i) enforceability may be limited by bankruptcy, insolvency, reorganization or other similar laws affecting creditors rights generally and (ii) the remedy of specific performance and injunctive and other forms of equitable relief may be subject to equitable defenses.

(b)    Subject to the receipt of the Required Consents, neither the execution and delivery of this Agreement or any of such Ancillary Documents or the consummation of any of the transactions contemplated hereby or thereby nor compliance with or fulfillment of the terms, conditions and provisions hereof or thereof will:

(i)    conflict with, result in a breach of the terms, conditions or provisions of, or constitute a default, or an event of default under (1) Buyer's certificate of incorporation or bylaws, (2) any Order to which Buyer is a party or by which it is bound or (3) any Legal Requirement affecting Buyer; or

(ii)    require the approval, consent, authorization or act of, or the making by Buyer of any declaration, filing or registration with Committee on Foreign Investment in the United States (CFIUS), or any Person, other than filings with the Bankruptcy Court or under the HSR Act or other anti-trust or competition laws.

Section 5.2    No Finder.  Except as set forth on Schedule 5.2, neither Buyer nor any Person acting on its behalf has paid or become obligated to pay any fee or commission to any broker, finder or intermediary for or on account of the transactions contemplated by this Agreement for which any Seller is or will become liable, and Buyer shall hold harmless and indemnify Seller from any claims with respect to any such fees or commissions.

Section 5.3    Financing.  Buyer has provided Seller with information concerning financing necessary to fund the Purchase Price.  Buyer does not have any reason to believe that such financing will not be available at Closing.

# ARTICLE VI

## ACTIONS PRIOR TO THE CLOSING DATE

The Parties, as applicable to the extent set forth below, covenant and agree to take the following actions between the date hereof and the earlier of the termination of this Agreement and the Closing Date:

Section 6.1    Information Regarding the Business.    In connection with consummating the transactions contemplated herein, Seller will, to the extent practicable (a) provide Buyer and its officers, employees, counsel, accountants, partners, affiliates, financial advisors, consultants and other representatives (collectively, "Representatives") with full access, upon reasonable prior notice and during normal business hours, to the offices and properties of the Companies, (b) furnish Buyer and its Representatives with such information and data not contained in the Data Room (including without limitation copies of Contracts, licenses, personal property Leases and other books and records) concerning the former Business, the Purchased Assets and the Assumed Liabilities as Buyer or any of its Representatives may reasonably request in connection with such investigation, except to the extent that furnishing any such information or data would violate any Law, Order, Contract or license applicable to Seller or by which any of the assets and properties is bound, and permit Buyer and its authorized Representatives to make copies of such materials at the sole expense of the Buyer or its authorized Representatives as those Representatives reasonably request relating to the Former Business, the Purchased Assets and the Assumed Liabilities, (c) furnish or make available to Buyer or its authorized Representatives such additional information concerning the Purchased Assets, the Former Business and the Assumed Liabilities as shall be reasonably requested by Buyer or its authorized Representatives and (d) use commercially reasonable efforts to cause his outside counsel and any other professional representatives of the Trustee to cooperate with Buyer in its consummation of the transactions.  Nothing in this Agreement shall give the Buyer any rights of access to Design Information until upon and after the Closing.  Buyer agrees that all Representatives are within the scope of and covered by the Non-Disclosure Agreement executed by Mason Holland for Eclipse Aerospace on June 30, 2009.

Section 6.2    Contact with Customers, Vendors and Employees.    Subject to applicable Law, Seller shall use its commercially reasonable efforts to facilitate Buyer's contact and communication with employees of the Companies, and customers, suppliers, vendors and distributors of the Business of the Companies to the extent agreed to by Seller, as requested by Buyer at any time from and after the execution of this Agreement, provided, however, that nothing herein shall be construed to permit or require any communication in violation of any contract or agreement with an employee.  All such contact and communication will be requested through, and arranged by, the Seller, or Seller's agent, to be designated in writing to Buyer.

Section 6.3    Third Party Consents.  Seller shall use his commercially reasonable efforts to obtain all Third Party Consents; provided, that Seller shall not be required to pay or commit to pay any amount to (or incur any obligation in favor of) any person from whom any such consent may be required (other than nominal filing or application fees).

Section 6.4    <u>Purchased Deposits</u>.  Seller will take all commercially reasonable steps necessary to transfer to Buyer on the Closing Date all of Seller's right, title and interest in and to the Purchased Deposits. The Buyer shall pay to Seller at Closing on behalf of the Chapter 7 Estates the cash value of the Purchased Deposits.

Section 6.5    <u>Governmental Approvals</u>.

(a)    During the period prior to the Closing Date, Seller and Buyer shall act diligently and reasonably, and shall cooperate with each other, to do or cause to be done, all things necessary, proper or advisable consistent with applicable confidentiality and Legal Requirements to cause the conditions precedent to the Closing to be satisfied and to cause the Closing to occur, including to secure any consents and approvals of any governmental authority required to be obtained by them under non-United States antitrust or competition laws, in order to assign or transfer any Permits to Buyer, to permit the consummation of the transactions contemplated by this Agreement, or to otherwise satisfy the conditions set forth in <u>Article VIII</u>, in each case as necessary to the extent such consents are not provided for or satisfied by the Sale Order; <u>provided</u>, <u>however</u>, that Seller shall not make any agreement or understanding affecting the Purchased Assets or the Business (excluding the Excluded Assets or Excluded Liabilities) as a condition for obtaining any such consents or approvals except with the prior written consent of Buyer.  Subject to the limitations set forth in this <u>Section 6.5</u>, Buyer shall act diligently and reasonably to cooperate with Seller, to the extent commercially reasonable, to obtain the consents and approvals contemplated by this <u>Section 6.5(a)</u>; <u>provided</u>, <u>however</u>, Buyer shall not be required to waive any of the conditions to Closing set forth in <u>Article VIII</u>.

(b)    Subject to all applicable confidentiality and Legal Requirements, each Seller and Buyer (i) shall promptly inform each other of any communication from any Governmental Authority concerning this Agreement, the transactions contemplated hereby, and any filing, notification or request for approval and (ii) shall permit the other Party to review in advance any proposed written communication or information submitted to any such Governmental Authority in response thereto; <u>provided</u>, <u>however</u>, that no Party shall be required to provide any other Party with copies of confidential documents or information included in any filings and submissions, and <u>provided</u>, <u>further</u>, that a Party may request entry into a joint defense agreement as a condition to providing any such materials and that, upon receipt of that request, the Parties shall work in good faith to enter into a joint defense agreement to create and preserve attorney-client privilege in a form and substance mutually acceptable to the Parties.  In addition, none of the Parties shall agree to participate in any meeting with any Governmental Authority in respect of any filings, investigation or other inquiry with respect to this Agreement or the transactions contemplated hereby, unless such Party consults with the other Parties in advance and, to the extent permitted by any such Governmental Authority, gives the other Parties the opportunity to attend and participate threat, in each case to the maximum extent practicable.  Subject to any restrictions under applicable laws, rules or regulations, each Party shall furnish the other with copies of all correspondence, filings and communications (and memoranda setting forth the substance thereof) between it and its Affiliates and their respective Representatives on the one hand, and the Governmental Authority or members of its staff on the other hand, with respect to this Agreement, the transactions contemplated hereby (excluding documents and communications

which are subject to preexisting confidentiality agreements or to the attorney-client privilege or work product doctrine) or any such filing, notification or request for approval. Each Party shall also furnish the other Party with such necessary information and assistance as such other party and its Affiliates may reasonably request in connection with their preparation of necessary filings, registration or submissions of information to the Governmental Authority in connection with this Agreement, the transactions contemplated hereby and any such filing, notification or request for approval. Seller and Buyer shall prosecute all required requests for approval with all necessary diligence and otherwise use their respective commercially reasonable efforts to obtain the grant thereof by an Order as soon as possible.

(c)     Notwithstanding anything else to the contrary in this Agreement, in the event that any administrative or judicial action or proceeding is instituted (or threatened to be instituted) by a Governmental Authority or private party challenging the transactions hereunder or any other agreement contemplated hereby, (i) each Party shall cooperate in all respects with each other and use its respective best efforts to contest and resist any such action or proceeding and to have vacated, lifted, reversed or overturned any decree, judgment, injunction or other order, whether temporary, preliminary or permanent, that is in effect and that prohibits, prevents or restricts consummation of the transactions contemplated by this Agreement, and (ii) Buyer must defend, at its sole cost and expense, any action or actions, whether judicial or administrative, in connection with the transactions contemplated by this Agreement. Notwithstanding the foregoing, in no event shall Buyer be required to divest any of the Purchased Assets in order to comply with this Section 6.5(c).

Section 6.6     Certain Intellectual Property Matters.  Seller covenants and agrees to authorize Buyer, at Buyer's expense and with Seller's full cooperation, to take all actions useful or necessary, to assist with the transfer, assignment, full cooperation, in regard to the Seller Intellectual Property as soon as practicable following the Closing Date:

(a)  the Australian trademarks (Registration Nos. 890219 and 890220) shall have been assigned to the Companies or to Seller from 5 Star Hill Holdings PTY LTD;

(b)  the Japanese patent (Registration No. 3868500) shall have been assigned to the Companies or to Seller from Hunting Research and Engineering;

(c)  the European patent (Registration No. EP0932432) shall have been assigned to the Companies or to Seller in Germany, France, the United Kingdom, the Netherlands, Belgium and Switzerland;

(d)  the outstanding security interests on United States patents (Registration Nos. 5,957,405; 6,089,504; 6,199,795; 6,170,780; 7,225,966; and 2006/0273223) shall have been released by the appropriate termination statement under the Uniform Commercial Code; and

(e)  the United States patent applications (Application Nos. 11/427,783; 11/456,548 and 11/929,743) shall have been assigned to the Companies or to Seller.

Seller shall be responsible for paying all maintenance fees and annuity payments related to foreign patents through August 31, 2009.

Section 6.7     Certain Provisions relating to Consents, Cooperation and Adequate Assurance.  Seller shall use commercially reasonable efforts prior to and after the Closing Date to obtain all consents of Governmental Agencies and counterparties to Contracts and Leases that Buyer has designated as Assumed Contracts or Assumed Leases that are required in connection with the transactions contemplated by this Agreement; provided, however, that Seller shall not be obligated to offer or to pay any consideration or grant any financial accommodation in connection therewith.

Section 6.8     Conduct of Business Prior to the Closing Date. To the extent permitted or required by the Bankruptcy Cases, and consistent with the availability of the Employees, Seller shall use commercially reasonable efforts to (i) maintain the Purchased Assets and the assets and properties of, or used by, the Seller relating to the Business in their current condition (ordinary wear and tear excepted), and (ii) maintain the Documents of the Business. In connection therewith, the Seller shall not terminate any Employee without notice to the Buyer. or cancel, terminate or amend any Assumed Contract.

Section 6.9     Notification of Breach; Disclosure.  Each Party shall promptly notify the other of any event, condition or circumstance of which such Party becomes aware prior to the Closing Date that would cause, or would reasonably be expected to cause, a violation or breach of this Agreement (or a breach of any representation or warranty contained in this Agreement).  During the period prior to the Closing Date, each Party will promptly advise the other in writing of any written notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement.  It is acknowledged and understood that no notice given pursuant to this Section 6.9 shall have any effect on the representations, warranties, covenants or agreements contained in this Agreement for purposes of determining satisfaction of the conditions contained herein.

Section 6.10     Insurance.   Until the Closing, Seller shall maintain (including necessary renewals thereof) Insurance Policies against risk and liabilities to the extent and in the manner and at the levels maintained by Seller as of the date hereof with respect to the Business and the Purchased Assets.  If requested by Buyer, Seller shall in good faith cooperate with Buyer and take all actions reasonably requested by Buyer that are necessary or desirable to permit Buyer to have available to it following the Closing the benefits (whether direct or indirect) of the insurance policies maintained by or on behalf of Seller with respect to the Business, the Purchased Assets or the Assumed Liabilities that are currently in force and in the manner and at the levels maintained by Seller as of the date hereof, including, but not limited to, taking those actions which may be necessary to assign the Insurance Policies to Buyer.

Section 6.11     Bankruptcy Matters; Bidding Process.

(a)     Seller and Buyer acknowledge that this Agreement and the sale of the Purchased Assets are subject to Bankruptcy Court approval.  Seller and Buyer acknowledge that (i) to obtain such approval, Seller must demonstrate that they have taken reasonable steps to obtain the highest or otherwise best offer possible for the Purchased Assets, including, but not limited to, giving notice of the transactions contemplated by this Agreement to creditors and certain other interested parties as ordered by the Bankruptcy Court, and conducting an

auction in respect of the Purchased Assets (the "<u>Auction</u>"), and (ii) Buyer must pay the Cure Costs and cure all defaults and provide adequate assurance of future performance under the Designated Contracts.

(b)     Seller has filed or will promptly file with the Bankruptcy Court a motion (the "<u>Sale Motion</u>"), notices and proposed orders, to the extent amended as of the date hereof each in form and substance reasonably satisfactory to Buyer seeking the Bankruptcy Court's issuance of:

(i)     the bidding procedures Order attached hereto as <u>Exhibit A</u> (the "<u>Bidding Procedures Order</u>"); and

(ii)     the sale Order attached hereto as <u>Exhibit B</u> (the "<u>Sale Order</u>").

(c)     Seller shall serve a copy of the Sale Motion on: (i) all entities known to assert any interest in or lien upon the Purchased Assets; (ii) all parties to Designated Contracts; (iii) all parties that are entitled to notice under Bankruptcy Rule 2002; (iv) the attorneys general of all states in which the Purchased Assets are located; (v) the Office of the United States Trustee; (vi) the Securities and Exchange Commission; (vii) the Internal Revenue Service and any governmental taxing authority that has filed a claim against the Chapter 7 Estates; (viii) all entities that expressed to the Seller an interest in purchasing the Purchased Assets; (ix) any party appearing in the Bankruptcy Cases and claiming a secured interest in the Purchased Assets; or any party known to the Seller and claiming a secured interest in the Purchased Assets; and (x) any and all other parties directed by the Court.

(d)     Seller shall use his reasonable best efforts to provide Buyer with copies of all motions, applications and supporting papers prepared by or on behalf of the Seller (including forms of orders and notices to interested parties) directly relating to the Purchased Assets or this Agreement at least two (2) Business Days, unless the exigencies of time prevent the period from being that long, prior to the filing thereof in the Bankruptcy Cases so as to allow Buyer to provide reasonable comments for incorporation into same; except that the Sale Motion (including forms of orders and notices to interested parties) shall be provided to Buyer at least three (3) Business Days prior to its filing.

Section 6.12     <u>Best Efforts</u>.  Upon the terms and subject to the conditions of this Agreement, each of the Parties hereto shall use its best efforts to take, or cause to be taken, all action, and to do, or cause to be done, all things necessary, proper or advisable consistent with applicable Legal Requirements to consummate and make effective in the most expeditious manner practicable the transactions contemplated hereby.  Without limiting the foregoing, Seller shall not voluntarily dismiss the Bankruptcy Cases and shall use his reasonable best efforts to:

(a)     obtain the Bidding Procedures Order on or before ___, 2009;

(b)     obtain the Sale Order on or prior to, August __, 2009 and, upon entry, cause it not to be (i) vacated, stayed or reversed or (ii) (except with the express written consent of the Buyer, or as would not be adverse to Buyer in any material respect) amended, supplemented or otherwise modified; and

(c)    subject to the fiduciary duties of the Trustee, prevent the dismissal of the Bankruptcy Cases.

Section 6.13    <u>Bidding Procedures Order</u>.  Seller agrees to comply (and cause his Representatives to comply) with each of the procedures, terms, conditions and provisions set forth in the Bidding Procedures Order.

Section 6.14    <u>Takeover Proposal; Confidential Information</u>.

(a)    Seller shall not furnish information concerning their business, properties or assets to any Third Party, except pursuant to a confidentiality agreement with terms and conditions no less restrictive than those contained in the Confidentiality Agreement between the parties.  Seller shall not release any Third Party from, or waive any provision of, any such confidentiality agreement or any similar confidentiality or standstill agreement to which any Seller is a party.  To the extent that this <u>Section 6.14</u> conflicts with the Bidding Procedures Order, the Bidding Procedures Order shall govern.

(b)    Seller shall promptly (and in any event within one (1) Business Day) notify Buyer in writing at such time as any Takeover Proposal has been determined to be a Qualified Bid.

Section 6.15    <u>DayJet Transaction</u>.  Seller agrees that upon the Closing, Buyer shall have acquired all of the Seller's right, title and interest in the DayJet aircraft and any and all obligations from DayJet Leasing LLC and or its affiliates and no further or additional consideration shall be due Seller on account of such interest.

Section 6.16    <u>Access to Premises</u>.  Seller shall before and after the Closing Date, use its reasonable efforts to take those steps necessary to permit Buyer to have access to all property, buildings and facilities at which the Purchased Assets are located, including, but not limited to, any locations subject to leases which Buyer may elect not to assume, for purposes of Buyer's taking possession of the Purchased Assets under this Agreement.


# ARTICLE VII

## ADDITIONAL AGREEMENTS

Section 7.1    <u>Taxes</u>.

(a)    Seller shall be liable for and shall pay, and pursuant to <u>Section 7.1(c)</u> shall reimburse Buyer for, all Taxes (whether assessed or unassessed) applicable to the Business and the Purchased Assets, in each case attributable to periods (or portions of Straddle Periods) ending on or prior to the Closing Date.  Buyer shall be liable for and shall pay all Taxes (whether assessed or unassessed) applicable to the Business, the Purchased Assets and the Assumed Liabilities, in each case attributable to periods (or portions of Straddle Periods) beginning after the Closing Date.  For purposes of this paragraph (a), any period beginning before and ending after the Closing Date (a "<u>Straddle Period</u>") shall be treated as two partial

periods, one ending on the Closing Date and the other beginning on the day after the Closing Date and items of income, gain, deduction, loss or credit, and state and local apportionment factors for the Straddle Period shall be allocated between such two partial periods on a "closing of the books basis" by assuming that the books of the Person subject to such Tax were closed at the close of the day on the Closing Date, provided, however, that exemptions, allowances or deductions that are calculated on an annual basis (such as the deduction for depreciation), and Taxes (such as property Taxes) imposed on a periodic basis shall be allocated on a daily basis.

(b)     Without limiting the other terms set forth in this Agreement, any sales Tax, use Tax, real property transfer or gains Tax, real property records recordation fees, documentary stamp Tax or similar Tax attributable to the sale or transfer of the Purchased Assets and not exempted under the Sale Order  ("Transfer Taxes") shall be borne by Buyer. Seller and Buyer shall use reasonable efforts and cooperate in good faith to exempt the sale and transfer of the Purchased Assets from any such Transfer Taxes.  Buyer shall be entitled to offset against the Cash Consideration 50% of the amount of Transfer Taxes actually paid by Buyer.

(c)     In the event that any Party pays the Tax that is the responsibility of the other Party in accordance with the terms of this Section 7.1, such responsible Party shall provide reimbursement to the paying Party for such Tax.  Within a reasonable time prior to the payment of any such Tax, the Party that is to pay such Tax shall give notice to the other Party of the Tax payable and its liability therefor, although failure to do so will not relieve the Party responsible for the Tax under this Section 7.1 from its liability hereunder.

(d)     Buyer and Seller agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Business and the Purchased Assets (including access to books and records) as is reasonably necessary for the filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any taxing authority, and the prosecution or defense of any claim, suit or proceeding relating to any Tax.  Buyer and Seller shall retain all books and records with respect to Taxes pertaining to the Purchased Assets for a period of at least six years following the Closing Date.  On or after the end of such period, each party shall provide the other with at least 10 days prior written notice before destroying any such books and records, during which period the party receiving such notice can elect to take possession, at its own expense, of such books and records.  Seller and Buyer shall cooperate with each other in the conduct of any audit or other proceeding relating to Taxes involving the Purchased Assets or the Business.

(e)     Seller shall use all commercially reasonable efforts to obtain certificates, releases or other appropriate documentation from all Governmental Agencies that may seek to collect property Taxes or impose on Seller, Buyer or any Purchased Assets penalties for any property Taxes, to the extent such Governmental Agencies provide such certificates, releases or documentation in the ordinary course, providing that such property Taxes have been paid or are not owed.

Section 7.2     No Successor Liability to Employees. Under no circumstances shall Buyer assume or be obligated to pay, and the Purchased Assets shall not be or become liable for or subject to, any claims of or liabilities of the Companies' Employees, including but not limited to, any claims or liabilities related to employment practices, COBRA, equal employment opportunity, nondiscrimination, harassment, wrongful termination, breach of contract, immigration, wage and hour laws, any other state, federal or local labor and employment laws, liability under the WARN Act, salaries, vacations, sick pay, incentives, severance pay, bonus, overtime, meal period, pension profit sharing retirement and/or deferred compensation and any other compensation or benefits (the "Employee Claims"), which Employee Claims shall be and remain the liability, responsibility and obligation (if any) of Seller and the Chapter 7 Estates.

Section 7.3     Employment.

(a)     Buyer may (but shall not be required to), in its sole and absolute discretion, offer employment to any and all individuals employed, or formerly employed, by Seller or the Companies in connection with the Business as of the Closing Date to commence immediately following the Closing, each such offer contingent upon the issuance of the Sale Order of the Bankruptcy Court and the Closing.  Buyer's employment of any individuals previously employed by Seller or the Companies shall be on an "at will" basis and on such other terms and conditions of employment as Buyer shall offer in its sole discretion.  Except as otherwise agreed to in writing, Buyer shall be under no obligation to employ or continue to employ any individual for any period.  The employees who accept Buyer's offer of employment and who commence employment with Buyer from and after the Closing Date shall be referred to herein as the "Hired Employees."  Under no circumstance shall any individual employed or formerly employed by Seller or the Companies become an employee of Buyer unless such individual becomes a Hired Employee.

(b)     With respect to each Hired Employee, Seller hereby waives and releases each such individual from any and all contractual, common law or other restrictions enforceable by Seller on the employment, activities or other conduct of such individuals after their termination of employment with Seller; provided, however, that Seller shall assign to Buyer Seller's rights to all obligations of each Hired Employee not to disclose confidential information relating to the Business and all obligations not to compete with the Business owed to Seller by such Hired Employee.

(c)     Except as expressly provided herein, nothing herein shall be construed as transferring to Buyer (i) any Contract or agreement with any current of former employee of the Companies or for the employment of any Person or engagement of any independent contractor by Seller or (ii) any rights or obligation Seller or the Companies may owe to or be owed by any current or former employee, officer, director, consultant, independent contractor or agent of the Companies.

(d)     Nothing herein, express or implied, shall confer upon any employee or former employee of the Companies any rights or remedies (including any right to employment or continued employment for any specific period) of any nature or kind whatsoever, under or by reason of this Agreement. Buyer and Seller agree that the provisions contained herein are

not intended to be for the benefit of or otherwise be enforceable by, any third party, including any employee or former employee of the Companies.

(e)     Buyer shall have no obligation to pay any severance obligation of any Employee or former Employee of the Companies, irrespective of whether such individual becomes a Hired Employee, and any such obligations remain obligations of the Seller or Chapter 7 Estates.

(f)     Subject to Section 7.3(h), nothing contained in this Agreement shall be construed to require, or prevent the termination of, employment of any individual, require minimum benefit or compensation levels or prevent any change in the employee benefits provided to any individual Employee.  No provision of this Agreement shall create any third party beneficiary rights in any employee or former employee of the Companies or any other Persons or entities (including any beneficiary or dependent thereof), in respect of continued employment (or resumed employment) for any specified period of any nature or kind whatsoever.

(g)     Within ten Business Days of the date hereof, Seller shall deliver to Buyer a list of all of the Employees of the Companies or Seller together with the particulars of the date of commencement of employment or service, periods of continuous employment or service, job description or grade, and holiday entitlements.

Section 7.4     Collection of Receivable.  If, after the Closing Date, Seller shall receive payment from any account debtor with respect to any Accounts Receivable included in the Purchased Assets, Seller shall promptly thereafter deliver such funds and assets to Buyer.

Section 7.5     Adequate Assurances Regarding Assumed Contracts and Assumed Leases.  With respect to each Assumed Contract and each Assumed Lease, Buyer will use commercially reasonable efforts to cure all defaults and provide adequate assurance as required under the Bankruptcy Code of the future performance by Buyer of each such Assumed Contract and Assumed Lease and will pay all Cure Costs necessary to cure any defaults.  Buyer and Seller agree that they will promptly take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that all defaults have been cured and there has been an adequate demonstration of adequate assurance of future performance under the Assumed Contracts and the Assumed Leases, such as furnishing affidavits, non-confidential financial information or other documents or information for filing with the Bankruptcy Court and making Buyer's and Seller's employees and representatives available to testify before the Bankruptcy Court.

Section 7.6     Certifications.  Prior to the Closing Date, Seller shall cooperate with and provide reasonable assistance to the Buyer in connection with the Buyer's negotiation with (i) all EASA authorities, employees, officials and personnel to transfer to Buyer the Eclipse EASA Certificate and (ii) all FAA authorities, employees, officials and personnel to transfer to Buyer the Eclipse Type Certificate.  Seller shall use its reasonable efforts to maintain the EASA certificate until the date of Closing; provided that Seller shall not be obligated to pay any amounts or incur any obligations. Buyer shall be entitled to offset against the Cash Purchase Price at the Closing any and all fees due to EASA.

Section 7.7    Certain Actions.  As soon as practicable following the Closing Date, the Seller shall take such corporate and other actions necessary to change the names of the Companies with respect to the Bankruptcy Cases, to names that are not similar to, or confusing with, the current names of the Companies.  In connection with enabling Buyer, at or as soon as practicable after the Closing Date, to use the current corporate names of each of the Companies, the Seller shall execute and deliver to Buyer all consents related to such change of name as may be requested by Buyer, and will otherwise cooperate with Buyer in effecting such name change as soon as is practicable before or after the Closing.  Within ten (10) days after Closing, and at Buyer's expense, Seller shall file in all jurisdictions in which the Companies are qualified to do business any documents necessary to reflect such change of name or to terminate their qualification therein.

Section 7.8    Substitution of Parties.  As soon as practicable following the Closing Date, the Seller shall take such actions as necessary to substitute the Buyer in place of the Seller or, as appropriate, to allow Buyer to intervene, in the adversary proceedings described on Schedule 7.8 (the "WIP Adversary Proceedings") and the adversary proceeding styled Opinicus Corporation v. Jeoffrey L. Burtch et al Adversary Proceeding No. 09-50406-MFW and pursuant to the terms of this Agreement shall assign to Buyer any and all rights, defenses, cause of actions, claims or other interests in these proceedings, against the parties to these proceedings and the property which is the subject of those proceedings, provided, however, that Buyer's liability pursuant to these proceedings shall be strictly limited to any liability which is included in Assumed Liabilities and shall not include, to the extent applicable, any claims against Seller, the Companies or the Chapter 7 Estate for (a) specific performance or (b) any monetary claims of any kind or nature, including but not limited to, any claims to deposits or segregated funds.

Section 7.9    Cure Amounts.  Set forth on Schedule 2.3 is a list of the costs that pursuant to Bankruptcy Code Section 365(b) will be required to cure any default on the part of the Seller under the Designated Contracts, which costs must be delivered to the nondebtor under the Designated Contracts, or with respect to which adequate assurance of prompt delivery by such Seller must be provided as a prerequisite to the assumption of such Designated Contracts under Bankruptcy Code Section 365(a) (the "Cure Costs").  Appropriate additions and deletions shall be made to Schedule 2.3, and the Cure Costs shall be correspondingly amended, to reflect additions and deletions to Schedule 2.3 made from time to time in accordance with Section 2.3. Prior to the Closing, Seller shall cooperate with Buyer to resolve any disputes with the nondebtor party to any of the Designated Contracts regarding the amount of the Cure Costs,   Subject to entry of the Approval Order and it becoming a Final Order, Buyer shall pay the Cure Costs designated in Schedule 2.3, subject to any reduction in the Cash Consideration provided in Section 2.3(b), in accordance with the terms and conditions of any Order approving the assumption and assignment of the Assumed Contracts.

Section 7.10    Reasonable Access to Records and Certain Personnel.  In order to facilitate Trustee's efforts to (i) administer and close the Bankruptcy Cases, and (ii) prepare tax returns (together, the "Post-Close Filings"), Buyer shall permit Trustee's counsel, accountants and any other professional representative of the Trustee, during regular business hours, with reasonable notice, and subject to reasonable rules and regulations, reasonable access to any information acquired by the Buyer pursuant to this Agreement, including financial information of the Companies, and other books and records which comprised part of the Purchased Assets,

that are required for the Trustee to complete the Post-Close Filings, or to facilitate the administration of these Bankruptcy Cases. Buyer shall retain all any information acquired by the Buyer pursuant to this Agreement for a period of at least six (6) years following the Closing Date. On or after the end of such period, the Buyer shall provide the Trustee with at least forty-five (45) days prior written notice before destroying any such information, during which period the Trustee can elect to take possession, at its own expense, of such books and records. The obligations created by this <u>Section 7.10</u> shall terminate 30 days after the entry of a final non-appealable order by the Bankruptcy Court approving the Trustee's Final Report.

Section 7.11 <u>Deposit</u>. Immediately upon the Bankruptcy Court's entry of the Bidding Procedures Order and its approval of this Agreement as the stalking horse bid, Buyer will deposit $5,000,000 (the "<u>Deposit</u>") with a third party escrow agent pursuant to a deposit escrow agreement in substantially the form of <u>Exhibit C</u> (the "<u>Deposit Escrow Agreement</u>").

Section 7.12 <u>Seller Post-Closing Obligations</u>. Notwithstanding any provision in this Agreement to the contrary, in no event shall the Seller be obligated to incur any expense or expenses that aggregate over $100,000 in connection with any obligations to cooperate or facilitate actions specified to occur following the Closing. This shall not apply to those offsets against the Cash Consideration provided for in <u>Section 3.2</u> and described with particularity in <u>Sections 2.3(b)</u>, <u>7.1(b)</u> and <u>7.6</u>.

Section 7.13 <u>Organization of the Companies</u>. To the extent reasonably required to consummate the transactions contemplated by this Agreement, Seller will pay, or allow Buyer to pay and deduct from the Cash Consideration (a reasonable time prior to the Closing) subject to the limitations set forth in Section 7.12, any amounts due and owing to the Secretary of the State of Delaware which may be necessary to cause each Company to be an organization in good standing pursuant to its jurisdiction of incorporation. For the avoidance of doubt, to the extent there is no requirement that the Companies be in good standing to consummate the transactions contemplated by this Agreement, neither Buyer nor Seller desire to incur any cost pursuant to this Section 7.13.


# ARTICLE VIII

# CONDITIONS TO CLOSING

Section 8.1 <u>Conditions to Obligations of Each Party</u>. The respective obligations of each Party to affect the sale and purchase of the Purchased Assets shall be subject to the fulfillment (or, if permitted by applicable law, waiver) on or prior to the Closing Date, of the conditions as set forth in <u>Section 8.2</u> in the case of the Buyer and <u>Section 8.3</u> in the case of the Seller.

Section 8.2 <u>Conditions to Obligations of Buyer</u>. The obligation of Buyer to effect the purchase of the Purchased Assets contemplated by this Agreement shall be subject to the fulfillment (unless waived in writing by Buyer) on or prior to the Closing Date of the following additional conditions:

(a)     the representations and warranties of Seller contained in <u>Article IV</u> of this Agreement shall be true and correct on and as of the Closing Date with the same effect as if such representations and warranties had been made on and as of such date (other than any such representations and warranties that address matters only as of a particular date, which shall be true and correct as of such date), in each case except for breaches as to matters that, individually or in the aggregate, would not have a Material Adverse Effect.  For purposes of determining the satisfaction of this condition, the representations and warranties of Seller contained in <u>Article IV</u> of this Agreement shall be deemed not qualified by any references therein to materiality generally or to whether or not any breach results in a Material Adverse Effect.  Buyer shall have received a certificate of each Seller to such effect signed by a duly authorized officer of such Seller.

(b)     each covenant and obligation that Seller is required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been duly performed and complied with in all material respects.  Buyer shall have received a certificate of the Seller to such effect.

(c)     the Sale Order shall have been entered on or before August __, 2009; and shall not have been (i) stayed, vacated, or reversed, or be the subject of any pending motion seeking such relief (ii) (except with the express written consent of the Buyer not to be unreasonably withheld or delayed) amended, supplemented or otherwise modified or (iii) subject to an appeal, other than an appeal by any party to any of the WIP Adversary Proceedings, which, in the Buyer's reasonable judgment, would not be mooted as a result of the Closing;

(d)     each of the deliveries required to be made to Buyer pursuant to <u>Section 3.6</u> shall have been so delivered;

(e)     each of the Governmental Authority authorizations, consents or waiting periods set forth on <u>Schedule 8.2(e)</u> shall have been obtained or expired, as applicable;

(f)     no Governmental Authority shall have enacted, issued, promulgated, entered any Order that is in effect and has the effect of making illegal or otherwise prohibiting the consummation of the transactions contemplated by this Agreement that has not been withdrawn or terminated; and

(g)     No event shall have occurred which has had or will have a Material Adverse Effect.

Any condition specified in this <u>Section 8.2</u> may be waived by Buyer; provided that no such waiver shall be effective against Buyer unless it is set forth in a writing executed by Buyer.

Section 8.3     <u>Conditions to Obligations of Seller</u>.  The obligation of Seller to effect the sale of the Purchased Assets contemplated by this Agreement shall be subject to the fulfillment (unless waived in writing by Seller) on or prior to the Closing Date of the following additional conditions:

(a)    the representations and warranties of Buyer contained in this Agreement shall be true and correct in all material respects when made and on and as of the Closing Date with the same effect as if such representations and warranties had been made on and as of such date (other than representations and warranties that address matters only as of a particular date, which shall be true and correct in all material respects as of such date), except that any representations and warranties made by Buyer that by their terms are subject to any materiality or material adverse effect qualifier or exception, shall be true and correct in all respects when made on and as of the Closing Date with the same effect as if such representations and warranties had been made on and as of such date (other than representations and warranties that address matters only as of a particular date, which shall be true and correct in all respects as of such date) and Seller shall have received a certificate of Buyer to such effect signed by a duly authorized officer thereof;

(b)    each covenant and obligation that Buyer is required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been duly performed and complied with in all material respects, and Seller shall have received a certificate of Buyer to such effect signed by a duly authorized officer thereof;

(c)    each of the deliveries required to be made to Seller pursuant to Section 3.5 shall have been so delivered;

(d)    Buyer shall have delivered the Purchase Price to Seller or as otherwise directed by the Sale Order;

(e)    the Sale Order shall have been entered and shall not have been (i) stayed, vacated or reversed or (ii) except with the express written consent of Trustee or as would not be adverse to Trustee in any material respect, amended, supplemented or otherwise modified; and

(f)    as of and immediately after giving effect to the Closing, there shall be no default, and no event that with notice, or the passage of time, or both, would constitute a default under the Notes.

Any condition specified in this Section 8.3 may be waived by Seller; provided that no such waiver shall be effective against Seller unless it is set forth in a writing executed by the Seller.


# ARTICLE IX

# TERMINATION

Section 9.1    Termination.    Anything in this Agreement to the contrary notwithstanding, this Agreement and the transactions contemplated hereby may be terminated in any of the following ways at any time prior to the Closing Date and in no other manner:

(a)     By mutual written consent of Buyer and Seller; *provided* that such written consent is approved in writing by the holders of a majority in principal amount of the Prior Notes.

(b)     By Buyer, immediately without further notice, if Seller and Buyer are unable to reach agreement on the form of the Notes and related security agreement and intercreditor agreement at least two (2) days prior to the entry of the Bidding Procedures Order;

(c)     By Buyer upon five (5) Business Days notice if, at or prior to the Closing Date, satisfaction of any condition set forth in Section 8.2 is or becomes impossible (other than through the breach by Buyer of any of its representations or warranties or the failure of Buyer to perform any of its obligations pursuant to this Agreement) and Buyer shall not have waived such condition in writing at or prior to the Closing Date.

(d)     By Seller upon five (5) Business Days notice if, at or prior to the Closing Date, satisfaction of any condition set forth in Section 8.3 is or becomes impossible (other than through the breach by Seller of any of their representations or warranties or the failure of Seller to perform any of their obligations pursuant to this Agreement) and Seller shall not have waived such condition in writing at or prior to the Closing Date.

(e)     By Buyer or Seller, immediately upon the occurrence of any of the following events:

(i)     The Bankruptcy Court approves an Alternative Transaction, or an Alternative Transaction is consummated; or

(ii)    The Sale Order is not entered on or before August __, 2009.

(f)     By either party, provided the terminating party is not in default of its obligations under this Agreement, if the Closing shall not have occurred for any reason within thirty days after the entry of the Sale Order.

(g)     By either party if a Governmental Authority issues a final and non-appealable Order prohibiting the transactions contemplated by this Agreement.

Section 9.2     Effect of Termination.

(a)     In the event this Agreement is terminated pursuant to Section 9.1, all further obligations of the parties hereunder shall terminate, except for this Section 9.2 and Article XI (to the extent applicable to the aforesaid surviving provisions), and except that nothing in this Section 9.2 shall relieve any party hereto of any liability for the willful breach of any of the covenants or of any of the representations or warranties contained in this Agreement prior to such termination.

