# EXHIBIT 1

ASSET PURCHASE AGREEMENT

Dated July 30, 2009

Among

JEOFFREY L. BURTCH, as the trustee of

ECLIPSE AVIATION CORPORATION and

ECLIPSE IRB SUNPORT, LLC (and not in his personal capacity),

And

ECLIPSE AEROSPACE, INC., as Buyer

# TABLE OF CONTENTS

Page

**ARTICLE I**

**DEFINITIONS** ..................................................................................1
Section 1.1     Definitional and Interpretive Matters.............................1
Section 1.2     Accounting Terms and Determinations .......................2

**ARTICLE II**

**PURCHASE AND SALE** ...............................................................3
Section 2.1     Purchase and Sale of Purchased Assets ....................3
Section 2.2     Assumption of Liabilities...........................................3
Section 2.3     Assignments..............................................................3
Section 2.4     Further Assurances...................................................4

**ARTICLE III**

**PURCHASE PRICE** ......................................................................5
Section 3.1     Purchase Price..........................................................5
Section 3.2     Closing Date Payment; Issuance of Buyer Notes .......5
Section 3.3     Allocation of Purchase Price.....................................5
Section 3.4     Closing Date.............................................................6
Section 3.5     Buyer's Deliveries ...................................................6
Section 3.6     Seller's Deliveries ...................................................6

**ARTICLE IV**

**REPRESENTATIONS AND WARRANTIES OF SELLER**................8
Section 4.1     Organization of the Companies ................................8
Section 4.2     Subsidiaries and Investments...................................8
Section 4.3     Authority of Seller ...................................................8
Section 4.4     Title to Purchased Assets ........................................8
Section 4.5     Intellectual Property Assets ....................................8

**ARTICLE V**

**REPRESENTATIONS AND WARRANTIES OF BUYER** ..................8
Section 5.1     Organization and Authority of Buyer .........................9
Section 5.2     No Finder ..................................................................9

**ARTICLE VI**

**ACTIONS PRIOR TO THE CLOSING DATE**....................................10
Section 6.1     Information Regarding the Business............................10

| Section 6.2 | Contact with Customers, Vendors and Employees | 10 |
| Section 6.3 | Third Party Consents | 10 |
| Section 6.4 | Purchased Deposits | 11 |
| Section 6.5 | Governmental Approvals | 11 |
| Section 6.6 | Certain Intellectual Property Matters | 12 |
| Section 6.7 | Certain Provisions relating to Consents, Cooperation and Adequate Assurance | 13 |
| Section 6.8 | Conduct of Business Prior to the Closing Date | 13 |
| Section 6.9 | Notification of Breach; Disclosure | 13 |
| Section 6.10 | Insurance | 13 |
| Section 6.11 | Bankruptcy Matters; Bidding Process | 13 |
| Section 6.12 | Best Efforts | 14 |
| Section 6.13 | Bidding Procedures Order | 15 |
| Section 6.14 | Takeover Proposal; Confidential Information | 15 |
| Section 6.15 | DayJet Transaction | 15 |
| Section 6.16 | Access to Premises | 15 |

**ARTICLE VII**

|  | **ADDITIONAL AGREEMENTS** | **15** |
| Section 7.1 | Taxes | 15 |
| Section 7.2 | No Successor Liability to Employees | 17 |
| Section 7.3 | Employment | 17 |
| Section 7.4 | Collection of Receivables | 18 |
| Section 7.5 | Adequate Assurances Regarding Assumed Contracts and Assumed Leases | 18 |
| Section 7.6 | Certifications | 18 |
| Section 7.7 | Certain Actions | 19 |
| Section 7.8 | Substitution of Parties | 19 |
| Section 7.9 | Cure Amounts | 19 |
| Section 7.10 | Reasonable Access to Records and Certain Personnel | 19 |
| Section 7.11 | Deposit | 20 |
| Section 7.12 | Seller Post-Closing Obligations | 20 |

**ARTICLE VIII**

|  | **CONDITIONS TO CLOSING** | **20** |
| Section 8.1 | Conditions to Obligations of Each Party | 20 |
| Section 8.2 | Conditions to Obligations of Buyer | 20 |
| Section 8.3 | Conditions to Obligations of Seller | 21 |

**ARTICLE IX**

|  | **TERMINATION** | **22** |
| Section 9.1 | Termination | 22 |
| Section 9.2 | Effect of Termination | 23 |

**ARTICLE X**

**INDEMNIFICATION** ...................................................................................**24**
Section 10.1    No Survival of Representations, Warranties, Covenants and
Agreements ..........................................................................................24

**ARTICLE XI**

**GENERAL PROVISIONS** ......................................................................**24**
Section 11.1    Confidential Nature of Information ..........................................24
Section 11.2    No Public Announcement ........................................................25
Section 11.3    Notices ....................................................................................25
Section 11.4    Successors and Assigns............................................................26
Section 11.5    Entire Agreement; Amendments; Disclosure Schedules ..........................27
Section 11.6    Waivers ...................................................................................27
Section 11.7    Expenses .................................................................................27
Section 11.8    Partial Invalidity......................................................................27
Section 11.9    Execution in Counterparts........................................................27
Section 11.10   Governing Law and Dispute Resolution....................................28
Section 11.11   No Third Party Beneficiaries ....................................................28

# ASSET PURCHASE AGREEMENT

This **ASSET PURCHASE AGREEMENT** (this "Agreement") dated July 30, 2009 (the "Effective Date"), by and among Jeoffrey L. Burtch as the duly appointed Chapter 7 trustee of the Chapter 7 estates of each of Eclipse Aviation Corporation ("Eclipse") and Eclipse IRB Sunport, LLC ("Eclipse LLC"), and not in his personal capacity ("Seller" or "Trustee") and Eclipse Aerospace, Inc., a Delaware corporation ("Buyer"). Capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in Annex 1.

**WHEREAS,** Eclipse and Eclipse LLC were formerly engaged primarily in (i) the design, production and sale of very light jet aircraft ("VLJs") and (ii) the support of the VLJs including training, maintenance, flight and data services and other product support (the "Business");

**WHEREAS,** each of Eclipse and Eclipse LLC (collectively, the "Companies") have filed voluntary petitions commencing Chapter 11 Bankruptcy Cases (hereinafter, the "Bankruptcy Cases") pursuant to Title 11 of United States Code, 11 U.S.C. Sections 101 et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), the date such petitions are filed the "Petition Date," which cases have been converted to Chapter 7 Bankruptcy Cases;

**WHEREAS,** Jeoffrey L. Burtch has been appointed as the trustee for each of Eclipse and Eclipse LLC in the Chapter 7 Bankruptcy Cases;

**WHEREAS,** Seller desires to sell the Purchased Assets to Buyer and Buyer desires to purchase from Seller the Purchased Assets and assume the Assumed Liabilities, upon the terms and conditions hereinafter set forth;

**WHEREAS,** the Parties intend to effectuate the transactions contemplated by this Agreement through a sale of the Purchased Assets pursuant to section 363 of the Bankruptcy Code; and

**WHEREAS,** the execution and delivery of this Agreement and Seller's ability to consummate the transactions set forth in this Agreement are subject, among other things, to the entry of the Sale Order.

**NOW, THEREFORE,** in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, the Parties agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.1     Definitional and Interpretive Matters.  Unless otherwise expressly

provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(a)    Calculation of Time Period.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.  A "Business Day" means any day other than a Saturday, a Sunday or a day on which banks in New York City are required or authorized to close.

(b)    Dollars.  Any reference in this Agreement to $ shall mean U.S. dollars.

(c)    Exhibits/Schedules.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in Annex 1.

(d)    Gender and Number.  Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(e)    Headings.  The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement.  All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

(f)    Herein.  The words such as "herein," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.  References to the "date hereof" are to the Effective Date.

(g)    Including.  The word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(h)    No Strict Construction.  The Parties participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

Section 1.2    Accounting Terms and Determinations.    Unless otherwise specified herein, all accounting terms used herein shall be interpreted, all determinations with respect to accounting matters hereunder shall be made, and all financial statements and certificates and reports as to financial matters required to be furnished hereunder shall be prepared, in accordance with GAAP.

## ARTICLE II

## PURCHASE AND SALE

Section 2.1    Purchase and Sale of Purchased Assets.

(a)    On the terms and subject to the conditions set forth in this Agreement, at the Closing (and on the applicable Assumption Date with respect to Purchased Assets consisting of rights under any Designated Contract assumed by Seller and assigned to Buyer after the Closing Date as provided herein), Buyer shall purchase from Seller, and Seller shall sell, transfer, assign, convey and deliver or cause to be sold, transferred, assigned, conveyed and delivered to Buyer, all of the Purchased Assets, free and clear of all Liens and free and clear of all Liabilities (other than the Assumed Liabilities).

(b)    Indivisible Transaction.    The sale of all of the Purchased Assets to Buyer constitutes a single, indivisible transaction and the Purchased Assets are intended to be sold to Buyer as a single, indivisible group of assets.

Section 2.2    Assumption of Liabilities.

(a)    On the terms and subject to the conditions set forth in this Agreement, at the Closing (and on the applicable Assumption Date with respect to Assumed Liabilities under any Designated Contract assumed by a Seller and assigned to Buyer after the Closing Date as provided herein), Buyer shall assume and become responsible for the Assumed Liabilities.

(b)    ANYTHING CONTAINED HEREIN TO THE CONTRARY NOTWITHSTANDING, EXCEPT FOR THE ASSUMED LIABILITIES DESCRIBED IN THIS SECTION 2.2, BUYER SHALL NOT AND BUYER DOES NOT ASSUME ANY LIABILITIES, TAXES, OR OBLIGATIONS (FIXED OR CONTINGENT, KNOWN OR UNKNOWN, MATURED OR UNMATURED) OF THE SELLER OR THE COMPANIES WHETHER OR NOT ARISING OUT OF OR RELATING TO THE ASSETS OR THE BUSINESS OR ANY OTHER BUSINESS OF THE SELLER OR THE COMPANIES, ALL OF WHICH LIABILITIES, TAXES, AND OBLIGATIONS SHALL, AT AND AFTER THE CLOSING, REMAIN THE EXCLUSIVE RESPONSIBILITY OF THE SELLER (AS APPLICABLE).

Section 2.3    Assignments.

(a)    Schedule 2.3 lists all Assumed Contracts and Assumed Leases that Buyer may elect to assume and have Seller assume and assign to Buyer (the "Designated Contracts"). Buyer shall have, except as otherwise provided below with respect to contracts with the City of Albuquerque, until that date which is five (5) business days prior to the date scheduled for hearing on the entry of the Sale Order to designate which of such Contracts it wishes to assume and have the Seller assume and assign to Buyer at Closing (such date being referred to herein as the "Contract Designation Date"); provided that Buyer shall have until thirty (30) days after the Closing to designate any contract identified on Schedule 2.3 with the City of Albuquerque.  In all cases, appropriate additions and deletions to Schedule 2.3 (and

3

corresponding additions and deletions to Schedule A-1 and Schedule A-2) shall be made to reflect such elections made by Buyer. Any amendment to Schedule 2.3 as provided for above, shall be served by Buyer on the parties to the Designated Contracts who have been added to Schedule 2.3.

(b)     With respect to each Designated Contract, on the Closing Date, Seller shall (i) assume such Designated Contract in the Bankruptcy Cases and (ii) subject to Buyer paying any amounts necessary to cure any default under such Designated Contract (the "Cure Costs") and providing adequate assurance of performance to the counterparty thereto to the extent required by the Bankruptcy Court, assign such Designated Contract to Buyer pursuant to an Order of the Bankruptcy Court (which may be the Sale Order). Seller shall provide Buyer with a credit against the Purchase Price by reducing the Cash Consideration in an amount equal to the lesser of (x) $175,000 and (y) the actual amount of Cure Costs attributable to breaches occuring after the Petition Date of the Designated Contracts actually assumed by Buyer. Effective on the Closing Date, or as otherwise provided in Section 2.3(a) with respect to contracts with the City of Albuquerque, Buyer shall assume each such Designated Contract.

(c)     The Sale Order shall provide that, as of the Closing, Seller (as applicable) shall assign to Buyer the Designated Contracts and the Designated Contracts shall be identified by (i) the name and date of the Designated Contracts (if available), (ii) the other party to the Designated Contract, and (iii) the address of such party for notice purposes, all included on an exhibit attached to either the motion filed in connection with the Sale Order or a motion for authority to assume and assign such Designated Contracts or a notice filed pursuant to the Bidding Procedures Order. Such exhibit shall also (A) set forth the amounts necessary to cure any defaults under each of the Designated Contracts as determined by Seller based on the Companies' books and records or as otherwise determined by the Bankruptcy Court, and (B) delineate a procedure for transferring to Buyer the rights to any security deposits in the form of cash or letters of credit on deposit with the other party to any Designated Contract.

(d)     In the case of licenses, certificates, approvals, permits, authorizations, leases, Contracts and other commitments included in the Purchased Assets that cannot be transferred or assigned effectively without the consent of any third party, which consent has not been obtained prior to the Closing (after giving effect to the Sale Order and the Bankruptcy Code), Seller shall, subject to any approval of the Bankruptcy Court that may be required and the terms set forth in Section 6.3, cooperate with Buyer in endeavoring to obtain such consent.

Section 2.4     Further Assurances.

(a)     At the Closing, and at all times thereafter as may be necessary, upon the request of the Buyer, Seller shall execute and deliver (or use his best efforts to have any applicable third party execute and deliver) such instruments of transfer and instruments of release as shall be reasonably necessary to vest in Buyer title to the Purchased Assets free and clear of all Encumbrances, and such other instruments, agreements and documents as shall be reasonably necessary to evidence the assignment by Seller and the assumption by Buyer or its designee of the Assumed Liabilities, including the Assumed Contracts and the Assumed

Leases.  Seller and Buyer shall cooperate with one another to execute and deliver such other documents and instruments as may be reasonably required to carry out the transactions contemplated hereby.