(b)     If this Agreement is terminated pursuant to Section 9.1(e)(i), then Seller shall pay to Buyer in immediately available funds a cash fee equal to $1,600,000 (the "Break-Up Fee"), such fee to be paid, as applicable, promptly following the closing of the Alternative

Transaction; _provided_, _however_, that no Break-Up Fee shall be payable by Seller in the event that a material breach by Buyer of any representation or warranty contained in this Agreement shall have occurred or Buyer fails to perform and comply with all of its covenants and agreements under this Agreement, which breach or failure, as applicable, results in the termination of this Agreement by Seller.  The Break-Up Fee, payable under the circumstances provided in the immediately preceding sentence shall be the exclusive remedy of Buyer for any termination of this Agreement pursuant to Section 9.1(e)(i).  The claims of Buyer to the Break-Up Fee shall constitute a first priority administrative expense against the Chapter 7 Estates, jointly and severally, under 11 U.S.C. § 507(a)(2).


# ARTICLE X

## INDEMNIFICATION

Section 10.1  No Survival of Representations, Warranties, Covenants and Agreements.  The representations, warranties, covenants and agreements contained in this Agreement shall not survive beyond the Closing Date, and there shall be no liability in respect thereof, whether such liability has accrued prior to the Closing Date or after the Closing Date, on the part of either party or its officers, directors, employees, agents and Affiliates; _provided_, _however_, that all covenants and agreements, which, by their terms, contemplate performance after the Closing Date, shall survive in accordance with their terms.  Nothing in the foregoing sentence shall preclude any party from bringing an action for fraud involving intentional and wanton conduct involving the entire transaction provided for in this Agreement.


# ARTICLE XI

## GENERAL PROVISIONS

Section 11.1  Confidential Nature of Information.  Each Party agrees that it will treat in confidence all documents, materials and other information that it shall have obtained regarding the other Party during the course of the negotiations leading to the consummation of the transactions contemplated hereby (whether obtained before or after the date of this Agreement), the investigation provided for herein and the preparation of this Agreement and other related documents.  Such documents, materials and information shall not be disclosed or communicated to any third Person (other than, in the case of Buyer, to its counsel, accountants, financial advisors and potential lenders, and in the case of Seller, to the holders of a majority in principal amount of the Prior Notes and to the respective counsel, accountants and financial advisors of Seller and the holders of a majority in principal amount of the Prior Notes).  No Party shall use any confidential information referred to in the second immediately preceding sentence in any manner whatsoever except solely for the purpose of evaluating the proposed purchase and sale of the Purchased Assets and the enforcement of its rights hereunder and under the Ancillary Documents; _provided_, _however_, that after the Closing, Buyer may use or disclose any confidential information included in the Purchased Assets and may use or disclose other confidential information that is otherwise reasonably related to the Business or the Purchased

Assets, subject to any restrictions imposed by non-bankruptcy law. The obligation of each Party to treat such documents, materials and other information in confidence shall not apply to any information that (i) is or becomes available to such Party from a source other than the disclosing Party, provided such other source was not, and such Party would have no reason to believe such source was, subject to a confidentiality obligation in respect of such information, (ii) is or becomes available to the public other than as a result of disclosure by such Party or its agents, (iii) is required to be disclosed under applicable law or judicial process, including the Bankruptcy Cases, but only to the extent it must be disclosed, or (iv) such Party reasonably deems necessary to disclose to obtain any of the consents or approvals contemplated hereby.

Section 11.2    No Public Announcement.  Neither Seller nor Buyer shall, without the approval of Seller (in the case of a disclosure by Buyer) or Buyer (in the case of a disclosure by Seller), make any press release or other public announcement concerning the transactions contemplated by this Agreement, except as and to the extent that any such party shall be so obligated by law, including as may be required by the Bankruptcy Cases, securities laws, or the rules of any stock exchange, in which case the other party or parties shall be advised prior to such disclosure and the parties shall use their reasonable best efforts to cause a mutually agreeable release or announcement to be issued.

Section 11.3    Notices.    All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given (a) when delivered personally to the recipient, (b) one (1) Business Day after the date when sent to the recipient by reputable express courier service (charges prepaid), or (c) seven (7) Business Days after the date when mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, if delivered personally (with written confirmation of receipt), on the date of such delivery or, if sent via facsimile, on the date of the transmission of the facsimile, provided that the sender thereof receives written confirmation that the facsimile was successfully delivered to the intended recipient.  Notice by Buyer to Eclipse shall be deemed to be notice to all Seller.  Such notices, demands and other communications shall be sent to Seller and to Buyer at the addresses indicated below:

If to Buyer, to:

Eclipse Aerospace, Inc.
125 Fairchild St.
Suite 100, Charleston, SC 29492
Attn: Mason Holland, President
Facsimile: 843-849-9298

with a copy to (which shall not constitute notice):

       Nelson Mullins Riley & Scarborough LLP
       Atlantic Station
       201 17th Street, Suite 1700
       Atlanta, Georgia 30363
       Attn: William J. Ching, Esq.
            Michael E. Hollingsworth II, Esq.
       Facsimile:  (404) 322-6050

If to Seller, to:

       The Trustee:
       Jeoffrey L. Burtch, Esq.
       Cooch & Taylor, P.A.
       1000 West Street
       Wilmington, Delaware 19801
       Facsimile: (302) 984-3939

with a copy to (which shall not constitute notice):

       Cooch & Taylor, P.A.
       1000 West Street
       Wilmington, Delaware 19801
       Attn: Adam Singer, Esq.
       Facsimile: (302) 984-3939

or to such other address or facsimile number as such party may indicate by a notice delivered to the other party hereto.

Section 11.4  <u>Successors and Assigns</u>.

(a)  Except as expressly permitted in this Agreement, the rights and obligations of the Parties under this Agreement shall not be assignable by such parties without the written consent of the other parties hereto; provided, however, that concurrent with the Closing, Buyer may, without the prior written consent of the Seller or the holders of a majority in principal amount of the Prior Notes, assign the right to receive the assets owned by Seller to one or more affiliates of the Buyer, *provided* that no such assignment shall release Buyer from any of its obligations under this Agreement.  Notwithstanding the foregoing, from and after the Closing Buyer shall have the unrestricted right to assign this Agreement as collateral and in connection therewith to delegate all or any part of its obligations hereunder to any lender in connection with any financing or to any Affiliate of Buyer, but in such event Buyer shall remain fully liable for the performance of all of such obligations in the manner prescribed in this Agreement.

(b)  This Agreement shall be binding upon and inure to the benefit of the Parties and their successors and permitted assigns.  The successors and permitted assigns hereunder shall include any permitted assignee as well as the successors in interest to such

permitted assignee (whether by merger, consolidation, liquidation (including successive mergers, consolidations or liquidations) or otherwise). Nothing in this Agreement, expressed or implied, is intended or shall be construed to confer upon any Person other than the parties and successors and assigns permitted by this <u>Section 11.4</u> any right, remedy or claim under or by reason of this Agreement.

Section 11.5 <u>Entire Agreement; Amendments; Disclosure Schedules</u>. This Agreement, the Ancillary Documents and Disclosure Schedules referred to herein contain the entire understanding of the parties hereto with regard to the subject matter contained herein or therein, and supersede all prior agreements, understandings or letters of intent between or among any of the parties hereto with respect to such subject matter. This Agreement shall not be amended, modified or supplemented except by a written instrument signed by the Buyer and Seller and approved in writing by the holders of a majority of the principal amount of the Prior Notes.

Section 11.6 <u>Waivers</u>. Any term or provision of this Agreement may be waived, or the time for its performance may be extended, by an instrument in writing executed by the party or parties entitled to the benefit thereof; *provided*, that any such waiver is approved in writing by the holders of a majority in principal amount of the Prior Notes. Any such waiver shall be validly and sufficiently authorized for the purposes of this Agreement if, as to any party, it is authorized in writing by an authorized representative of such party. Except as otherwise provided herein, the failure of any party hereto to enforce at any time any provision of this Agreement shall not be construed to be a waiver of such provision, nor in any way to affect the validity of this Agreement or any part hereof or the right of any party thereafter to enforce each and every such provision. No waiver of any breach of this Agreement shall be held to constitute a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any right, power or remedy. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

Section 11.7 <u>Expenses</u>. Each Party hereto will pay all costs and expenses incident to its negotiation and preparation of this Agreement and to its performance and compliance with all agreements and conditions contained herein on its part to be performed or complied with, including the fees, expenses and disbursements of its counsel and accountants.

Section 11.8 <u>Partial Invalidity</u>. Wherever possible, each provision hereof shall be interpreted in such manner as to be effective and valid under applicable law, but in case any one or more of the provisions contained herein shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such provision shall be ineffective to the extent, but only to the extent, of such invalidity, illegality or unenforceability without invalidating the remainder of such invalid, illegal or unenforceable provision or provisions or any other provisions hereof, unless such a construction would be unreasonable.

Section 11.9 <u>Execution in Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be considered an original instrument, but all of which shall be considered one and the same agreement, and shall become binding when one or more

counterparts have been signed by and delivered to each of the Parties hereto.  Delivery of an executed counterpart of a signature page to this Agreement by facsimile shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 11.10  <u>Governing Law and Dispute Resolution</u>.

(a)     This Agreement and the legal relations between the parties hereto shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and performed therein and the Bankruptcy Code, to the extent applicable.

(b)     During the pendency of the Bankruptcy Cases any Proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement may only be brought against any of the parties in the Bankruptcy Court, and each of the parties consents to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts) in any such action or proceeding and waives any objection to venue laid therein.

(c)     At any time after the entry of a final non appealable order of the Bankruptcy Court approving the Trustee's Final Report, any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by arbitration in New York, New York before one arbitrator.  The parties hereby waive all right to trial by jury with respect to the foregoing.  The arbitration shall be administered by JAMS (www.jamsadr.com) pursuant to its Streamlined Arbitration Rules and Procedures.  Judgment on the award may be entered in any court having jurisdiction.  The arbitrator may, in his or her sole discretion, allocate all or part of the costs of the arbitration in the award, including the fees of the arbitrator and the reasonable attorneys' fees of the parties.  The arbitrator shall not have the power to award punitive damages.

Section 11.11  <u>No Third Party Beneficiaries</u>.  This Agreement is for the sole benefit of the Parties and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable benefit, claim, cause of action, remedy or right of any kind.

[SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed the day and year first above written.

**BUYER:**

**Eclipse Aerospace, Inc.**

By: _____
    Name: Mason Holland
    Its:    President

**SELLER:**

**Jeoffrey L. Burtch, Chapter 7 Trustee of Eclipse Aviation Corporation**

By:_____
    Name: Jeoffrey L. Burtch
    Title: Chapter 7 Trustee

**Jeoffrey L. Burtch, Chapter 7 Trustee of Eclipse IRB Sunport, LLC**

By:_____
    Name: Jeoffrey L. Burtch
    Title: Chapter 7 Trustee

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed the day and year first above written.

**BUYER:**

**Eclipse Aerospace, Inc.**

By:     _____

        Name: Mason Holland
        Its:    President

**SELLER:**

**Jeoffrey L. Burtch, Chapter 7 Trustee of Eclipse Aviation Corporation**

By:_____

    Name: Jeoffrey L. Burtch
    Title: Chapter 7 Trustee

**Jeoffrey L. Burtch, Chapter 7 Trustee of Eclipse IRB Sunport, LLC**

By:_____

    Name: Jeoffrey L. Burtch
    Title: Chapter 7 Trustee

# ANNEX 1

## DEFINITIONS

"<u>Accounts Receivable</u>" means, with respect to a Seller, all accounts receivable and other rights to payment of such Seller and the full benefit of all security for such accounts receivable or rights to payment, including, but not limited to, all accounts receivable in respect of goods shipped or products sold or services rendered to customers by such Seller, any other miscellaneous accounts receivable of such Seller, and any claim, remedy or other right of such Seller related to any of the foregoing.

"<u>Action</u>" means any legal action, suit or arbitration, or any inquiry, proceeding or investigation, by or before any Governmental Authority.

"<u>Administrative Claim</u>" means a Claim for payment of an administrative expense solely in the Chapter 11 Bankruptcy Cases of a kind specified in section 503(b) of the Bankruptcy Code and entitled to priority pursuant to section 507(a)(1) of the Bankruptcy Code.

"<u>Affiliate</u>" means, as to any Person, any other Person which directly or indirectly controls, or is under common control with, or is controlled by, such Person. As used in this definition, "control" (including, with its correlative meanings, "controlled by" and "under common control with") shall mean possession, directly or indirectly, of the power to direct or cause the direction of management or policies (whether through ownership of securities or partnership or other ownership interests, by contract or otherwise) of such Person.

"<u>Agreement</u>" has the meaning specified in the preamble.

"<u>Alternative Transaction</u>" means any one of the following transactions with or by a Third Party resulting in the sale of the Business: (a) a merger, consolidation or similar transaction involving the Seller, or (b) a sale, lease or other disposition directly or indirectly by merger, consolidation, tender offer, share exchange or otherwise of assets of Seller constituting a majority of the consolidated assets of Seller, excluding the Excluded Assets.

"<u>Ancillary Documents</u>" means a Bill of Sale, the Assumption and Assignment Agreement, an Assignment of Patents, an Assignment of Trademarks, an Assignment of Copyrights, an Assignment of Domain Names, an Assumption and Assignment of Leases, each in form and substance reasonably satisfactory to Buyer, and each other agreement, document or instrument (other than this Agreement) executed and delivered by the parties hereto in connection with the consummation of the transactions contemplated by this Agreement.

"<u>Approval Order</u>" means the Sale Order or any other order entered by the Bankruptcy Court approving the assumption and assignment of the Designated Contracts.

"<u>Assumed Capitalized Leases</u>" has the meaning specified below in the definition of "Purchased Assets."

"<u>Assumed Contracts</u>" has the meaning specified below in the definition of "Purchased Assets."

"Assumed Leases" has the meaning specified below in the definition of "Purchased Assets."

"Assumed Liabilities" shall only mean only the following liabilities and obligations (without duplication):

(i)     All obligations of the Companies or the Seller with respect to the Companies arising at and after the Closing under the Assumed Contracts and the Assumed Leases, in each case solely to the extent such obligations are required to be performed from and after the Closing Date;

(ii)    the Cure Costs;

(iii)   the obligation of Seller to return any aircraft or aircraft parts held by the Seller as of the date of the Closing or arising out of any Final Order in the WIP Adversary Proceedings set forth on Schedule 7.8, but not including, to the extent applicable, any claims against Seller, the Companies or the Chapter 7 Estate for (a) specific performance; or (b) any monetary claims against the Seller, including but not limited to, any claims to deposits or segregated funds; and

(iv)    the obligation to return any Eclipse 500 Full Flight Simulators or Flight Training Devices to OPINICUS Corporation if ordered by the Bankruptcy Court by any final order entered in the adversary proceeding styled Opinicus Corporation v. Jeoffrey L. Burtch et al Adversary Proceeding No. 09-50406-MFW.

"Assumption and Assignment Agreement" has the meaning specified in Section 3.5.

"Assumption and Assignment of Leases" has the meaning specified in Section 3.6(f).

"Assumption Date" means the date as of which a Designated Contract is assumed by a Seller in the Bankruptcy Cases and assigned to the Buyer pursuant to an Order of the Bankruptcy Court (which may be the Sale Order), in accordance with the terms of this Agreement.

"Auction" has the meaning specified in Section 6.11(a).

"Avoidance Actions" means any and all claims of the Seller under Chapter 5 of the Bankruptcy Code and any other causes of action the Seller (or the Companies) may have against Third Parties; provided, however, that such actions will expressly not include any claims relating in any manner to the WIP Adversary Proceedings, the Opinicus Adversary Proceeding or any claims which constitute or relate to claims for the recovery of property of the estate removed during the pendency of the Bankruptcy Cases and claims for the enforcement of non competition agreements, non disclosure or confidentiality agreements, all of which claims shall be expressly reserved for the benefit of the Buyer.

"Bankruptcy Cases" has the meaning specified in the recitals.

"Bankruptcy Code" means Title 11 of the United States Code 11 U.S.C. Sections 101 et. seq.

"Bankruptcy Court" has the meaning specified in the recitals.

"Benefit Plan" means any benefits plans provide by the Companies to any Employee.

"Bidding Procedures" means the bidding procedures set forth in the Bidding Procedures Order.

"Bidding Procedures Order" has the meaning set forth in Section 6.11(b)(i).

"Bill of Sale" has the meaning set forth in Section 3.6(a).

"Break-Up Fee" has the meaning set forth in Section 9.2(b).

"Business" has the meaning specified in the recitals.

"Business Day" has the meaning specified in Section 1.1(a).

"Buyer" has the meaning specified in the preamble.

"Buyer Protections" means the procedures, provisions and conditions set forth in the Bidding Procedures Order.

"Bidding Procedures Order" has the meaning set forth in Section 6.11(b)(i).

"Cash Consideration" means an amount equal to Twenty Million Dollars ($20,000,000).

"Cash Purchase Price" means an amount equal to the Cash Consideration.

"Chapter 7 Estates" means the bankruptcy estates of both Eclipse Aviation Corporation, and Eclipse IRB Sunport, LLC.

"Claim" means a claim against the Companies (all or either of them) as defined in section 101(5) of the Bankruptcy Code.

"Closing" has the meaning specified in Section 3.4.

"Closing Date" has the meaning specified in Section 3.4.

"COBRA" means the United States Consolidated Omnibus Budget Reconciliation Act of 1985.

"Code" means the United States Internal Revenue Code of 1986, as amended.

"Computers" means all computer equipment and hardware, including, without limitation, all central processing units, terminals, disk drives, tape drives, electronic memory units, printers, keyboards, screens, peripherals (and other input/output devices), modems and other

communication controllers, and any and all parts and appurtenances thereto, together with all Intellectual Property used in connection with the operation of such computer equipment, including all Software and rights under any licenses related to such use.

"Contract" means any agreement, contract, obligation, promise, instrument, undertaking or other arrangements (whether written or oral), and any amendment thereto, that is legally binding, other than a Lease, to which any Seller is party.

"Contract Designation Date" has the meaning specified in Section 2.3(a).

"Copyrights" means all U.S. and common law works of authorship and copyrightable subject matter, and copyrights, whether registered or unregistered, copyright registrations and applications therefor, all rights to register and obtain renewals and extensions of copyright registrations, and all other rights corresponding to any of the foregoing throughout the world, including "moral" rights.

"Cure Costs" has the meaning specified in Section 7.9.

"Deposit" has the meaning specified in Section 7.11.

"Deposit Escrow Agreement" has the meaning set forth in Section 7.11.

"Designated Contract" has the meaning specified in Section 2.3(a).

"Design Information" means all information, whether in physical form or electronic form, including all software and electronic information hosted on Eclipse computer servers and in hard copy that relates to: (1) Engineering and technical information concerning either the Eclipse 500 aircraft Type Design or the Eclipse 400 concept airplane; (2) All engineering documents pertaining to the software and hardware design of the Eclipse 500 aircraft or the Eclipse 400 concept airplane; and (3) all supporting, specifications documents and drawings relating to the Eclipse 500 aircraft or the Eclipse 400 concept airplane.

"Disclosure Schedules" means the disclosure schedules attached hereto that Seller has prepared and delivered to Buyer pursuant to the terms of this Agreement, setting forth information regarding the Business, the Purchased Assets, the Assumed Liabilities and other matters with respect to the Companies as set forth therein.

"Documents" means all books, records, files, invoices, inventory records, product specifications, advertising materials, customer lists, cost and pricing information, supplier lists, business plans, catalogs, customer literature, quality control records and manuals, research and development files, records and laboratory books and credit records of customers, and all records, notes, and documents relating to any Software (including all data and other information stored on discs, tapes or other media) to the extent used in or to the extent relating to the assets, properties, including the Seller Intellectual Property, business or operations of the Business.

"Domain Names" means any alphanumeric designation registered with or assigned by a domain name registrar, registry or domain name registration authority as part of an electronic address on the Internet.

"EASA" means the European Aviation Safety Agency.

"Eclipse" has the meaning specified in the preamble.

"Eclipse EASA Certificate" means the Type Certificate for Eclipse 500 (EA500), identified as NBR: EASA.IMA.A.171 and issued to Eclipse on November 21, 2008.

"Eclipse Production Certificate" means Production Certificate Number 500 issued to Eclipse on April 26, 2007 by the U.S. Department of Transportation Federal Aviation Administration.

"Eclipse Type Certificate" means Type Certificate Number A00002AC reissued to Eclipse on September 30, 2006 by the U.S. Department of Transportation Federal Aviation Administration.

"Employee" means any full- or part-time employee or independent contractor of any Seller as of the date of this Agreement.

"Employee Claims" has the meaning specified in Section 7.2.

"Encumbrance" means any interest, charge, lien, claim (as defined in section 101(5) of the Bankruptcy Code), mortgage, sublease, hypothecation, deed of trust, pledge, security interest, option, right of use, first offer or first refusal, easement, servitude, restrictive covenant, encroachment, encumbrance, or other similar restriction of any kind.

"Environmental Laws" means any Legal Requirement relating to protection of human health, safety, the environment, and natural resources, including without limitation Hazardous Materials, drinking water, groundwater, wetlands, landfills, open dumps, storage tanks, underground storage tanks, solid waste, waste water, storm water runoff, waste emissions or wells. Without limiting the generality of the foregoing, the term will encompass each of the following statutes, and the regulations promulgated thereunder, in each case as in effect as of Closing: (a) the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (codified in scattered sections of 26 U.S.C., 33 U.S.C., 42 U.S.C. and 42 U.S.C. § 9601 et seq., "CERCLA"); (b) the Resource Conservation and Recovery Act of 1976 (42 U.S.C. § 6901 et seq., "RCRA"); (c) the Hazardous Materials Transportation Act (49 U.S.C § 1801 et seq., "HMTA"); (d) the Toxic Substances Control Act (15 U.S.C. § 2061 et seq., "TSCA"); (e) the Clean Water Act (33 U.S.C. § 1251 et seq.); (f) the Clean Air Act and Amendments (42 U.S.C. § 7401 et seq.); (g) the Safe Drinking Water Act (21 U.S.C. § 349); 42 U.S.C. § 201 and § 300 et seq.); (h) the National Environmental Policy Act of 1969 (42 U.S.C. § 4321); (i) the Superfund Amendment and Reauthorization Act of 1986 (codified in scattered sections of 10 U.S.C., 29 U.S.C., 33 U.S.C. and 42 U.S.C., "SARA"); and (j) Title III of the Superfund Amendment and Reauthorization Act (42 U.S.C. § 11,001 et seq.).

"Equipment" means all furniture, fixtures, equipment, Computers, machinery, apparatus, appliances, spare parts, signage, supplies, vehicles, forklifts and all other tangible personal property of every kind and description in which Seller have an interest, including simulators.

"ERISA" means the United States Employee Retirement Income Security Act of 1974, as amended.

"Excluded Assets" means:

(a)    all cash, cash equivalents and marketable securities of the Companies;

(b)    any customer lists or other customer data maintained or collected by Sellers that constitutes or incorporates personally identifiable information, to the extent such information is required to be excluded from the transaction by an Order of the Bankruptcy Court;

(c)    all shares of capital stock or other equity interests of either of the Companies or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest of either of the Companies;

(d)    all minute books, stock ledgers, corporate seals and stock certificates of the Companies;

(e)    any Contracts with Employees or otherwise pertaining to employee matters except to the extent such Contracts are Purchased Assets;

(f)    any Contracts listed or described in Schedule A-1 (the "Excluded Contracts");

(g)    any Leases, and rights thereunder, listed or described in Schedule A-2 (the "Excluded Leases");

(h)    any rights, claims or causes of action of Seller against the Buyer under this Agreement or the Ancillary Documents, including all right, title and interest to the Cash Purchase Price and the Note Consideration;

(i)    all receivables, claims or causes of action related solely to any Excluded Asset;

(j)    rights under director and officer liability policies, ERISA and trustee liability policies and employment practices liability policies, and all rights under insurance policies relating to claims for losses related solely to any Excluded Asset or Excluded Liability;

(k)    subject to Section 7.3(h), all Benefit Plans;

(l)    all Documents relating solely to an Excluded Asset or an Excluded Liability;

(m)    all refunds, if any, of Taxes due to any Seller for any taxable period ending on or before the Closing Date; and

(n)     any and all Avoidance Actions.

"Excluded Contracts" has the meaning specified above in this Annex 1.

"Excluded Leases" has the meaning specified above in this Annex 1.

"Excluded Liabilities" shall mean all Liabilities of Seller, other than the Assumed Liabilities. For the avoidance of doubt, the Excluded Liabilities include, but are not limited to, the following (other than the Assumed Liabilities):

(a)     any Liability of Seller, arising out of, or relating to, this Agreement or the transactions contemplated by this Agreement, whether incurred prior to, at or subsequent to the Closing Date, including, without limitation, all finder's or broker's fees and expenses, any and all fees and expenses of any Representatives of Seller, and any severance, change in control, termination or similar payments to any employees of Seller;

(b)     any Liability relating to (x) events or conditions occurring or existing in connection with, or arising out of, the Business as operated prior to the Closing Date, or (y) the ownership, possession, use, operation or sale or other disposition prior to the Closing Date of any Purchased Assets (or any other assets, properties, rights or interests associated, at any time prior to the Closing Date, with the Business);

(c)     any (i) Liability for Taxes; (ii) Liability or obligation of the Chapter 7 Estates, or any member of any consolidated, affiliated, combined or unitary group of which one or more of the Companies is or has been a member, for Taxes and (iii) Taxes of any other Person pursuant to an agreement or otherwise;

(d)     any Liability incurred by the Companies or their respective directors, officers, stockholders, agents or employees (acting in such capacities) whether arising prior to or after the Closing;

(e)     any Liability of Seller to any Person on account of any Action or Proceeding;

(f)     Employee Claims;

(g)     any Liability relating to or arising out of an Excluded Asset;

(h)     any liability or obligation, whether known or unknown, (i) arising under Environmental Laws attributable to or incurred as a result of any acts, omissions, or conditions first occurring or in existence as of or prior to the Closing Date, including, but not limited to, any liability or obligation with respect to the release, handling, discharge, treatment, storage, generation, disposal, or presence of Hazardous Substances at any location, (ii) claims relating to employee health and safety, including claims for injury, sickness, disease or death of any Person or (iii) compliance with any Legal Requirement relating to any of the foregoing;

(i)     any Liability or obligation relating to or arising out of any Benefit Plan;

(j)     fees or expenses of Seller incurred with respect to the transactions contemplated herein; and

(k)     any severance, termination, change of control or other similar payment obligations of the Seller (whether arising prior to or after the Closing).

"<u>FAA</u>" means the Federal Aviation Administration of the United States of America and any successor Governmental Agency.

"<u>Final Order</u>" means an action taken or Order issued by the applicable Governmental Authority as to which: (i) no request for stay of the action or Order is pending, no such stay is in effect, and, if any deadline for filing any such request is designated by statute or regulation, it is passed, including any extensions thereof; (ii) no petition for rehearing or reconsideration of the action or Order, or protest of any kind, is pending before the Governmental Authority and the time for filing any such petition or protest is passed; (iii) the Governmental Authority does not have the action or Order under reconsideration or review on its own motion and the time for such reconsideration or review has passed; and (iv) the action or Order is not then under judicial review, there is no notice of appeal or other application for judicial review pending, and the deadline for filing such notice of appeal or other application for judicial review has passed, including any extensions thereof.

"<u>FTC</u>" has the meaning specified in <u>Section 6.5(a)</u>.

"<u>GAAP</u>" means generally accepted accounting principles employed in the United States, as strictly applied.

"<u>Governmental Agency</u>" or "<u>Governmental Authority</u>"   means (a) any international, foreign, federal, state, county, local or municipal government or administrative agency or political subdivision thereof, (b) any governmental agency, authority, board, bureau, commission, department or instrumentality, (c) any court or administrative tribunal, (d) any non-governmental agency, tribunal or entity that is vested by a governmental agency with applicable jurisdiction, or (e) any arbitration tribunal or other non-governmental authority with applicable jurisdiction.

"<u>Hazardous Materials</u>" means each and every element, compound, chemical mixture, contaminant, pollutant, material, waste or other substance which is defined, determined or identified as hazardous or toxic under any Environmental Law or the Release of which is prohibited or regulated under any Environmental Law.  Without limiting the generality of the foregoing, the term will include: (a) "*hazardous substances*" as defined in CERCLA, SARA, or Title III of the Superfund Amendments and Reauthorization Act, each as amended to date, and regulations promulgated thereunder; (b) "*hazardous waste*" as defined in RCRA and regulations promulgated thereunder; (c) "*hazardous materials*" as defined in the HMTA, as amended to date, and regulations promulgated thereunder; (d) "*chemical substance or mixture*" as defined in the TSCA as amended to date, and regulations promulgated thereunder; (e) "*petroleum*," including crude oil or any fraction; and (f) "*natural gas*," including liquids and synthetic gas usable for fuel.

"<u>Hired Employees</u>" has the meaning specified in <u>Section 7.3(a)</u>.

"Insurance Policies" means insurance policies of the Seller as of the date hereof, other than those described under clause (j) of the definition of "Excluded Assets".

"Intellectual Property" means all of the following:

(a)    all Trademarks;

(b)    all Patents;

(c)    all Copyrights;

(d)    all inventions (whether patentable or not), invention disclosures, discoveries, and improvements;

(e)    all Trade Secrets;

(f)    all industrial designs and any registrations and applications therefor throughout the world;

(g)    all databases and data collections and all rights therein throughout the world;

(h)    all Software;

(i)    licenses, immunities, covenants not to sue and the like relating to the foregoing;

(j)    books and records describing or used in connection with the foregoing, including all contracts, licenses, and other agreements to which any Seller is a party or by which it is bound either as licensee or licensor relating to any intellectual property described above;

(k)    any and all other intellectual property rights and proprietary rights relating to any of the foregoing; and

(l)    all goodwill, franchises, licenses, permits, consents, approvals and claims or causes of action arising out of or related to infringement or misappropriation of any of the foregoing.

"Law" means each provision of any currently implemental federal, state, local or foreign law, statute, ordinance, decree, injunction, judgment, order, code, rule or regulation, promulgated or issued by any Governmental Authority.

"Leased Real Property" has the meaning specified below in the definition of "Purchased Assets."

"Leases" means any Contract pertaining to leased real property.

"Legal Requirement" means any federal, state, provincial, local, municipal, foreign, international, multinational, or other administrative Order, constitution, law, ordinance, principle of common law, regulation, statute or treaty.

"Liability" means any debt, loss, claim (as defined in section 101(5) of the Bankruptcy Code), damage, demand, fine, judgment, penalty, liability or obligation (whether direct or indirect, known or unknown, absolute or contingent, asserted or unasserted, accrued or unaccrued, matured or unmatured, determined or determinable, liquidated or unliquidated, or due or to become due, and whether in contract, tort, strict liability, successor liability or otherwise), and including all costs and expenses relating thereto (including fees, discounts and expenses of legal counsel, experts, engineers and consultants and costs of investigations).

"Lien" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge, equitable interest, conditional sale or other title retention device or arrangement, occupancy agreement, license or lease, or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Material Adverse Effect" means a loss by the Company of either its Eclipse Type Certificate or Eclipse EASA Certificate.

"Non-Transferable Agreement" means any Assumed Contract or Assumed Lease that (i) Buyer does not timely elect to assume pursuant to Section 2.3(a), or (ii) that may not be assigned to Buyer due to Buyer's failure to cure all defaults of Seller thereunder and/or provide adequate assurance of performance to the counterparty thereto to the extent required by the Bankruptcy Court.

"Note Consideration" means Twenty Million  Dollars ($20,000,000), the aggregate principal amount of Notes issued at Closing.

"Notes" means the 7% senior subordinated secured notes due on September 1, 2011.

"Order" means any decree, writ, assessment, award, decision, injunction, judgment, order, ruling, subpoena, verdict or arbitration award entered, issued, made, or rendered by any Governmental Agency or Governmental Authority.

"Ordinary Course of Business" means the ordinary and usual course of day-to-day operations of the Business (including acts and omissions of Seller in the ordinary and usual course) through the date hereof, consistent with the past practice of the Trustee and the Chapter 7 Estates.

"Party" or "Parties" means, individually or collectively, Buyer and each Seller.

"Patents" means (a) patent rights, inventions, discoveries and invention disclosures (whether or not patentable) and (b) U.S. and foreign patents (including certificates of invention and other patent equivalents), utility models, and applications for any of the foregoing, including

provisional applications, and all continuations, and continuations-in-part, divisionals, reissues, re-examinations, renewals, and extensions thereof or related thereto, and all applications or counterparts in any jurisdiction pertaining to the any of the foregoing.

"Permits" means all franchises, grants, authorizations, licenses, permits, easements, variances, exceptions, consents, certificates, approvals, clearances and orders of any Governmental Authority which are necessary or required for Seller to own, lease and operate their properties and assets or to carry on the Business as it was or is now being conducted or as is presently intended to be conducted.

"Permitted Liens" means (i) easements, covenants, conditions, restrictions and other similar matters of record on real property, leasehold estates or personalty that do not in any material respect detract from the value thereof and do not individually or in the aggregate in any material respect interfere with the use of the property subject thereto, (ii) Encumbrances that constitute Assumed Liabilities and (iii) foreign, local, county, state and federal laws, ordinances or governmental regulations now or hereafter in effect relating to the real property, which do not, individually or in the aggregate, materially detract from the value thereof and do not individually or in the aggregate in any material respect interfere with the use of the property subject thereto, (iv) statutory liens for current property Taxes and assessments not yet due and payable, including, without limitation, liens for *ad valorem* Taxes and statutory liens not yet due and payable arising other than by reason of any default by the Chapter 7 Estates that, in each case, are not material to the Business or the value of the Purchased Assets, and (v) landlords', carriers', warehousemen's, mechanics', suppliers', materialmen's, repairmen's liens or other like Encumbrances arising in the Ordinary Course of Business that, in each case, are not material to the Business, and are with respect to amounts not yet overdue.

"Person" means any individual, corporation, partnership, joint venture, limited liability company, association, joint-stock company, trust, unincorporated organization, Governmental Authority or other entity.

"Petition Date" has the meaning specified in the recitals.

"Post-Close Filings" has the meaning specified in Section7.9.

"Prior Notes" means those certain pre petition obligations of the Companies representing senior secured notes due May 31, 2012.

"Proceeding" means any action, arbitration, audit, claim, cause of action, hearing, investigation, litigation, or suit (whether civil, criminal, administrative or investigative) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Authority or arbitrator.

"Products" means any and all products and services, and related documentation, currently or previously researched, designed, developed, manufactured, sold, leased, licensed, delivered, distributed, installed, or otherwise made commercially available by or on behalf of a Seller, including, without limitation, any VLJs.

"Purchase Price" has the meaning specified in Section 3.1.

"Purchased Assets" shall mean all of the properties and assets of the Companies (other than the Excluded Assets) and Chapter 7 Estates of every kind and description, wherever located, real, personal or mixed, tangible or intangible, owned, leased, licensed, used or held for use in or relating to the Business, including, but not limited to, all right, title and interest of Seller in, to or under:

      (a)     all Accounts Receivable;

      (b)     any customer lists or other customer data maintained or collected by Sellers to the extent, and only to the extent, not prohibited to be transferred by order of the Bankruptcy Court;

      (c)     the right to receive and retain payments in respect of any Accounts Receivable and the right to receive and retain the Companies and the Seller's mail and other communications relating to the Business;

      (d)     all Equipment;

      (e)     all Contracts listed or described on Schedule 2.3, as updated from time to time by Buyer prior to the Contract Designation Date (the "Assumed Contracts");

      (f)     all Contracts pertaining to the lease of any real property ("Leased Real Property") listed or described on Schedule 2.3, as updated from time to time by Buyer prior to the Contract Designation Date (such Leases, the "Assumed Leases");

      (g)     all Permits and pending applications therefor;

      (h)     all Seller Intellectual Property;

      (i)     all Products, including all products in development by the Companies;

      (j)     to the extent permitted by applicable law, all Documents except those (i) relating solely to any Excluded Asset or Excluded Liability; or (ii) relating to employees of Seller who are not Hired Employees;

      (k)     all telephone, telex and telephone facsimile numbers and other directory listings used in connection with the Business;

      (l)     all Purchased Deposits;

      (m)     inventories of raw materials, work-in-process, finished goods, spare parts, supplies, products under research and development, and other accessories related thereto which are held at, or are in transit from or to, the locations at which the Business is conducted, or located at customers' or suppliers' premises on consignment, in each case, which are used by any Seller in the conduct of the Business, and expressly including the work in progress performed for all parties, including, but not limited to, for those plaintiffs in the WIP Adversary Proceedings;

(n)　　all of the Seller's right, title and interest in the DayJet aircraft and any and all obligations from DayJet Leasing LLC and or its affiliates and no further or additional consideration shall be due Seller on account of such interest.

(o)　　all rights to proceeds under insurance policies relating to claims for losses related to any Purchased Asset or Assumed Liability;

(p)　　the capitalized leases listed or described on <u>Schedule 2.3</u> (the "<u>Assumed Capitalized Leases</u>");

(q)　　except for Avoidance Actions, any rights, claims, refunds, causes of action, choses in action, rights of recovery and rights of setoff of Seller against third parties arising out of events occurring prior to the Closing Date;

(r)　　all goodwill and other intangible assets associated with the Business or the Purchased Assets;

(s)　　any proprietary or licensed rights in Internet protocol addresses, ideas, concepts, methods, processes, formulae, models, methodologies, algorithms, reports, data, customer lists, mailing lists, business plans, market surveys, market research studies, websites, information contained on drawings and other documents, information relating to research, development or testing, and documentation and media constituting, describing or relating to the Seller Intellectual Property, including memoranda, manuals, technical specifications and other records wherever created throughout the world, but excluding reports of accountants, investment bankers, crisis managers, turnaround consultants and financial advisors or consultants;

(t)　　all advertising, marketing and promotional materials, studies, reports and all other printed or written materials relating to the Business;

(u)　　all rights of Seller under non-disclosure or confidentiality, non-disparagement, non-compete, or non-solicitation agreements with former employees of the Companies, agents of Seller or with third parties;

(v)　　all other or additional assets, properties, privileges, rights (including prepaid expenses) and interests of Seller related to the Business of every kind and description and wherever located, whether known or unknown, fixed or unfixed, tangible or intangible, accrued, absolute, contingent or otherwise, and whether or no specifically referred to in this Agreement;

(w)　　the Insurance Policies;

(x)　　all real property owned by the Seller; and

(y)　　all tax credits and similar Tax attributes relating to the Business or the Purchased Assets.