(b)     At the Closing, and at all times thereafter as may be necessary, Seller shall, at the reasonable request of Buyer, execute, deliver, and file, or cause to be executed, delivered, and filed by any applicable third party, such other instruments of conveyance, transfer and release and take such other actions as Buyer may reasonably request, in order to more effectively consummate the transactions contemplated by this Agreement and to vest in Buyer title to the Seller Intellectual Property free and clear of all Encumbrances, including, without limitation, executing, filing, and recording, with all appropriate intellectual property registration authorities and other relevant entities, all assignment instruments and other filings that are necessary to correctly record the prior chain of title with respect to ownership of the Seller Intellectual Property.  Any out-of-pocket expenses incurred by Seller pursuant to this Section 2.4 shall be subject to the provisions of Section 7.12.


# ARTICLE III

# PURCHASE PRICE

Section 3.1     Purchase Price.  Subject to the terms and conditions set forth in this Agreement and in reliance upon the representations and warranties of the Parties set forth herein, at the Closing, the aggregate purchase price to be paid by Buyer to the Seller in exchange for the Purchased Assets shall be an amount equal to (i) the Cash Consideration which amount shall be payable as set forth in Section 3.2 below, plus (ii) the Note Consideration (collectively, the "Purchase Price").  The Buyer and Seller agree that the aggregate value of the Purchase Price is $40,000,000.  Upon the entry by the Bankruptcy Court of the Bidding Procedures Order, Buyer shall deposit the amount of $5,000,000 of the Cash Consideration pursuant to the Deposit Escrow Agreement.

Section 3.2     Closing Date Payment; Issuance of Buyer Notes.  At the Closing, Buyer shall (i) pay to Seller or as otherwise provided in the Sale Order wire transfer of immediately available funds to the account(s) designated by Seller, the Cash Purchase Price, plus any amount Buyer is required to credit Seller pursuant to Section 6.4, less any amount Buyer is entitled to offset pursuant to Section 2.3(b), any amounts pursuant to the last sentence of Section 7.1(b), and the last sentence of Section 7.6, and (ii) issue to the Seller or such other Person or Agent as otherwise provided in the Sale Order, the Notes in an aggregate principal amount equal to the Note Consideration.

Section 3.3     Allocation of Purchase Price.  Buyer shall determine the allocation of the consideration paid by Buyer for the Purchased Assets.  Each party hereto agrees (i) that any such allocation shall be consistent with the requirements of Section 1060 of the Code and the regulations thereunder, (ii) to complete jointly and to file separately Form 8594 with its Federal income Tax Return consistent with such allocation for the tax year in which the Closing Date occurs and (iii) that no party will take a position on any income, transfer or gains Tax Return,

before any Governmental Authority charged with the collection of any such Tax or in any judicial proceeding, that is in any manner inconsistent with the terms of any such allocation without the consent of the other party.

Section 3.4    Closing Date.    Upon the terms and conditions set forth in this Agreement, the closing of the sale of the Purchased Assets and the assumption of the Assumed Liabilities contemplated hereby (the "Closing") shall take place at the offices of Cooch & Taylor P.A., 1000 West Street, Wilmington, Delaware 19801, as promptly as practicable, and at no time later than the fifth Business Day, following the date on which the conditions set forth in Article VIII have been satisfied or waived (other than the conditions which by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), or at such other place or time as Buyer and Seller may mutually agree.  The date and time at which the Closing actually occurs is hereinafter referred to as the "Closing Date."

Section 3.5    Buyer's Deliveries.    At or prior to the Closing, Buyer shall deliver to Seller, in addition to the Cash Purchase Price:

(a)    an assumption and assignment agreement having terms and conditions consistent with this Agreement and otherwise in form and substance reasonably satisfactory to Buyer (the "Assumption and Assignment Agreement") and each other Ancillary Document to which Buyer is a party, duly executed by Buyer;

(b)    the Notes, having an aggregate principal amount of $20,000,000 issued in the name of the Seller or such other Persons as designated by the Seller;

(c)    the certificates required to be delivered pursuant to Sections 8.3(a) and 8.3(b);

(d)    a certificate of an authorized Person of Buyer, dated the Closing Date, in form and substance reasonably satisfactory to Seller, as to (i) Buyer's authorization to execute and perform its obligations under this Agreement and the Ancillary Documents to which Buyer is a party and (ii) incumbency and signatures of the authorized Persons of Buyer executing this Agreement and such Ancillary documents; and

(e)    such other assignments and other good and sufficient instruments of assumption and transfer, in form reasonably satisfactory to Seller, as Seller may reasonably request to transfer and assign the Assumed Liabilities to Buyer.

Section 3.6    Seller's Deliveries.    At or prior to the Closing, Seller shall deliver to Buyer:

(a)    a bill of sale, in form and substance reasonably satisfactory to Buyer (the "Bill of Sale"), the Assumption and Assignment Agreement and each other Ancillary Document to which any of the Companies or Seller is a party, duly executed by Seller;

(b)    instruments of assignment of the Patents, Trademarks, Copyrights and Domain Names that are owned by Seller and included in the Purchased Assets, if any, duly executed by Seller, in form and substance reasonably satisfactory to Buyer and any other assignments or instruments with respect to any Seller Intellectual Property for

which an assignment or instrument is required to assign, transfer and convey such assets to Buyer;

(c)     a certified copy of the Sale Order;

(d)     Seller's certificates required to be delivered pursuant to <u>Sections 8.2(a)</u> and <u>8.2(b)</u>;

(e)     a certificate executed by Seller, in the form prescribed under Treasury Regulation Section 1.1445-2(b), that Seller is not a foreign person within the meaning of Section 1445(f)(3) of the Code;

(f)     to the extent approved by the Sale Order, instruments of assumption and assignment of the Assumed Leases in form and substance reasonably satisfactory to Buyer (the "<u>Assumption and Assignment of Leases</u>"), duly executed by Seller, in form for recordation with the appropriate public land records, if necessary, and any other related documentation or instruments with respect to any Assumed Lease reasonably requested by Buyer;

(g)     to the extent in Seller's possession: (i) all lease files for the Assumed Leases (including copies of any plans of the Leased Real Property), and (ii) keys for the Leased Real Property, the combination of any safes located in the Leased Real Property, and the access codes for any electronic security system located at the Leased Real Property, in each case, in respect of the Assumed Leases;

(h)     an executed security agreement and intercreditor agreement with respect to the Notes in a form to be agreed to among the Buyer and the holders of a majority in principal amount of the Prior Notes on or before a date which is at least two (2) days prior to the entry of the Bidding Procedures Order.

(i)     a certificate of Seller, dated the Closing Date, in form and substance reasonably satisfactory to Buyer, as to Seller's authorization to execute and perform his obligations under this Agreement and the Ancillary Documents to which Seller or the Companies is a party;

(j)     all instruments and documents necessary to release (or evidence the release of) any and all Encumbrances, including, without limitation, appropriate UCC financing statement amendments (termination statements), mortgage release instruments and certificates of title;

(k)     such other bills of sale, deeds, endorsements, assignments and other good and sufficient instruments of conveyance and transfer, in form reasonably satisfactory to Buyer, as Buyer may reasonably request to vest in Buyer all the right, title and interest of Seller in, to or under any or all the Purchased Assets; and

(l)     all other documents required to be entered into by the Seller pursuant to this Agreement or reasonably requested by the Buyer to convey the Purchased Assets to Buyer or to otherwise consummate the transactions contemplated by this Agreement.

# ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF SELLER

As an inducement to Buyer to enter into this Agreement and to consummate the transactions contemplated hereby, Seller represents and warrants to Buyer as of the date hereof and as of the Closing Date as follows:

Section 4.1 Intentionally Omitted.

Section 4.2 Subsidiaries and Investments. Except as set forth on Schedule 4.2, each of the Companies do not, directly or indirectly, own, of record or beneficially, any outstanding voting securities, membership interests or other equity interests in any Person.

Section 4.3 Authority of Seller. Seller has full power and authority to execute, deliver and, subject to the entry of the Sale Order, perform his obligations under, and consummate the transactions contemplated by, this Agreement and each of the Ancillary Documents to which Seller is a party. This Agreement, subject to the entry of the Sale Order, is the legal, valid and binding obligation of Seller enforceable in accordance with its terms, and each of the Ancillary Documents to which Seller is a party has been duly authorized by Seller and upon execution and delivery by Seller and subject to the entry of the Sale Order, will be a legal, valid and binding obligation of Seller enforceable in accordance with its terms in each case.

Section 4.4 Title to Purchased Assets. Seller has, and, upon delivery to Buyer on the Closing Date of the instruments of transfer contemplated by Section 3.6, and subject to the terms of the Sale Order, Seller will thereby transfer to Buyer, good and valid title to, or, in the case of property leased or licensed by Seller, a valid and subsisting leasehold interest in or a legal, valid and enforceable licensed interest in or right to use, all of the material Purchased Assets (other than any Non-Transferable Agreement), free and clear of all Encumbrances, except for the Assumed Liabilities and Permitted Liens.

Section 4.5 Intellectual Property Assets. Seller has listed on Schedule 4.5, all of Seller's Intellectual Property that is subject to registration with the United States Patent and Trademark Office or any foreign patent or trademark agency.

# ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF BUYER

As an inducement to Seller to enter into this Agreement and to consummate the transactions contemplated hereby, Buyer hereby represents and warrants to Seller as of the date hereof and as of the Closing Date as follows:

Section 5.1   Organization and Authority of Buyer.

     (a)    Buyer is a Delaware corporation, duly organized, validly existing and in good standing under the laws of the State of Delaware. Buyer has full corporate power and authority to execute, deliver and perform its obligations under this Agreement and all of the Ancillary Documents to which it is a party. The execution, delivery and performance of this Agreement and such Ancillary Documents by Buyer have been duly authorized and approved by Buyer's board of directors and do not require any further authorization or consent of Buyer or any stockholder. This Agreement has been duly authorized, executed and delivered by Buyer and is the legal, valid and binding agreement of Buyer enforceable against Buyer in accordance with its terms, and each Ancillary Document to which Buyer is a party has been duly authorized by Buyer and upon execution and delivery by Buyer will be a legal, valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms, except as (i) enforceability may be limited by bankruptcy, insolvency, reorganization or other similar laws affecting creditors rights generally and (ii) the remedy of specific performance and injunctive and other forms of equitable relief may be subject to equitable defenses.

     (b)    Subject to the receipt of the Required Consents, neither the execution and delivery of this Agreement or any of such Ancillary Documents or the consummation of any of the transactions contemplated hereby or thereby nor compliance with or fulfillment of the terms, conditions and provisions hereof or thereof will:

         (i)    conflict with, result in a breach of the terms, conditions or provisions of, or constitute a default, or an event of default under (1) Buyer's certificate of incorporation or bylaws, (2) any Order to which Buyer is a party or by which it is bound or (3) any Legal Requirement affecting Buyer; or

         (ii)    require the approval, consent, authorization or act of, or the making by Buyer of any declaration, filing or registration with Committee on Foreign Investment in the United States (CFIUS), or any Person, other than filings with the Bankruptcy Court or under the HSR Act or other anti-trust or competition laws.

     Section 5.2   No Finder. Except as set forth on Schedule 5.2, neither Buyer nor any Person acting on its behalf has paid or become obligated to pay any fee or commission to any broker, finder or intermediary for or on account of the transactions contemplated by this Agreement for which any Seller is or will become liable, and Buyer shall hold harmless and indemnify Seller from any claims with respect to any such fees or commissions.

     Section 5.3   Financing. Buyer has provided Seller with information concerning financing necessary to fund the Purchase Price. Buyer does not have any reason to believe that such financing will not be available at Closing.

# ARTICLE VI

## ACTIONS PRIOR TO THE CLOSING DATE

The Parties, as applicable to the extent set forth below, covenant and agree to take the following actions between the date hereof and the earlier of the termination of this Agreement and the Closing Date:

Section 6.1    Information Regarding the Business.    In connection with consummating the transactions contemplated herein, Seller will, to the extent practicable (a) provide Buyer and its officers, employees, counsel, accountants, partners, affiliates, financial advisors, consultants and other representatives (collectively, "Representatives") with full access, upon reasonable prior notice and during normal business hours, to the offices and properties of the Companies, (b) furnish Buyer and its Representatives with such information and data not contained in the Data Room (including without limitation copies of Contracts, licenses, personal property Leases and other books and records) concerning the former Business, the Purchased Assets and the Assumed Liabilities as Buyer or any of its Representatives may reasonably request in connection with such investigation, except to the extent that furnishing any such information or data would violate any Law, Order, Contract or license applicable to Seller or by which any of the assets and properties is bound, and permit Buyer and its authorized Representatives to make copies of such materials at the sole expense of the Buyer or its authorized Representatives as those Representatives reasonably request relating to the Former Business, the Purchased Assets and the Assumed Liabilities, (c) furnish or make available to Buyer or its authorized Representatives such additional information concerning the Purchased Assets, the Former Business and the Assumed Liabilities as shall be reasonably requested by Buyer or its authorized Representatives and (d) use commercially reasonable efforts to cause his outside counsel and any other professional representatives of the Trustee to cooperate with Buyer in its consummation of the transactions.  Nothing in this Agreement shall give the Buyer any rights of access to Design Information until upon and after the Closing.  Buyer agrees that all Representatives are within the scope of and covered by the Non-Disclosure Agreement executed by Mason Holland for Eclipse Aerospace on June 30, 2009.

Section 6.2    Contact with Customers, Vendors and Employees.    Subject to applicable Law, Seller shall use its commercially reasonable efforts to facilitate Buyer's contact and communication with employees of the Companies, and customers, suppliers, vendors and distributors of the Business of the Companies to the extent agreed to by Seller, as requested by Buyer at any time from and after the execution of this Agreement, provided, however, that nothing herein shall be construed to permit or require any communication in violation of any contract or agreement with an employee. All such contact and communication will be requested through, and arranged by, the Seller, or Seller's agent, to be designated in writing to Buyer.

Section 6.3    Third Party Consents. Seller shall use his commercially reasonable efforts to obtain all Third Party Consents; provided, that Seller shall not be required to pay or commit to pay any amount to (or incur any obligation in favor of) any person from whom any such consent may be required (other than nominal filing or application fees).

Section 6.4    Purchased Deposits.  Seller will take all commercially reasonable steps necessary to transfer to Buyer on the Closing Date all of Seller's right, title and interest in and to the Purchased Deposits. The Buyer shall pay to Seller at Closing on behalf of the Chapter 7 Estates the cash value of the Purchased Deposits.

Section 6.5    Governmental Approvals.