(z) any and all of Seller's rights, defenses, cause of actions, claims or other interests in the Opinicus Corporation v. Jeoffrey L. Burtch et al, Adversary Proceeding No. 09-50406 MFW and the WIP Adversary Proceedings, including, but not limited to, any such claims or defenses that have been, or could have been, asserted at any time, against the parties top those proceedings or the property which is the subject of those proceedings, provided, however that to the extent, the Seller shall remain a party to any of the adversary proceedings described above, Seller shall retain those rights, claims and defenses to the extent of any claims against Seller or as otherwise agreed to between Buyer and Seller.

"Purchased Deposits" means all deposits (including customer deposits and security deposits for rent and electricity (including such deposits made by Seller in connection with the Assumed Leases)) and prepaid charges and expenses of Seller, other than any deposits or prepaid charges and expenses paid in connection with or relating solely to any Excluded Assets or any Excluded Liability.

"Qualified Bid" shall have the meaning set forth in the Bidding Procedures.

"Representative" has the meaning specified in Section 6.1.

"Required Consents" means the filings by Seller and Buyer required by the HSR Act and the expiration or earlier termination of all waiting periods under the HSR Act.

"Sale Motion" has the meaning set forth in Section 6.11(b).

"Sale Order" has the meaning set forth in Section 6.11(b).

"Seller" has the meaning specified in the preamble.

"Seller Copyrights" means all Copyrights owned by each Seller or used or held for use by a Seller in the Business.

"Seller Intellectual Property" means all of the following, owned, used or held for use in connection with the Business:

(a) all Seller Trademarks;

(b) all Seller Patents;

(c) all Seller Copyrights;

(d) all inventions (whether patentable or not), invention disclosures, discoveries, and improvements;

(e) all Seller Trade Secrets;

(f) all industrial designs and any registrations and applications therefor throughout the world;

(g)     all databases and data collections and all rights therein throughout the world;

(h)     all Software;

(i)     licenses, immunities, covenants not to sue and the like relating to the foregoing;

(j)     books and records describing or used in connection with the foregoing, including all contracts, licenses, and other agreements to which any Seller is a party or by which it is bound either as licensee or licensor relating to any intellectual property described above;

(k)     any and all other intellectual property rights and proprietary rights relating to any of the foregoing; and

(l)     all goodwill, franchises, licenses, permits, consents, approvals and claims or causes of action arising out of or related to infringement or misappropriation of any of the foregoing.

"Seller Patents" means all Patents owned by each Seller or used or held for use by a Seller in the Business.

"Software" means all computer software (whether in source code, object code, or other form), including firmware, development tools, files, records, specifications, and data, all media on which any of the foregoing is recorded;  and all systems, databases and platforms owned, licensed or used by a Seller, including all compilations, tool sets, compilers, higher level or "proprietary" languages, related documentation, technical manuals and materials, and any licenses to use or other rights relating to the foregoing, including all documentation and tools reasonably necessary for a skilled programmer to maintain, modify, and create derivative works of the applicable Software.

"Straddle Period" has the meaning specified in Section 7.1(a).

"Takeover Proposal" means any inquiry, proposal or offer from any Third Party, whether in writing or otherwise, relating to any Alternative Transaction.

"Tax" or "Taxes" (and with correlative meaning, "Taxable" and "Taxing") means (i) any federal, state, provincial, local, foreign or other income, alternative, minimum, add-on minimum, accumulated earnings, personal holding company, franchise, capital stock, net worth, capital, profits, intangibles, windfall profits, gross receipts, value added, sales, use, goods and services, excise, customs duties, transfer, conveyance, mortgage, registration, stamp, documentary, recording, premium, severance, environmental, natural resources, real property, personal property, ad valorem, intangibles, rent, occupancy, license, occupational, employment, unemployment insurance, social security, disability, workers' compensation, payroll, health care, withholding, estimated or other similar taxes, duty, levy or other governmental charge or assessment or deficiencies thereof (whether payable directly or by withholding and whether or not requiring the filing of a Tax Return), whether disputed or not and including any obligations

to indemnify or otherwise assume or succeed to Taxes of any other Person, and including all interest and penalties thereon and additions thereto , (ii) any liability in respect of any items described in clause (i) above arising as a result of being a member of a combined, consolidated, unitary or affiliated group of which the Seller (or any predecessor) is or was a member on or prior to the Closing Date, including pursuant to Treasury Regulations Section 1.1502-6 or any analogous or similar provision of state, local or foreign laws and (iii) any and all Taxes referenced in clauses (i) and (ii) hereof of any Person (other than the Seller) imposed on the Seller (x) as a transferee or successor, (y) by Contract or Law or (z) otherwise, which Taxes relate to an event occurring prior to or on the Closing Date.

"<u>Tax Return</u>" means any return, report or similar statement required to be filed with respect to any Taxes (including any attached schedules), including any information return, claim for refund, amended return or declaration of estimated Tax.

"<u>Third Party</u>" means any Person or group other than Buyer and its Affiliates.

"<u>Third Party Consents</u>" means each material consent, waiver, authorization or approval of any governmental or regulatory authority, domestic or foreign, or of any other Person, and each material declaration to or filing or registration with any such governmental or regulatory authority, that is required in connection with the execution and delivery of this Agreement and the Ancillary Documents by the Seller or the performance by the Seller of their obligations thereunder.

"<u>Trademarks</u>" means all trademarks, service marks, trade and business names (including all assumed or fictitious names under which the Business is conducted), brand names, trade dress, designs, logos, packaging design, slogans, Internet domain names and other commercial symbols in any and all forms, whether registered or unregistered, all registrations and pending applications to register any of the foregoing (including intent to use applications), throughout the world.

"<u>Trade Secrets</u>" means rights in all confidential, non-public, or proprietary information, including, ideas, research and development, know-how, trade secrets, processes, formulae, compositions, processes, technology, methodologies, blueprints, drawings, schematics, flow charts, models, prototypes, testing procedures and results, specifications, designs, plans, concepts, ideas, inventor's notes, invention disclosures, algorithms, techniques, technical data, customer and supplier lists, pricing and cost information, and business and marketing plans and proposals formulae, and customer lists, all documentation relating to any of the foregoing, and the right in any jurisdiction to limit the use or disclosure thereof.

"<u>Transfer Taxes</u>" has the meaning specified in <u>Section 7.1(b)</u>.

"<u>VLJ</u>" has the meaning specified in the recitals.

"<u>WARN Act</u>" means The Worker Adjustment and Retraining Notification Act of 1988, as amended, and the relevant rules and regulations promulgated thereunder.

"<u>WIP Adversary Proceedings</u>" means those adversary proceedings set forth on Schedule 7.8.

# Second Amended Schedule 2.3
## Designated Contracts

| Name of other parties to lease or contract | Address 1 | Address 2 | City | State | Zip | Country | Description of contract or lease and nature of debtor's interest. | Cure Cost |
|---|---|---|---|---|---|---|---|---|
| AVIDYNE CORPORATION | ATTN: VP, CORPORATE DEVELOPMENT | 55 OLD BEDFORD ROAD | LINCOLN | MA | 01773 | | IP License Agreement - dated 02/21/2007 | $0 |
| CITY OF ALBUQUERQUE | PO BOX 9948 | | ALBUQUERQUE | NM | 87119-1048 | | Albuquerque International Sunport III Hangar Lease | $356,318.38 |
| CITY OF ALBUQUERQUE | 2200 SUNPORT BLVD SE 3RD FLOOR | | ALBUQUERQUE | NM | 87106 | | Albuquerque International Sunport I & II Office & Hangar Lease | $150,612.20 |
| CITY OF ALBUQUERQUE | 2200 SUNPORT BLVD SE 3RD FLOOR | | ALBUQUERQUE | NM | 87106 | | Albuquerque International Sunport IV Hangar Lease | $29,464.66 |
| CITY OF ALBUQUERQUE | 2200 SUNPORT BLVD SE 3RD FLOOR | | ALBUQUERQUE | NM | 87106 | | Apron Area Lease and Agreement | $8,085.00 |
| COMANT INDUSTRIES INC | 577 BURNING TREE RD | | FULLERTON | CA | 92833 | | Supply Chain Agreement | $0 |
| ESSEX INDUSTRIES INC MANUFACTURING DIVISION | 6 SUNNEN DR | | ST. LOUIS | MS | 63143 | | Supply Chain Agreement | $0 |
| EXPRESS LOGISTICS dba Pilot Freight Services | MELANIE TRUJILLO | 2430 ALAMO AVE SE | ALBUQUERQUE | NM | 87106 | | Sub-Lease Agreement | $6,485.00 |
| ITELLIGENCE INNOVATIVE SOLUTIONS, INC. (software reseller) and | MARK CUMMINGS, GENERAL COUNSEL (Itelligence) | 3400 WATERVIEW PARKWAY STE 100 | RICHARDSON | TX | 75080 | | Certified Business Solutions Provider End-User License Agreement | $3,585.83 |
| SAP AMERICA, INC (party in interest) | DONALD K. LUDMAN, ESQ. BROWN & CONNERY, LLP (SAP America, Inc.) | 6 NORTH BROAD STREET | WOODBURY | NJ | 08096 | | | |
| JD LOCKAWAY, LLC | C/O TERRESA CURRIER, ESQUIRE | SAUL EWING LLP, 222 DELAWARE AVE., SUITE 1200 | WILMINGTON | DE | 19801 | | Real Property Commercial Lease: 2800 Karsten CT, SE, Albuquerque, NM - Sunport 10 | $36,000.00 as set forth in a Stipulation between JD Lockaway and the Buyer |
| JNJ PROPERTY MANAGEMENT, LLC | NICK CHAVEZ | 2601 KARSTEN COURT SE STE B | ALBUQUERQUE | NM | 87102 | | Commercial Lease | $13,017.00 |

| Name of other parties to lease or contract | Address 1 | Address 2 | City | State | Zip | Country | Description of contract or lease and nature of debtor's interest. | Cure Cost |
|---|---|---|---|---|---|---|---|---|
| KABA BENZING AMERICA INC | PRESIDENT & CEO | 3015 NORTH COMMERCE PARKWAY | MIRAMAR | FL | 33025 | | Software License and Professional Services Agreement | $0 |
| PARAMETRIC TECHNOLOGY CORPORATION | PO BOX 945722 | | ATLANTA | GA | 30394-5722 | | Software Maintenance Agreement (arbortext/Math/CAD) and License Agreements | $0 |
| PETER HAALAND/PHYRIX, LTD. LIABILITY CO. | 518 WEST LINDEN STREET | | LOUISVILLE | CO | 80027-3124 | | Patent and Asset Purchase Agreement - dated 03/23/2007 | $140,000.00 |
| PS ENGINEERING INC | MARK SCHEUER-PRESIDENT | 9800 MARTEL RD | LENOIR CITY | TN | 37772 | | Supply Chain Agreement | $0 |
| RANCH JOINT VENTURE LLP | WILLIAM L. ROGERS | 200 CRESCENT COURT, SUITE 1040 | DALLAS | TX | 75201 | | Special Warranty Deed | $0 |
| RESUME MIRROR | RESUME MIRROR, A DIVISION OF TALENT TECHNOLOGY CORPORATION | STE 300 10991 SHELLBRIDGE PARKWAY | RICHMOND | BC | V6X 3C6 | CANADA | License Agreement | $0 |
| REYNOLDS MASON INDUSTRIES INC | 1900 WELD BLVD STE 110 | | EL CAJON | CA | 92020 | | Supply Chain Agreement | $66,304.00 |
| S TEC CORPORATION | KEN PAUL, VP SALES AND MARKETING | ONE S TEC WAY | MINERAL WELLS | TX | 76067 | | Supply Chain Agreement | $183,894.00 |
| SAINT GOBAIN PERFORMANCE PLASTICS CORP | PO BOX 642625 | | PITTSBURGH | PA | 15264-2625 | | Supply Chain Agreement | $0 |
| SOUTHWEST RESEARCH INSTITUTE | DIRECTOR OF CONTRACTS | 6220 CULEBRA RD | SAN ANTONIO | TX | 78238 | | Purchase Agreement | $360,697.08 |
| TALEO | RAYMOND INGRASSIA | 4140 DUBLIN BLVD STE 400 | DUBLIN | CA | 94568 | | Taleo Business Edition Services Agreement | $31,350.00 |
| THE WELDING INSTITUTE | ATTN: INTELLECTUAL PROPERTY MANAGER | GRANTA PARK; GREAT ABBINGTON | CAMBRIDGE | | CB1 6AL | UK | License Agreement - dated 11/07/2001 | $38,808.75 |
| THYSSENKRUPP ELEVATOR | THYSSENKRUPP ELEVATOR CORPORATION | 8920 ADAMS ST NE STE B | ALBUQUERQUE | NM | 87113 | | Extended Warranty Service Agreement | $512.00 |
| TIGHITCO INC | VP-NEW BUSINESS DEVELOPMENT | 1375 SEABOARD INDUSTRIAL BLVD | ATLANTA | GA | 30319 | | Supply Chain Agreement | $5,706.00 |
| UNIGRAPHIC SOLUTIONS | JAMES R. MENGEGO | 13736 RIVERPORT DR | MARYLAND HIGHTS | MO | 63043 | | End User Purchase/License | $126,591.00 |

| Name of other parties to lease or contract | Address 1 | Address 2 | City | State | Zip | Country | Description of contract or lease and nature of debtor's interest. | Cure Cost |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | Agreement | |
| UGS CORP | BETTY RICHARDS, BUSINESS MANAGEMENT | 8822 S REITGLEINE BLVD STE 120 | HIGHLAND RANCH | CO | 80129 | | Professional Services Agreement; Teamcenter | $0 |
| WILLIAMS SCOTSMAN, INC. | 4015 HAWKINS NE | | ALBUQUERQUE | NM | 87109-4534 | | Lease Agreement; Flight Test Trailer located at 2503 Clark Carr Loop | $29,544.19 |

## SCHEDULE 4.1

## <u>ORGANIZATION OF SELLERS</u>

**<u>Intentionally Omitted.</u>**

**SCHEDULE 4.2**

**<u>SUBSIDIARIES AND INVESTMENTS</u>**

- Eclipse IRB Support, LLC is a wholly-owned subsidiary of Eclipse Aviation Corporation

- Eclipse Aviation Corporation owns 101,819 shares of common stock of Aspen Avionics, Inc., which was obtained by Eclipse Aviation Corporation in connection with the settlement of a claim against Aspen Avionics, Inc. in February 2007.

# Schedule 4.5

# Intellectual Property

**PATENT – Foreign**

|  | Country | Application /Patent No. | Title |
|---|---|---|---|
| 154494-0048 | Japan | 2004527783 | Method of Welding, by Using for Example Friction Stir Welding Surfaces with Polymer Sealant and Welded Structure |
| 154494-0089 | Japan | 2007551432 | Fire Suppression Systems |
| 154494-0093 | Japan | 517468/98 /3868500 | Labile Bromine Fire Suppressants |
| 154494-0051 | Australia | 2003258106 | Method of Welding, by Using for Example Friction Stir Welding Surfaces with Polymer Sealant and Welded Structure |
| 154494-0083 | Australia | 1996073952 | Labile Bromine Fire Suppressants |
| 154494-0084 | Australia | 2006204755 | Fire Suppression Systems |
| 154494-0058 | Spain | 03784945.2 EP1556186 | Method of Welding, by Using for Example Friction Stir Welding Surfaces with Polymer Sealant and Welded Structure |
| 154494-0059 | Italy | 03784945.2 EP1556186 | Method of Welding, by Using for Example Friction Stir Welding Surfaces with Polymer Sealant and Welded Structure |
| 154494-0060 | United Kingdom | 03784945.2 EP1556186 | Method of Welding, by Using for Example Friction Stir Welding Surfaces with Polymer Sealant and Welded Structure |
| 154494-0061 | France | 03784945.2 EP1556186 | Method of Welding, by Using for Example Friction Stir Welding Surfaces with Polymer Sealant and Welded Structure |
| 154494-0062 | Germany | 03784945.2 EP1556186 | Method of Welding, by Using for Example Friction Stir Welding Surfaces with Polymer Sealant and Welded Structure |
|  | **European Patent Office** | **EP1861174** | **Fire Suppressant Systems** |
| 154494-0077 | Germany | 69608707.3 EP0932432 | Labile Bromine Fire Suppressants |
| 154494-0078 | United Kingdom | 96936260.7 EP0932432 | Labile Bromine Fire Suppressants |
| 154494-0079 | France | 96936260.7 EP0932432 | Labile Bromine Fire Suppressants |

|  | Country | Application /Patent No. | Title |
|---|---|---|---|
| 154494-0080 | Netherlands | 96936260.7 EP0932432 | Labile Bromine Fire Suppressants |
| 154494-0081 | Belgium | 96936260.7 EP0932432 | Labile Bromine Fire Suppressants |
| 154494-0082 | Switzerland | 96936260.7 EP0932432 | Labile Bromine Fire Suppressants |
| 154494-0050 | Russia | 2005106228 RU2325981 | Method of Welding, by Using for Example Friction Stir Welding Surfaces with Polymer Sealant and Welded Structure |
| 154494-0091 | Russia | 2007130445 | Fire Suppression Systems |
| 154494-0053 | China | 03819156.3 | Method of Friction Stir Welding |
| 154494-0086 | China | 200680002236.2 | Fire Suppression Systems |
| 154494-0098 | Hong Kong | 08105868.0 | Fire Suppression Systems |
| 154494-047 | Israel | 166643 | Method of Welding, by Using for Example Friction Stir Welding Surfaces with Polymer Sealant and Welded Structure |
| 154494-0088 | Israel | 183869 | Fire Suppression Systems |
| 154494-0049 | Korea | 10-2005-7002026 | Method of Welding, by Using for Example Friction Stir Welding Surfaces with Polymer Sealant and Welded Structure |
| 154494-0090 | Korea | 1020077015807 | Fire Suppression Systems |
| 154494-0085 | Canada | 2,591,669 | Fire Suppression Systems |
| 154494-0052 | Canada | 2,494,143 | Method of Welding, by Using for Example Friction Stir Welding Surfaces with Polymer Sealant and Welded Structure |

**PATENT – USA**

|  | Country | Application /Patent No. | Title |
|---|---|---|---|
| 154494-0030 | USA | 08/897,771/ 5,957,405 | Twin Engine Aircraft |
| 154494-0031 | USA | 08/898,138/ 6,089,504 | Single Engine Aircraft |
| 154494-0032 | USA | 09/132,273/ 6,199,795 | Twin Engine Aircraft |
| 154494-0033 | USA | 09/143,047/ 6,170,780 | Twin Engine Aircraft |

|  | Country | Application /Patent No. | Title |
|---|---|---|---|
| 154494-0034 | USA | 10/635,829/ 7,225,966 | Welded Joints with Polymer Sealant |
| 154494-0044 | USA | 11/331,524 2006/60273223 | Fire Suppression Systems |
| 154494-0065 | USA | 11/427,783 2007/0119602 | Fire Suppression Systems |
| 154494-0066 | USA | 11/456,548 2007/0119603 | Fire Suppression Systems |
| 154494-0074 | USA | 08/423,209/ 5,626,786 | Labile Bromine Fire Suppressants |
| 154494-0095 | USA | 11/929,743 2008/0115950 | Fire Suppression Systems |

**TRADEMARK**

| Country | Mark | Date of Filing | App. No./ Reg. No. |
|---|---|---|---|
| Australia | ECLIPSE AVIATION AUSTRALIA | 9/25/01 | 890219 |
| Australia | EAA ECLIPSE AVIATION AUSTRALIA & Design | 9/25/01 | 890220 |
| Australia | ECLIPSE AVIATION & Design | 4/15/2004 | 998221 |
| Australia | ECLIPSE AVIATION | 4/15/2004 | 998230 |
| U.S. | ECLIPSE | 1/20/00 | 75/899,693 3,557,904 |
| U.S. | JETCOMPLETE | 7/12/05 | 78/669,039 3,525,722 |
| U.S. | ECLIPSE | 10/9/06 | 77/017,234 |
| India | ECLIPSE | 6/19/08 | **1701261** |
| India | ECLIPSE 500 | 6/19/08 | **1701262** |
| India | Design Only (Airplane Design) | 6/19/08 | **1701263** |
| Uruguay | ECLIPSE | 5/12/06 | 370,856 |
| U.S. | PHOSTREX | 5/23/05 | 3,469,367 |
| U.S. | ECLIPSE 500 | 10/9/06 | 77/017249 |
| U.S. | ECLIPSE 500 | 10/11/00 | 3,373,394 |
| U.S. | Design Only (Circles) | 8/15/00 | 2,992,733 |
| U.S. | ECLIPSE 500 JET | 5/11/00 | 3,373,395 |
| U.S. | ECLIPSE AVIATION | 2/3/00 | 3,169,023 |

**Schedule 5.2**

**Brokers and Finders**

**None.**

**Schedule 7.8**

**WIP Adversaries**

| Adversary Proceeding No. | |
|---|---|
| 08-51891-MFW | Mata et al v. Eclipse Aviation et al |
| 08-51904-MFW | Vermeer Manufacturing Company v. Eclipse Aviaion Corporation et al |
| 09-50027-MFW | Alpha-Airways GMBH v. Eclipse Aviation Corporation et al |
| 09-50028-MFW | La Scogliera, S.p.A, an Italian Corporation v. Eclipse Aviation Corp. |
| 09-50030-MFW | Maverik, Inc. v. Eclipse Aviation Corporation et al |

**Schedule 8.2(e)**

**Governmental Consents**

**Schedule A-1**

**Excluded Contracts**

1.     Amended and Restated Shareholders Agreement, among Eclipse Aviation Corporation and certain Shareholders, dated as of June 8, 1999, as amended and restated on February 15, 2008.

2.     Any Purchase Agreements related to any equity or security in Eclipse Aviation Corporation.

3.     Note, Conversion Share and Redemption Equity Warrants Subscription Agreement by and between Eclipse Aviation Corporation and certain Investors, dated as of May 26, 2006.

4.     Third Amended and Restated Intercreditor Agreement, among Bank of New York and Eclipse Aviation Corporation, dates as May 31, 2006.

5.     Security Agreement by Bank of New York, Eclipse Aviation Corporation, dates as of March 15, 2007.

6.     Collateral Agent Agreement, by Bank of New York, Eclipse Aviation Corporation and certain Lenders, dates as of March 13, 2007.

7.     Accession Agreement, among Bank of New York and Eclipse Aviation Corporation, dated as of March 31, 2006.

8.     Convertible Loan Agreement, among Eclipse Aviation Corporation and Alfred E. Mann Living Trust, dated as of July 29, 2008.

9.     Promissory Note, by Eclipse Aviation Corporation, dated as of August [__], 2008.

10.    Convertible Loan Agreement, among Eclipse Aviation Corporation and ETIRC Aviation S.a.r.l., dated as of August [__], 2008.

11.    Warrant to Purchase Series A Common Stock of Exlipse Aviation Corporation, by Eclipse Aviation Corporation and Roel Pieper, dated as of August [__], 2008.

12.    Limited Waiver of Change of Control Redemption Provision by Parker [_____] LP. dated as of August 1, 2008.

13.    Limited Waiver of Change of Control Redemption Provision by Daniel J. McElroy, dated as of August 4, 2008.

14.    Limited Waiver of Change of Control Redemption Provision by JBJK Investments, LLC, dated as of August 4, 2008.

15.     Limited Waiver of Change of Control Redemption Provision by Richard Novel, dated as of August 1, 2008.

16.     Limited Waiver of Change of Control Redemption Provision by Lars Thuesen, dated as of August 1, 2008.

17.     Limited Waiver of Change of Control Redemption Provision by Texas Eclipse Group, dated as of August 7, 2008.

18.     Limited Waiver of Change of Control Redemption Provision by Melinda Mason, dated as of August 4, 2008.

19.     Limited Waiver of Change of Control Redemption Provision by Monte Ahuja Family Trust and Usha Ahuja Family Trust, dated as of August 6, 2008.

20.     Limited Waiver of Change of Control Redemption Provision by Robert A. Mittledorf, Peggy A. Mittledorf TTE FBO the Mittledorf Family Trust, dated as of August 5, 2008.

21.     Limited Waiver of Change of Control Redemption Provision by Brian L. Mittledorf, dated as of August 5, 2008.

22.     Limited Waiver of Change of Control Redemption Provision by Irell & Manella LLP, dated as of August 5, 2008.

23.     Limited Waiver of Change of Control Redemption Provision by William Luterman, dated as of August 5, 2008.

24.     Limited Waiver of Change of Control Redemption Provision by Jeffrey M. Rubenstein, dated as of July 30, 2008.

25.     Limited Waiver of Change of Control Redemption Provision by Rapid Prototypes, Inc. dated as of August 5, 2008.

26.     Limited Waiver of Change of Control Redemption Provision by Klaburde Revocable Trust, dated as of July 31, 2008.

27.     Limited Waiver of Change of Control Redemption Provision by Lloyd Marcum DDS Inc. Profit Sharing Plan, dated as of July 30, 2008.

28.     Limited Waiver of Change of Control Redemption Provision by Brook J. Lenfest, dated as of August 1, 2008.

29.     Limited Waiver of Change of Control Redemption Provision by Global Light Industrial, Inc., dated as of July 31, 2008.

30.     Limited Waiver of Change of Control Redemption Provision by Sand Hill Sakura Fund, LP, dated as of August 1, 2008.

31.     Limited Waiver of Change of Control Redemption Provision by Eric M. Kobern, dated as of July 31, 2008.

32.     Limited Waiver of Change of Control Redemption Provision by James Teng, dated as of [_____].

33.     Amended and Restated Security Agreement made by Eclipse IRB Sunport LLC in favor of the Bank of New York, dated as of February 15, 2008.

34.     Second Amendment to Mortgage with Assignment of Rents and Fixture Filling, by and between Eclipse Aviation Corporation and the Bank of New York, dated as of February 15, 2008.

35.     Fourth Accession Agreement, by the Bank of New York and Eclipse Aviation Corporation, dated as of February 15, 2008.

36.     Amended and Restated Shareholders Agreement, by Eclipse Aviation Corporation and certain Investors named therein, dated as of February 15, 2008.

37.     J-1 and J-2 Preferred Stock Subscription Agreement, by and between ETIRC Aviation S.a.r.l. and Eclipse Aviation Corporation, dated as of January 17, 2008.

38.     Joinder Agreement to Amended and Restated Shareholders Agreement by ETIRC Aviation S.a.r.l., dated as of June 8, 1999.

39.     Exchange Agent Agreement, by Eclipse Aviation Corporation and accepted be The Bank of New York Trust Company, N.A., dated as of January 17, 2008.

40.     Exchange Offer Agreement by and among Eclipse Aviation Corporation, Kings Road Investments Ltd., Citadel Horizon S.a.r.l. and HBK Master Fund L.P., dated as of February 12, 2008.

41.     July 2008 Restructing Agreement by and among Eclipse Aviation Corporation, ETIRC Aviation S.a.r.l., Alfred E. Mann as defined therein, and the Consenting Holders as defined therein, dated as of July 28, 2008.

42.     Air Taxi Financing Agreement between Eclipse Aviation Corporation and UT Finance Corporation, dated as of April 5, 2005.

43.     Air Taxi Financing Agreement by and among Eclipse Aviation Corporation, UT Finance Corporation and Pratt & Whitney Canada Corp., dated as of June 30, 2007.

44. Option Agreement to Subscribe Shares of Capital of ETIRC Aviation S.a.r.l. between Eclipse Aviation Corporation and ETIRC Aviation S.a.r.l., dated as of May 9, 2008.

45. Option and Factory Extenstion Agreement between ETIRC Aviation S.a.r.l. and Eclipse Aviation Corporation, dated as of June 30, 2008, to extend the Memorandum of Understanding between ETIRC Aviation S.a.r.l. and Eclipse Aviation Corporation, dated as of December 15, 2007.

46. Distributor Agreement between Eclipse Aviation Corporation and ETIRC Aviation Cyprus Ltd., dated as of September 17, 2007.

47. Confidentiality and Non-Disclosure Agreement by and among Eclipse Aviation Corporation, ETIRC Aviation Cyprus Ltd., and ETIRC Aviation S.a.r.l., dated as of September 17, 2007.

48. Eclipse 500 Fleet Aircraft Purchase Agreement between ETIRC Aviation Europe and Eclipse Aviation Corporation, dated as of January 12, 2006.

49. Pilot Training Services Agreement between Eclipse Aviation Corporation and United Air Lines, Inc., dated as of November 11, 2004, as terminated by Eclipse Aviation Corporation and United Air Lines, Inc. by the Amendment to Agreement – Pilot Training Services, dated as of February 15, 2007.

50. Aircraft Lease Agreement between Eclipse Aviation Corporation and Vern Raburn, dated as of August 27, 2008.

51. Severance Agreement and General Release between Vern Raburn, Eclipse Aviation Corporation and ETIRC Aviation S.a.r.l., dated as of July 25, 2008, as amended by Vern Raburn and Eclipse Aviation Corporation by the Amendment to Severance Agreement and General Release, dated as of August 27, 2008.

52. Letter Agreement between Vern Raburn, King Road Investments, Ltd., Citadel Horizons S.a.r.l., and HBK Master Fund, L.P., dated as of July 28, 2008.

53. Severeance Agreement and General Release between Chris Herzog and Eclipse Aviation, Inc., dated as of October 31, 2004.

54. Severance Agreement and General Release between Eugene Garnes and Eclipse Aviation, Inc., dated as of December 30, 2006.

55. Severance Agreement and General Release between Don Taylor and Eclipse Aviation, Inc., dated as of November 5, 2007.

56. Severance Agreement and General Release between William Bonder and Eclipse Aviation, Inc., dated as of June 7, 2008.

57.     Employment Agreement between Eclipse Aircraft Corporation and Oliver Masefield, dated as of July 1, 2001.

58.     Employment Agreement between Eclipse Aviation Corporation and J. Mark Borseth, dated as of June 11, 2008.

59.     Bonus Letter from Eclipse Aviation Corporation to J. Mark Borseth, dated as of August 25, 2008.

60.     Bonus Letter from Eclipse Aviation Corporation to Michael McConnell, dated as of August 25, 2008.

61.     Bonus Letter from Eclipse Aviation Corporation to Peg Billson, dated as of August 25, 2008.

62.     All Contracts relating to the Jet Complete Program.

63.     All Contracts with Irell & Manella LLP.

64.     All Contracts with International Business Machines.

65.     All Contracts with BAE Systems.

66.     All Contracts with Mach 2 Management, Inc.

67.     All Contracts with Unifist Corporation.

68.     All Contracts with Albuquerque Isotopes.

69.     All Contracts with Productivity Team LLC.

70.     All Contracts with Wexler & Walker Public Policy Association.

71.     All Contracts with Castle & Cooke Aviation Services, I.

72.     All Contracts with Gallagher & Kennedy.

73.     All Contracts with The Santa Fe Opera.

74.     All Contracts with Pool Aviation.

75.     All Contracts with Jack Harrington.

76.     Contract with Axon Solutions Inc.

77.     License and Cooperation Agreement with Jeppesen Sanderson Inc.

78.   Subject to Section 2.3(b) of the Agreement, any Contract not identified as a Designated Contract or a Pending Designated Contract shall be deemed on Excluded Contract.

**Schedule A-2**

**Excluded Leases**

1.      Sublease between Castle & Cooke Aviation Services Inc. and Eclipse Aviation Corporation, dated as of December 1, 2006 pertaining to 7415, 7501, 7530 and 7405 Hayvenhurst Place, Van Nuys, California.

2.      Memorandum of Agreement between Lian Tien Ventures, LLC and Eclipse Aviation Corporation, dated as of June 14, 2007.

3.      Lease between SKAR, LLC and Eclipse Aviation Corporation, dated as of February 28, 2008 pertaining to 2811 Karsten Court SE, Albuquerque, New Mexico.

4.      Sub-Lease between Bode Aero Services, Inc. and Eclipse Aviation Corporation, dated as of September 1, 2007 pertaining to 7401 Paseo Del Volcan NW, Albuquerque, New Mexico.

5.      Subject to Section 2.3(b) of the Agreement, any Lease not identified as a Designated Contract or a Pending Designated Contract shall be deemed to be an Excluded Lease.

**Exhibit A**

**Bidding Procedures Order**

**(see attached)**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| ECLIPSE AVIATION CORPORATION, *et al.*, | ) | Case No. 08-13031 (MFW) |
| | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |

## ORDER (A) APPROVING BID PROCEDURES RELATING TO SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS; (B) BREAK UP FEE; (C) SCHEDULING A HEARING TO CONSIDER THE SALE AND APPROVING THE FORM AND MATTER OF NOTICES; (D) ESTABLISHING PROCEDURES RELATING TO ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, INCLUDING NOTICE OF PROPOSED CURE AMOUNTS; AND (E) GRANTING RELATED RELIEF

Upon the Motion[1], dated July __, 2009 (the "Sale Motion"), of Jeoffrey L. Burtch, as the Chapter 7 trustee (the "Trustee") of the above-captioned debtors (collectively, the "Debtors") for the entry of an order (A) approving bid procedures which are attached as Exhibit 1 hereto (the "Bid Procedures") with respect to the proposed sale of substantially all of the Debtors' assets, as more fully set forth in that certain asset purchase agreement (the "Agreement") dated as of July __, 2009 by and between the Trustee and Eclipse Aerospace, Inc. ("Buyer"); (B) scheduling a hearing (the "Sale Hearing") and approving the form and manner of notice of the Auction and the Bid Procedures; (C) establishing procedures relating to the assumption and assignment of certain Designated Contracts, including notice of proposed cure amounts; and (D) granting related relief; and the Court having determined that, to the extent set forth herein, the relief requested in the Motion is in the best interests of the Debtors, the Chapter 7 estates, creditors and

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Agreement (as defined below), or in the Bid Procedures (defined below).

other parties in interest; due and appropriate notice of the Motion and the relief requested therein was provided by the Trustee pursuant to Bankruptcy Rules 2002, 4001, 6004, 6006 and 9014 on the following parties: (i) all entities known to assert any interest in or lien upon the Purchased Assets; (ii) all parties to Designated Contracts; (iii) all parties that are entitled to notice under Bankruptcy Rule 2002; (iv) the attorneys general of all states in which the Purchased Assets are located; (v) the Office of the United States Trustee; (vi) the Securities and Exchange Commission; (vii) the Internal Revenue Service and any governmental taxing authority that has filed a claim against the Chapter 7 Estates; (viii) all entities that expressed to the Seller an interest in purchasing the Purchased Assets; (ix) any party appearing in the Bankruptcy Cases and claiming a secured interest in the Purchased Assets; or any party known to the Seller and claiming a secured interest in the Purchased Assets; and (x) any and all other parties directed by the Court (collectively, the "Notice Parties"); and after consideration of the Sale Motion to the extent of the relief granted herein; and the remainder of the record herein; and after due deliberation thereon; and good and sufficient cause appearing therefore, it is hereby

FOUND, CONCLUDED, AND DECLARED THAT:[2]

A.      The Court has jurisdiction over this matter and over the property of the Debtors and their bankruptcy estates pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

B.      Notice of the Hearing, the Motion and proposed entry of this Order has been provided to the Notice Parties. Under the urgent circumstances, requisite notice of the Motion and the relief requested thereby and this Order has been provided in accordance with Bankruptcy

---

[2]      Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. See Fed. R. Bankr. P. 7052.

Rules 2002, 4001, 6004, 6006 and 9014, which notice is sufficient for all purposes under the Bankruptcy Code, including, without limitation, Bankruptcy Code § 102(1), and no further notice of, or hearing on, the Motion or this Order is necessary or required.

C.  The proposed notices (in substantially the form attached hereto as Exhibit 2) of (i) the Proposed Sale of the Assets, (ii) the assumption and assignment of the Designated Contracts and any Cure Costs payable in respect thereof, as described or referred to in the Agreement, (iii) the Agreement, and the terms contained therein, and (iv) the Bid Procedures, are appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Proposed Sale of the Assets, the Auction, the assumption and assignment of Designated Contracts and the cure associated therewith, the Agreement and the Bid Procedures to be employed in connection therewith.

D.  The approval of the Bidding Procedures is in the best interest of the estates, their creditors and other parties in interest.  The Trustee has articulated good and sufficient reasons for this Court to grant the relief requested in the Motion regarding the Bid Procedures and has demonstrated sound business justifications to support such relief.  The Bidding Procedures, including the Break Up Fee, are fair, reasonable and reasonably calculated to enhance the prospect of competitive bidding and maximize recovery for the estates and their creditors.

E.  The entry of this Order and the relief contained herein are in the best interests of the Debtors, their estates, creditors and other parties-in-interest; and it is therefore

ORDERED, ADJUDGED AND DECREED THAT:

1.  The relief requested in the Motion is granted, to the extent set forth herein.

2.     The Bid Procedures attached hereto as Exhibit 1 are hereby approved and fully incorporated into this Order, and shall apply with respect to the Proposed Sale of the Assets. The Trustee is authorized to take any and all actions necessary to implement the Bid Procedures.