(a)    During the period prior to the Closing Date, Seller and Buyer shall act diligently and reasonably, and shall cooperate with each other, to do or cause to be done, all things necessary, proper or advisable consistent with applicable confidentiality and Legal Requirements to cause the conditions precedent to the Closing to be satisfied and to cause the Closing to occur, including to secure any consents and approvals of any governmental authority required to be obtained by them under non-United States antitrust or competition laws, in order to assign or transfer any Permits to Buyer, to permit the consummation of the transactions contemplated by this Agreement, or to otherwise satisfy the conditions set forth in Article VIII, in each case as necessary to the extent such consents are not provided for or satisfied by the Sale Order; provided, however, that Seller shall not make any agreement or understanding affecting the Purchased Assets or the Business (excluding the Excluded Assets or Excluded Liabilities) as a condition for obtaining any such consents or approvals except with the prior written consent of Buyer.  Subject to the limitations set forth in this Section 6.5, Buyer shall act diligently and reasonably to cooperate with Seller, to the extent commercially reasonable, to obtain the consents and approvals contemplated by this Section 6.5(a); provided, however, Buyer shall not be required to waive any of the conditions to Closing set forth in Article VIII.

(b)    Subject to all applicable confidentiality and Legal Requirements, each Seller and Buyer (i) shall promptly inform each other of any communication from any Governmental Authority concerning this Agreement, the transactions contemplated hereby, and any filing, notification or request for approval and (ii) shall permit the other Party to review in advance any proposed written communication or information submitted to any such Governmental Authority in response thereto; provided, however, that no Party shall be required to provide any other Party with copies of confidential documents or information included in any filings and submissions, and provided, further, that a Party may request entry into a joint defense agreement as a condition to providing any such materials and that, upon receipt of that request, the Parties shall work in good faith to enter into a joint defense agreement to create and preserve attorney-client privilege in a form and substance mutually acceptable to the Parties.  In addition, none of the Parties shall agree to participate in any meeting with any Governmental Authority in respect of any filings, investigation or other inquiry with respect to this Agreement or the transactions contemplated hereby, unless such Party consults with the other Parties in advance and, to the extent permitted by any such Governmental Authority, gives the other Parties the opportunity to attend and participate thereat, in each case to the maximum extent practicable.  Subject to any restrictions under applicable laws, rules or regulations, each Party shall furnish the other with copies of all correspondence, filings and communications (and memoranda setting forth the substance thereof) between it and its Affiliates and their respective Representatives on the one hand, and the Governmental Authority or members of its staff on the other hand, with respect to this Agreement, the transactions contemplated hereby (excluding documents and communications

which are subject to preexisting confidentiality agreements or to the attorney-client privilege or work product doctrine) or any such filing, notification or request for approval. Each Party shall also furnish the other Party with such necessary information and assistance as such other party and its Affiliates may reasonably request in connection with their preparation of necessary filings, registration or submissions of information to the Governmental Authority in connection with this Agreement, the transactions contemplated hereby and any such filing, notification or request for approval. Seller and Buyer shall prosecute all required requests for approval with all necessary diligence and otherwise use their respective commercially reasonable efforts to obtain the grant thereof by an Order as soon as possible.

(c)     Notwithstanding anything else to the contrary in this Agreement, in the event that any administrative or judicial action or proceeding is instituted (or threatened to be instituted) by a Governmental Authority or private party challenging the transactions hereunder or any other agreement contemplated hereby, (i) each Party shall cooperate in all respects with each other and use its respective best efforts to contest and resist any such action or proceeding and to have vacated, lifted, reversed or overturned any decree, judgment, injunction or other order, whether temporary, preliminary or permanent, that is in effect and that prohibits, prevents or restricts consummation of the transactions contemplated by this Agreement, and (ii) Buyer must defend, at its sole cost and expense, any action or actions, whether judicial or administrative, in connection with the transactions contemplated by this Agreement. Notwithstanding the foregoing, in no event shall Buyer be required to divest any of the Purchased Assets in order to comply with this Section 6.5(c).

Section 6.6     Certain Intellectual Property Matters. Seller covenants and agrees to authorize Buyer, at Buyer's expense and with Seller's full cooperation, to take all actions useful or necessary, to assist with the transfer, assignment, full cooperation, in regard to the Seller Intellectual Property as soon as practicable following the Closing Date:

(a) the Australian trademarks (Registration Nos. 890219 and 890220) shall have been assigned to the Companies or to Seller from 5 Star Hill Holdings PTY LTD;

(b) the Japanese patent (Registration No. 3868500) shall have been assigned to the Companies or to Seller from Hunting Research and Engineering;

(c) the European patent (Registration No. EP0932432) shall have been assigned to the Companies or to Seller in Germany, France, the United Kingdom, the Netherlands, Belgium and Switzerland;

(d) the outstanding security interests on United States patents (Registration Nos. 5,957,405; 6,089,504; 6,199,795; 6,170,780; 7,225,966; and 2006/0273223) shall have been released by the appropriate termination statement under the Uniform Commercial Code; and

(e) the United States patent applications (Application Nos. 11/427,783; 11/456,548 and 11/929,743) shall have been assigned to the Companies or to Seller.

Seller shall be responsible for paying all maintenance fees and annuity payments related to foreign patents through August 31, 2009.

Section 6.7    Certain Provisions relating to Consents, Cooperation and Adequate Assurance.  Seller shall use commercially reasonable efforts prior to and after the Closing Date to obtain all consents of Governmental Agencies and counterparties to Contracts and Leases that Buyer has designated as Assumed Contracts or Assumed Leases that are required in connection with the transactions contemplated by this Agreement; provided, however, that Seller shall not be obligated to offer or to pay any consideration or grant any financial accommodation in connection therewith.

Section 6.8    Conduct of Business Prior to the Closing Date.  To the extent permitted or required by the Bankruptcy Cases, and consistent with the availability of the Employees, Seller shall use commercially reasonable efforts to (i) maintain the Purchased Assets and the assets and properties of, or used by, the Seller relating to the Business in their current condition (ordinary wear and tear excepted), and (ii) maintain the Documents of the Business. In connection therewith, the Seller shall not terminate any Employee without notice to the Buyer. or cancel, terminate or amend any Assumed Contract.

Section 6.9    Notification of Breach; Disclosure.  Each Party shall promptly notify the other of any event, condition or circumstance of which such Party becomes aware prior to the Closing Date that would cause, or would reasonably be expected to cause, a violation or breach of this Agreement (or a breach of any representation or warranty contained in this Agreement).  During the period prior to the Closing Date, each Party will promptly advise the other in writing of any written notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement.  It is acknowledged and understood that no notice given pursuant to this Section 6.9 shall have any effect on the representations, warranties, covenants or agreements contained in this Agreement for purposes of determining satisfaction of the conditions contained herein.

Section 6.10    Insurance.  Until the Closing, Seller shall maintain (including necessary renewals thereof) Insurance Policies against risk and liabilities to the extent and in the manner and at the levels maintained by Seller as of the date hereof with respect to the Business and the Purchased Assets.  If requested by Buyer, Seller shall in good faith cooperate with Buyer and take all actions reasonably requested by Buyer that are necessary or desirable to permit Buyer to have available to it following the Closing the benefits (whether direct or indirect) of the insurance policies maintained by or on behalf of Seller with respect to the Business, the Purchased Assets or the Assumed Liabilities that are currently in force and in the manner and at the levels maintained by Seller as of the date hereof, including, but not limited to, taking those actions which may be necessary to assign the Insurance Policies to Buyer.

Section 6.11    Bankruptcy Matters; Bidding Process.

(a)    Seller and Buyer acknowledge that this Agreement and the sale of the Purchased Assets are subject to Bankruptcy Court approval.  Seller and Buyer acknowledge that (i) to obtain such approval, Seller must demonstrate that they have taken reasonable steps to obtain the highest or otherwise best offer possible for the Purchased Assets, including, but not limited to, giving notice of the transactions contemplated by this Agreement to creditors and certain other interested parties as ordered by the Bankruptcy Court, and conducting an

auction in respect of the Purchased Assets (the "Auction"), and (ii) Buyer must pay the Cure Costs and cure all defaults and provide adequate assurance of future performance under the Designated Contracts.

(b)     Seller has filed or will promptly file with the Bankruptcy Court a motion (the "Sale Motion"), notices and proposed orders, to the extent amended as of the date hereof each in form and substance reasonably satisfactory to Buyer seeking the Bankruptcy Court's issuance of:

(i)     the bidding procedures Order attached hereto as Exhibit A (the "Bidding Procedures Order"); and

(ii)     the sale Order attached hereto as Exhibit B (the "Sale Order").

(c)     Seller shall serve a copy of the Sale Motion on: (i) all entities known to assert any interest in or lien upon the Purchased Assets; (ii) all parties to Designated Contracts; (iii) all parties that are entitled to notice under Bankruptcy Rule 2002; (iv) the attorneys general of all states in which the Purchased Assets are located; (v) the Office of the United States Trustee; (vi) the Securities and Exchange Commission; (vii) the Internal Revenue Service and any governmental taxing authority that has filed a claim against the Chapter 7 Estates; (viii) all entities that expressed to the Seller an interest in purchasing the Purchased Assets; (ix) any party appearing in the Bankruptcy Cases and claiming a secured interest in the Purchased Assets; or any party known to the Seller and claiming a secured interest in the Purchased Assets; and (x) any and all other parties directed by the Court.

(d)     Seller shall use his reasonable best efforts to provide Buyer with copies of all motions, applications and supporting papers prepared by or on behalf of the Seller (including forms of orders and notices to interested parties) directly relating to the Purchased Assets or this Agreement at least two (2) Business Days, unless the exigencies of time prevent the period from being that long, prior to the filing thereof in the Bankruptcy Cases so as to allow Buyer to provide reasonable comments for incorporation into same; except that the Sale Motion (including forms of orders and notices to interested parties) shall be provided to Buyer at least three (3) Business Days prior to its filing.

Section 6.12     Best Efforts.  Upon the terms and subject to the conditions of this Agreement, each of the Parties hereto shall use its best efforts to take, or cause to be taken, all action, and to do, or cause to be done, all things necessary, proper or advisable consistent with applicable Legal Requirements to consummate and make effective in the most expeditious manner practicable the transactions contemplated hereby.  Without limiting the foregoing, Seller shall not voluntarily dismiss the Bankruptcy Cases and shall use his reasonable best efforts to:

(a)     obtain the Bidding Procedures Order on or before ___, 2009;

(b)     obtain the Sale Order on or prior to, August __, 2009 and, upon entry, cause it not to be (i) vacated, stayed or reversed or (ii) (except with the express written consent of the Buyer, or as would not be adverse to Buyer in any material respect) amended, supplemented or otherwise modified; and

(c)     subject to the fiduciary duties of the Trustee, prevent the dismissal of the Bankruptcy Cases.

Section 6.13     Bidding Procedures Order.  Seller agrees to comply (and cause his Representatives to comply) with each of the procedures, terms, conditions and provisions set forth in the Bidding Procedures Order.

Section 6.14     Takeover Proposal; Confidential Information.

(a)     Seller shall not furnish information concerning their business, properties or assets to any Third Party, except pursuant to a confidentiality agreement with terms and conditions no less restrictive than those contained in the Confidentiality Agreement between the parties.  Seller shall not release any Third Party from, or waive any provision of, any such confidentiality agreement or any similar confidentiality or standstill agreement to which any Seller is a party.  To the extent that this Section 6.14 conflicts with the Bidding Procedures Order, the Bidding Procedures Order shall govern.

(b)     Seller shall promptly (and in any event within one (1) Business Day) notify Buyer in writing at such time as any Takeover Proposal has been determined to be a Qualified Bid.

Section 6.15     DayJet Transaction.  Seller agrees that upon the Closing, Buyer shall have acquired all of the Seller's right, title and interest in the DayJet aircraft and any and all obligations from DayJet Leasing LLC and or its affiliates and no further or additional consideration shall be due Seller on account of such interest.

Section 6.16     Access to Premises.  Seller shall before and after the Closing Date, use its reasonable efforts to take those steps necessary to permit Buyer to have access to all property, buildings and facilities at which the Purchased Assets are located, including, but not limited to, any locations subject to leases which Buyer may elect not to assume, for purposes of Buyer's taking possession of the Purchased Assets under this Agreement.


# ARTICLE VII

## ADDITIONAL AGREEMENTS

Section 7.1     Taxes.

(a)     Seller shall be liable for and shall pay, and pursuant to Section 7.1(c) shall reimburse Buyer for, all Taxes (whether assessed or unassessed) applicable to the Business and the Purchased Assets, in each case attributable to periods (or portions of Straddle Periods) ending on or prior to the Closing Date.  Buyer shall be liable for and shall pay all Taxes (whether assessed or unassessed) applicable to the Business, the Purchased Assets and the Assumed Liabilities, in each case attributable to periods (or portions of Straddle Periods) beginning after the Closing Date.  For purposes of this paragraph (a), any period beginning before and ending after the Closing Date (a "Straddle Period") shall be treated as two partial

periods, one ending on the Closing Date and the other beginning on the day after the Closing Date and items of income, gain, deduction, loss or credit, and state and local apportionment factors for the Straddle Period shall be allocated between such two partial periods on a "closing of the books basis" by assuming that the books of the Person subject to such Tax were closed as of the close of the day on the Closing Date, provided, however, that exemptions, allowances or deductions that are calculated on an annual basis (such as the deduction for depreciation), and Taxes (such as property Taxes) imposed on a periodic basis shall be allocated on a daily basis.

(b)     Without limiting the other terms set forth in this Agreement, any sales Tax, use Tax, real property transfer or gains Tax, real property records recordation fees, documentary stamp Tax or similar Tax attributable to the sale or transfer of the Purchased Assets and not exempted under the Sale Order ("Transfer Taxes") shall be borne by Buyer. Seller and Buyer shall use reasonable efforts and cooperate in good faith to exempt the sale and transfer of the Purchased Assets from any such Transfer Taxes. Buyer shall be entitled to offset against the Cash Consideration 50% of the amount of Transfer Taxes actually paid by Buyer.

(c)     In the event that any Party pays the Tax that is the responsibility of the other Party in accordance with the terms of this Section 7.1, such responsible Party shall provide reimbursement to the paying Party for such Tax. Within a reasonable time prior to the payment of any such Tax, the Party that is to pay such Tax shall give notice to the other Party of the Tax payable and its liability therefor, although failure to do so will not relieve the Party responsible for the Tax under this Section 7.1 from its liability hereunder.