3.     All objections to the relief requested in the Motion that have not been withdrawn, waived, or settled as announced to the Court at the hearing on the Motion or by stipulation filed with the Court, are overruled.

4.     A Qualified Bidder that desires to make a Bid shall deliver written copies of its bid to the parties set forth below not later than 12:00 noon (prevailing Eastern time) on August __, 2009 (the "Bid Deadline") and shall comply with the requirements set forth in the Bid Procedures for making such bid: (a) Jeoffrey L. Burtch, Esq., Cooch & Taylor, P.A., 1000 West Street, Wilmington, Delaware 19801 with a copy to Cooch & Taylor, P.A., 1000 West Street, Wilmington, Delaware 19801 Att.: Adam Singer, Esq.; (b) Buyer: Eclipse Aerospace, Inc., 125 Fairchild St., Suite 100, Charleston, SC 29492, Attn.: Mason Holland, President, with a copy to: Nelson Mullins Riley & Scarborough LLP, Atlantic Station, 201 17th Street, Suite 1700, Atlanta, Georgia 30363, Attn.: William J. Ching, Esq. and Michael E. Hollingsworth II, Esq; and (c) the Ad Hoc Committee: Covington & Burling LLP, The New York Times Building, 620 Eighth Avenue, New York, New York 10018, Attn: Benjamin Hoch and Andrew Ment.

5.     The Trustee shall have the right to reject any and all bids that he believes in his reasonable discretion, in consultation with the Ad Hoc Committee of Senior Secured Noteholders, do not comply with the Bid Procedures. Buyer is deemed to be a Qualified Bidder, and Buyer's Bid as embodied in the Agreement, is deemed to be a Qualified Bid.

6.     As further described in the Bid Procedures, if a Qualified Bid other than Buyer's Bid is timely received, the Auction will be held on August __, 2009 at _____ _.m. (prevailing

Eastern time), and the Trustee shall, not later than _____ m. (prevailing Eastern time) on

August __, 2009, notify Buyer, all Qualified Bidders who have submitted a Qualified Bid and

expressed their intent to participate in the Auction, counsel for the Ad Hoc Committee of Senior

Secured Noteholders and the United States Trustee that the Auction will be held on August __,

2009 at _____ at the offices of Cooch & Taylor, 1000 West Street, Wilmington, Delaware

19801.

7.      Not later than three (3) days after entry of this Order, the Trustee will cause the

Auction and Sale Notice, substantially similar to the form attached hereto as Exhibit 2 to be sent

by first-class mail postage prepaid to the Notice Parties.

8.      In addition, to facilitate the sale, assumption and assignment of any Designated

Contracts, the Trustee will serve a notice (the "Cure Amount Notice"), similar to the form

attached hereto as Exhibit 3 hereto not later than three (3) days after the entry of this Order upon

each counterparty to a Designated Contract under the Agreement.  Buyer shall have the right

until the date provided in the Agreement to amend the Designated Contracts schedule to include

additional executory contracts and unexpired leases or to exclude executory contracts or

unexpired leases previously included as provided in the Agreement.  To the extent that Buyer is

not the Successful Bidder and an alternative Successful Bidder is seeking to have certain

Designated Contracts assumed and assigned as part of an alternative transaction, the Trustee will

provide financial information for the alternative bidder with respect to all non-debtor parties to

such Designated Contracts immediately following the Auction via facsimile or Federal Express

or email.

9.      The Trustee will attach to the Cure Amount Notice his calculation of the

undisputed cure amounts that the Trustee believes must be paid to cure all prepetition defaults

under all Designated Contracts (the "Prepetition Cure Amounts"). If no such amount is listed, then the Trustee believes that there is no Prepetition Cure Amount. Unless the non-debtor party to a Designated Contract files an objection (the "Cure Amount Objection") to its scheduled Prepetition Cure Cost or any other objection to the proposed assumption and assignment of its Designated Contract no later than 4:00 p.m. (prevailing Eastern time) on August __, 2009 (or in the event Buyer is not the Successful Bidder, at or prior to the Sale Hearing), and serves the objection, so that it is actually received before such deadline, upon (a) counsel to the Trustee: Jeoffrey L. Burtch, Esq., Cooch & Taylor, P.A., 1000 West Street, Wilmington, Delaware 19801, (b) Buyer: Eclipse Aerospace, Inc., 125 Fairchild St., Suite 100, Charleston, SC 29492, Attn.: Mason Holland, President, with a copy to: Nelson Mullins Riley & Scarborough LLP, Atlantic Station, 201 17th Street, Suite 1700, Atlanta, Georgia 30363, Attn.: William J. Ching, Esq. and Michael E. Hollingsworth II, Esq.; and (c) counsel for the Ad Hoc Committee of Senior Secured Noteholders: Covington & Burling LLP, The New York Times Building, 620 Eighth Avenue, New York, New York 10018, Attn: Benjamin Hoch and Andrew Ment; such non debtor party shall (i) be forever barred from objecting to the Prepetition Cure Amount and from asserting any additional cure or other amounts with respect to such Designated Contract or any other objection to the proposed assumption and assignment of its Designated Contract and the Trustee shall be entitled to rely solely upon the Prepetition Cure Amount; and (ii) be forever barred and estopped from asserting or claiming against the Debtors, Buyer, or such other Successful Bidder or any other assignee of the relevant Designated Contract that any additional amounts are due or defaults exist under such Designated Contract.

10. In the event that a Cure Amount Objection is timely filed, the Cure Amount Objection must set forth (i) the basis for the objection, (ii) with specificity, the amount the party

asserts as the Prepetition Cure Amount, and (iii) appropriate documentation in support of the Prepetition Cure Amount.

11.    Hearings on Cure Amount Objections may be held (a) at the Sale Hearing, or (b) on such other date as this Court may designate upon request by the Trustee with the prior written consent of Buyer.

12.    The Trustee's decision to assume and assign Designated Contracts is subject to Court approval and consummation of the Proposed Sale of the Assets. Absent consummation of the Proposed Sale of the Assets, each of the Designated Contracts shall neither be deemed assumed nor assigned and shall in all respects be subject to further administration under the Bankruptcy Code.

13.    Except to the extent otherwise provided in the Agreement or any agreement with a Successful Bidder, subject to any required Prepetition Cure Amount payments, the assignee of any assumed Designated Contract will not be subject to any liability to the assigned Designated Contract counterparty that accrued or arose before the closing date of the Proposed Sale of the Assets and the Debtors and the Chapter 7 estates shall be relieved of all liability accruing or arising thereafter pursuant to Bankruptcy Code § 365(k).

14.    Recognizing the value and benefits that the Buyer has provided to the estates by entering into the Asset Purchase Agreement, as well as Buyer's expenditure of time, energy and resources, Buyer is hereby granted a fee equal to $1,600,000 (the "Break Up Fee"), such fee payable in the event the Court fails to approve a sale to Buyer and instead approves a sale of some or all of the Purchased Assets to an entity that has submitted a Qualified Bid and such sale closes. The Break Up Fee shall be payable at the closing of the sale in connection with such Bid from the first proceeds of such sale without further order of the Court. The Break Up Fee, when

earned, shall constitute an administrative claim against the estate under Bankruptcy Code Sections 503(b)(1) and 507(a)(2).

15. If Buyer elects to participate in bidding at the Auction, the amount of the Break Up Fee shall be considered if added to Buyer's bid in determining whether Buyer's bid is a higher and better offer for the Purchased Assets.

16. Objections, if any, to the relief requested in the Sale Motion must: (1) be in writing; (2) comply with the Bankruptcy Rules and the Local Bankruptcy Rules; (3) be filed with the clerk of the Bankruptcy Court for the District of Delaware, 3rd Floor, 824 Market Street, Wilmington, Delaware 19801, on or before 12:00 p.m. (prevailing Eastern Time) on January 15, 2009 and (4) be served so as to be received no later than 4:00 p.m. (prevailing Eastern Time) on such date, upon (a) counsel to the Trustee: Jeoffrey L. Burtch, Esq., Cooch & Taylor, P.A., 1000 West Street, Wilmington, Delaware 19801, (b) Buyer: Eclipse Aerospace, Inc., 125 Fairchild St., Suite 100, Charleston, SC 29492, Attn.: Mason Holland, President, with a copy to: Nelson Mullins Riley & Scarborough LLP, Atlantic Station, 201 17th Street, Suite 1700, Atlanta, Georgia 30363, Attn.: William J. Ching, Esq. and Michael E. Hollingsworth II, Esq.; and (c) counsel for the Ad Hoc Committee of Senior Secured Noteholders: Covington & Burling LLP, The New York Times Building, 620 Eighth Avenue, New York, New York 10018, Attn: Benjamin Hoch and Andrew Ment; provided however, to the extent that Buyer is not the Successful Bidder and an alternative Successful Bidder is seeking to have certain unexpired leases, license agreements and executory contracts assumed and assigned as part of an alternative transaction, the non-debtor parties to such unexpired leases, license agreements and executory contracts shall have until the Sale Hearing to raise objections under Bankruptcy Code § 365(b)(1)(C).

17.     The Sale Hearing shall be held before this Court on August __, 2009 at _____m. (prevailing Eastern Time).  The Sale Hearing may be adjourned, from time to time, without further notice to creditors or other parties-in-interest other than by announcement of said adjournment before this Court or on this Court's calendar on the date scheduled for said hearing.

18.     The notices to be issued in connection with the Proposed Sale of the Assets, substantially in the form of the notices annexed hereto as [Exhibits 2 and 3] are approved in all respects.

19.     This Order shall constitute findings of fact and conclusions of law and shall take effect immediately upon execution hereof.

20.     As provided by Bankruptcy Rules 6004(g) and 6006(d), this Order shall not be stayed for ten (10) days after the entry thereof and shall be effective and enforceable immediately upon its entry on this Court's docket.

21.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

22.     This Court shall retain jurisdiction over any matters related to or arising from the implementation of this Order and the Bid Procedures.

Dated August_____, 2009
Wilmington, Delaware

_____
Mary F. Walrath
United States Bankruptcy Judge

**EXHIBIT 1**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| Eclipse Aviation Corporation, *et al.*,[1] | ) | Case No. 08-13031 (MFW) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

## BID PROCEDURES

On November 25, 2008 (the "Petition Date"), Eclipse Aviation Corporation and its affiliated debtors (collectively, the "Debtors") filed chapter 11 cases pending in the Bankruptcy Court and jointly administered under Case No. 08-13031 (MFW). On March 5, 2009, the Debtors' cases converted to cases under Chapter 7 of the Bankruptcy Code. Jeoffrey L. Burtch was appointed as interim chapter 7 trustee on March 5, 2009, and serves as the chapter 7 trustee (the "Trustee") in these cases pursuant to section 702(d) of the Bankruptcy Code. On July [__], 2009, the Trustee entered into an asset purchase agreement (the "Agreement")[2] with Eclipse Aerospace Inc. ("Buyer") in which Buyer proposes to purchase substantially all of the Debtors' assets. By motion dated July [__], 2009 (the "Motion"), the Trustee sought, among other things, approval for the sale of substantially all the assets (the "Assets") of the Debtors and of the process and procedures set forth below (the "Bid Procedures") through which the Trustee, with the consultation of the Ad Hoc Committee of Senior Secured Noteholders, will determine the highest and best offer for the Assets. On July [__], 2009, the Bankruptcy Court entered its order (the "Bidding Procedures Order"), which, among other things, approved the Bid Procedures.

On August [__], 2009, at ____ _. m. (prevailing Eastern Time) as further described below, in the Motion and in the Bidding Procedures Order, the Bankruptcy Court shall conduct the Sale Hearing at which the Trustee shall seek entry of the Sale Order authorizing and approving the sale of the Assets (the "Proposed Sale") to Buyer (defined below) or to one or more other Qualified Bidders (defined below) that the Trustee, in consultation with the Ad Hoc Committee of Senior Secured Noteholders, determines to have made the highest and best offer.

*Agreement*

Pursuant to the terms and conditions of the Agreement, Buyer would provide consideration for the Assets equal to the following (the "Purchase Price"): (i) the Cash Consideration, which amount shall be payable as set forth in <u>Section 3.2</u> of the Agreement, plus (ii) the Note Consideration. The transaction contemplated by the Agreement is subject to

---

[1]      The Debtors in these proceedings are: Eclipse Aviation Corporation (Tax I.D. No. XX-XXX9000) and Eclipse IRB Sunport, LLC, a wholly-owned subsidiary of Eclipse Aviation Corporation (Tax I.D. No. XX-XX4013), each with a mailing address of 2503 Clark Carr Loop SE, Albuquerque, NM  87106.

[2]      Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

competitive bidding as set forth herein, and approval by the Bankruptcy Court pursuant to sections 363 and 365 of the Bankruptcy Code.

*Assets for Sale*

The Trustee is offering for sale in one or more transactions all or substantially all of the assets of Eclipse Aviation Corporation and its affiliated debtor.  The assets proposed to be sold to the Buyer consist of the Purchased Assets as set forth in the Agreement.  The assets for sale to the Buyer do not include the Excluded Assets, which shall mean (i) the excluded assets specified in the Agreement.

*Participation Requirements*

In order to participate in the bidding process and to or otherwise be considered for any purpose hereunder, a person interested in all or portions of the Assets (a "Potential Bidder") must first deliver (unless previously delivered) to the Trustee and his counsel no later than 12:00 noon (prevailing Eastern Time) on August ___, 2009:

(a)    <u>Confidentiality Agreement</u>. An executed confidentiality agreement in form and substance acceptable to the Trustee and his counsel; such form attached as Exhibit 1 hereto (if not already provided); and

(b)    <u>Identification of Potential Bidder</u>.  Identification of the Potential Bidder and any Principals (defined below), and  the representatives thereof who are authorized to appear and act on their behalf for all purposes regarding the contemplated transaction.

*Designation as Qualified Bidder*

A "Qualified Bidder" is a Potential Bidder (or combination of Potential Bidders whose bids for the Debtors' assets do not overlap and who agree to have their bids combined for purposes of the determination of whether such Potential Bidders together constitute a Qualified Bidder, and who shall also be referred to herein as a single Qualified Bidder) that delivers the documents described in subparagraphs (a)-(b) above, and that the Trustee in his discretion and with assistance from his advisors, and in consultation with the Ad Hoc Committee of Senior Secured Noteholders, determines is reasonably likely to submit a *bona fide* offer that would result in greater total consideration being received for the benefit of the Debtors' creditors than under the Agreement and to be able to consummate a sale if selected as a Successful Bidder (defined below).

Upon the receipt from a Potential Bidder of the information required under subparagraphs (a)-(b) above, the Trustee, in consultation with the Ad Hoc Committee of Senior Secured Noteholders, as soon as is practicable, shall determine and notify the Potential Bidder with respect to whether such Potential Bidder is a Qualified Bidder.

Buyer is a Qualified Bidder.

*Access to Due Diligence Materials*

Only Potential Bidders that comply with the Participation Requirements are eligible to receive due diligence access or additional non-public information. If the Trustee, in consultation with the Ad Hoc Committee of Senior Secured Noteholders, determines that a Potential Bidder who has satisfied the Participation Requirements does not constitute a Qualified Bidder, then such Potential Bidder's right to receive due diligence access or additional non-public information shall terminate. The Trustee will designate a representative to coordinate all reasonable requests for additional information and due diligence access from such Qualified Bidders. The Trustee shall not be obligated to furnish any due diligence information after the Bid Deadline (as hereinafter defined). The Trustee is not responsible for, and will bear no liability with respect to, any information obtained by Qualified Bidders in connection with the sale of the Assets.

*Due Diligence From Bidders*

Each Potential Bidder and Qualified Bidder (collectively, a "Bidder") shall comply with all reasonable requests for additional information and due diligence access by the Trustee, the Ad Hoc Committee of Senior Secured Noteholders or their advisors regarding such Bidder and its contemplated transaction. Failure by a Potential Bidder to comply with requests for additional information and due diligence access will be a basis for the Trustee to determine that the Potential Bidder is not a Qualified Bidder. Failure by a Qualified Bidder to comply with requests for additional information and due diligence access will be a basis for the Trustee to determine that a bid made by a Qualified Bidder is not a Qualified Bid.

### Bidding Process

The Trustee and his advisors, in consultation with the Ad Hoc Committee of Senior Secured Noteholders, shall: (i) determine whether a Potential Bidder is a Qualified Bidder; (ii) coordinate the efforts of Bidders in conducting their due diligence investigations, as permitted by the provisions, above; (iii) receive offers from Qualified Bidders; and (iv) negotiate any offers made to purchase the Assets (collectively, the "Bidding Process"). The Trustee shall have the right to adopt such other rules for the Bidding Process (including rules that may depart from those set forth herein) that will better promote the goals of the Bidding Process and that are not inconsistent with any of the other provisions hereof or of any Bankruptcy Court order.

*Bid Deadline*

**The deadline for submitting bids by a Qualified Bidder shall be August ___, 2009, at 12:00 noon (Eastern Time) (the "Bid Deadline").**

Prior to the Bid Deadline, a Qualified Bidder that desires to make an offer, solicitation or proposal (a "Bid") shall deliver written copies of its bid to: (a) counsel to the Trustee, Cooch & Taylor P.A., The Brandywine Building, 1000 West Street, 10th Floor, P.O. Box 1680, Wilmington, Delaware 19899-1680, Attn: Adam Singer; (b) Eclipse Aerospace, Inc., 125 Fairchild St., Suite 100, Charleston, SC 29492, Attn.: Mason Holland, President, with a copy to: Nelson Mullins Riley & Scarborough LLP, Atlantic Station, 201 17th Street, Suite 1700, Atlanta, Georgia 30363, Attn.: William J. Ching, Esq. and Michael E. Hollingsworth II, Esq; and (c) counsel to the Ad Hoc Committee of Senior Secured Noteholders, Covington & Burling LLP,

The New York Times Building, 620 Eighth Avenue, New York, New York 10018, Attn: Benjamin Hoch and Andrew Ment (collectively, the "Notice Parties"), so that the bid is actually received by the Bid Deadline.

A Bid received after the Bid Deadline shall not constitute a Qualified Bid unless otherwise agreed by the Trustee in consultation with the Ad Hoc Committee of Senior Secured Noteholders.

*Bid Requirements*

To be eligible to participate in the Auction, each Bid and each Qualified Bidder submitting such a Bid must be determined by the Trustee, in consultation with the Ad Hoc Committee of Senior Secured Noteholders, to satisfy each of the following conditions:

(a) <u>Good Faith Deposit</u>:  Each Bid must be accompanied by a deposit (the "Good Faith Deposit") in the form of cash or a certified check payable to the order of the Trustee in an amount of not less than $5.0 million.

(b) <u>Minimum Overbid</u>:  The aggregate consideration must exceed the sum of the Purchase Price by at least $2,000,000.

(c) <u>Irrevocable</u>:  A bid must be irrevocable until two (2) business days after the Assets have been sold pursuant to the Closing of the sale or sales approved by the Bankruptcy Court (the "Termination Date").

(d) <u>The Same or Better Terms</u>:  The Bid may be for the Purchased Assets under the Agreement, as applicable for the Purchased Assets subject to the Bid (provided, however, that any variations from one or more material terms must, in the aggregate constitute an improvement, as determined by the Trustee in consultation with the Ad Hoc Committee of Senior Secured Noteholders, upon such term or terms as set forth in the Agreement).  The Bid must be on terms that, in the Trustee's business judgment, in consultation with the Ad Hoc Committee of Senior Secured Noteholders, are substantially the same or better than the terms of the Agreement.  A Bid must include executed transaction documents pursuant to which the Qualified Bidder proposes to effectuate the contemplated transaction (the "Contemplated Transaction Documents'').  A Bid shall include a copy of the Agreement marked to show all changes requested by the Bidder (including those related to Purchase Price). The Contemplated Transaction Documents must include a written commitment satisfactory to the Trustee and the Ad Hoc Committee of Senior Secured Noteholders of its financial ability and intention to complete the transaction and contain a representation that the Qualified Bidder shall make all necessary regulatory filings, if any, and pay all costs and expenses of such filings (including the Trustee's costs and expenses).

For all Qualified Bidders seeking to acquire all or substantially all assets of the Debtors:

(a)      Contingencies: A Bid may not be conditioned on obtaining financing or any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy in all material respects at the closing of specified representations and warranties or the satisfaction in material respects at the closing of specified conditions, none of which shall be more burdensome than those set forth in the Agreement, as applicable.

(b)      Corporate Authority:    A Bid must include written evidence of the Qualified Bidder's chief executive officer or other appropriate senior executive's approval of the contemplated transaction; provided, however, that if the Qualified Bidder is an entity specially formed for the purpose of effectuating the contemplated transaction, then the Qualified Bidder must furnish written evidence reasonably acceptable to the Trustee of the approval of the contemplated transaction by the equity holder(s) of such Potential Bidder (the "Principals").

(c)      Financing Sources: A Bid must contain written evidence satisfactory to the Trustee, in consultation with the Ad Hoc Committee of Senior Secured Noteholders, that demonstrates the Qualified Bidder has the necessary financial ability to close the contemplated transaction and provide adequate assurance of future performance under all contracts to be assumed in such contemplated transaction. Such information should include, *inter alia*, the following:

     (i)      the Qualified Bidder's current financial statements (audited if they exist);

     (ii)      contact names and numbers for verification of financing sources,

     (iii)      evidence of the Qualified Bidder's internal resources and proof of any debt or equity funding commitments that are needed to close the contemplated transaction; and

     (iv)      any such other form of financial disclosure or credit quality support information or enhancement reasonably acceptable to the Trustee in consultation with the Ad Hoc Committee of Senior Secured Noteholders demonstrating that such Qualified Bidder has the ability to close the contemplated transaction provided, however, that the Trustee shall determine, in his reasonable discretion, in consultation with his advisors and the Ad Hoc Committee of Senior Secured Noteholders, whether the written evidence of such financial wherewithal is reasonably acceptable, and shall not unreasonably withhold acceptance of a Qualified Bidder's financial qualifications.

(d)    <u>No Fees payable to Qualified Bidder</u>:  A Bid may not request or entitle the Qualified Bidder to any breakup fee, termination fee, expense reimbursement or similar type of payment.  Moreover, by submitting a Bid a Bidder shall be deemed to waive the right to pursue a substantial contribution claim under section 503 of the Bankruptcy Code related in any way to the submission of its Bid or the Bid Procedures.

A Bid received from a Qualified Bidder before the Bid Deadline that meets the above requirements, and that satisfies the Bid Deadline requirement above, shall constitute a "Qualified Bid," if the Trustee believes, in his reasonable discretion and after consultation with the Ad Hoc Committee of Senior Secured Noteholders, that such bid would be consummated if selected as the Successful Bid.  For purposes hereof, the Agreement shall constitute a Qualified Bid.  Promptly upon such determination, the Trustee shall provide any other Qualified Bids to the Buyer and to any Qualified Bidders.

In the event that any Bid is determined by the Trustee, in consultation with the Ad Hoc Committee of Senior Secured Noteholders, not to be a Qualified Bid, the Qualified Bidder shall be refunded its deposit and all accumulated interest thereon within three (3) business days after that determination.

## Auction

Only if a Qualified Bid (other than Buyer's) is received by the Bid Deadline, shall the Trustee conduct an auction (the "Auction") to determine the highest and best bid with respect to the Purchased Assets under the Agreement.  The Trustee shall provide Buyer and all Qualified Bidders with copies of all Qualified Bids at least eighteen (18) hours prior to the Auction.  The Auction shall commence on August ___, 2009 at 10:00 a.m. (prevailing Eastern time).

No later than 4:00 p.m. (prevailing Eastern time) on August ___, 2009, the Trustee will notify all Qualified Bidders of (i) the highest and best Qualified Bid(s), as determined in the Trustee's discretion after consultation with the Ad Hoc Committee of Senior Secured Noteholders (the "Baseline Bid") and (ii) the time and place of the Auction, and provide copies of all submitted bids to all Qualified Bidders.  If, however, no other such Qualified Bid is received by the Bid Deadline, then the Auction will not be held, Buyer will be the Successful Bidder, the Agreement will be the Successful Bid, and, at the August ___, 2009 Sale Hearing, the Trustee will seek approval of and authority to consummate the Proposed Sale contemplated by the Agreement.

The Auction shall be conducted according to the following procedures:

(a)    Participation at the Auction

Only a Qualified Bidder that has submitted a Qualified Bid is eligible to participate at the Auction.  The auction shall be conducted openly and all creditors shall be entitled to attend. Each Qualified Bidder shall have at least one representative physically present at the location of the Auction.  During the Auction, bidding shall begin initially with the highest Baseline Bid as to the Purchased Assets under the Agreement and subsequently continue in minimum increments of at least $100,000.  Bidding at the auction shall be transcribed or

videotaped. Other than otherwise set forth herein, the Trustee may conduct the Auction in the manner he determines, in consultation with the Ad Hoc Committee of Senior Secured Noteholders, will result in the highest and best offer for the Purchased Assets under the Agreement.

(b)     The Trustee Shall Conduct the Auction

The Trustee and his professionals shall direct and preside over the Auction. At the start of the Auction the Trustee shall describe the terms of the Baseline Bid. The determination of which Qualified Bid constitutes the Baseline Bid shall take into account any factors the Trustee, in consultation with the Ad Hoc Committee of Senior Secured Noteholders, reasonably deems relevant to the value of the Qualified Bid to the estate, including, *inter alia*, the following: (A) the amount and nature of the consideration; (B) the proposed assets to be purchased and the assumption of any liabilities, if any; (C) the ability of the Qualified Bidder to close the proposed transaction; (D) the proposed Closing Date and the likelihood, extent and impact of any potential delays in Closing; (E) any purchase price adjustments; (F) the impact of the contemplated transaction on any actual or potential litigation; (G) the net economic effect of any changes from the Agreement, if any, contemplated by the Contemplated Transaction Documents and (H) the net after-tax consideration to be received by the Debtors' estates (collectively, the "Bid Assessment Criteria"). All Bids made thereafter shall be Overbids (as defined below), and shall be made and received on an open basis, and all material terms of each Bid shall be fully disclosed to all other Qualified Bidders. The Trustee shall maintain a transcript of all Bids made and announced at the Auction, including the Baseline Bid, all Overbids and the Successful Bid.

(c)     Terms of Overbids

An "Overbid" is any bid made at the Auction subsequent to the Trustee's announcement of the Baseline Bid. To submit an Overbid for purposes of this Auction, a Qualified Bidder seeking to acquire all or substantially all of the Debtors' assets must comply with the following conditions:

(i)     Minimum Overbid Increment

Any Overbid after the Baseline Bid shall be made in increments of at least $100,000.

(ii)     Remaining Terms are the Same as for Qualified Bids

Except as modified herein, an Overbid must comply with the conditions for a Qualified Bid set forth above, provided, however, that the Bid Deadline shall not apply. Any Overbid made by a Qualified Bidder must remain open and binding on the Qualified Bidder until and unless (a) the Trustee, in consultation with the Ad Hoc Committee of Senior Secured Noteholders, accepts a higher Qualified Bid as an Overbid and (b) such Overbid is not selected as the Back-up Bid (as defined below).

To the extent not previously provided (which shall be determined by the Trustee), a Qualified Bidder submitting an Overbid must submit, as part of its Overbid, written evidence (in the form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Trustee and the Ad Hoc Committee of Senior Secured Noteholders) demonstrating such Qualified Bidder's ability to close the transaction proposed by such Overbid.

    (iii)    Announcing Overbids

The Trustee shall announce at the Auction the material terms of each Overbid, the basis for calculating the total consideration offered in each such Overbid and the resulting benefit to the Debtors' estates based on, *inter alia*, the Bid Assessment Criteria.

(d)    Additional Procedures

The Trustee, in consultation with the Ad Hoc Committee of Senior Secured Noteholders, may adopt rules for the Auction at or prior to the Auction that, in his reasonable discretion, will better promote the goals of the Auction and that are not inconsistent with any of the provisions of the Bidding Procedures Order. All such rules will provide that all bids shall be made and received in one room, on an open basis, and all other Qualified Bidders shall be entitled to be present for all bidding with the understanding that the true identity of each Qualified Bidder (*i.e.*, the principals submitting the Bid) shall be fully disclosed to all other Qualified Bidders and that all material terms of each Qualified Bid will be fully disclosed to all other Qualified Bidders throughout the entire Auction. Subject to the prior consent of the Buyer, the Trustee, in consultation with the Ad Hoc Committee of Senior Secured Noteholders, in his reasonable discretion, may adjourn without further notice the Auction (and Sale Hearing) if in his reasonable discretion an adjournment will better promote the goals of the Auction and allow parties to make progress towards modifications of any Qualified Bid that could result in a higher and better Qualified Bid.

(e)    Consent to Jurisdiction as Condition to Bidding

All Qualified Bidders at the Auction shall be deemed to have consented to the core jurisdiction of the Bankruptcy Court and waived any right to a jury trial in connection with any disputes relating to the Auction, and the construction and enforcement of the Bidder's Contemplated Transaction Documents, as applicable.

(f)    Closing the Auction

Upon conclusion of the bidding, the Auction shall be closed, and the Trustee, in consultation with the Ad Hoc Committee of Senior Secured Noteholders, shall (i) immediately review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the Proposed Sale, and (ii) immediately identify the highest and best offer for the Purchased Assets

under the Agreement (the "Successful Bid") and the entity submitting such Successful Bid (the "Successful Bidder"), which highest and best offer will provide the greatest amount of net value to the Debtors' estates, and the next highest or otherwise best offer after the Successful Bid (the "Back-up Bid"), and advise the Qualified Bidder of such determination. If Buyer's final bid is deemed to be highest and best at the conclusion of the Auction, Buyer will be the Successful Bidder, and such bid, the Successful Bid.

## Acceptance of Successful Bid

The Trustee shall sell the assets subject to the Successful Bid(s) to the Successful Bidder(s) upon the approval of the Successful Bid by the Bankruptcy Court after the Sale Hearing. The Trustee's presentation of a particular Qualified Bid to the Bankruptcy Court for approval does not constitute the Trustee's acceptance of the bid. The Trustee will be deemed to have accepted a Bid only when the Bid has been approved by the Bankruptcy Court at the Sale Hearing. All interested parties reserve their right to object to the Trustee's selection of the Successful Bidder (including the assignment of any of such objector's Designated Contract thereto, provided, however, that any objection to such assignment on the basis of the Cure Amount must be made and/or reserved as set forth in the order approving these Bid Procedures).

## "As Is, Where Is"

The sale of the Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Trustee, his agents or the Chapter 7 estates except to the extent set forth in the Agreement or the purchase agreement of another Successful Bidder. Buyer and each Qualified Bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all due diligence regarding the Assets prior to making its offer, that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its bid, and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in these Bid Procedures or, (i) as to Buyer, the terms of the sale of the Purchased Assets under the Agreement shall be set forth in the Agreement, or (ii) as another Successful Bidder, the terms of the sale of the Assets shall be set forth in the applicable purchase agreement.

## Free Of Any And All Interests

Except as otherwise provided in the Agreement or another Successful Bidder's purchase agreement, all of Chapter 7 estates' right, title and interest in and to the Assets subject thereto shall be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options and interests thereon and there against (collectively, the "Interests'') in accordance with section 363 of the Bankruptcy Code, with such Interests to attach to the net proceeds of the sale of the Assets.

## Sale Hearing

The Sale Hearing shall be conducted by the Bankruptcy Court on August ___, 2009 or on such date as may be established by the Bankruptcy Court. Following the approval of the sale of the Assets to the Successful Bidder(s) at the Sale Hearing, if any Successful Bidder fails to consummate an approved sale within ten (10) days after entry of an Order approving the Sale, the Trustee, unless such Order approving the Sale is otherwise stayed by order of a court with competent jurisdiction, shall be authorized, but not required, to deem the Back-Up Bid, as disclosed at the Sale Hearing, the Successful Bid, and the Trustee shall be authorized, but not required, to consummate the sale with the Qualified Bidder submitting such Bid without further order of the Bankruptcy Court.

## Return of Good Faith Deposit

Good Faith Deposits of the Successful Bidder(s) shall be applied to the purchase price of such transaction at Closing. The Good Faith Deposit of the Back-up Bidder shall be held in an interest-bearing account until five (5) days after the Closing of the transactions contemplated by the Successful Bid, and thereafter returned to the Back-up Bidder. Good Faith Deposits of all other Qualified Bidders shall be held in an interest-bearing escrow account until no later than two (2) business days after the Sale Hearing, and thereafter returned to the respective bidders. If a Successful Bidder or the Back-up Bidder, as appropriate, fails to consummate an approved sale because of a breach or failure to perform on the part of such Bidder, the Trustee shall be entitled to retain the Good Faith Deposit as part of the Debtors' damages resulting from the breach or failure to perform by such Bidder.

## Modifications

The Trustee, after consultation with the Ad Hoc Committee of Senior Secured Noteholders, may (a) determine, which Qualified Bid, if any, is the highest and best offer; and (b) reject at any time before entry of an order of the Bankruptcy Court approving a Qualified Bid, any Bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bid Procedures or the terms and conditions of sale, or (iii) contrary to the best interests of the Debtors' estates and creditors. The Trustee shall not make material modifications to these Bidding Procedures without Bankruptcy Court approval, provided, however, that, to the extent not contrary to the Bidding Procedures Order, the Trustee in consultation with the Ad Hoc Committee of Senior Secured Noteholders and the Buyer, may make other non-material modifications to such procedures if their reasonable judgment such modifications would be in the best interests of the Debtors' estates and promote an open and fair sale process.

In all cases where the Bid Procedures require the Trustee to obtain consent or consult with the Buyer or the Ad Hoc Committee of Senior Secured Noteholders, the Trustee's fiduciary duties shall not be limited by such requirement.

# EXHIBIT 1 TO BID PROCEDURES

## Confidentiality Agreement

# CONFIDENTIALITY AGREEMENT

In connection with your consideration of materials relating to a possible acquisition (the "**Transaction**") of part or all of the assets of Eclipse Aviation Corporation and Eclipse IRB Sunport, LLC (the "**Company**"), you are being or have been provided with certain Confidential Information (as defined below). All information concerning the Company that is non-public, confidential or proprietary, whether written, in electronic or other tangible or intangible form, in any other medium whatsoever, or oral, including without limitation, trade secrets, inventions, system designs, processes, business plans, marketing strategies, pricing information, budgets, financial statements, lists or other  information relating to suppliers, customers, clients, and employees, together with any evaluations, ideas, analyses, reports, notes, compilations, interpretations, or other documents or technical, business or financial data of any kind, furnished to you by or on behalf of the Chapter 7 Trustee or the Company, or containing all or any part of, or derived from, any of the foregoing, from the date hereof through the term of this Confidentiality Agreement (this "**Agreement**") is hereinafter referred to as the "**Confidential Information**." Notwithstanding the foregoing, Confidential Information does not include any information that (A) is or becomes generally available to the public other than as a result of disclosure or actions by you or your Representatives (as defined below) in breach of this Agreement, (B) is or becomes available to you or your Representatives on a nonconfidential basis from a source (other than the Chapter 7 Trustee or his representatives, or the Company or its Representatives) which, to your knowledge, had no obligation to the Chapter 7 Trustee or the Company or any other party to maintain the confidentiality of such information, (C) was in your possession prior to the date of this Agreement and the source of such information, to your knowledge, had no obligation to the Chapter 7 Trustee or the Company or any other party to maintain the confidentiality of such information or (D) has been independently developed or acquired by you or your Representatives without violating your or any of their respective obligations under this Agreement.

In consideration of the Chapter 7 Trustee furnishing you with the Confidential Information, the Chapter 7 Trustee and you hereby agree that:

      1.      <u>Non-Disclosure; Limitations On Use; Representatives</u>. Except as otherwise expressly provided herein, without the prior consent of the Chapter 7 Trustee or the Company, you and your Representatives (A) will not disclose to any person (i) the fact that any discussions or negotiations took place concerning an Transaction; (ii) the economic or other terms of the Transaction; and (iii) the Confidential Information, the fact that the Confidential Information has been made available to you or that you have inspected or have knowledge of any portion of the Confidential Information, and (B) will use the Confidential Information solely for the purpose of evaluating, negotiating, documenting and/or consummating the Transaction, will keep the Confidential Information confidential and will not disclose the Confidential Information to any third party whatsoever; <u>provided</u>, <u>however</u>, that the Confidential Information may be disclosed to  any of your directors, officers, employees, representatives, accountants, advisers, potential financing sources, agents and legal counsel (collectively, "**Representatives**") who need the Confidential Information solely for the purpose of evaluating, negotiating, documenting and/or consummating the Transaction on your behalf, so long as such Representatives agree to maintain the confidentiality thereof in accordance with the terms of this Agreement.  The obligations of you and your Representatives with respect to Confidential Information shall terminate two (2) years from the date of this Agreement (the "**Term**").  You shall be responsible for any breach of the confidentiality provisions of this Agreement by any of your Representatives.

You agree that, for a period of 24 months after the date of this Agreement, you will not, without the prior written consent of the Chapter 7 Trustee or the Company, directly or indirectly, solicit for employment or hire any employee of the Company or any of its subsidiaries provided, however, that you shall not be precluded or otherwise restricted from hiring or employing, or from having employment or hiring discussions with, any such person (i) who is not then employed by the Company or any of its subsidiaries, (ii) who contacts you without any solicitation by you or (iii) who responds to a general solicitation for employment placed by you or your agents in newspapers, trade journals, the Internet, through recruiters or by any similar media; and provided further that no such general solicitation shall constitute a breach of this Agreement. You also agree that until 24 months after the date of this Agreement, you will not, without the prior written consent of the Chapter 7 Trustee, initiate or maintain contact (except in the ordinary course of business) with any officer, director, employee, supplier, vendor, distributor, broker, customer or agent of the Company for purposes of discussing the Transaction.