(d)     Buyer and Seller agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Business and the Purchased Assets (including access to books and records) as is reasonably necessary for the filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any taxing authority, and the prosecution or defense of any claim, suit or proceeding relating to any Tax. Buyer and Seller shall retain all books and records with respect to Taxes pertaining to the Purchased Assets for a period of at least six years following the Closing Date. On or after the end of such period, each party shall provide the other with at least 10 days prior written notice before destroying any such books and records, during which period the party receiving such notice can elect to take possession, at its own expense, of such books and records. Seller and Buyer shall cooperate with each other in the conduct of any audit or other proceeding relating to Taxes involving the Purchased Assets or the Business.

(e)     Seller shall use all commercially reasonable efforts to obtain certificates, releases or other appropriate documentation from all Governmental Agencies that may seek to collect property Taxes or impose on Seller, Buyer or any Purchased Assets penalties for any property Taxes, to the extent such Governmental Agencies provide such certificates, releases or documentation in the ordinary course, providing that such property Taxes have been paid or are not owed.

Section 7.2 **No Successor Liability to Employees**. Under no circumstances shall Buyer assume or be obligated to pay, and the Purchased Assets shall not be or become liable for or subject to, any claims of or liabilities of the Companies' Employees, including but not limited to, any claims or liabilities related to employment practices, COBRA, equal employment opportunity, nondiscrimination, harassment, wrongful termination, breach of contract, immigration, wage and hour laws, any other state, federal or local labor and employment laws, liability under the WARN Act, salaries, vacations, sick pay, incentives, severance pay, bonus, overtime, meal period, pension profit sharing retirement and/or deferred compensation and any other compensation or benefits (the "Employee Claims"), which Employee Claims shall be and remain the liability, responsibility and obligation (if any) of Seller and the Chapter 7 Estates.

Section 7.3 **Employment**.

(a)     Buyer may (but shall not be required to), in its sole and absolute discretion, offer employment to any and all individuals employed, or formerly employed, by Seller or the Companies in connection with the Business as of the Closing Date to commence immediately following the Closing, each such offer contingent upon the issuance of the Sale Order of the Bankruptcy Court and the Closing. Buyer's employment of any individuals previously employed by Seller or the Companies shall be on an "at will" basis and on such other terms and conditions of employment as Buyer shall offer in its sole discretion. Except as otherwise agreed to in writing, Buyer shall be under no obligation to employ or continue to employ any individual for any period. The employees who accept Buyer's offer of employment and who commence employment with Buyer from and after the Closing Date shall be referred to herein as the "Hired Employees." Under no circumstance shall any individual employed or formerly employed by Seller or the Companies become an employee of Buyer unless such individual becomes a Hired Employee.

(b)     With respect to each Hired Employee, Seller hereby waives and releases each such individual from any and all contractual, common law or other restrictions enforceable by Seller on the employment, activities or other conduct of such individuals after their termination of employment with Seller; provided, however, that Seller shall assign to Buyer Seller's rights to all obligations of each Hired Employee not to disclose confidential information relating to the Business and all obligations not to compete with the Business owed to Seller by such Hired Employee.

(c)     Except as expressly provided herein, nothing herein shall be construed as transferring to Buyer (i) any Contract or agreement with any current of former employee of the Companies or for the employment of any Person or engagement of any independent contractor by Seller or (ii) any rights or obligation Seller or the Companies may owe to or be owed by any current or former employee, officer, director, consultant, independent contractor or agent of the Companies.

(d)     Nothing herein, express or implied, shall confer upon any employee or former employee of the Companies any rights or remedies (including any right to employment or continued employment for any specific period) of any nature or kind whatsoever, under or by reason of this Agreement. Buyer and Seller agree that the provisions contained herein are

not intended to be for the benefit of or otherwise be enforceable by, any third party, including any employee or former employee of the Companies.

(e)     Buyer shall have no obligation to pay any severance obligation of any Employee or former Employee of the Companies, irrespective of whether such individual becomes a Hired Employee, and any such obligations remain obligations of the Seller or Chapter 7 Estates.

(f)     Subject to Section 7.3(h), nothing contained in this Agreement shall be construed to require, or prevent the termination of, employment of any individual, require minimum benefit or compensation levels or prevent any change in the employee benefits provided to any individual Employee. No provision of this Agreement shall create any third party beneficiary rights in any employee or former employee of the Companies or any other Persons or entities (including any beneficiary or dependent thereof), in respect of continued employment (or resumed employment) for any specified period of any nature or kind whatsoever.

(g)     Within ten Business Days of the date hereof, Seller shall deliver to Buyer a list of all of the Employees of the Companies or Seller together with the particulars of the date of commencement of employment or service, periods of continuous employment or service, job description or grade, and holiday entitlements.

Section 7.4     Collection of Receivable.  If, after the Closing Date, Seller shall receive payment from any account debtor with respect to any Accounts Receivable included in the Purchased Assets, Seller shall promptly thereafter deliver such funds and assets to Buyer.

Section 7.5     Adequate Assurances Regarding Assumed Contracts and Assumed Leases.  With respect to each Assumed Contract and each Assumed Lease, Buyer will use commercially reasonable efforts to cure all defaults and provide adequate assurance as required under the Bankruptcy Code of the future performance by Buyer of each such Assumed Contract and Assumed Lease and will pay all Cure Costs necessary to cure any defaults.  Buyer and Seller agree that they will promptly take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that all defaults have been cured and there has been an adequate demonstration of adequate assurance of future performance under the Assumed Contracts and the Assumed Leases, such as furnishing affidavits, non-confidential financial information or other documents or information for filing with the Bankruptcy Court and making Buyer's and Seller's employees and representatives available to testify before the Bankruptcy Court.

Section 7.6     Certifications.  Prior to the Closing Date, Seller shall cooperate with and provide reasonable assistance to the Buyer in connection with the Buyer's negotiation with (i) all EASA authorities, employees, officials and personnel to transfer to Buyer the Eclipse EASA Certificate and (ii) all FAA authorities, employees, officials and personnel to transfer to Buyer the Eclipse Type Certificate.  Seller shall use its reasonable efforts to maintain the EASA certificate until the date of Closing; provided that Seller shall not be obligated to pay any amounts or incur any obligations. Buyer shall be entitled to offset against the Cash Purchase Price at the Closing any and all fees due to EASA.

Section 7.7    Certain Actions.  As soon as practicable following the Closing Date, the Seller shall take such corporate and other actions necessary to change the names of the Companies with respect to the Bankruptcy Cases, to names that are not similar to, or confusing with, the current names of the Companies.  In connection with enabling Buyer, at or as soon as practicable after the Closing Date, to use the current corporate names of each of the Companies, the Seller shall execute and deliver to Buyer all consents related to such change of name as may be requested by Buyer, and will otherwise cooperate with Buyer in effecting such name change as soon as is practicable before or after the Closing.  Within ten (10) days after Closing, and at Buyer's expense, Seller shall file in all jurisdictions in which the Companies are qualified to do business any documents necessary to reflect such change of name or to terminate their qualification therein.

Section 7.8    Substitution of Parties.  As soon as practicable following the Closing Date, the Seller shall take such actions as necessary to substitute the Buyer in place of the Seller or, as appropriate, to allow Buyer to intervene, in the adversary proceedings described on Schedule 7.8 (the "WIP Adversary Proceedings") and the adversary proceeding styled Opinicus Corporation v. Jeoffrey L. Burtch et al Adversary Proceeding No. 09-50406-MFW and pursuant to the terms of this Agreement shall assign to Buyer any and all rights, defenses, cause of actions, claims or other interests in these proceedings, against the parties to these proceedings and the property which is the subject of those proceedings, provided, however, that Buyer's liability pursuant to these proceedings shall be strictly limited to any liability which is included in Assumed Liabilities and shall not include, to the extent applicable, any claims against Seller, the Companies or the Chapter 7 Estate for (a) specific performance or (b) any monetary claims of any kind or nature, including but not limited to, any claims to deposits or segregated funds.

Section 7.9    Cure Amounts.  Set forth on Schedule 2.3 is a list of the costs that pursuant to Bankruptcy Code Section 365(b) will be required to cure any default on the part of the Seller under the Designated Contracts, which costs must be delivered to the nondebtor under the Designated Contracts, or with respect to which adequate assurance of prompt delivery by such Seller must be provided as a prerequisite to the assumption of such Designated Contracts under Bankruptcy Code Section 365(a) (the "Cure Costs").  Appropriate additions and deletions shall be made to Schedule 2.3, and the Cure Costs shall be correspondingly amended, to reflect additions and deletions to Schedule 2.3 made from time to time in accordance with Section 2.3.  Prior to the Closing, Seller shall cooperate with Buyer to resolve any disputes with the nondebtor party to any of the Designated Contracts regarding the amount of the Cure Costs,   Subject to entry of the Approval Order and it becoming a Final Order, Buyer shall pay the Cure Costs designated in Schedule 2.3, subject to any reduction in the Cash Consideration provided in Section 2.3(b), in accordance with the terms and conditions of any Order approving the assumption and assignment of the Assumed Contracts.

Section 7.10    Reasonable Access to Records and Certain Personnel.  In order to facilitate Trustee's efforts to (i) administer and close the Bankruptcy Cases, and (ii) prepare tax returns (together, the "Post-Close Filings"), Buyer shall permit Trustee's counsel, accountants and any other professional representative of the Trustee, during regular business hours, with reasonable notice, and subject to reasonable rules and regulations, reasonable access to any information acquired by the Buyer pursuant to this Agreement, including financial information of the Companies, and other books and records which comprised part of the Purchased Assets,

that are required for the Trustee to complete the Post-Close Filings, or to facilitate the administration of these Bankruptcy Cases. Buyer shall retain all any information acquired by the Buyer pursuant to this Agreement for a period of at least six (6) years following the Closing Date. On or after the end of such period, the Buyer shall provide the Trustee with at least forty-five (45) days prior written notice before destroying any such information, during which period the Trustee can elect to take possession, at its own expense, of such books and records. The obligations created by this <u>Section 7.10</u> shall terminate 30 days after the entry of a final non-appealable order by the Bankruptcy Court approving the Trustee's Final Report.

Section 7.11    <u>Deposit</u>.   Immediately upon the Bankruptcy Court's entry of the Bidding Procedures Order and its approval of this Agreement as the stalking horse bid, Buyer will deposit $5,000,000 (the "<u>Deposit</u>") with a third party escrow agent pursuant to a deposit escrow agreement in substantially the form of <u>Exhibit C</u> (the "<u>Deposit Escrow Agreement</u>").

Section 7.12    <u>Seller Post-Closing Obligations</u>.   Notwithstanding any provision in this Agreement to the contrary, in no event shall the Seller be obligated to incur any expense or expenses that aggregate over $100,000 in connection with any obligations to cooperate or facilitate actions specified to occur following the Closing. This shall not apply to those offsets against the Cash Consideration provided for in <u>Section 3.2</u> and described with particularity in <u>Sections 2.3(b)</u>, <u>7.1(b)</u> and <u>7.6</u>.

Section 7.13    <u>Organization of the Companies</u>.   To the extent reasonably required to consummate the transactions contemplated by this Agreement, Seller will pay, or allow Buyer to pay and deduct from the Cash Consideration (a reasonable time prior to the Closing) subject to the limitations set forth in Section 7.12, any amounts due and owing to the Secretary of the State of Delaware which may be necessary to cause each Company to be an organization in good standing pursuant to its jurisdiction of incorporation. For the avoidance of doubt, to the extent there is no requirement that the Companies be in good standing to consummate the transactions contemplated by this Agreement, neither Buyer nor Seller desire to incur any cost pursuant to this Section 7.13.

## ARTICLE VIII

## CONDITIONS TO CLOSING

Section 8.1    <u>Conditions to Obligations of Each Party</u>.   The respective obligations of each Party to affect the sale and purchase of the Purchased Assets shall be subject to the fulfillment (or, if permitted by applicable law, waiver) on or prior to the Closing Date, of the conditions as set forth in <u>Section 8.2</u> in the case of the Buyer and <u>Section 8.3</u> in the case of the Seller.

Section 8.2    <u>Conditions to Obligations of Buyer</u>.   The obligation of Buyer to effect the purchase of the Purchased Assets contemplated by this Agreement shall be subject to the fulfillment (unless waived in writing by Buyer) on or prior to the Closing Date of the following additional conditions:

(a)     the representations and warranties of Seller contained in Article IV of this Agreement shall be true and correct on and as of the Closing Date with the same effect as if such representations and warranties had been made on and as of such date (other than any such representations and warranties that address matters only as of a particular date, which shall be true and correct as of such date), in each case except for breaches as to matters that, individually or in the aggregate, would not have a Material Adverse Effect. For purposes of determining the satisfaction of this condition, the representations and warranties of Seller contained in Article IV of this Agreement shall be deemed not qualified by any references therein to materiality generally or to whether or not any breach results in a Material Adverse Effect. Buyer shall have received a certificate of each Seller to such effect signed by a duly authorized officer of such Seller.

(b)     each covenant and obligation that Seller is required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been duly performed and complied with in all material respects. Buyer shall have received a certificate of the Seller to such effect.

(c)     the Sale Order shall have been entered on or before August __, 2009; and shall not have been (i) stayed, vacated, or reversed, or be the subject of any pending motion seeking such relief (ii) (except with the express written consent of the Buyer not to be unreasonably withheld or delayed) amended, supplemented or otherwise modified or (iii) subject to an appeal, other than an appeal by any party to any of the WIP Adversary Proceedings, which, in the Buyer's reasonable judgment, would not be mooted as a result of the Closing;

(d)     each of the deliveries required to be made to Buyer pursuant to Section 3.6 shall have been so delivered;

(e)     each of the Governmental Authority authorizations, consents or waiting periods set forth on Schedule 8.2(e) shall have been obtained or expired, as applicable;

(f)     no Governmental Authority shall have enacted, issued, promulgated, entered any Order that is in effect and has the effect of making illegal or otherwise prohibiting the consummation of the transactions contemplated by this Agreement that has not been withdrawn or terminated; and

(g)     No event shall have occurred which has had or will have a Material Adverse Effect.

Any condition specified in this Section 8.2 may be waived by Buyer; provided that no such waiver shall be effective against Buyer unless it is set forth in a writing executed by Buyer.