2.    <u>Termination</u>. The Chapter 7 Trustee may at any time terminate this Agreement and cease to provide to you Confidential Information and you may at any time terminate this Agreement with respect to any information furnished to you after receipt by the Chapter 7 Trustee of your notice of termination. At such time that this Agreement is terminated, upon written request by the Chapter 7 Trustee  you and your Representatives shall promptly destroy or return to the Chapter 7 Trustee all instances and copies of the Confidential Information, in any medium, and shall destroy analyses, reports, notes, compilations, studies, summaries, extracts or other documents containing any of, or derived from, the Confidential Information prepared by you or your Representatives; <u>provided</u> <u>that</u>, in the event that you destroy rather than return any such Confidential Information to the Chapter 7 Trustee, upon the written request of the Chapter 7 Trustee, you shall confirm such destruction in writing to the Chapter 7 Trustee; and <u>provided</u>, <u>further</u>, that you may retain copies of such Confidential Information in accordance with your internal record retention policies, so long as such Confidential Information continues to be treated as such and all such Confidential Information shall continue to be subject to this Agreement through the remainder of the Term. The termination of this Agreement will not affect the respective obligations of you and your Representatives hereunder, all of which obligations shall continue in effect through the remainder of the Term for any Confidential Information obtained from the Chapter 7 Trustee or the Company prior to such termination.

3.    <u>Compelled Disclosure</u>. If you or any of your Representatives reasonably believe that you are legally required to disclose any of the Confidential Information to a third party or you are requested by regulatory authority to provide Confidential Information, unless legally prohibited you will before such disclosure has occurred provide as soon as is practical, written notice to the Chapter 7 Trustee of the proposed disclosure; provided in the case of a broad regulatory request with respect to your business (not specifically targeted at the Chapter 7 Trustee or the Company) you may promptly comply with the request and provide notice (if permitted by such regulator) to the Chapter 7 Trustee thereafter of such disclosure. You and your Representatives will use commercially reasonable efforts to cooperate with the Chapter 7 Trustee  in his efforts to decline, resist or narrow such request and, if reasonably necessary, to assist Chapter 7 Trustee in his efforts to obtain an appropriate protective order or other reliable assurance that confidential treatment, if available, will be accorded to such disclosure.

4.    <u>No Representations or Warranties</u>. You shall assume full responsibility for all conclusions you derive from the Confidential Information. The Confidential Information is being provided "as is" without representation or warranty hereunder of any kind.  You acknowledge and agree that none of the Chapter 7 Trustee or the Company and their respective Representatives makes any express or implied representations or warranties as to the accuracy, completeness or fitness for a particular purpose of any Confidential Information, and you agree that none of such persons shall

have any liabilities to you or any of your Representatives relating to or arising from your or their use of any Confidential Information or for any errors therein or omissions therefrom except to the extent otherwise provided in a definitive agreement.

5.    <u>Privilege Issues; Work Product</u>.  To the extent that any Confidential Information may include material subject to the attorney-client privilege, work product doctrine or any other applicable privilege concern pending or threatened legal proceedings or governmental investigations, you understand and agree that we have a commonality of interest with respect to such matters and it is our desire, intention and mutual understanding that the disclosure of such material is not intended to, and shall not, waive or diminish in any way the confidentiality of such material or its continued protection under the attorney-client privilege, work product doctrine or other applicable privilege and any such Confidential Information shall remain entitled to all protection under these privileges, this agreement, and under the joint defense doctrine.  Nothing in this agreement obligates any party to reveal material subject to the attorney-client privilege, work product doctrine or any other applicable privilege.

6.    <u>Equitable Remedies</u>. You agree that money damages may not be a sufficient remedy for any breach of this Agreement by you or your Representatives, and that the Chapter 7 Trustee and the Company would be irreparably harmed in the event of such a breach. Accordingly the Chapter 7 Trustee and the Company shall, in addition to any other remedies or money damages to which it may be entitled, be entitled to specific performance and injunctive or other equitable relief as a remedy for any such threatened or actual breach. The parties hereby waive any requirement of the posting of a bond or other security in connection with the granting to the Chapter 7 Trustee or the Company of any such injunctive relief.

7.    <u>Waiver; Governing Law; Assignment; Severability; Counterparts</u>. It is understood and agreed that no failure or delay in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any right, power or privilege hereunder. The agreements set forth herein may only be waived or modified by an agreement in writing signed on behalf of the parties hereto. This Agreement shall be governed by the laws of the State of Delaware without regard to the principles of choice of law thereof. This Agreement is not assignable by either party; any purported assignment will be void and without effect.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors. Except as set forth in Section 1 hereof, there are no third-party beneficiaries of this Agreement. In case specific provisions of this Agreement shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions of the Agreement shall not in any way be affected or impaired thereby. This Agreement may be executed in counterparts, each of which shall be deemed an original, and all of such counterparts taken together shall be deemed to constitute one and same instrument.

8.    <u>Term</u>.  This Agreement shall expire two years following the date hereof.

9.      By execution below, the signatory represents and warrants that he has fully authority to bind the entity for which he is signing.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized representatives as of the later of the dates under the signatures below.

[Name of Entity and Address]

By: _____
Name:
Title:

Date:

Jeoffrey L. Burtch, Chapter 7 Trustee for Eclipse Aviation Corporation  and and Eclipse IRB Sunport, LLC,

By: _____
Name: Adam Singer
Title: Counsel to the Chapter 7 Trustee

Date:

# EXHIBIT 2

## Notice of Auction and Sale Hearing

# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| Eclipse Aviation Corporation, *et al.*,[1] | ) | Case No. 08-13031 (MFW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: Docket No. 763, ____** |

## NOTICE OF AUCTION AND SALE

**PLEASE TAKE NOTICE** that on July 31, 2009, Jeoffrey L. Burtch, the Chapter 7

Trustee (the "Trustee") for the above caption cases filed his *Motion Of The Chapter 7 Trustee To*

*Approve Sale Procedures And Approve Sale And For Related Relief* (the "Sale Motion") with the

United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").  The

Trustee has received a Qualified Bid[2] from Eclipse Aerospace, Inc. (the "Buyer"), subject to

higher and better offers, and under certain circumstances, an Auction (as defined below), all

pursuant to the Bid Procedures Order (as defined below), and with respect to the asset purchase

agreement dated as of July 30, 2009 between the Trustee and the Buyer (the "Agreement").

**PLEASE TAKE FURTHER NOTICE** that at a hearing held on August 10, 2009, the

Bankruptcy Court entered an order (the "Bid Procedures Order") approving the Bidding

Procedures sought as part of the Sale Motion and scheduled a hearing to consider granting final

relief as to the Sale Motion for August_____2009, at ____ (prevailing Eastern Time).  At

that hearing, the Bankruptcy Court will consider approving the sale of the assets of the Chapter 7

estates, free and clear of all claims, liens, and encumbrances.

---

[1] The Debtors in these proceedings are: Eclipse Aviation Corporation (Tax ID No. XX-XXX9000) and
Eclipse IRB Sunport, LLC, a wholly owned subsidiary of Eclipse Aviation Corporation (Tax ID No. XX-
XXX4013), each with a mailing address of 2503 Clark Carr Loop SE, Albuquerque, NM 87106.
[2] All capitalized terms not defined herein have the meaning ascribed to them in the Bid Procedures Order.

**PLEASE TAKE FURTHER NOTICE** that only those parties that submit Qualified Bids may participate in the Auction (as defined below).  If you are interested in determining how to submit such a Qualified Bid, you must comply with the terms of the Bid Procedures as referenced in the Bid Procedures Order.  Any party in interest wishing to receive the Agreement may do so free of charge upon request of Trustee's Counsel:  Cooch and Taylor, The Brandywine Building, 1000 West Street, 10th Floor, Wilmington, DE 19801, Attn:  Claire McCudden (cmccudden@coochtaylor.com).  Any party that wishes to take part in this process and submit a bid for the Eclipse Assets must submit its competing bid prior to August ___2009 at noon (prevailing Eastern Time) (the "Bid Deadline") to:  (a) The Trustee, c/o Cooch and Taylor, The Brandywine Building, 1000 West Street, 10th Floor, Wilmington, DE 19801, Attn: Adam Singer (asinger@coochtaylor.com); (b) the Ad Hoc Committee:  Covington & Burling LLP, The New York Times Building, 620 Eighth Avenue, New York, New York 10018, Attn: Benjamin Hoch and Andrew Ment.

**PLEASE TAKE FURTHER NOTICE** that if a Qualified Bid (other than the Buyer's Qualified Bid) is received by the Bid Deadline, an auction (the "Auction") with respect to a contemplated transaction shall take place on August ___, 2009 at 10:00 a.m. (prevailing Eastern Time), at the offices of Cooch and Taylor, The Brandywine Building, 1000 West Street, 10th Floor, Wilmington, DE 19801.  If, however, no such Qualified Bid is received by the Bid Deadline, then the Auction will not be held, the Buyer will be deemed the Successful Bidder, the Agreement will be the Successful Bid, and, at the Sale Hearing scheduled for August ___, 2009, at ____ (prevailing Eastern Time), the Trustee will seek approval of and authority to consummate the transaction contemplated by the Agreement.

**PLEASE TAKE FURTHER NOTICE** that only a Qualified Bidder who has submitted a Qualified Bid will be eligible to participate at the Auction.  Each Qualified Bidder must appear in person.  The Auction shall be conducted openly and all creditors shall be entitled to attend.  At the Auction, Qualified Bidders will be permitted to increase their bids.  The bidding at the Auction shall start at the purchase price stated in the highest or otherwise best Qualified Bid as disclosed to all Qualified Bidders prior to commencement of the Auction, and continue in increments of at least $100,000.

**PLEASE TAKE FURTHER NOTICE** that at the Sale Hearing, the Trustee will present the Successful Bid to the Bankruptcy Court for approval.  The Trustee will sell the Assets or any portion thereof to the Successful Bidder, or to the Buyer in accordance with the applicable Agreements if a higher or otherwise better Qualified Bid is not received and accepted as the Successful Bid.  If the Successful Bidder fails to consummate an approved Sale, the next highest or otherwise best Qualified Bid, as approved at the Sale Hearing, shall be deemed to be the Successful Bid and the Trustee shall be authorized to effect such Sale without further order of the Bankruptcy Court.

**PLEASE TAKE FURTHER NOTICE** that if you seek to object to the sale of the Assets or any portion thereof, you must comply with the terms for making such objections as set forth in the Bid Procedures Motion and the Bidding Procedures Order.  Any objections to the relief requested in the Sale Motion must be (a) in writing, (b) comply with the Federal Rules of Bankruptcy Procedures and the Local Bankruptcy Rules, (c) be filed with the clerk of the Bankruptcy Court for the District of Delaware, Third Floor, 824 Market Street, Wilmington, Delaware 19801, no later than 12:00 p.m. prevailing Eastern time on August ___ , 2009 and (d) be served so as to be **received** no later than 12:00 p.m. (prevailing Eastern Time) on the same

day, upon:  The Trustee, c/o Cooch and Taylor, The Brandywine Building, 1000 West Street, 10th Floor, Wilmington, DE 19801, Attn:  Adam Singer (asinger@coochtaylor.com); (b) the Ad Hoc Committee:  Covington & Burling LLP, The New York Times Building, 620 Eighth Avenue, New York, New York 10018, Attn:  Benjamin Hoch and Andrew Ment; and (c) Buyer: Eclipse Aerospace, Inc., 125 Fairchild St., Suite 100, Charleston, SC 29492, Attn.: Mason Holland, President, with a copy to: Nelson Mullins Riley & Scarborough LLP, Atlantic Station, 201 17th Street, Suite 1700, Atlanta, Georgia 30363, Attn.: William J. Ching, Esq. and Michael E. Hollingsworth II, Esq.  If any party fails to timely file and serve an objection in accordance with the Bidding Procedures Order, the Bankruptcy Court may disregard such objection and such person shall be deemed to consent to the sale and will be forever bound by any conclusions or findings by the Bankruptcy Court with respect to the sale.

**PLEASE TAKE FURTHER NOTICE** that the proposed sale contemplates the sale of substantially all of the Eclipse Assets free and clear of all liens, claims, and encumbrances and the assumption and assignment of certain executory contracts and unexpired leases.  Any person purporting to hold a lien, claim, or other encumbrance against the Eclipse Assets and who does not file an objection in accordance with the terms for making such objections set forth in the Bid Procedures Motion and the Bidding Procedures Order (and as set forth above), shall be deemed to consent to the sale of the Eclipse Assets fee and clear of any lien, claim, or other encumbrance such person purports to hold.

**PLEASE TAKE FURTHER NOTICE** that any party to a Designated Contract who does not file an objection in accordance with the terms for making such objections as set forth in the Bid Procedures Motion and the Bidding Procedures Order (and as set forth above), shall be

deemed to consent to the assumption and assignment of such Designated Contract including the

proposed cure amounts in connection therewith.

Dated: August  , 2009                        COOCH AND TAYLOR, P.A.


_____
Adam Singer (No. 2472)
M. Claire McCudden (No. 5036)
The Brandywine Building
1000 West Street, 10th Floor
Wilmington, DE  19801
Telephone:  (302) 984-3800
Facsimile:  (302) 984-3939

Attorneys for Jeoffrey L. Burtch,
Chapter 7 Trustee

## EXHIBIT 3

## Notice of Cure Amounts

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ECLIPSE AVIATION CORPORATION, *et al.*, | ) | Case No. 08-13031 (MFW) |
| | ) | |
| | ) | |
| Debtors. | ) | **Re: Docket No. 763, ___** |

**NOTICE OF AUCTION AND SALE, POTENTIAL ASSUMPTION AND ASSIGNMENT OF DESIGNATED CONTRACTS, AND CURE AMOUNTS ASSOCIATED THEREWITH**

    **PLEASE TAKE NOTICE** that July 31, 2009, Jeoffrey L. Burtch, the Chapter 7 Trustee (the "Trustee") for the above caption cases filed his *Motion Of The Chapter 7 Trustee To Approve Sale Procedures And Approve Sale And For Related Relief* (the "Sale Motion") with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The Trustee has received a Qualified Bid[1] from Eclipse Aerospace, Inc. (the "Buyer"), subject to higher and better offers, and under certain circumstances, an Auction (as defined below), all pursuant to the Bid Procedures Order (as defined below), and with respect to the asset purchase agreement dated as of July 30, 2009 between the Trustee and the Buyer (the "Agreement"). You may obtain a copy of the Agreement by making a written request to the undersigned counsel.

    **PLEASE TAKE FURTHER NOTICE** that at a hearing held on August 10, 2009, the Bankruptcy Court entered an order (the "Bid Procedures Order") approving the Bidding Procedures sought as part of the Sale Motion and scheduled a hearing to consider granting final relief as to the Sale Motion for August_____2009, at ____ (prevailing Eastern Time). At that hearing, the Bankruptcy Court will consider approving the sale of the assets of the Chapter 7 estates, free and clear of all claims, liens, and encumbrances.

---

[1] All capitalized terms not defined herein have the meaning ascribed to them in the [Bid Procedures Order] (as defined below).

**PLEASE TAKE FURTHER NOTICE** that pursuant to the Sale Motion, the Trustee may assume, sell and assign certain of the unexpired leases, license agreements, and executory contracts (collectively referred to as the "Contracts") free and clear of all liens, claims, encumbrances, and interests upon satisfaction of the cure amounts required under section 365(b)(l)(A) of the Bankruptcy Code (the "Cure Costs"). The Contracts that the Trustee **MAY** seek to assume, sell and assign (the "Designated Contracts") and corresponding Cure Costs are listed on the attached <u>Exhibit A</u>.

**PLEASE TAKE FURTHER NOTICE** that the listing of any Contract on <u>Exhibit A</u> may not necessarily result in any such Contract ultimately becoming a Designated Contract or being assumed, sold and assigned.

**PLEASE TAKE FURTHER NOTICE** that the Buyer shall have the right until [date which is five (5) business days prior to the date scheduled for hearing on the entry of the Sale Order ]_____, to amend the list of Designated Contracts to include additional executory contracts or unexpired leases or to exclude executory contracts and unexpired leases previously included on the list of Designated Contracts and to amend the Cure Costs.

**PLEASE TAKE FURTHER NOTICE** that with respect to contracts with the City of Albuquerque, the Buyer shall have until thirty (30) days after the Closing to designate any contract with the City of Albuquerque.

**PLEASE TAKE FURTHER NOTICE** that any objections to the relief requested in the Sale Motion, including the assumption, sale and assignment of the Designated Contracts and the corresponding Cure Costs, must be (a) in writing, (b) comply with the Federal Rules of Bankruptcy Procedures and the Local Bankruptcy Rules, (c) be filed with the clerk of the Bankruptcy Court for the District of Delaware, Third Floor, 824 Market Street, Wilmington, Delaware 19801, no later than 4:00 p.m. prevailing Eastern time on  August___, 2009 (the "Cure Objection Deadline") and (d) be served so as to be received no later than 4:00 p.m. (prevailing Eastern Time) on the same day, upon: The Trustee, c/o Cooch and Taylor, The Brandywine Building, 1000 West Street, 10th Floor, Wilmington, DE

19801, Attn: Adam Singer (asinger@coochtaylor.com); (b) the Ad Hoc Committee: Covington & Burling LLP, The New York Times Building, 620 Eighth Avenue, New York, New York 10018, Attn: Benjamin Hoch and Andrew Ment; and (c) Buyer: Eclipse Aerospace, Inc., 125 Fairchild St., Suite 100, Charleston, SC 29492, Attn.: Mason Holland, President, with a copy to: Nelson Mullins Riley & Scarborough LLP, Atlantic Station, 201 17th Street, Suite 1700, Atlanta, Georgia 30363, Attn.: William J. Ching, Esq. and Michael E. Hollingsworth II, Esq.; provided however, to the extent that the Buyer is not the Successful Bidder and the alternative Successful Bidder is seeking to have certain unexpired leases, license agreements and executory contracts assumed and assigned as part of an alternative transaction, the non-debtor parties to such unexpired leases, license agreements and executory contracts shall have until the Sale Hearing to raise objections under section 365(b)(1)(C).

PLEASE TAKE FURTHER NOTICE that any person or entity receiving notice of the Sale Hearing and this Notice that fails to file an objection on a timely basis shall (i) be forever barred from objecting to the Cure Costs and from asserting any additional cure or other amounts with respect to such unexpired lease, license agreement or executory contract and the Trustee and the Buyer shall be entitled to rely solely upon the Cure Costs; (ii) be deemed to have consented to the assumption and assignment of such unexpired lease, license agreement or executory contract; and (iii) be forever barred and estopped from asserting or claiming against the Trustee, the Chapter 7 estates, or the Successful Bidder or any other assignee of the relevant Designated Contract that any additional amounts are due or defaults exist under such Designated Contract.

PLEASE TAKE FURTHER NOTICE that any person or entity receiving notice of the Sale Hearing and this Notice that fails to file an objection on a timely basis shall be

deemed to have been provided with adequate assurance of future performance under any assumed and assigned unexpired lease, license agreement or executory contract and shall be forever barred from raising any defense, claim, or objection with respect to the assignment of such lease, license agreement or executory contract on account of the Successful Bidder's financial condition.

**PLEASE TAKE FURTHER NOTICE** that the Sale Hearing may be adjourned from time to time without further notice to creditors or parties-in-interest other than by announcement of said adjournment in the Bankruptcy Court or on the Bankruptcy Court's calendar on the date scheduled for the Sale Hearing.

Dated: August ____, 2009                      COOCH AND TAYLOR, P.A.

 

_____

Adam Singer (No. 2472)
M. Claire McCudden (No. 5036)
The Brandywine Building
1000 West Street, 10th Floor
Wilmington, DE  19801
Telephone:  (302) 984-3800
Facsimile:  (302) 984-3939

Attorneys for Jeoffrey L. Burtch,
Chapter 7 Trustee

**Exhibit B**

**Sale Order**

**(see attached)**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| ECLIPSE AVIATION CORPORATION, *et al.*,[1] | ) | Case No. 08-13031 (MFW) |
| | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |

## ORDER (A) AUTHORIZING THE TRUSTEE TO SELL SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES, (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED <u>LEASES AND (C) GRANTING RELATED RELIEF</u>

Upon the motion, dated July [__], 2009 (the "<u>Sale Motion</u>"), of Jeoffrey L. Burtch, the appointed chapter 7 trustee (the "<u>Trustee</u>") for the debtors in the above-captioned cases (the "<u>Debtors</u>") for the entry of an order pursuant to sections 105, 363 and 365 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "<u>Bankruptcy Code</u>") and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") authorizing the Trustee to, *inter alia,* (i) enter into that certain Asset Purchase Agreement, dated as of July 30, 2009, between Eclipse Aerospace, Inc. (the "<u>Buyer</u>") and the Trustee (the "<u>Agreement</u>," attached hereto as <u>Exhibit 1</u>),[2] (ii) sell substantially all of the Debtors' assets free and clear of all Encumbrances (as defined below), with such sale to be in accordance with the terms and conditions of the Agreement; (iii) assume and sell and assign certain executory contracts and unexpired leases to the Buyer; and (iv) granting related relief; and this Court having entered an order dated August [__], 2009 (the "<u>Procedures Order</u>," and attached hereto as

---

[1]    The Debtors in these proceedings are: Eclipse Aviation Corporation (Tax I.D. No. XX-XXX9000) and Eclipse IRB Sunport, LLC, a wholly-owned subsidiary of Eclipse Aviation Corporation (Tax I.D. No. XX-XX4013), each with a mailing address of 2503 Clark Carr Loop SE, Albuquerque, NM 87106.

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Agreement.

Exhibit 2, the "Bid Procedures") authorizing the Trustee to conduct, and approving the terms and conditions of, the Auction and Bid Procedures to consider higher and better offers for the Assets, establishing a date for the Auction and approving, inter alia, (i) the Bid Procedures in connection with the Auction; (ii) the form and manner of notice of the Auction and Bid Procedures; (iii) procedures relating to certain Designated Contracts, including notice of proposed cure amounts; and (iv) the Break-Up Fee; and the Court having established the date of the Sale Hearing; and the Court having jurisdiction to consider the Sale Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157(b)(2) and 1334; and after consideration of the Sale Motion, the relief requested therein, and the responses thereto, if any; and this being a core proceeding in accordance with 28 U.S.C. § 157(b); and the appearance of all interested parties and all responses and objections, if any, to the Sale Motion having been duly noted in the record of the Sale Hearing; and upon the record of the Sale Hearing, and all other pleadings and proceedings in this case, including the Sale Motion; and it appearing that the relief requested in the Sale Motion is in the best interests of the Debtors, the Chapter 7 estates, their creditors and all other parties in interest; and after due deliberation and sufficient cause appearing therefore;

I.    FINDINGS OF FACT:

IT IS HEREBY FOUND, DETERMINED AND CONCLUDED THAT:[3]

**Jurisdiction, Final Order, Statutory Predicates**

A.    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

B.    The Court has jurisdiction over this matter and over the property of the Debtors,

---

[3]    To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. See FED. R. BANKR. P. 7052.

including the Purchased Assets to be sold, transferred or conveyed pursuant to the Agreement, and the Chapter 7 estates pursuant to 28 U.S.C. § § 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of this chapter 7 case and the Sale Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C.     The statutory predicates for the relief sought in the Sale Motion and the basis for the approvals and authorizations herein are (i) sections 363 and 365 of the Bankruptcy Code and (ii) Bankruptcy Rules 2002, 6004, 6006 and [9014].

D.     This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(g) and 6006(d), the parties may consummate the transactions provided for under the terms and conditions of the Agreement immediately upon entry of this Order. To any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Order.

### Retention of Jurisdiction

E.     It is necessary and appropriate for the Court to retain jurisdiction to, among other things, interpret and enforce the terms and provisions of this Order and the Agreement, and to adjudicate, if necessary, any and all disputes relating in any way to the transactions provided for under the terms and conditions of the Agreement.

### Time Is of the Essence

F.     On November 25, 2008 (the "Petition Date"), the Debtors filed voluntary petitions for reorganization under chapter 11 of the Bankruptcy Code. On March 5, 2009 (the "Conversion Date"), the Court entered an order converting the Debtors' chapter 11 cases to cases under chapter 7 of the Bankruptcy Code. On the Conversion Date, Jeoffrey L. Burtch was

appointed as interim chapter 7 trustee and currently serves as the Trustee in these cases pursuant to section 702(d) of the Bankruptcy Code.

G.     Time is of the essence in consummating the sale.  In order to maximize the value of the Purchased Assets, it is essential that the sale of the Purchased Assets occur within the time constraints set forth in the Agreement.  Accordingly, there is cause to lift the stays contemplated by Bankruptcy Rules 6004 and 6006.

**Notice of the Sale Motion**

H.     As evidenced by the affidavits of service filed with the Court, (i) proper, timely, adequate and sufficient notice of the Sale Motion, the Auction and the Sale Hearing (including due and proper notice of the assumption, sale and assignment of each Designated Contract to each non-Debtor party under each such Designated Contract) have been provided in accordance with sections 102(1) and 363(b) of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9006, 9007, 9008 and 9014, the local rules of this Court, the procedural due process requirements of the United States Constitution and in compliance with the Procedures Order; (ii) such notice was good and sufficient and appropriate under the particular circumstances; and (iii) no other or further notice of the Sale Motion, the Auction, the Sale Hearing, the assumption and assignment of the Designated Contracts or of the entry of this Order is necessary or shall be required.

I.      Actual written notice of the Sale Motion, the Auction and the Sale Hearing (including due and proper notice of the assumption, sale and assignment of each Designated Contract to each non-Debtor party under each such Designated Contract) and a reasonable opportunity to object or be heard regarding the requested relief has been afforded to all interested persons and entities, including, without limitation, (i) all entities known to assert any interest in

or lien upon the Purchased Assets; (ii) all parties to Designated Contracts; (iii) all parties that are entitled to notice under Bankruptcy Rule 2002; (iv) the attorneys general of all states in which the Purchased Assets are located; (v) the Office of the United States Trustee; (vi) the Securities and Exchange Commission; (vii) the Internal Revenue Service and any governmental taxing authority that has filed a claim against the Chapter 7 Estates; (viii) all entities that expressed to the Seller an interest in purchasing the Purchased Assets; (ix) any party appearing in the Bankruptcy Cases and claiming a secured interest in the Purchased Assets; or any party known to the Seller and claiming a secured interest in the Purchased Assets. Other parties interested in bidding on the Purchased Assets were provided, upon request, sufficient information to make an informed judgment on whether to bid on the Purchased Assets.

### Compelling Circumstances for Immediate Sale

J.       The Trustee has demonstrated a sufficient basis and the existence of exigent circumstances requiring it to enter into the Agreement, sell the Purchased Assets and assume and assign the Designated Contracts under sections 363 and 365 of the Bankruptcy Code, and such actions are appropriate exercises of the Trustee's business judgment and in the best interests of the Debtors, the Chapter 7 estates and their creditors, in that:

1.       The holders of Senior Secured Notes would not consent to the use of additional cash collateral absent a sale of substantially all of the assets.

2.       If the sale and related transactions under the Agreement is not approved and consummated promptly, the Trustee will exhaust any cash collateral available, thereby potentially consigning the Debtors to a piecemeal liquidation that would achieve far less value for creditors than the transactions contemplated by the Agreement.

3. A sale pursuant to section 363(b) of the Bankruptcy Code is the only viable alternative for preserving and capturing the maximum value of the Purchased Assets and allow for the Debtors to begin operations again for the benefit of current owners of Eclipse aircraft and other customers. Thus, the only way to preserve and maximize value is to consummate the sale and sell the Purchased Assets pursuant to section 363(b) of the Bankruptcy Code, thereby ensuring an orderly and equitable sales process and distribution of proceeds.

4. A sale of the Purchased Assets at this time to Buyer would result in the highest possible purchase price therefore.

## Consent of Senior Secured Noteholders

K. Pursuant to the terms of the Debtors' Senior Secured Notes, the liens securing the Senior Secured Notes may be released with the consent of the holders of more than 50% of the Debtors' Senior Secured Notes and the requisite consent of holders have so consented.

## Good Faith

L. The Buyer is a purchaser in good faith, as that term is used in the Bankruptcy Code and court decisions thereunder, and is entitled to the protections of section 363(m) of the Bankruptcy Code. The Agreement was negotiated and entered into in good faith, based upon arm's length bargaining, and without collusion or fraud of any kind. The sales process and Auction were conducted in accordance with the Procedures Order and in good faith within the meaning of section 363(m) of the Bankruptcy Code. Neither the Trustee nor the Buyer have engaged in any conduct that would prevent the application of section 363(m) of the Bankruptcy Code or cause the application of or implicate section 363(n) of the Bankruptcy Code to the Agreement or to the consummation of the sale transaction and transfer of the Purchased Assets

and Designated Contracts to Buyer.  The Buyer is entitled to all the protections and immunities of section 363(m) of the Bankruptcy Code.  The Buyer will be acting in good faith within the meaning of section 363(m) of the Bankruptcy Code in closing the transactions pursuant to the terms and conditions of the Agreement any time after the entry of this Order, including immediately after its entry.  The Court has found that the Buyer has acted in good faith in all respects in connection with these chapter 7 cases and the transactions under the Agreement in that, among other things:

1. The Trustee, as a fiduciary of this Court pursuant to section 702 of the Bankruptcy Court,  conducted the sale process and negotiated with the Buyer;

2. The Buyer recognized that the Trustee was free to negotiate with any other party that expressed qualified interest in purchasing the Purchased Assets;

3. The Buyer agreed to subject its bid to the competitive bidding procedures set forth in the Bidding Procedures Order;

4. All payments to be made by the Buyer and other Agreement or arrangements entered into by Buyer with the Trustee in connection with the Agreement have been disclosed; and

5. The negotiation and execution of the Agreement and all other aspects of the transactions contemplated therein were conducted in good faith and at arms' length.

M.    In the absence of a stay pending appeal, the Buyer will be acting in good faith, pursuant to section 363(m) of the Bankruptcy Code, in closing the transactions contemplated by the Agreement at any time on or after the entry of this Order and cause has been shown as to why this Order should not be subject to the stay provided by Bankruptcy Rules 6004(g) and 6006(d).

## No Collusion

N.      The Buyer has not violated section 363(n) of the Bankruptcy Code by any action or inaction.  The sale price to be paid by Buyer was not controlled by an agreement among potential bidders at such sale.  The transactions under the Agreement may not be avoided, and no damages may be assessed against the Buyer or any other party under section 363(n) of the Bankruptcy Code or any other applicable bankruptcy or non-bankruptcy law.

## Bid Procedures Fair

O.      The Bid Procedures set forth in the Procedures Order were non-collusive, substantively and procedurally fair to all parties and were the result of arms length negotiations between the Trustee and the Buyer.

P.      The Trustee and his professionals have complied, in good faith, in all respects with the Procedures Order.  As demonstrated by (i) the testimony and other evidence proffered or adduced at the Sale Hearing and (ii) the representations of counsel made on the record at the Sale Hearing.  Through marketing, and an open and competitive sale process conducted in accordance with the Procedures Order, the Trustee (i) afforded interested potential purchasers a full, fair and reasonable opportunity to qualify as bidders and submit their highest or otherwise best offer to purchase substantially all of the Debtors' assets; (ii) provided potential purchasers, upon request, sufficient information to enable them to make an informed judgment on whether to bid on the Purchased Assets; (iii) considered any bids submitted on or before the Bid Deadline; and (iv) conducted the Auction on _____.

**Marketing Efforts Leading to Sale**

Q.      Since the date of his appointment, the Trustee has identified interested parties who have previously expressed an interest in the Purchased Assets and continued to identify other parties who may have a strategic or financial interest in acquiring the Purchased Assets.  The Trustee negotiated with several parties in an attempt to reach an asset purchase agreement and selected the Buyer as the most qualified and beneficial bid after several months of negotiations.

**Auction**

R.      On August ____, 2009 the Trustee conducted an auction in accordance with the terms of the Court's Order approving the bidding procedures.

**Highest and Best Offer**

S.      [At the conclusion of the Auction, the Trustee announced that, after consultation with the Ad Hoc Committee, he had determined that the offer submitted by the Buyer in the Agreement was the highest and best offer and the Buyer is the Successful Bidder for the Purchased Assets in accordance with the Procedures Order.]  The Bidding Procedures obtained the highest value for the Purchased Assets.

T.      The offer of the Buyer, upon the terms and conditions set forth in the Agreement, including the form and total consideration to be realized by the Trustee pursuant to the Agreement, (i) is the highest and best offer received by the Trustee; (ii) is fair and reasonable; (iii) is in the best interests of the Debtors' creditors and estates; (iv) constitutes full and adequate consideration and reasonably equivalent value for the Purchased Assets; and (v) will provide a greater recovery for the Debtors' creditors and other interested parties than would be provided by any other practical and available alternative.  The Trustee's determination that the Agreement

constitutes the highest and best offer for the Purchased Assets constitutes a valid and sound exercise of the Trustee's business judgment.

U.      The Agreement and the transactions thereunder is not being entered into to escape liability for the estates' debts.  The Chapter 7 estates are unable to satisfy all of the Debtors' debts.

**No Fraudulent Transfer**

V.      The total consideration provided by the Buyer for the Purchased Assets is the highest and best offer received by the Trustee, and the Purchase Price constitutes (i) reasonably equivalent value under the Bankruptcy Code and the Uniform Fraudulent Transfer Act; (ii) fair consideration under the Uniform Fraudulent Conveyance Act; and (iii) under any other applicable laws of the United States, any state, territory or possession or the District of Columbia, reasonably equivalent value, fair consideration and fair value for the Purchased Assets.

**Validity of Transfer**

W.      Prior to the transactions contemplated under the Agreement, the Purchased Assets are property of the Chapter 7 estates and title thereto is vested in the Chapter 7 estates.

X.      The Trustee has full power and authority to execute the Agreement and all other documents contemplated thereby, and the sale of the Purchased Assets has been duly and validly authorized by all necessary corporate authority by the Trustee to consummate the transactions contemplated by the Agreement.  No consents or approvals, other than as may be expressly provided for in the Agreement, are required by the Trustee to consummate such transactions.

Y.      The Trustee has advanced sound business reasons for seeking to enter into the Agreement and to sell and/or assume and sell and assign the Purchased Assets and the Designated Contracts, as more fully set forth in the Sale Motion and as demonstrated at the Sale

Hearing, and it is a reasonable exercise of the Trustee's business judgment to sell and assign the Purchased Assets and the Designated Contracts and to consummate the transactions contemplated by the Agreement. Notwithstanding any requirement for approval or consent by any person, the transfer of the Purchased Assets to the Buyer and the assumption and assignment of the Designated Contracts is a legal, valid and effective transfer of the Purchased Assets and any Designated Contracts.

Z.       The terms and conditions of the Agreement, including the consideration to be realized by the Debtors pursuant to the Agreement, are fair and reasonable, and the transactions contemplated by the Agreement are in the best interests of the Chapter 7 estates.

## Section 363(f) of the Bankruptcy Code is Satisfied

AA.       Except as otherwise provided in the Agreement or otherwise specifically set forth in this Order, the Purchased Assets shall be sold free and clear of all of the following (collectively, the "Encumbrances"): mortgages, security interests, conditional sale or other retention agreement, pledges, liens (as that term is defined in section 101(37) of the Bankruptcy Code), claims (as that term is defined in section 101(5) of the Bankruptcy Code), obligations, guaranties, debts, obligations, rights, contractual commitments, interests, judgments, demands, easements, charges, encumbrances, defects, options, rights of first refusal, other Encumbrances (as defined in the Agreement), Liens (as defined in the Agreement) and restrictions of any kind or nature whether imposed by agreement, understanding, law, equity, or otherwise, including, without limitation (i) encumbrances that purport to give any party a right or option to effect any forfeiture, modification or termination of any Debtor or of the Buyer in the Purchased Assets or (ii) in respect of taxes, in each case accruing, arising or relating to a period prior to the Closing.

BB.     The transfer of the Purchased Assets to the Buyer will be a legal, valid and effective transfer of the Purchased Assets, and, except as may otherwise be provided in the Agreement, shall vest Buyer with all right, title and interest of the Trustee to the Purchased Assets free and clear of any and all Encumbrances.  Except as specifically provided in the Agreement or this Order, the Buyer shall not assume or become liable for any Encumbrances relating to the Purchased Assets being sold by the Debtor.

CC.     The transfer of the Purchased Assets to the Buyer free and clear of all Encumbrances will not result in any undue burden or prejudice to any holders of any Encumbrances as all such Encumbrances of any kind or nature whatsoever shall attach to the net proceeds of the sale of the Purchased Assets received by the Trustee in the order of their priority, with the same validity, force and effect which they now have as against the Purchased Assets and subject to any claims and defenses the Debtors or other parties may possess with respect thereto. All persons having Encumbrances of any kind or nature whatsoever against or in any of the Debtors or the Purchased Assets shall be forever barred, estopped and permanently enjoined from pursuing or asserting such Encumbrances against the Buyer, any of its assets, property, successors or assigns, or the Purchased Assets.

DD.     The Trustee may sell the Purchased Assets free and clear of all Encumbrances of any kind or nature whatsoever because, in each case, one or more of the standards set forth in section 363(f) of the Bankruptcy Code has been satisfied.  Those (i) holders of Encumbrances and (ii) non-Debtor parties, who did not object, or who withdrew their objections, to the sale of the Purchased Assets and the Sale Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.  Those holders of Encumbrances who did object fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are

adequately protected by having their Encumbrances, if any, attach to the proceeds of the sale of the Purchased Assets ultimately attributable to the property against or in which they claim or may claim any Encumbrances, with such Encumbrances being subject to treatment as prescribed by separate order of this Court.