Section 8.3     Conditions to Obligations of Seller. The obligation of Seller to effect the sale of the Purchased Assets contemplated by this Agreement shall be subject to the fulfillment (unless waived in writing by Seller) on or prior to the Closing Date of the following additional conditions:

(a) the representations and warranties of Buyer contained in this Agreement shall be true and correct in all material respects when made and on and as of the Closing Date with the same effect as if such representations and warranties had been made on and as of such date (other than representations and warranties that address matters only as of a particular date, which shall be true and correct in all material respects as of such date), except that any representations and warranties made by Buyer that by their terms are subject to any materiality or material adverse effect qualifier or exception, shall be true and correct in all respects when made on and as of the Closing Date with the same effect as if such representations and warranties had been made on and as of such date (other than representations and warranties that address matters only as of a particular date, which shall be true and correct in all respects as of such date) and Seller shall have received a certificate of Buyer to such effect signed by a duly authorized officer thereof;

(b) each covenant and obligation that Buyer is required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been duly performed and complied with in all material respects, and Seller shall have received a certificate of Buyer to such effect signed by a duly authorized officer thereof;

(c) each of the deliveries required to be made to Seller pursuant to Section 3.5 shall have been so delivered;

(d) Buyer shall have delivered the Purchase Price to Seller or as otherwise directed by the Sale Order;

(e) the Sale Order shall have been entered and shall not have been (i) stayed, vacated or reversed or (ii) except with the express written consent of Trustee or as would not be adverse to Trustee in any material respect, amended, supplemented or otherwise modified; and

(f) as of and immediately after giving effect to the Closing, there shall be no default, and no event that with notice, or the passage of time, or both, would constitute a default under the Notes.

Any condition specified in this Section 8.3 may be waived by Seller; provided that no such waiver shall be effective against Seller unless it is set forth in a writing executed by the Seller.

## ARTICLE IX

## TERMINATION

Section 9.1    Termination.    Anything in this Agreement to the contrary notwithstanding, this Agreement and the transactions contemplated hereby may be terminated in any of the following ways at any time prior to the Closing Date and in no other manner:

(a)     By mutual written consent of Buyer and Seller; *provided* that such written consent is approved in writing by the holders of a majority in principal amount of the Prior Notes.

(b)     By Buyer, immediately without further notice, if Seller and Buyer are unable to reach agreement on the form of the Notes and related security agreement and intercreditor agreement at least two (2) days prior to the entry of the Bidding Procedures Order;

(c)     By Buyer upon five (5) Business Days notice if, at or prior to the Closing Date, satisfaction of any condition set forth in Section 8.2 is or becomes impossible (other than through the breach by Buyer of any of its representations or warranties or the failure of Buyer to perform any of its obligations pursuant to this Agreement) and Buyer shall not have waived such condition in writing at or prior to the Closing Date.

(d)     By Seller upon five (5) Business Days notice if, at or prior to the Closing Date, satisfaction of any condition set forth in Section 8.3 is or becomes impossible (other than through the breach by Seller of any of their representations or warranties or the failure of Seller to perform any of their obligations pursuant to this Agreement) and Seller shall not have waived such condition in writing at or prior to the Closing Date.

(e)     By Buyer or Seller, immediately upon the occurrence of any of the following events:

(i)     The Bankruptcy Court approves an Alternative Transaction, or an Alternative Transaction is consummated; or

(ii)    The Sale Order is not entered on or before August __, 2009.

(f)     By either party, provided the terminating party is not in default of its obligations under this Agreement, if the Closing shall not have occurred for any reason within thirty days after the entry of the Sale Order.

(g)     By either party if a Governmental Authority issues a final and non-appealable Order prohibiting the transactions contemplated by this Agreement.

Section 9.2     Effect of Termination.

(a)     In the event this Agreement is terminated pursuant to Section 9.1, all further obligations of the parties hereunder shall terminate, except for this Section 9.2 and Article XI (to the extent applicable to the aforesaid surviving provisions), and except that nothing in this Section 9.2 shall relieve any party hereto of any liability for the willful breach of any of the covenants or of any of the representations or warranties contained in this Agreement prior to such termination.

(b)     If this Agreement is terminated pursuant to Section 9.1(e)(i), then Seller shall pay to Buyer in immediately available funds a cash fee equal to $1,600,000 (the "Break-Up Fee"), such fee to be paid, as applicable, promptly following the closing of the Alternative

Transaction; provided, however, that no Break-Up Fee shall be payable by Seller in the event that a material breach by Buyer of any representation or warranty contained in this Agreement shall have occurred or Buyer fails to perform and comply with all of its covenants and agreements under this Agreement, which breach or failure, as applicable, results in the termination of this Agreement by Seller. The Break-Up Fee, payable under the circumstances provided in the immediately preceding sentence shall be the exclusive remedy of Buyer for any termination of this Agreement pursuant to Section 9.1(e)(i). The claims of Buyer to the Break-Up Fee shall constitute a first priority administrative expense against the Chapter 7 Estates, jointly and severally, under 11 U.S.C. § 507(a)(2).


## ARTICLE X

### INDEMNIFICATION

Section 10.1  No Survival of Representations, Warranties, Covenants and Agreements.  The representations, warranties, covenants and agreements contained in this Agreement shall not survive beyond the Closing Date, and there shall be no liability in respect thereof, whether such liability has accrued prior to the Closing Date or after the Closing Date, on the part of either party or its officers, directors, employees, agents and Affiliates; provided, however, that all covenants and agreements, which, by their terms, contemplate performance after the Closing Date, shall survive in accordance with their terms.  Nothing in the foregoing sentence shall preclude any party from bringing an action for fraud involving intentional and wanton conduct involving the entire transaction provided for in this Agreement.


## ARTICLE XI

### GENERAL PROVISIONS

Section 11.1  Confidential Nature of Information.  Each Party agrees that it will treat in confidence all documents, materials and other information that it shall have obtained regarding the other Party during the course of the negotiations leading to the consummation of the transactions contemplated hereby (whether obtained before or after the date of this Agreement), the investigation provided for herein and the preparation of this Agreement and other related documents.  Such documents, materials and information shall not be disclosed or communicated to any third Person (other than, in the case of Buyer, to its counsel, accountants, financial advisors and potential lenders, and in the case of Seller, to the holders of a majority in principal amount of the Prior Notes and to the respective counsel, accountants and financial advisors of Seller and the holders of a majority in principal amount of the Prior Notes).  No Party shall use any confidential information referred to in the second immediately preceding sentence in any manner whatsoever except solely for the purpose of evaluating the proposed purchase and sale of the Purchased Assets and the enforcement of its rights hereunder and under the Ancillary Documents; provided, however, that after the Closing, Buyer may use or disclose any confidential information included in the Purchased Assets and may use or disclose other confidential information that is otherwise reasonably related to the Business or the Purchased

Assets, subject to any restrictions imposed by non-bankruptcy law. The obligation of each Party to treat such documents, materials and other information in confidence shall not apply to any information that (i) is or becomes available to such Party from a source other than the disclosing Party, provided such other source was not, and such Party would have no reason to believe such source was, subject to a confidentiality obligation in respect of such information, (ii) is or becomes available to the public other than as a result of disclosure by such Party or its agents, (iii) is required to be disclosed under applicable law or judicial process, including the Bankruptcy Cases, but only to the extent it must be disclosed, or (iv) such Party reasonably deems necessary to disclose to obtain any of the consents or approvals contemplated hereby.

Section 11.2    No Public Announcement.  Neither Seller nor Buyer shall, without the approval of Seller (in the case of a disclosure by Buyer) or Buyer (in the case of a disclosure by Seller), make any press release or other public announcement concerning the transactions contemplated by this Agreement, except as and to the extent that any such party shall be so obligated by law, including as may be required by the Bankruptcy Cases, securities laws, or the rules of any stock exchange, in which case the other party or parties shall be advised prior to such disclosure and the parties shall use their reasonable best efforts to cause a mutually agreeable release or announcement to be issued.

Section 11.3    Notices.  All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given (a) when delivered personally to the recipient, (b) one (1) Business Day after the date when sent to the recipient by reputable express courier service (charges prepaid), or (c) seven (7) Business Days after the date when mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, if delivered personally (with written confirmation of receipt), on the date of such delivery or, if sent via facsimile, on the date of the transmission of the facsimile, provided that the sender thereof receives written confirmation that the facsimile was successfully delivered to the intended recipient.  Notice by Buyer to Eclipse shall be deemed to be notice to all Seller.  Such notices, demands and other communications shall be sent to Seller and to Buyer at the addresses indicated below:

If to Buyer, to:

Eclipse Aerospace, Inc.
125 Fairchild St.
Suite 100, Charleston, SC 29492
Attn: Mason Holland, President
Facsimile: 843-849-9298

with a copy to (which shall not constitute notice):

> Nelson Mullins Riley & Scarborough LLP
> Atlantic Station
> 201 17th Street, Suite 1700
> Atlanta, Georgia 30363
> Attn: William J. Ching, Esq.
>     Michael E. Hollingsworth II, Esq.
> Facsimile: (404) 322-6050

If to Seller, to:

> The Trustee:
> Jeoffrey L. Burtch, Esq.
> Cooch & Taylor, P.A.
> 1000 West Street
> Wilmington, Delaware 19801
> Facsimile: (302) 984-3939

with a copy to (which shall not constitute notice):

> Cooch & Taylor, P.A.
> 1000 West Street
> Wilmington, Delaware 19801
> Attn: Adam Singer, Esq.
> Facsimile: (302) 984-3939

or to such other address or facsimile number as such party may indicate by a notice delivered to the other party hereto.

Section 11.4    Successors and Assigns.

(a)    Except as expressly permitted in this Agreement, the rights and obligations of the Parties under this Agreement shall not be assignable by such parties without the written consent of the other parties hereto; provided, however, that concurrent with the Closing, Buyer may, without the prior written consent of the Seller or the holders of a majority in principal amount of the Prior Notes, assign the right to receive the assets owned by Seller to one or more affiliates of the Buyer, *provided* that no such assignment shall release Buyer from any of its obligations under this Agreement. Notwithstanding the foregoing, from and after the Closing Buyer shall have the unrestricted right to assign this Agreement as collateral and in connection therewith to delegate all or any part of its obligations hereunder to any lender in connection with any financing or to any Affiliate of Buyer, but in such event Buyer shall remain fully liable for the performance of all of such obligations in the manner prescribed in this Agreement.

(b)    This Agreement shall be binding upon and inure to the benefit of the Parties and their successors and permitted assigns. The successors and permitted assigns hereunder shall include any permitted assignee as well as the successors in interest to such

permitted assignee (whether by merger, consolidation, liquidation (including successive mergers, consolidations or liquidations) or otherwise). Nothing in this Agreement, expressed or implied, is intended or shall be construed to confer upon any Person other than the parties and successors and assigns permitted by this <u>Section 11.4</u> any right, remedy or claim under or by reason of this Agreement.

Section 11.5   <u>Entire Agreement; Amendments; Disclosure Schedules</u>.   This Agreement, the Ancillary Documents and Disclosure Schedules referred to herein contain the entire understanding of the parties hereto with regard to the subject matter contained herein or therein, and supersede all prior agreements, understandings or letters of intent between or among any of the parties hereto with respect to such subject matter.   This Agreement shall not be amended, modified or supplemented except by a written instrument signed by the Buyer and Seller and approved in writing by the holders of a majority of the principal amount of the Prior Notes.

Section 11.6   <u>Waivers</u>.   Any term or provision of this Agreement may be waived, or the time for its performance may be extended, by an instrument in writing executed by the party or parties entitled to the benefit thereof; *provided*, that any such waiver is approved in writing by the holders of a majority in principal amount of the Prior Notes. Any such waiver shall be validly and sufficiently authorized for the purposes of this Agreement if, as to any party, it is authorized in writing by an authorized representative of such party.   Except as otherwise provided herein, the failure of any party hereto to enforce at any time any provision of this Agreement shall not be construed to be a waiver of such provision, nor in any way to affect the validity of this Agreement or any part hereof or the right of any party thereafter to enforce each and every such provision.   No waiver of any breach of this Agreement shall be held to constitute a waiver of any other or subsequent breach.   No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any right, power or remedy.   All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

Section 11.7   <u>Expenses</u>.   Each Party hereto will pay all costs and expenses incident to its negotiation and preparation of this Agreement and to its performance and compliance with all agreements and conditions contained herein on its part to be performed or complied with, including the fees, expenses and disbursements of its counsel and accountants.

Section 11.8   <u>Partial Invalidity</u>.   Wherever possible, each provision hereof shall be interpreted in such manner as to be effective and valid under applicable law, but in case any one or more of the provisions contained herein shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such provision shall be ineffective to the extent, but only to the extent, of such invalidity, illegality or unenforceability without invalidating the remainder of such invalid, illegal or unenforceable provision or provisions or any other provisions hereof, unless such a construction would be unreasonable.

Section 11.9   <u>Execution in Counterparts</u>.   This Agreement may be executed in counterparts, each of which shall be considered an original instrument, but all of which shall be considered one and the same agreement, and shall become binding when one or more

counterparts have been signed by and delivered to each of the Parties hereto. Delivery of an executed counterpart of a signature page to this Agreement by facsimile shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 11.10 <u>Governing Law and Dispute Resolution</u>.

(a)     This Agreement and the legal relations between the parties hereto shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and performed therein and the Bankruptcy Code, to the extent applicable.

(b)     During the pendency of the Bankruptcy Cases any Proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement may only be brought against any of the parties in the Bankruptcy Court, and each of the parties consents to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts) in any such action or proceeding and waives any objection to venue laid therein.

(c)     At any time after the entry of a final non appealable order of the Bankruptcy Court approving the Trustee's Final Report, any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by arbitration in New York, New York before one arbitrator. The parties hereby waive all right to trial by jury with respect to the foregoing. The arbitration shall be administered by JAMS (www.jamsadr.com) pursuant to its Streamlined Arbitration Rules and Procedures. Judgment on the award may be entered in any court having jurisdiction. The arbitrator may, in his or her sole discretion, allocate all or part of the costs of the arbitration in the award, including the fees of the arbitrator and the reasonable attorneys' fees of the parties. The arbitrator shall not have the power to award punitive damages.