### Cure under Designated Contracts; Adequate Assurance of Future Performance

EE.     The Trustee and the Buyer have, to the extent necessary, satisfied the requirements of section 365 of the Bankruptcy Code.  Pursuant to the terms and subject to the conditions of this Order and the Agreement, the Buyer shall, within the time period set forth in the Agreement, (i) cure or provide adequate assurance of cure of any undisputed default existing prior to the Closing under any of the assigned Designated Contracts, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code and (ii) provide compensation or adequate assurance of compensation to any party other than the Trustee for any undisputed actual pecuniary loss to such party resulting from an undisputed default prior to the Closing under any of the assigned Designated Contracts, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code.  The Buyer has demonstrated adequate assurance of future performance with respect to the Designated Contracts, within the meaning of section 365(b)(1)(C) of the Bankruptcy Code.  The Designated Contracts are assignable notwithstanding any provisions contained therein to the contrary pursuant to section 365(f) of the Bankruptcy Code.  The assumption and assignment of the Designated Contracts pursuant to the terms of this Order is integral to the Agreement and is in the best interests of the Chapter 7 estates, creditors and other parties in interest, and represents the exercise of sound and prudent business judgment by the Trustee.

## No Successor Liability

FF.    The transactions contemplated under the Agreement do not amount to a consolidation, merger or *de facto* merger of the Buyer and the Chapter 7 estates, there is not substantial continuity between the Buyer and the Debtors, there is no continuity of enterprise between the Debtors and the Buyer, the Buyer is not a mere continuation of the Debtors or the Chapter 7 estates, and the Buyer does not constitute a successor to the Debtors or the Chapter 7 estates.

GG.    Except as expressly set forth in the Agreement, the transfer of the Purchased Assets to the Buyer and assumption and assignment to Buyer of the Designated Contracts and the Assumed Liabilities by Buyer do not and will not subject the Buyer or any of its affiliates or subsidiaries to any liability by reason of such transfer under (i) the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based in whole or part on, directly or indirectly, including without limitation, any theory of antitrust, environmental, products liability, successor or transferee liability, labor law, *de facto* merger or substantial continuity or (ii) any employment contract, understanding or agreement, including without limitation collective bargaining agreements, employee pension plans or employee welfare or benefit plans.

HH.    Pursuant to the terms of the Asset Purchase Agreement, the Buyer has agreed to assume certain liabilities of the Debtor Eclipse Aviation Corporation and the related Chapter 7 estate which are the subject of pending adversary proceedings  described in Schedule 7.8 of the Asset Purchase Agreement, those liabilities assumed by the Buyer are expressly limited to the obligations of the Chapter 7 estate to return to the Plaintiffs in those actions any aircraft parts, or in the case of the Opinicus Corporation, aircraft simulators, to the extent such rights,  if any, are

established by the Court. Any claims against Buyer pursuant to those actions, shall be, and hereby are, limited to the obligation to return to the Plaintiffs, if such rights are established, any property which is part of the Purchased Assets and which the Court may later determine the Plaintiffs are entitled to possession of under applicable law. The Buyer shall not be liable for; (1) specific performance; or (2) any monetary claims against the Seller, including but not limited to, any claims to deposits or segregated funds. The Buyer shall be substituted for the chapter 7 Trustee as party in the adversary proceedings set forth on Schedule 7.8, or, as procedurally appropriate, and at the election of Buyer, shall be allowed to intervene, and shall have all rights, claims and defenses to which the Debtors, chapter 7 estates and/ or the Trustee could assert against the parties to those actions or the property which is the subject of those actions; however that to the extent the Trustee or the Debtors shall remain a party to any of the adversary proceedings described above, the Trustee and the Debtors shall retain those rights, claims and defenses to the extent of any claims against Trustee or as otherwise agreed to between Buyer and Trustee.

II.     The sale contemplated by this Order is a sale of all or substantially all of the Estates' assets in a single sale pursuant to section 363 of the Bankruptcy Code, to which the Senior Secured Notes consent.

CONCLUSIONS OF LAW:

NOW, THEREFORE, BASED UPON ALL OF THE FOREGOING, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:[4]

1.     The relief requested in the Sale Motion is granted in its entirety, subject to the terms and conditions contained herein.

---

[4]     To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such. See FED. R. BANKR. P. 7052.

2.　All objections, responses and requests for continuance concerning the Sale Motion are resolved in accordance with the terms of this Order and as set forth in the record of the Sale Hearing.  To the extent any such objection, response or request for continuance was not otherwise withdrawn, waived, or settled, it, and all reservations of rights contained therein, is overruled and denied on the merits.

3.　Notice of the Sale Hearing was fair and adequate under the circumstances and complied in all respects with section 102(1) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006.

### Approval of Sale

4.　The sale of the Purchased Assets, the terms and conditions of the Agreement (including all schedules and exhibits affixed thereto), the bid by the Buyer and the transactions contemplated thereby be, and hereby are, authorized and approved in all respects.

5.　The sale of the Purchased Assets and the consideration provided by the Buyer under the Agreement is fair and reasonable and shall be deemed for all purposes to constitute a transfer for reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable law.

6.　The Buyer is hereby granted and is entitled to all of the protections provided to a good faith buyer under section 363(m) of the Bankruptcy Code, including with respect to the transfer of the Designated Contracts as part of the sale of the Purchased Assets pursuant to section 365 of the Bankruptcy Code and this Order.

7.　The Trustee be, and hereby is, authorized and directed to fully assume, perform under, consummate and implement the terms of the Agreement together with any and all additional instruments and documents that may be reasonably necessary or desirable to

implement and effectuate the terms of the Agreement, this Order and sale of the Purchased Assets contemplated thereby including, without limitation, deeds, assignments, stock powers and other instruments of transfer, and to take all further actions as may reasonably be requested by the Buyer for the purpose of assigning, transferring, granting, conveying and conferring to the Buyer, or reducing to possession any or all of the Purchased Assets or Assumed Liabilities and the assumption and assignment of the Designated Contracts, as may be necessary or appropriate to the performance of the Trustee's obligations as contemplated by the Agreement, without any further corporate action or orders of this Court. The Buyer shall have no obligation to proceed with the Closing of the Agreement until all conditions precedent to its obligations to do so have been met, satisfied or waived. The Buyer may consummate the transactions under the Agreement at any time after the entry of this Order (including immediately thereafter) by waiving all closing conditions set forth in the Agreement that have not been satisfied and by proceeding to close such transactions, without any notice to the Court, any pre-petition or post-petition creditor of the Debtors or any other party in interest.

      8.     The Trustee is authorized and directed to deposit and hold in escrow the Cash Consideration (as defined in the Agreement), and furthermore to make distributions from the Cash Consideration and of the Notes on the Closing Date as follows:

      a.     The Trustee shall deposit $3,324,944.73 (the "Chapter 11 Professional Fee Amount") in a separate account for payment of the chapter 11 professional fees pursuant to the *Omnibus Order Awarding Allowance of Compensation for Services Rendered and Reimbursement Or Expenses of Chapter 11 Professionals Employed in This Case* [Docket No. 733].

      b.     The Trustee shall deposit [$_____] (the "U.S. Trustee Fee Amount")

in a separate account for payment of outstanding U.S. Trustee fees.

c.      The Trustee shall deposit $636,250.00 (the "Trustee Compensation Reserve") in a separate account for payment of compensation to which the Chapter 7 Trustee may be entitled pursuant to section 326 of the Bankruptcy Code subject to further order of the Court.

d.      The Trustee shall deposit $5,000.00 (the "Trustee Expense Reserve") in a separate account to reimburse him for his reasonable expenses subject to further order of the Court.

e.      The Trustee shall deposit an amount sufficient to pay unpaid fees and expenses of professionals employed by the Chapter 7 Trustee in excess of the Chapter 7 Carve-Out (as defined in the Stipulation And Agreed Order Authorizing Limited Use Of Cash Collateral (the "Cash Collateral Order") [Docket no. 714] (the "Chapter 7 Professional Fee Amount") in a separate account to pay unpaid fees and expenses of professionals employed by the Chapter 7 Trustee after further order of this Court.

f.      The Trustee shall deposit $100,000.00 (the "Closing Expense Reserve") in a separate account to be available without further order of the Court to pay any necessary post-closing obligations of the Trustee as Seller that are contemplated by the Agreement.

g.      The Trustee shall deposit an amount sufficient to pay any unpaid expense approved by the Stipulation And Agreed Order Authorizing Limited Use Of Cash Collateral [Docket no. 714] (and any agreed-upon extensions thereof) and any fees and expenses of counsel to the Ad Hoc

Committee of Secured Noteholders in excess of any amounts payable pursuant to the Cash Collateral Order (and any extensions thereof) that are incurred by the Ad Hoc Committee of Secured Noteholders through and including the Closing Date; and

h.  The Trustee shall distribute to each of (i) the Bank of New York, in its capacity as Collateral Agent under that certain Amended and Restated Security Agreement dated as of February 15, 2008, as payment for amounts due and owing the holders of the Debtors' Senior Secured Notes pursuant to the terms of the Senior Secured Notes and (ii) to the Alfred Mann Living Trust for his share pursuant to the Final Order Pursuant to 11 U.S.C. Sections 105, 362, 363 and 364 and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (1) Authorizing Incurrence by the Debtors of Post-Petition Secured Indebtedness with Priority Over All Other Secured Indebtedness and with Administrative Superpriority, (2) Granting Liens and (3) Modifying the Automatic Stay [Docket No. 230], their prorated share of the remaining Cash Consideration and the Note Consideration.  Any funds held by the Trustee in escrow as stated above in subparagraphs 8(a) through 8(g), inclusive, that are not actually expended by the Trustee shall be distributed in accordance with subparagraph 8(h).

Pending distribution of the Cash Consideration the Trustee shall not commingle the Cash Consideration with any other of the Debtors' assets

9.  The Trustee and each other person or entity having duties or responsibilities under the Agreement, any agreements related thereto or this Order, and their respective directors,

officers, employees, members, agents, representatives and attorneys, are authorized and empowered, subject to the terms and conditions contained in the Agreement, to carry out all of the provisions of the Agreement and any related agreements; to issue, execute, deliver, file and record, as appropriate, the documents evidencing and consummating the Agreement, and any related agreements; to take any and all actions contemplated by the Agreement, any related agreements or this Order; and to issue, execute, deliver, file and record, as appropriate, such other contracts, instruments, releases, indentures, mortgages, deeds, bills of sale, assignments, leases or other agreements or documents and to perform such other acts and execute and deliver such other documents, as are consistent with, and necessary or appropriate to implement, effectuate, and consummate, the Agreement, any related agreements and this Order and the transactions contemplated thereby and hereby, all without further application to, or order of, the Court. The Trustee shall be, and hereby is, authorized to certify or attest to any of the foregoing actions (but no such certification or attestation shall be required to make any such action valid, binding, and enforceable). The Trustee is further authorized and empowered to cause to be filed with the secretary of state of any state or other applicable officials of any applicable governmental units any and all certificates, agreements or amendments necessary or appropriate to effectuate the transactions contemplated by the Agreement, any related agreements and this Order, including amended and restated certificates or articles of incorporation and by-laws or certificates or articles of amendment, and all such other actions, filings, or recordings as may be required under appropriate provisions of the applicable laws of all applicable governmental units or as the Trustee may determine are necessary or appropriate. The execution of any such document or the taking of any such action shall be, and hereby is, deemed conclusive evidence of the authority of such person to so act. Without limiting the generality of the foregoing, this

Order shall constitute all approvals and consents, if any, required by the corporation laws of the State of Delaware and all other applicable business corporation, trust and other laws of the applicable governmental units with respect to the implementation and consummation of the Agreement, any related agreements and this Order, and the transactions contemplated thereby and hereby.

10. Effective as of the Closing, (a) the sale of the Purchased Assets by the Trustee to the Buyer shall constitute a legal, valid and effective transfer of the Purchased Assets notwithstanding any requirement for approval or consent by any person and shall vest Buyer with all right, title and interest of the Debtors in and to the Purchased Assets, free and clear of all Claims, Liens, Interests and Encumbrances of any kind, pursuant to section 363(f) of the Bankruptcy Code, and (b) the assumption of any Assumed Liabilities by the Buyer shall constitute a legal, valid and effective delegation of any Assumed Liabilities to the Buyer and shall divest the Debtors of all liability with respect to any Assumed Liabilities.

11. The sale of the Purchased Assets is not subject to avoidance, and no damages may be assessed against the Buyer or any other party, pursuant to section 363(n) of the Bankruptcy Code.

## Transfer of Purchased Assets

12. Except to the extent specifically provided in the Agreement, upon the closing the Trustee shall be, and hereby is, authorized, empowered and directed, pursuant to sections 105 and 363(b) of the Bankruptcy Code, to sell the Purchased Assets to the Buyer. Except with respect to the Assumed Liabilities, the sale of the Purchased Assets shall vest Buyer with all right, title and interest of the Debtors to the Purchased Assets free and clear of any and all Encumbrances and other liabilities and claims, whether secured or unsecured, choate or inchoate,

filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or noncontingent, liquidated or unliquidated, matured or unmatured, disputed or undisputed, or known or unknown, whether arising prior to or subsequent to the Petition Date, whether imposed by agreement, understanding, law, equity or otherwise, with all such Encumbrances and other liabilities and claims to attach only to the proceeds of the sale (if any) with the same priority, validity, force and effect, if any, as they now have in or against the Purchased Assets, subject to all claims and defenses the Debtors may possess with respect thereto. Following the Closing Date, no holder of any Encumbrance in the Purchased Assets shall interfere with the Buyer's use and enjoyment of the Purchased Assets based on or related to such Encumbrance, or any actions that the Debtors may take in their chapter 11 cases and no person shall take any action to prevent, interfere with or otherwise enjoin consummation of the transactions contemplated in or by the Agreement or this Order. To the extent provided for in the Agreement, any and all of the Debtors' security deposits, or other security held by landlords, lessors and other counterparties to the contracts, leases and licenses that are to be assumed and assigned under the Agreement are being transferred and assigned to, and shall be the property of, the Buyer from and after the Closing, which transfer and assignment of security deposits, other deposits or security shall satisfy in full the requirements of section 365(l) of the Bankruptcy Code for all contracts, leases, and licenses assumed and assigned pursuant to this Order or the Agreement.

13.     The provisions of this Order authorizing the sale of the Purchased Assets free and clear of Encumbrances, other than Assumed Liabilities, shall be self-executing, and neither the Trustee nor the Buyer shall be required to execute or file releases, termination statements, assignments, consents or other instruments in order to effectuate, consummate and implement the

provisions of this Order. However, the Trustee and the Buyer, and each of their respective officers, employees and agents are hereby authorized and empowered to take all actions and execute and deliver any and all documents and instruments that either the Trustee or the Buyer deem necessary or appropriate to implement and effectuate the terms of the Agreement and this Sale Order. Moreover, effective as of the Closing, the Buyer, its successors and assigns, shall be designated and appointed the Debtors' true and lawful attorney and attorneys, with full power of substitution, in the Debtors' name and stead, on behalf and for the benefit of the Buyer, its successors and assigns, to demand and receive any and all of the Purchased Assets and to give receipts and releases for and in respect of the Purchased Assets, or any part thereof, and from time to time to institute and prosecute in the Debtors' name, for the benefit of the Buyer, its successors and assigns, any and all proceedings at law, in equity or otherwise, which the Buyer, its successors and assigns, may deem proper for the collection or reduction to possession of any of the Purchased Assets, and to do all acts and things with respect to the Purchased Assets which the Buyer, its successors and assigns, shall deem desirable. The foregoing powers are coupled with an interest and are and shall be irrevocable by the Debtors.

14.     On or before the Closing Date, all parties holding Encumbrances of any kind are authorized and directed to execute such documents and take all other actions as may be necessary to release any Encumbrances of any kind against the Purchased Assets, as such Encumbrances may have been recorded or may otherwise exist. If any person or entity that has filed financing statements or other documents or agreements evidencing any Encumbrances in or against the Purchased Assets shall not have delivered to the Trustee prior to the Closing after request therefor, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, or releases of all such Encumbrances that the person or

entity has with respect to the Purchased Assets, the Trustee is hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to such Purchased Assets prior to the Closing, and the Buyer is authorized to execute and file such documents after Closing.

15.     To the greatest extent available under applicable law, the Buyer shall be authorized, as of the Closing Date, to operate under any license, permit, registration and governmental authorization or approval of the Trustee with respect to the Purchased Assets, and all such licenses, permits, registrations and governmental authorizations and approvals are deemed to have been, and hereby are, directed to be transferred to the Buyer as of the Closing Date.

16.     All of the Debtors' interests in the Purchased Assets to be acquired by the Buyer under the Agreement shall be, as of the Closing Date and upon the occurrence of the Closing, transferred to and vested in the Buyer.  Upon the occurrence of the Closing, this Order shall be considered and constitute for any and all purposes a full and complete general assignment, conveyance and transfer of the Purchased Assets acquired by the Buyer under the Agreement and/or a bill of sale or assignment transferring good and marketable, indefeasible title and interest in the Purchased Assets to the Buyer.

17.     Except as expressly provided in the Agreement or this Order, the Buyer is not assuming nor shall it or any affiliate or subsidiary of Buyer be in any way liable or responsible, as a successor or otherwise, for any liabilities, debts or obligations of the Debtors in any way whatsoever relating to or arising from the Debtors' ownership or use of the Purchased Assets prior to the consummation of the transactions contemplated by the Agreement, or any liabilities calculable by reference to the Debtors or their operations or the Purchased Assets, or relating to

continuing or other conditions existing on or prior to consummation of the transactions contemplated by the Agreement, which liabilities, debts, and obligations are hereby extinguished insofar as they may give rise to liability, successor or otherwise, against Buyer or any affiliate or subsidiary of the Buyer.

18.     With respect to the pending adversary proceedings described in Schedule 7.8 of the Asset Purchase Agreement, those liabilities assumed by the Buyer are expressly limited to the obligations of the chapter 7 estate to return to the Plaintiffs in those actions any aircraft parts, or in the case of the Opinicus Corporation, aircraft simulators, to the extent such rights, if any, are established by Final Order of the Court.   Any claims against Buyer pursuant to those actions, shall be, and hereby are, limited to the obligation to return to the Plaintiffs, if such rights are established, any property which is part of the Purchased Assets and which the Court may later determine the Plaintiffs are entitled to possession of under applicable law. The Buyer shall not be liable for; (1) specific performance; or (2) any monetary claims against the Seller, including but not limited to, any claims to deposits or segregated funds.  The Buyer shall be substituted for the chapter 7 Trustee as party in the adversary proceedings set forth on Schedule 7.8, or, as appropriate, and at the election of Buyer, shall be allowed to intervene, and shall have all rights, claims and defenses to which the Debtor, chapter 7 estates and/ or the Trustee could assert against the parties to those actions or the property which is the subject of those actions; however that to the extent the Trustee or the Debtors shall remain a party to any of the adversary proceedings described above, the Trustee and the Debtors shall retain those rights, claims and defenses to the extent of any claims against Trustee or as otherwise agreed to between Buyer and Trustee.

19.     Except as otherwise provided in the Agreement, on the Closing Date, each of the Debtors' creditors is authorized and directed to execute such documents and take all other

actions as may be necessary to release their respective Interests or Claims against the Purchased Assets, if any, as may have been recorded or may otherwise exist.

20.     Except as otherwise expressly provided in the Agreement, all persons or entities, presently or on or after the Closing Date, in possession of some or all of the Purchased Assets are directed to surrender possession of the Purchased Assets to the Buyer on the Closing Date or at such time thereafter as the Buyer may request.

## **Designated Contracts**

21.     Subject to the terms of the Agreement and the occurrence of the Closing Date, the assumption by the Trustee of the Designated Contracts and the sale and assignment of such agreements to the Buyer, as provided for or contemplated by the Agreement, be, and hereby is, authorized and approved pursuant to sections 363 and 365 of the Bankruptcy Code.

22.     The Designated Contracts shall be deemed valid and binding and in full force and effect and assumed by the Trustee and sold and assigned to the Buyer at the Closing, pursuant to sections 363 and 365 of the Bankruptcy Code, subject only to (a) the payment by Buyer of all cures required to assume and assign the Designated Contracts to the Buyer as provided in this Order and the Agreement; and (b) the Buyer's right to exclude Designated Contracts from the definition of Designated Contracts in accordance with the terms of the Agreement.  To the extent the Buyer excludes any Designated Contracts from the definition of Designated Contracts, the Trustee shall file a revised Schedule 2.3 to the Agreement with the Court and provide proper and adequate notice thereof.

23.     Upon the Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, the Buyer shall be fully and irrevocably vested in all right, title and interest of each Designated Contract.  The Trustee shall cooperate with, and take all actions reasonably requested

by, the Buyer to effectuate the foregoing.

24.     Pursuant to sections 365(b)(1)(A) and (B) of the Bankruptcy Code, pursuant to the terms and subject to the conditions of this Order and the Agreement, within the time period provided in the Agreement the Buyer shall pay or cause to be paid to the parties to any Designated Contracts the requisite Cure Amounts, if any, set forth in the notice served by the Trustee on each of the parties to the Designated Contracts, except to the extent that a cure amount was amended on the record of the Sale Hearing (the "Cure Amounts"), following the assumption and assignment thereof.  The Cure Amounts are hereby fixed at the amounts set forth in the notice served by the Trustee, or the amounts set forth on the record of the Sale Hearing, as the case may be, and the non-Debtor parties to the Designated Contracts are forever bound by such Cure Amounts.

25.     All defaults or other obligations under the Designated Contracts arising prior to the Closing (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be deemed cured by payment of the Cure Amounts.

26.     Any provision in any Designated Contract that purports to declare a breach, default or payment right as a result of an assignment or a change of control in respect of the Debtors is unenforceable, and all Designated Contracts shall remain in full force and effect, subject only to payment of the appropriate Cure Amount, if any.  No sections or provisions of any Designated Contract that purport to provide for additional payments, penalties, charges or other financial accommodations in favor of the non-Debtor third party to the Designated Contracts shall have any force and effect with respect to the sale transaction and assignments authorized by this Order, and such provisions constitute unenforceable anti-assignment

provisions under section 365(f) of the Bankruptcy Code and/or are otherwise unenforceable under section 365(e) of the Bankruptcy Code and no assignment of any Designated Contract pursuant to the terms of the Agreement shall in any respect constitute a default under any Designated Contract. The non-Debtor party to each Designated Contract shall be deemed to have consented to such assignment under section 365(c)(1)(B) of the Bankruptcy Code, and the Buyer shall enjoy all of the rights and benefits under each such Designated Contract as of the applicable date of assumption without the necessity of obtaining each such non-Debtor party's written consent to the assumption or assignment thereof.

27.     The Buyer has satisfied all requirements under sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code to provide adequate assurance of future performance under the Designated Contracts.

28.     The Debtors and the Chapter 7 estates shall be relieved of any liability for any breach of any of the Designated Contracts occurring from and after Closing, pursuant to and in accordance with section 365(k) of the Bankruptcy Code.

### Additional Provisions

29.     Each and every federal, state and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Agreement and this Order.

30.     The Buyer has not assumed and is otherwise not obligated for any of the Debtors' liabilities other than the Assumed Liabilities as set forth in the Agreement, and the Buyer has not purchased any of the Excluded Assets. Consequently, all persons, Governmental Units (as defined in sections 101(27) and 101(41) of the Bankruptcy Code) and all holders of Encumbrances based upon or arising out of liabilities retained by the Debtors are hereby

enjoined from taking any action against any of the Buyer, its affiliates and subsidiaries or the Purchased Assets to recover any Encumbrance or on account of any liabilities of the Debtors other than Assumed Liabilities pursuant to the Agreement. All persons holding or asserting any Encumbrance in the Excluded Assets are hereby enjoined from asserting or prosecuting such Encumbrance or cause of action against any of the Buyer, its affiliates, and subsidiaries or the Purchased Assets for any liability associated with the Excluded Assets.

31.     The Buyer is not a "successor" to the Debtors or the Chapter 7 estates by reason of any theory of law or equity, and the Buyer, its affiliates and subsidiaries shall not assume, nor be deemed to assume, nor in any way be responsible for any liability or obligation of any of the Debtors and/or the Chapter 7 estates including, but not limited to, any bulk sales law, successor liability or similar liability except as otherwise expressly provided in the Agreement. Neither the purchase of the Purchased Assets by the Buyer or its affiliates or subsidiaries, nor the fact that the Buyer or its affiliates or subsidiaries are using any of the Purchased Assets previously operated by the Debtors, will cause the Buyer or any of its affiliates or subsidiaries to be deemed a successor in any respect to the Debtors' businesses within the meaning of any foreign, federal, state or local revenue, pension, ERISA, tax, labor, employment, environmental or other law, rule or regulation (including without limitation filing requirements under any such laws, rules or regulations), or under any products liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine, or under any product warranty liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine, and the Buyer, its affiliates and subsidiaries shall have no liability or obligation on account of any of the foregoing. Buyer and its affiliates shall have no liability or obligation under the WARN Act (29 U.S.C. § 210 *et seq.*) or the Comprehensive Environmental Response Compensation and

Liability Act, or any foreign, federal, state or local labor, employment, or environmental law by virtue of the Buyer's purchase of the Purchased Assets or assumption of the Assumed Liabilities.

32.     Except to the extent expressly included in the Assumed Liabilities, pursuant to sections 105 and 363 of the Bankruptcy Code, all persons and entities, including, but not limited to, the Debtors, all debt security holders, equity security holders, the Debtors' employees or former employees, governmental, tax and regulatory authorities, lenders, parties to or beneficiaries under any benefit plan, any claimant asserting a products liability claim, trade and other creditors asserting or holding an Encumbrance of any kind or nature whatsoever against, in or with respect to any of the Debtors or the Purchased Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated), arising under or out of, in connection with, or in any way relating to the Debtors, the Purchased Assets, the operation of the Debtors' businesses prior to the Closing Date or the transfer of the Purchased Assets to the Buyer, shall be forever barred, estopped and permanently enjoined from asserting, prosecuting or otherwise pursuing such Encumbrance or other liability against the Buyer or any affiliate, subsidiary, successor or assign thereof and each of their respective current and former members, officers, directors, managed funds, investment advisors, attorneys, employees, partners, affiliates and representatives (each of the foregoing in its individual capacity) or the Purchased Assets.  For the avoidance of doubt, the foregoing shall not prevent the Debtors, the Chapter 7 estates, successors or permitted assigns from pursuing claims, if any, against the Buyer and/or its successors and assigns in and only in accordance with the terms of the Agreement.

33.     Subject to the terms of the Agreement, the Agreement and any related agreements may be waived, modified, amended, or supplemented by agreement of the Trustee, the Ad Hoc

Committee and the Buyer without further action or order of the Court; provided, however, that any such waiver, modification, amendment or supplement is not material and substantially conforms to and effectuates the Agreement and any related Agreement.

34. No bulk sale law or any similar law of any state or other jurisdiction shall apply in any way to the sale and the transactions contemplated by the Agreement.

35. The failure specifically to include any particular provisions of the Agreement or any related Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court, the Trustee and the Buyer that the Agreement and any related agreements are authorized and approved in their entirety with such amendments thereto as may be made by the parties in accordance with this Order prior to Closing. To the extent any provisions of this Order conflict with the terms and conditions of the Agreement, the terms and conditions of the Agreement shall govern and control. Nothing in this Order shall alter or amend the Agreement and the obligations of the Trustee and Buyer thereunder.

36. This Order and the Agreement shall be binding upon and govern the acts of all Persons and entities, including without limitation, the Debtors and the Buyer, their respective successors and permitted assigns, including, without limitation, any successor chapter 7 trustee hereinafter appointed for the Chapter 7 estates, all creditors of any Debtor (whether known or unknown), filing agents, filing officers, title agents, recording agencies, secretaries of state and all other persons and entities who may be required by operation of law, the duties of their office or contract to accept, file, register or otherwise record or release any documents or instruments or who may be required to report or insure any title in or to the Purchased Assets. All Encumbrances against the Chapter 7 estates of record as of the Closing shall forthwith be removed and stricken as against the Purchased Assets, without further order of the Court or act

of any party. Upon Closing, the entities listed above in this paragraph are authorized and directed to strike all such recorded Encumbrances against the Purchased Assets as provided for herein from their records, official and otherwise. Each and every federal, state and local governmental agency, unit or department are hereby directed to accept this Order as sole and sufficient evidence of the transfer of title of the Purchased Assets to the Buyer, and such agency, unit or department may rely upon this Order in consummating the transactions contemplated by the Agreement.

37.     The provisions of this Order are non-severable and mutually dependent.

38.     Nothing in any order of this Court shall conflict with or derogate from the provisions of the Agreement or the terms of this Order.

39.     Notwithstanding Bankruptcy Rules 6004, 6006 and 7062, this Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing. In the absence of any person or entity obtaining a stay pending appeal, the Trustee and the Buyer are free to close under the Agreement at any time, subject to the terms of the Agreement. If, in the absence of any person or entity obtaining a stay pending appeal, the Trustee and the Buyer close under the Agreement, the Buyer shall be deemed to be acting in "good faith" and shall be entitled to the protections of section 363(m) of the Bankruptcy Code as to all aspects of the transactions under and pursuant to the Agreement if this Order or any authorization contained herein is reversed or modified on appeal.

40.     This Order may be recorded by the Buyer in any registry or government office.

41.     This Court shall retain jurisdiction even after the closing of these chapter 7 cases to:

        a.      Interpret, implement and enforce the terms and provisions of this Order, the

Procedures Order, and the Agreement, all amendments thereto and any waivers or consents thereunder and each of the Agreement executed in connection therewith in all respects;

b.    Decide any disputes concerning this Order, the Agreement or the rights and duties of the parties hereunder or thereunder or any issues relating to the Agreement and this Order including, but not limited to, the interpretation of the terms, conditions and provisions hereof and thereof, the status, nature and extent of the Purchased Assets and any Designated Contracts and all issues and disputes arising in connection with the relief authorized herein, inclusive of those concerning the transfer of the assets free and clear of all Encumbrances;

c.    Protect the Buyer or any of the Designated Contracts or Purchased Assets against any of the Encumbrances as provided herein including, without limitation, to enjoin the commencement or continuation of any action seeking to impose successor liability or bulk sale liability;

d.    Enter orders in aid or furtherance of the transactions contemplated by the Agreement or to ensure the peaceful use and enjoyment of the Designated Contracts or the Purchased Assets by the Buyer;

e.    Compel delivery of all Purchased Assets to the Buyer;

f.    Adjudicate any and all remaining issues concerning the Trustee's right and authority to assume and assign the Designated Contracts and the rights and obligations of the Debtors and the Buyer with respect to such assignment and the existence of any default under any such Designated Contract;

g.    Adjudicate any and all disputes concerning alleged pre-Closing Encumbrances in and to the Purchased Assets including without limitation the extent, validity, enforceability, priority, and nature of any and all such alleged Encumbrances; and

h.    Adjudicate any and all disputes relating to the Trustee's right, title or interest in the Purchased Assets and the proceeds thereof.


Dated: _____, 2009
Wilmington, Delaware


_____
The Honorable Mary F. Walrath
United States Bankruptcy Judge

**Exhibit C**

**Deposit Escrow Agreement**

**(see attached)**

# FORM OF ESCROW AGREEMENT

THIS ESCROW AGREEMENT (this "Agreement"), is made and entered into as of this _____ day of _____, 2009, by and among Eclipse Aerospace, Inc., a Delaware corporation ("Purchaser"), Jeoffrey L. Burch, as the trustee of Eclipse Aviation Corporation and Eclipse IRB Sunport, LLC ("Seller"), and SUNTRUST BANK, a Georgia banking corporation, as escrow agent (the "Escrow Agent"). Purchaser, Seller and the Escrow Agent are each referred to herein as a "Party" and collectively as the "Parties."

## BACKGROUND

A.      Purchaser and Seller have entered into an Asset Purchase Agreement (the "Asset Purchase Agreement"), dated as of July __, 2009, pursuant to which Purchaser will purchase all of the assets used or held by Seller in the conduct of its business, and Purchaser will assume certain of the liabilities and obligations of Seller.

B.      Purchaser and Seller have agreed to establish an escrow fund pursuant to Section 3.1 of the Asset Purchase Agreement, providing for the delivery on the entry of the Bidding Procedures Orders to the Escrow Agent of the sum of $5,000,000 (the "Escrow Amount").

C.      The Escrow Agent is willing to act as escrow agent under this Agreement.

## AGREEMENT

In consideration of the premises and the mutual promises and agreements contained herein, the Parties, intending to be legally bound, hereby agree as follows:

1.      Definitions. Capitalized terms used but not otherwise defined in this Agreement shall have the meanings ascribed to such terms in the Asset Purchase Agreement.

2.      The Escrow Agent Appointment. Purchaser and Seller hereby appoint and designate SunTrust Bank as the Escrow Agent, to receive, hold, and distribute the Escrow Fund (as hereinafter defined) in accordance with the terms of this Agreement. The Escrow Agent hereby accepts its appointment as the escrow agent and agrees to hold, administer, invest, and disburse the Escrow Fund in accordance with the terms hereof.

3.      Escrow Fund.

3.1      Escrow Fund. Simultaneously with the execution of this Agreement, Purchaser has delivered to the Escrow Agent, by wire transfer of immediately available funds, the amount of $5,000,000 (such sum, as adjusted from time to time pursuant to the terms hereof, together with any investment proceeds thereon, being referred to collectively herein as the "Escrow Fund"). The Escrow Agent shall invest the Escrow Fund as instructed by Purchaser in writing in a SunTrust Non-Interest Deposit Account, which shall be fully insured by the FDIC until December 31, 2009. Any payments of income from the Escrow Fund shall be subject to

withholding regulation then in force with respect to United States taxes. Except for the delivery of Forms 1099, the Escrow Agent shall have no duty to prepare or file any federal or state tax report or return with respect to the Escrow Fund.

        3.2    <u>Disbursement of the Escrow Fund</u>. The Escrow Agent shall disburse the amounts on deposit in the Escrow Fund as follows:

        (a)    as provided in a joint written direction of Purchaser and Seller;

        (b)    as provided in an order of the Bankruptcy Court or other court of competent jurisdiction; or

        (c)    if neither (a) nor (b) above has occurred on or before September 15, 2009 and Purchaser and Seller have not theretofore notified Escrow Agent in writing of an extension, then the Escrow Agent shall distribute the Escrow Funds to Purchaser pursuant to written instructions provided by Purchaser; provided, however, that in the event Seller shall notify Escrow Agent of any good-faith dispute with Purchaser regarding the disbursement of the amounts on deposit, Escrow Agent shall retain the amounts on deposit until receipt of a joint written direction or order of the Bankruptcy Court or other court of competent jurisdiction as provided for in (a) or (b) above.

        3.3    <u>Termination of Escrow Fund</u>. The escrow provided for hereunder shall terminate upon the disbursement of the Escrow Fund pursuant to the terms of this Agreement.

        4.    <u>Escrow Agent</u>.

        4.1    <u>Duties</u>. In performing its duties under this Agreement or upon the claimed failure to perform its duties hereunder, the Escrow Agent shall have no liability except for liability caused by or arising out of Escrow Agent's fraud, willful misconduct or gross negligence. The Escrow Agent's sole responsibility shall be for the safekeeping and disbursement of the Escrow Fund in accordance with the terms of this Agreement. The Escrow Agent shall have no implied duties or obligations and shall not be charged with knowledge or notice of any fact or circumstance not specifically set forth herein. The Escrow Agent shall be entitled to rely upon and shall be protected in acting upon any request, instruction, statement or other instrument, not only as to its due execution, validity and effectiveness, but also as to the truth and accuracy of any information contained therein, which the Escrow Agent shall in good faith believe to be genuine, to have been signed or presented by the person or parties purporting to sign the same and to conform to the provisions of this Agreement. In no event shall the Escrow Agent be liable for incidental, indirect, special, consequential or punitive damages. The Escrow Agent shall not be obligated to take any legal action or to commence any proceeding in connection with the Escrow Fund, any account in which the Escrow Fund is deposited, or this Agreement, or to appear in, prosecute or defend any such legal action or proceedings. The Escrow Agent may consult legal counsel selected by it in the event of any dispute or question as to the construction of any of the provisions hereof or of any other agreement or of its duties

hereunder, and shall incur no liability and shall be fully protected from any liability whatsoever in acting in accordance with the advice, opinion or instruction of such counsel. Purchaser and Seller shall be jointly and severally liable for, and shall promptly pay, upon demand, the reasonable fees and expenses (with each of Purchaser, on the one hand, and Seller, on the other hand, being responsible for such expenses consistent with Section 4.2(b)) of any such counsel pursuant to the terms of Section 4.6 hereof. The Escrow Agent shall not be required to take notice of or have any obligations or responsibilities in connection with the Asset Purchase Agreement, the transactions contemplated thereby or any other agreement between any other parties to the Asset Purchase Agreement, other than this Agreement.

4.2    <u>Indemnification</u>.