Section 11.11 <u>No Third Party Beneficiaries</u>. This Agreement is for the sole benefit of the Parties and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable benefit, claim, cause of action, remedy or right of any kind.

[SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed the day and year first above written.

**BUYER:**

**Eclipse Aerospace, Inc.**

By: _____
      Name: Mason Holland
      Its:     President

**SELLER:**

**Jeoffrey L. Burtch, Chapter 7 Trustee of Eclipse Aviation Corporation**

By:_____
      Name: Jeoffrey L. Burtch
      Title: Chapter 7 Trustee

**Jeoffrey L. Burtch, Chapter 7 Trustee of Eclipse IRB Sunport, LLC**

By:_____
      Name: Jeoffrey L. Burtch
      Title: Chapter 7 Trustee

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed the day and year first above written.

**BUYER:**

**Eclipse Aerospace, Inc.**

By: _____

Name: Mason Holland

Its:    President


**SELLER:**

**Jeoffrey L. Burtch, Chapter 7 Trustee of Eclipse Aviation Corporation**

By: _____

Name: Jeoffrey L. Burtch

Title: Chapter 7 Trustee


**Jeoffrey L. Burtch, Chapter 7 Trustee of Eclipse IRB Sunport, LLC**

By: _____

Name: Jeoffrey L. Burtch

Title: Chapter 7 Trustee

## DEFINITIONS

"Accounts Receivable" means, with respect to a Seller, all accounts receivable and other rights to payment of such Seller and the full benefit of all security for such accounts receivable or rights to payment, including, but not limited to, all accounts receivable in respect of goods shipped or products sold or services rendered to customers by such Seller, any other miscellaneous accounts receivable of such Seller, and any claim, remedy or other right of such Seller related to any of the foregoing.

"Action" means any legal action, suit or arbitration, or any inquiry, proceeding or investigation, by or before any Governmental Authority.

"Administrative Claim" means a Claim for payment of an administrative expense solely in the Chapter 11 Bankruptcy Cases of a kind specified in section 503(b) of the Bankruptcy Code and entitled to priority pursuant to section 507(a)(1) of the Bankruptcy Code.

"Affiliate" means, as to any Person, any other Person which directly or indirectly controls, or is under common control with, or is controlled by, such Person. As used in this definition, "control" (including, with its correlative meanings, "controlled by" and "under common control with") shall mean possession, directly or indirectly, of the power to direct or cause the direction of management or policies (whether through ownership of securities or partnership or other ownership interests, by contract or otherwise) of such Person.

"Agreement" has the meaning specified in the preamble.

"Alternative Transaction" means any one of the following transactions with or by a Third Party resulting in the sale of the Business: (a) a merger, consolidation or similar transaction involving the Seller, or (b) a sale, lease or other disposition directly or indirectly by merger, consolidation, tender offer, share exchange or otherwise of assets of Seller constituting a majority of the consolidated assets of Seller, excluding the Excluded Assets.

"Ancillary Documents" means a Bill of Sale, the Assumption and Assignment Agreement, an Assignment of Patents, an Assignment of Trademarks, an Assignment of Copyrights, an Assignment of Domain Names, an Assumption and Assignment of Leases, each in form and substance reasonably satisfactory to Buyer, and each other agreement, document or instrument (other than this Agreement) executed and delivered by the parties hereto in connection with the consummation of the transactions contemplated by this Agreement.

"Approval Order" means the Sale Order or any other order entered by the Bankruptcy Court approving the assumption and assignment of the Designated Contracts.

"Assumed Capitalized Leases" has the meaning specified below in the definition of "Purchased Assets."

"Assumed Contracts" has the meaning specified below in the definition of "Purchased Assets."

"Assumed Leases" has the meaning specified below in the definition of "Purchased Assets."

"Assumed Liabilities" shall only mean only the following liabilities and obligations (without duplication):

        (i)     All obligations of the Companies or the Seller with respect to the Companies arising at and after the Closing under the Assumed Contracts and the Assumed Leases, in each case solely to the extent such obligations are required to be performed from and after the Closing Date;

        (ii)    the Cure Costs;

        (iii)the    obligation of Seller to return any aircraft or aircraft parts held by the Seller as of the date of the Closing or arising out of any Final Order in the WIP Adversary Proceedings set forth on Schedule 7.8, but not including, to the extent applicable, any claims against Seller, the Companies or the Chapter 7 Estate for (a) specific performance; or (b) any monetary claims against the Seller, including but not limited to, any claims to deposits or segregated funds; and

        (iv)    the obligation to return any Eclipse 500 Full Flight Simulators or Flight Training Devices to OPINICUS Corporation if ordered by the Bankruptcy Court by any final order entered in the adversary proceeding styled Opinicus Corporation v. Jeoffrey L. Burtch et al Adversary Proceeding No. 09-50406-MFW.

"Assumption and Assignment Agreement" has the meaning specified in Section 3.5.

"Assumption and Assignment of Leases" has the meaning specified in Section 3.6(f).

"Assumption Date" means the date as of which a Designated Contract is assumed by a Seller in the Bankruptcy Cases and assigned to the Buyer pursuant to an Order of the Bankruptcy Court (which may be the Sale Order), in accordance with the terms of this Agreement.

"Auction" has the meaning specified in Section 6.11(a).

"Avoidance Actions" means any and all claims of the Seller under Chapter 5 of the Bankruptcy Code and any other causes of action the Seller (or the Companies) may have against Third Parties; provided, however, that such actions will expressly not include any claims relating in any manner to the WIP Adversary Proceedings, the Opinicus Adversary Proceeding or any claims which constitute or relate to claims for the recovery of property of the estate removed during the pendency of the Bankruptcy Cases and claims for the enforcement of non competition agreements, non disclosure or confidentiality agreements, all of which claims shall be expressly reserved for the benefit of the Buyer.

"Bankruptcy Cases" has the meaning specified in the recitals.

"Bankruptcy Code" means Title 11 of the United States Code 11 U.S.C. Sections 101 et. seq.

"Bankruptcy Court" has the meaning specified in the recitals.

"Benefit Plan" means any benefits plans provide by the Companies to any Employee.

"Bidding Procedures" means the bidding procedures set forth in the Bidding Procedures Order.

"Bidding Procedures Order" has the meaning set forth in Section 6.11(b)(i).

"Bill of Sale" has the meaning set forth in Section 3.6(a).

"Break-Up Fee" has the meaning set forth in Section 9.2(b).

"Business" has the meaning specified in the recitals.

"Business Day" has the meaning specified in Section 1.1(a).

"Buyer" has the meaning specified in the preamble.

"Buyer Protections" means the procedures, provisions and conditions set forth in the Bidding Procedures Order.

"Bidding Procedures Order" has the meaning set forth in Section 6.11(b)(i).

"Cash Consideration" means an amount equal to Twenty Million Dollars ($20,000,000).

"Cash Purchase Price" means an amount equal to the Cash Consideration.

"Chapter 7 Estates" means the bankruptcy estates of both Eclipse Aviation Corporation, and Eclipse IRB Sunport, LLC.

"Claim" means a claim against the Companies (all or either of them) as defined in section 101(5) of the Bankruptcy Code.

"Closing" has the meaning specified in Section 3.4.

"Closing Date" has the meaning specified in Section 3.4.

"COBRA" means the United States Consolidated Omnibus Budget Reconciliation Act of 1985.

"Code" means the United States Internal Revenue Code of 1986, as amended.

"Computers" means all computer equipment and hardware, including, without limitation, all central processing units, terminals, disk drives, tape drives, electronic memory units, printers, keyboards, screens, peripherals (and other input/output devices), modems and other

communication controllers, and any and all parts and appurtenances thereto, together with all Intellectual Property used in connection with the operation of such computer equipment, including all Software and rights under any licenses related to such use.

"Contract" means any agreement, contract, obligation, promise, instrument, undertaking or other arrangements (whether written or oral), and any amendment thereto, that is legally binding, other than a Lease, to which any Seller is party.

"Contract Designation Date" has the meaning specified in Section 2.3(a).

"Copyrights" means all U.S. and common law works of authorship and copyrightable subject matter, and copyrights, whether registered or unregistered, copyright registrations and applications therefor, all rights to register and obtain renewals and extensions of copyright registrations, and all other rights corresponding to any of the foregoing throughout the world, including "moral" rights.

"Cure Costs" has the meaning specified in Section 7.9.

"Deposit" has the meaning specified in Section 7.11.

"Deposit Escrow Agreement" has the meaning set forth in Section 7.11.

"Designated Contract" has the meaning specified in Section 2.3(a).

"Design Information" means all information, whether in physical form or electronic form, including all software and electronic information hosted on Eclipse computer servers and in hard copy that relates to: (1) Engineering and technical information concerning either the Eclipse 500 aircraft Type Design or the Eclipse 400 concept airplane; (2) All engineering documents pertaining to the software and hardware design of the Eclipse 500 aircraft or the Eclipse 400 concept airplane; and (3) all supporting, specifications documents and drawings relating to the Eclipse 500 aircraft or the Eclipse 400 concept airplane.

"Disclosure Schedules" means the disclosure schedules attached hereto that Seller has prepared and delivered to Buyer pursuant to the terms of this Agreement, setting forth information regarding the Business, the Purchased Assets, the Assumed Liabilities and other matters with respect to the Companies as set forth therein.

"Documents" means all books, records, files, invoices, inventory records, product specifications, advertising materials, customer lists, cost and pricing information, supplier lists, business plans, catalogs, customer literature, quality control records and manuals, research and development files, records and laboratory books and credit records of customers, and all records, notes, and documents relating to any Software (including all data and other information stored on discs, tapes or other media) to the extent used in or to the extent relating to the assets, properties, including the Seller Intellectual Property, business or operations of the Business.

"Domain Names" means any alphanumeric designation registered with or assigned by a domain name registrar, registry or domain name registration authority as part of an electronic address on the Internet.

"EASA" means the European Aviation Safety Agency.

"Eclipse" has the meaning specified in the preamble.

"Eclipse EASA Certificate" means the Type Certificate for Eclipse 500 (EA500), identified as NBR: EASA.IMA.A.171 and issued to Eclipse on November 21, 2008.

"Eclipse Production Certificate" means Production Certificate Number 500 issued to Eclipse on April 26, 2007 by the U.S. Department of Transportation Federal Aviation Administration.

"Eclipse Type Certificate" means Type Certificate Number A00002AC reissued to Eclipse on September 30, 2006 by the U.S. Department of Transportation Federal Aviation Administration.

"Employee" means any full- or part-time employee or independent contractor of any Seller as of the date of this Agreement.

"Employee Claims" has the meaning specified in Section 7.2.

"Encumbrance" means any interest, charge, lien, claim (as defined in section 101(5) of the Bankruptcy Code), mortgage, sublease, hypothecation, deed of trust, pledge, security interest, option, right of use, first offer or first refusal, easement, servitude, restrictive covenant, encroachment, encumbrance, or other similar restriction of any kind.

"Environmental Laws" means any Legal Requirement relating to protection of human health, safety, the environment, and natural resources, including without limitation Hazardous Materials, drinking water, groundwater, wetlands, landfills, open dumps, storage tanks, underground storage tanks, solid waste, waste water, storm water runoff, waste emissions or wells. Without limiting the generality of the foregoing, the term will encompass each of the following statutes, and the regulations promulgated thereunder, in each case as in effect as of Closing: (a) the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (codified in scattered sections of 26 U.S.C., 33 U.S.C., 42 U.S.C. and 42 U.S.C. § 9601 et seq., "CERCLA"); (b) the Resource Conservation and Recovery Act of 1976 (42 U.S.C. § 6901 et seq., "RCRA"); (c) the Hazardous Materials Transportation Act (49 U.S.C § 1801 et seq., "HMTA"); (d) the Toxic Substances Control Act (15 U.S.C. § 2061 et seq., "TSCA"); (e) the Clean Water Act (33 U.S.C. § 1251 et seq.); (f) the Clean Air Act and Amendments (42 U.S.C. § 7401 et seq.); (g) the Safe Drinking Water Act (21 U.S.C. § 349); 42 U.S.C. § 201 and § 300 et seq.); (h) the National Environmental Policy Act of 1969 (42 U.S.C. § 4321); (i) the Superfund Amendment and Reauthorization Act of 1986 (codified in scattered sections of 10 U.S.C., 29 U.S.C., 33 U.S.C. and 42 U.S.C., "SARA"); and (j) Title III of the Superfund Amendment and Reauthorization Act (42 U.S.C. § 11,001 et seq.).

"Equipment" means all furniture, fixtures, equipment, Computers, machinery, apparatus, appliances, spare parts, signage, supplies, vehicles, forklifts and all other tangible personal property of every kind and description in which Seller have an interest, including simulators.

"ERISA" means the United States Employee Retirement Income Security Act of 1974, as amended.

"Excluded Assets" means:

(a)     all cash, cash equivalents and marketable securities of the Companies;

(b)     any customer lists or other customer data maintained or collected by Sellers that constitutes or incorporates personally identifiable information, to the extent such information is required to be excluded from the transaction by an Order of the Bankruptcy Court;

(c)     all shares of capital stock or other equity interests of either of the Companies or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest of either of the Companies;

(d)     all minute books, stock ledgers, corporate seals and stock certificates of the Companies;

(e)     any Contracts with Employees or otherwise pertaining to employee matters except to the extent such Contracts are Purchased Assets;

(f)     any Contracts listed or described in Schedule A-1 (the "Excluded Contracts");

(g)     any Leases, and rights thereunder, listed or described in Schedule A-2 (the "Excluded Leases");

(h)     any rights, claims or causes of action of Seller against the Buyer under this Agreement or the Ancillary Documents, including all right, title and interest to the Cash Purchase Price and the Note Consideration;

(i)     all receivables, claims or causes of action related solely to any Excluded Asset;

(j)     rights under director and officer liability policies, ERISA and trustee liability policies and employment practices liability policies, and all rights under insurance policies relating to claims for losses related solely to any Excluded Asset or Excluded Liability;

(k)     subject to Section 7.3(h), all Benefit Plans;

(l)     all Documents relating solely to an Excluded Asset or an Excluded Liability;

(m)     all refunds, if any, of Taxes due to any Seller for any taxable period ending on or before the Closing Date; and

(n)     any and all Avoidance Actions.

"Excluded Contracts" has the meaning specified above in this Annex 1.

"Excluded Leases" has the meaning specified above in this Annex 1.