(a)    From and at all times after the date of this Agreement, Purchaser and Seller shall, subject to the last sentence of Section 4.2(b) hereof, jointly and severally (with each of Purchaser, on the one hand, and Seller, on the other hand, being responsible for such expenses consistent with Section 4.2(b)), to the fullest extent permitted by law and to the extent provided herein, indemnify and hold harmless the Escrow Agent and each director, officer, employee, attorney, agent and affiliate of the Escrow Agent (collectively, the "<u>Indemnified Parties</u>") against any and all actions, claims (whether or not valid), losses, damages, liabilities, costs and expenses of any kind or nature whatsoever (including, without limitation, reasonable attorneys' fees, costs and expenses) incurred by or asserted against any of the Indemnified Parties from and after the date hereof in connection with the Escrow Agent's good faith acceptance of and performance of its duties and obligations under this Agreement; <u>provided</u>, <u>however</u>, that no Indemnified Party shall have the right to be indemnified hereunder for any liability (or any cost or expense related to such liability, including, without limitation, attorneys' fees, costs and expenses) finally determined by an arbitrator or a court of competent jurisdiction, subject to no further appeal, to the extent such liability results from fraud, gross negligence or willful misconduct of such Indemnified Party. If any such action or claim shall be brought or asserted against any Indemnified Party, such Indemnified Party shall promptly notify Purchaser and Seller in writing, and Purchaser and Seller shall assume the defense thereof, including the employment of counsel and the payment of all expenses (which expenses shall be subject to Section 4.2(b)). Such Indemnified Party shall, in its sole discretion, have the right to employ separate counsel in any such action and to participate in the defense thereof, and the fees and expenses of such counsel shall be paid by such Indemnified Party unless (i) Purchaser and Seller agree in writing to pay such fees and expenses (with Seller's portion deducted from the Escrow Fund), (ii) Purchaser or Seller shall fail to assume the defense of such action or proceeding or shall fail, in the reasonable

discretion of such Indemnified Party, to employ counsel reasonably satisfactory to the Indemnified Party in any such action or proceeding, or (iii) the named parties to any such action or proceeding (including any impleaded parties) include both the Indemnified Party, on the one hand, and Purchaser or Seller, on the other hand, and the Indemnified Party shall have been advised by counsel that there may be one or more legal defenses available to it which are different from or additional to those available to Purchaser or Seller. All such fees and expenses payable by Purchaser or Seller pursuant to the foregoing sentence shall be paid from time to time as incurred, both in advance of and after the final disposition of such action or claim. All of the foregoing losses, damages, costs and expenses of the Indemnified Parties shall be payable upon demand of such Indemnified Party, in accordance with Sections 4.2(b) and 4.6 hereof, jointly and severally (with each of Purchaser, on the one hand, and Seller, on the other hand, being responsible for such expenses consistent with Section 4.2(b)). The obligations of Purchaser and Seller under this Section 4.2 shall survive any termination of this Agreement and the resignation or removal of the Escrow Agent.

(b)      The Parties agree that neither the payment by Purchaser or Seller of any claim by the Escrow Agent for indemnification hereunder nor the disbursement of any amounts to the Escrow Agent from the Escrow Fund in respect of a claim by the Escrow Agent for indemnification shall impair, limit, modify, or affect, as between Purchaser and Seller, the respective rights and obligations of Seller, on the one hand, and Purchaser, on the other hand, under this Agreement. Seller and Purchaser agree among themselves that any obligation for indemnification under this Section 4.2 (or for fees and expenses of the Escrow Agent described in the penultimate sentence of Section 4.1) shall be borne by the Party or Parties determined by an arbitrator or a court of competent jurisdiction to be responsible for causing the loss, damage, liability, cost or expense against which the Escrow Agent is entitled to indemnification or, if no such determination is made, then one-half by Purchaser and one-half by Seller.

4.3     Disputes.  If, at any time, there shall exist any dispute between Purchaser and Seller with respect to the holding or disposition of any portion of the Escrow Fund or any other obligations of the Escrow Agent hereunder, or if at any time the Escrow Agent is unable to determine, to the Escrow Agent's sole satisfaction, the proper disposition of any portion of the Escrow Fund or the Escrow Agent's proper actions with respect to its obligations hereunder, or if Purchaser and Seller have not, within thirty (30) days of the furnishing by the Escrow Agent of a notice of resignation pursuant to Section 4.4 below, appointed a successor escrow agent to act hereunder, then the Escrow Agent may, in its sole discretion, take either or both of the following actions:

(a)     suspend the performance of any of its obligations under this Agreement until such dispute or uncertainty shall be resolved to the sole satisfaction of the Escrow Agent or until a successor escrow agent shall have been appointed (as the case may be); or

(b)     petition (by means of an interpleader action or any other appropriate method) any court of competent jurisdiction, for instructions with respect to such dispute or uncertainty, and pay into or deposit with such court all disputed Escrow Funds held by it in the Escrow Fund for holding and disposition in accordance with the instructions of such court and Escrow Agent shall thereupon be discharged from all further obligations as Escrow Agent under this Agreement.

The Escrow Agent shall have no liability to Purchaser, Seller or any other person with respect to any such suspension of performance or disbursement into court, specifically including any liability that may arise, or be alleged to have arisen, out of or as a result of any delay in the disbursement of funds held in the Escrow Fund or any delay in or with respect to any other action required or requested of the Escrow Agent.

4.4     <u>Resignation of Escrow Agent</u>.  The Escrow Agent may resign from the performance of its duties hereunder at any time by giving thirty (30) days' prior written notice to Purchaser and Seller or may be removed, with or without cause, by Purchaser and Seller, acting jointly, at any time by the giving of ten (10) days' prior written notice to the Escrow Agent. Such resignation or removal shall take effect upon the appointment of a successor escrow agent as provided herein.  Upon any such notice of resignation or removal, Purchaser and Seller, acting jointly, shall appoint a successor escrow agent hereunder, which shall be a commercial bank, trust company or other financial institution with a combined capital and surplus in excess of $1 Billion, unless otherwise agreed by Purchaser and Seller.  In the event Purchaser and Seller shall fail to appoint a successor escrow agent within sixty (60) days after the resignation or removal of the Escrow Agent, as contemplated hereby, the Escrow Agent may deposit the Escrow Fund into the registry of a court of competent jurisdiction and shall thereupon be discharged from all further duties as Escrow Agent under this Agreement.  Upon the acceptance in writing of any appointment as Escrow Agent hereunder by a successor escrow agent, such successor escrow agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Escrow Agent, and the retiring Escrow Agent shall be discharged from its duties and obligations under this Agreement, but shall not be discharged from any liability for actions taken as Escrow Agent hereunder prior to such succession.  After any retiring Escrow Agent's resignation or removal, the provisions of this Agreement shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Escrow Agent under this Agreement.

4.5     <u>Receipt</u>.  By its execution and delivery of this Agreement, the Escrow Agent acknowledges receipt of the Escrow Amount.

4.6     <u>Fees</u>.  Purchaser and Seller shall compensate the Escrow Agent for its services hereunder in accordance with <u>Schedule I</u> attached hereto and, in addition, shall reimburse the Escrow Agent for all of its reasonable out-of-pocket expenses, including attorneys'

fees (actually incurred by outside counsel), travel expenses, telephone and facsimile transmission costs, postage (including express mail and overnight delivery charges), copying charges and the like (other than indemnification obligations of the parties, which shall be subject to Section 4.2 hereof) in accordance with <u>Schedule I</u> attached hereto. All of the compensation and reimbursement obligations set forth in the previous sentence shall be payable upon demand by the Escrow Agent and, with respect to the Escrow Agent, shall be a joint and several obligation of Purchaser and Seller, and, solely as between Purchaser and Seller, shall be paid one-half by Purchaser and one-half by Seller, subject to Section 4.2(b). The obligations of Purchaser and Seller under this Section 4.6 shall survive any termination of this Agreement and the resignation or removal of the Escrow Agent. All fees, expenses or other amounts payable by Seller in accordance with the terms of this Agreement shall be paid from the Escrow Fund to the extent available therefor.

5.      <u>Miscellaneous</u>.

        5.1     <u>Notices</u>.     All notices, communications and deliveries hereunder shall be made in writing signed by or on behalf of the Party making the same and shall be delivered personally or sent by registered or certified mail (return receipt requested) or by any national overnight courier service (with postage and other fees prepaid) as follows:

| | |
|---|---|
| To Purchaser: | Eclipse Aerospace, Inc. |
| | 125 Fairchild St. |
| | Suite 100 |
| | Charleston, SC 29492 |
| | Attn: Mason Holland, President |
| | Tel. 843-971-5025 |
| | Fax 843-849-9298 |
| | |
| with copies to: | William J. Ching, Esq. |
| | Nelson Mullins Riley & Scarborough LLP |
| | Atlantic Station |
| | 201 17th Street, N.W., Suite 1700 |
| | Atlanta, GA 30363 |
| | Tel. 404.322.6000 |
| | Fax 404-322-6050 |
| | |
| To Seller: | The Trustee: |
| | Jeoffrey L. Burtch, Esq. |
| | Cooch & Taylor, P.A. |
| | 1000 West Street |
| | Wilmington, Delaware 19801 |
| | Facsimile: (302) 984-3939 |

| with a copy to: | Cooch & Taylor, P.A. |
| | 1000 West Street |
| | Wilmington, Delaware 19801 |
| | Attn: Adam Singer, Esq. |
| | Facsimile: (302) 984-3939 |

| If to Escrow Agent: | SunTrust Bank |
| | Escrow Services |
| | Nickida Colbert |
| | Trust Officer |
| | Mail Code HDQ-5307 |
| | 919 E. Main Street |
| | Richmond, VA 23219 |
| | Tel. 804-782-7610 |
| | Fax 804-782-5858 |
| | Email: nickida.colbert@suntrust.com |

or to such other representative or at such other address of a Party as such Party hereto may furnish to the other Parties in writing. Any such notice, communication or delivery shall be deemed given or made (a) on the date of delivery if delivered in person (by courier service or otherwise), (b) on the fifth (5th) business day after it is mailed by registered or certified mail, or (c) on the next day if sent for next day delivery to a domestic address by a recognized overnight delivery service; provided that no notice, communication or delivery to the Escrow Agent shall be deemed effective prior to the Escrow Agent's actual receipt thereof.

5.2     Time of the Essence; Computation of Time. Time is of the essence for each and every provision of this Agreement. Whenever the last day for the exercise of any privilege or the discharge of any duty under this Agreement shall fall upon a Saturday, Sunday or any date on which banks in Georgia are closed, the Party having such privilege or duty may exercise such privilege or discharge such duty on the next succeeding day which is a regular business day.

5.3     Assignment; Binding Effect. No party may assign this Agreement or its rights or obligations hereunder without, if Seller intends to assign, the consent of Purchaser and the Escrow Agent, or, if Purchaser intends to assign, the consent of Seller and the Escrow Agent, which consent, in either case, will not be unreasonably withheld or delayed. This Agreement shall inure to the benefit of and shall be binding upon the Parties hereto and their respective successors and assigns.

5.4     Headings. The headings of the sections of this Agreement are inserted for reference purposes only and shall not affect the meaning or interpretation of any provisions of this Agreement.

5.5     Waiver. Any Party may, at its option, waive in writing any or all of the conditions herein contained to which its obligations hereunder are subject. No waiver of any provision of this Agreement, however, shall constitute a waiver of any other provision (whether

or not similar), nor shall such waiver constitute a continuing waiver unless otherwise expressly provided.

5.6    Construction.    The provisions of this Agreement shall be construed according to their fair meaning and neither for nor against any Party hereto irrespective of which Party caused such provisions to be drafted.  Each of the Parties acknowledges that it has been represented by an attorney in connection with the preparation and execution of this Agreement.

5.7    No Limitation.  The Parties (other than the Escrow Agent) agree that the rights and remedies of any Party under this Agreement shall not operate to limit any other rights and remedies otherwise available to any party under the Asset Purchase Agreement.

5.8    Counterparts.    This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original but all of which together shall constitute one and the same instrument.

5.9    Severability.    It is the desire and intent of the Parties hereto that the provisions of this Agreement be enforced to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought.  Accordingly, if any particular provision of this Agreement shall be adjudicated by a court of competent jurisdiction to be invalid, prohibited or unenforceable for any reason, such provision, as to such jurisdiction, shall be ineffective, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction. Notwithstanding the foregoing, if such provision could be more narrowly drawn so as not to be invalid, prohibited or unenforceable in such jurisdiction, it shall, as to such jurisdiction, be so narrowly drawn, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.

5.10    Governing Law and Choice of Forum.  THIS AGREEMENT WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE DOMESTIC LAWS OF THE STATE OF GEORGIA, WITHOUT GIVING EFFECT TO ANY CHOICE OF LAW OR CONFLICTING PROVISION OR RULE (WHETHER OF THE STATE OF GEORGIA OR ANY OTHER JURISDICTION) THAT WOULD CAUSE THE LAWS OF ANY JURISDICTION OTHER THAN THE STATE OF GEORGIA TO BE APPLIED.  IN FURTHERANCE OF THE FOREGOING, THE INTERNAL LAWS OF THE STATE OF GEORGIA WILL CONTROL THE INTERPRETATION AND CONSTRUCTION OF THIS AGREEMENT, EVEN IF UNDER SUCH JURISDICTION'S CHOICE OF LAW OR CONFLICT OF LAW ANALYSIS, THE SUBSTANTIVE LAW OF SOME OTHER JURISDICTION WOULD ORDINARILY APPLY.

5.11    Other Transactions with Purchaser.    The Escrow Agent and any stockholder, director, officer or employee of the Escrow Agent may become pecuniarily interested in any transaction in which Purchaser may be interested, and contract and lend money to Purchaser and otherwise act as fully and freely as though it were not Escrow Agent under this Agreement.  Nothing herein shall preclude the Escrow Agent from acting in any other capacity for Purchaser or for any other entity.

5.12 <u>Authorized Signatures.</u> Contemporaneously with the execution and delivery of this Agreement and, if necessary, from time to time thereafter, each of the parties to this Agreement (other than the Escrow Agent) shall execute and deliver to the Escrow Agent a Certificate of Authority substantially in the form of Schedule II hereto (a "<u>Certificate of Authority</u>") for the purpose of establishing the identity and authority of persons entitled to issue notices, instructions or directions to the Escrow Agent on behalf of each such party. Until such time as the Escrow Agent shall receive an amended Certificate of Authority replacing any Certificate of Authority theretofore delivered to the Escrow Agent, the Escrow Agent shall be fully protected in relying, without further inquiry, on the most recent Certificate of Authority furnished to the Escrow Agent. Whenever this Agreement provides for joint written notices, joint written instructions or other joint actions to be delivered to the Escrow Agent, the Escrow Agent shall be fully protected in relying, without further inquiry, on any joint written notice, instructions or action executed by persons named in such Certificate of Authority.

* * * * *

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the date first above written.


PURCHASER:                          ECLIPSE AEROSPACE, INC.


                                    By: _____
                                        Name:
                                        Title:


SELLER:


                                    By: _____
                                        Name: Jeoffrey L. Burtch
                                        Title: Chapter 7 Trustee


ESCROW AGENT:                       SUNTRUST BANK


                                    By: _____
                                        Name: _____
                                        Title: _____



**Schedule I**

**SunTrust Bank, as Escrow Agent**

**Eclipse Aerospace, Inc.**

**and**

**Jeoffrey L. Burch, as the trustee of
Eclipse Aviation Corporation and Eclipse IRB Sunport, LLC**

**Schedule of Fees & Expenses**

**Acceptance/Legal Review Fee:**     **$500.00** – one time only payable at the time of signing the escrow agreement

The Legal Review Fee includes review of all related documents and accepting the appointment of Escrow Agent on behalf of SunTrust Bank.  The fee also includes setting up the required account(s) and accounting records, document filing, and coordinating the receipt of funds/assets for deposit to the Escrow Account.  This is a one-time fee payable upon execution of the Escrow Agreement.  <u>As soon as SunTrust Bank's attorney begins to review the escrow agreement, the legal review fee is subject to payment regardless if the parties decide to appoint a different escrow agent or a decision is made that the escrow agreement is not needed.</u>

**Administration Fee:**     **[$]** – payable at the time of signing the escrow agreement and on the anniversary date thereafter, if applicable

The Administration Fee includes providing routine and standard services of an Escrow Agent.  The fee includes administering the escrow account, performing investment transactions, processing cash transactions (including wires and check processing), disbursing funds in accordance with the Agreement (note any pricing considerations below), and providing trust account statements to applicable parties for a twelve (12) month period.  If the account remains open beyond the twelve (12) month term, the parties will be invoiced each year on the anniversary date of the execution of the Escrow Agreement.  Additional fees will be billed for processing claim notices and/or objections. Extraordinary expenses, including legal counsel fees, will be billed as out-of-pocket.  The Administration Fee is due upon execution of the Escrow Agreement.

**Out-of-Pocket Expenses:**     **At Cost**

Out-of-pocket expenses such as, but not limited to, postage, courier, overnight mail, insurance, money wire transfer, long distance telephone charges, facsimile, stationery, travel, legal (out-of-pocket to counsel) or accounting, will be billed at cost.

**Note:  This fee schedule is based on the assumption that the escrowed funds will be invested in SunTrust Bank's money market cash sweep account, the RidgeWorth Money Market Funds.**

All escrow agent fees and expense reimbursements shall be paid jointly and severally to the Escrow Agent, provided that, as between Seller and Purchaser, one-half shall be paid by Seller and one-half shall be paid by Purchaser, subject to Section 4.2(b) of this Agreement.  All fees and expense reimbursements to be paid by Seller may be paid from the Escrow Fund at Purchaser's sole discretion.

* * * * *

# Schedule II

## Certificate As To Authorized Signatures

Re: Escrow Agreement dated _____, 2009, among SunTrust Bank, Eclipse Aerospace, Inc. and Jeoffrey L. Burch, as the trustee of Eclipse Aviation Corporation and Eclipse IRB Sunport, LLC (the "Escrow Agreement)

The specimen signatures set forth below are the specimen signatures of the persons authorized to execute and deliver documents and to initiate and approve transactions pertaining to the Escrow Agreement on behalf of Eclipse Aerospace, Inc.

| **Name/Title** | **Specimen Signature** |
|---|---|
| | |
| Name and Title | Signature |
| | |
| Name and Title | Signature |
| | |
| Name and Title | Signature |

The specimen signatures set forth below are the specimen signatures of the persons authorized to execute and deliver documents and to initiate and approve transactions pertaining to the Escrow Agreement on behalf of Jeoffrey L. Burch, as the trustee of Eclipse Aviation Corporation and Eclipse IRB Sunport, LLC.

| **Name/Title** | **Specimen Signature** |
|---|---|
| | |
| Name and Title | Signature |
| | |
| Name and Title | Signature |
| | |
| Name and Title | Signature |

# EXHIBIT 2

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| ECLIPSE AVIATION CORPORATION, *et al.*, | ) | Case No. 08-13031 (MFW) |
| | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | **Re: Docket No. 763** |

### ORDER (A) APPROVING BID PROCEDURES RELATING TO SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS; (B) BREAK UP FEE; (C) SCHEDULING A HEARING TO CONSIDER THE SALE AND APPROVING THE FORM AND MATTER OF NOTICES; (D) ESTABLISHING PROCEDURES RELATING TO ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, INCLUDING NOTICE OF PROPOSED CURE AMOUNTS; AND (E) GRANTING RELATED RELIEF

Upon the Motion[1], dated July 31, 2009 (the "Sale Motion"), of Jeoffrey L. Burtch, as the

Chapter 7 trustee (the "Trustee") of the above-captioned debtors (collectively, the "Debtors") for

the entry of an order (A) approving bid procedures which are attached as Exhibit 1 hereto (the

"Bid Procedures") with respect to the proposed sale of substantially all of the Debtors' assets, as

more fully set forth in that certain asset purchase agreement (the "Agreement") dated as of

July 30, 2009 by and between the Trustee and Eclipse Aerospace, Inc. ("Buyer"); (B) scheduling

a hearing (the "Sale Hearing") and approving the form and manner of notice of the Auction and

the Bid Procedures; (C) establishing procedures relating to the assumption and assignment of

certain Designated Contracts, including notice of proposed cure amounts; and (D) granting

related relief; and the Court having determined that, to the extent set forth herein, the relief

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Agreement (as defined below), or in the Bid Procedures (defined below).

requested in the Motion is in the best interests of the Debtors, the Chapter 7 estates, creditors and other parties in interest; due and appropriate notice of the Motion and the relief requested therein was provided by the Trustee pursuant to Bankruptcy Rules 2002, 4001, 6004, 6006 and 9014 on the following parties: (i) all entities known to assert any interest in or lien upon the Purchased Assets; (ii) all parties to Designated Contracts; (iii) all parties that are entitled to notice under Bankruptcy Rule 2002; (iv) the attorneys general of all states in which the Purchased Assets are located; (v) the Office of the United States Trustee; (vi) the Securities and Exchange Commission; (vii) the Internal Revenue Service and any governmental taxing authority that has filed a claim against the Chapter 7 Estates; (viii) all entities that expressed to the Seller an interest in purchasing the Purchased Assets; (ix) any party appearing in the Bankruptcy Cases and claiming a secured interest in the Purchased Assets; or any party known to the Seller and claiming a secured interest in the Purchased Assets; and (x) any and all other parties directed by the Court (collectively, the "Notice Parties"); and after consideration of the Sale Motion to the extent of the relief granted herein; and the remainder of the record herein; and after due deliberation thereon; and good and sufficient cause appearing therefore, it is hereby FOUND, CONCLUDED, AND DECLARED THAT:[2]

A.      The Court has jurisdiction over this matter and over the property of the Debtors and their bankruptcy estates pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

B.      Notice of the Hearing, the Motion and proposed entry of this Order has been provided to the Notice Parties. Under the urgent circumstances, requisite notice of the Motion

---

[2]     Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. See Fed. R. Bankr. P. 7052.

and the relief requested thereby and this Order has been provided in accordance with Bankruptcy Rules 2002, 4001, 6004, 6006 and 9014, which notice is sufficient for all purposes under the Bankruptcy Code, including, without limitation, Bankruptcy Code § 102(1), and no further notice of, or hearing on, the Motion or this Order is necessary or required.

C.     The proposed notices (in substantially the form attached hereto) of (i) the Auction and Sale Notice, (ii) the assumption and assignment of the Designated Contracts and any Cure Costs payable in respect thereof, as described or referred to in the Agreement, and (iii) the Bid Procedures, are appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Proposed Sale of the Assets, the Auction, the assumption and assignment of Designated Contracts and the cure associated therewith, the Agreement and the Bid Procedures to be employed in connection therewith.

D.     The approval of the Bidding Procedures is in the best interest of the estates, their creditors and other parties in interest. The Trustee has articulated good and sufficient reasons for this Court to grant the relief requested in the Motion regarding the Bid Procedures and has demonstrated sound business justifications to support such relief. The Bidding Procedures, including the Break Up Fee, are fair, reasonable and reasonably calculated to enhance the prospect of competitive bidding and maximize recovery for the estates and their creditors.

E.     The entry of this Order and the relief contained herein are in the best interests of the Debtors, their estates, creditors and other parties-in-interest; and it is therefore

ORDERED, ADJUDGED AND DECREED THAT:

1.     The relief requested in the Motion is granted, to the extent set forth herein.

4

2. The Bid Procedures attached hereto as Exhibit 1 are hereby approved and fully incorporated into this Order, and shall apply with respect to the Proposed Sale of the Assets. The Trustee is authorized to take any and all actions necessary to implement the Bid Procedures.

3. All objections to the relief requested in the Motion that have not been withdrawn, waived, or settled as announced to the Court at the hearing on the Motion or by stipulation filed with the Court, are overruled.

4. A Qualified Bidder that desires to make a Bid shall deliver written copies of its bid to the parties set forth below not later than 12:00 noon (prevailing Eastern time) on August 14, 2009 (the "Bid Deadline") and shall comply with the requirements set forth in the Bid Procedures for making such bid: (a) Jeoffrey L. Burtch, Esq., Cooch & Taylor, P.A., 1000 West Street, Wilmington, Delaware 19801 with a copy to Cooch & Taylor, P.A., 1000 West Street, Wilmington, Delaware 19801 Att.: Adam Singer, Esq.; (b) Buyer: Eclipse Aerospace, Inc., 125 Fairchild St., Suite 100, Charleston, SC 29492, Attn.: Mason Holland, President, with a copy to: Nelson Mullins Riley & Scarborough LLP, Atlantic Station, 201 17th Street, Suite 1700, Atlanta, Georgia 30363, Attn.: William J. Ching, Esq. and Michael E. Hollingsworth II, Esq; and (c) the Ad Hoc Committee: Covington & Burling LLP, The New York Times Building, 620 Eighth Avenue, New York, New York 10018, Attn: Benjamin Hoch and Andrew Ment.

5. The Trustee shall have the right to reject any and all bids that he believes in his reasonable discretion, in consultation with the Ad Hoc Committee of Senior Secured Noteholders, do not comply with the Bid Procedures. Buyer is deemed to be a Qualified Bidder, and Buyer's Bid as embodied in the Agreement, is deemed to be a Qualified Bid.

6. As further described in the Bid Procedures, if a Qualified Bid other than Buyer's Bid is timely received, the Auction will be held on August 17, 2009 at 10:00 a.m. (prevailing

5

Eastern time), and the Trustee shall, not later than 6 p.m. (prevailing Eastern time) on August 15, 2009, notify Buyer, all Qualified Bidders who have submitted a Qualified Bid and expressed their intent to participate in the Auction, counsel for the Ad Hoc Committee of Senior Secured Noteholders and the United States Trustee that the Auction will be held on August 17, 2009 at 10:00 a.m. at the offices of Cooch & Taylor, 1000 West Street, Wilmington, Delaware 19801.

7.    Not later than one (1) days after entry of this Order, the Trustee will cause the Auction and Sale Notice, substantially similar to the form attached hereto as Exhibit 2 to be sent by first-class mail postage prepaid to the Notice Parties; however with respect to all entities that expressed to the Seller an interest in purchasing the Purchased Assets, the Trustee will serve the Auction and Sale Notice by email, facsimile transmission, or by overnight mail.

8.    In addition, to facilitate the sale, assumption and assignment of any Designated Contracts, the Trustee will e-file and serve by email, facsimile transmission, or by overnight mail a notice (the "Cure Amount Notice"), similar to the form attached hereto as Exhibit 3 hereto not later than three (3) days after the entry of this Order upon each counterparty to a Designated Contract under the Agreement (including counsel of record, if known, to such counterparties via hand delivery or overnight courier). Buyer shall have the right until the date provided in the Agreement to amend the Designated Contracts schedule to include additional executory contracts and unexpired leases or to exclude executory contracts or unexpired leases previously included as provided in the Agreement. To the extent that Buyer is not the Successful Bidder and an alternative Successful Bidder is seeking to have certain Designated Contracts assumed and assigned as part of an alternative transaction, the Trustee will provide financial information for the alternative bidder with respect to all non-debtor parties to such Designated Contracts immediately following the Auction via facsimile or Federal Express or email.

6

9.     The Trustee will attach to the Cure Amount Notice his calculation of the undisputed cure amounts that the Trustee believes must be paid to cure all defaults under all Designated Contracts (the "Cure Amounts"). If no such amount is listed, then the Trustee believes that there is no Cure Amount. Unless the non-debtor party to a Designated Contract files an objection (the "Cure Amount Objection") to its scheduled Cure Cost or any other objection to the proposed assumption and assignment of its Designated Contract no later than 12:00 p.m. (prevailing Eastern time) on August 18, 2009 (or in the event Buyer is not the Successful Bidder, at or prior to the Sale Hearing), and serves the objection, so that it is actually received before such deadline, upon (a) counsel to the Trustee: Jeoffrey L. Burtch, Esq., Cooch & Taylor, P.A., 1000 West Street, Wilmington, Delaware 19801, (b) Buyer: Eclipse Aerospace, Inc., 125 Fairchild St., Suite 100, Charleston, SC 29492, Attn.: Mason Holland, President, with a copy to: Nelson Mullins Riley & Scarborough LLP, Atlantic Station, 201 17th Street, Suite 1700, Atlanta, Georgia 30363, Attn.: William J. Ching, Esq. and Michael E. Hollingsworth II, Esq.; and (c) counsel for the Ad Hoc Committee of Senior Secured Noteholders: Covington & Burling LLP, The New York Times Building, 620 Eighth Avenue, New York, New York 10018, Attn: Benjamin Hoch and Andrew Ment; such non debtor party shall (i) be forever barred from objecting to the Cure Amount and from asserting any additional cure or other amounts with respect to such Designated Contract or any other objection to the proposed assumption and assignment of its Designated Contract and the Trustee shall be entitled to rely solely upon the Cure Amount; and (ii) be forever barred and estopped from asserting or claiming against the Debtors, Buyer, or such other Successful Bidder or any other assignee of the relevant Designated Contract that any additional amounts are due or defaults exist under such Designated Contract.

7

10.     In the event that a Cure Amount Objection is timely filed, the Cure Amount Objection must set forth (i) the basis for the objection, (ii) with specificity, the amount the party asserts as the Cure Amount, and (iii) appropriate documentation in support of the Cure Amount.

11.     Hearings on Cure Amount Objections may be held (a) at the Sale Hearing, or (b) on such other date as this Court may designate upon request by the Trustee with the prior written consent of Buyer.

12.     The Trustee's decision to assume and assign Designated Contracts is subject to Court approval and consummation of the Proposed Sale of the Assets. Absent consummation of the Proposed Sale of the Assets, each of the Designated Contracts shall neither be deemed assumed nor assigned and shall in all respects be subject to further administration under the Bankruptcy Code.

13.     Except to the extent otherwise provided in the Agreement or any agreement with a Successful Bidder, subject to any required Cure Amount payments, the assignee of any assumed Designated Contract will not be subject to any liability to the assigned Designated Contract counterparty that accrued or arose before the closing date of the Proposed Sale of the Assets and the Debtors and the Chapter 7 estates shall be relieved of all liability accruing or arising thereafter pursuant to Bankruptcy Code § 365(k).

14.     Recognizing the value and benefits that the Buyer has provided to the estates by entering into the Asset Purchase Agreement, as well as Buyer's expenditure of time, energy and resources, Buyer is hereby granted a fee equal to $1,600,000 (the "Break Up Fee"), such fee payable in the event the Court fails to approve a sale to Buyer and instead approves a sale of some or all of the Purchased Assets to an entity that has submitted a Qualified Bid and such sale closes. The Break Up Fee shall be payable at the closing of the sale in connection with such Bid

8

from the first proceeds of such sale without further order of the Court. The Break Up Fee, when earned, shall constitute an administrative claim against the estate under Bankruptcy Code Sections 503(b)(1) and 507(a)(2).

15. If Buyer elects to participate in bidding at the Auction, the amount of the Break Up Fee shall be considered if added to Buyer's bid in determining whether Buyer's bid is a higher and better offer for the Purchased Assets.

16. Objections, if any, to the relief requested in the Sale Motion must: (1) be in writing; (2) comply with the Bankruptcy Rules and the Local Bankruptcy Rules; (3) be filed with the clerk of the Bankruptcy Court for the District of Delaware, 3rd Floor, 824 Market Street, Wilmington, Delaware 19801 and served so as to be received on or before 12:00 p.m. (prevailing Eastern Time) on August 18, 2009 upon (a) counsel to the Trustee: Jeoffrey L. Burtch, Esq., Cooch & Taylor, P.A., 1000 West Street, Wilmington, Delaware 19801, (b) Buyer: Eclipse Aerospace, Inc., 125 Fairchild St., Suite 100, Charleston, SC 29492, Attn.: Mason Holland, President, with a copy to: Nelson Mullins Riley & Scarborough LLP, Atlantic Station, 201 17th Street, Suite 1700, Atlanta, Georgia 30363, Attn.: William J. Ching, Esq. and Michael E. Hollingsworth II, Esq.; and (c) counsel for the Ad Hoc Committee of Senior Secured Noteholders: Covington & Burling LLP, The New York Times Building, 620 Eighth Avenue, New York, New York 10018, Attn: Benjamin Hoch and Andrew Ment; provided however, to the extent that Buyer is not the Successful Bidder and an alternative Successful Bidder is seeking to have certain unexpired leases, license agreements and executory contracts assumed and assigned as part of an alternative transaction, the non-debtor parties to such unexpired leases, license agreements and executory contracts shall have until the Sale Hearing to raise objections under Bankruptcy Code § 365(b)(1)(C).

9

17. The Sale Hearing shall be held before this Court before the Honorable Mary F. Walrath on August 20, 2009 at 3:30 p.m. (prevailing Eastern Time). The Sale Hearing may be adjourned, from time to time, without further notice to creditors or other parties-in-interest other than by announcement of said adjournment before this Court or on this Court's calendar on the date scheduled for said hearing.

18. The notices to be issued in connection with the Proposed Sale of the Assets, substantially in the form of the notices annexed hereto as Exhibits 1, 2 and 3 are approved in all respects.

19. This Order shall constitute findings of fact and conclusions of law and shall take effect immediately upon execution hereof.

20. As provided by Bankruptcy Rules 6004(g) and 6006(d), this Order shall not be stayed for ten (10) days after the entry thereof and shall be effective and enforceable immediately upon its entry on this Court's docket.

21. All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

22. This Court shall retain jurisdiction over any matters related to or arising from the implementation of this Order and the Bid Procedures.

Dated August ___11___, 2009
Wilmington, Delaware

_____
Peter J. Walsh
United States Bankruptcy Judge

10

# EXHIBIT 1

# BID PROCEDURES

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 7 |
|  | ) |  |
| Eclipse Aviation Corporation, et al.,[1] | ) | Case No. 08-13031 (MFW) |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |

## BID PROCEDURES

On November 25, 2008 (the "Petition Date"), Eclipse Aviation Corporation and its affiliated debtors (collectively, the "Debtors") filed chapter 11 cases pending in the Bankruptcy Court and jointly administered under Case No. 08-13031 (MFW). On March 5, 2009, the Debtors' cases converted to cases under Chapter 7 of the Bankruptcy Code. Jeoffrey L. Burtch was appointed as interim chapter 7 trustee on March 5, 2009, and serves as the chapter 7 trustee (the "Trustee") in these cases pursuant to section 702(d) of the Bankruptcy Code. On July 30, 2009, the Trustee entered into an asset purchase agreement (the "Agreement")[2] with Eclipse Aerospace Inc. ("Buyer") in which Buyer proposes to purchase substantially all of the Debtors' assets. By motion dated July 31, 2009 (the "Motion"), the Trustee sought, among other things, approval for the sale of substantially all the assets (the "Assets") of the Debtors and of the process and procedures set forth below (the "Bid Procedures") through which the Trustee, with the consultation of the Ad Hoc Committee of Senior Secured Noteholders, will determine the highest and best offer for the Assets. On August [__], 2009, the Bankruptcy Court entered its order (the "Bidding Procedures Order"), which, among other things, approved the Bid Procedures.

On August 20, 2009, at 3:30 p.m. (prevailing Eastern Time) as further described below, in the Motion and in the Bidding Procedures Order, the Bankruptcy Court shall conduct the Sale Hearing at which the Trustee shall seek entry of the Sale Order authorizing and approving the sale of the Assets (the "Proposed Sale") to Buyer (defined below) or to one or more other Qualified Bidders (defined below) that the Trustee, in consultation with the Ad Hoc Committee of Senior Secured Noteholders, determines to have made the highest and best offer.

*Agreement*

Pursuant to the terms and conditions of the Agreement, Buyer would provide consideration for the Assets equal to the following (the "Purchase Price"): (i) the Cash Consideration, which amount shall be payable as set forth in Section 3.2 of the Agreement, plus (ii) the Note Consideration. The transaction contemplated by the Agreement is subject to

---

[1] The Debtors in these proceedings are: Eclipse Aviation Corporation (Tax I.D. No. XX-XXX9000) and Eclipse IRB Sunport, LLC, a wholly-owned subsidiary of Eclipse Aviation Corporation (Tax I.D. No. XX-XX4013), each with a mailing address of 2503 Clark Carr Loop SE, Albuquerque, NM 87106.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

competitive bidding as set forth herein, and approval by the Bankruptcy Court pursuant to sections 363 and 365 of the Bankruptcy Code.

*Assets for Sale*

The Trustee is offering for sale in one or more transactions all or substantially all of the assets of Eclipse Aviation Corporation and its affiliated debtor. The assets proposed to be sold to the Buyer consist of the Purchased Assets as set forth in the Agreement. The assets for sale to the Buyer do not include the Excluded Assets, which shall mean (i) the excluded assets specified in the Agreement.

Notwithstanding the foregoing, the Trustee proposes to sell any and all of the assets, either under one or a series of related transactions (e.g. to the Buyer) or in lots ("Lot Bids") consisting of discrete assets.

*Participation Requirements*

In order to participate in the bidding process and to or otherwise be considered for any purpose hereunder, a person interested in all or portions of the Assets (a "Potential Bidder") must first deliver (unless previously delivered) to the Trustee and his counsel and counsel to the Ad Hoc Committee of Senior Secured Noteholders no later than 12:00 noon (prevailing Eastern Time) on August 14, 2009:

(a)  Confidentiality Agreement. An executed confidentiality agreement in form and substance acceptable to the Trustee and his counsel; such form attached as Exhibit 1 hereto (if not already provided); and

(b)  Identification of Potential Bidder. Identification of the Potential Bidder and any Principals (defined below), and the representatives thereof who are authorized to appear and act on their behalf for all purposes regarding the contemplated transaction.

*Designation as Qualified Bidder*

A "Qualified Bidder" is a Potential Bidder (or combination of Potential Bidders whose bids for the Debtors' assets do not overlap and who agree to have their bids combined for purposes of the determination of whether such Potential Bidders together constitute a Qualified Bidder, and who shall also be referred to herein as a single Qualified Bidder) that delivers the documents described in described in subparagraphs (a)-(b) of the Participation Requirements above and (a)-(d) of the Bid Requirements (as defined below), and that the Trustee in his discretion and with assistance from his advisors, and in consultation with the Ad Hoc Committee of Senior Secured Noteholders, determines is reasonably likely to submit a *bona fide* offer that would result in greater total consideration being received for the benefit of the Debtors' creditors than under the Agreement and to be able to consummate a sale if selected as a Successful Bidder (defined below).