"Excluded Liabilities" shall mean all Liabilities of Seller, other than the Assumed Liabilities. For the avoidance of doubt, the Excluded Liabilities include, but are not limited to, the following (other than the Assumed Liabilities):

(a)     any Liability of Seller, arising out of, or relating to, this Agreement or the transactions contemplated by this Agreement, whether incurred prior to, at or subsequent to the Closing Date, including, without limitation, all finder's or broker's fees and expenses, any and all fees and expenses of any Representatives of Seller, and any severance, change in control, termination or similar payments to any employees of Seller;

(b)     any Liability relating to (x) events or conditions occurring or existing in connection with, or arising out of, the Business as operated prior to the Closing Date, or (y) the ownership, possession, use, operation or sale or other disposition prior to the Closing Date of any Purchased Assets (or any other assets, properties, rights or interests associated, at any time prior to the Closing Date, with the Business);

(c)     any (i) Liability for Taxes; (ii) Liability or obligation of the Chapter 7 Estates, or any member of any consolidated, affiliated, combined or unitary group of which one or more of the Companies is or has been a member, for Taxes and (iii) Taxes of any other Person pursuant to an agreement or otherwise;

(d)     any Liability incurred by the Companies or their respective directors, officers, stockholders, agents or employees (acting in such capacities) whether arising prior to or after the Closing;

(e)     any Liability of Seller to any Person on account of any Action or Proceeding;

(f)     Employee Claims;

(g)     any Liability relating to or arising out of an Excluded Asset;

(h)     any liability or obligation, whether known or unknown, (i) arising under Environmental Laws attributable to or incurred as a result of any acts, omissions, or conditions first occurring or in existence as of or prior to the Closing Date, including, but not limited to, any liability or obligation with respect to the release, handling, discharge, treatment, storage, generation, disposal, or presence of Hazardous Substances at any location, (ii) claims relating to employee health and safety, including claims for injury, sickness, disease or death of any Person or (iii) compliance with any Legal Requirement relating to any of the foregoing;

(i)     any Liability or obligation relating to or arising out of any Benefit Plan;

(j)     fees or expenses of Seller incurred with respect to the transactions contemplated herein; and

(k)     any severance, termination, change of control or other similar payment obligations of the Seller (whether arising prior to or after the Closing).

"FAA" means the Federal Aviation Administration of the United States of America and any successor Governmental Agency.

"Final Order" means an action taken or Order issued by the applicable Governmental Authority as to which: (i) no request for stay of the action or Order is pending, no such stay is in effect, and, if any deadline for filing any such request is designated by statute or regulation, it is passed, including any extensions thereof; (ii) no petition for rehearing or reconsideration of the action or Order, or protest of any kind, is pending before the Governmental Authority and the time for filing any such petition or protest is passed; (iii) the Governmental Authority does not have the action or Order under reconsideration or review on its own motion and the time for such reconsideration or review has passed; and (iv) the action or Order is not then under judicial review, there is no notice of appeal or other application for judicial review pending, and the deadline for filing such notice of appeal or other application for judicial review has passed, including any extensions thereof.

"FTC" has the meaning specified in Section 6.5(a).

"GAAP" means generally accepted accounting principles employed in the United States, as strictly applied.

"Governmental Agency" or "Governmental Authority" means (a) any international, foreign, federal, state, county, local or municipal government or administrative agency or political subdivision thereof, (b) any governmental agency, authority, board, bureau, commission, department or instrumentality, (c) any court or administrative tribunal, (d) any non-governmental agency, tribunal or entity that is vested by a governmental agency with applicable jurisdiction, or (e) any arbitration tribunal or other non-governmental authority with applicable jurisdiction.

"Hazardous Materials" means each and every element, compound, chemical mixture, contaminant, pollutant, material, waste or other substance which is defined, determined or identified as hazardous or toxic under any Environmental Law or the Release of which is prohibited or regulated under any Environmental Law. Without limiting the generality of the foregoing, the term will include: (a) "*hazardous substances*" as defined in CERCLA, SARA, or Title III of the Superfund Amendments and Reauthorization Act, each as amended to date, and regulations promulgated thereunder; (b) "*hazardous waste*" as defined in RCRA and regulations promulgated thereunder; (c) "*hazardous materials*" as defined in the HMTA, as amended to date, and regulations promulgated thereunder; (d) "*chemical substance or mixture*" as defined in the TSCA as amended to date, and regulations promulgated thereunder; (e) "*petroleum*," including crude oil or any fraction; and (f) "*natural gas*," including liquids and synthetic gas usable for fuel.

"Hired Employees" has the meaning specified in Section 7.3(a).

"Insurance Policies" means insurance policies of the Seller as of the date hereof, other than those described under clause (j) of the definition of "Excluded Assets".

"Intellectual Property" means all of the following:

(a)     all Trademarks;

(b)     all Patents;

(c)     all Copyrights;

(d)     all inventions (whether patentable or not), invention disclosures, discoveries, and improvements;

(e)     all Trade Secrets;

(f)     all industrial designs and any registrations and applications therefor throughout the world;

(g)     all databases and data collections and all rights therein throughout the world;

(h)     all Software;

(i)     licenses, immunities, covenants not to sue and the like relating to the foregoing;

(j)     books and records describing or used in connection with the foregoing, including all contracts, licenses, and other agreements to which any Seller is a party or by which it is bound either as licensee or licensor relating to any intellectual property described above;

(k)     any and all other intellectual property rights and proprietary rights relating to any of the foregoing; and

(l)     all goodwill, franchises, licenses, permits, consents, approvals and claims or causes of action arising out of or related to infringement or misappropriation of any of the foregoing.

"Law" means each provision of any currently implemental federal, state, local or foreign law, statute, ordinance, decree, injunction, judgment, order, code, rule or regulation, promulgated or issued by any Governmental Authority.

"Leased Real Property" has the meaning specified below in the definition of "Purchased Assets."

"Leases" means any Contract pertaining to leased real property.

"Legal Requirement" means any federal, state, provincial, local, municipal, foreign, international, multinational, or other administrative Order, constitution, law, ordinance, principle of common law, regulation, statute or treaty.

"Liability" means any debt, loss, claim (as defined in section 101(5) of the Bankruptcy Code), damage, demand, fine, judgment, penalty, liability or obligation (whether direct or indirect, known or unknown, absolute or contingent, asserted or unasserted, accrued or unaccrued, matured or unmatured, determined or determinable, liquidated or unliquidated, or due or to become due, and whether in contract, tort, strict liability, successor liability or otherwise), and including all costs and expenses relating thereto (including fees, discounts and expenses of legal counsel, experts, engineers and consultants and costs of investigations).

"Lien" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge, equitable interest, conditional sale or other title retention device or arrangement, occupancy agreement, license or lease, or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Material Adverse Effect" means a loss by the Company of either its Eclipse Type Certificate or Eclipse EASA Certificate.

"Non-Transferable Agreement" means any Assumed Contract or Assumed Lease that (i) Buyer does not timely elect to assume pursuant to Section 2.3(a), or (ii) that may not be assigned to Buyer due to Buyer's failure to cure all defaults of Seller thereunder and/or provide adequate assurance of performance to the counterparty thereto to the extent required by the Bankruptcy Court.

"Note Consideration" means Twenty Million  Dollars ($20,000,000), the aggregate principal amount of Notes issued at Closing.

"Notes" means the 7% senior subordinated secured notes due on September 1, 2011.

"Order" means any decree, writ, assessment, award, decision, injunction, judgment, order, ruling, subpoena, verdict or arbitration award entered, issued, made, or rendered by any Governmental Agency or Governmental Authority.

"Ordinary Course of Business" means the ordinary and usual course of day-to-day operations of the Business (including acts and omissions of Seller in the ordinary and usual course) through the date hereof, consistent with the past practice of the Trustee and the Chapter 7 Estates.

"Party" or "Parties" means, individually or collectively, Buyer and each Seller.

"Patents" means (a) patent rights, inventions, discoveries and invention disclosures (whether or not patentable) and (b) U.S. and foreign patents (including certificates of invention and other patent equivalents), utility models, and applications for any of the foregoing, including

provisional applications, and all continuations, and continuations-in-part, divisionals, reissues, re-examinations, renewals, and extensions thereof or related thereto, and all applications or counterparts in any jurisdiction pertaining to the any of the foregoing.

"Permits" means all franchises, grants, authorizations, licenses, permits, easements, variances, exceptions, consents, certificates, approvals, clearances and orders of any Governmental Authority which are necessary or required for Seller to own, lease and operate their properties and assets or to carry on the Business as it was or is now being conducted or as is presently intended to be conducted.

"Permitted Liens" means (i) easements, covenants, conditions, restrictions and other similar matters of record on real property, leasehold estates or personalty that do not in any material respect detract from the value thereof and do not individually or in the aggregate in any material respect interfere with the use of the property subject thereto, (ii) Encumbrances that constitute Assumed Liabilities and (iii) foreign, local, county, state and federal laws, ordinances or governmental regulations now or hereafter in effect relating to the real property, which do not, individually or in the aggregate, materially detract from the value thereof and do not individually or in the aggregate in any material respect interfere with the use of the property subject thereto, (iv) statutory liens for current property Taxes and assessments not yet due and payable, including, without limitation, liens for *ad valorem* Taxes and statutory liens not yet due and payable arising other than by reason of any default by the Chapter 7 Estates that, in each case, are not material to the Business or the value of the Purchased Assets, and (v) landlords', carriers', warehousemen's, mechanics', suppliers', materialmen's, repairmen's liens or other like Encumbrances arising in the Ordinary Course of Business that, in each case, are not material to the Business, and are with respect to amounts not yet overdue.

"Person" means any individual, corporation, partnership, joint venture, limited liability company, association, joint-stock company, trust, unincorporated organization, Governmental Authority or other entity.

"Petition Date" has the meaning specified in the recitals.

"Post-Close Filings" has the meaning specified in Section7.9.

"Prior Notes" means those certain pre petition obligations of the Companies representing senior secured notes due May 31, 2012.

"Proceeding" means any action, arbitration, audit, claim, cause of action, hearing, investigation, litigation, or suit (whether civil, criminal, administrative or investigative) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Authority or arbitrator.

"Products" means any and all products and services, and related documentation, currently or previously researched, designed, developed, manufactured, sold, leased, licensed, delivered, distributed, installed, or otherwise made commercially available by or on behalf of a Seller, including, without limitation, any VLJs.

"Purchase Price" has the meaning specified in Section 3.1.

"Purchased Assets" shall mean all of the properties and assets of the Companies (other than the Excluded Assets) and Chapter 7 Estates of every kind and description, wherever located, real, personal or mixed, tangible or intangible, owned, leased, licensed, used or held for use in or relating to the Business, including, but not limited to, all right, title and interest of Seller in, to or under:

      (a)    all Accounts Receivable;

      (b)    any customer lists or other customer data maintained or collected by Sellers to the extent, and only to the extent, not prohibited to be transferred by order of the Bankruptcy Court;

      (c)    the right to receive and retain payments in respect of any Accounts Receivable and the right to receive and retain the Companies and the Seller's mail and other communications relating to the Business;

      (d)    all Equipment;

      (e)    all Contracts listed or described on Schedule 2.3, as updated from time to time by Buyer prior to the Contract Designation Date (the "Assumed Contracts");

      (f)    all Contracts pertaining to the lease of any real property ("Leased Real Property") listed or described on Schedule 2.3, as updated from time to time by Buyer prior to the Contract Designation Date (such Leases, the "Assumed Leases");

      (g)    all Permits and pending applications therefor;

      (h)    all Seller Intellectual Property;

      (i)    all Products, including all products in development by the Companies;

      (j)    to the extent permitted by applicable law, all Documents except those (i) relating solely to any Excluded Asset or Excluded Liability; or (ii) relating to employees of Seller who are not Hired Employees;

      (k)    all telephone, telex and telephone facsimile numbers and other directory listings used in connection with the Business;

      (l)    all Purchased Deposits;

      (m)    inventories of raw materials, work-in-process, finished goods, spare parts, supplies, products under research and development, and other accessories related thereto which are held at, or are in transit from or to, the locations at which the Business is conducted, or located at customers' or suppliers' premises on consignment, in each case, which are used by any Seller in the conduct of the Business, and expressly including the work in progress performed for all parties, including, but not limited to, for those plaintiffs in the WIP Adversary Proceedings;

(n)     all of the Seller's right, title and interest in the DayJet aircraft and any and all obligations from DayJet Leasing LLC and or its affiliates and no further or additional consideration shall be due Seller on account of such interest.

(o)     all rights to proceeds under insurance policies relating to claims for losses related to any Purchased Asset or Assumed Liability;

(p)     the capitalized leases listed or described on <u>Schedule 2.3</u> (the "<u>Assumed Capitalized Leases</u>");

(q)     except for Avoidance Actions, any rights, claims, refunds, causes of action, choses in action, rights of recovery and rights of setoff of Seller against third parties arising out of events occurring prior to the Closing Date;

(r)     all goodwill and other intangible assets associated with the Business or the Purchased Assets;

(s)     any proprietary or licensed rights in Internet protocol addresses, ideas, concepts, methods, processes, formulae, models, methodologies, algorithms, reports, data, customer lists, mailing lists, business plans, market surveys, market research studies, websites, information contained on drawings and other documents, information relating to research, development or testing, and documentation and media constituting, describing or relating to the Seller Intellectual Property, including memoranda, manuals, technical specifications and other records wherever created throughout the world, but excluding reports of accountants, investment bankers, crisis managers, turnaround consultants and financial advisors or consultants;

(t)     all advertising, marketing and promotional materials, studies, reports and all other printed or written materials relating to the Business;

(u)     all rights of Seller under non-disclosure or confidentiality, non-disparagement, non-compete, or non-solicitation agreements with former employees of the Companies, agents of Seller or with third parties;

(v)     all other or additional assets, properties, privileges, rights (including prepaid expenses) and interests of Seller related to the Business of every kind and description and wherever located, whether known or unknown, fixed or unfixed, tangible or intangible, accrued, absolute, contingent or otherwise, and whether or no specifically referred to in this Agreement;

(w)     the Insurance Policies;

(x)     all real property owned by the Seller; and

(y)     all tax credits and similar Tax attributes relating to the Business or the Purchased Assets.