Upon the receipt from a Potential Bidder of the information required under subparagraphs (a)-(b) above, the Trustee, in consultation with the Ad Hoc Committee of

3

Senior Secured Noteholders, as soon as is practicable, shall determine and notify the Potential Bidder with respect to whether such Potential Bidder is a Qualified Bidder.

Buyer is a Qualified Bidder.

*Access to Due Diligence Materials*

Only Potential Bidders that comply with the Participation Requirements are eligible to receive due diligence access or additional non-public information. If the Trustee, in consultation with the Ad Hoc Committee of Senior Secured Noteholders, determines that a Potential Bidder who has satisfied the Participation Requirements does not constitute a Qualified Bidder, then such Potential Bidder's right to receive due diligence access or additional non-public information shall terminate. The Trustee will designate a representative to coordinate all reasonable requests for additional information and due diligence access from such Qualified Bidders. The Trustee shall not be obligated to furnish any due diligence information after the Bid Deadline (as hereinafter defined). The Trustee is not responsible for, and will bear no liability with respect to, any information obtained by Qualified Bidders in connection with the sale of the Assets.

*Due Diligence From Bidders*

Each Potential Bidder and Qualified Bidder (collectively, a "Bidder") shall comply with all reasonable requests for additional information and due diligence access by the Trustee, the Ad Hoc Committee of Senior Secured Noteholders or their advisors regarding such Bidder and its contemplated transaction. Failure by a Potential Bidder to comply with requests for additional information and due diligence access will be a basis for the Trustee to determine that the Potential Bidder is not a Qualified Bidder. Failure by a Qualified Bidder to comply with requests for additional information and due diligence access will be a basis for the Trustee to determine that a bid made by a Qualified Bidder is not a Qualified Bid.

**Bidding Process**

The Trustee and his advisors, in consultation with the Ad Hoc Committee of Senior Secured Noteholders, shall: (i) determine whether a Potential Bidder is a Qualified Bidder; (ii) coordinate the efforts of Bidders in conducting their due diligence investigations, as permitted by the provisions, above; (iii) receive offers from Qualified Bidders; and (iv) negotiate any offers made to purchase the Assets (collectively, the "Bidding Process"). The Trustee shall have the right to adopt such other rules for the Bidding Process (including rules that may depart from those set forth herein) that will better promote the goals of the Bidding Process and that are not inconsistent with any of the other provisions hereof or of any Bankruptcy Court order.

*Bid Deadline*

**The deadline for submitting bids shall be August 14, 2009, at 12:00 noon, (Eastern Time) (the "Bid Deadline").**

Prior to the Bid Deadline, a bidder that desires to make an offer, solicitation or proposal (a "Bid") shall deliver written copies of its bid to: (a) counsel to the Trustee, Cooch &

4

Taylor P.A., The Brandywine Building, 1000 West Street, 10th Floor, P.O. Box 1680, Wilmington, Delaware 19899-1680, Attn: Adam Singer; (b) Eclipse Aerospace, Inc., 125 Fairchild St., Suite 100, Charleston, SC 29492, Attn.: Mason Holland, President, with a copy to: Nelson Mullins Riley & Scarborough LLP, Atlantic Station, 201 17th Street, Suite 1700, Atlanta, Georgia 30363, Attn.: William J. Ching, Esq. and Michael E. Hollingsworth II, Esq; and (c) counsel to the Ad Hoc Committee of Senior Secured Noteholders, Covington & Burling LLP, The New York Times Building, 620 Eighth Avenue, New York, New York 10018, Attn: Benjamin Hoch and Andrew Ment (collectively, the "Notice Parties"), so that the bid is actually received by the Bid Deadline.

A Bid received after the Bid Deadline shall not constitute a Qualified Bid unless otherwise agreed by the Trustee in consultation with the Ad Hoc Committee of Senior Secured Noteholders.

*Bid Requirements*

To be eligible to participate in the Auction, each Bid and each Qualified Bidder submitting such a Bid must be determined by the Trustee, in consultation with the Ad Hoc Committee of Senior Secured Noteholders, to satisfy each of the following conditions:

(a)     Good Faith Deposit:  Each Bid must be accompanied by a deposit (the "Good Faith Deposit") in the form of cash or a certified check payable to the order of the Trustee in an amount of not less than $5.0 million.

(b)     Minimum Overbid:  The aggregate consideration must exceed the sum of the Purchase Price by at least $2,000,000.

(c)     Irrevocable:  A bid must be irrevocable until two (2) business days after the Assets have been sold pursuant to the Closing of the sale or sales approved by the Bankruptcy Court (the "Termination Date").

(d)     The Same or Better Terms:  The Bid may be for the Purchased Assets under the Agreement, as applicable for the Purchased Assets subject to the Bid (provided, however, that any variations from one or more material terms must, in the aggregate constitute an improvement, as determined by the Trustee in consultation with the Ad Hoc Committee of Senior Secured Noteholders, upon such term or terms as set forth in the Agreement). The Bid must be on terms that, in the Trustee's business judgment, in consultation with the Ad Hoc Committee of Senior Secured Noteholders, are substantially the same or better than the terms of the Agreement. A Bid must include executed transaction documents pursuant to which the Qualified Bidder proposes to effectuate the contemplated transaction (the "Contemplated Transaction Documents"). A Bid shall include a copy of the Agreement marked to show all changes requested by the Bidder (including those related to Purchase Price). The Contemplated Transaction Documents must include a written commitment satisfactory to the Trustee and the Ad Hoc Committee of

Senior Secured Noteholders of its financial ability and intention to complete the transaction and contain a representation that the Qualified Bidder shall make all necessary regulatory filings, if any, and pay all costs and expenses of such filings (including the Trustee's costs and expenses).

For Qualified Bidders seeking to acquire discrete assets ("Lot Bidders"):

(a)    Good Faith Deposit: Each Bid must be accompanied by a Good Faith Deposit in the form of cash or a certified check payable to the order of the Debtors in an amount of not less than ten percent (10%) of such Qualified Bidder's Lot Bid.

(b)    Irrevocable: Be irrevocable until two (2) business days after a Termination Date.

For all Qualified Bidders, including Lot Bidders and Qualified Bidders seeking to acquire all or substantially all assets of the Debtors:

(a)    Contingencies: A Bid may not be conditioned on obtaining financing or any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy in all material respects at the closing of specified representations and warranties or the satisfaction in material respects at the closing of specified conditions, none of which shall be more burdensome than those set forth in the Agreement, as applicable.

(b)    Corporate Authority:  A Bid must include written evidence of the Qualified Bidder's chief executive officer or other appropriate senior executive's approval of the contemplated transaction; provided, however, that if the Qualified Bidder is an entity specially formed for the purpose of effectuating the contemplated transaction, then the Qualified Bidder must furnish written evidence reasonably acceptable to the Trustee of the approval of the contemplated transaction by the equity holder(s) of such Potential Bidder (the "Principals").

(c)    Financing Sources: A Bid must contain written evidence satisfactory to the Trustee, in consultation with the Ad Hoc Committee of Senior Secured Noteholders, that demonstrates the Qualified Bidder has the necessary financial ability to close the contemplated transaction and provide adequate assurance of future performance under all contracts to be assumed in such contemplated transaction. Such information should include, *inter alia*, the following:

(i)    the Qualified Bidder's current financial statements (audited if they exist);

(ii)    contact names and numbers for verification of financing sources,

6

<ol type="i" start="3">
<li>evidence of the Qualified Bidder's internal resources and proof of any debt or equity funding commitments that are needed to close the contemplated transaction; and</li>
<li>any such other form of financial disclosure or credit quality support information or enhancement reasonably acceptable to the Trustee in consultation with the Ad Hoc Committee of Senior Secured Noteholders demonstrating that such Qualified Bidder has the ability to close the contemplated transaction provided, however, that the Trustee shall determine, in his reasonable discretion, in consultation with his advisors and the Ad Hoc Committee of Senior Secured Noteholders, whether the written evidence of such financial wherewithal is reasonably acceptable, and shall not unreasonably withhold acceptance of a Qualified Bidder's financial qualifications.</li>
</ol>

(d)     <u>No Fees payable to Qualified Bidder</u>:  A Bid may not request or entitle the Qualified Bidder to any breakup fee, termination fee, expense reimbursement or similar type of payment.  Moreover, by submitting a Bid a Bidder shall be deemed to waive the right to pursue a substantial contribution claim under section 503 of the Bankruptcy Code related in any way to the submission of its Bid or the Bid Procedures.

A Bid received from a Qualified Bidder before the Bid Deadline that meets the above requirements, and that satisfies the Bid Deadline requirement above, shall constitute a "Qualified Bid," if the Trustee believes, in his reasonable discretion and after consultation with the Ad Hoc Committee of Senior Secured Noteholders, that such bid would be consummated if selected as the Successful Bid.  For purposes hereof, the Agreement shall constitute a Qualified Bid.  Promptly upon such determination, the Trustee shall provide any other Qualified Bids to the Buyer and to any Qualified Bidders.

In the event that any Bid is determined by the Trustee, in consultation with the Ad Hoc Committee of Senior Secured Noteholders, not to be a Qualified Bid, the Qualified Bidder shall be refunded its deposit and all accumulated interest thereon within three (3) business days after that determination.

<b>Auction</b>

Only if a Qualified Bid (other than Buyer's) is received by the Bid Deadline, shall the Trustee conduct an auction (the "Auction") to determine the highest and best bid with respect to the Purchased Assets under the Agreement.  The Trustee shall provide Buyer and all Qualified Bidders with copies of all Qualified Bids at least twelve (18) hours prior to the Auction.  The Auction shall commence on August 17, 2009 at 10:00 a.m. (prevailing Eastern time).

No later than 4:00 p.m. (prevailing Eastern time) on August 16, 2009, the Trustee will notify all Qualified Bidders of (i) the highest and best Qualified Bid(s), as determined in the

Trustee's discretion after consultation with the Ad Hoc Committee of Senior Secured Noteholders (the "Baseline Bid") and (ii) the time and place of the Auction, and provide copies of all submitted bids to all Qualified Bidders. If, however, no other such Qualified Bid is received by the Bid Deadline, then the Auction will not be held, Buyer will be the Successful Bidder, the Agreement will be the Successful Bid, and, at the August 20, 2009 Sale Hearing, the Trustee will seek approval of and authority to consummate the Proposed Sale contemplated by the Agreement.

The Auction shall be conducted according to the following procedures:

(a)     Participation at the Auction

Only a Qualified Bidder that has submitted a Qualified Bid is eligible to participate at the Auction. The auction shall be conducted openly and all creditors shall be entitled to attend. Each Qualified Bidder shall have at least one representative physically present at the location of the Auction. During the Auction, bidding shall begin initially with the highest Baseline Bid as to the Purchased Assets under the Agreement and subsequently continue in minimum increments of at least $100,000. Bidding at the auction shall be transcribed or videotaped. Other than otherwise set forth herein, the Trustee may conduct the Auction in the manner he determines, in consultation with the Ad Hoc Committee of Senior Secured Noteholders, will result in the highest and best offer for the Purchased Assets under the Agreement.

(b)     The Trustee Shall Conduct the Auction

The Trustee and his professionals shall direct and preside over the Auction. At the start of the Auction the Trustee shall describe the terms of the Baseline Bid. The determination of which Qualified Bid constitutes the Baseline Bid shall take into account any factors the Trustee, in consultation with the Ad Hoc Committee of Senior Secured Noteholders, reasonably deems relevant to the value of the Qualified Bid to the estate, including, *inter alia*, the following: (A) the amount and nature of the consideration; (B) the proposed assets to be purchased and the assumption of any liabilities, if any; (C) the ability of the Qualified Bidder to close the proposed transaction; (D) the proposed Closing Date and the likelihood, extent and impact of any potential delays in Closing; (E) any purchase price adjustments; (F) the impact of the contemplated transaction on any actual or potential litigation; (G) the net economic effect of any changes from the Agreement, if any, contemplated by the Contemplated Transaction Documents and (H) the net after-tax consideration to be received by the Debtors' estates (collectively, the "Bid Assessment Criteria"). All Bids made thereafter shall be Overbids (as defined below), and shall be made and received on an open basis, and all material terms of each Bid shall be fully disclosed to all other Qualified Bidders. The Trustee shall maintain a transcript of all Bids made and announced at the Auction, including the Baseline Bid, all Overbids and the Successful Bid.

(c)     Terms of Overbids

An "Overbid" is any bid made at the Auction subsequent to the Trustee's announcement of the Baseline Bid. To submit an Overbid for purposes of this

8

Auction, a Qualified Bidder seeking to acquire all or substantially all of the Debtors' assets must comply with the following conditions:

(i) Minimum Overbid Increment

Any Overbid after the Baseline Bid shall be made in increments of at least $100,000.

(ii) Remaining Terms are the Same as for Qualified Bids

Except as modified herein, an Overbid must comply with the conditions for a Qualified Bid set forth above, provided, however, that the Bid Deadline shall not apply. Any Overbid made by a Qualified Bidder must remain open and binding on the Qualified Bidder until and unless (a) the Trustee, in consultation with the Ad Hoc Committee of Senior Secured Noteholders, accepts a higher Qualified Bid as an Overbid and (b) such Overbid is not selected as the Back-up Bid (as defined below).

To the extent not previously provided (which shall be determined by the Trustee), a Qualified Bidder submitting an Overbid must submit, as part of its Overbid, written evidence demonstrating such Qualified Bidder's ability to close the transaction proposed by such Overbid.

(iii) Announcing Overbids

The Trustee shall announce at the Auction the material terms of each Overbid, the basis for calculating the total consideration offered in each such Overbid and the resulting benefit to the Debtors' estates based on, *inter alia*, the Bid Assessment Criteria.

(d) Additional Procedures

The Trustee, in consultation with the Ad Hoc Committee of Senior Secured Noteholders, may adopt rules for the Auction at or prior to the Auction that, in his reasonable discretion, will better promote the goals of the Auction and that are not inconsistent with any of the provisions of the Bidding Procedures Order. All such rules will provide that all bids shall be made and received in one room, on an open basis, and all other Qualified Bidders shall be entitled to be present for all bidding with the understanding that the true identity of each Qualified Bidder (*i.e.*, the principals submitting the Bid) shall be fully disclosed to all other Qualified Bidders and that all material terms of each Qualified Bid will be fully disclosed to all other Qualified Bidders throughout the entire Auction. Subject to the prior consent of the Buyer,

9

the Trustee, in consultation with the Ad Hoc Committee of Senior Secured Noteholders, in his reasonable discretion, may adjourn without further notice the Auction (and Sale Hearing) if in his reasonable discretion an adjournment will better promote the goals of the Auction and allow parties to make progress towards modifications of any Qualified Bid that could result in a higher and better Qualified Bid.

(e)     Consent to Jurisdiction as Condition to Bidding

All Qualified Bidders at the Auction shall be deemed to have consented to the core jurisdiction of the Bankruptcy Court and waived any right to a jury trial in connection with any disputes relating to the Auction, and the construction and enforcement of the Bidder's Contemplated Transaction Documents, as applicable.

(f)     Closing the Auction

Upon conclusion of the bidding, the Auction shall be closed, and the Trustee, in consultation with the Ad Hoc Committee of Senior Secured Noteholders, shall (i) immediately review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the Proposed Sale, and (ii) immediately identify the highest and best offer for the Purchased Assets under the Agreement (the "Successful Bid") and the entity submitting such Successful Bid (the "Successful Bidder"), which highest and best offer will provide the greatest amount of net value to the Debtors' estates, and the next highest or otherwise best offer after the Successful Bid (the "Back-up Bid"), and advise the Qualified Bidder of such determination. If Buyer's final bid is deemed to be highest and best at the conclusion of the Auction, Buyer will be the Successful Bidder, and such bid, the Successful Bid.

### Acceptance of Successful Bid

The Trustee shall sell the assets subject to the Successful Bid(s) to the Successful Bidder(s) upon the approval of the Successful Bid by the Bankruptcy Court after the Sale Hearing. The Trustee's presentation of a particular Qualified Bid to the Bankruptcy Court for approval does not constitute the Trustee's acceptance of the bid. The Trustee will be deemed to have accepted a Bid only when the Bid has been approved by the Bankruptcy Court at the Sale Hearing. All interested parties reserve their right to object to the Trustee's selection of the Successful Bidder (including the assignment of any of such objector's Designated Contract thereto, provided, however, that any objection to such assignment on the basis of the Cure Amount must be made and/or reserved as set forth in the order approving these Bid Procedures).

### "As Is, Where Is"

The sale of the Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Trustee, his agents or the Chapter 7 estates except to the extent set forth in the Agreement or the purchase agreement of another Successful Bidder. Buyer and each Qualified Bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all due diligence regarding the Assets prior to making its offer, that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its bid, and

that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in these Bid Procedures or, (i) as to Buyer, the terms of the sale of the Purchased Assets under the Agreement shall be set forth in the Agreement, or (ii) as another Successful Bidder, the terms of the sale of the Assets shall be set forth in the applicable purchase agreement.

## Free Of Any And All Interests

Except as otherwise provided in the Agreement or another Successful Bidder's purchase agreement, all of Chapter 7 estates' right, title and interest in and to the Assets subject thereto shall be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options and interests thereon and there against (collectively, the "Interests") in accordance with section 363 of the Bankruptcy Code, with such Interests to attach to the net proceeds of the sale of the Assets.

## Sale Hearing

The Sale Hearing shall be conducted by the Bankruptcy Court on August 20, 2009, 3:30 p.m before the Honorable Mary F. Walrath. Following the approval of the sale of the Assets to the Successful Bidder(s) at the Sale Hearing, if any Successful Bidder fails to consummate an approved sale within ten (10) days after entry of an Order approving the Sale, the Trustee, unless such Order approving the Sale is otherwise stayed by order of a court with competent jurisdiction, shall be authorized, but not required, to deem the Back-Up Bid, as disclosed at the Sale Hearing, the Successful Bid, and the Trustee shall be authorized, but not required, to consummate the sale with the Qualified Bidder submitting such Bid without further order of the Bankruptcy Court.

## Return of Good Faith Deposit

Good Faith Deposits of the Successful Bidder(s) shall be applied to the purchase price of such transaction at Closing. The Good Faith Deposit of the Back-up Bidder shall be held in an interest-bearing account until five (5) days after the Closing of the transactions contemplated by the Successful Bid, and thereafter returned to the Back-up Bidder. Good Faith Deposits of all other Qualified Bidders shall be held in an interest-bearing escrow account until no later than two (2) business days after the Sale Hearing, and thereafter returned to the respective bidders. If a Successful Bidder or the Back-up Bidder, as appropriate, fails to consummate an approved sale because of a breach or failure to perform on the part of such Bidder, the Trustee shall be entitled to retain the Good Faith Deposit as part of the Chapter 7 estates' damages resulting from the breach or failure to perform by such Bidder.

## Modifications

The Trustee, after consultation with the Ad Hoc Committee of Senior Secured Noteholders, may (a) determine, which Qualified Bid, if any, is the highest and best offer; and (b) reject at any time before entry of an order of the Bankruptcy Court approving a Qualified Bid, any Bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of

the Bankruptcy Code, the Bid Procedures or the terms and conditions of sale, or (iii) contrary to the best interests of the Chapter 7 estates and their creditors. The Trustee shall not make material modifications to these Bidding Procedures without Bankruptcy Court approval, provided, however, that, to the extent not contrary to the Bidding Procedures Order, the Trustee in consultation with the Ad Hoc Committee of Senior Secured Noteholders and the Buyer, may make other non-material modifications to such procedures if their reasonable judgment such modifications would be in the best interests the Chapter 7 estates and promote an open and fair sale process.

In all cases where the Bid Procedures require the Trustee to obtain consent or consult with the Buyer or the Ad Hoc Committee of Senior Secured Noteholders, the Trustee's fiduciary duties shall not be limited by such requirement.

# EXHIBIT 2

## NOTICE OF AUCTION AND SALE

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| Eclipse Aviation Corporation, *et al.*,[1] | ) | Case No. 08-13031 (MFW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: Docket No. 763, ____** |

### NOTICE OF AUCTION AND SALE

**PLEASE TAKE NOTICE** that on July 31, 2009, Jeoffrey L. Burtch, the Chapter 7 Trustee (the "Trustee") for the above caption cases filed his *Motion Of The Chapter 7 Trustee To Approve Sale Procedures And Approve Sale And For Related Relief* (the "Sale Motion") with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The Trustee has received a Qualified Bid[2] from Eclipse Aerospace, Inc. (the "Buyer"), subject to higher and better offers, and under certain circumstances, an Auction (as defined below), all pursuant to the Bid Procedures Order (as defined below), and with respect to the asset purchase agreement dated as of July 30, 2009 between the Trustee and the Buyer (the "Agreement").

**PLEASE TAKE FURTHER NOTICE** that at a hearing held on August 10, 2009, the Bankruptcy Court entered an order (the "Bid Procedures Order") approving the Bidding Procedures sought as part of the Sale Motion and scheduled a hearing to consider granting final relief as to the Sale Motion for **August 20, 2009, at 3:30 p.m. (prevailing Eastern Time)**. At that hearing, the Bankruptcy Court will consider approving the sale of the assets of the Chapter 7 estates, free and clear of all claims, liens, and encumbrances.

---

[1] The Debtors in these proceedings are: Eclipse Aviation Corporation (Tax ID No. XX-XXX9000) and Eclipse IRB Sunport, LLC, a wholly owned subsidiary of Eclipse Aviation Corporation (Tax ID No. XX-XXX4013), each with a mailing address of 2503 Clark Carr Loop SE, Albuquerque, NM 87106.

[2] All capitalized terms not defined herein have the meaning ascribed to them in the Bid Procedures Order.

2

**PLEASE TAKE FURTHER NOTICE** that only those parties that submit Qualified Bids may participate in the Auction (as defined below). If you are interested in determining how to submit such a Qualified Bid, you must comply with the terms of the Bid Procedures as referenced in the Bid Procedures Order. Any party in interest wishing to receive the Agreement may do so free of charge upon request of Trustee's Counsel: Cooch and Taylor, The Brandywine Building, 1000 West Street, 10th Floor, Wilmington, DE 19801, Attn: Claire McCudden (cmccudden@coochtaylor.com). Any party that wishes to take part in this process and submit a bid for the Eclipse Assets must submit its competing bid prior to **August 14, 2009 at noon (prevailing Eastern Time)** (the "Bid Deadline") to: (a) The Trustee, c/o Cooch and Taylor, The Brandywine Building, 1000 West Street, 10th Floor, Wilmington, DE 19801, Attn: Adam Singer (asinger@coochtaylor.com); (b) the Ad Hoc Committee: Covington & Burling LLP, The New York Times Building, 620 Eighth Avenue, New York, New York 10018, Attn: Benjamin Hoch and Andrew Ment.

**PLEASE TAKE FURTHER NOTICE** that if a Qualified Bid (other than the Buyer's Qualified Bid) is received by the Bid Deadline, an auction (the "Auction") with respect to a contemplated transaction shall take place on **August 17, 2009 at 10:00 a.m. (prevailing Eastern Time)**, at the offices of Cooch and Taylor, The Brandywine Building, 1000 West Street, 10th Floor, Wilmington, DE 19801. If, however, no such Qualified Bid is received by the Bid Deadline, then the Auction will not be held, the Buyer will be deemed the Successful Bidder, the Agreement will be the Successful Bid, and, at the Sale Hearing scheduled for August 20, 2009, at 3:30 p.m. (prevailing Eastern Time), the Trustee will seek approval of and authority to consummate the transaction contemplated by the Agreement.

3

**PLEASE TAKE FURTHER NOTICE** that only a Qualified Bidder who has submitted a Qualified Bid will be eligible to participate at the Auction. Each Qualified Bidder must appear in person. The Auction shall be conducted openly and all creditors shall be entitled to attend. At the Auction, Qualified Bidders will be permitted to increase their bids. The bidding at the Auction shall start at the purchase price stated in the highest or otherwise best Qualified Bid as disclosed to all Qualified Bidders prior to commencement of the Auction, and continue in increments of at least $100,000.

**PLEASE TAKE FURTHER NOTICE** that at the Sale Hearing, the Trustee will present the Successful Bid to the Bankruptcy Court for approval. The Trustee will sell the Assets or any portion thereof to the Successful Bidder, or to the Buyer in accordance with the applicable Agreements if a higher or otherwise better Qualified Bid is not received and accepted as the Successful Bid. If the Successful Bidder fails to consummate an approved Sale, the next highest or otherwise best Qualified Bid, as approved at the Sale Hearing, shall be deemed to be the Successful Bid and the Trustee shall be authorized to effect such Sale without further order of the Bankruptcy Court.

**PLEASE TAKE FURTHER NOTICE** that if you seek to object to the sale of the Assets or any portion thereof, you must comply with the terms for making such objections as set forth in the Bid Procedures Motion and the Bidding Procedures Order. Any objections to the relief requested in the Sale Motion must be (a) in writing, (b) comply with the Federal Rules of Bankruptcy Procedures and the Local Bankruptcy Rules, (c) be filed with the clerk of the Bankruptcy Court for the District of Delaware, Third Floor, 824 Market Street, Wilmington, Delaware 19801, and served so as to be **received** no later than **12:00 p.m. prevailing Eastern time on August 18 , 2009** upon: The Trustee, c/o Cooch and Taylor, The Brandywine Building,

4

1000 West Street, 10th Floor, Wilmington, DE 19801, Attn: Adam Singer (asinger@coochtaylor.com); (b) the Ad Hoc Committee: Covington & Burling LLP, The New York Times Building, 620 Eighth Avenue, New York, New York 10018, Attn: Benjamin Hoch and Andrew Ment; and (c) Buyer: Eclipse Aerospace, Inc., 125 Fairchild St., Suite 100, Charleston, SC 29492, Attn.: Mason Holland, President, with a copy to: Nelson Mullins Riley & Scarborough LLP, Atlantic Station, 201 17th Street, Suite 1700, Atlanta, Georgia 30363, Attn.: William J. Ching, Esq. and Michael E. Hollingsworth II, Esq. If any party fails to timely file and serve an objection in accordance with the Bidding Procedures Order, the Bankruptcy Court may disregard such objection and such person shall be deemed to consent to the sale and will be forever bound by any conclusions or findings by the Bankruptcy Court with respect to the sale.

**PLEASE TAKE FURTHER NOTICE** that the proposed sale contemplates the sale of substantially all of the Eclipse Assets free and clear of all liens, claims, and encumbrances and the assumption and assignment of certain executory contracts and unexpired leases. Any person purporting to hold a lien, claim, or other encumbrance against the Eclipse Assets and who does not file an objection in accordance with the terms for making such objections set forth in the Bid Procedures Motion and the Bidding Procedures Order (and as set forth above), shall be deemed to consent to the sale of the Eclipse Assets fee and clear of any lien, claim, or other encumbrance such person purports to hold.

5

**PLEASE TAKE FURTHER NOTICE** that any party to a Designated Contract who does not file an objection in accordance with the terms for making such objections as set forth in the Bid Procedures Motion and the Bidding Procedures Order (and as set forth above), shall be deemed to consent to the assumption and assignment of such Designated Contract including the proposed cure amounts in connection therewith.

Dated: August , 2009

COOCH AND TAYLOR, P.A.

_____

Adam Singer (No. 2472)
M. Claire McCudden (No. 5036)
The Brandywine Building
1000 West Street, 10th Floor
Wilmington, DE 19801
Telephone: (302) 984-3800
Facsimile: (302) 984-3939

Attorneys for Jeoffrey L. Burtch,
Chapter 7 Trustee

6

# EXHIBIT 3

# NOTICE OF CURE AND RELATED SALE PROCEDURES

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ECLIPSE AVIATION CORPORATION, *et al.*, | ) | Case No. 08-13031 (MFW) |
| | ) | |
| | ) | |
| Debtors. | ) | **Re: Docket No. 763, ___** |

## NOTICE OF AUCTION AND SALE,
## POTENTIAL ASSUMPTION AND ASSIGNMENT OF
## DESIGNATED CONTRACTS, AND CURE AMOUNTS ASSOCIATED THEREWITH

**PLEASE TAKE NOTICE** that July 31, 2009, Jeoffrey L. Burtch, the Chapter 7 Trustee

(the "Trustee") for the above caption cases filed his *Motion Of The Chapter 7 Trustee To*

*Approve Sale Procedures And Approve Sale And For Related Relief* (the "Sale Motion") with the

United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The

Trustee has received a Qualified Bid[1] from Eclipse Aerospace, Inc. (the "Buyer"), subject to

higher and better offers, and under certain circumstances, an Auction (as defined below), all

pursuant to the Bid Procedures Order (as defined below), and with respect to the asset purchase

agreement dated as of July 30, 2009 between the Trustee and the Buyer (the "Agreement").

You may obtain a copy of the Agreement by making a written request to the undersigned

counsel.

**PLEASE TAKE FURTHER NOTICE** that at a hearing held on August 10,

2009, the Bankruptcy Court entered an order (the "Bid Procedures Order") approving the

Bidding Procedures sought as part of the Sale Motion and scheduled a hearing to consider

granting final relief as to the Sale Motion for August 20, 2009, at 3:30 p.m. (prevailing Eastern

---

[1] All capitalized terms not defined herein have the meaning ascribed to them in the [Bid Procedures Order] (as defined below).

2

Time). At that hearing, the Bankruptcy Court will consider approving the sale of the assets of the Chapter 7 estates, free and clear of all claims, liens, and encumbrances.

**PLEASE TAKE FURTHER NOTICE** that pursuant to the Sale Motion, the Trustee may assume, sell and assign certain of the unexpired leases, license agreements, and executory contracts (collectively referred to as the "Contracts") free and clear of all liens, claims, encumbrances, and interests upon satisfaction of the cure amounts required under section 365(b)(l)(A) of the Bankruptcy Code (the "Cure Costs"). The Contracts that the Trustee **MAY** seek to assume, sell and assign (the "Designated Contracts") and corresponding Cure Costs are listed on the attached Exhibit A.

**PLEASE TAKE FURTHER NOTICE** that the listing of any Contract on Exhibit A may not necessarily result in any such Contract ultimately becoming a Designated Contract or being assumed, sold and assigned.

**PLEASE TAKE FURTHER NOTICE** that the Buyer shall have the right until August 13, 2009, to amend the list of Designated Contracts to include additional executory contracts or unexpired leases or to exclude executory contracts and unexpired leases previously included on the list of Designated Contracts and to amend the Cure Costs.

**PLEASE TAKE FURTHER NOTICE** that with respect to contracts with the City of Albuquerque, the Buyer shall have until thirty (30) days after the Closing to designate any contract with the City of Albuquerque.

**PLEASE TAKE FURTHER NOTICE** that any objections to the relief requested in the Sale Motion, including the assumption, sale and assignment of the Designated Contracts and the corresponding Cure Costs, must be (a) in writing, (b) comply with the Federal Rules of Bankruptcy Procedures and the Local Bankruptcy Rules, (c) be filed with the clerk of

3

the Bankruptcy Court for the District of Delaware, Third Floor, 824 Market Street, Wilmington, Delaware 19801 and served so as to be received no later than 12:00 p.m. prevailing Eastern time on August 18, 2009 (the "Cure Objection Deadline") upon: The Trustee, c/o Cooch and Taylor, The Brandywine Building, 1000 West Street, 10th Floor, Wilmington, DE 19801, Attn: Adam Singer (asinger@coochtaylor.com); (b) the Ad Hoc Committee: Covington & Burling LLP, The New York Times Building, 620 Eighth Avenue, New York, New York 10018, Attn: Benjamin Hoch and Andrew Ment; and (c) Buyer: Eclipse Aerospace, Inc., 125 Fairchild St., Suite 100, Charleston, SC 29492, Attn.: Mason Holland, President, with a copy to: Nelson Mullins Riley & Scarborough LLP, Atlantic Station, 201 17th Street, Suite 1700, Atlanta, Georgia 30363, Attn.: William J. Ching, Esq. and Michael E. Hollingsworth II, Esq.; provided however, to the extent that the Buyer is not the Successful Bidder and the alternative Successful Bidder is seeking to have certain unexpired leases, license agreements and executory contracts assumed and assigned as part of an alternative transaction, the non-debtor parties to such unexpired leases, license agreements and executory contracts shall have until the Sale Hearing to raise objections under section 365(b)(1)(C).

**PLEASE TAKE FURTHER NOTICE** that any person or entity receiving notice of the Sale Hearing and this Notice that fails to file an objection on a timely basis shall (i) be forever barred from objecting to the Cure Costs and from asserting any additional cure or other amounts with respect to such unexpired lease, license agreement or executory contract and the Trustee and the Buyer shall be entitled to rely solely upon the Cure Costs; (ii) be deemed to have consented to the assumption and assignment of such unexpired lease, license agreement or executory contract; and (iii) be forever barred and estopped from asserting or claiming against the Trustee, the Chapter 7 estates, or the Successful Bidder or any other assignee of the relevant

4

Designated Contract that any additional amounts are due or defaults exist under such Designated Contract.

**PLEASE TAKE FURTHER NOTICE** that any person or entity receiving notice of the Sale Hearing and this Notice that fails to file an objection on a timely basis shall be deemed to have been provided with adequate assurance of future performance under any assumed and assigned unexpired lease, license agreement or executory contract and shall be forever barred from raising any defense, claim, or objection with respect to the assignment of such lease, license agreement or executory contract on account of the Successful Bidder's financial condition.

**PLEASE TAKE FURTHER NOTICE** that the Sale Hearing may be adjourned from time to time without further notice to creditors or parties-in-interest other than by announcement of said adjournment in the Bankruptcy Court or on the Bankruptcy Court's calendar on the date scheduled for the Sale Hearing.

Dated: August , 2009                    COOCH AND TAYLOR, P.A.

_____
Adam Singer (No. 2472)
M. Claire McCudden (No. 5036)
The Brandywine Building
1000 West Street, 10th Floor
Wilmington, DE 19801
Telephone: (302) 984-3800
Facsimile: (302) 984-3939

Attorneys for Jeoffrey L. Burtch,
Chapter 7 Trustee

5

# EXHIBIT 3

# SPECIAL WARRANTY DEED

This Special Warranty Deed is being delivered pursuant to that certain Donation Agreement dated February 25, 2002, as it may have been amended (the "Donation Agreement"), by and between RANCH JOINT VENTURE, L.L.P., a New Mexico limited liability partnership ("Ranch"), and ECLIPSE AVIATION CORPORATION, a Delaware corporation ("Eclipse"), Ranch, for consideration paid, grants to Eclipse, whose address is 2503 Clark Carr Loop SE, Albuquerque, NM 87106, the following described real estate in Bernalillo County, New Mexico:

Tract D-1 of the "Bulk Land Plat for Aerospace Technology Park Tracts D and S of Double Eagle II Airport and Adjacent Lands within Section 36, Township 11 North, Range 1 East and Section 3, Township 10 North, Range 1 East, City of Albuquerque Bernalillo County, New Mexico October 2004" as the same is shown and designated on said Bulk Land Plat filed December 21, 2004 as Doc. No. 2004178149 in Bk. 2004C, Pg. 396 of the records of the County Clerk of Bernalillo County, New Mexico (the "Eclipse Tract").

Upon the appointment of a custodian, trustee, liquidator or receiver for or for any of the Eclipse Tract, the assignment for the benefit of creditors by, or the filing of a petition under bankruptcy, insolvency or debtor's relief law or the filing of a petition for any adjustment of indebtedness, composition or extension by or against Eclipse prior to the construction of a manufacturing facility on the Eclipse Tract, Ranch shall have the option to purchase the Eclipse Tract for $10,000.00, or if Eclipse does not construct a manufacturing facility on the Eclipse Tract within five (5) years from the date of this deed, the Eclipse Tract shall revert to the Ranch. Provided, however, if 6.1(i) of the Donation Agreement is inapplicable, Eclipse may, by written notice to Ranch no more than six (6) months prior to the expiration of five years, cause the reversion to be postponed for an additional three (3) years to allow Eclipse to construct its Manufacturing Facility.

Subject to restrictions and easements of record and taxes for the current year and thereafter.

with special warranty covenants.

WITNESS its hand and seal 15 day of January, 2005.

RANCH JOINT VENTURE, L.L.P.,
a New Mexico limited liability partnership

By:     B-R Ranch Management II Partners, L.P.,
        a Texas limited partnership,
        It's General Partner

        By:     TexWest LLC, a Delaware limited liability company,
                It's General Partner

                By: _W. L. Rogers_____
                     W. L. Rogers, Sole Member and Manager

2005009859
0005009
Page: 1 of 2
01/28/2005 03:20P
Bk-A99 Pg-9831

Mary Herrera     Bern. Co.   SPWD     R 11.00

STATE OF TEXAS
COUNTY OF TRAVIS

This instrument was acknowledged before me on January 14, 2005, by W. L. Rogers as Sole Member and Manager of TexWest LLC, a Delaware limited liability company, General Partner of B-R Ranch Management II Partners, L.P., a Texas limited partnership, General Partner of Ranch Joint Venture, L.L.P., a New Mexico limited liability partnership.

(Seal)

Notary Public

GAYLEE COOK
Notary Public, State of Texas
My Commission Expires
January 30, 2008

My commission expires: 1/30/08

K:\dox\client\17972\116\W0437987.DOC



2005009059
0265000
Page: 2 of 2
01/28/2005 03:28P
Mary Herrera    Bern. Co. SPWD    R 11.00    Bk-A00 Pg-9031