(z)     any and all of Seller's rights, defenses, cause of actions, claims or other interests in the Opinicus Corporation v. Jeoffrey L. Burtch et al, Adversary Proceeding No. 09-50406 MFW and the WIP Adversary Proceedings, including, but not limited to, any such claims or defenses that have been, or could have been, asserted at any time, against the parties top those proceedings or the property which is the subject of those proceedings, provided, however that to the extent, the Seller shall remain a party to any of the adversary proceedings described above, Seller shall retain those rights, claims and defenses to the extent of any claims against Seller or as otherwise agreed to between Buyer and Seller.

"Purchased Deposits" means all deposits (including customer deposits and security deposits for rent and electricity (including such deposits made by Seller in connection with the Assumed Leases)) and prepaid charges and expenses of Seller, other than any deposits or prepaid charges and expenses paid in connection with or relating solely to any Excluded Assets or any Excluded Liability.

"Qualified Bid" shall have the meaning set forth in the Bidding Procedures.

"Representative" has the meaning specified in Section 6.1.

"Required Consents" means the filings by Seller and Buyer required by the HSR Act and the expiration or earlier termination of all waiting periods under the HSR Act.

"Sale Motion" has the meaning set forth in Section 6.11(b).

"Sale Order" has the meaning set forth in Section 6.11(b).

"Seller" has the meaning specified in the preamble.

"Seller Copyrights" means all Copyrights owned by each Seller or used or held for use by a Seller in the Business.

"Seller Intellectual Property" means all of the following, owned, used or held for use in connection with the Business:

(a)     all Seller Trademarks;

(b)     all Seller Patents;

(c)     all Seller Copyrights;

(d)     all inventions (whether patentable or not), invention disclosures, discoveries, and improvements;

(e)     all Seller Trade Secrets;

(f)     all industrial designs and any registrations and applications therefor throughout the world;

(g)     all databases and data collections and all rights therein throughout the world;

(h)     all Software;

(i)     licenses, immunities, covenants not to sue and the like relating to the foregoing;

(j)     books and records describing or used in connection with the foregoing, including all contracts, licenses, and other agreements to which any Seller is a party or by which it is bound either as licensee or licensor relating to any intellectual property described above;

(k)     any and all other intellectual property rights and proprietary rights relating to any of the foregoing; and

(l)     all goodwill, franchises, licenses, permits, consents, approvals and claims or causes of action arising out of or related to infringement or misappropriation of any of the foregoing.

"Seller Patents" means all Patents owned by each Seller or used or held for use by a Seller in the Business.

"Software" means all computer software (whether in source code, object code, or other form), including firmware, development tools, files, records, specifications, and data, all media on which any of the foregoing is recorded;  and all systems, databases and platforms owned, licensed or used by a Seller, including all compilations, tool sets, compilers, higher level or "proprietary" languages, related documentation, technical manuals and materials, and any licenses to use or other rights relating to the foregoing, including all documentation and tools reasonably necessary for a skilled programmer to maintain, modify, and create derivative works of the applicable Software.

"Straddle Period" has the meaning specified in Section 7.1(a).

"Takeover Proposal" means any inquiry, proposal or offer from any Third Party, whether in writing or otherwise, relating to any Alternative Transaction.

"Tax" or "Taxes" (and with correlative meaning, "Taxable" and "Taxing") means (i) any federal, state, provincial, local, foreign or other income, alternative, minimum, add-on minimum, accumulated earnings, personal holding company, franchise, capital stock, net worth, capital, profits, intangibles, windfall profits, gross receipts, value added, sales, use, goods and services, excise, customs duties, transfer, conveyance, mortgage, registration, stamp, documentary, recording, premium, severance, environmental, natural resources, real property, personal property, ad valorem, intangibles, rent, occupancy, license, occupational, employment, unemployment insurance, social security, disability, workers' compensation, payroll, health care, withholding, estimated or other similar taxes, duty, levy or other governmental charge or assessment or deficiencies thereof (whether payable directly or by withholding and whether or not requiring the filing of a Tax Return), whether disputed or not and including any obligations

to indemnify or otherwise assume or succeed to Taxes of any other Person, and including all interest and penalties thereon and additions thereto , (ii) any liability in respect of any items described in clause (i) above arising as a result of being a member of a combined, consolidated, unitary or affiliated group of which the Seller (or any predecessor) is or was a member on or prior to the Closing Date, including pursuant to Treasury Regulations Section 1.1502-6 or any analogous or similar provision of state, local or foreign laws and (iii) any and all Taxes referenced in clauses (i) and (ii) hereof of any Person (other than the Seller) imposed on the Seller (x) as a transferee or successor, (y) by Contract or Law or (z) otherwise, which Taxes relate to an event occurring prior to or on the Closing Date.

"Tax Return" means any return, report or similar statement required to be filed with respect to any Taxes (including any attached schedules), including any information return, claim for refund, amended return or declaration of estimated Tax.

"Third Party" means any Person or group other than Buyer and its Affiliates.

"Third Party Consents" means each material consent, waiver, authorization or approval of any governmental or regulatory authority, domestic or foreign, or of any other Person, and each material declaration to or filing or registration with any such governmental or regulatory authority, that is required in connection with the execution and delivery of this Agreement and the Ancillary Documents by the Seller or the performance by the Seller of their obligations thereunder.

"Trademarks" means all trademarks, service marks, trade and business names (including all assumed or fictitious names under which the Business is conducted), brand names, trade dress, designs, logos, packaging design, slogans, Internet domain names and other commercial symbols in any and all forms, whether registered or unregistered, all registrations and pending applications to register any of the foregoing (including intent to use applications), throughout the world.

"Trade Secrets" means rights in all confidential, non-public, or proprietary information, including, ideas, research and development, know-how, trade secrets, processes, formulae, compositions, processes, technology, methodologies, blueprints, drawings, schematics, flow charts, models, prototypes, testing procedures and results, specifications, designs, plans, concepts, ideas, inventor's notes, invention disclosures, algorithms, techniques, technical data, customer and supplier lists, pricing and cost information, and business and marketing plans and proposals formulae, and customer lists, all documentation relating to any of the foregoing, and the right in any jurisdiction to limit the use or disclosure thereof.

"Transfer Taxes" has the meaning specified in Section 7.1(b).

"VLJ" has the meaning specified in the recitals.

"WARN Act" means The Worker Adjustment and Retraining Notification Act of 1988, as amended, and the relevant rules and regulations promulgated thereunder.

"WIP Adversary Proceedings" means those adversary proceedings set forth on Schedule 7.8.

## Second Amended Schedule 2.3
## Designated Contracts

| Name of either parties to lease or contract | Address 1 | Address 2 | City | State | Zip | Country | Description of contract or lease and nature of debtor's interest | Cure Cost |
|---|---|---|---|---|---|---|---|---|
| AVIDYNE CORPORATION | ATTN: VP, CORPORATE DEVELOPMENT | 55 OLD BEDFORD ROAD | LINCOLN | MA | 01773 | | IP License Agreement - dated 02/21/2007 | $0 |
| CITY OF ALBUQUERQUE | PO BOX 9948 | | ALBUQUERQUE | NM | 87119-1048 | | Albuquerque International Sunport III Hangar Lease | $356,318.38 |
| CITY OF ALBUQUERQUE | 2200 SUNPORT BLVD SE 3RD FLOOR | | ALBUQUERQUE | NM | 87106 | | Albuquerque International Sunport I & II Office & Hangar Lease | $150,612.20 |
| CITY OF ALBUQUERQUE | 2200 SUNPORT BLVD SE 3RD FLOOR | | ALBUQUERQUE | NM | 87106 | | Albuquerque International Sunport IV Hangar Lease | $29,464.66 |
| CITY OF ALBUQUERQUE | 2200 SUNPORT BLVD SE 3RD FLOOR | | ALBUQUERQUE | NM | 87106 | | Apron Area Lease and Agreement | $8,085.00 |
| COMANT INDUSTRIES INC | 577 BURNING TREE RD | | FULLERTON | CA | 92833 | | Supply Chain Agreement | $0 |
| ESSEX INDUSTRIES INC MANUFACTURING DIVISION | 6 SUNNEN DR | | ST. LOUIS | MS | 63143 | | Supply Chain Agreement | $0 |
| EXPRESS LOGISTICS dba Pilot Freight Services | MELANIE TRUJILLO | 2430 ALAMO AVE SE | ALBUQUERQUE | NM | 87106 | | Sub-Lease Agreement | $6,485.00 |
| ITELLIGENCE INNOVATIVE SOLUTIONS, INC. (software reseller) and | MARK CUMMINGS, GENERAL COUNSEL (Itelligence) | 3400 WATERVIEW PARKWAY STE 100 | RICHARDSON | TX | 75080 | | Certified Business Solutions Provider End-User License Agreement | $3,585.83 |
| SAP AMERICA, INC (party in interest) | DONALD K. LUDMAN, ESQ. BROWN & CONNERY, LLP (SAP America, Inc.) | 6 NORTH BROAD STREET | WOODBURY | NJ | 08096 | | | |
| JD LOCKAWAY, LLC | C/O TERRESA CURRIER, ESQUIRE | SAUL EWING LLP, 222 DELAWARE AVE., SUITE 1200 | WILMINGTON | DE | 19801 | | Real Property Commercial Lease: 2800 Karsten CT, SE, Albuquerque, NM - Sunport 10 | $36,000.00 as set forth in a Stipulation between JD Lockaway and the Buyer |
| JNJ PROPERTY MANAGEMENT, LLC | NICK CHAVEZ | 2601 KARSTEN COURT SE STE B | ALBUQUERQUE | NM | 87102 | | Commercial Lease | $13,017.00 |

~Doc# 1028243.1~

| Name of other parties to lease or contract | Address 1 | Address 2 | City | State | Zip | Country | Description of contract or lease and nature of debtor's interest | Cure Cost |
|---|---|---|---|---|---|---|---|---|
| KABA BENZING AMERICA INC | PRESIDENT & CEO | 3015 NORTH COMMERCE PARKWAY | MIRAMAR | FL | 33025 | | Software License and Professional Services Agreement | $0 |
| PARAMETRIC TECHNOLOGY CORPORATION | PO BOX 945722 | | ATLANTA | GA | 30394-5722 | | Software Maintenance Agreement (arbortext/Math/CAD) and License Agreements | $0 |
| PETER HAALAND/PHYRIX, LTD. LIABILITY CO. | 518 WEST LINDEN STREET | | LOUISVILLE | CO | 80027-3124 | | Patent and Asset Purchase Agreement - dated 03/23/2007 | $140,000.00 |
| PS ENGINEERING INC | MARK SCHEUER-PRESIDENT | 9800 MARTEL RD | LENOIR CITY | TN | 37772 | | Supply Chain Agreement | $0 |
| RANCH JOINT VENTURE LLP | WILLIAM L. ROGERS | 200 CRESCENT COURT, SUITE 1040 | DALLAS | TX | 75201 | | Special Warranty Deed | $0 |
| RESUME MIRROR | RESUME MIRROR, A DIVISION OF TALENT TECHNOLOGY CORPORATION | STE 300 10991 SHELLBRIDGE PARKWAY | RICHMAND | BC | V6X 3C6 | CANADA | License Agreement | $0 |
| REYNOLDS MASON INDUSTRIES INC | 1900 WELD BLVD STE 110 | | EL CAJON | CA | 92020 | | Supply Chain Agreement | $66,304.00 |
| S TEC CORPORATION | KEN PAUL, VP SALES AND MARKETING | ONE S TEC WAY | MINERAL WELLS | TX | 76067 | | Supply Chain Agreement | $183,894.00 |
| SAINT GOBAIN PERFORMANCE PLASTICS CORP | PO BOX 642625 | | PITTSBURGH | PA | 15264-2625 | | Supply Chain Agreement | $0 |
| SOUTHWEST RESEARCH INSTITUTE | DIRECTOR OF CONTRACTS | 6220 CULEBRA RD | SAN ANTONIO | TX | 78238 | | Purchase Agreement | $360,697.08 |
| TALEO | RAYMOND INGRASSIA | 4140 DUBLIN BLVD STE 400 | DUBLIN | CA | 94568 | | Taleo Business Edition Services Agreement | $31,350.00 |
| THE WELDING INSTITUTE | ATTN: INTELLECTUAL PROPERTY MANAGER | GRANTA PARK, GREAT ABBINGTON | CAMBRIDGE | | CB1 6AL | UK | License Agreement - dated 11/07/2001 | $38,808.75 |
| THYSSENKRUPP ELEVATOR | THYSSENKRUPP ELEVATOR CORPORATION | 8920 ADAMS ST NE STE B | ALBUQUERQUE | NM | 87113 | | Extended Warranty Service Agreement | $512.00 |
| TIGHTCO INC | VP-NEW BUSINESS DEVELOPMENT | 1375 SEABOARD INDUSTRIAL BLVD | ATLANTA | GA | 30319 | | Supply Chain Agreement | $5,706.00 |
| UNIGRAPHIC SOLUTIONS | JAMES R. MENGEGO | 13736 RIVERPORT DR | MARYLAND HIGHTS | MO | 63043 | | End User Purchase/License | $126,591.00 |

| Name of other parties to lease or contract | Address 1 | Address 2 | City | State | Zip | Country | Description of contract or lease and nature of debtor's interest. | Cure Cost |
|---|---|---|---|---|---|---|---|---|
| UGS CORP | BETTY RICHARDS, BUSINESS MANAGEMENT | 8822 S REITGI EINE BLVD STE 120 | HIGHLAND RANCH | CO | 80129 | | Agreement Professional Services Agreement; Teamcenter | $0 |
| WILLIAMS SCOTSMAN, INC. | 4015 HAWKINS NE | | ALBUQUERQUE | NM | 87109-4534 | | Lease Agreement; Flight Test Trailer located at 2503 Clark Carr Loop | $29,544.19 |

## SCHEDULE 4.1

## ORGANIZATION OF SELLERS

**Intentionally Omitted.**

**SCHEDULE 4.2**

**<u>SUBSIDIARIES AND INVESTMENTS</u>**

- Eclipse IRB Support, LLC is a wholly-owned subsidiary of Eclipse Aviation Corporation

- Eclipse Aviation Corporation owns 101,819 shares of common stock of Aspen Avionics, Inc., which was obtained by Eclipse Aviation Corporation in connection with the settlement of a claim against Aspen Avionics, Inc. in February 2007.